## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY<br><br>                 Plaintiff<br>v.<br><br>BRIMAR TRANSIT, INC.<br><br>                 Defendant,<br>and<br><br>PITTSBURGH PUBLIC SCHOOL DISTRICT<br><br>          Intervenor-Defendant | : : : : : : : : : : : : : : : | Civil Action No. 2:18-cv-01129-NBF |

## NATIONAL LIABILITY & FIRE INSURANCE COMPANY'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56 IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

      Plaintiff National Liability & Fire Insurance Company ("National"), by and through its undersigned counsel, Cozen O'Connor, hereby submits this Concise Statement of Undisputed Material Facts Pursuant to Local Rule 56 in Support of its Motion for Summary Judgment. Counsel for National hereby Certify that the Exhibits cited herein are true and correct copies of pleadings on file or documents produced by the parties through discovery in the instant action, produced by the parties through discovery in the Underlying Action, and/or during the insurance claim process. National respectfully submits that the following represents each material fact as to which there is no genuine issue to be tried:

**The Underlying Action**

1.      Defendant Brimar Transit, Inc. ("Brimar") is a transportation company engaged in the operation of school buses. Second Amended Complaint, ECF No. 46 ("SAC"), at ¶4.

2.      Intervenor-Defendant Public School District of Pittsburgh (hereinafter, "School District") is a governmental entity located at 341 S. Bellfield Avenue, Pittsburgh, PA 15213, that provides educational services. SAC at ¶¶5-6.

3.      Brimar and School District were sued in a matter captioned, *M.M., parent and natural guardian of K.M., a minor v. Pittsburgh School Dist. and Brimar Transit, Inc.*, in the Court of Common Pleas of Allegheny County, Pennsylvania (the "Underlying Action"). Enerson Decl., ¶ 3, Ex. A.

4.      On December 7, 2018, Plaintiffs filed a Third Amended Complaint (the "Underlying Complaint") against  Brimar and the School District (collectively, the "Defendants") in the Underlying Action.  Enerson Decl., Ex. A.

5.      In April 2016, Brimar contracted with the School District to transport students to and from school. Enerson Decl., Ex. A, at ¶¶ 11 and Exhibit A to the Underlying Complaint (contract between Brimar and School District).

6.      The Underlying Action is based upon an April 29, 2016 sexual assault that occurred on a school bus operated by Brimar (the "April 29 sexual assault"). Enerson Decl., Ex. A, at ¶¶ 14, 27-29, 46.

7.      Underlying Plaintiff K.M. is a disabled minor female who attended Pittsburgh Classical Academy, which is administered by the School District. Enerson Decl., Ex. A, at ¶¶ 2, 5-6.

8.  A male student (hereinafter "student perpetrator") sexually assaulted K.M. while on a school bus that Brimar operated. The student perpetrator also attended Pittsburgh Classical Academy and was disabled. *Id.* ¶¶ 13, 14, 27-29, 46-49.

9.  The bus was a small van-like bus approximately 11 feet long with the capacity to transport about nine student passengers. Richardson Affidavit, ¶ 9, Ex. B, Transcript of Deposition of Marciano Nesbeth ("Nesbeth Dep. Tr.") at 215:20-22; 279:20-22; Richardson Affidavit, ¶ 9, Ex. C, Transcript of Deposition of Theodore R. Vasser, III at 57:10-11; 57:16-20; 98:10-15; 98:25 to 99:10.

10.  M.M. is the parent and legal guardian of K.M. Underlying Complaint, Enerson Decl., Ex. A at ¶ 1.

11.  K.M. alleges that the April 29 sexual assault caused K.M. to suffer from anxiety and emotional distress, including experiencing fear and distress of encountering the student perpetrator. Richardson Affidavit, ¶ 10, Ex. J, Plaintiffs' Answer to Interrogatory No. 18.

**The Pattern of Ongoing Assaults**

12.  On January 27, 2016, the student perpetrator inappropriately fondled K.M.'s breasts while he and K.M. were in gym class equipment room (the "gym class sexual assault"). Richardson Affidavit, ¶ 10, Ex. J, Plaintiffs' Answers to Interrogatory Nos. 27, 28, 29; Richardson Affidavit, ¶ 9, Ex. D, Transcript of the Deposition of Candice Miller ("Miller Dep. Tr.") at 50:1 to 52:10.

13.  Before the gym class sexual assault and April 29 sexual assault, paraprofessional/classroom assistant Michelle Stanton had to separate K.M. and the student perpetrator on multiple occasions during school, including during lunch in the cafeteria, because K.M. and the student perpetrator were inappropriately close. Richardson Affidavit, ¶ 9, Ex. E Transcript of the Deposition of Michelle Stanton ("Stanton Dep. Tr.") at 16:19 to 20:4.

14.    Prior to the gym class sexual assault and April 29 sexual assault, all of the students, including K.M. and the student perpetrator, had been instructed by paraprofessional/classroom assistant Michelle Stanton that only one person was permitted to be in the gym equipment room at one time. Richardson Affidavit, Ex. E, Stanton Dep. Tr. at 23:20 to 24:24.

15.    Michelle Stanton instructed the students that only one person could be in the gym equipment room at a time because of prior incidents that had occurred, including the incident involving K.M. and the male perpetrator in the cafeteria during lunch, and to make sure that no student would be touching another student or inappropriately in another student's space. Richardson Affidavit, Ex. E, Stanton Dep. Tr. at 24:1 to 25:15.

16.    Michelle Stanton testified at her deposition as follows:

> Q.    You said prior incidents had prompted you to give that instruction. Did any of those prior incidents involve the male student?
>
> A.    The prior incident was the cafeteria, which is why it was very important to, okay, we need to make sure we're pro-active with these kind of things because they are teenagers and you guys have hormones, so it was constant to keep your eye out for touching, inappropriate touching. And that was just because we were in the middle school, and that was consistent all of the time.
>
> But because they are our kids with special ed and those kind of things, we kind of will reiterate that kind of stuff so that way it was in the front of your head type of thing.

Richardson Affidavit, Ex. E, Stanton Dep. Tr. at 24:25 to 25:15.

17.    On January 27, 2016, K.M. informed Michelle Stanton that the student perpetrator touched her breast. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 50:20 to 51:11; 51:20-24; 52:5-10.

18.     Michelle Stanton then informed teacher Candice Miller of the gym class sexual assault. *Id.* at 50:20 to 51:11; 51:20-24; 52:5-10.

19.      Upon learning of the gym class sexual assault, Candice Miller spoke with K.M. and asked her what happened. *Id.*at  52:17 to 54:2; 55:4-15.

20.     K.M. told Candice Miller that the student perpetrator touched her breast while they were in the gym equipment room. *Id.* at  53:18 to 54:15.

21.     The School District reported the gym class sexual assault to M.M. Richardson Affidavit, ¶ 10, Ex. J, Plaintiffs' Answer to Interrogatory Nos. 27 and 29.

22.     Candice Miller called M.M. on January 27, 2016, and left M.M. a voicemail message notifying M.M. about the gym class sexual assault. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 56:7-18; 57:17-24.

23.     Before she called M.M., Candice Miller spoke with principal Valerie Merlo concerning the gym class sexual assault. *Id.* at 56:10-13; 57:17-24; 153:20 to 154:12.

24.     On January 28, 2016, Candice Miller received an email from M.M.  *Id.* at 57:17-24.

25.     M.M.'s January 28, 2016 email referred to K.M.'s breast being grabbed by the student perpetrator on January 27, 2016. Richardson Affidavit, ¶ 9, Ex. F, Transcript of the Deposition of Valerie Merlo ("Merlo Dep. Tr.") 94:18 to 95:1-8; 97:1-13; 121:7-11.

26.     In M.M.'s January 28, 2016 email, M.M. wrote that K.M. and M.M. did not feel comfortable with the student perpetrator being in gym class with K.M. or with the student perpetrator riding the same bus as K.M. to and from school and asked if the student perpetrator could be assigned to another vehicle. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 61:5-11;

61:13-17; 108:4-19; 108:20 to 109:3; Richardson Affidavit, Ex. F, Merlo Dep. Tr. at 98:2-5; 99:20 to 100:3.

**The Plan to Separate K.M. and the Student Perpetrator**

27.     After receiving M.M.'s email on January 28, 2016, Candice Miller went to speak with principal Valerie Merlo. Richardson Affidavit, Ex. D, Miller Dep. Tr. 58:5-9; 59:1-5.

28.     At the meeting between Candice Miller and Valerie Merlo on January 28, 2016, a plan was developed to keep the student perpetrator and K.M. from any close contact, which included keeping them separated during breakfast, lunch or related arts classes, and on their school bus (the "Plan"). Richardson Affidavit, Ex. D, Miller Dep. Tr. 58:10 to 60:15; 106-10-18; Richardson Affidavit, Ex. F, Merlo Dep. Tr. at 42:14 to 43:8; 44:12-17; 74:14 to 75:17; Richardson Affidavit, ¶ 9, Ex. G, Transcript of the Deposition of Kayla Reynolds ("Reynolds Dep. Tr.") at 19:11 to 21:22.

29.     The Plan involved having school personnel in charge at the relevant times, including the classroom assistants/paraprofessionals, keep K.M. and the student perpetrator separated during school, including during breakfast, lunch, recess, and related arts class. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 59:6 to 60:3; 154:14 to 155:19.

30.     With regard to the bus, the Plan developed by Candice Miller and Valerie Merlo was that K.M. and the student perpetrator would be assigned separated seats. K.M. was to be assigned a seat on the school bus located directly behind the driver and the student perpetrator was to be assigned a seat in the very last row of the bus. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 60:4-15; Richardson Affidavit, Ex. E, Stanton Tr. at 35:22 to 37:2.

31.     Candice Miller called M.M. on January 28, 2016, to discuss the Plan. Candice Miller specifically informed M.M. during this call that K.M. would be assigned to a seat directly

behind the bus driver and the student perpetrator would be assigned a seat in the last row of the bus. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 62:1-13; 156:12-16; Richardson Affidavit, Ex. J, Plaintiffs' Answers to Interrogatory Nos. 31, 42.

32.     An agreement was reached between M.M. and the School District after the gym class sexual assault that the student perpetrator would be separated from K.M. in accordance with the Plan. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 115:2-19; 121:17-25; 123:15-19; 135:4-10; Richardson Affidavit, Ex. J, Plaintiffs' Answer to Interrogatory No. 27.

33.     At school dismissal time on January 28, 2016, Candice Miller explained to K.M. and the student perpetrator's regular bus driver, Shaniece Johnson, that K.M. should be seated directly behind the driver and that the student perpetrator should be seated in the last row of the bus. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 64:8 to 65:24; 118:11-19; 156:6-20; Merlo Dep. Tr. at 49:19 to 50:18; Richardson Affidavit, Ex. J, Plaintiffs' Answer to Interrogatory Nos. 27, 30, 31, 42; Stanton Dep. Tr. at 89:13 to 90:11.

34.     Candice Miller told the regular bus driver Shaniece Johnson that the reason for seating K.M. and the student perpetrator separately was because the school "wanted to make sure that there was no touching occurring between male student and K.M. and that there was a situation that occurred that led to us to make this decision." Richardson Affidavit, Ex. D, Miller Dep. Tr. at 65:14-24.

35.     Shaniece Johnson told Candice Miller that the separated seating arrangement would be followed. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 116:23 to 117:20; 125:18 to 126:13; Richardson Affidavit, Ex. J, Plaintiffs' Answers to Interrogatory Nos. 27, 30, 31, 42.

36.     Paraprofessional Kayla Reynolds also told Shaniece Johnson that K.M. and the student perpetrator were to be separated on the bus. Richardson Affidavit, Ex. G, Reynolds Dep. Tr. at 10:11-20; 22:6 to 23:18.

37.     After the gym class sexual assault, the School District informed M.M. that an agreement was reached between the School District and Brimar and that K.M. and the student perpetrator would be kept separated on the bus. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 123:15-19.

38.     After the gym class sexual assault, the student perpetrator continued to demonstrate infatuation with K.M. and his interest in K.M. and attempts to touch K.M. inappropriately continued on the bus. Richardson Affidavit, Ex. J, Plaintiffs' Answer to Interrogatory No. 42; Richardson Affidavit, Ex. D, Miller Dep. Tr. at 85:18 to 89:7; 180:15 to 181:10; Richardson Affidavit, ¶ 11, Ex. K, KM PPS 000001 – 000003.

39.     The agreement to keep K.M. and the student perpetrator separated on the bus in accordance with the Plan was followed for a period of time by Shaniece Johnson and by a substitute male driver who drove the bus after Shaniece Johnson went out on maternity leave. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 123:20 to 124:15; Richardson Affidavit, Ex. E, Stanton Dep. Tr. at 118:9 to 119:13.

**The April 29, 2016 Sexual Assault of K.M.**

40.     On Friday, April 29, 2016, neither Shaniece Johnson nor the substitute male driver was driving the bus. Instead, a substitute female driver was driving the bus. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 124:7-20; Richardson Affidavit, Ex. E, Stanton Dep. Tr. at 138:20 to 140:20; Richardson Affidavit, Ex. G, Reynolds Dep. Tr. at 24:8-17.

41.     On Friday, April 29, 2016, the agreement to keep K.M. and the student perpetrator separated on the bus was not adhered to. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 116:9-17; 125:3-17.

42.     On Friday, April 29, 2016, the substitute bus driver did not keep K.M. and the student perpetrator separated and this resulted in the sexual assault occurring. Richardson Affidavit, Ex. J, Plaintiffs' Answer to Interrogatory No. 42.

43.     At approximately 4:30 p.m. on April 29, 2016, Kayla Reynolds called Candice Miller and told her that she was behind K.M.'s school bus and saw that K.M. was sitting in the back seat of the bus with the student perpetrator. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 77:25 to 79:3; 157:21 to 158:2; 158:18-22; 172:5-18; 176:2-10.

44.     The following Monday, May 2, 2016, Candice Miller spoke with K.M. concerning K.M. not being in her assigned seat on April 29, 2016. During this conversation, K.M. became upset and informed Candice Miller that the student perpetrator told her to come to the back of the bus, and that her pants and the student perpetrator's pants were down, and something was put in her butt, which she believed to be a finger. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 80:9 to 82:2; 159:6-13; 178:7-11; Richardson Affidavit, ¶ 9, Ex. H, Transcript of the Deposition of Melissa Ringold ("Ringold Dep. Tr.") at 25:7 to 26:17; Richardson Affidavit, Ex. F, Merlo Dep. Tr. at 105:11 to 106:14.

45.     K.M. stated that the student perpetrator told her to pull her pants down, that she said kept saying "no," and that she asked him to stop. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 82:18 to 83:11; Richardson Affidavit, Ex. F, Ringold Dep. Tr. at 26:15-17.

46.     Candice Miller testified at deposition that what the student perpetrator did to K.M. on April 29, 2016 was a sexual assault. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 22-25.

47.     During a conversation with K.M. on Monday, May 2, 2016, Candice Miller wrote

down K.M.'s statements verbatim. K.M. stated as follows:

> On Friday when we were going home [REDACTED] touched me.
> he tried to hug me. I pushed him off of me. I hit him in the back.
> Then [REDACTED] started talking to [REDACTED] about me and
> him in bed together. I asked him what he was talking about. Then I
> hit him for talking about me inappropriate. Then he told me to lay
> on him. I said no. then he said please. I said no. Then he forced me
> to lay on him. He told me to pull my pants down. And he pulled his
> pants down too. Then he stuck his finger or something else in my
> butt. And I pushed him off of the seat. When I was getting off of the
> bus, he slapped my butt and said hey. Then I hit him back in the
> hand hard.

> On Thursday or Tuesday last week when I was sitting on the bus.
> He told me to lay down on the space on the bus. I said no. Then he
> touched my leg. I kicked him. Then I asked my frieds [*sic*] to tell
> [REDACTED] to stop. Then he wanted me to kiss him. So I hit him
> in the elbow. Then when I was almost home, he said bye in a funny
> voice.

> One more time, I was watching videos w/ [REDACTED],
> [REDACTED], and [REDACTED]. Then [REDACTED] tried to
> touch my waist. I pushed him towards the window.

Richardson Affidavit, Ex. D, Miller Dep. Tr. at 85:18 to 89:7; 180:15 to 181:10; Richardson

Affidavit, Ex. K, KM PPS 000001 – 000003.

48.     Teacher Melissa Ringold spoke with the student perpetrator on May 2, 2016 and

the student perpetrator confirmed the factual statements made by K.M. concerning the April 29

sexual assault. Richardson Affidavit, Ex. H, Ringold Dep. Tr. at 28:5 to 30:1.

49.     The student perpetrator admitted that he urged K.M. to pull down her pants and her

underwear; that he pulled down his own pants and underwear; that K.M. was sitting on his lap;

and that he "put his finger in her." Richardson Affidavit, Ex. H, Ringold Dep. Tr. at 48:5 to 49:22;

Richardson Affidavit, Ex. F, Merlo Dep. Tr. at 115:1 to 117:6.

50.     Candice Miller spoke with another male student after the April 29 sexual assault. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 83:21-24.

51.     This other male student told Candice Miller that K.M. moved to the back of the bus with the student perpetrator and that K.M. was hitting the student perpetrator and telling him to stop; that he (the other male student) also told the student perpetrator to stop; and that the student perpetrator would not stop. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 83:25 to 84:10; Richardson Affidavit, Ex. F, Merlo Dep. Tr. at 116:20 to 117:6.

52.     The other male student also told Candice Miller that he saw the student perpetrator touching K.M.'s breast. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 84:11-15.

53.     On May 2, 2016, Melissa Ringold also asked the other male student to write down a statement of what happened on the bus on April 29, 2016, and the other male student independently wrote as follows:

every time ████ touch █ ina ppropriatly I tau ████ to stop But he said leave me alone then ████ touch her boobs she do not like it. and when █ no ████ Beg her and k ████ said yes but not in a happy voice. it sounded in a sad way ████ er tuff her pants down and ████ tell me and i look back like me and ████ friend But he should not do that to █ he likes her But why do he do that to her she my friend and no one should do that to a friend so that all i got

Richardson Affidavit, Ex. H, Ringold Dep. Tr. at 31:17 to 32:10; 33:9-21; 53:3 to 56:23; Richardson Affidavit, Ex. K, KM PPS 000004.

54.     The other male student wrote on May 2, 2016 that the student perpetrator touched K.M.'s boobs, that the K.M. and the student perpetrator's pants were down, and that K.M. was saying "no." Richardson Affidavit, Ex. F, Merlo Dep. Tr. at 134:24 to 135:18.

55.     The other male student was interviewed on a later date by a therapist and stated that he had seen the student perpetrator touch K.M.'s breasts on several occasions on the bus prior to April 29, 2016. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 92:7 to 93:8; 141:8 to 143:4; Richardson Affidavit, ¶ 9, Ex. I, Deposition transcript of Justin Drexler ("Drexler Dep. Tr.") at 71:21 to 73:4.

56.     Valerie Merlo reported the April 29 sexual assault to the police and submitted a ChildLine Support Report. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 85:2-14.

57.     On May 2, 2016, Valerie Merlo telephoned the owner of Brimar, Marciano Nesbeth, and informed him that a student had molested another student on the bus on April 29, 2016. Richardson Affidavit, Ex. B, Nesbeth Dep. Tr. at 65:17 to 66:15; 68:18-24.

58.     After the April 29, 2016 sexual assault, K.M. and the student perpetrator were completely separated by the School District. The School District arranged for a separate bus for the student perpetrator. The student perpetrator also did not attend to the same related arts classes, recess, or other activities as K.M., and K.M. and the student perpetrator did not attend the same breakfast and lunch. Richardson Affidavit, Ex. D, Miller Dep. Tr. at 93:10 to 94:3; Richardson Affidavit, Ex. E, Stanton Dep. Tr. at 58:2-12; Richardson Affidavit, Ex. F, Merlo Dep. Tr. at 69:12 to 70:10; Richardson Affidavit, Ex. I, Drexler Dep. Tr. 77:13 to 78:16.

59.     After the April 29, 2016 sexual assault, K.M. would become upset upon hearing the student perpetrator's name and would tell the classroom assistant/paraprofessional that

somebody has said the student perpetrator's name. Richardson Affidavit, Ex. E, Stanton Dep. Tr.

at 92:14-22.

**K.M.'s Allegations in the Underlying Action**

      60.    The Underlying Complaint, *inter alia,* alleged that:

      6.    K.M. was diagnosed with disabilities and the Defendant School District is aware of these disabilities and her needs. The Defendants had a duty of care to all students, including K.M., entrusted in their care at school and/or during transportation to and from school. The Defendants specifically owed a duty to K.M. and breached said duties of care as described herein. The Pennsylvania Department of Transportation publishes guidelines for school bus drivers. The Pennsylvania School Bus Drivers Manual, as published by the department of Transportation, recognizes certain duties that are owed to students with disabilities and/or special needs. These duties would apply to both K.M. and the male student described herein.

      \*      \*      \*

      10.    At all times relevant hereto the Defendants had a duty and obligation to provide a safe environment for students, including K.M., and this included during the time K.M. was transported to and from school.

      \*      \*      \*

      12.    K.M. was assigned transportation in which the Defendant Brimar would transport K.M. home from school. The transportation vehicle (referred to herein as "the bus" and/or "the vehicle") was not a full-size bus, but a smaller vehicle and, on average, approximately seven (7) students would be on the vehicle each day. M.M. was notified and assured of the agreement that steps would be taken to protect her daughter and prevent the male student from sitting next to her on the school bus. The school district had a duty to provide transportation for K.M. and Brimar had a duty to provide safe transportation and both Defendants breached this duty. M.M. detrimentally relied on the assurances of the school district that the Defendants would adhere to this agreement. M.M. detrimentally relied on these assurances and such reliance forms the consideration of the agreement K.M. would continue to ride the bus. This consideration avoided the school district and/or Brimar from having to provide alternative transportation. The consideration between the

school district and Brimar is established as a result of alternative transportation not having to be provided so long as the agreement was adhered to.  M.M. relied on the agreement of the school district and Brimar that the male student would be separated from K.M.  As a result of this reasonable reliance and assurance, M.M. refrained from further action as a result of the prior sexual assault in gym class.

\*      \*      \*

13.    One of the students who was assigned to the same bus as K.M. was a male student who also had disabilities and behavioral problems (referenced herein as "the mail student").

\*      \*      \*

15.    Prior to the incident that occurred on April 29, 2016, both the Defendant Pittsburgh Public School District and the Defendant Brimar were aware of issues with and inappropriate behavior demonstrated by the male student toward K.M.  This behavior originally occurred earlier in 2016.  At that time, K.M. and the male student were in the same room for a physical education (gym) class.  K.M. was instructed to put balls away after they were used in the physical education class.  While K.M. was putting the balls away, the male student approached her and subjected her to a sexual assault by grabbing her breasts.  The incident was reported to the school principal, K.M.'s teacher and the other teachers.  As a result of this incident, the Defendant Brimar was notified that K.M. and the male student should be separated on the school bus.  M.M. relied on this agreement and understood K.M. and the male student would be separated.

16.    From and after the time of the incident in gym class, the male student was infatuated with K.M. and continued to demonstrate inappropriate behavior toward K.M. The Defendants knew or, in the exercise of reasonable diligence, should have known of this behavior. The Defendants also knew or should have known the male student was a threat to K.M. and/or a threat to engage in continued sexual assaults.

17.    K.M. and the male student were separated as a result of the original incident with the male student and his continuing to exert inappropriate behavior and comments towards K.M. …

\*      \*      \*

23.    The Defendant School District knew or should have known to keep the students separate as a result of prior incidents described

above and instead placed these students on and continued to have them ride the same vehicle.

\*      \*      \*

25.     … [O]nce the sexual assault began, the driver breached her duties to the students on the vehicle by failing to be aware of what was going on or to respond to the students as the incident occurred, which allowed the assault to both occur and to continue.

\*      \*      \*

27.     During the bus trip home on April 29, 2016, the male student pinned K.M. down on the seat and was on top of K.M.  At that time, she yelled out for him to stop and the bus driver did not take any action to stop the incident from occurring or to separate the students. The driver was negligent in failing to be attentive and/or respond and this allowed the assault to occur and continue.

28.     During this time period, the other students on the bus were yelling out to the bus driver, who ignored the cries/yells of the other students.  Sufficient time went by while K.M. and the male student were next to each other and this allowed the male student to continue with the sexual assault as a result of the driver's negligence.

29.     During this time period, the pants of both K.M. and the male student were down.  During this time period, K.M. was penetrated from behind by the male student.  In spite of the vehicle not being large and the bus driver obviously being able to hear and/or see what was going on if the bus driver had been paying attention, the driver took no action to stop or prevent the assault.

30.     The incident in question was allowed to occur as a result of the Defendants breaching their agreement and procedure of separating these two (2) students.  The incident was further allowed to occur as a result of the bus driver ignoring the students and failing to pay attention to her surroundings that a sexual assault was occurring in proximity to her.

31.     In spite of the incident occurring on a Friday afternoon, M.M., the mother of K.M., was not informed of the incident until the following school week.  This prevented K.M. from being seen at Children's Hospital on the day of the incident.

\*      \*      \*

39.     K.M. described the incident in question in detail to medical providers at Children's Hospital of Pittsburgh.  This description

15

confirmed penetration and a sexual assault. The Children's Hospital records further confirm a report of not only penetration but kissing of her chest by the 12 year-old male student.

*     *     *

41.     As a direct and proximate result of the sexual assault as described herein, K.M. has experienced great emotional distress and is at an increased risk for emotional problems that are associated with children who have suffered a sexual assault.

*     *     *

43.     On information and belief, the School District was aware of the history between K.M. and the male student and had every opportunity for a monitor to be on the van/bus. The School District and Brimar could have prevented the sexual assault promptly, at the very least, by following the steps/agreement they originally carried out in keeping K.M. and the male student separated.

*     *     *

45.     Given the disabilities of the students, as described herein, the Defendants knew or should have known of the duty of care these students were entitled to and also knew or should have known of the obligation to provide a safe and supervised environment for their students. The Defendants have breached these obligations and duties and said breach has resulted in the damages set forth herein.

46.     Following the incident in question, the School District arranged for statements and K.M. provided a statement shortly after the incident which confirmed that the male student attempted to touch her and hug her and that K.M. pushed the male student off of her. The statement also indicated that another student started to talk about K.M. being in bed with the male student, and K.M. lashed out and struck the student for talking inappropriately. The male student then told K.M. to lay on him and she said no. He then said, "please" and she again said "no". At that point, the male student forced K.M. to lay on him. The male student pulled down his pants and told K.M. to pull down her pants. K.M. then felt penetration and pushed the male student off the seat. As K.M. was getting off the bus, the male student then slapped her in the rear.

47.     K.M. also reported an incident during the prior week when she was seated on the bus and the male student told her to lay down and touched her leg. The male student wanted to kiss K.M. and she resisted. She also reported an incident when the male student touched her waist.

16

48.     The male student also provided a written statement to the school on or about May 2, 2016. The male student admitted that he kissed K.M., that he pulled his pants down, that K.M. pulled her pants down and that he penetrated her. This report acknowledged that K.M. kept saying no and kept hitting him.

*          *          *

52.     This action is brought on behalf of M.M. as parent and guardian of her daughter, K.M., a minor child.  As a direct and proximate result of the claims set forth herein, the Plaintiffs are entitled to the damages set forth herein as a result of the physical sexual assault as well as the mental anguish which came about as a result of the subject claims.  These damages include those for treatment, medical tests therapy, emotional anguish, past and future medical expenses, past and future therapy expenses, post-traumatic stress, increased risk for post-traumatic stress and/or emotional issues associated with victims of sexual assault.

53.     As a result of the physical and sexual assault, K.M. experienced, she has experienced emotional distress and has the potential to develop post traumatic stress and issues associated with child sexual assault/abuse throughout her life.

54.     The Plaintiff is entitled to be compensated for economic and non-economic damages as described herein, including past and future medical expenses and therapy expenses as well as pain, suffering, the loss of the basic and pleasurable activities of life and expense for psychological treatment, therapy and counseling, the need for such treatment and counseling as may arise in the future as a result to being exposed to a sexual assault as a child.  Plaintiff is also entitled to be compensated for severe emotional distress.

55.     In addition, Defendant Brimar is responsible for the actions and inactions, errors, omission, and conduct of the bus driver and/or the supervisors who were responsible for conveying the message that the male student and K.M. must be separated.  The Defendant Brimar is also responsible for blatant disregard of their obligations and breach of the duties described herein.   Said conduct was outrageous and was committed with reckless indifference to the minor Plaintiff.  As a result, Plaintiff is entitled to an award of punitive damages, in addition to an award of compensatory damages.

Enerson Decl., Ex. A, Underlying Complaint, at ¶¶ 6, 10, 12-13, 15-17, 23, 25, 27-31, 39, 41, 43,

45-48, 52-55.

61.    The Underlying Complaint alleged that Brimar negligently failed to supervise the student perpetrator on the bus, which permitted the sexual assault to occur and caused K.M.'s injuries. *Id.* at ¶¶ 8, 21-27, 29-30, 45, 58, 62, 71.

62.    All of the damages alleged by the plaintiffs against Brimar and the School District in the Underlying Complaint were based on the injuries to K.M. caused by the April 29, 2016 sexual assault. *Id.* at ¶¶ 56-124.

63.    All of the causes of action alleged by the plaintiffs in the Underlying Complaint against Brimar and the School District sought compensatory and/or punitive damages based on the injuries to K.M. caused by the April 29, 2016 sexual assault.  *Id.* at ¶¶56-124.

**The National Policy**

64.    National issued Brimar Transit, Inc. a business auto policy,  number 73 APB 001185,  for the policy period January 1, 2016 through January 1, 2017 (the "Policy"). Enerson Decl., ¶ 4, Ex. B (the "Policy").

65.    Brimar is the Named Insured under the Policy. *Id*.

66.    The Policy provides business auto coverage, subject to the Policy's terms, exclusions, and conditions.

67.    The Business Auto Coverage Form of the Policy contains the following language:

**BUSINESS AUTO COVERAGE FORM**

**SECTION II – LIABILITY COVERAGE**

**A.    Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto." . . .

Enerson Decl., Ex. B.

68.     The "Pennsylvania Changes – Defense Costs" endorsement in the Policy provides:

**PENNSYLVANIA CHANGES – DEFENSE COSTS**

This endorsement modifies insurance provided under the following:
COMMERCIAL AUTOMOBILE COVERAGE PART
…

If we initially defend an insured ("insured") or
pay for an insured's ("insured's") defense but later
determine that none of the claims ("claims"), for
which we provided a defense or defense costs,
are covered under this insurance, we have the
right to reimbursement for the defense costs we
have incurred.

The right to reimbursement under this provision
will only apply to the costs we have incurred after
we notify you in writing that there may not be
coverage and that we are reserving our rights to
terminate the defense or the payment of defense
costs and to seek reimbursement for defense
costs.

Enerson Decl., Ex. B.

69.     The Policy contains the following exclusion:

**ABUSE OR MOLESTATION EXCLUSION**

PLEASE READ THIS ENDORSEMENT CAREFULLY

This endorsement modifies insurance provided under the
following:

BUSINESS AUTO COVERAGE FORM

The following exclusion is added to the policy:

This insurance does not apply to bodily injury or property damage
arising out of:

(a)  the alleged, actual or threatened abuse, molestation or sexual
       contact, whether or not intentional, by anyone of any person; or

19

(b) the negligent:

         (i)     employment;

         (ii)    investigation;

         (iii)   supervision; or

         (iv)   retention;

of anyone or negligent entrustment to anyone whose conduct would be excluded by (a) above; or

(c) the reporting to authorities or failure to report to authorities the alleged, actual or threatened abuse, molestation or sexual contact by anyone of any person.

All other terms, conditions and agreements shall remain unchanged.

Enerson Decl., Ex. B.

70.     In the Joint Status Report filed by the parties on January 21, 2022, the School District stated that it intends to voluntarily dismiss its Counterclaim against National, without prejudice. ECF Doc. 149, at Page 2 of 7.

**The Claim**

71.     After Brimar made a claim for coverage under the Policy for the Underlying Action, National provided a defense to Brimar with respect to the Underlying Action, subject to a full and complete written reservation of rights and disclaimer, which included a reservation of National's right to seek recoupment of defense costs if it was later determined that no coverage exists.  July 24, 2018 Letter, Enerson Aff., Ex. C.

72.     The School District retained counsel of its own choosing to defend it in the Underlying Action. ECF Doc. 46, ¶ 16.

73.     On August 24, 2018, National initiated this declaratory judgment action against Brimar. ECF Doc. 1.

74.     The School District filed a Motion to Intervene on December 20, 2018, alleging that it was an additional insured under the Policy. This Court granted the School District's Motion on January 4, 2019.  ECF Doc. 22; ECF Doc. 28.

75.     On January 14, 2020, this Court determined that National had a duty to defend both Brimar and the School District in connection with the Underlying Action[1], but determined that issues related to the duty to indemnify were premature. ECF Doc. 91.

76.     The parties to the Underlying Action reached a settlement after a mediation was convened and in late December 2020, National paid to settle the Underlying Action on behalf of Brimar and the School District, and the underlying plaintiffs' claims against Brimar and the School District were dismissed with prejudice. Underlying Action Docket, Enerson Decl., Ex. D.

77.     Brimar and the School District also agreed to dismiss their respective cross claims and the Underlying Action in its entirety has been dismissed with prejudice. *Id.*

78.     National funded the settlement of the Underlying Action subject to an express reservation of all rights which preserved its ability to challenge coverage in this matter, and to seek reimbursement of all funds paid. December 4, 2020 Letter, Enerson Decl., Ex. E.

79.     On December 4, 2020, National notified Brimar and the School District in writing that if "National makes any settlements to the plaintiffs in the [Underlying Action], National will seek full reimbursement" from Brimar and the School District.  *Id.*

80.     National also memorialized its reservations to dispute coverage and seek reimbursement in the underlying settlement agreement itself. Enerson Decl. ¶ 12.

---

[1] National respectfully disagrees with the Court's decision with regard to the duty to defend, and reserves all of its rights to appeal that decision.

81.     In accordance with the Court's January 14, 2020 Order, and without waiving any of its rights to appeal that Order, on February 10, 2021, National issued payment to counsel for the School District in the amount of $266,800.86 for its documented and paid defense costs incurred in defending the School District in the Underlying Action. February 10, 2021 Letter, Enerson Decl., Ex. F.

82.     After the School District supplied additional documentation, National made a supplemental payment in the amount of $71,346.00 for the documented and paid costs incurred in defending the School District in the Underlying Action. July 9, 2021 Letter, Enerson Decl., Ex. G.

83.     National's payments of defense costs to counsel for the School District were clearly made subject to all of its rights to dispute coverage, and National expressly advised the School District that it fully intended to seek reimbursement of all monies paid to or on behalf of the School District, including defense and settlement payments. December 4, 2020 Letter, Enerson Decl., Ex. E.; February 10, 2021 Letter, Enerson Decl., Ex. F; July 9, 2021 Letter, Enerson Decl., Ex. G; .

84.     National's payment to counsel for the School District was also made subject to its right to challenge the reasonableness and necessity of the reimbursed defense costs in the event a duty to defend is deemed to exist as to the School District. *Id.* Enerson Decl., Ex. F; Enerson Decl., Ex. G.

85.     National incurred $80,958.79 in defense costs on behalf of Brimar in connection with the Underlying Action. Enerson Decl. ¶ 16.

**General Liability Policy**

86.     The School District alleged that National issued a Commercial General Liability ("CGL") policy of insurance to Brimar. ECF Doc. 48, Count I – Counterclaim – Breach of Contract, at ¶¶ 2, 7-11.

87.     National did not issue a CGL policy to Brimar. Declaration of Linda Bobro, OMA000482-483, Enerson Decl., ¶ 17, Ex. H.

Respectfully submitted,

**COZEN O'CONNOR**

Dated:  March 16, 2022          By:     */s/Wendy Enerson*_____
                                        Wendy N. Enerson, Esquire
                                        (*admitted pro hac vice*)
                                        123 North Wacker Drive, Suite 1800
                                        Chicago, IL 60606
                                        (312) 382-3162
                                        wenerson@cozen.com

                                        -and-

                                        Charles J. Jesuit, Jr., Esquire (PA 91163)
                                        (*admitted pro hac vice*)
                                        One Liberty Place
                                        1650 Market Street, Suite 2800
                                        Philadelphia, PA 19103
                                        215-665-6967
                                        cjesuit@cozen.com

                                        -and-

                                        Paul Steinman, Esquire (PA _____)
                                        One Oxford Centre
                                        31 Grant St., 41st Floor
                                        Pittsburgh, PA 15219
                                        412-620-6544
                                        psteinman@cozen.com

                                        *Attorneys for Plaintiff National Liability &*
                                        *Fire Insurance Company*