## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY | : : : | |
| Plaintiff | : : | |
| v. | : : | Civil Action No. 2:18-cv-01129-NBF |
| BRIMAR TRANSIT, INC. | : : : | |
| Defendant, | : : | |
| and | : : | |
| PITTSBURGH PUBLIC SCHOOL DISTRICT | : : : | |
| Intervenor-Defendant | : : | |

### AFFIDAVIT OF MARK RICHARDSON

I, Mark Richardson, depose and state as follows:

1.     I am a Senior Claim Examiner for National Liability and Fire Insurance Company ("National").  I have held that position for over four years.  In that capacity, I regularly monitor the defense of personal injury claims submitted to me by defense counsel.  I have personal knowledge of the facts set forth herein.

2.     I submit this affidavit in support of National's Motion for Summary Judgment filed in the above-captioned matter.

3.     On or about June 4, 2018, M.M., as parent and natural guardian of K.M., a minor, filed a personal injury suit styled *MM v. Pittsburgh Public School District and Brimar Transit, Inc.*, No. GD18-003257, in the Allegheny Court of Common Pleas ("the Underlying Action").

4.      The Underlying Action alleges that K.M. was sexually assaulted by a male classmate while riding on a bus operated by Defendant Brimar Transit, Inc. ("Brimar") for students of Defendant Pittsburgh Public School District ("District").

5.      I was the Senior Claim Examiner responsible for, among other things, monitoring the Underlying Action.

6.      On or about March 2017, National retained the Law Firm of Dibella Geer McCallister Best, P.C. ("the Firm") to defend Brimar. The Firm assigned the defense of Brimar in the Underlying Action to Jason Peck, Esquire ("Peck").

7.      Throughout the course of the Underlying Action, Peck and the Firm provided copies of filings made in the Underlying Action, including the Third Amended Complaint filed on December 7, 2018 ("Underlying Complaint"), of which a true and correct copy is attached as Exhibit A.

8.      Throughout the course of the Underlying Action, the parties deposed ten non-party witnesses.

9.      Peck and the Firm provided transcripts of those ten witnesses to National.  A true and correct copy of the following transcripts are attached as follows:

        a)      Transcript of Deposition of Marciano Nesbeth ("Nesbeth Dep. Tr."), attached as Exhibit B;

        b)      Transcript of Deposition of Theodore R. Vasser, III ("Vasser Dep. Tr."), attached as Exhibit C;

        c)      Transcript of the Deposition of Candice Miller ("Miller Dep. Tr."), attached as Exhibit D;

        d)      Transcript of the Deposition of Michelle Stanton ("Stanton Dep. Tr."), attached as Exhibit E;

e)     Transcript of the Deposition of Valerie Merlo ("Merlo Dep. Tr."), attached as Exhibit F;

f)     Deposition of Kayla Reynolds ("Reynolds Dep. Tr."), attached as Exhibit G;

g)     Deposition of Melissa Ringold ("Ringold Dep. Tr."), attached as Exhibit H; and,

h)     Deposition transcript of Justin Drexler ("Drexler Dep. Tr."), attached as Exhibit I.

10.     Peck and the Firm also provided copies of discovery exchanged between the parties including M.M. and K.M.'s written and verified answers to Brimar's Interrogatories and Document Requests. A true and correct copy of the written and verfied answers to Brimar's Interrogatories and Document Requests is attached as Exhibit J.

11.     Peck and the Firm also provided copies of documents produced in response to discovery in the Underlying Action. A true and correct copy of the document production bates labeled KM PPS 000001 to 000004, is attached as Exhibit K.

12.     To date, National has incurred $80,958.79 in defense costs on behalf of Brimar in connection with the Underlying Action.

All the facts set forth in this affidavit are based upon my personal knowledge, and are true and correct to the best of my knowledge, information and belief.

Further affiant sayeth not.

Sworn and Subscribed before me

This 16 day of March, 2022

Notary Public

GENERAL NOTARY - State of Nebraska
SARAH E. STARKEY
My Comm. Exp. JULY 24 2024

4

# EXHIBIT

# A

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

M.M., parent and natural guardian of K.M., a minor,

                Plaintiffs,

        v.

PITTSBURGH PUBLIC SCHOOL DISTRICT and BRIMAR TRANSIT, INC.,

              Defendants.

CIVIL DIVISION

No.:  GD18-003257

PLEADING FILED:

**AMENDED COMPLAINT IN CIVIL ACTION IN RESPONSE TO PRELIMINARY OBJECTIONS OF THE DEFENDANT BRIMAR**

FILED ON BEHALF OF:

Plaintiffs

COUNSEL OF RECORD FOR THIS PARTY:

Fred C. Jug, Jr., Esquire
PA ID No. 58285

BRANDT, MILNES & REA, P.C.,
310 Grant Street
1109 Grant Building
Pittsburgh, PA  15219

412-255-6500

**JURY TRIAL DEMANDED**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| M.M., parent and natural guardian of K.M., a minor, | ) | CIVIL DIVISION |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No.: GD18-003257 |
| | ) | |
| v. | ) | |
| | ) | |
| PITTSBURGH PUBLIC SCHOOL DISTRICT and BRIMAR TRANSIT, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE TO DEFEND**

YOU HAVE BEEN SUED IN COURT.  IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU.  YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU. YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

LAWYER REFERRAL SERVICE
THE ALLEGHENY COUNTY BAR ASSOCIATION
400 KOPPERS BUILDING
436 SEVENTH AVENUE
PITTSBURGH, PENNSYLVANIA 15219
TELEPHONE: 412-261-5555
WWW.ACBALRS.ORG

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| M.M., parent and natural guardian of K.M., a minor, | ) ) ) | CIVIL DIVISION |
| Plaintiffs, | ) ) | No.: GD18-003257 |
| v. | ) ) | |
| PITTSBURGH PUBLIC SCHOOL DISTRICT and BRIMAR TRANSIT, INC., | ) ) ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT IN CIVIL ACTION IN RESPONSE TO PRELIMINARY OBJECTIONS OF THE DEFENDANT SCHOOL DISTRICT

AND NOW, COMES the Plaintiff, M.M., parent and natural guardian of K.M., a minor, by and through the undersigned counsel, Fred C. Jug, Jr., Esquire and BRANDT, MILNES & REA, P.C., who file the following Amended Complaint in Civil Action and Jury Demand in response to Preliminary Objections filed by Defendant Brimar:

1.      The Plaintiff, M.M., is the parent and natural guardian of K.M., who at all times relevant hereto was a minor child. K.M. lives with her mother, M.M., in Allegheny County. The Defendants are aware of the address of M.M. and K.M. Neither the full name of M.M. and K.M., nor their address is provided herein to satisfy confidentiality requirements involving claims brought on behalf of a minor child.

2.      The Defendant, Pittsburgh Public Schools, has an address of 341 S. Bellefield Avenue, Pittsburgh, PA 15213.  At all times relevant to this cause of action, the minor child, K.M., was a student within the Pittsburgh Public School District.

3.      The Defendant, Brimar Transit, Inc., is a Pennsylvania Corporation with an address of 712 Rebecca Avenue, Pittsburgh, PA 15221.

4.      Jurisdiction and venue are proper in the Court of Common Pleas of Allegheny County as both Defendants are located in Allegheny County and the incidents and events described herein occurred in Allegheny County.

5.      At all times relevant hereto, K.M. was a student at Pittsburgh Classical Academy Middle School.

6.      K.M. was diagnosed with disabilities and the Defendant School District is aware of these disabilities and her needs. The Defendants had a duty of care to all students, including K.M., entrusted in their care at school and/or during transportation to and from school. The Defendants specifically owed a duty to K.M. and breached said duties of care as described herein.  The Pennsylvania Department of Transportation publishes guidelines for school bus drivers. The Pennsylvania School Bus Drivers Manual, as published by the Department of Transportation, recognizes certain duties that are owed to students with disabilities and/or special needs. These duties would apply to both K.M. and the male student described herein.

7.      The Defendant, Brimar Transit, Inc. (hereinafter "Brimar") knew or should have known the Pennsylvania School Bus Drivers Manual has a specific section on student seating plans.  Those guidelines appear at page B-4 of the Pennsylvania School Bus Drivers Manual and this section of the School Bus Drivers Manual provides direction that the school bus company is to check with the school district regarding the use of seating charts and further suggests it may be a good policy to establish and use seating charts when possible as such charts are helpful in controlling student behavior.

8.      The School Bus Manual Student Seating Plan further provides that seating charts are especially helpful for a substitute driver and during an emergency and on the date which is the subject of this litigation, a substitute driver was operating the school bus.  The Student

Seating Plan further provides direction for the development of a seating plan and this direction includes consideration of supervision for behavioral or medical conditions and consideration of students who are compatible with each other and who are not.  In the case at hand, the school bus company and the school district agreed to a plan in which the male student would be kept away from K.M. on the bus.  This plan was agreed to following an incident that occurred earlier and which is described herein. This duty was breached on the date in question.

9.      The Pennsylvania School Bus Manual further includes direction on the prohibition against texting or use of a cell or mobile phone by the school bus driver.  Such direction is found on pages F-16 and F-17 of the School Bus Drivers Manual. Said manual further recognizes a ban on texting for all drivers and the ban on cell phone use for commercial vehicle drivers was enacted by the Federal Motor Carrier Safety Administration in 49 C.F.R. 392.80 and 392.82 and such bans were adopted in their entirety in Pennsylvania. 67 Pa. Code 231.

10.     At all times relevant hereto the Defendants had a duty and obligation to provide a safe environment for students, including K.M., and this included during the time K.M. was transported to and from school.

11.     The Defendant Brimar Transit, Inc., (hereinafter "Brimar") is the agent of and/or had a contract with the Pittsburgh Public School District for the transportation of students.  The Defendant Brimar is a transportation company and owed the duty of care required by a common carrier or a contractual carrier.  In this case, Brimar has a contract with the School District, a copy of which is attached hereto as Exhibit "A" and incorporated by reference herein. Additional obligations are established by the portions of the Pennsylvania School Bus Manual attached hereto as Exhibit "B." The Defendant Brimar is liable for the errors, omissions, negligence and

acts of its employees, agents, drivers, and those acting on their behalf. At all times relevant hereto, the driver of the vehicle who was transporting K.M. on the date of the incident described herein was acting within the scope of the driver's employment as the agent, servant or employee of the Defendant Brimar.

12.     K.M. was assigned transportation in which the Defendant Brimar would transport K.M. home from school.  The transportation vehicle (referred to herein as "the bus" and/or "the vehicle") was not a full-size school bus, but a smaller vehicle and, on average, approximately seven (7) students would be on the vehicle each day. M.M. was notified and assured of the agreement that steps would be taken to protect her daughter and prevent the male student from sitting next to her on the school bus.  The school district had a duty to provide transportation for K.M. and Brimar had a duty to provide safe transportation and both Defendants breached this duty. M.M. detrimentally relied on the assurances of the school district that the Defendants would adhere to this agreement.  M.M. detrimentally relied on these assurances and such reliance forms the consideration of the agreement K.M. would continue to ride the bus. This consideration avoided the school district and/or Brimar from having to provide alternative transportation. The consideration between the school district and Brimar is established as a result of alternative transportation not having to be provided so long as the agreement was adhered to. M.M. Relied on the agreement of the school district and Brimar that the male student would be separated from K.M. As a result of this reasonable reliance and assurance, M.M. refrained from further action as a result of the prior sexual assault in gym class.

13.     One of the students who was assigned to the same bus as K.M. was a male student who also had disabilities and behavioral problems. (referenced herein as "the male student").

The male student was 12 years of age and attended the same school as K.M.  As described herein, the male student previously sexually assaulted K.M. in gym class.

14.     On or about Friday, April 29, 2016, K.M. and the male student were on the same vehicle being transported home from school.  At said time and date, the driver of the bus was acting as the agent, servant and/or employee of the Defendant Brimar.

15.     Prior to the incident that occurred on April 29, 2016, both the Defendant Pittsburgh Public School District and the Defendant Brimar were aware of issues with and inappropriate behavior demonstrated by the male student toward K.M. This behavior originally occurred earlier in 2016. At that time, K.M. and the male student were in the same room for a physical education (gym) class. K.M. was instructed to put balls away after they were used in the physical education class. While K.M. was putting the balls away, the male student approached her and subjected her to a sexual assault by grabbing her breasts. The incident was reported to the school principal, K.M.'s teacher and the other teachers. As a result of this incident, the Defendant Brimar was notified that K.M. and the male student should be separated on the school bus.  M.M. relied on this agreement and understood K.M. and the male student would be separated.

16.     From and after the time of the incident in gym class, the male student was infatuated with K.M. and continued to demonstrate inappropriate behavior toward K.M. The Defendants knew or, in the exercise of reasonable diligence, should have known of this behavior. The Defendants also knew or should have known the male student was a threat to K.M. and/or a threat to engage in continued sexual assaults.

17.     K.M. and the male student were separated as a result of the original incident with the male student and his continuing to exert inappropriate behavior and comments towards K.M.

Following the incident that occurred during the gym class, the Defendant School District and Brimar entered into an agreement in which K.M. and the male student would be separated. The agreement was that K.M. would be seated in close proximity to the bus driver and the male student was not permitted to sit next to K.M. and would be separated from her at all times when these students were transported to and from school. M.M. relied on this agreement and reasonably believed that by separating the students the School District and the bus company would prevent future incidents from occurring. The Defendant Brimar has denied having a duty to keep the male student separated from K.M. on the bus. This assertion by Brimar is not supported by the facts of this case. The Defendant School District has filed a Reply to New Matter, at Paragraph 102, which specifically denies Brimar Transit did not know of any need or necessity to control the male student and/or to keep K.M. and the male student separated on the bus. Paragraph 102 of the Reply to New Matter further alleged a representative of the School District had notified the regular driver of the bus to keep the two students separated. In fact, K.M. and the male student were kept separated by the driver who was regularly assigned to the bus route. Brimar's denial of the duty or obligation to keep the two students separated ignores the fact that Brimar previously undertook and assumed this obligation but then ignored it on the date K.M. was physically and sexually assaulted. Brimar's breach of the obligation they previously assumed resulted in the harm described herein, and said harm would not have occurred but for this breach.

18.     After this agreement was made the students were kept apart and the regular bus driver took steps so that K.M. and the male student were not seated next to each other.

19.     The regular bus driver then went on maternity leave. The replacement driver who originally substituted for the driver on maternity leave continued to follow the above-described agreement and procedure.

20.     After the temporary/substitute bus driver adhered to the terms of the agreement, he was then replaced by another driver.

21.     On Friday, April 29, 2016, another driver, who at all times relevant hereto was acting as the agent, servant or employee of the Defendant Brimar, was operating the bus. This driver breached the agreement to separate the male student and K.M., but rather allowed the two of them to sit next to each other. As a result of the failure of the Defendant to keep these students separated as agreed to, the male student was able to sexually assault K.M.

22.     The sexual assault would not have occurred but for the breach of the agreement. Both Defendants were parties to this agreement and responsible for the breach and resultant damages. The Defendant School had an obligation to monitor activities and to inform the bus company and driver of the requirement the students be separated.  The Defendant, Brimar, has now filed an Answer in which they deny they were a party to an agreement to keep K.M. and the male student separated. This denial is found at Paragraph 22 of Brimar's Answer. If discovery establishes that Brimar was not informed of the need to keep the students separated, as suggested by Brimar, this conduct would establish reckless indifference on the part of the School District and a breach of their duty of care to special needs students after they had knowledge of the prior incident and continued infatuation of the male student. If it is determined by the trier of fact in this case that Brimar was so informed, this establishes Brimar filed an Answer which had no basis in fact and further establishes the liability of Brimar. Brimar's contract with the School District includes contractual obligations which Brimar's denial completely ignores. A resolution

of these issues is properly resolved by the jury as the trier of fact. In addition, the School District could have easily avoided the situation from occurring by simply arranging for separate transportation so these two students were not together in close proximity.

23.    The Defendant School District knew or should have known of the need to keep the students separate as a result of the prior incidents described above and instead placed these students on and continued to have them ride the same vehicle.

24.    The Defendant, Brimar, is liable for the actions or inactions of the driver of the vehicle and is also liable for failing to inform, train, supervise and/or to make sure the driver followed the agreement to keep these students separated.

25.    In addition, once the sexual assault began, the driver breached her duties to the students on the vehicle by failing to be aware of what was going on or to respond to the students as the incident occurred, which allowed the assault to both occur and to continue.

26.    On information and belief, the driver on April 29, 2016 engaged in a pattern of texting and/or otherwise being on her cell phone, instead of paying attention to the students seated behind her.  The driver failed to respond to the events happening just a few feet away from her.

27.    During the bus trip home on April 29, 2016, the male student pinned K.M. down on the seat and was on top of K.M. At that time, she yelled out for him to stop and the bus driver did not take any action to stop the incident from occurring or to separate the students. The driver was negligent in failing to be attentive and/or respond and this allowed the assault to occur and continue.

28.    During this time period, the other students on the bus were yelling out to the bus driver, who ignored the cries/yells of the other students.  Sufficient time went by while K.M. and

the male student were next to each other and this allowed the male student to continue with the sexual assault as a result of the driver's negligence.

29.     During this time period, the pants of both K.M. and the male student were down. During this time-period, K.M. was penetrated from behind by the male student.  In spite of the vehicle not being large and the bus driver obviously being able to hear and/or see what was going on if the bus driver had been paying attention, the driver took no action to stop or prevent the assault.

30.     The incident in question was allowed to occur as a result of the Defendants' breaching their agreement and procedure of separating these two (2) students.  The incident was further allowed to occur as a result of the bus driver ignoring the students and failing to pay attention to her surroundings that a sexual assault was occurring in proximity to her.

31.     In spite of the incident occurring on a Friday afternoon, M.M., the mother of K.M., was not informed of the incident until the following school week. This prevented K.M. from being seen at Children's Hospital on the day of the incident.

32.     The Defendant, Pittsburgh Public School District, had notice of the incident as a teacher driving home from school on the date of the incident observed the bus at the intersection of Liberty Avenue and Main Street.  The teacher in question noticed K.M. and the male student sitting in the last row.  At that time, K.M. appeared to be sitting on the lap of the male student. Although the incident was observed by the teacher on Friday afternoon, it was not reported nor was M.M. notified until the following Monday.  Thereafter, on information and belief, the male student received an out-of-school suspension and was informed he would not be permitted back on the bus.

33.     The following school year, the male student was not in attendance at the same school, but was at a different school.  However, the same students came into contact as a result of a fieldtrip to an event thereafter at PPG Arena in Pittsburgh.  At that time, K.M.'s class and the male student's class were both in attendance and the male student made comments to K.M. which caused her distress.

34.     On information and belief, the sexual assault was investigated by the Pittsburgh Police and the Office of the District Attorney. On information and belief, the male student was found to not be competent to stand trial in this case and this presumably was as a result of his disabilities.  At all times relevant hereto, the school district and Brimar both knew of these disabilities, and knew of the prior incident and need to keep these two (2) students separated as the male student had an infatuation with K.M. and repeatedly engaged in conduct which was inappropriate and/or threatening to K.M.

35.     The male student is not a Defendant in this case as, upon information and belief, he did not have the mental capacity to appreciate his actions were wrong. For this reason, the male student was not criminally charged.  At all times relevant hereto, the Defendants knew or should have known of the threat the male student posed to K.M.

36.     At all times relevant hereto and prior to the incident which gives rise to this litigation, both the City of Pittsburgh School District and Brimar were aware of the need to keep these students separated and took action to do so for a period of time.

37.     Upon M.M. being informed of the incident by the school district, she asked the school district to release her daughter to her and K.M. was examined at Children's Hospital of Pittsburgh. The delay in treatment occurred as a result of M.M. not being informed of the

incident on the day it happened. M.M. was not informed even though the teacher observed the incident.

38.     K.M. was subjected to testing, including testing for sexually transmitted diseases as a result of the sexual assault that is the subject of this litigation.

39.     K.M. described the incident in question in detail to medical providers at Children's Hospital of Pittsburgh.  This description confirmed penetration and a sexual assault. The Children's Hospital records further confirm a report of not only penetration but kissing of her chest by the 12-year-old male student.

40.     Follow-up treatment notes were recorded on May 17, 2016. At that time, it was reported that the school had hired a different bus company and the male student was no longer on the bus/van which transports K.M. home.  At that time, K.M. and the male student were not in the same class but may pass each other in the hallway or at other non-structured times. M.M. reported a concern that this is causing K.M. distress and her ability to focus at school had gotten worse.

41.     As a direct and proximate result of the sexual assault as described herein, K.M. has experienced great emotional distress and is at an increased risk for emotional problems that are associated with children who have suffered a sexual assault.

42.     K.M. was required to submit to physical examination and re-live the assault when describing the incident to the medical providers and discussing it thereafter. K.M. is also at risk for future problems associated with the victims of child sexual assault/abuse.

43.     On information and belief, the School District was aware of the history between K.M. and the male student and had every opportunity for a monitor to be on the van/bus.  The School District and Brimar could have prevented the sexual assault promptly, at the very least,

by following the steps/agreement they originally carried out in keeping K.M. and the male student separated.

44.     If the teacher who was in her vehicle driving in proximity to the van/bus was able to observe what was going on inside the van/bus, then the school bus driver and/or a monitor would have had every opportunity to observe what was going on and to take defensive action to prevent the sexual assault from occurring or from continuing once the assault first started.

45.     Given the disabilities of the students, as described herein, the Defendants knew or should have known of the duty of care these students were entitled to and also knew or should have known of the obligation to provide a safe and supervised environment for their students. The Defendants have breached these obligations and duties and said breach has resulted in the damages set forth herein.

46.     Following the incident in question, the School District arranged for statements and K.M. provided a statement shortly after the incident which confirmed that the male student attempted to touch her and hug her and that K.M. pushed the male student off of her. The statement also indicated that another student started to talk about K.M. being in bed with the male student, and K.M. lashed out and struck the student for talking inappropriately. The male student then told K.M. to lay on him and she said no.  He then said, "please" and she again said "no".  At that point, the male student forced K.M. to lay on him.  The male student pulled down his pants and told K.M. to pull down her pants. K.M. then felt penetration and pushed the male student off the seat. As K.M. was getting off the bus, the male student then slapped her in the rear.

47.     K.M. also reported an incident during the prior week when she was seated on the bus and the male student told her to lay down and touched her leg.  The male student wanted to

kiss K.M. and she resisted. She also reported an incident when the male student touched her waist.

48.     The male student also provided a written statement to the school on or about May 2, 2016. The male student admitted that he kissed K.M., that he pulled his pants down, that K.M. pulled her pants down and that he penetrated her. This report acknowledged that K.M. kept saying no and kept hitting him.

49.     In addition to the male student and the victim K.M., another student provided a written statement to the school district. The student's summary indicated that she would tell the male student to stop it when he touched K.M. inappropriately. This statement further indicated that the male student would touch her breast and she did not like it.

50.     It was established that the incident went on for a sufficient period of time and there is a sufficient history that the students should not have been next to each other nor should this incident have been allowed to occur.

51.     This incident has resulted in distress to K.M. This distress manifested itself again when K.M. saw the male student at the PPG Paints Arena at the field trip and the incident has affected K.M.'s ability to focus and concentrate.

52.     This action is brought on behalf of M.M. as parent and natural guardian of her daughter, K.M., a minor child. As a direct and proximate result of the claims set forth herein, the Plaintiffs are entitled to the damages set forth herein as a result of the physical and sexual assault as well as the mental anguish which came about as a result of the subject claims. These damages include those for treatment, medical tests, therapy, emotional anguish, past and future medical expenses, past and future therapy expenses, post traumatic stress, increased risk for post traumatic stress and/or emotional issues associated with victims of sexual assault.

53.     As a result of the physical and sexual assault, K.M. experienced, she has experienced emotional distress and has the potential to develop post traumatic stress and issues associated with child sexual assault/abuse throughout her life.  Said actions of the Defendants also resulted in the Plaintiff incurring humiliation, embarrassment, and injury. K.M. also experienced the damages recoverable for assault and battery, including apprehension, and said damages would not have occurred but for the actions of the Defendants as described herein.

54.     The Plaintiff is entitled to be compensated for economic and non-economic damages as described herein, including past and future medial expenses and therapy expenses as well as pain, suffering, the loss of the basic and pleasurable activities of life and expense for psychological treatment, therapy and counseling, the need for such treatment and counseling as may arise in the future as a result to being exposed to a sexual assault as a child. Plaintiff is also entitled to be compensated for severe emotional distress.

55.     In addition, Defendant Brimar is responsible for the actions and inactions, errors, omissions, and conduct of the bus driver and/or the supervisors who were responsible for conveying the message that the male student and K.M. must be separated. The Defendant Brimar is also responsible for blatant disregard of their obligations and breach of the duties described herein.  Said conduct was outrageous and was committed with at least reckless indifference to the minor Plaintiff.  As a result, Plaintiff is entitled to an award of punitive damages, in addition to an award of compensatory damages.

## COUNT I – NEGLIGENCE
## AS TO DEFENDANT BRIMAR

56.     Plaintiffs incorporate by reference herein paragraphs 1-55 above as if set forth in their entirety.

57.     As a common carrier or contractual, the Defendant Brimar owed a duty of care to the students they were transporting and, in this case, owed a heightened duty of care as a result of the disabilities described herein, their prior knowledge of the need to keep these students separated and their agreement to do so. As described above, the Defendant Brimar failed to uphold their duties as established by the Commonwealth of Pennsylvania School Bus Drivers Manual as at all times relevant hereto the Defendant Brimar was transporting students for a public school district and subject to the requirements of said Manual.

58.     The Defendant accepted a duty and promised to keep the minor Plaintiff and the male student separated, and said duty was based on a promise to keep K.M. safe following the first sexual assault which occurred in the gym class described herein. The Defendant Brimar had a duty to train, supervise and inform the driver of the need to separate the students. Brimar is liable for the damages that occurred as a result of this negligence. Brimar is also liable for the negligence of their driver being inattentive, failing to respond to students, being aware of her surroundings, driving without regard to students and/or texting and being on her phone. The Defendant breached this duty when they permitted or failed to prevent the minor Plaintiff, K.M. and the male student, from sitting next to each other on the bus, and this allowed the offensive conduct to occur and resulted in injury to the minor Plaintiff as described herein.

59.     The conduct of the Defendant, as set forth above, constitutes a breach of duties which directly resulted in the injuries and damages set forth herein.

60.     The harm suffered by the Plaintiffs and damages set forth herein would not have occurred but for the breach of the duties described herein by Defendant.

61.    The resulting harm to the Plaintiffs was foreseeable.  In this case, Defendant had knowledge of and had specifically agreed to carry out a plan in which the male student would be separated from K.M.

62.    In addition to the breach of duties set forth herein, the Defendant Brimar, acting through the bus driver who was working and driving the bus on the day in question, violated the following duties:

    a.    The driver failed to separate the male student and K.M. Further, the Defendant Brimar failed to have a seating chart in place and also failed to satisfy the requirements of the Pennsylvania School Bus Drivers Manual as set forth above;

    b.    Defendant, Brimar, acting by and through the supervisor and/or other employees or agents with knowledge of the agreement and procedure to separate K.M. and the male student, negligently and/or recklessly failed to convey this information to the bus driver who was operating the bus on the date of the incident which is the subject of this litigation;

    c.    Defendant, Brimar, is also negligent and the Plaintiffs incurred the damages set forth herein as a result of negligent supervision or training of the driver;

    d.    The bus driver who was operating the bus on the day in question did so with a reckless disregard for the activities that were occurring in close proximity to her and in failing to observe the actions of the male student which were in plain sight and would have been seen by the bus driver if she was paying attention and/or also should have been heard;

    e.    In addition, the bus driver was negligent in failing to react/respond to K.M. telling the male student "no" when he began to assault K.M. and/or in failing to respond to the other children on the bus when they reacted as the assault occurred;

    f.    On information and belief, the bus driver was texting and/or using her cell phone at the time she was operating the bus when the children on the bus were entrusted to her care;

    g.    The bus driver's actions/inactions, as set forth herein, and her failure to pay attention or to respond constitute gross negligence and constitute reckless indifference to the Plaintiffs which entitle the Plaintiffs to an award of compensatory and punitive damages.

       h.    Defendant Brimar failed to properly train its employee, resulting in harm to the Plaintiffs.

63.    The Pennsylvania School Bus Driver's Manual (hereinafter the "Manual") is intended as a means for certified instructors to deliver training courses effectively and uniformly to school bus drivers throughout Pennsylvania.

64.    According to the Manual, since poor student behavior on the school bus can be distracting to the driver and contribute to crashes, it is important to establish clear rules for the students to follow. (Pennsylvania School Bus Driver's Manual, B-5). As such, students are advised under the Manual keep their hands and feet off other children. (Pennsylvania School Bus Driver's Manual, B-5). A copy of the School Bus Driver's Manual is attached hereto as Exhibit "B" and is incorporated by reference herein.

65.    The Manual also addresses suggested methods for dealing with bullying and harassment, including separating the children having difficulty and assigning them seats. (Pennsylvania School Bus Driver's Manual, B-17).

66.    The transportation of students with disabilities is also addressed in the Manual by, amongst other considerations, noting the potential of special procedures and the need to become familiar with local guidelines and training. (Pennsylvania School Bus Driver's Manual, D-13).

67.    The Manual also explains the negative impacts that texting while driving can have on a driver, and provides that it is illegal in Pennsylvania to use a wireless communication device to send, read or write a text-based communication while driving and while the vehicle is in motion. (Pennsylvania School Bus Driver's Manual, F-16-17). Similar language is also found in the Pennsylvania Driver's Manual and the Commercial Driver's Manual.

68.    The Manual explains that, to manage students with disabilities while transporting them, you must know individual specific behavior patterns and required treatments.

(Pennsylvania School Bus Driver's Manual, D-4). Additionally, the Manual instructs drivers to be observant and try to anticipate problems, as well as to always expect the unexpected. (Pennsylvania School Bus Driver's Manual, D-4). The Manual goes on to explain that substitute drivers must also be made aware and be properly trained to understand and work with each student on the bus.

69.     The Manual states that, before transporting students with special needs, it is critical to understand the disability and potential behavior each student may exhibit. (Pennsylvania School Bus Driver's Manual, D-15). As part of this, the driver is advised to make periodic checks on the students and watch for any behaviors that might cause a dangerous situation while on the road. (Pennsylvania School Bus Driver's Manual, D-15).

70.     Defendant's driver failed to perform the functions listed in the Manual as described herein, such as texting while driving and by failing to be properly informed of her passengers' unique situations. This resulted in harm to the minor Plaintiff.

71.     The Defendant Brimar is liable for the actions of the bus driver as set forth herein and Defendant was negligent in failing to ensure K.M. was provided a safe environment for her transportation home from school and/or the in failing to follow the prior agreement to separate K.M. and the male student, which resulted in the assault being able to occur.


WHEREFORE, as a direct and proximate result of the negligence of the Defendant as set forth herein, Plaintiffs demand that Judgment be entered in their favor and against the Defendant in an amount in excess of the arbitration limits of the Court of Common Pleas of Allegheny County.

## COUNT II – BREACH OF CONTRACT

72.     Plaintiffs incorporate by reference herein paragraphs 1-71 above as if set forth in their entirety.

73.     Following the incident which occurred during a gym class, the parties entered into an agreement in which the minor male student would be kept separated from K.M.  The agreement was entered into following an incident earlier in the school year in which the male student sexually assaulted K.M. during gym class. Thereafter, the school district informed K.M.'s mother that an agreement was reached with the bus company that K.M. and the male student who assaulted her would be separated on the bus. M.M. relied on this agreement and refrained from taking further action as a result of the prior sexual assault. Said detrimental reliance created the consideration necessary for the formation of a contract. Further consideration of this reliance was the fact that having the two (2) students on the same bus avoided the need for alternative transportation for one of the students by the school district and/or Brimar. This agreement was followed for a period of time by the regular driver. After the regular driver went on maternity leave, the agreement as again followed by a substitute driver. The substitute driver was replaced by the driver who was working on the day of the incident which is the subject of this litigation and the new substitute driver breached the agreement by failing to separate the students on the bus.

74.     The terms of the agreement and the promises of the Defendants were relied on by the mother of K.M. when the mother of K.M. allowed K.M. to continue to ride the bus. By making the promise, the school district and the Defendant bus company induced detrimental reliance and this resulted in K.M. continuing to use the bus transportation. The school district had an obligation to provide such transportation and these promises resulted in them not being required to provide alternative transportation for K.M. or the male student.  The promises further

induced forbearance on the part of the Plaintiff and the injuries and damages complained of herein came about as a direct and proximate result of the breach of the agreement as described herein.

75.      As set forth herein, the subject agreement was breached, and this has resulted in the damages set forth herein. The school district breached the agreement if it is determined by the trier of fact that the school district never informed Brimar of the need to separate the students as suggested in Brimar's responsive pleading described herein. The Defendant Brimar likewise breached the agreement if the trier of fact determines a representative of the school district did notify Brimar of the obligations as described in paragraph 102 of the school district's Reply to Brimar's New Matter.

76.      Following the incident in gym class, the Defendants agreed to provide a safe environment and agreed to take steps to prevent the male student from having access to or contact with K.M.  Further, the Defendants knew or should have known of the male student's infatuation with K.M. and the threat he posed to her physical and mental well-being.

77.      The serious nature of the incident in the gym class constituted a substantial change in position from which Plaintiffs relied in order to keep K.M. safe.  As a direct and proximate result of the breach of contract as set forth herein, the Plaintiffs have suffered the damages set forth herein.

78.      There are at least three (3) agreements in this case. The first is the written contract entered into between Defendant Brimar and Defendant School District dealing with transportation services. Said agreement is attached hereto as Exhibit "A."

79.      Numerous obligations were imposed on Defendant Brimar under this agreement. For instance, in paragraph 3 of that agreement, Defendant Brimar agreed to provide pupil

services to the Defendant School District on school days for a certain period of time, and, in paragraph 11, Defendant Brimar agreed to be subject to Defendant School District's policy prohibiting sexual harassment in the workplace.

80. Similarly, Defendant Brimar agreed to be subject to various policies and undertake certain obligations. For example, in paragraph 37, Defendant Brimar agreed that a properly trained and licensed driver will operate each vehicle. This obligation was breached based on Defendant Brimar's driver's failure to properly operate the motor vehicle on the day of the incident.

81. Additionally, in paragraph 8 of that agreement, Defendant Brimar agreed to indemnify, defend and hold harmless the Defendant School District, amongst others, against any and all loss, damage, cost and expenses Defendant School District thereafter suffered or incurred arising from Defendant Brimar's obligations under that agreement.

82. In paragraph 38, Defendant Brimar agreed to provide any training for its drivers which may be required by the Vehicle Code and any other Federal or State statute or regulation. This obligation, however, was not adhered to.

83. For instance, pursuant to 75 Pa.C.S. § 3316(a) of the Vehicle Code, no driver shall operate a motor vehicle on a highway or trafficway in this commonwealth while using an interactive wireless communications device to send, read or write a text-based communication while the vehicle is in motion.

84. Defendant Brimar's employee, however, was texting or utilizing search functions on her phone while operating the vehicle. As such, this provision was not adhered to and constituted a breach of the contract between the parties and/or negligence.

85.     Furthermore, 75 Pa.C.S. § 3736(a) of the Vehicle Code states that any person who drives any vehicle in willful or wanton disregard for the safety of persons or property is guilty of reckless driving. Defendant Brimar's employee engaged in such conduct when she accessed or used her phone while driving the motor vehicle.

86.     Similarly, even if 75 Pa.C.S. § 3736(a) does not apply, 75 Pa.C.S. § 3714(a) states that any person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense. Defendant Brimar's employee demonstrated a careless disregard of her duties while operating the vehicle. As such, this provision was also not adhered to and constituted a breach of the contract between the parties and/or negligence.

87.     The second agreement implicated in this action is the one between Defendant School District and Defendant Brimar.

88.     Defendant School District admitted that one of its representatives notified the regular driver of the route, a Brimar Employee, at some time prior to the incident of the need to keep the two students separated and that the driver had done so. (Answer and New Matter to Second Amended Complaint by Pittsburgh Public School District, ¶ 8).

89.     Defendant Brimar already filed Preliminary Objections in this matter, but now, essentially, is arguing that Plaintiff failed to comply with Pa. R.C.P. 1019(h) and 1019(i) by failing to include a copy of this agreement.

90.     According to Pa. R.C.P. 1028(b), all preliminary objections shall be raised at one time. By failing to raise this issue in its first set of Preliminary Objections, Defendant Brimar has waived these issues.

91.     Furthermore, at least one case has explained that, in the application of Pa. R.C.P. 1019(i), if the writing is not accessible to the pleader, it is sufficient so to state, together with the

reason, and to set forth the substance in writing. Moreover, writings that are in the possession of the opposing party need not be attached to a pleading.

92.     In this matter, any agreements between the Defendants would be in the Defendants' possession. As such, Plaintiff need not attach any physical documents, if they do exist, to any pleading under the standard set forth above.

93.     Additionally, Plaintiffs do not have access to any other written agreements between the Defendants at this time as Plaintiff has not yet had an opportunity to engage in discovery. The Defendants must be held liable for breach of agreements in their possession which have not yet been made available to the Plaintiffs through the discovery process. In the contract with the School District, Brimar assumed contractual obligations. As such, Plaintiffs have set forth the terms of these agreements to the best of their information and belief in the factual summary above.

94.     Relatedly, another case explained that, under Pa. R.C.P. 1019(h), where a pleading does not specify whether the alleged contract was written or oral, the inference is that it was an oral contract. In that matter, the Superior Court found that a party had not violated Pa. R.C.P. 1019(h) by failing to attach a copy of the alleged contract because it was not a written one and, logically, could not be attached to the Complaint.

95.     In this case, at least two of the alleged agreements between the parties appear to be oral and, therefore, would not be required to be attached. The agreement to separate the students is described in Count III below and incorporated by reference herein.

96.     Therefore, Defendant Brimar is incorrect in its assertion that Plaintiffs' Complaint is legally insufficient under Pa. R.C.P. 1019(h) and 1019(i).

97. The third contract in this matter was between Defendant School District and Plaintiffs to keep Plaintiff K.M. safe.

98. Based on the same logic outlined above, Plaintiff is not required to provide a physical copy of this arrangement either.

WHEREFORE, as a direct and proximate result of the breach of the Defendants as set forth herein, Plaintiffs demand that Judgment be entered in their favor and against the Defendants in an amount in excess of the jurisdictional arbitration limits of the Court of Common Pleas of Allegheny County.

## COUNT III – THIRD-PARTY BENEFICIARY

99. Plaintiffs incorporate by reference herein paragraphs 1-98 above as if set forth in their entirety.

100. In this case, the minor Plaintiff was the intended third-party beneficiary of the contract/agreement described herein.  In Pennsylvania, one is treated as and recognized as a third-party beneficiary to the contract where the parties thereto express an intention to benefit the third party.  Such circumstances exist in this case as the agreement was to keep the two (2) students separated and the purpose of this agreement was to protect K.M. from further sexual and/or physical assault by the male student.

101. The minor plaintiff became a third-party beneficiary to at least two agreements, the previously described written agreement and the oral agreement.

102. The agreements set forth herein demonstrated and established an intention to benefit K.M. and keep K.M. safe from the kinds of harm and actions of the male student which had occurred in the past and which the Defendants knew or should have known were likely to occur in the future unless the agreement was adhered to.

103.    The circumstances set forth herein are so compelling that recognition of Plaintiff's rights as a third-party beneficiary is appropriate to effectuate the intention of the parties as said agreement was meant to protect K.M. and directly affected her welfare.

104.    The circumstances also show the parties agreed to give K.M. the benefit of the promised performance and the agreements were intended to keep K.M. from suffering more harm.

WHEREFORE, as a direct and proximate result of the breach of the agreement and the Plaintiff's status as third-party beneficiary, the Plaintiff suffered the injuries and damages set forth herein. Plaintiffs demand that Judgment be entered in their favor and against the Defendants in an amount in excess of the jurisdictional arbitration limits of the Court of Common Pleas of Allegheny County.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

105.    Plaintiffs incorporate by reference herein paragraphs 1-104 above as if set forth in their entirety.

106.    This claim is submitted by M.M. on behalf of K.M. as M.M. was not physically present at the time of the assault. M.M. is a party to this action as the parent and natural guardian of K.M. and the claim for damages as a result of intentional infliction of emotional distress is made on behalf of K.M.   The actions of the Defendants, as described herein, constitute outrageous conduct which occurred either intentionally or recklessly and has resulted in severe emotional distress to the Plaintiffs.

107.    The actions of the Defendants, as described herein, were clearly reckless as they knew or should have known of the increased risk of harm which came about to the minor

Plaintiff and that said harm could have been avoided if the Defendants would have fulfilled their obligations to the Plaintiffs. As set forth above, Brimar has filed an Answer in which they suggest they were not aware of the duty. The School District has filed a Reply to Brimar's New Matter in which they allege Brimar did know of the need and necessity to keep K.M. and the male student separated. These are issues to be resolved by the trier of fact, and if it is established Brimar was not informed by the School District as they suggest, that would constitute reckless disregard of the school district's obligations which resulted in severe emotional distress and humiliation by the minor Plaintiff.

108.    In addition to the Defendants acting recklessly when they failed to carry out or fulfill their agreement to keep the students separated, the bus driver engaged in actions, as described herein, which were also reckless and resulted in the subject harm and infliction of emotional distress.

109.    The violation of the agreement was an outrageous act as a result of the harm to a vulnerable child, and the Plaintiffs relied on the prior representations and conduct of the Defendants.

110.    The conduct of the Defendants was also extreme because of the mere fact that such acts could occur not only once, but on more than one occasion, as this shows a disregard for the welfare and well-being for the minor Plaintiff.

111.    In the alternative, Defendant bus company claims Defendant School District never informed them about the prior incident between the students.

112.    If so, then such conduct by the School District would be outrageous given the circumstances and would also satisfy the elements of this intentional tort.

113.    As a result of said actions, Plaintiffs have incurred damages for emotional distress.

WHEREFORE, Plaintiffs demand that Judgment be entered in their favor and against the Defendants in an amount in excess of the jurisdictional arbitration limits of the Court of Common Pleas of Allegheny County.

## COUNT V – COMMON CARRIER LIABILITY

114.    Plaintiffs incorporate by reference herein paragraphs 1-113 above as if set forth in their entirety.

115.    A common carrier owes the passengers the highest degree of care and diligence in carrying them to their destination.  While carrying school children to and from school, the bus company is bound to use every reasonable caution and care for the safety of the children.

116.    Even if Defendant is not found to be a common carrier under Pennsylvania law, Defendant would still be held to a heightened standard as a contractual carrier.

The Defendant Brimar breached said duty as a result of the actions of the bus company and the driver as described herein. Said breach resulted in the injuries and damages set forth herein.

WHEREFORE, the Plaintiffs respectfully request that Judgment be entered in their favor and against the Defendants in an amount in excess of the arbitration limits of the Court of Common Pleas of Allegheny County.

## COUNT VI – INTENTIONAL MISREPRESENTATION

117.    Plaintiffs incorporate by reference herein paragraphs 1-116 above as if set forth in their entirety.

118.    The elements of intentional misrepresentation are as follows: A representation; which is material to the transaction at hand; made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; with the intent of misleading another into relying on it; justifiable reliance on the misrepresentation; and, the resulting injury was proximately caused by the reliance.

119.    Defendant School District represented that they would take steps to ensure the children were separated on the bus following the prior incident.

120.    This representation was material because it directly concerned the safety of the child and influenced the child's mother when deciding how to respond to the first incident.

121.    The Defendant bus company has stated that the School District never informed it that the children should be separated.

122.    Plaintiffs justifiably relied on this false representation and were injured because of the School District's misrepresentation as to their intention.

123.    While a promise to do something in the future in itself does not ordinarily constitute fraud, at least one court has recognized that a misrepresentation of one's intention or state of mind may amount to fraud.

124.    As a result, the Plaintiffs are entitled to the damages set forth herein.

WHEREFORE, Plaintiff respectfully requests that Judgment be entered in their favor and against the Defendant in an amount in excess of the arbitration limits of the Court of Common Pleas of Allegheny County and such other damages as the Court deems just and proper.

**JURY TRIAL DEMANDED.**

Respectfully Submitted,
BRANDT, MILNES & REA, P.C.,

/s/ Fred C. Jug, Jr.
Fred C. Jug, Jr.
Counsel for Plaintiffs

## **VERIFICATION**

I, M.M., parent and natural guardian of K.M., a minor, Plaintiff, verify that the statements made in the foregoing Amended Complaint in Civil Action are true and correct.  I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.§ 4904 relating to unsworn falsification to authorities.

**BY:  /s/ M.M.**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

BRANDT, MILNES & REA

 /s/ Fred C. Jug, Jr.
Fred C. Jug, Jr., Esquire
Pa I.D. 58285
Attorneys for Plaintiff

1109 Grant Building
Pittsburgh, PA  15219

(412) 255-6500

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing **AMENDED COMPLAINT**

**IN CIVIL ACTION** has been served upon the following by First Class U.S. Mail, postage pre-

paid, this _____7th_ day of December, 2018 at the following address:


Jaime N. Doherty, Esquire
Goehring Rutter & Beohm
14th Floor, Frick Building
437 Grant Street
Pittsburgh, Pennsylvania 15219


Jason H. Peck, Esquire
DiBella Geer McAllister Best
20 Stanwix Street, 11th Floor
Pittsburgh, Pennsylvania 15222


BRANDT, MILNES & REA


 /s/ Fred C. Jug, Jr.
Fred C. Jug, Jr., Esquire
Attorneys for Plaintiff

1109 Grant Building
Pittsburgh, PA  15219

(412) 255-6500

<u>THIS AGREEMENT,</u>

By and between

THE BOARD OF PUBLIC EDUCATION
OF THE SCHOOL DISTRICT OF PITTSBURGH,

Hereinafter referred to as "SCHOOL DISTRICT"

AND

Brimar Transit Inc.
712 Rebecca Avenue
PO Box 91311
Pittsburgh, PA 15221

Hereinafter referred to as "CARRIER,"

WITNESSETH:

WHEREAS, SCHOOL DISTRICT is desirous of securing pupil transportation services, and

WHEREAS, CARRIER is prepared to provide such transportation services, and

WHEREAS, the SCHOOL DISTRICT and the CARRIER are parties to a transportation agreement providing for transportation services for the SCHOOL DISTRICT for the 2013-2014 school year; and

WHEREAS, the SCHOOL DISTRICT and CARRIER have held discussions regarding revisions to the terms of said Agreement and extending the Agreement to provide services.

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

<u>General Terms and Conditions</u>

1.   This Agreement shall constitute a novation of the above referenced Agreement and shall set forth the terms and conditions under which student transportation will be provided to the SCHOOL DISTRICT.

2.   CARRIER and SCHOOL DISTRICT agree that the following definitions apply to this Agreement:



b. "Prime Time" — That continuous period from the first assigned pick-up time in the morning to the last drop-off time in the morning, plus that continuous period from the first assigned pick-up time in the afternoon to the last drop-off time in the afternoon.

c. "Off-Peak Time"- That period from the time the vehicle reaches its last morning drop-off point assigned during prime time until the first afternoon pick-up point assigned during prime time, plus those hours following the last assigned drop-off point in the afternoon.

d. "School Day" — A day when the Pittsburgh Public Schools are actually in session providing a full educational program for its students or a day designated by the SCHOOL DISTRICT'S Director of Pupil Transportation as a "School Day".

e. "School Year" — That period of time beginning with the fall semester (usually August or September) and continuing through to the end of the spring semester (usually June), and including summer runs (usually June through August).

f. "Accepted Vehicle" — A vehicle that meets the requirements of the Pennsylvania Vehicle Code and all regulations promulgated thereunder that may be used for the transportation of school children and that is properly registered, licensed and insured for that purpose.

3. CARRIER agrees to provide pupil transportation services to the SCHOOL DISTRICT on school days during the school years 2012/13, 2013/14, 2014/15, and 2015/16 in accordance with the terms and conditions set forth in this Agreement. CARRIER has the right to cancel this Agreement with 180 days notice to the SCHOOL DISTRICT'S Director of Pupil Transportation.

4. It is understood between the parties to this Agreement that the number and type of vehicles offered by CARRIER for each of the four respective school years (2012/13 - 2015/16) which are listed on Exhibit "A", represent only the maximum number of vehicles the SCHOOL DISTRICT may utilize hereunder. The SCHOOL DISTRICT reserves the right to utilize up to the maximum number of vehicles listed on Exhibit "A", to utilize any lesser number of vehicles, or, in fact, to utilize no vehicles at any time during the term of this Agreement. The decision as to the number of CARRIER'S vehicles that will be utilized by the SCHOOL DISTRICT at any given time during the term of this Agreement will be made by the SCHOOL DISTRICT'S Director of Pupil Transportation and the Pupil Transportation Director's decision to modify the number of vehicles supplied by CARRIER is final, and any such decision can be made for any reason whatsoever.

2

MONRO00183

5.  CARRIER agrees that the SCHOOL DISTRICT'S Director of Pupil Transportation, while attempting to assign vehicles to areas convenient to CARRIER'S garage, shall have the right to assign vehicles to specific routes and change those routes at any time.

6.  CARRIER agrees that the SCHOOL DISTRICT shall have exclusive use of all vehicles operated during each school day during the school years 2012/13 - 2015/16.

7.  CARRIER agrees that the SCHOOL DISTRICT shall incur no costs for the operation of vehicles other than those set forth in the Pupil Transportation Rate Sheet attached as Exhibit "A".

8.  CARRIER agrees to indemnify, defend and hold harmless SCHOOL DISTRICT, its directors, officers, agents and employees against any and all loss, damage, cost and expenses which the SCHOOL DISTRICT may hereafter suffer or incur arising from CARRIER'S obligations under this Agreement.

9.  It is understood and agreed to by both parties hereto that CARRIER, while engaged in carrying out and complying with any of the terms and conditions of this contract, is an INDEPENDENT CONTRACTOR and is not an officer, agent or employee of the SCHOOL DISTRICT.

10. The within contractor hereby verifies under penalty of perjury that he/she is either a citizen of the United States, a national of the United States, an alien lawfully admitted for permanent residence or an alien authorized to be hired for employment as a contractor of the School District of Pittsburgh.

11. CARRIER agrees that it and all of its employees shall be subject to the SCHOOL DISTRICT'S policy prohibiting sexual harassment in the workplace, its policy regarding smoking, and its policy on ethics as a condition of receiving the contract and performing under this contract. The SCHOOL DISTRICT will make a copy of these policies available to the CARRIER upon the CARRIER'S request.

12. CARRIER also agrees that it and all of its employees shall be subject to the SCHOOL DISTRICT's policy concerning substance abuse, as further described in paragraph 32 of this Agreement.

13. The SCHOOL DISTRICT reserves the right to terminate or cancel CARRIER's services prior to performance and will pay only for services actually performed prior to termination.

**Vehicle Requirements**

14. CARRIER agrees that the age of any and all vehicles made available to the SCHOOL DISTRICT shall not exceed twelve (12) model years at the beginning of school years

3

MONRO00184

2012/13, 2013/14, and 2014/15, except such vehicles that are equipped with diesel particulate filters (DPFs) and closed crankcase ventilation systems (CCVs), which shall not exceed fourteen (14) model years in age. CARRIER agrees that at the beginning of school year 2015/16, the age of any and all vehicles made available to SCHOOL DISTRICT shall not exceed eleven (11) model years, except for such vehicles that are equipped with diesel particulate filters (DPFs) and closed crankcase ventilation (CCVs), which shall not exceed thirteen (13) model years in age.

15.   CARRIER understands that beginning with school year 2010/11, preference for afterschool activity, field trip, and mid-day runs will be given to CARRIERS with larger percentages of diesel powered vehicles retrofitted with, at a minimum, closed CCVs, and preferably with DPFs.

16.   CARRIER agrees that all 6-8 passenger capacity vehicles have been eliminated for the SCHOOL DISTRICT's use beginning with school year 2011/12, except when the SCHOOL DISTRICT specifically requests that type of vehicle.

17.   CARRIER agrees that all accepted vehicles be registered, licensed and insured, in accordance with paragraph 1.f., under the CARRIER holding the contract.

18.   CARRIER agrees to provide to the SCHOOL DISTRICT'S Director of Pupil Transportation by July 15th before the beginning of the upcoming school year, a current copy of each vehicle's registration certificate as issued by the State of Pennsylvania. This certificate will indicate the manufacturer's serial number, make of body, make of chassis, year of manufacture of chassis, and the serial numbers of the two way radios or mobile phones and video cameras. Without this information vehicles will not be assigned to CARRIER. CARRIER further agrees that the same information will be provided immediately if new vehicles are placed in service during any given school year.

19.   CARRIER agrees to provide no later than July 1 of each year a certificate of insurance, naming the SCHOOL DISTRICT as additional insured, verifying coverage of $1,000,000 per accident and a $5,000,000 umbrella.

20.   CARRIER agrees that all vehicles will be washed every two (2) weeks and kept clean with a daily gathering of litter left from the previous day's operation.

21.   CARRIER agrees that all vehicles used for the SCHOOL DISTRICT will be stored in a secure area.

22.   CARRIER, at no cost to the SCHOOL DISTRICT, agrees to place and/or refurbish appropriate vehicle numbers and/or other identifying insignia on the front and rear body corners of all vehicles, as determined by the SCHOOL DISTRICT'S Director of Pupil Transportation. Block numerals or letters shall be

4

black in color and shall be a minimum of five (5) inches in height and three (3) inches wide. CARRIER further agrees that CARRIER'S name will be marked on both sides of accepted vehicles, in accordance with State law.

23. CARRIER agrees that all vehicles will be equipped with a two-way radio or mobile phone in good working order which provides contact at all times with CARRIER'S administrative offices.

24. CARRIER agrees that all vehicles of a 36 passenger or greater capacity will be equipped with cameras and video recording devices. CARRIER will replace VCRs as they fail with DVD or other digital technology but in no case later than the end of school year 2013/14.

25. CARRIER agrees that all vehicles that are not State Police inspected, have a GVW of less than 6,200 pounds and operated for the SCHOOL DISTRICT will not have mileage in excess of 150,000 miles.

26. CARRIER agrees that the SCHOOL DISTRICT may at its sole discretion begin GPS monitoring in vehicles for purposes of evaluating CARRIER'S performance of this Agreement but not later at any time during this Agreement and the CARRIER'S reimbursement may be affected thereby. At such time the SCHOOL DISTRICT deems appropriate, it will furnish a GPS device, at no expense to the CARRIER, for each accepted vehicle. Such device may be a GPS only device requiring installation on each vehicle or maybe a GPS enabled phone. CARRIER is required to install or begin using these devices as soon as reasonably possible after they are furnished by the SCHOOL DISTRICT.

27. CARRIER agrees to collect information concerning mileage and days run and furnish such information to the SCHOOL DISTRICT for after school activity runs.

### Driver Requirements

28. CARRIER agrees to submit on company letterhead an alphabetical list of each of its drivers, with hire dates, no later than August 15th of each year. The following information on each driver should also be submitted by August 15th of each year and updated annually: A copy of the annual physical examination, a copy of the Commercial Driver's License and/or Pennsylvania Driver's License, a copy of the Pennsylvania Department of Transportation certificate of completion card, a copy of the Pennsylvania Act 34 Criminal History, a copy of the Pennsylvania Child Abuse Act 151 clearance, and a copy of the MVR. CARRIER will run an FBI fingerprint check for each new hire driving for the SCHOOL DISTRICT and provide a copy of the FBI check with the above listed items annually. CARRIER further agrees that ALL drivers for the SCHOOL DISTRICT must have Criminal History Act 34 clearance, even if the driver was previously exempt from the requirement.

5

MONRO0018

29.  CARRIER agrees that a driver in possession of an "occupational license," allowing the driver to only drive to work and back home, will not be allowed to drive a school vehicle for the SCHOOL DISTRICT.

30.  CARRIER agrees that any driver whose criminal history and background checks under Acts 34, 114, and 151, the latter relating to Child Abuse Clearance, contain a disqualifying conviction under said acts shall not operate a vehicle transporting DISTRICT students and further agrees that said driver shall be removed from operating such a vehicle should such a conviction come to the attention of the SCHOOL DISTRICT. CARRIER further agrees that it will require all drivers to notify CARRIER of any offenses committed after the dates of the MVR and criminal history and background checks respectively, and should it become aware of any such offenses or convictions during the term of this Agreement, through driver notification or any other means, it shall promptly notify the SCHOOL DISTRICT through the Director of Pupil Transportation and shall remove said driver from transporting SCHOOL DISTRICT students and having any direct contact with such students.

31.  The SCHOOL DISTRICT reserves the right to assess the character and ability to perform all necessary duties of all bus drivers who are employees of CARRIER. Such an assessment of an individual driver's character and ability may be above and beyond the requirements that are set forth in the Public School Code of 1949 at Section 111, 24 P.S. §1-111, and also under 23 Pa. C.S. §6355, which deals with child abuse background clearances. Nothing in section 111 of the Public School Code or in 23 Pa. C.S. §6355 precludes the SCHOOL DISTRICT from assessing the overall compatibility of an individual bus driver employed by CARRIER, and determining that the overall nature of such driver's significant criminal background may be sufficient to prohibit said driver and CARRIER from transporting children within the SCHOOL DISTRICT.

32.  CARRIER agrees that all drivers and safety personnel, at all times when performing services for the SCHOOL DISTRICT, will wear identification conspicuously on their persons. Such identification will be at least the size of a Pennsylvania driver's license and include CARRIER'S name, as well as the name of the employee and a photograph of the employee.

33.  CARRIER shall certify that each driver has passed a pre-employment drug/alcohol screening test before being permitted to transport students for the SCHOOL DISTRICT, pursuant to the DISTRICT'S policy concerning substance abuse. A copy of the SCHOOL DISTRICT'S substance abuse policy and certificate of compliance is attached hereto as Exhibit B. The certificate shall be executed and returned to the Director of Pupil Transportation at the time of the execution of the contract.

6

MONRO00187

34. CARRIER agrees that drivers employed for the SCHOOL DISTRICT runs will have attained twenty (20) years of age.

35. CARRIER agrees that a driver who has not met all the requirements of paragraphs 28–33 will not drive for the SCHOOL DISTRICT.

36. CARRIER shall be responsible for random drug/alcohol screening in accordance with Pennsylvania State regulations. Carrier shall be responsible for the immediate removal of any driver who fails to pass the drug/alcohol test. CARRIER further agrees to provide proof of compliance with this paragraph to the SCHOOL DISTRICT.

37. CARRIER agrees to provide the necessary drivers, at its cost and expense, and further agrees that a properly trained and licensed driver will operate each vehicle.

38. CARRIER agrees to provide, at no cost to the SCHOOL DISTRICT, any training for its drivers which may be required by the Vehicle Code (Pa. Act 81 of 1976) and any other Federal or State statute or regulation.

39. CARRIER agrees that only adult employees of CARRIER who meet the criteria for drivers enumerated in paragraphs 28–33 of this Agreement and assigned students will be on vehicle during operation of run paid for by the SCHOOL DISTRICT. When a monitor is requested by the SCHOOL DISTRICT, such monitor will also meet the criteria for drivers enumerated in paragraphs 28–33 of this Agreement. Reimbursement for monitors requested by the SCHOOL DISTRICT will be made in accordance with paragraph 45 of this Agreement.

**Carrier Reimbursement**

40. The SCHOOL DISTRICT agrees to pay for a minimum of two prime time hours for each utilized accepted vehicle on each school day during the school years 2009/10, 2010/11, 2011/12, 2012/13, and 2013/14. The rate paid for 2012-13 AND 2013-14 will reflect the rate paid for 2011-12.

41. In determining the payments to be made under the Pupil Transportation Rate Sheet, CARRIER understands that it will receive compensation for prime time runs, which exceed a given hour by thirty (30) minutes or less, an amount half-way between the rate for the given hour and the rate for the next higher given hour.

42. CARRIER will be paid monthly by the SCHOOL DISTRICT on the basis of properly certified invoices. CARRIER will also receive from the SCHOOL DISTRICT, following the completion of ten (10) days of public school operation during each school year, a payment equal to ten (10) times the estimated daily rate under this Agreement. This payment will be deducted from the CARRIER'S invoice for the last full school month's (usually May) two week payment.

7

MONRO00188

43. Should the self-service retail price of diesel fuel and gasoline in Allegheny County exceed Two and 25/100 Dollars ($2.25) per gallon according to the most recent West Penn AAA Fuel Gauge Report, the SCHOOL DISTRICT agrees to pay CARRIER an additional sum per vehicle (not under PUC Rates), of One Dollar ($1.00) per day of operation beginning with the next full calendar month, and an additional One Dollar ($1.00) per day of operation for each additional ten cent ($0.10) increase in the self-service retail price of diesel fuel and gasoline. If the self-service retail price of diesel fuel and gasoline in Allegheny County, according to the most recent AAA Fuel Gauge Report, includes taxes which CARRIER is not required to pay, CARRIER agrees that, for the purposes of determining what additional compensation, if any, should be paid under this paragraph, the self-service retail price of diesel fuel or gasoline will be reduced by an amount equal to the taxes which CARRIER is not required to pay.

Should the self-service retail price of diesel fuel and gasoline in Allegheny County fall below One and 25/100 Dollars ($1.25) per gallon according to the most recent West Penn AAA Fuel Gauge Report, the SCHOOL DISTRICT will deduct the sum of One Dollar ($1.00) per vehicle (not under PUC Rates) per day of operation, which would otherwise be payable under this Agreement to CARRIER, beginning with the next full calendar month, and the SCHOOL DISTRICT will further deduct an additional One Dollar ($1.00) per day of operation per vehicle for each additional ten cent ($0.10) decrease in the self-service retail price of diesel fuel and gasoline.

44. CARRIER understands and agrees that the SCHOOL DISTRICT reserves the right to begin purchasing fuel for CARRIERS during the term of this contract and that at such time as the SCHOOL DISTRICT begins purchasing fuel for CARRIER, paragraph 43 of this Agreement will be void. It is further agreed that the cost of such fuel shall be deducted from CARRIER'S monthly invoice with the balance being due to the CARRIER less any other agreed upon adjustments.

45. The SCHOOL DISTRICT will grant CARRIER an additional Twenty Dollars ($20.00) per hour per vehicle when a monitor is requested by the SCHOOL DISTRICT to ride on vehicle.

**Evaluation of Service and Compliance**

46. The SCHOOL DISTRICT'S Director of Pupil Transportation will evaluate the provision of services by CARRIER under this Agreement twice annually. The evaluation process will take into consideration, by way of illustration but not limitation, the following items: (1) CARRIER'S safety record; (2) transportation complaint record; (3) CARRIER'S vehicles' condition, including cleanliness and mechanical condition; (4) CARRIER'S vehicle facility—housing and maintenance; (5) CARRIER'S general contractual compliance and responsiveness to the SCHOOL DISTRICT'S transportation needs

8

MONRO00189

47.   CARRIER agrees that a representative from the SCHOOL DISTRICT'S Pupil Transportation staff will visit CARRIER'S garage during the first two weeks of every August, and at other times as Director of Pupil Transportation may require, to verify accuracy of vehicle identification cards.   CARRIER also agrees to cooperate with and facilitate such verification by the SCHOOL DISTRICT'S representative.

### Other Requirements

48.   CARRIER agrees to have an "in house" employee dedicated to dispatching vehicles and answering phone calls available from 6:00 AM (5:00 AM on inclement weather mornings) until fifteen minutes after the last vehicle serving the SCHOOL DISTRICT returns to the garage.   CARRIER further agrees that the SCHOOL DISTRICT and parents will be able to reach CARRIER throughout a given school year at the same phone number with which CARRIER begins a given school year.

49.   CARRIER agrees to furnish safety vehicles and staff if running ten or more vehicles for the SCHOOL DISTRICT.  Safety vehicles must be easily identifiable as such by the public.  Driver of safety vehicle must be able to contact all drivers of school buses as well as members of the general public.  The safety person must function in that capacity alone and should not be required to also work as a school bus driver. CARRIER agrees to furnish at least one safety vehicle and safety person for each garage.  Safety vehicles must have markings with 8 inch lettering that identifies the carrier and that it is a safety vehicle.

50.   CARRIER agrees that at least one member of CARRIER's safety staff will participate in a monthly Safety Committee meeting at the SCHOOL DISTRICT'S Transportation Office.

51.   CARRIER agrees to cooperate with school principals in conducting semi-annual (September and March) bus evacuation drills.

52.   CARRIER agrees to notify the appropriate school principal when vehicles will be more than fifteen (15) minutes late when arriving at school.

53.   CARRIER agrees to furnish two monthly invoices for all contracted pupil transportation services.  The invoices will be: (1) Verified invoices listing gallons of fuel consumed in vehicles providing pupil transportation with additional evidence that the state tax was paid in accordance with the Liquid Fuels and Fuels Tax Act, and, (2) An invoice which includes all costs for providing pupil transportation.

54.   CARRIER agrees, upon request, to provide the SCHOOL DISTRICT with copies of purchase invoices of all vehicles utilized under this Agreement.

9

MONRO00190

55.   CARRIER agrees to provide the SCHOOL DISTRICT with all information essential to completion and submission of State Transportation reimbursement applications.

56.   CARRIER agrees to acquire electronic mail capabilities making possible electronic mail communication between the Pupil Transportation office and each garage.

### Penalties

57.   Failure by CARRIER to place appropriate vehicle numbers and/or identifying insignia on the vehicles within ten (10) days of being directed to do so by the SCHOOL DISTRICT'S Director of Pupil Transportation will result in a Two Dollar ($2.00) penalty per vehicle per school day, which is to be deducted by the SCHOOL DISTRICT from CARRIER'S monthly invoices.

58.   If, at any time, after any annual evaluation is conducted by the SCHOOL DISTRICT'S Director of Pupil Transportation, the Director determines that CARRIER'S performance is unsatisfactory, the SCHOOL DISTRICT'S Director of Pupil Transportation may modify the number of vehicles supplied by CARRIER pursuant to paragraph 3 of this Agreement.

59.   CARRIER understands and agrees that the SCHOOL DISTRICT will implement GPS monitoring of vehicles in accordance with paragraph 26 of this Agreement, and that deviation of CARRIER from the specific instructions on the appropriate route sheet, in any respect, without consent of the SCHOOL DISTRICT's Director of Pupil Transportation, will subject CARRIER to possible forfeiture of that run. CARRIER also understands and agrees that if CARRIER runs routes together that the SCHOOL DISTRICT has assigned separately, the SCHOOL DISTRICT will pay CARRIER consistent with how the routes were actually run.

60.   CARRIER agrees that if it is found to not have at least one safety vehicle and safety person for each garage, a $10.00 per vehicle per day charge will be deducted from CARRIER'S monthly bill for that garage's entire fleet.

61.   Penalties will be levied if driver or vehicle information is not up to date. For any driver or vehicle information that is not corrected immediately upon notification of non-compliance by the SCHOOL DISTRICT's Director of Pupil Transportation, a $10.00 per vehicle per day charge will be deducted from CARRIER'S monthly bill for the entire fleet for the period of non-compliance.

62.   A One Thousand Dollar ($1,000.00) per day charge will be deducted from CARRIER'S monthly bill for non-compliance with the insurance coverage provision of paragraph 19 for each day CARRIER is found to be out of compliance.

10

MONRO00191

provision of paragraph 19 for each day CARRIER is found to be out of compliance.

IN WITNESS WHEREOF, the parties hereto have affixed their hands and seals this

_3_ day of _October_, 2012.

ATTEST:                                    THE BOARD OF PUBLIC
                                           EDUCATION,
                                           THE SCHOOL
                                           DISTRICT OF PITTSBURGH, PA

_____              By: _____
Assistant Secretary                       President

                                     (Carrier) _____

Attest: _____

WITNESS:

_____              By: _____
(Title)                                   (Title)

APPROVED AS TO FORM:

_____
Solicitor

Payable from the appropriate Transportation appropriations.

Board Approved August 22, 2012

11

MONRO00192

CERTIFICATE OF COMPLIANCE WITH THE SUBSTANCE ABUSE POLICY
OF THE SCHOOL DISTRICT OF PITTSBURGH

I, _MELANIE NESBETH_ do hereby certify that I have
read and understand the Substance Abuse Policy of the School District of
Pittsburgh, and have supplied a copy of same to my employees and/or
subcontractors. I also declare that my employees and/or subcontractors and their
employees who will be performing tasks that are high risk, safety sensitive or
genuinely implicate public safety, will pass an appropriate test for substance abuse
prior to being permitted access to the School District of Pittsburgh's workplaces.

NOTARY PUBLIC

_Mildred L. Asmonga_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Mildred L. Asmonga, Notary Public
Swissvale Boro, Allegheny County
My Commission Expires Sept. 22, 2013
Member, Pennsylvania Association of Notaries

BY: _Brimar Transit Inc_
Name & Title of Contractor

Date _10-3/12_

Name of Company
**Brimar Transit Inc.**
_412-241-1870_
Telephone Number of Contractor

APPROVED BY SCHOOL DISTRICT OF PITTSBURGH COMPLIANCE
OFFICER OR CHIEF OF STAFF

_____
Compliance Officer or Chief of Staff

_____
Date

MONRO00193

No. 818.1

SECTION: OPERATIONS

TITLE: SUBSTANCE ABUSE
PROGRAM FOR
CONTRACTORS

# PITTSBURGH SCHOOL DISTRICT

ADOPTED: February 27, 2002

REVISED:

## 818.1. SUBSTANCE ABUSE PROGRAM FOR CONTRACTORS

**1. Purpose**
SC 510

The school district is committed to a policy which prohibits the use of illegal drugs and the use of alcohol at the workplace. Drug and alcohol abuse on and off the job can contribute both to incidents and to greater risk for all individuals employed on the school district's property, as well as the general public.

**2. Delegation of Responsibility**

The Director of Facilities, Purchasing Agent and the Chief Operations Officer, as well as all other appropriate administrators and departments, are hereby authorized, empowered and directed to implement this policy and to amend existing policies, specifications and future contracts so that this policy shall be a part of said documents.

**3. Guidelines**

The contractor shall certify that its employees have passed an appropriate drug test before the employees will be permitted access to the school district's workplaces (Pre-Access Testing). The contractor shall supply all employee test data to a third party administrator where it will be input into a database. Maintaining a current database provides the means to determine if the contractor's employees have had a valid negative test within twelve (12) months, thus avoiding duplicate testing. These requirements will help ensure that the school district's work sites are free from the use and adverse effects of illegal drugs.

The Pre-Access Testing Program will be entirely the obligation, responsibility and cost of the contractor. Each contractor is expected to establish, administer and enforce its own programs to ensure compliance with this section and certification requirements. The third party administrator will validate the contractor's substance abuse testing program, at the cost of the contractor; will implement and manage a random testing program; and will develop/maintain the database for the school district. Any arrangements for collection and testing are strictly between the contractor and the third party administrator. Alcohol testing shall be for cause only and shall be performed according to established federal guidelines.

Page 1 of 3

EXHIBIT B

MONRO00194

§18.1. SUBSTANCE ABUSE PROGRAM FOR CONTRACTORS - Pg. 2

The contractor's program shall also include testing for cause. Testing for cause shall include testing under any of the following circumstances:

1. Observed behavior, by a supervisor and/or the school district, indicating that the contractor's employee may be under the influence of drugs or alcohol.

2. Involvement in, or cause of, an incident or an accident, which causes or could have caused injury to the employee or another individual, or which causes or could have caused destruction or damage to the school district's property.

The contractor's program shall comply with the following:

1. For drug testing, the Department of Health and Human Services Mandatory Guidelines for Federal Workplace Drug Testing Program, 53 Federal Register 11970, April 11, 1988, (and any amendments thereto). A 10-panel test is the minimum test level required.

2. For alcohol testing, National Highway Traffic Safety Administration, Model Specifications and Evidential Breath Testing Devices, 49 Federal Register 48855, dated December 14, 1984, (and any amendments thereto). In addition, for purposes of this agreement, the cut off level for alcohol shall be 0.04%.

Random testing participants are selected by Social Security number from the total program participation. Selection is made by a computer using a number generating software program. Twenty-five percent (25%) of the total program participation is randomly tested annually. A participant may be tested more than once.

The cost for Pre-Access Testing, for cause and random testing shall be the contractor's responsibility.

The contractor shall be responsible for the removal of any contractor's employee who fails to pass the drug or alcohol test.

Any employee of the contractor who refuses to submit to the test or tampers with the samples shall not be permitted to work on any of the school district's sites.

The contractor may include in its program a rehabilitation provision for its employees. In such cases, employees may return to the job site, provided that the contractor receives evidence from the employee that the employee has successfully completed treatment at an accredited facility. Such facility must be accredited through the Joint Committee on Accreditation of Health Care Organizations. Further, the contractor shall establish a follow-up testing program for any employee

MONRO00195

818.1.  SUBSTANCE ABUSE PROGRAM FOR CONTRACTORS - Pg. 3

returning to the school district's job site under this or any agreement with the school district. The follow-up testing will be performed without notice and at no cost and expense to the school district.

The contractor and the third party administrator shall maintain in strict confidence the names of its employees who fail the drug and alcohol tests.

Subject to the paragraph above, the school district may request, from time to time, and the contractor, through the third party administrator, shall provide detailed information and/or statistical reports for the school district's use in verifying the effectiveness of the contractor's program.

Subject to above, the contractor hereby grants to the school district and/or its designee the absolute right to examine and review, from time to time, any and all records related to the contractor's substance abuse program.

The contractor shall at all times indemnify, defend, protect and hold harmless the school district, its agents, officers and employees from and against any and all claims, damages, losses, costs, fines and expenses including, but not limited to, attorney's fees and investigative costs arising out of or in any way connected with the requirements of the program by any person, including the contractor's employees.

The contractor shall include the subcontractor's employees in its program or include the aforementioned requirements in its agreement with the subcontractor.

School Code
510

49 CFR
Sec. 382.305

Page 3 of 3

MONRO00196

# EXHIBIT A

PITTSBURGH PUBLIC SCHOOLS RATE SHEET 2012-2013 TO 2015-16

**2013-14 RATE INCREASE**

| | vehicle | school yr | two hours | 2.5 hours | 3 hours | 3.5 hours | 4 hours | 4.5 hours | 5 hours | All Day 5.5 hours | off peak idle time 1 hour | 1.5 hours | run time 1 hour | 1.5 hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-2 | 77-90 | 2014-15 | | | | | | | | | | | | |
| 3,4,5,6 | 30-72 | 2014-15 | | | | | | | | | | | | |
| 7,8,9 | 16-26 | 2014-15 | | | | | | | | | | | | |
| A | 9 to 9 | 2014-15 | | | | | | | | | | | | |
| B | 5 to 8 | 2014-15 | | | | | | | | | | | | |
| D | lift van 3 | 2014-15 | | | | | | | | | | | | |
| E | lift van 2 | 2014-15 | | | | | | | | | | | | |
| F | lift bus 21 | 2014-15 | | | | | | | | | | | | |
| G | Lift bus -12 | 2014-15 | | | | | | | | | | | | |
| Z | 9/CONV | 2014-15 | | | | | | | | | | | | |

**2014-15 RATE INCREASE**

| | vehicle | school yr | two hours | 2.5 hours | 3 hours | 3.5 hours | 4 hours | 4.5 hours | 5 hours | All Day 5.5 hours | off peak idle time 1 hour | 1.5 hours | run time 1 hour | 1.5 hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-2 | 77-90 | 2015-16 | | | | | | | | | | | | |
| 3,4,5,6 | 30-72 | 2015-16 | | | | | | | | | | | | |
| 7,8,9 | 16-26 | 2015-16 | | | | | | | | | | | | |
| A | 9 to 9 | 2015-16 | | | | | | | | | | | | |
| B | 5 to 8 | 2015-16 | | | | | | | | | | | | |
| D | lift van 3 | 2015-16 | | | | | | | | | | | | |
| E | lift van 2 | 2015-16 | | | | | | | | | | | | |
| F | lift bus 21 | 2015-16 | | | | | | | | | | | | |
| G | Lift bus -12 | 2015-16 | | | | | | | | | | | | |
| Z | 9/CONV | 2015-16 | | | | | | | | | | | | |

PAGE 2 OF 2

MONRO00197

# EXHIBIT A

PITTSBURGH PUBLIC SHOOLS RATE SHEET 2012-2013 TO 2015-16

## Table 1

| code | vehicle | NO INCREASE school yr | two hours | 2.5 hours | 3 hours | 3.5 hours | 4 hours | 4.6 hours | 5 hours | All Day 5.5 hours | off peak idle time 1 hour | idle time 1.5 hours | run time 1 hour | run time 1.5 hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-2 | 77-90 | 2012-13 | $259.58 | $267.77 | $275.96 | $286.04 | $295.50 | $305.57 | $315.03 | $324.47 | $21.59 | $32.39 | $44.14 | $66.21 |
| 3,4,5,6 | 30-72 | 2012-13 | $209.32 | $223.31 | $235.40 | $243.67 | $251.30 | $260.84 | $270.39 | $280.58 | $21.59 | $32.39 | $42.93 | $64.40 |
| 7,8,9 | 16-26 | 2012-13 | $164.99 | $176.78 | $190.53 | $204.28 | $218.69 | $229.82 | $240.95 | $252.08 | $21.59 | $32.39 | $33.26 | $49.89 |
| A | 9 to 9 | 2012-13 | $146.58 | $153.06 | $160.31 | $166.69 | $173.17 | $181.60 | $190.03 | $197.81 | $21.59 | $32.39 | $31.45 | $47.17 |
| B | 5 to 8 | 2012-13 | $132.34 | $139.40 | $145.17 | $150.96 | $157.38 | $164.45 | $172.16 | $179.87 | $21.59 | $32.39 | $33.26 | $49.89 |
| D | lift van 3 | 2012-13 | $182.34 | $214.03 | $228.95 | $252.24 | $255.54 | $265.26 | $274.35 | $284.07 | $21.59 | $32.39 | $44.14 | $66.21 |
| E | lift van 2 | 2012-13 | $199.76 | $214.03 | $228.95 | $252.24 | $255.54 | $265.26 | $274.47 | $284.07 | $21.59 | $32.39 | $42.93 | $64.40 |
| F | lift bus -12 | 2012-13 | $199.76 | $259.58 | $275.96 | $286.04 | $295.50 | $305.57 | $315.02 | $280.58 | $21.59 | $32.39 | $32.39 | $49.89 |
| G | Lift bus -12 | 2012-13 | $259.58 | $267.77 | $235.40 | $243.67 | $251.30 | $260.84 | $270.39 | $280.58 | $21.59 | $32.39 | $42.93 | $64.40 |
| Z | 9/CONV | 2012-13 | $154.20 | $165.99 | $179.74 | $193.48 | $207.89 | $219.02 | $230.15 | $241.28 | $21.59 | $32.39 | $31.45 | $47.17 |

## Table 2

| code | vehicle | NO INCREASE school yr | two hours | 2.5 hours | 3 hours | 3.5 hours | 4 hours | 4.5 hours | 5 hours | All Day 5.5 hours | off peak idle time 1 hour | idle time 1.5 hours | run time 1 hour | run time 1.5 hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-2 | 77-90 | 2013-14 | $259.68 | $267.77 | $275.96 | $286.04 | $295.50 | $305.57 | $315.03 | $324.47 | $21.59 | $32.39 | $44.14 | $66.21 |
| 3,4,5,6 | 30-72 | 2013-14 | $209.32 | $223.31 | $235.40 | $243.67 | $251.30 | $260.84 | $270.39 | $280.58 | $21.59 | $32.39 | $42.93 | $64.40 |
| 7,8,9 | 16-26 | 2013-14 | $164.99 | $176.78 | $190.53 | $204.28 | $218.69 | $229.82 | $240.95 | $252.08 | $21.59 | $32.39 | $33.26 | $49.89 |
| A | 9 to 9 | 2013-14 | $146.58 | $153.06 | $160.31 | $166.69 | $173.17 | $181.60 | $190.03 | $197.81 | $21.59 | $32.39 | $31.45 | $47.17 |
| B | 5 to 8 | 2013-14 | $132.34 | $139.40 | $145.17 | $150.96 | $157.38 | $164.45 | $172.16 | $179.87 | $21.59 | $32.39 | $33.26 | $49.89 |
| D | lift van 3 | 2013-14 | $199.76 | $214.03 | $228.95 | $252.24 | $255.54 | $265.26 | $274.35 | $284.07 | $21.59 | $32.39 | $44.14 | $66.21 |
| E | lift van 2 | 2013-14 | $199.76 | $214.03 | $228.95 | $252.24 | $255.54 | $265.26 | $274.35 | $284.07 | $21.59 | $32.39 | $42.93 | $64.40 |
| F | lift bus -12 | 2013-14 | $259.58 | $267.77 | $275.96 | $286.04 | $295.50 | $305.57 | $315.02 | $324.47 | $21.59 | $32.39 | $31.45 | $47.17 |
| G | Lth bus -12 | 2013-14 | $209.32 | $223.31 | $235.40 | $243.67 | $251.30 | $260.84 | $270.39 | $280.58 | $21.59 | $32.39 | | |
| Z | 9/CONV | 2013-14 | $154.20 | $165.99 | $179.74 | $193.48 | $207.89 | $219.02 | $230.15 | $241.28 | $21.59 | $32.39 | $31.45 | $47.17 |

MONRO00198

# REVISIONS TO 2012/13-2015/16 TRANSPORTATION AGREEMENT

3

Initial here

X _MH_

4. It is understood between the parties to this Agreement that the number and type of vehicles offered by CARRIER for each of the ~~five~~ (four) respective school years (2012/13 – 2015/16) which are listed on Exhibit "A", represent only the maximum number of vehicles the SCHOOL DISTRICT may utilize hereunder. The SCHOOL DISTRICT reserves the right to utilize up to the maximum number of vehicles listed on Exhibit "A", to utilize any lesser number of vehicles, or, in fact, to utilize no vehicles at any time during the term of this Agreement. The decision as to the number of CARRIER'S vehicles that will be utilized by the SCHOOL DISTRICT at any given time during the term of this Agreement will be made by the SCHOOL DISTRICT'S Director of Pupil Transportation and the Pupil Transportation Director's decision to modify the number of vehicles supplied by CARRIER is final, and any such decision can be made for any reason whatsoever.

13

Initial here

X _MH_

14. CARRIER agrees that the age of any and all vehicles made available to the SCHOOL DISTRICT shall not exceed twelve (12) model years at the beginning of school years 2012/13, 2013/14, and 2014/15, except such vehicles that are equipped with diesel particulate filters (DPFs) and closed crankcase ventilation systems (CCVs), which shall not exceed fourteen (14) model years in age. CARRIER agrees that at the beginning of school years 2015/16, the age of any and all vehicles made available to SCHOOL DISTRICT shall not exceed eleven (11) model years, except for such vehicles that are equipped with diesel particulate filters (DPFs) and closed crankcase ventilation (CCVs), which shall not exceed thirteen (13) model years in age.

~~CARRIER agrees that at the beginning of school years 2014/15 and 2015/16, the age of any and all vehicles made available to SCHOOL DISTRICT shall not exceed ten (10) model years, except for such vehicles that are equipped with diesel particulate filters (DPFs) and closed crankcase ventilation (CCVs), which shall not exceed twelve (12) model years in age.~~



Initial here

X _MH_

28. CARRIER agrees to submit on company letterhead an alphabetical list of each of its drivers, with hire dates, no later than August 15th of each year. The following information on each driver should also be submitted by August 15th of each year and updated annually: A copy of the annual physical examination, a copy of the Commercial Driver's License and/or Pennsylvania Driver's License, a copy of the Pennsylvania Department of Transportation certificate of completion card, a copy of the Pennsylvania Act ~~151~~ (34) Criminal History, a copy of the Pennsylvania Child Abuse Act ~~34~~ (151) clearance, and a copy of the MVR. CARRIER will run an FBI fingerprint check for each new hire driving for the SCHOOL DISTRICT and provide a copy of the FBI check with the above listed items annually. CARRIER further agrees that ALL drivers for the SCHOOL DISTRICT must have Criminal History Act ~~34~~ (151) clearance, even if the driver was previously exempt from the requirement.

MONRO001

**REVISIONS TO 2012/13-2015/16 TRANSPORTATION AGREEMENT**

43. Should the self-service retail price of diesel fuel and gasoline in Allegheny County exceed Two and 75.25/100 Dollars ($2.75) $2.25 per gallon according to the most recent West Penn AAA Fuel Gauge Report, the SCHOOL DISTRICT agrees to pay CARRIER an additional sum per vehicle (not under PUC Rates), of One Dollar ($1.00) per day of operation beginning with the next full calendar month, and an additional One Dollar ($1.00) per day of operation for each additional ten cent ($0.10) increase in the self-service retail price of diesel fuel and gasoline.  If the self-service retail price of diesel fuel and gasoline in Allegheny County, according to the most recent AAA Fuel Gauge Report, includes taxes which CARRIER is not required to pay, CARRIER agrees that, for the purposes of determining what additional compensation, if any, should be paid under this paragraph, the self-service retail price of diesel fuel or gasoline will be reduced by an amount equal to the taxes which CARRIER is not required to pay.

Should the self-service retail price of diesel fuel and gasoline in Allegheny County fall below One and 75.25/100 Dollars ($1.75) $1.25 per gallon according to the most recent West Penn AAA Fuel Gauge Report, the SCHOOL DISTRICT will deduct the sum of One Dollar ($1.00) per vehicle (not under PUC Rates) per day of operation, which would otherwise be payable under this Agreement to CARRIER, beginning with the next full calendar month, and the SCHOOL DISTRICT will further deduct an additional One Dollar ($1.00) per day of operation per vehicle for each additional ten cent ($0.10) decrease in the self-service retail price of diesel fuel and gasoline.

Signature _____

Date _December 4 - 2012_____

**To clarify how the ECI Educational Cost Index will be applied to the contract:**

**Each September the state releases an ECI rate. For the district of Pittsburgh the rate has been approximately 2% over the past two years.**

## Example:   The September 2013 rate will impact the 2014/15 school year.   The September rate of 2014 will impact the 2015/16 school year

Initial here
x N.W

MONRO00200

# Pennsylvania
# School Bus Driver's Manual



**pennsylvania**
DEPARTMENT OF TRANSPORTATION

# FOREWORD

The Highway Safety Program of the National Highway Traffic Safety Administration, under the U.S. Department of Transportation's Federal Standard 17, requires each state to develop plans to reduce, as much as possible, the danger of death or injury to school children while being transported to and from school. This manual and the associated training course are Pennsylvania's response to this standard. This manual is intended as a means for certified instructors to deliver training courses effectively and uniformly to school bus drivers throughout Pennsylvania.

The course contained in this manual emphasizes fundamental concepts of school bus operation for the new driver and recertification (experienced) levels. This manual provides a basic foundation for new instructors, but also provides sufficient flexibility for enhancement and adaptation by the more knowledgeable and experienced instructors.

Organizations or individuals interested in pupil transportation and safety may freely use the contents of this manual in whole or in part, provided the material used is properly cited.

# THIS PUBLICATION IS NOT FOR SALE

# ACKNOWLEDGEMENTS

The revision of this manual benefited from the help of many individuals. PennDOT's Bureau of Driver Licensing staff Scott Shenk, Chris Miller, and Laura Krol directed the project's technical aspects and served as lead reviewers. Additional support at PennDOT was provided by Troy Roadcap in the Bureau of Driver Licensing and Jacquie Turk in the Bureau of Highway Safety and Traffic Engineering. Rebecca Lorah and Matthew Hedge of PennDOT's Bureau of Planning and Research managed the contractual aspects of the project, and kept the project on schedule and on budget.

The project was completed by Pennoni Associates in conjunction with Rod Sams Consulting and Vance and Renz, LLC. Mark Hood P.E., Steve Thompson, and Rod Sams served as primary authors and were supported by Larry Bankert P.E. and Rosalind Murray. Robert Vance Ph.D. and Michael Renz led the crash data analysis efforts.

The Task Force, listed below, was responsible for the many changes in content and the reorganization of the material in this latest revision of the Pennsylvania School Bus Driver's Manual.

Burt Blackburn
Director of Transportation
Radnor Township School District
Radnor, Pa.

Maggie Broerman
Director of Safety and Training, Central Region
Student Transportation of America, Inc.
Carnegie, Pa.

George "Rick" Comer
Safety and Training Manager
Customer Service Center Manager
Durham School Services
York, Pa.

Scott Downey
Transportation Coordinator
Lower Dauphin School District
Hummelstown, Pa.

Jane Gerhold
Operations Manager
Rohrer Bus Service
Duncannon, Pa.

Wayne Johnston
Director of Transportation
School District of Springfield Township
Oreland, Pa.

David Lutz
Director of Transportation
Coalico School District
Denver, Pa.

Selina Pittenger
Executive Director
Pennsylvania School Bus Association (PSBA)
Camp Hill, Pa.

Craig Poles
Coordinator of Driver Training and Certification
School District of Philadelphia
Philadelphia, Pa.

Dave Schlotter
Director of Safety and Operations
Brightbill Transportation, Inc.
Lebanon, Pa.

Gail Wolfel
Supervisor of Transportation Services
Unionville-Chadds Ford School District
Kennett Square, Pa.

David Yarian
Director of Transportation
Derry Township School District
Hershey, Pa.

Special thanks go to the following individuals for their outside review and comment on specific units or input into various legal or enforcement issues:

Barbara Schaefer, Ph.D., College of Education, Pennsylvania State University (Units B and D)

Shirley Woika, Ph.D., College of Education, Pennsylvania State University (Unit D)

Kristie Kaufman, M.D., Center Medical and Surgical Associates – Pediatrics (Unit I)

Brian Newcomb, M.D., Mt. Nittany Medical Center – Emergency Medicine (Unit I)

Edward Miller, Lower Moreland Police Department, Montgomery County

John Collins, Upper Merion Police Department, Montgomery County

Kathy Strotmeyer, Pennsylvania Chapter, American Academy of Pediatrics

# TABLE OF CONTENTS

**UNIT A**
**THE SCHOOL BUS DRIVER:  ROLE, RESPONSIBILITIES, AND REQUIREMENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-2
YOUR ROLE AND RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3
WHAT DO I NEED TO DO TO BECOME A SCHOOL BUS
DRIVER IN PENNSYLVANIA? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-7

**UNIT B**
**STUDENT MANAGEMENT AND DISCIPLINE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-2
SCHOOL BUS DRIVER RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-2
STUDENT RESPONSIBILTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-4
DRIVER-STUDENT INTERACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-5
CHARACTERISTICS OF STUDENT BEHAVIOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-9
GUIDELINES FOR CONTROLLING STUDENT BEHAVIOR . . . . . . . . . . . . . . . . . . . . . . . . . . .B-11
ASSERTIVE DISCIPLINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-13
GANG AWARENESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-15
BULLYING AND HARASSMENT ON THE SCHOOL BUS . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-16

**UNIT C**
**STUDENT LOADING AND UNLOADING**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-2
THE LOADING/UNLOADING AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-3
LOADING PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-4
UNLOADING PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-6
UNIQUE DANGERS OF LOADING AND UNLOADING ZONES . . . . . . . . . . . . . . . . . . . . . . . .C-8
ENFORCING THE SCHOOL BUS STOPPING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-8

**UNIT D**
**TRANSPORTATION OF STUDENTS WITH DISABILITES**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-2
DRIVER RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-3
CONFIDENTIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-3
GUIDELINES FOR MANAGING STUDENTS WITH DISABILITIES . . . . . . . . . . . . . . . . . . . . . . .D-4
TYPES OF DISABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-6
TRANSPORTING STUDENTS WITH DISABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-13

**UNIT E**
**PREVENTIVE MAINTENANCE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .E-2
PRE-TRIP INSPECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .E-2
PREVENTIVE MAINTENANCE WHILE ON THE ROAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .E-17
POST-TRIP PREVENTIVE MAINTENANCE PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . .E-22

**UNIT F**
**SAFE DRIVING**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-3
THE DRIVING TASK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-5
DRIVER CONDITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-7
VEHICLE CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-17
ENVIRONMENTAL AND ROADWAY CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-17
CONTROLLING SPEED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-30
STOPPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-31

**UNIT G**
**FUNDAMENTALS OF DRIVING A SCHOOL BUS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-2
PREPARING TO DRIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-2
KNOW YOUR ROUTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-4
FIELD TRIP / ATHLETIC TRIP CONCERNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-5
STARTING AND OPERATING A DIESEL VEHICLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-6
STEERING AND TURNING YOUR BUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-7
BACKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-10
MAKING A TURN-AROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-12
STOPPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-13
CHECKING OVERHEAD CLEARANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-15
APPROACHING RAILROAD CROSSINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-16

**UNIT H**
**CRASH AND EMERGENCY PROCEDURES**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-3
EMERGENCY DRIVING TECHNIQUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-3
EMERGENCY PROCEDURES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-10
EVACUATING THE BUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-14
EMERGENCY EQUIPMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-19
SCHOOL BUS SECURITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-22
HOSTAGE AWARENESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-24

**UNIT I**
**STUDENT EMERGENCIES**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-2
MEDICAL LIABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-3
FIRST AID PROCEDURES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-4
REPORT ALL INCIDENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-13
FIRST AID EQUIPMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14

# UNIT A - THE SCHOOL BUS DRIVER:
# ROLE RESPONSIBILITIES AND REQUIREMENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-2

YOUR ROLE AND RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3
   Your Role as a Driver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3
      Attitude . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3
      You Are Important . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3
      You Are Responsible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3
      You Are a Member of the Safety Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3
   Your Responsibilities as a Driver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-4
      Your Driving Technique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-4
      Your Passengers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-4
      Public Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-5
      Appropriate Dress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-5
      Your Supervisor and Fellow Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-6
      The Transportation Director/Your Supervisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-6

WHAT DO I NEED TO DO TO BECOME A SCHOOL BUS DRIVER IN PENNSYLVANIA? . . . . . . . . . . . .A-7
   Initial Requirements - First Step . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-7
   Knowledge Test Authorization and School Bus Learner's Permit - Second Step . . . . . . . . . . . . . . . . . .A-8
   Training and Skills Testing Requirements - Third Step . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-8
      The School Bus Driver Training Course . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-8
   Health and Safety Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-10
      Drug and Alcohol Testing for School Bus Drivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-11
      Positive Test or Refusing to Take a Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-11
   Driver Recertification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-12
   Completion of Report Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-13
   Annual Physical Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-13
   Change of Information on License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-13
   Documents Carried While Operating a School Bus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-14
   Comprehensive Resource . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-14

# UNIT A - THE SCHOOL BUS DRIVER:
# ROLE RESPONSIBILITIES AND REQUIREMENTS

## INTRODUCTION

Transporting students to and from school is a necessary part of a sound education program. For a safe, efficient, and economical transportation program, competent school bus drivers and standard bus operation are necessary. At present, there are approximately 30,000 school buses in operation within the Commonwealth of Pennsylvania and about 40,000 licensed school bus drivers. For detailed Pennsylvania school bus statistics, visit the Driver and Vehicle Statistics link under the News, Facts and Stats Information Center of PennDOT's Driver and Vehicle Services website, www.dmv.pa.gov

Before you get behind the wheel of a school bus, you need to understand your role as a bus driver and your responsibilities to your passengers, your school system, your community and your fellow workers. These topics are covered in the first part of this Unit. The second part describes the requirements for certified school bus drivers in Pennsylvania.

If you are a new school bus driver in PA, you will receive a minimum of 14 hours of classroom training and six hours of one-on-one in-bus instruction. If you are recertifying to maintain your license, you will receive a minimum of seven hours of classroom training and three hours of one-on-one in-bus instruction.

**If you are not given the minimum number of training hours, do not sign the Training Report Form (DL-714). You may contact PennDOT's Special Driver Programs Unit at (717) 787-6453 or ra-pdschoolbushelp@state.pa.us, if you have any concerns associated with your school bus driver training.**

Your employer may also provide you with additional training on the policies and procedures of the school district in which you will be working. Some of what you learn in this training might need to be adjusted to comply with your company's policies. For instance, in classroom training you might be instructed to notify a mechanic if you discover something wrong with your bus during a pre-trip inspection. Your company might require that mechanical complaints be reported to the dispatcher who notifies the mechanic. You should follow local policies and procedures as long as they don't violate state laws or regulations. Bring those to your employer's attention.

# YOUR ROLE AND RESPONSIBILITIES

The school bus driver plays an important role in the educational system. The role includes a number of responsibilities the driver must willingly accept.

## YOUR ROLE AS A DRIVER

Learning to operate a vehicle the size of a school bus is a difficult task involving knowledge of laws, regulations, visual and mechanical skills, judgments, decisions, and accurate responses. Your performance as a school bus operator is dependent on developing skills, acquiring necessary knowledge and maintaining a positive attitude.

### Attitude

Learn how to keep a positive attitude and recognize your moods. If you are angry, do you drive more aggressively? Do you still greet the students with a smile? Your mood not only affects your driving, but those around you. Keep a positive attitude. You must be mentally prepared to make allowances for the poor attitude and driving of other motorists, and not allow the actions of other motorists to cause you to react emotionally and involve you in a crash.

School bus drivers must be mentally alert at all times. They must keep their concentration on what they are doing.

### You Are Important

You, the professional school bus driver, are a very important person with a responsible part to play in the educational system. In many instances, you are the first representative of the school system to meet the children in the morning and the last to see them at night. You are in a position to have a large influence on a child's attitude toward school.

### You Are Responsible

Your position as a school bus driver is to safely transport students from one place to another.

You are responsible for how you drive and for how you feel about your students, coworkers, and position. You need to have a positive attitude, if you want to be a safe and successful school bus operator who enjoys your work.

You should like working with and being with students. If you don't, you will find it hard to keep a positive attitude about your position as a school bus operator.

### You Are a Member of the Safety Team

Safety starts with you.  Perhaps no other area of educational operations demands more responsibility for student welfare than the transportation of students in buses on public highways, streets and roads. The driver is a very important member of the safety team, which includes students, parents, teachers, school administrators, and law enforcement officials. As a key member of this team, you must constantly strive to improve operational safety and efficiency.

# YOUR RESPONSIBILITES AS A DRIVER

As a professional driver, you are expected to meet high standards of conduct. A school bus driver is more than a professional driver and is expected to meet standards of conduct higher than those of other professional drivers. Always conduct yourself in such a manner that your actions on and off duty will not be open to criticism. You are a role model for the students and a representative of the school district and your employer.

Student passengers and their parents place a great deal of confidence in you. You should act deserving of this confidence, including being:

- A dependable person who can be relied upon to carry out your duties;
- Emotionally stable to work effectively and patiently with students, parents, school officials, and the public;
- Mature enough to cope with unexpected and unusual situations;
- Interested in the welfare and needs of others;
- Willing to practice patience and understanding;
- Observant of all traffic laws, Pennsylvania Department of Transportation (PennDOT) regulations, and local rules, regulations and policies, which includes conducting at least a minimum of two emergency evacuation drills on your bus every school year;
- Neat and clean, as a symbol of the entire school system;
- Careful to refrain from using profanity;
- Well rested, so you are free from fatigue, and;
- Free from the effects of alcohol and drugs, including prescription and over-the-counter medication.

**A school bus driver also has the following specific responsibilities:**

**Your Driving Technique**

When you transport a bus load of children to school every day in a wide variety of highway and weather conditions, you are charged with a serious responsibility. The vital links to safety – proper driver attitude, knowledge and skills – are developed through your interest in safe driving. Your ability to cope with a constantly changing driving environment demands both pre-employment preparation and continual in-service activity. You must constantly reevaluate your driving technique. It is important that you honestly evaluate yourself to ensure you are physically and mentally prepared for driving your bus.

A safe and defensive school bus driver must exercise self-control, alertness, foresight, judgment, and skills in handling and maintaining control of the bus at all times. A good attitude about safe driving and safety procedures is the best guarantee of the safest trip possible.

**Your Passengers**

Try to establish a positive relationship with your passengers. Their conduct will depend a great deal on what you say and do. Greet your students in a personable and friendly manner whenever they board your bus, and if possible, learn their names. Your expression of interest in each child will help you to gain the confidence of your riders. Remember, an essential part of your job is to maintain discipline according to procedures established by your local school system. Since students desire recognition of their good traits and abilities, compliment good conduct, habits, and deeds.

If you explain existing rules at the beginning of the school year, you will usually have the cooperation of students. If students know drivers are fair and have their safety in mind, they usually accept the rules. Drivers should recognize each student's individuality. Drivers cannot maintain discipline and respect if they are too harsh or too lenient. Drivers who handle problems fairly and according to the rules get the respect of students, parents and administrators.

Under ordinary loading and unloading circumstances, communication between driver and passengers should be encouraged. You should help your passengers understand and follow what is considered normal and proper behavior on the school bus. Maintain a professional, yet friendly, relationship with all students. Refer to Unit B for additional information on Student Management and Discipline and to Unit C for additional information on Student Loading and Unloading.

**Public Relations**
Public relations are directly related to the opinion people have of drivers and the school system. This opinion is formed by the way you, a school bus driver, complete your daily responsibilities. Careful, courteous drivers make good impressions; careless, thoughtless drivers create harmful impressions. For example, the school bus driver who weaves in and out of traffic attracts unfavorable attention and more negative comment than one who observes proper lane usage. One discourteous, irresponsible act reflects poorly on all members of the student transportation team and, more significantly, can create a safety problem.

In many school districts, the school bus driver is the only contact parents have with school personnel other than teachers. Good or bad impressions of the school can be conveyed by the driver's attitude toward students and their parents. You will encounter students and parents with a wide range of attitudes toward you and the school system. You should strive to be flexible and treat everyone in a courteous and professional manner. Your reputation in the community, your courteous treatment of children and their parents, and your willingness to better prepare yourself for your position will help parents and children to have confidence in you.

You should consider all law enforcement officers in the community, as well as crossing guards and school patrols as part of the safety team. Their job, as well as yours, is to ensure safety on the highways you travel. You should strive to develop good working relations with them – their authority and experience may be invaluable to you.

Building desirable public relations is a continuous process and depends on the attitude you bring to work each day. You can add to your system's reputation by showing pride in your work. This sustains a good public opinion.

Good relations within your organization are essential. Public relations begins with fellow employees. An organization whose members have mutual friendliness, interest and respect meets a major requirement of good public relations.

**Appropriate Dress**
The way you dress and look affects many parts of your job.  As a school bus driver, it is necessary to identify oneself as an adult, not a student. In order to accomplish this, the driver must dress in a manner designed to instill a degree of respect. If one dresses in a careless way, the driver cannot expect to receive the appropriate level of respect from the students on the bus needed to maintain good discipline.

Types of shoes should comply with school district safety recommendations. This typically eliminates wearing open-toed shoes, sandals, clogs, wooden-soled shoes of any type, or heels of more than two-inch height. The best driving shoe is one that has a flat sole, covers the entire foot and fastens securely. The type of shoe you wear could affect your ability to perform in a safe manner during an emergency situation.

**Your Supervisor and Fellow Employees**

Someone in your school district or company is assigned the responsibility of supervising you as an employee. The person is another member of the safety team and is vitally interested in the safety of your riders. Cooperation with your supervisor and fellow employees is essential to transportation safety.

The following are ways you can cooperate with them:

- Understand and support your written school policy;

- Communicate often with your immediate supervisor and accept his/her authority;

- Willingly accept your responsibilities and assignments;

- Don't repeat personal or confidential information;

- Always inform your supervisor of discipline problems, bus conditions, highway conditions, and changing pick-up/discharge conditions;

- Submit required forms and reports on time;

- Report any and all crashes or incidents, whether or not damage is apparent, including crashes with property, pedestrians, vehicles, animals, and passengers. Also report those crashes near, but not involving, your bus;

- Be helpful, assisting others in pre-trip inspections, and in school bus loading and unloading zones;

- Comply with your school district regulations regarding the number of chaperons that accompany students on various school activities;

- Never change a bus stop or route without permission from your supervisor;

- Maintain a positive attitude; and

- Help out with conditions such as routine overload, route adjustments, equipment repair, loading stop adjustments, and other areas of student safety.


**The Transportation Director/Your Supervisor**

You should consider your transportation director or supervisor as your adviser and partner in working with students on your bus, especially when working through discipline problems. The transportation director/supervisor should be informed of any significant problems that arise. In many larger schools, the day-to-day responsibilities of the transportation director are delegated to a transportation area coordinator or other supervisor.

The transportation director/supervisor is often responsible for:

1. Assigning drivers to buses;

2. Establishing bus routes, stops and turn-around locations;

3. Assigning passengers to buses;

4. Ensuring buses are in safe operating condition; and

5. Appointing monitors/aides as needed.

# WHAT DO I NEED TO DO TO BECOME
# A SCHOOL BUS DRIVER IN PENNSYLVANIA?

According to federal standards, each state must have regulations to ensure all school bus drivers are in good physical condition, of good character and skilled in the operation of their vehicles. They should have strong morals, an even temperament, the ability to adjust to the varying conditions of their job, and a positive attitude toward safety. To become a certified school bus driver in Pennsylvania, a person must meet several initial requirements and then successfully complete the training and testing requirements established by PennDOT.

## INITIAL REQUIREMENTS – FIRST STEP

To become a certified school bus driver in Pennsylvania, you must first obtain an appropriate Commercial Driver's License (CDL) Knowledge Test Authorization/Learner's Permit. To apply for a CDL Knowledge Test Authorization/Learner's Permit:

- You must be eighteen (18) years of age or older.

- You must obtain a Commonwealth of Pennsylvania School Bus Driver's Physical Examination Form (DL-704), which is to be completed by either your health care provider or a physician appointed by the local school board. You must obtain this form from your employer. When completed, make sure your employer gets a copy for your personnel file. If you satisfactorily pass the physical examination, the examining health care provider will issue a Physical Examination Certificate (DL-742). You need to keep the DL-742. It is a credential that must be carried when driving a school bus. The Physical Examination Certificate is valid for one (1) year.

- You must self-certify the type of driving in which you expect to engage using a DL-11CD. Drivers engaged in "Non-excepted" transportation are also required to submit a valid Medical Examiner's Certificate to maintain licensure.

  - Driving types are

    - NI - Non-Excepted Interstate Transportation: Interstate drivers who are subject to the Federal Physical Qualifications and Examination regulations. A Medical Examiner's Certificate must accompany this form.

    - NA - Non-Excepted Intrastate Transportation: Intrastate drivers who are subject to the Federal Physical Qualifications and Examination regulations. A Medical Examiner's Certificate must accompany this form.

    - EI - Excepted Interstate Transportation: Interstate drivers who are not subject to the Federal Physical Qualifications and Examination regulations. Therefore, a Medical Examiner's Certificate is not required.

    - EA - Excepted Intrastate Transportation: Intrastate drivers who are not subject to the Federal Physical Qualifications and Examination regulations. Therefore, a Medical Examiner's Certificate is not required.

Additional information, including examples, is available in the Commercial Driver Information Center on our website at www.dmv.pa.gov.

- You must also complete the Commercial Learner's Permit Application (DL-31CD) and submit it along with the DL-704 with a check or money order payable to "PennDOT," for any applicable fee required with this form. The cost is prorated and can be calculated on the form. Note that the DL-31CD and DL-11CD are available on PennDOT's Driver and Vehicle Services website, www.dmv.pa.gov under Forms and Publications.

- Remember to submit the DL-704, DL-11CD and Medical Examiner's Certificate if applicable, and DL-31CD together with the fee.

Once these forms are completed and submitted, a Knowledge Test Authorization (KTA) and School Bus Learner's Permit can be obtained either through mail or same-day service available at PennDOT's Riverfront Office Center, Driver/Vehicle Customer Service in Harrisburg, or a Driver License Center. If the forms listed above and the fee are forwarded through the mail, the KTA and School Bus Learner's Permit will be returned in approximately 14 days from receipt of the documents.

Also visit PennDOT's Driver and Vehicle Services website for online driver and vehicle services.

## KNOWLEDGE TEST AUTHORIZATION (KTA) AND
## SCHOOL BUS LEARNER'S PERMIT - SECOND STEP

Upon receipt of these forms, PennDOT reviews your documents for correctness, license suspension and determination of medical competency. To see if you meet the physical requirements of the School Bus Driver Regulations (Title 67, Chapter 71 of the Pennsylvania Code), visit www.pacode.com.

A CDL Knowledge Test Authorization and School Bus Learner's Permit are issued.

If you do not meet the physical qualifications required of school bus drivers, your application will be denied.

The School Bus Learner's Permit is the only document that allows you to operate a school bus. **You may not use the KTA for driving purposes.**

The KTA and School Bus Learner's Permit are valid for one (1) year. During this one-year period, you will be required to complete all knowledge and skills testing. The knowledge examination will consist of:

- Vision Test;
- Knowledge Tests, including, but not limited to general knowledge, Passenger Endorsement (P), School Bus Endorsement (S), and if you are going to operate a bus with air brakes, removal of the air brake restriction, if applicable. If you already have a CDL, you may just be pursuing the "P" and "S" endorsements.


## TRAINING AND SKILLS TESTING REQUIREMENTS – THIRD STEP

Pennsylvania law requires certain commercial learner's permit holders to wait at least 15 days before taking the examination to upgrade their driving privilege. You will need to check the bottom of your learner's permit for your driver test eligibility date. This date identifies the earliest date you are eligible to take your driving test. Keep in mind that you MUST pass all applicable knowledge tests before taking your skills test.

**The School Bus Driver Training Course**
The Pennsylvania school bus driver training course is administered by local school districts, contractors or Intermediate Units (IU) under the supervision of PennDOT and is outlined in Section 71.5 of Title 67. This course is available to all public, private and parochial school bus driver applicants.

**To obtain a Pennsylvania School Bus endorsement (S), you must complete a minimum of 20 hours of instruction including at least 14 hours of classroom instruction and six (6) hours of one-on-one vehicle familiarity and driving instruction (in-bus training). ALL training must be completed by  a certified school bus driver instructor. Also note that the in-bus portion of the training must be one-on-one training with a certified instructor.**

This requirement (commonly known as the New Driver Training Course) can be completed in two ways:

- Complete the full 20 hours of instruction before attempting to pass the skills examination administered by PennDOT or a state-certified Third Party Tester. This method is recommended by PennDOT.

- Complete 10 hours of instruction (seven [7] hours of classroom training and three [3] hours of one-on-one in-bus training) and attempt to pass the skills examination administered by PennDOT or a state-certified Third Party Tester. If successful, you have 120 days from the date the endorsement card is issued to complete the remaining 10 hours of instruction (seven [7] additional hours of classroom training and three [3] additional hours of one-on-one in-bus training). Note: check with your employer as to which completion method they require; some specifically prohibit the 'splitting' of training.

After completing the full 20 hours of instruction or the first 10 hours of instruction, you are issued a Certificate of Completion Card (DL-713). You will need to keep this card as it is required to test. State law (Title 75, Section 1607) requires that a person hold the learner's permit to add or upgrade the commercial class for 15 days before they are eligible to take the skills test administered by PennDOT or a state-certified Third Party Tester, so check the bottom of your learner's permit for your driver test eligibility date.

Your permit is valid for one (1) year, so your skills examination must be completed within 12 months from the date on your permit issuance. Also keep in mind that your New Driver Training is also only valid for one (1) year.  If you do not pass your skills examination within one (1) year of the completion of the training, you must complete the training again.

When taking the skills examination, bring the following documents to the test site:

- A valid driver's license (if you are a licensed driver);
- A valid Pennsylvania CDL learner's permit;
- A valid Physical Examination Certificate (DL-742);
- A valid Certificate of Completion Card (DL-713);
- The current vehicle registration card for the bus being driven;
- A valid insurance card or proof of financial responsibility for the bus being driven; and
- A valid CDL of the person accompanying you that covers the class of license, endorsements (e.g., 'P'), and commercial restrictions for which you are being tested.

You must be accompanied by a commercial driver who is at least 21 years of age and has all proper applicable endorsements to legally drive the bus to the testing point and back in case you fail the driving examination. All applicable knowledge tests must be successfully completed before taking the skills test regardless of your eligibility date.

The skills examination will be administered in three parts. Refer to Pennsylvania's CDL Manual (Publication 223). The CDL Manual is available under Forms and Publications of PennDOT's Driver and Vehicle Services website, www.dmv.pa.gov.

http://www.dot.state.pa.us/Public/DVSPubsForms/BDL/BDL%20Manuals/Manuals/Commercial%20Drivers%20Manual/Comm%20Manual%20English/PUB%20223.pdf

- The safety inspection shall be the first part of the skills examination. Inability to correctly perform the air brake check will result in automatic failure of this portion, if applicable.
- The basic skills test is the second part of the skills examination. The test will be comprised of a selection of the following exercises:
    1. Simulated or discussed student discharge (scored as part of the skills test);
    2. Simulated or discussed railroad crossing (scored as part of the skills test);
    3. Forward Stop;

4.  Straight line backing;

5.  Alley dock;

6.  Parallel Park (driver side);

7.  Parallel Park (conventional);

8.  Right Turn; and

9.  Backward serpentine.

- The on-road driving test is the third part of the skills examination. An automatic failure will occur if you commit any traffic offense, run over a curb or sidewalk or cause a crash. (An accumulation of minor infractions will also cause a failure.)

You are permitted to take the driving examination three (3) times on a valid CDL learner's permit. The examination may be taken only once during a given day. If you fail a portion of the test, you may return on another day and retake only the portion you failed. Note that you do not have to retake the sections you already passed. If you fail the driving examination three (3) times, you must reapply for a CDL learner's permit, pay the appropriate fee, and complete all training requirements again. If you fail to successfully pass the skills test within 12 months of your training completion date, you will be required to repeat all 20 hours of training.

When you successfully complete the test, your passing test results will be credited to your driving record. Once your record reflects that all minimum requirements have been met, you will receive a CDL displaying the "S" endorsement and a School Bus Endorsement card from PennDOT. If the full 20 hours of the training has been completed, the school bus endorsement card is valid for one (1) year. The School Bus Endorsement card is reissued annually by PennDOT, if the requirement for the annual physical examination is met. If you successfully pass the driving examination after completing only 10 hours of instruction, you must complete the additional ten (10) hours of instruction (seven [7] hours of classroom and three [3] hours of one-on-one in-bus instruction) within 120 days of the endorsement card issue date, or PennDOT will cancel your School Bus Endorsement card.

PLEASE NOTE: School bus drivers are required to carry three credentials when operating a school bus in Pennsylvania: a valid CDL displaying the "S" endorsement, a valid School Bus Endorsement card, and a valid physician's certificate. If you are going to operate a bus with air brakes, you must have the air brakes restriction removed (passing applicable knowledge and skills tests).

# HEALTH AND SAFETY REQUIREMENTS

You must be fit to operate a school bus with regard to the health and safety of the students being transported. To establish fitness you must:

- Comply with Pennsylvania Department of Health and any local school district regulations and policies regarding communicable diseases;

- Have a clean criminal history record as evidenced by Pennsylvania State Police criminal history check.

- Have a clean child abuse history record;

- Have no record of motor vehicle crashes or traffic violations determined to be excessive in number by your employer;

- Complete FBI clearance checks (fingerprinting); and,

- Be drug-and alcohol-free when driving, and you must not consume any alcoholic beverages within eight (8) hours prior to operating a school bus and never consume illegal substances.

Local requirements may be more stringent than those listed above.

**Drug and Alcohol Testing for School Bus Drivers**

All CDL drivers operating commercial motor vehicles (CMVs) (i.e. transporting more than 16 passengers) on public roadways must be DOT drug and alcohol tested. This means any school bus driver required to possess a CDL, whether a full or part time driver must also be included in an employer's drug and alcohol testing program.

The regulations require a five panel testing for the following classes of controlled substances: marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP). Drug testing is accomplished by a urine sample while  alcohol testing is accomplished by breath analysis or other screening test approved by NHTSA.

There are many different methods used in establishing a policy on drug and alcohol testing. As a new driver, you are responsible to know and understand the drug and alcohol testing policies for your company or school district. Employers are required by federal law to do testing as indicated in the following:

1. **Pre-Employment Testing:** A new driver must be drug tested with a negative test result before an employer can permit him/her to operate a CMV on a public roadway.

2. **Random Testing:** CDL drivers are subject to unannounced random drug and alcohol testing throughout the year. Random alcohol testing must be conducted just before, during or just after a driver's performance of safety sensitive duties. Once notified of a random test, drivers must immediately report to the designated testing location.

3. **Post-Accident Testing:** This federally-mandated testing is required for any crash involving:

   • A fatality; or

   • Bodily injury requiring immediate medical treatment away from the scene AND the employee/driver has been issued a citation; or

   • Vehicle damage sufficient to require any of the involved vehicles to be towed AND the employee/driver has been issued a citation.

   Note: Pennsylvania state law (Section 3756 of Title 75) requires testing after any reportable crash in a school bus.

4. **Reasonable Suspicion:** Testing is done when a trained supervisor observes specific, contemporaneous, articulable objective facts indicating current drug or alcohol use.

5. **Return to Duty:**  After a positive drug and/or alcohol test or refusing to take a test, the employee/ applicant shall be referred to a Substance Abuse Professional (SAP). Following the initial assessment, the SAP will recommend a treatment unique to that individual. If your employer does not have a "Zero Tolerance Policy" and allows an employee to return to duty following a positive test and subsequent evaluation and treatment, the SAP will recommend a return-to-duty test when the employee has successfully completed treatment and is no longer a concern to safety.

6. **Follow-Up Testing:**  After completing a return to duty test, follow-up testing will be performed for a period of one to five years with a minimum of six unannounced tests conducted during the first year. The number and frequency of tests beyond the minimums is set by the SAP based on his/her evaluation of the employee. Follow-up testing is separate and in addition to any other testing.

**Positive Test or Refusing to Take a Test**

A drug or alcohol test is considered positive if the individual is found to have a quantifiable presence of a prohibited substance in the body above the minimum thresholds defined in 49 CFR Part 40. Any applicant or employee who tested positive or refused to take a drug or alcohol test must have a negative return-to-duty test and be evaluated and released by a SAP before returning to safety-sensitive work. There is no requirement the company pays for this treatment or schedules the SAP appointment.

# DRIVER RECERTIFICATION

State law requires you to renew your school bus endorsement every four (4) years, completing a minimum of 10 hours of instruction and the "S" endorsement knowledge and skills examinations. Recertification must occur in a school bus representative of the class of school bus the driver is licensed to operate, so test in the Class school bus listed on your license. The recertification skills exam is outlined in Chapter 71.4 of Title 67. Visit www.pacode.com.

The instruction must be provided by a certified instructor and must include seven (7) hours of classroom training and three (3) hours of one-on-one in-bus training. This ten 10-hour course (commonly known as the driver recertification course) may be completed at any time during the 12 months immediately preceding the recertification date on your School Bus Endorsement card. PennDOT notifies you of this requirement through a notice mailed one year before your endorsement expires. DO NOT LOSE YOUR RECERTIFICATION NOTICE; YOU WILL BE REQUIRED TO PRESENT IT TO THE EXAMINER WHEN TAKING THE KNOWLEDGE AND SKILLS TESTS.

Upon successful completion of the training and testing requirements, a new School Bus Endorsement card is issued to you 45 days prior to the expiration of your current "S" endorsement. If you fail the skills examination three (3) times, your current School Bus Endorsement card must be surrendered to the examiner. You must then reapply for the "S" endorsement learner's permit and complete all training requirements for new drivers outlined in the previous sections. Any training taken as a requirement for recertification cannot be counted toward new learner's permit training requirements. If the recertification requirements are not completed before the recertification date of the School Bus Endorsement, you have one (1) year from that date to complete the training and testing requirements, but you cannot drive except to complete in-bus training and the skills test. If the requirements are not completed within this additional year, you must reapply for an "S" endorsement permit and repeat all training and testing procedures.

After PennDOT receives your recertification paperwork, a new School Bus Endorsement card will be mailed to you. If your old School Bus Endorsement card expired before, or shortly after, the completion of recertification training, you are not permitted to operate a school bus until receiving the new School Bus Endorsement from PennDOT. Remember, you must have the School Bus Endorsement card with you to operate a school bus.

When taking the examination for recertification, you must bring the following documents to the testing site:

• Your valid commercial driver's license;

• Your school bus recertification notice;

• Your valid Physical Examination Certificate;

• The current vehicle registration card for the bus being driven; and

• A valid insurance card or proof of financial responsibility for the bus being driven.

# COMPLETION OF REPORT FORM

You, the school bus driver, will be asked to sign the School Bus Driver's Training Report Form (DL-714), verifying the minimum training requirements have been met.

PLEASE NOTE: Your signature on the Training Report Form certifies, under penalty of law, that the information contained on the form is true and correct.

WARNING: Falsification to authorities is a misdemeanor of the third degree and is punishable by a fine of up to $2,500 and/or imprisonment up to one year.

**IF YOU ARE NOT GIVEN THE MINIMUM NUMBER OF TRAINING HOURS OR YOUR IN-BUS TRAINING WASN'T ONE-ON-ONE, DO NOT SIGN THE TRAINING REPORT FORM. You may contact PennDOT's Special Driver Programs Unit at (717) 787-6453 or ra-pdschoolbushelp@state.pa.us, if you have any concerns associated with your school bus driver training.**

The safety of school children is the main concern of PennDOT. Compliance with every aspect of the School Bus Driver Training Program is essential to the safety of school children.

# ANNUAL PHYSICAL EXAMINATION

To maintain a valid School Bus Endorsement, you must pass an annual physical examination given by either your physician or a physician appointed or approved by the local school board. A Pennsylvania School Bus Driver's Physical Examination Form (DL-704) must contain the signature of the physician before sending it to PennDOT. Refer to Section 71.3 of Title 67 for details on this examination. Visit www.pacode.com.

A letter is mailed to you approximately 90 days prior to the expiration of your school bus physical. The purpose of this letter is to remind you that your physical is about to expire. Your School Bus Endorsement card will not be renewed unless PennDOT has a current physical on file. You must pass the minimum requirements listed on the physical examination form. Additional medical information may be required to further determine physical competency. If PennDOT determines you are not physically competent to operate a school bus, your School Bus Endorsement will be cancelled. You may request a re-examination.

Upon passing the physical examination, the examining physician will issue a Physical Examination Certificate valid for one (1) year. This certificate must be carried whenever operating a school bus.

In addition to the annual School Bus Driver's Physical Examination (DL-704), commercial drivers engaged in "Non-excepted" transportation are also required to submit a valid Medical Examiner's Certificate in order to maintain commercial licensure.

Additional information is available in the Commercial Driver Information Center on our website at www.dmv.pa.gov.

# CHANGE OF INFORMATION ON LICENSE

A new camera card or photo license will be issued whenever you are adding or deleting an endorsement, removing a restriction or upgrading your class of license.

If you are changing your name or address on your CDL and "S" endorsement, you must complete form DL-80CD (Commercial Driver's License Application to Replace/Correct) and forward it to PennDOT with the appropriate fee. The DL-80CD is located under the Forms and Publications link on PennDOT's Driver and Vehicle Services website, www.dmv.pa.gov.

## DOCUMENTS CARRIED WHILE OPERATING A SCHOOL BUS

The following current and valid documents must be carried by you at all times while operating a school bus:

- CDL, with Passenger and School Bus Endorsements;

- Pennsylvania School Bus Endorsement Card;

- Physical Examination Certificate (DL 742);

- Vehicle registration card for the bus being driven;

- A valid insurance card or proof of financial responsibility for the bus being driven; and

- DOT physical, if applicable (i.e., contractors who cross state lines). This physical is known as the Medical Examination Report for Commercial Driver's Fitness Determination and is available at www.fmcsa.dot.gov.

## COMPREHENSIVE RESOURCE

For a comprehensive resource on virtually all aspects of becoming a school bus operator, visit the School Bus Information Center on PennDOT's Driver and Vehicle Services website, www.dmv.pa.gov.

# UNIT B -
# STUDENT MANAGEMENT AND DISCIPLINE

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-2

SCHOOL BUS DRIVER RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-3
    Student Seating Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-4

STUDENT RESPONSIBILTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-5

DRIVER-STUDENT INTERACTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-6
    General Guidelines for Interacting with Students . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-6
    Class:  A Student Management Memory Aid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-7
    Serious Discipline Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-8

CHARACTERICTICS OF STUDENT BEHAVIOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-9
Kindergarten and Elementary School Age Students (Grades K-5) . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-9
    Middle-School Age Students (Grades 6-8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-9
    Secondary Age Students (Grades 9-12)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-10
    Summary of Age-Level Characteristics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-10

GUIDELINES FOR CONTROLLING STUDENT BEHAVIOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-11
    Keep Discipline Private Whenever Possible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-11
    Stay Professional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-11
    Set Discipline Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-12
    Work with School Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-12
    Don't Deal with On-Bus Problems when Loading and Unloading. . . . . . . . . . . . . . . . . . . . . . . . . . . .B-13

ASSERTIVE DISCIPLINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-13
    Non-Assertive Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-14
    Hostile Discipline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-14
    Assertive Discipline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-14

GANG AWARENESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-15
    Gangs and the Bus Driver  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-16

BULLYING AND HARASSMENT ON THE SCHOOL BUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-16
    Description of Harassment and Bullying  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-17
    Reporting Suspected Child Abuse and/or Neglect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .B-18

# UNIT B -
# STUDENT MANAGEMENT AND DISCIPLINE

# INTRODUCTION

This unit is a general guide to help you manage student passengers. General guidelines are presented, which you may need to adapt to meet the specific local policies approved by your school district's board of directors. **In disciplinary cases, always follow written school district policy. The person ultimately responsible to discipline students is the school principal.**

You, the driver, are often the first contact children have outside their homes every day. Your attitude toward them may set the stage for their conduct for the remainder of the day. Your words and actions can have a tremendous influence. Students are affected by what they experience while they are traveling to and from school. Undesirable conduct not only makes all passengers uncomfortable, but can jeopardize their safety. These experiences, good and bad, are an extension of the regular school day and become an important part of their education. Many of the same rules of behavior are in effect on the bus as in the classroom.

As a school bus driver, you are in the people business. Children, like adults, can be unpredictable and often have moods that reflect what is going on in their personal lives. These moods and changes in their life will be reflected in how they interact with you and with other passengers on the bus. Behavior is typically dependent on age and cognitive development, and can range from that of a toddler to a young adult. You should become familiar with the general characteristics for each age group with which you will be dealing, as well as how to apply positive techniques to manage student behavior.

In cooperation with students, parents and school officials, you are responsible for the safety of the students who ride your bus. You must be able to control them, and the bus during the ride, and during loading and unloading. The student ridership program should be a cooperative effort among students, parents, school officials, and bus drivers. A sound program makes the bus driver's job easier and improves transportation safety.

# SCHOOL BUS DRIVER RESPONSIBILITIES

School bus drivers have a significant responsibility to transport their students safely and efficiently to and from school. In order to do this effectively, you must create a positive atmosphere for travel, by implementing the following points:

1. Familiarize yourself with and abide by all rules, policies and procedures relating to student transportation.

2. Familiarize yourself with all assigned routes and designated school bus stops.

3. Maintain your passenger lists so they are up-to-date.  These will be critical in an emergency.

4. Recognize the importance of establishing solid working relationships with students, parents, supervisors, and school administrators, especially when working to ensure proper student conduct.

5. Instruct students on proper behavior while on the bus and the consequences of improper behavior. Provide and enforce general policies regarding riding the bus, and instructions during emergency evacuation drills.

6. Conduct yourself in a professional and respectable manner.

7. Avoid becoming too closely acquainted with students; maintain a friendly but firm adult/student relationship. You should never put your hands on a student, nor should you grab, slap, hit, or shake a student.

8. Maintain order and safety on the bus at all times. Create an atmosphere where the rights of others are respected on the school bus and at the school bus stop. You can do this by:

    a. Requiring an orderly entrance and exit;

    b. Minimizing interior noise;

    c. Controlling passenger movement;

    d. Requiring silence at railroad crossings; and

    e. Prohibiting transportation of unauthorized materials.

9. Keep rules of conduct reasonable and simple for students to understand. Deal with infractions promptly, firmly and fairly.

10. Handle minor infractions with school district approved consequences. In instances of serious or recurring misconduct, follow school district policy.

11. Present a positive image in dress, hygiene, language, and manner while on duty because you represent the school system.

12. Be considerate and patient with all children, especially young students or students with special needs. These children may be entering school for the first time and may be intimidated or frightened by all the new experiences. It is important to make these children feel safe and welcome. Some students with special needs will require repetition and practice to become clear on expectations. Others may react strongly to changes in routine or environment.

13. Keep the bus clean during both regular route and extra-curricular trips. Consider making this part of students' responsibilities by having them take any of their trash with them.

14. Remember to inspect the interior of the bus before a new group of students enters and again after they exit. This can help identify students who may be tampering with or destroying parts of the bus.

15. Consider keeping a daily log of events at the end of your routes.

16. Work with your school district to have a readily-available emergency contact list in case of an emergency, and ensure your communication system is operational.

17. Avoid negative verbal interactions, such as sarcasm, as these are not effective tools for student management.

# STUDENT SEATING PLANS

Check with your school district regarding the use of seating charts in your bus. It may be a good policy to establish and use seating charts for morning and evening runs, when possible. These charts are helpful in controlling student behavior and assist you in getting to know the students' names. This is particularly useful for elementary age students. Seating charts are especially helpful for a substitute driver and during an emergency.

Some things to consider when developing a seating plan:

1. Your route and the order in which students are loaded and unloaded at home and at school.

2. The medical conditions of the students. Keep in mind that you might not know this information. Otherwise, consider the following:

   a. Students who are medically fragile or vulnerable and who need to sit further front where there is less bounce;

   b. Students who are prone to seizures in certain light conditions;

   c. Younger students and those in child safety seats who need to sit in the first few seats;

   d. Students with respiratory conditions who need to sit away from the lift area and away from rear windows near the exhaust. Note that changes in temperature also tend to bother these students; and

   e. Students who may need to sit over wheel wells for additional lower extremity support.

3. For evacuations, consider:

   a. Which students can evacuate themselves;

   b. Which students need help;

   c. Which students could help others; and

   d. Which students are in child safety seats.

      i. They should not be in emergency exit rows; and

      ii. Never seat a student next to a window, if there is a child safety seat in the aisle position.

4. Consider behavior by thinking about students who are compatible with each other and who aren't.

5. Consider supervision for behavior or a medical condition as indicated above.

6. Consider the age of the student. For example, some districts require grade levels to be seated together, chronologically from the front to the back of the bus. Know and follow your district procedures.

7. Consider your ability to observe the student.

# STUDENT RESPONSIBILITIES

Like the school bus driver, the student has responsibilities with regard to his/her behavior during the transportation process. Since poor student behavior on the school bus can be distracting to the driver and contribute to crashes, it is important to establish clear rules for the student to follow and for each student to follow them. All students and parents need to know and understand the rules, and that these rules were established for the safety of the students who ride the bus. Further, students and parents must also understand the consequences of unacceptable behavior. Often, your school administration will prepare lists of rules and regulations covering student behavior and distribute them to students and parents. The parents' active cooperation is also helpful. Therefore, students should:

1.  Know the rules, and understand and accept responsibility for their actions.

2.  Be respectful of the rights of other students.

3.  Be on time at bus stop locations at home and at school. They should leave home in time to reach the bus stop five (5) minutes before scheduled pickup and avoid playing when waiting for a bus, especially right next to the roadway. Present clear safety procedures for walking on the highway or crossing roadways.

4.  Be aware of the dangers involved in the loading and unloading zones, including the dangers involved with loose clothing, clothing accessories and personal items that can drop under the bus.

5.  Enter and leave the bus at school loading and unloading zones and at bus stops in an orderly fashion, and follow instructions. They must be careful about their own safety and the safety of others. They must move without haste, crowding or pushing.

6.  Upon entering the bus, go directly to their seats, and remain seated until instructed to stand and unload.

7.  Keep the aisle clear at all times. Books, lunch boxes, instruments and book bags must be placed under the seat or held on the student's lap. DO NOT BLOCK THE AISLE!

8.  Refrain from loud conversation, unnecessary noise and boisterous conduct.

9.  Use appropriate language (e.g., no profanity permitted).

10. Never bring tobacco, glass containers, weapons, drugs, alcohol, or any other items that could distract the driver on the bus.

11. Keep all body parts and other objects inside the school bus. The driver will tell students when they may open and close windows.

12. Never tamper with or block emergency exits.

13. Keep hands and feet off other children and their possessions. Throwing materials, hitting, pushing, spitting, biting, tripping and rough behavior will not be tolerated.

14. Never tamper with or destroy the school bus. Students can be prosecuted for doing so.

15. Remain silent while the school bus is stopped at railroad crossings.

16. Be aware that transportation can be ultimately denied to students who act inappropriately.

17. Keep the school bus clean. Do not leave trash behind.

As a new school bus driver, you will learn the after-school route may be more demanding on the driver when compared to the morning route. After being in a classroom all day, students may have a lot of energy and a desire to release tension. You will need to develop a higher tolerance for the students' behavior on the after-school route, without allowing flagrant abuse of the privilege to ride the school bus.

# DRIVER-STUDENT INTERACTIONS

As a professional bus driver, you should always have a general knowledge of each of your passengers, including their names and general behavior. Since you have contact with the students for only a short time each day, you may not initially know as much about the students as their teachers, but often you will be assigned to a route transporting the same students for several years. This may give you a chance to develop relationships with students that other district staff may not have. You must not only know how to perform your job as a driver, but you must also know something of your riders' behavior patterns and a great deal about their reactions in order to safely pick up and deliver your passengers. Your main function is to transport the students to their destination and discharge them safely.

You must also know how to approach students in a way that will gain their respect. It is better to talk to students without shouting, showing anger or displaying irritation. Be careful to never threaten them with any action you cannot enforce. Give your instructions to the students without favoritism. If you overlook poor behavior by one student, you lose the respect of the other students. Strike a happy medium by being neither too lenient nor too harsh; both extremes are equally bad for the morale of the students on your bus. Your attitude should be friendly, cheerful and professional.

Building good bus conduct starts the first day of the school year. After arriving at your first destination and prior to unloading, stand and state the rules very clearly. Be sure to deal with the very first infraction promptly and firmly. It is much easier to prevent a bad situation than to correct one.

Work to build cooperation with your students by being friendly, courteous and helpful. Over time, high student morale will help you control the worst offenders. When offenders find that improper conduct is unacceptable to the group, they will think twice about doing things that cause them to "lose face" with the group. If your school district has a student court of inquiry, it can often help in enforcing discipline.

# GENERAL GUIDELINES FOR INTERACTING WITH STUDENTS

You can avoid many problems on the bus by recognizing good behavior and using proper techniques to reinforce that behavior. While it is often easier to use negative terms when dealing with behavior, it is much more effective to use positive comments to reinforce the good things that happen on the bus. Learn to recognize desirable behaviors and emphasize them with positive comments.

For example:
- "I saw you pick up that gum wrapper, Fred, and I appreciate it."
- "Jane, you were at the stop on time this morning. Good for you."
- "That's what I like to see."

If you learn to stress specific, positive and behaviorally-related activities on your bus, you will eventually eliminate the negative ones. Work to develop this skill. It will mean many safe and pleasant trips.

Remember the following points, when dealing with students:
- Though each student is different, do not allow special privileges for any student unless requested by the school administration.
- Observe the rights and privileges of each child only as long as he or she obeys the rules of good bus behavior. Riding is a privilege, not a right. The moment a student "gets out of line," deal with the offender fairly, impartially and in the same manner you treat all such offenders.

- Remember that all eyes are on you while you are driving the bus. Your words and actions have tremendous influence on your passengers. Speak quietly, clearly, confidently, and firmly when talking to the students on your bus.
- Praise students generously when they accept responsibility and show a general pattern of good behavior.

If you are faced with a discipline problem, pause and relax for a few seconds. Use this time to think about what you are going to say and do next. How you handle behavioral situations, appropriately and inappropriately, will be watched closely by the students for consistency, fairness and understanding.

1. If you yell, expect yelling back, if not at you, then at someone else.
2. If you praise, expect it to be picked up by others.
3. Expect and encourage discussion and openness with students, and you will get it.
4. Keep discussions short and simple.
5. Never use profane or obscene language or raise your voice above a level necessary to be heard.

A word of warning directed to the offender may be enough for a minor infraction. Avoid getting into lengthy discussions, while the bus is moving.

## CLASS: A STUDENT MANAGEMENT MEMORY AID

To help you remember important student management techniques, learn the rules represented by the letters of the word "CLASS." By remembering one easy word, you will be able to remember five simple rules for student management.

C = Consistent....        Always be consistent with praise and discipline. Whenever a student behavior problem arises, follow through with the appropriate consequences.

L = Limits.............        Set limits and make sure the students are aware of them. They should be the same for all students.

A = Attitude..........        Have a positive attitude. A cheerful smile may change the behavior of a student. The attitude of the driver often becomes the attitude of the student.

S = Share............        Share with the students what is expected of them. State the rules and their consequences. If the students do not know the rules, they cannot be expected to follow them.

S = Support.........        Support other drivers and exchange experiences. Other individuals may be able to assist in difficult situations. Also by sharing, common problems may be discovered and new techniques explored. Support is also available from your supervisors and from the school district, usually via the principal.

# SERIOUS DISCIPLINE PROBLEMS

For problems of a more serious nature, such as a fight on the school bus, follow your school district's procedures for discipline or refusal of rights to ride the bus and apply the following general procedure:

1. Drive out of traffic to a safe location, stop and secure the bus. This may be in a parking lot or a driveway. The fact you have taken this action makes the students realize the situation is one out of the ordinary.

2. After stopping the engine and removing the ignition key, get out of your seat, and stand and face the students. Address the offenders in a courteous manner, but in a firm voice. Don't show anger, but all students must realize you expect an immediate, positive response.

3. Address the student(s) involved by name and state specifically what behavior you will not allow. Explain the district guidelines you expect the student to obey and you can enforce. Maintain control of yourself and avoid projecting hostility.

4. Relate your comments to a specific unacceptable behavior you want changed; don't humiliate the child involved. This may require repeating the action you expect (using the same words) several times. Limit this communication to what is not acceptable and what must occur to remedy the situation. Suggest an action that can be performed successfully.

5. Before you specify related consequences, be sure they are supported by existing policy and the school principal, you are willing to follow through, and **THEY ARE WITHIN YOUR POWER TO INITIATE.**

6. Once you are sure you are on firm and acceptable ground, and you have committed yourself, THEN relay the consequences. You cannot afford to initiate hollow consequences. You must take the action you have indicated. This emphasizes the point made in Unit A regarding your relationship with your transportation director/supervisor and with the school principal.

7. Don't forget to inform your supervisor as soon as possible after any confrontation. Make sure you document the incident, children involved and actions taken so a record is on file.

If these steps don't work, radio the supervisor or dispatcher; don't start the bus until you get a response. **NEVER** ask or send students to telephone school officials. You are responsible for all students; keep them on the bus. If you are near the school, you also might consider turning the bus around and driving back to the school. Never order any student off of the bus. Always call for assistance and be prepared if there is not a response. A call to the local police is not out of the question if the violator(s) are creating a hazardous situation which would make transporting the students unsafe.

When working through more serious discipline problems, never physically move a student. In fact, be extremely careful about physically touching a child. If a change in seating is needed, do not direct the student to sit directly behind you, but to a seat where you can more closely observe the behavior. Also keep in mind you have no legal right to put the student off the bus, except at the student's regular bus stop or at school. Similarly, you cannot deny the student a seat on the bus the next morning.

Keep in mind there are behavioral approaches to help you with student management. However, it is most important to consistently follow established school district procedures.

If the situation escalates or requires additional attention, do not try to handle serious discipline cases by yourself. Refer all such cases to your supervisor or the school principal. Give all the facts, in detail, and be sure the entire problem is stated clearly. Usually the child who causes problems on the bus is also causing problems in the classroom. The school administrator has the whole picture of the child, while you, as a driver, know only about his or her bus behavior.

# CHARACTERISTICS OF STUDENT BEHAVIOR

As described below, kindergarten and elementary students behave differently than middle school and secondary students. By learning some of these characteristics, you will be better informed when managing the students on the bus.

## KINDERGARTEN AND ELEMENTARY SCHOOL AGE STUDENTS (GRADES K-5)

The kindergarten or elementary school age student tends to prefer a great deal of physical activity. Normally, these students have a problem staying in their seats. When they can't move, they often talk instead. Loud talking on the bus is a problem you will need a lot of patience to deal with, but absolute silence among students is not a healthy school bus atmosphere. Students vary in the amount of activity they need, and their behavior will vary from day to day. Students of this age have limited attention spans and short memories, and the day after an occurrence they may have forgotten all about it. For this reason, they rarely hold grudges against those who discipline them. Beginning bus drivers should not try to gain the children's favor by letting small misdeeds go unnoticed. Take prompt and continued action for all infractions of bus conduct.

These younger students tend not to pay attention to the feelings of adults, but, on the other hand, they care a lot about what the adults think of them. Some children can be actively rejected by their peers, sometimes because they are perceived as odd or have poor social skills. They also are sensitive to the opinions of other youngsters and sometimes tend to pick on children who do not fit in well with the group. If you transport students in special education and students in general education in the same bus, be alert to ensure the exceptional students are not being insulted or targeted.

Bullying can also emerge among older elementary school students. Bullying and other forms of victimization reflect individuals' lack of self-control, and bullies tend to seek victims who are insecure, anxious and isolated. Bus drivers should monitor children's behavior and provide appropriate intervention when bullying or harassment occurs or is reported. See the section below on bullying and harassment.

Be careful not to allow individual children to hurt themselves socially by setting themselves up as the "driver's pet." Some students who have not yet learned to get along with others may also misbehave to attract attention.

Given the way students of this age behave, you may be able to promote a group spirit "to make our bus the best." Many bus drivers have achieved excellent results by discussing bus rules with their students and making them "our rules." Some drivers develop a game of having each busload try to excel in keeping the bus clean, behaving well on the bus, and staying orderly when loading and unloading. This method requires considerable skill, and new bus drivers should consult experienced drivers before attempting to start this type of competition. Keep in mind, however, that art work, festive decorations, etc., should not be displayed on the bus. These can interfere with safe operations.

## MIDDLE-SCHOOL AGE STUDENTS (GRADES 6-8)

Students in the middle school are often centered on themselves and will argue to convince others or to clarify their own thinking. They begin to think more independently and critically, and also tend to become more focused on acceptance and popularity among peers. With adolescence and hormonal changes, middle school students may experience mood swings and begin to test the limits of adult authority. Social interactions may involve changing seats or loud conversations. Verbal and sometimes physical aggression can occur, sometimes in the form of bullying and harassment. Fads and conformity in communication and dress develops among peer groups. Some youth begin exploring with sexual activity, and a small percentage, especially boys, may become involved in gangs and other delinquent social activities.

# SECONDARY AGE STUDENTS (GRADES 9-12)

In the junior and senior high school age groups, girls tend to be more mature than boys, but teens remain highly socially self-conscious. Relationships between romantic couples emerge, and sometimes may cause trouble on the school bus when some of the students are "going steady." Other students often shield "making out" in the rear of the bus. Be alert to stop such actions as soon as you spot them. Ingenuity in seating arrangements can help to prevent this problem. For instance, placing the senior girls opposite seventh grade boys may help.

Students of this age are very concerned about their dignity and want to be treated like adults, although they do not always act the part. They are apt to be erratic in their behavior, and they are usually very anxious to dress and act the same as all members of their group.

You must be very careful not to make remarks about administrators and teachers. Secondary school students are chronic gossips, and any belittling remark you make may be widely circulated and magnified when retold. Students may also pass on remarks unintentionally to parents and others.

Young bus drivers must expect the older students to resent any great show of authority. Do not hesitate to ask for help from your supervisor or principal to solve problems involving these students.

# SUMMARY OF AGE-LEVEL CHARACTERISTICS

The behavioral characteristics of elementary and secondary students are presented in summary form to assist you in dealing with these age groups.

**Kindergarten and Elementary Students can be expected to be:**

- Physically active;
- Talkative (loud);
- Forgetful (predictably unpredictable);
- Insensitive to the feelings of others (may pick on students with physical or mental disabilities);
- Sensitive to adult criticism;
- Willing to cooperate in group projects; and
- Harder to handle in the afternoon than in the morning.

**Middle-School Age Students can be expected to:**

- Change at different rates;
- Be vulnerable to bouts of low self esteem;
- Have new interests and abilities as well as many new feelings, thoughts, and concerns;
- Identify with their peer groups and want to belong;
- Seek limited independence and autonomy;
- Question rules and beliefs they had accepted at face value until now;
- Be easily offended and sensitive to criticism; and
- Behave erratically and inconsistently.

**Secondary Students have the following characteristics:**

- Girls will be more mature than boys;

- Girls will be more influenced by boys than vice versa;

- Boy/girl relationships may cause problems;

- Concerned with their dignity (image);

- Gossipy, repeat things to their parents;

- Resent authority;

- Organize in groups;

- More prone to vandalism; and

- Try to disturb the driver.

# GUIDELINES FOR CONTROLLING STUDENT BEHAVIOR

The following pointers can help you prevent and/or control discipline problems you may encounter on your bus.

## KEEP DISCIPLINE PRIVATE WHENEVER POSSIBLE

- If an individual breaks the rules of bus conduct, do not reprimand him or her in front of all the students riding the bus. Individual behavior problems that do not affect the others on the bus are best handled in a private manner.

- Avoid a showdown with a chronic troublemaker in front of the other students. Instead, report an incident to the principal or supervisor, and request their help in the matter.

- Do not threaten the entire busload for the misdeeds of a few. Focus your attention on the students creating the disorder; avoid disciplining all of the students when restoring order.

- It is a good rule never to say anything unpleasant to more than one person at a time. On the other hand, if general bus safety is being threatened by one or more students, a driver should point out their misbehavior in front of all bus passengers. A case in point is the lighting of matches by students riding the bus. Stop the incident immediately in front of the entire busload of students.

## STAY PROFESSIONAL

- Young people greatly resent any sign of favoritism. Avoid being too lenient with normally well-behaved students and too harsh toward those who have been causing trouble.

- Never lose your temper. In the event of an argument or misunderstanding, the less emotion you display, the less emotion you will rouse in the student.  Avoid using threats or physical force. Be consistent in your actions.

- Young people tend to test adults to see how far they can go or how much they can get away with doing. Deal with this behavior fairly and firmly, avoiding harshness or unfriendliness. If students know that reasonably good behavior is expected of them at all times on the school bus, then you may not have any real disciplinary problems.

- Start out the school year being extremely strict and gradually lessen discipline, if bus behavior remains satisfactory. Students may also calm down during the course of the year. If a difficult child shows signs of calming down, do not hold a grudge; rather, show encouragement.

- Do not exchange wise cracks and gossip with the students, as your actions should aid the educational program of the school district. Avoid shouting, arguing, and obscene or profane language.

- Avoid biases against students. Do not prejudge students because of family name, background, appearance or neighborhood. Avoid being overly suspicious, but be alert for potential discipline problems.

- Act in a responsible manner. Show the importance of your job in your actions.
- Always be courteous to children. Provide compliments whenever possible.
- Keep alert. Do not ignore minor incidents; they can easily become major problems.

## SET DISCIPLINE STANDARDS

- Do everything possible to inform students they have important responsibilities in ensuring group safety.
- Settle discipline problems quickly.
- Handle serious discipline problems only when the bus is stopped.
- Seat any troublemakers near you where you can see them and observe their behavior.
- Display smooth driving skills; poor driving habits often increase student misbehavior and frighten younger passengers.
- Be firm, fair, impartial and consistent.
- Never lose your temper.
- Treat students as you would like your child to be treated.

## WORK WITH SCHOOL AUTHORITIES

Discipline on school buses is the biggest problem confronting school bus drivers, and the critical relationship to nurture is the one with school authorities.

While a school bus driver is not alone when it comes to solving discipline problems, he/she may be alone when a disturbance occurs. You are responsible for the conduct of students on your bus, but you must have the backing of the school administration to effectively discharge this responsibility. A copy of local school district rules should be posted in a conspicuous place in the bus. Always follow written school district policy. In cases of continued misconduct, report the student to the supervisor or school principal.

In many school districts, the first action taken is a reprimand.  A withdrawal of bus privileges for a short period of time may occur next. If the student's behavior does not improve after returning, the privilege to ride the bus for the balance of the school year may be denied or the student may be transferred to another bus. Never put a student off of the bus for misconduct; you are not empowered to make the decision yourself. School officials may take this step after all other measures have failed to improve the situation. Keep in mind some districts will discipline a student while in school so as not to interrupt their educational experience. Some students will not come to school, if they are denied a ride on the bus.

Remember the following pointers:

- Always follow the local policy adopted by the school board.
- Supply a copy of the rules to each student and post a copy of the rules so every student is aware of your expectations.
- If any action taken by the school administration does not promote good or safe school bus behavior, ask to meet with your supervisor to discuss the matter. They can work with administration to emphasize the safety of the entire busload of students is threatened, if no action is taken against chronic offenders.
- Maintain close contact with the principal and secure their cooperation.

## DON'T DEAL WITH ON-BUS PROBLEMS WHEN LOADING AND UNLOADING

In order to get students to and from school safely and on time, you need to be able to concentrate on the driving task. Loading and unloading requires all your concentration, especially considering the number of injuries and other incidents that occur during these times. Don't take your eyes off of what is happening outside the bus. If there is a behavior problem on the bus, wait until the students have finished loading or have unloaded to a place of safety. If necessary, pull the bus over to handle the problem.

# ASSERTIVE DISCIPLINE

There are many differences between the students of today and the students of past decades, and past disciplinary techniques used by school bus drivers and other school officials/personnel are no longer as useful as they once were.

While there are many theories regarding behavior management for children, one respected set of guidelines and disciplinary skills known as assertive discipline, can assist school personnel, including school bus drivers with handling disciplinary problems (Canter, 1976, 1992). Assertive discipline was developed for classroom situations so teachers and other personnel would be able to understand and communicate their needs to students in order to meet the needs of the students. A more productive environment results when needs of students and teachers are met. Essentially, a key to this technique is catching students being "good," recognizing and supporting them when they behave appropriately, and on a consistent basis letting them know you like what they are doing.

Assertive discipline can and should be applied to school bus driver/student situations. School bus drivers need to have an orderly and quiet bus; students need a safe ride to and from school. The ride is much safer for the students when your needs are met. Along with the differences in today's students, individual bus drivers also differ. Each bus driver operates in a different manner and may allow behaviors other bus drivers will not allow. This creates a conflict for the student who expects you to react in the same manner previous bus driver. Assertive discipline can help you communicate your particular needs to the students. Although you should effectively maintain order on the school bus, you also need to avoid alienating students or infringing upon their rights. Setting limits for the students must be balanced with showing compassion and warmth.

An assertive discipline plan can be used by you to:

  · Provide students with clear expectations;

  · Help you handle all behavior (major and minor) problems consistently;

  · Provide a common approach everyone understands;

  · Prevent you from reacting emotionally or overreacting; and

  · Remind you to frequently praise students and acknowledge positive behavior.

Disciplinary measures can be categorized into three types: non-assertive, hostile and assertive. These terms describe the methods used, not the person using them.

## NON-ASSERTIVE DISCIPLINE

There are two basic situations that can be classified as non-assertive discipline. First, if you do not clearly convey your wants and needs, then the student cannot be expected to follow them. A second non-assertive technique is to state your needs, but not back up the statements with actions. A bus driver who acts in a non-assertive manner is passive. Students will not usually cooperate with a non-assertive individual. If you feel you cannot handle student behavior, let students misbehave, back down when challenged, or feel overwhelmed, you are most likely a non-assertive driver, and you will need to change to manage student behavior.

## HOSTILE DISCIPLINE

On the other hand, hostile bus drivers express their wants and needs in (negative) ways that may violate the rights of the student. While students usually obey a hostile bus driver, they may become afraid of you and act more aggressively when threatened.  If you find yourself yelling constantly, threatening students (and not following up), or using physical force, you are acting in a hostile way, which is not appropriate for a school bus operator.

## ASSERTIVE DISCIPLINE

Assertive discipline creates a positive environment in which the needs of you and your students are met.  It creates a balance between the rights of each person, and a balance between the limits you place on students and the support you show for students. Because of this, the students trust and respect you (Canter, 1976, 1993).

Assertive bus drivers are neither hostile nor passive. They clearly state their needs and back up their statements with appropriate actions. Assertive drivers have a positive outlook and believe in their abilities. They communicate effectively and plan how to respond with actions. They are persistent and quick to respond in a meaningful way, operating in a take-charge manner, but aware of the support needed by each individual child. To summarize, assertive bus drivers:

- Are the boss on the bus;
- Say what they mean and mean what they say;
- Clearly and firmly tell students exactly how they want them to behave;
- Stay calm and use a normal tone of voice;
- Have a plan of action when students do not behave; and
- Reward students when they do behave. (Canter 1987)

To become an assertive bus driver,

1. Start with an assertive attitude–No student will stop me from driving a safe bus;
2. Speak assertively–calm, firm, clear, and without anger;
3. Have an assertive discipline plan:
   a. Set clear, simple rules for behavior on the bus
   b. Have consequences when students don't follow the rules and be sure consequences match the problem behavior; and
   c. Provide positive rewards when students do behave.

Several obstacles may stand in your way as you try to achieve assertive discipline. First, you will not be able to influence a student, if you do not believe you can. It's easy to make excuses for poor student behavior, such as heredity, ignorance, peer pressure, inadequate parenting, socio-economic background, or environment. You need to recognize the difference between students who cannot control their actions and those who can, but choose not to control them. Even many students with disabilities can choose whether to display good or poor behavior, as referenced in Unit D.

Don't forget you must identify a student's individual needs for a given bus trip; they may be different for field trips than for routine trips. You must also be able to clearly state these needs to all students on the bus. Tell all students you expect them to behave well and tell them the consequences, should they choose to behave poorly. Reinforce these directives by following through with appropriate actions. This includes praise when a student does something well and discipline for poor behavior. All students must receive the same disciplinary sanctions, but recognize some students need more attention and support than others. Misbehavior in a student may indicate the need for extra attention.

No disciplinary plan is foolproof. Some students will continue to misbehave even when you have acted correctly. Sometimes you will need to ask the help of other drivers, a teacher, or the principal in dealing with a particular student or situation. The assertive discipline plan is a necessary tool for routine student management.

## BE ASSERTIVE!

# GANG AWARENESS

One unique student discipline problem that may arise is gangs. Gangs have become commonplace in most cities, and unfortunately their members and activities are present on the school bus. Kids are entering gangs as early as elementary school. While you, as a school bus driver, cannot control who is or is not recruited, you can report unusual or inappropriate behavior to your supervisor. Under no circumstances are you, the bus driver, to confront gang leaders or potential gang members. Explain to your bus riding students the rules of the bus (what is and is not acceptable behavior). If they misbehave, follow district policy.

Gang activity is extremely serious and sometimes deadly. Never interfere. Should you see gang signs or symbols on the outside or inside of the bus, report it and then remove it. If you or your students are approached by gang members, avoid a confrontation, leave the area as quickly and as safely as possible, then report the incident to your dispatcher.

## GANGS AND THE BUS DRIVER

Gang members generally bother kids who are not in gangs and are usually more interested in fighting rival gangsters, not a school bus driver. They usually associate only with fellow gang members. It is important to set and enforce rules on the school bus and at the school bus stop. Gang members need to know the school and school bus stop are neutral zones, and gang violence will not be tolerated. When speaking to a suspected gang member, do not disrespect the gang, their family members or friends. Speak one-on-one with the student, and do not belittle them. Treat them with the same respect all students deserve. If they misbehave, follow local school district policies.

Make sure you report all incidents that appear to be suspicious to the proper school district official. Listen to the kids on your bus since they often know what is going to happen long before the school district official or police are made aware of a problem. Some school districts may have 24-hour tip lines students should be aware of, if they are afraid to come to you. Refer to your school district policy.

A few summary points when dealing with gang issues:

1. Be assertive, decisive, firm, and fair. Lenient treatment of gang members is viewed as a weakness, and they will take advantage of your "weakness."

2. Intimidation of gang members usually escalates into a confrontation and seldom creates respect. Remember, lectures to scare "gangsters straight" DO NOT WORK!

3. When gang graffiti is found, report it and remove it as soon as possible. It will attract rival gangs and/or invite more "writing on the wall" and vandalism of your bus.

4. Prevent conflict whenever possible. Experience has proven that an incident, no matter how minor today, can cause more gang-related or motivated acts of vengeance or reprisals as much as two or more years later.

5. Never insult or show disrespect for a gang member, particularly in front of his or her peers. In the gang subculture, no insult goes unchallenged.

6. Never be critical of gang clothing, slang, tattoos, jewelry, hand signs, rap music, graffiti, or other indicators of the gang subculture. This would be an obvious form of disrespect.

7. Never confront gang status, only behavior.

8. Never confront a gang member in the company of their gang peers. This invites resistance in normal society let alone in the gang subculture.

9. Never mimic gang activity by affecting a gang stance or throwing a gang hand sign.

10. Never call a gang member a "wannabe." This is openly disrespectful and may induce the individual to prove you have underestimated them.

11. Never place rival gang members together.

12. Never assume you are safe just because you are encountering a gang member in a school bus.

13. Never physically confront a gang member.

14. Never underestimate the threat from a young or small gang member.

15. Never assume anything.

## BULLYING AND HARASSMENT ON THE SCHOOL BUS

While there is a great deal of research in the topics of bullying and harassment in the school setting, relatively little has been investigated in these topics on the way to or from school or on the school bus. One of the few recent studies that has been completed with high school students found more students reported being fearful of their peers on the school bus than they were during any other time of their school day (DeLara, 2000; 2002).

Harassment includes unfair and disrespectful remarks, written words, or pictures that are unpleasant and offensive. Similarly, a person is bullied when they are exposed repeatedly over time to the negative actions of one or more other students.  These actions may range from stares and teasing up to and including physical assault. Research has found that two incidents of bullying occur on each bus ride, and a full bus and poorly supervised conditions are prime environmental factors for bullying (Raskauskas, 2005).

Sexual harassment, in particular, appears to be rampant among secondary students with 80 percent of students reporting sexual harassment, and half of all students admitting they sexually harass others (AAUW, 2001). This type of harassment has also been reported among middle school age students. In fact, one university researcher has indicated sexual harassment is a much more serious issue in public schools than most people have been willing to admit, and it's much more likely to occur in unsupervised venues like buses or bathrooms (Williamson and Aratani, 2005). Remember that sexual harassment is a form of sex discrimination and is illegal according to Title VII of the Civil Rights Act of 1964, as amended, which protects the adolescent at work, and Title IX of 1972, which protects the teen from sex discrimination at school.

# DESCRIPTION OF HARASSMENT AND BULLYING

Harassment includes unwelcome remarks or behavior that shows disrespect for its victims. It hurts and harms the students in long-lasting ways. No student should be treated in this manner.

- It is a deliberate or repeated behavior, which is unwelcome, not asked for, and not returned.
- It is intentional.
- The behavior can be verbal, nonverbal, visual, and/or physical.
- Examples of verbal harassment could include teasing someone about their body development or body parts; telling dirty sexist jokes; calling others names that have a negative sexual meaning; or saying something to someone about sexual acts.
- Examples of nonverbal harassment could include looking at another person in a way that makes them feel uncomfortable (suggestive looks, leering, staring), obscene gestures or whistling.
- Examples of visual harassment could include glaring or staring; obscene/ suggestive letters, notes, or graffiti; obscene/suggestive pictures taped on notebooks.
- Examples of physical harassment could include "purposely" brushing against someone's body; "friendly" pats, pinches, grabs and holds; pulling down someone's gym shorts; or using force to "physically hold/ corner" a person in one place.
- Examples of cyber bullying could include the use of e-mail, instant messaging, chat rooms, pagers, cell phones, or other forms of information technology to deliberately and repeatedly, harass, taunt, ridicule, threaten, or intimidate someone. This can occur on the bus or at a bus stop.
- The word "unwelcome" places responsibility on the receiver to tell the sender the behavior is unwanted.
- The student who is a victim may:
    a. Suffer from loss of confidence or self-esteem;
    b. Find it hard to study and pay attention; and
    c. Dread or even avoid going to school or sports in which they anticipate harassment.

School personnel have a legal responsibility to protect students from known or reasonably foreseeable harm occurring during or in connection with school activities.

Harassment and bullying are not limited to children. Often the school bus driver has been the victim of harassment. If you feel as though you have been harassed, report the incident to your supervisor.

The bus driver should expect all students to travel with dignity and respect, and to arrive at school safely and ready to learn. In the transportation arena, we have an opportunity and obligation to be role models who will display and expect respect is always the order of the day. If a student confides in you, listen, and show understanding and support.

When you hear unkind, and humiliating remarks, respond immediately.

In her exploratory study, DeLara (2008) outlined the following strategies developed BY school bus operators, FOR school bus operators to help combat bullying and harassment:

1. Seat who are susceptible to bullying or being victimized children close to the driver;
2. Separate children who are fighting or having difficulty and assign seats;
3. Be "aware of everything" and watch for the moods and signs of troubled kids;
4. Talk with bullies about being respectful on the bus;
5. Intervene before anything happens and discuss with students;

6.  Maintain a good relationship with each child;

7.  Ask about interests and hobbies;

8.  Try to engage potential bullies in positive conversations; and

9.  Above all, talk to students with respect.

These strategies build on the strengths of aggressive children and distract them from disrespectful and disruptive behavior.

In cases of bullying or harassment, you as the school bus operator must document and report all incidents and allegations. Take all your concerns to your supervisor, principal or other designated school personnel.

# REPORTING SUSPECTED CHILD ABUSE AND/OR NEGLECT

In some unfortunate circumstances, you may encounter a situation where levels of bullying or harassment have severely escalated. School bus drivers have the unique opportunity to get to know their students. Often the same driver will be assigned to a route transporting the same students for several years. This gives drivers the chance to develop relationships with students that other district staff may not have. Because of this level of trust, it is possible that a student may disclose information to a driver or the driver may begin to observe behavior leading to a suspicion of child abuse or neglect.

Each school district and/or transportation department should have specific policies and procedures that must be followed to facilitate reporting of suspected child abuse or neglect. This may include specific forms for documentation or a designated contact person. Know your district's policies and procedures for reporting suspected child abuse or neglect.

Whether you are reporting through district channels or directly to Child Protective Services (CPS), the following information is needed to the extent available:

• Name, address, and age of child;

• Name and address of custodial parent/guardian;

• Nature and extent of injury/injuries;

• Nature and extent of neglect;

• Nature and extent of sexual abuse.;

• Evidence of previous injuries, including nature and extent; and

• Any other pertinent information supporting the reasonable suspicion of abuse, neglect, or the perpetrator.

The law protects any person reporting or testifying regarding suspected child abuse and neglect. You are immune from any liability resulting from such reporting/testimony.

# UNIT C -
# STUDENT LOADING AND UNLOADING

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-2
   Fatalities During Loading and Unloading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-2

THE LOADING/UNLOADING AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-3
   Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-4
   Physical Tools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-4
   When Selecting Loading Zones at a Bus Stop Follow
   These Procedures Carefully . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-4

LOADING PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-5
   Approach and Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-5
   Stop. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-5
   Load . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-5
   Check and Proceed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-6

UNLOADING PROCEDURES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-7
   Approach and Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-7
   Stop. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-7
   Unload. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-7
   Check and Proceed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-8
   When in Doubt, Check it Out . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-8

UNIQUE DANGERS OF LOADING AND UNLOADING ZONES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-8
   Don't Deal with On-Bus Problems when Loading and Unloading. . . . . . . . . . . . . . . . . . . . . . . . . . .C-9

ENFORCING THE SCHOOL BUS STOPPING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C-9

# UNIT C -
# STUDENT LOADING AND UNLOADING

# INTRODUCTION

In Pennsylvania, and across the nation, incidents during student loading and unloading are responsible for more school bus-related fatalities than any other source. While fatalities are very low, you must be vigilant during student loading and unloading to help prevent these incidents from occurring.

Listed below are descriptions of a few fatalities. Unfortunately, students are often killed by their own school bus because the driver could not see them crossing in front of or behind the bus. A particularly hazardous situation is when a student leaving the bus reaches a point of safety, then re-approaches the bus, slipping under the wheels as it proceeds. To prevent these situations, you must be very attentive at all times during student loading and unloading.

## FATALITIES DURING LOADING AND UNLOADING

- A student was waiting in his parent's vehicle across the street from the school bus stop. As the school bus slowed to approach the stop with its amber lights flashing, the student exited his mother's vehicle and darted in front of an oncoming vehicle. The student ,a 6-year-old male, was struck and killed.

- A student was waiting at his bus stop when a car drove up on the sidewalk striking the student from behind. The student ,a 10-year-old male, was killed.

- A student exited the school bus and crossed the street. The bus driver completed student drop off and pulled up to make a left turn. As the driver was turning, the student, a 9-year-old male, chose to run toward the bus and slipped on the ice and slid under the bus, being run over by the left rear duals.

- A student was exiting her bus after dark at her bus stop. An oncoming vehicle failed to stop for the flashing school bus lights and struck her with the left front bumper. There was no evidence the driver applied the brakes. The student, a 5-year-old female, died without regaining consciousness.

- A 5-year-old female student was run over and killed by the left rear wheels of her school bus after she had exited the bus.

- A 6-year-old male student unexpectedly ran back toward the school bus, after he had been discharged from the bus and was struck and killed beneath the left front wheels of the bus.

- A student arrived at his bus stop early and decided to cross the road to a store on the opposite side of the road. When the student came out of the store, he saw the school bus approaching his stop and was in a hurry to get back to the bus stop. As the 9-year-old male ran across the roadway in the direction of his stop, he was struck and killed by a passing vehicle.

- A student and his brother missed their bus at the assigned bus stop location. The students went to their old bus stop, which had been declared unsafe due to sight distance. The bus driver had been instructed by dispatch not to pick up the student at the old location. As the school bus driver was coming up the road, the two students were in the roadway attempting to stop the bus. The school bus driver opened her driver's window to tell the students she could not pick them up at the location when an approaching vehicle came over the hill. One student was able to get out of the roadway, but the other, a 16-year-old male, was struck and killed by an approaching vehicle. The bus did not have the eight-way light system in operation.

- A 4-year-old male student ran back toward the bus to pick up something he had dropped, and was struck and killed by the right rear dual wheels of the bus.

- A student was late getting to her bus. As she ran up on the right to catch her bus, the 10-year-old female was struck and killed by the right rear dual wheels of the bus.

Loading and unloading maneuvers expose students and drivers to many hazards. You must be aware of the proper procedures for driving the bus and maintaining student behavior while performing these maneuvers. Driving procedures can be found in Units F and G.

This unit presents procedures for maintaining safety during loading and unloading. These procedures include: controlling traffic; assisting students crossing streets or highways; seating the students; and loading and unloading the students. The procedures below also cover proper use of the eight-way light system at the bus stop.

## THE LOADING/UNLOADING AREA

While children are safest on the school bus, the school bus loading and unloading area is a dangerous location because children are at a greater risk of being struck. The 10-foot area immediately around the bus is known as the danger zone because it is the area where children entering and exiting the school bus are at greatest risk of being hit by a motor vehicle, or accidentally run over by their bus driver. It is shown below in Figure C-1.



**Figure C-1. School Bus Danger Zone**

To help alleviate the danger in the loading and unloading area, the school bus driver has a number of tools at their disposal.

## EDUCATION

Educating children on how to be safe pedestrians is fundamental to school bus safety. Beginning with their first step onto a school bus, children must learn how to safely arrive at the school bus stop, board the bus, behave during the bus ride, exit the bus, and arrive home safely. Most of the time, children only get this information from the school bus operator. If the school bus operator doesn't instruct them on these items, chances are no instruction will be received until they get in trouble.

As a school bus operator, not only are you educating the students that ride your bus, you must also adequately warn (educate) other motorists of your actions when loading or unloading students. This is accomplished through different devices on the school bus.

## PHYSICAL TOOLS

All school buses in Pennsylvania are equipped with a school bus eight-way light system. This system consists of two amber flashing lights and two red flashing lights mounted on the front and rear of the bus.

School buses also have a side stop arm with a stop sign and a crossing arm. The crossing control arm, which is attached to the front of the bus, causes students to walk far enough in front of the bus so the bus driver can easily see them.

## WHEN LOADING AT A BUS STOP, FOLLOW THESE PROCEDURES CAREFULLY!

1. Load students only at designated bus stops approved by the school board. NEVER change a bus stop without approval by your supervisor. Student loading zones should be on the right side of the highway where visibility is clear. Refer to Chapter 104 of Title 67 for loading zone standards. Visit www.pacode. com.

2. Students should wait at a specific designated place. This place should be at least 10 feet from the edge of the highway at the approved bus stop. You may often have to remind students after they board to stay back from the bus as it approaches.

3. Tell students to be on time according to district policy. Typically this means students are to be at the bus stop five minutes before the scheduled pick-up time. The driver and students share the responsibility of maintaining the bus schedule.

4. As a bus operator, if you are running late, don't speed to make up the lost time. Remember, it is safety first and schedule second.

5. If you arrive at a pick-up location early or on time and the student is not present, proceed with extreme caution. The student may be running late and be rushing to catch the bus. If you proceed without double checking, you may miss the location of the approaching child.

# LOADING PROCEDURES

## APPROACH AND CHECK

1. When approaching the designated stop, start slowing down in preparation for the stop. Evaluate the stop as far in advance as possible and approach at a slow rate using extreme caution. Look for pedestrians, traffic or people who may not belong at the school bus stop.

2. Always watch for late-arriving students who may be running to the bus stop. Use the mirrors to check for students to the rear of the bus.

3. When the loading zone is between 150-300 feet away (at most the length of a football field), activate the amber flashing lights of the school bus eight-way light system to warn other vehicles. Brake gradually with the transmission in gear while approaching the stop. The greater your approach speed, the greater the distance away you should activate your amber lights.

4. Check all mirrors to see if traffic is clear and it is safe for you to stop.

5. Approach students with extreme care giving due consideration to the surface on which you are going to stop:

   a. When road and traffic conditions are normal, require students to stand at least 10 feet from the edge of the road. If students are not complying with this, remind them as they board the bus, before the next pickup.

   b. When road surfaces are hazardous (e.g., slippery, rough), stop short of the bus stop, by as much as 20 feet, and ease the bus carefully to the stop. Instruct students to always wait a safe distance from the flow of traffic, especially in inclement weather.

## STOP

1. Come to a full stop;

2. When stopped, set the parking (emergency) brake;

3. Place the transmission in neutral;

4. Open the service door slightly (note this may not be possible with some automatic doors), activating the red flashing lights, side stop arm, crossing arm, and automatically deactivating the amber flashing lights of the eight-way light system; and

5. Check traffic to assure all traffic is stopped, and open the door completely ONLY after traffic stops.

## LOAD

1. Instruct students not to move toward the bus until the bus stops and the door opens. Make sure to count all the students while loading. This will let you know if you have picked up all of the students assigned to that stop on your roster.

   a. When students must cross a roadway before getting on the bus, you must be able to see them at all times. When crossing in front of the bus, students should cross in front of the arm and should be able to see your face (at least 10 feet in front of the bus). If you have concern with a particular bus stop being at an unsafe location for students to cross the street (poor sight distance, long crossing distance for the student, etc.), let your transportation director/supervisor know immediately.

   b. Be alert to warn students of an illegally passing motorist. Stress that students must look both ways before crossing the street or highway in front of the bus. Do not tolerate crowding or pushing. Have students board the bus slowly, in single file, and using the handrail.

2. Seat students according to local policy. Refer to Unit B for Seating Plans.

   a. Keep in mind that seating capacity is limited according to the inspection sticker affixed on the bus by the Pennsylvania State Police. However, this rating is not an absolute; it is a maximum. Refer to Section 4552(d) of Title 75 as well as Sections 42, 69, and 144 of Chapter 171 of Title 67 for additional information on aisle and seating requirements.

      • Aisles shall be unobstructed at all times. Passengers may not be seated so as to encroach on the minimum aisle clearance.

      • A seating space at least 13 inches wide shall be provided for each passenger.

   b. Remember that passengers are not permitted to stand while the bus is in motion.

# CHECK AND PROCEED

1. Check all mirrors around the bus for students.

2. When all students are accounted for, prepare to leave. Close the service door, which turns off the red lights,  and retracts the stop arm and the crossing arm.

   a. Wait for everyone to be seated before putting the bus in motion. Otherwise, you cannot expect your passengers to remain seated while the bus is in motion. You may consider requiring students to be seated before the door is shut to help prevent a driver behind your bus accidentally rear-ending the bus and causing standing students to fall.

   b. Know the students assigned to your bus and be careful not to leave students stranded. Account for all the students on your bus.

   c. When all passengers are seated, prepare to proceed to the next stop.

3. Using all mirrors, check traffic, put the transmission into proper gear, then release the parking brake.

4. Check child safety, recheck the mirrors and proceed safely to your next stop.

# UNLOADING PROCEDURES

When unloading students, you must make sure all of your students get safely across the street and out of the danger zone. Unload students only at properly designated bus stops. Use the following procedures when unloading students at a bus stop:

## APPROACH AND CHECK

1.  When approaching the designated bus stop, start slowing down in preparation for the stop.
2.  As you approach the bus stop, look in your mirrors to check traffic conditions.
3.  When the loading zone is between 150-300 feet away, activate the amber flashing lights of the school bus eight-way light system to warn other vehicles. Brake gradually with the transmission in gear while approaching the stop.
4.  Do not allow students to stand until the bus has come to a full stop.
5.  Check all mirrors to see if traffic is clear and it is safe for you to stop.

## STOP

1.  Come to a full stop;
2.  When stopped, set the parking (emergency) brake;
3.  Place the transmission in neutral;
4.  Open the service door slightly (if physically possible), activating the red flashing lights, side stop arm, crossing arm, and automatically deactivating the amber flashing lights of the eight-way light system; and
5.  Check traffic and open the door completely after traffic stops, and ONLY after traffic stops.

## UNLOAD

1.  Do not permit students to leave the bus except at regularly assigned stops, unless they have written permission from a school administrator (Refer to school district policy). It is illegal for you to discharge students at places other than designated bus stops as per Section 3345(i) of Title 75.
2.  Have students exit in an orderly fashion, counting them as they exit; this will let you know if you have dropped off all of the students assigned to that stop. Observe students as they step from the bus to see all move promptly away from the danger zone. Recount the students as they reach a place of safety outside of the danger zone, i.e. sidewalks, curbsides, or inside houses for door to door routes.
    a.  Instruct students who must cross a roadway after getting off of the bus to stand on the side of the roadway far enough in front of the bus to see your face (at least 10 feet). Be alert for passing motorists so you may warn students. The students are to look both ways before stepping into the roadway. They should cross in front of the crossing arm.
    b.  Instruct students who do not have to cross the roadway after unloading exactly where they should walk or wait until the bus pulls completely away. Tell them to never re-approach the bus.
    c.  Students should never cross the roadway behind the bus.
    d.  Take extra time with elementary school age students to make sure they understand these procedures. Be overly cautious when loading and unloading these students.

## CHECK AND PROCEED

1. Check all mirrors for students, and make sure students are not returning to the bus, and check for traffic and other pedestrians;

2. Close the service door to deactivate the flashing red lights, side stop arm, and crossing arm;

3. Check the mirrors, put the transmission in gear, release the parking (emergency) brake; and

4. Recheck child safety, recheck mirrors, and proceed safely to your next stop.

If you cannot account for a student outside the bus, secure the bus, (engage emergency brake, shut off the engine and remove keys) and get out and check around and underneath the bus.

## WHEN IN DOUBT, CHECK IT OUT!

The following is an example of an alert, quick acting driver who prevented a tragedy:

• During a noon return of kindergarten students at a stop with a wide shoulder, the bus was stopped and a student was unloading. The driver saw a car in her mirrors that was obviously committed to passing the bus on the right side. The bus door was open, and the child was going down the steps. The driver grabbed the child's coat and pulled her down onto the bus step.

Hopefully, you will be prepared to act in a similar manner if the situation arises.

# UNIQUE DANGERS OF
# LOADING AND UNLOADING ZONES

1. Dropped or Forgotten Objects - Always focus on students as they approach the bus and watch for any who disappear from sight. Students may drop an object near the bus during loading and unloading. Stopping to pick up the object or returning to pick up the object, may cause the student to disappear from the driver's sight at a very dangerous time. Students should be told to leave any dropped items and move to a safe place out of danger and attempt to get the driver's attention to retrieve it.

2. Handrail Dangers - Students have been injured or killed when clothing, accessories or even parts of their body get caught in the handrail or door as they exit the bus. You need to closely observe all students exiting the bus to confirm they are in a safe location prior to moving the bus.

3. Schools - Another area where serious incidents occur is the loading and unloading zones at the schools. You as a driver must train your students not to push and shove other students when they get on or off the bus. Teach the students to use handrails and go directly to their seats and face forward at all times.

4. **Students Left on the Bus - After your last drop off, in a safe location, make sure to walk to the back of your bus and check for sleeping or hiding students before returning to the yard.**

## WHEN POSSIBLE, DON'T DEAL WITH ON-BUS PROBLEMS WHEN LOADING AND UNLOADING

As outlined in Unit B, in order to get students to and from school safely and on time, you need to be able to concentrate on the driving task. Loading and unloading requires all your concentration, especially considering the number of injuries and other incidents that occur during these times. Don't take your eyes off of what is happening outside the bus. If there is a behavior problem on the bus, wait until the students have finished loading or have unloaded to a place of safety. If necessary, pull the bus over to handle the problem.

## ENFORCING THE SCHOOL BUS STOPPING LAW

While loading or unloading, check to make certain traffic in all directions obeys the red flashing lights as required by Section 3345 of Title 75 (Pennsylvania Vehicle Code). The following summarizes this section and provides some requirements for school bus operators to follow to help with enforcement. Note that Figures C-2, C-3, and C-4 illustrate examples of required motorist stops for school buses.

• On highways or trafficways not separated by a physical barrier, traffic in all directions must stop at least 10 feet away from the bus and remain stopped until every child has entered the bus (when loading) or has reached the sidewalk or side of highway (when unloading). Painted center lines, ridged or grooved roadway dividers, or a center turning lane do NOT create separate roadways or constitute a physical barrier; all traffic must stop on highways with these markings.



**Figure C-2. Drivers Stopping for a School Bus on Undivided Highway**

ALL TRAFFIC MUST STOP

MUST STOP

RED LIGHTS ACTIVATED



Figure C-3. Drivers Stopping for a School Bus on Undivided Highway

- On highways or trafficways separated by a physical barrier, traffic moving in the same direction as the bus must stop as described above. Traffic approaching the bus from the opposite direction may proceed with caution. A highway with separate roadways is divided into two or more roadways with physical barriers such as: concrete median barrier, metal median barrier, non-mountable curb or clearly indicated dividing sections (e.g., concrete mountable curb, trees or shrubs, rock or boulders, stream grass) to block traffic between the roadways.

- The driver of a vehicle approaching an intersection where a school bus is stopped to load or unload students must stop the vehicle at the intersection until the flashing red signal lamps are no longer actuated.

- You, as a school bus driver, should not be stopping in the middle of an intersection.

- If you are having difficulty at an intersection or drop off location, work with your transportation director or supervisor to find a better location.



Figure C-4. Drivers Stopping for a School Bus at Intersection

- Emergency vehicles (fire engines, ambulances and police cars) must also obey the red flashing warning lights of a loading or unloading school bus. In fact, Section 3105(h) of Title 75 states "… the driver of an emergency vehicle shall come to a complete stop when a school bus flashes its red signal lights and activates its side stop signal arms. After stopping, the driver of the emergency vehicle may pass the school bus only after exercising due diligence and caution for the safety of the students in a manner that will not risk the safety of the students."

**If you see another vehicle disobeying these laws:**

- Try your best to warn students before they attempt to cross the highway;
- Note the license plate number, color and type of the vehicle; time and location of the incident; and identity of the driver (as much as you can tell). You must deliver a signed, written report containing this information within 48 hours to the state or local police with jurisdiction where the incident occurred.

When someone is convicted of violating Pennsylvania's School Bus Stopping Law, they will receive a 60-day driver's license suspension, five points on their driving record and a $250 fine, plus court costs.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# UNIT D -
# TRANSPORTATION OF STUDENTS WITH DISABILITIES

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-2

DRIVER RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-3

CONFIDENTIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-3

GUIDELINES FOR MANAGING STUDENTS WITH DISABILITIES. . . . . . . . . . . . . . . . . . . . . . . . .D-4
    START: A Memory Aid for Managing Students with Disabilities . . . . . . . . . . . . . . . . . . . . . . . . . .D-5

TYPES OF DISABILITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-5
    Autism  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-6
    Deaf and Blind (Deaf-Blindness). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-7
    Deafness/Hearing Impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-7
    Emotional Disturbance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-8
    Intellectual Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-8
    Multiple Disabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-9
    Orthopedic Impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-9
    Other Health Impairments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-9
        Epilepsy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-10
        Tourette Syndrome . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-11
        Attention Deficit Hyperactivity Disorder (ADHD). . . . . . . . . . . . . . . . . . . . . . . . . . .D-11
    Specific Learning Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-12
    Speech or Language Impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-12
    Traumatic Brain Injury (TBI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-12
    Visual Impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-13

TRANSPORTING STUDENTS WITH DISABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-13
    General Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-13
    Bus Stop Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-14
        Identifying Bus Stops . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-14
        Loading Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-14
        Assigning Seats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-15
        On the Road. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-15
        Unloading Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-15
    Modified Vehicles and Special Equipment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-15
        Modified Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-15
        Special Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-15
    Emergency Procedures and Evacuation Drills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .D-17

# UNIT D -
# TRANSPORTATION OF STUDENTS WITH DISABILITIES

# INTRODUCTION

There are two significant laws that ensure services to students with disabilities. The Individuals with Disabilities Education Improvement Act (IDEIA) is a federal law ensuring special education and related services to children with disabilities throughout the nation. IDEIA governs how states and public agencies provide early intervention, special education and related services including transportation. This law mandates that school districts provide transportation services for all eligible students, regardless of their disability. Chapter 14 of the Pennsylvania Code (Title 22) provides regulatory guidance in Pennsylvania to ensure compliance with IDEIA, and its regulations. This chapter can be found at www.pacode.com.

A second major law related to students with disabilities is Section 504 of the Rehabilitation Act of 1973. This federal law assures other protected students with disabilities receive the accommodations and related services they require in order to access educational programs. Students who qualify for Section 504 services do not require specially designed instruction (or special education services which would require an IEP); however, they do require accommodations that may include specialized transportation services. The federal requirements of Section 504 are addressed under Chapter 15 of the Pennsylvania Code (Title 22).

Local school districts are responsible for providing individualized educational programs (IEP) for the students who qualify for special education services under the IDEIA within their district. The school district or intermediate unit is responsible for identifying, locating, evaluating, and providing services for all students who qualify for special education within its boundaries and placing them into appropriate programs planned uniquely for them. Students are required to be included in the least restrictive (e.g., general education) environment when appropriate, including ordinary transportation to and from school. Where this is not possible or appropriate, however, specialized transportation services are provided, often involving different types of vehicles and procedures. With this special transportation, these students can receive the education, therapy and other opportunities they need.

Although transportation is a privilege for regular education students, it is an entitlement for students with special needs. Transportation is typically listed as a related service on IEPs. If special considerations for transportation are warranted for students, they will be addressed within the 504 Service Agreement (or Chapter 15 Service Agreement).

The inclusion of special education and other protected students with disabilities in general education classes and transportation is increasing. Consequently, bus drivers must have a working knowledge of the guidelines for managing students with disabilities while they are being transported; and special transportation procedures used for these students.

This unit provides information on both of these topics. The position you hold as driver for these students may be one of the most demanding and difficult jobs you will ever have, but it may also be one of the most rewarding. Keep in mind that additional, more specialized training may be provided by your employer on these topics including the proper use of wheelchair securement devices and other occupant protection systems.

# DRIVER RESPONSIBILITY

Local policy is the guideline for your role and responsibility as a driver of students with disabilities. To ensure smooth pick-up and return of students, keep in mind:

- Stops will be established by the intermediate unit or school district staff in cooperation with the transportation provider. Changes in stops must be approved by the Transportation Department. You cannot establish or change bus stops.
- The student's home may be assigned as the pick-up and return location. If so, you may wish to introduce yourself to each student's parent(s) by telephone or personal visit, and tell them approximately what time you will pick up the student each morning and approximately when you will deliver the student home in the afternoon.
- Remind parents to have the student ready for morning pickup at least five minutes before your expected arrival. If the student is continually late for pickup, notify your supervisor. (Keep written notes of dates.)
- A responsible adult should be home to receive the student in the afternoon. If not, contact your supervisor. Never leave a student with a significant disability alone, especially if help at home is expected.

**To ensure students' safety in case of a crash:**
- Keep a written description of your route, pupils' addresses, and their telephone numbers in a safe place. This information is critical to emergency response personnel.
- If you assign permanent seats in your bus, keep one copy of the seating arrangement in the bus and turn one copy in to the office.
- Coordinate activities with any aides, paraprofessionals, personal care assistants or therapeutic support staff (TSS) who may be assigned to assist specific students or the entire bus.
- Also keep written emergency seizure plans, local policies on allergy management, use of medication, etc. Be familiar with the plans and policies as described throughout this unit and in Units H and I.

# CONFIDENTIAL INFORMATION

By law, information contained in school records is confidential. No one should see school records unless he/ she has an educational interest in the child. Typically, only individuals who are responsible for some aspect of a child's educational program have an educational interest. As a bus driver, you are entitled to know certain information regarding a child's disability, and it may be shared with you, if you have a legitimate educational interest as a service provider. However, it is your duty to keep the information confidential. This means you cannot share records or information about a child with anyone who does not have an educational interest. More specifically, you cannot talk about a child's special needs with other students, parents of other students, or other bus drivers who do not provide transportation services for the child.

You will have to talk occasionally to parents and teachers about transporting a student. Apart from these practical conversations, do not discuss anything concerning students, parents, teachers, classes, or vehicles with parents or neighbors. If anyone raises a question, refer them to the proper source, i.e., teacher, principal, or supervisor. Never hold any discussions in front of the students.

Obtain medical and emergency information for each student from your transportation director or supervisor. Any medications used by the student, their administration, and any possible side effects should be included for each student as applicable. This information must be kept current and accessible to aides and substitute

drivers who will work with the students on your bus. Note any unique behavior patterns to watch for and procedures for managing any circumstances that might arise while the student is under your supervision. If you feel behavior patterns warrant additional attention, contact your supervisor. **Work closely with your employer to determine the extent of your duties regarding the administration of medication: FOLLOW YOUR LOCAL POLICIES.**

# GUIDELINES FOR
# MANAGING STUDENTS WITH DISABILITIES

To manage students with disabilities while transporting them, you must know individual specific behavior patterns and required treatments. All students are affected by other people's actions, particularly people who play significant roles in their lives. Students with disabilities may be especially sensitive to the behavior and moods of others.

Parents, teachers and special education professionals can give you information about the nature and extent of a student's disability along with other relevant information. In some instances, it may be appropriate for a bus driver to be included in an IEP meeting or a 504 Service Plan meeting in order to ensure necessary information is shared. School staff will coordinate such meetings, and you will be invited, if deemed appropriate.

In addition to following the previous guidelines for managing students outlined in Unit B, keep these points in mind when working with students with disabilities:

- Be observant and try to anticipate problems. Always expect the unexpected.
- Keep teachers, professionals and parents informed of problems with the student or significant changes   in behavior.
- In dealing with individuals with limited cognitive skills or mental retardation, work with the classroom teacher or parents to learn and understand appropriate communication methods for that student. Some students may use an augmentative communication device such as a laminated card with pictures or a computer with a voice simulator to express their needs.  It may be helpful to ask simple yes/no questions in order to communicate effectively.
- Give students with emotional or behavioral disorders some responsibility in setting the standards of behavior they must meet.
- If a student with an emotional disorder becomes agitated or loses self-control, you should verbally intervene and attempt to calm the situation. Do so in a calm, directive manner.
- Be aware that "bad days" happen. The student's efficiency and self control may vary from day to day or from week to week. These puzzling shifts may lead you to feel much of the student's behavior is willful disobedience. Remember, these fluctuations may not be under the student's control. Document these incidents and report them to your supervisor, if you feel additional attention is needed. In some cases, you may work with a classroom teacher and parent to implement a Behavior Intervention Plan (BIP) reflecting the goals identified for that student's development.
- Always put safety first. If a student's behavior is distracting or dangerous to others, report the situation to your supervisor immediately.
- Introduce a substitute driver to the students in advance, if possible, since a change in routine or environment (e.g., driver change) may cause some students to react emotionally. Substitute drivers or aides must also be made aware, and be properly trained to understand and work with each student on the bus. Make sure the new driver has explicit, written instructions about the route and pick-up and drop-off times for each student.

# "START": A MEMORY AID FOR MANAGING STUDENTS WITH DISABILITIES

You will likely carry at least one student with a disability on your bus during your driving career. Because a bus operator may not even know he/she is transporting a student with a disability, all operators should be aware of the special concerns relating to these passengers. An easy way to remember these special concerns is with the word "START."

S = Special . . . . . . . . . . . Every student is unique. You should get to know each one and learn their individual traits. Talk with the student, their parents, aides, and teachers to find out important information. Students, even those who have similar conditions, are different. The more you know about their needs, the better you can accommodate them. Be aware some information is confidential.

T = Treat Equally . . . . . . . Students with disabilities want to be treated the same as all other students. Although there are many differences, whenever possible, all students should be required to follow the same rules.

A = Attention . . . . . . . . . . You must pay specific attention to students with disabilities. Some students will behave poorly in order to get your attention. By paying attention to them when their behavior is appropriate, you may improve their behavior. They may require more of your time than other students.

R = Restraints . . . . . . . . . Students with physical disabilities often require special seats or restraining devices. If you are driving a bus equipped with these devices, learn to properly secure these students in their seats. Wheelchairs used by students need to be properly tied down.

T = Different Techniques . . One particular method may not work in all situations with all students. If you are having trouble maintaining control of a student, change your method and try something new. Keep trying until you find something that works. The old saying "try, try, try again" is particularly appropriate when it comes to working with students with disabilities. Be sure to ask other drivers or your supervisor for helpful suggestions in working with particular students or situations. Even better, consult a behavioral specialist or school psychologist with expertise in this area.

# TYPES OF DISABILITIES

In addition to the general guidelines above, you should understand the different types of disabilities defined in the IDEIA that students you transport may have, and the specific procedures used in managing each type. Many of these conditions may not be visibly apparent, so drivers must be prepared to work with different conditions.

As mentioned earlier, some students with disabilities outlined below will require specialized transportation services often involving different types of vehicles and procedures. At the same time, some students with disabilities will be included in general education transportation, so you need to be aware of any unique guidelines or specialized procedures that are required.

# AUTISM

IDEIA defines autism as, "a developmental disability significantly affecting verbal and non-verbal communication and social interaction, generally evident before age three adversely affecting a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." Autism spectrum disorders are viewed on a continuum. Students with severe autism may be nonverbal and often have mental retardation as a co-existing condition while students with milder symptoms may have some social skills deficits and a limited range of interests. Some students with autism may be included in general education transportation while others may require specialized services.

**Behaviors that may be evident in students who are autistic include:**

• Indifference to other people - Students with autism sometimes treat other people as if they were objects and just in the way. They may bump into you as if you were a piece of furniture, without excusing themselves or noticing they bumped into another person.

• Difficulty looking people in the eye - When you talk to students with autism, you may have to work hard to get and keep their attention, especially if they are not facing you. The students may not notice or pay attention to other students or adults.

• Problems with their speech and language - Some students with autism cannot speak at all, and others may just scream or make other noises. Students who do speak may have some unusual speech patterns. For example, some students have trouble with pronouns and may use "you" instead of "I" when speaking. Some students tend to repeat what they hear instead of responding in a more typical way.  For example, a student may repeat, "How are you?," instead of responding to the question.

• Unusual reactions to different parts of their environment - They are very resistant to any change in routine or environment. They are easily upset and anxious about changes other students may not even notice, such as if a different type of bus picks them up, if they are in the window seat instead of the aisle seat, or if they are sitting next to someone new. They are often very sensitive to changes in temperature, loud noises, or physical touch, and may have a panic reaction at times to some of these changes.

• Unusual interest in objects - They may cling to objects, and examine and reexamine them. They may also be fascinated by various kinds of movements, for example, becoming completely absorbed by a spinning wheel or fan.

• Problems with their own movement - They may repeat movements over and over again without any particular purpose, for example, swaying, rocking, banging their head, or flapping their hands.

• Non-age appropriate behavior - Some students with autism may display behavior more typical of much younger students.

When working with students who are autistic, remember these students are affected by a disorder; their conduct is not necessarily willful. They cannot always control or stop their behavior upon request. These students need sameness, calmness, structure, and firmness along with gentleness, and patience. Here are a few pointers:

• Stick to a routine with the students. It will be critical.

• Prepare students for changes, such as detours, new passengers or substitute bus drivers.

- Use short, simple sentences and concrete concepts when communicating. For example, "Stay in your seat."
- Recognize when students may be experiencing stress from changes in the environment.
- Do not insist on eye contact.
- Some students respond well to music. Parents may be able to help you determine what medium will provide a calming effect during the bus ride.

## DEAF AND BLIND (DEAF-BLINDNESS)

Some students may have hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs they cannot be accommodated in special education programs solely for children with deafness or children with blindness. If available, you should work with a mobility specialist and the student to determine the best methods for assistance (sighted guide techniques, etc.). Many intermediate units (IUs) will have mobility specialists who can work with you.

Drivers should learn signals for help, distress, toileting needs, illness, hunger, and any other daily events that may occur on a bus as these signals are the only means by which the student can communicate. Consider seating students who are deaf and blind close to the bus door for ease of exit/entry and to avoid objects or people who may block movement in the aisle. Also, avoid seat reassignment for behavior management to ensure a consistent orientation route from the stairwell to their seat.

## DEAFNESS/HEARING IMPAIRMENTS

Students who have hearing impairments may require special transportation, though the inclusion of students with hearing impairments in general education transportation is fairly common. Hearing impairments may range from some degree of hearing loss to totally deaf.

Students who are deaf are taught and communicate through their other senses and therefore rely on visual and tactile information. Their greatest difficulty is to learn speech and language. To communicate, the student often learns to respond to lip movement, facial expression, signs, and/or finger spelling. When reading lips, students may not understand all of what is said, so repetition may be necessary. As a driver, you may need to gain the student's attention by tapping him/her on the shoulder or waving your hand. Remember to look directly at the student, maintain eye contact, and speak clearly, naturally and slowly; shouting is useless. Repetition, facial expressions and gestures can also help with communication. Ask the teacher or parent to explain the nature and extent of the student's hearing loss, and the best way to communicate with him or her. If the student communicates using sign language, you should attempt to learn a few common, useful 'signs' the student will understand.

# EMOTIONAL DISTURBANCE

Students who are emotionally disturbed have a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects their educational performance:

• An inability to learn that cannot be explained by intellectual, sensory or health factors;

• An inability to build or maintain satisfactory relationships with peers and teachers;

• Inappropriate types of behavior or feelings under normal circumstances;

• A general pervasive mood of unhappiness or depression; and

• A tendency to develop physical symptoms or fears associated with personal or school problems.

The inclusion of students with emotional disturbance in general education transportation is fairly common. These students may act in ways that are inappropriate, either in their nature or in their timing or degree. Since many have unusual difficulties maintaining interpersonal relationships, they can be aggressive, withdrawn, anxious, or easily frustrated. These students may be unable to express feelings and needs.They may be loud, excitable, defiant and aggressive, particularly when confronted by adults setting rules, such as bus drivers. Behavior may include destroying property, starting fights, and using offensive or inappropriate language. On the other end of the spectrum, some students who are emotionally disturbed have a pervasive mood of unhappiness or depression, and do not cope well with stress. They may be excessively shy and withdrawn, and avoid contact with their peers and adults alike.

As a bus driver, it is likely you will encounter students with emotional disturbances. Therefore, it is important to be calm, firm, fair, and consistent. Pay attention to your students and immediately report any threats of suicide to the school. It is a difficult challenge to maintain a professional distance and to stay involved with the students, but it is an important responsibility of the bus driver.

# INTELLECTUAL DISABILITY

IDEIA defines intellectual disability as, "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period that adversely affects the child's educational performance." In other words, these students have impaired intellectual development, which seriously reduces their ability to learn. In addition, they struggle with age appropriate adaptive behavior skills. Adaptive behavior refers to the daily living skills that students need to function and includes communication, personal care, motor skills, and social skills. Some students will have mild intellectual disability while others will be significantly impaired, and so the levels of driver assistance and/or specialized equipment may vary.

As the bus driver, you may find it useful to assign specific seats with appropriate seat belts or child safety restraint systems (CSRS, i.e., car seat, safety vest, etc.). One person per seat is best. Consistency in the bus routes, personnel and service will help the trip go smoothly. Be patient as students with intellectual disability will require more repetition than typical peers to learn procedures.

## MULTIPLE DISABILITIES

A student with multiple disabilities has a combination of disabilities (such as intellectual disability and blindness or intellectual disability and orthopedic impairment). The combination of disabilities causes such severe educational needs that such students cannot be accommodated in special education programs solely for one of the impairments.

Students with multiple disabilities often require specialized transportation, especially if one of the impairments is an orthopedic impairment. These students are typically severely impaired and may need significant assistance in all areas of functioning. It would be important to obtain specific guidance for such severely impaired students from knowledgeable individuals such as the parents, teachers and other specialists to include physical therapists, speech therapists or mobility specialists.

## ORTHOPEDIC IMPAIRMENTS

Students with orthopedic impairments have severe orthopedic issues that adversely affect their educational performance. The impairments may be a result of a congenital anomaly, disease or other causes. Some students may require wheelchairs or other holding devices for mobility, while others can walk with crutches or a walker. Therefore, they may need help in loading and unloading the bus. Refer to the later section on special equipment and your local specialized training provided by your employer or IU.

Whenever possible, students with minor physical disabilities are integrated into the regular transportation system, but may need some slight assistance. Other students may have physical disabilities that might not affect mobility in terms of boarding a bus, but may impair speech or other forms of communication, writing, or arm, hand, eye, and head movement. This may affect their seating requirements on your bus.

**Some common physical disorders and their effects include:**

- **Cerebral Palsy (CP) —** Causes abnormal changes in physical movement, such as slow or spastic limb movement or seizures. A person with CP may be unable to coordinate body movement and may have possible speech problems. Intellectual functioning is often not affected. In the transportation setting, a student with CP may need a special harness.
- **Muscular Dystrophy (MD) —** A progressive general weakening of various muscle groups in the body. Students with MD may fatigue easily and may require the use of braces, harnesses or a wheelchair.
- **Spina Bifida —** A birth defect involving the spinal cord. Depending upon the severity of the defect, the student may be partially paralyzed (lower half of the body) or have a physical deformation. Some students with spina bifida are very verbal. On the bus, be careful with lower body positioning because these students may not have feeling in the lower half of their body. If they are positioned too close to a baseboard heater, they can get serious burns on their legs and not realize it.

## OTHER HEALTH IMPAIRMENTS

Students with other health impairments have limited strength, vitality or alertness, including a heightened alertness to environmental stimuli resulting in limited alertness with respect to the educational environment. This is due to chronic or acute health problems, such as asthma, attention deficit hyperactivity disorder (ADHD), diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, or Tourette's Syndrome. These conditions can adversely affect a child's educational performance.

When transporting students on the severe end of the spectrum, such as those requiring special transportation, you may need to talk to parents or teachers to find out about the special needs of these students on your route. Some students may wear medical identification tags specifying care and medical limitations.

Some of the more common impairments are discussed below.

# EPILEPSY

Epilepsy is a chronic nervous disorder, characterized by seizures of varying degrees. Students with epilepsy are commonly included in general education transportation. Epileptic seizures may be triggered by stress, hitting bumps in the road while driving, hot weather or a hot passenger compartment, strobes or flashing lights. You should know what to do, if a student has a seizure during the bus ride. Most students will have an "emergency preparedness plan" or "seizure plan". This plan will provide you with some basic information on how to respond appropriately for that student.

**Follow these steps to minimize any injuries to the student:**

- Listen to the student - Sometimes a student with epilepsy experiences a peculiar sensation known as an aura before a seizure. If the student warns you, pull the bus over to a safe location.
- Keep calm - The student is usually not suffering or in danger.
- Help the child to a safe place, but do not restrain his or her movements. Move anything the student may strike against with his or her head, arms, or legs. Most injuries occur from bumping hard objects.
- Do not force a hard object between the student's teeth.
- Do not give the student anything to drink.
- Saliva may flow from the student's mouth. Wipe it away with a tissue.
- Stand by until the student has fully recovered consciousness and seems clearheaded. The student may seem dazed and incoherent for awhile after a seizure.
- Encourage deep breathing after the student regains consciousness.
- Assure the student all is well and encourage him or her to go about regular activities.
- If the student is unconscious after the seizure, call for assistance and place him/her on his/her side in the recovery position.
- Occasionally, after a seizure, the student may want to sleep. Help him or her to a safe place to rest.
- Refer to local guidelines and procedures regarding the administration of medications and any supervisor/ parent notification requirements.

# TOURETTE'S SYNDROME

Tourette's Syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements, and vocalizations called tics. The early symptoms of Tourette's are almost always noticed between the ages of seven and 10 years. Most people with the condition experience their worst symptoms in their early teens, with improvement occurring in the late teens and continuing into adulthood. Students with Tourette's are commonly included in general education transportation.

Tics are classified as either simple or complex. Simple motor tics are sudden, brief and repetitive movements such as eye blinking and other vision irregularities, facial grimacing, shoulder shrugging, and head or shoulder jerking. Simple vocalizations might include repetitive throat-clearing, sniffing or grunting sounds. Complex motor tics might include facial grimacing combined with a head twist and a shoulder shrug. Other complex motor tics may actually appear purposeful, including sniffing or touching objects, hopping, jumping, bending, or twisting. More complex vocal tics include words or phrases. Do not be offended by the behavior or language exhibited as this may be a manifestation of the syndrome. Note that tics are involuntary and are often worse with excitement or anxiety and better during calm, focused activities.

**Here are a few tips for you as a bus driver:**

- Do not point out the behavior to the student;
- Give careful consideration to seat assignment;
- Stick to a routine as much as possible; and
- Keep your rules and directions short.

# ATTENTION DEFICIT HYPERACTIVITY DISORDER (ADHD)

Attention Deficit Hyperactivity Disorder (ADHD) includes primarily inattentive type, primarily hyperactive-impulsive type, and combined type. Students with ADHD have significant difficulty maintaining their attention to effortful tasks, excessive physical activity and impulsivity, or both.

**Common symptoms include:**

- Impulsiveness - A child who acts quickly without thinking first or exhibits uncontrolled, abrupt and sudden changes in behavior. Students often act without considering the consequences and may endanger or harm themselves, or others.
- Hyperactivity - A child who can't sit still, walks, runs, or climbs around when others are seated, talks when others are talking. They may also be unable to stick to one task for very long before looking for something else to do.
- Inattention - A child who daydreams or seems to be in another world or is sidetracked by what is going on around him or her.
- Forgetfulness - The student may forget items or have a tendency to misplace them.

Have patience with a student with ADHD. Like other students with impairments, have firm, fair and consistent expectations. You may need to provide verbal clues to let your student know when his/her stop is nearby so he/she can gather his/her belongings. For some students, permission to use electronic devices (i.e., music device, handheld game, etc.) may be considered to keep the child engaged in a preferred activity and minimize problem behaviors.

# SPECIFIC LEARNING DISABILITY

Students with learning disabilities are those who have a disorder in one or more of the basic psychological processes involved in understanding or using spoken or written language. The disorder may show up as trouble with listening, thinking, speaking, reading, writing, spelling, or solving math problems. This category does not include students with learning disorders caused by visual, hearing or motor disabilities, or intellectual, emotional, cultural, economic or environmental disorders. The inclusion of students with learning disabilities in general education transportation is common.

You may find it helpful to contact the classroom teacher to ascertain what is working for the student during the school day.

# SPEECH OR LANGUAGE IMPAIRMENT

A speech or language impairment means a communication disorder, such as stuttering, impaired articulation or a speech or language impairment that adversely affects a child's educational performance. The inclusion of students with a speech or language impairment in general education transportation is fairly common.

Students with speech or language impairments may have trouble communicating clearly because they may be difficult to understand. Listen attentively and repeat back what you think was said. Keep your manner of responding "encouraging" rather than "correcting" and be patient! Watch a student's reaction to your response. It will help you know whether the message has been communicated. If you still don't understand the student, ask a peer to help, or ask a series of short questions that require "yes" or "no" answers. It may be helpful to use an alternative means of communication such as a pen and paper.

# TRAUMATIC BRAIN INJURY (TBI)

Some students have acquired injury to the brain resulting in total or partial functional disability including impairments in one or more areas, such as cognition; language; memory; attention; reasoning; abstract thinking; judgment; problem-solving; sensory, perceptual, and motor abilities; psychosocial behavior; physical functions; information processing; or speech. Participation in regular transportation will be dependent on the level of impairment.

**Students with TBI may exhibit the following characteristics:**
- Reduced physical stamina,
- Possible seizures or headaches,
- Possible hearing or vision problems,
- Easily confused,
- Susceptible to mood swings, and
- Issues with social skills.

Remember to be consistent, and review the rules of the bus often. Be clear with your expectations. You may find it helpful to contact the classroom teacher to ascertain what is working for the student during the school day.

## VISUAL IMPAIRMENTS

IDEIA indicates that students who have visual impairments have vision that, even with correction, adversely affects their educational performance. They may have partial sight, meaning they can only see low light or shapes, or be legally blind. While the visual impairment may affect their educational performance, it will not affect their intelligence unless they have cognitive disabilities as well. The educational development of students with visual impairments may not be very different from students without a visual impairment. The inclusion of students with visual impairments in general education transportation is fairly common.

Students with visual impairments should be allowed to move independently, but they should be monitored for safety. Students with visual impairments may use a cane, service animal or other mobility device, and may rely on auditory and tactile information. Consultation with an orientation or mobility specialist may be warranted when transporting students with visual impairments.

If a student with a visual impairment rides your bus, provide descriptive feedback during the ride to help the student orient, especially in advance of their stop, so they can prepare. Having the student sit near the driver can help with this. Some students may need assistance navigating the narrow steps and aisles on the bus. Also, be sure to address the student clearly and specifically by name so he/she is sure you are communicating with him/her. As the student becomes more familiar with riding your bus, he/she may need less assistance as the school year progresses. Exercise particular caution during pickup and drop off.

## TRANSPORTING STUDENTS WITH DISABILITIES

As indicated in the sections above, transporting students with disabilities may involve special equipment and procedures in addition to basic bus driving skills. This section describes general procedures, unique bus stop procedures, the modified vehicles and special equipment used in transporting students with disabilities as well as emergency procedures and evacuation drills. Talk to your employer about obtaining specialized training in the use of unique equipment or procedures. You must become familiar with local guidelines and training.

## GENERAL CONSIDERATIONS

When determining the level of support a given student may require related to transportation, it is important to consider the following factors:

1. **Length of Ride –** Health factors and the impact of the student's disability should be considered as they influence the safety of the student during transit. Young students may show limited tolerance for extended bus rides, and the behavior of students with emotional disturbance or behavioral disorders tends to deteriorate as the length of the bus ride increases. There may also be unique issues for students requiring medication.

2. **Level of Assistance Needed –** The level of assistance required by a student is influenced by the student's age, size, sensory skills (e.g., vision, hearing), communication skills, level of intelligence, and social/emotional factors.

3. **Seating –** Seating decisions are generally based on the student's level of functioning. Students with limited trunk strength may require a seat belt or vest to provide additional support while on a moving bus. Students with visual impairments are likely to require an assigned seat they can independently locate. Students with significant intellectual limitations may require assistance to find their seats. Students with seizure disorders may need to be seated where they can be monitored and where lighting can be controlled.

4. **Special Adaptive and Assistive Equipment –** Seat belts, vests, harnesses, and wheelchair securement devices must be properly used. It is important to consult with a knowledgeable professional such as a physical therapist, school therapist or mobility specialist to ensure any such devices are used properly. If a student brings an assistive device on the bus, make sure it is properly secured for transport.

5. **Evacuation –** When preparing for the possible evacuation of students with disabilities, it is essential to have a written plan, which pays close attention to the individual needs of students. All students should participate in evacuation drills unless they have been exempted by authorized medical personnel. School bus operators and other personnel should plan to evacuate all students using all available exits with and without the use of the power lift (if applicable). Refer to Unit H for evacuation procedures.

# BUS STOP PROCEDURES

**Identifying Bus Stops**

- The bus stop for many students with disabilities, especially those with physical disabilities using wheelchairs, may be located on the sidewalk or driveway in front of the students' homes.
- The bus stop should have level parking, smooth approaches from the house, and adequate space for placing ramps and loading wheelchairs.
- Bus stops where you must pull your bus over to the left side of the street, facing oncoming traffic, are prohibited.
- Just as each student requires individual attention, each stop requires its own approach. Adapt your pickup and drop off procedures for the particular needs of the student and the location.
- Stops for students with disabilities require more time and care than those for typical students. Try to find a place where traffic will not be unduly held up, if the school bus eight-way light system is activated.

**Loading Procedures**

- Follow the procedures outlined in Unit C on loading and unloading for pulling up to the bus stop.
- If you can move your bus completely off of the roadway, you do not need to use the school bus eight-way light system. However, you must use the hazard warning lights.
- Sometimes students will need your help boarding or carrying their belongings. Assisting in the loading of a student with a disability (usually a student with a physical disability) is a time when you are permitted to leave the wheel of your vehicle. If you must leave the wheel, put the transmission in park or neutral and turn off the ignition. Be sure to remove the keys and set the emergency brake. On some vehicles with special equipment such as a lift, you must leave the engine on during loading and unloading. In these situations, make sure the transmission is in park or neutral, and the emergency brake is engaged before you leave the vehicle for loading or unloading. Know your vehicle.
- In order to board or exit the bus, some students may need the help of several people (e.g., parents, aides) in addition to you. Be sure all persons involved know their role in this procedure, ideally before the beginning of the school year.
- Most vehicles that transport students with disabilities have seat belts or other forms of child safety restraint systems (CSRS) you must help students secure. Before turning on the engine again, make sure all seat belts are fastened, all doors and windows are locked, all security devices are engaged, and all belongings are securely placed. Keep messages and supplies for delivery to parents or teachers in a secure place.

- Plan considerably more time to load students with disabilities, especially those with physical impairments. Follow your school district policy on wait time and expected boarding time. Parents should be instructed to have students at the bus stop five minutes before the scheduled time of arrival.

- Remember — if a student requires an aide, you must never leave him or her unattended.

### Assigning Seats

- If you are transporting a student with a disability in a large bus with general education students, don't automatically assign the student to the front seat. Typically, front seats are saved for "problem" students, and not many students want to sit near the driver. Students with disabilities are like most of your student passengers — they would prefer to sit with their friends.

- When assigning a seat to a student with a disability, consider such factors as mobility and independence of the student, needs of the student, ease of emergency evacuation, availability of dependable assistance, and vulnerability of the student during interactions with other students.

### On The Road

- While on the road, watch for any behaviors that might cause a dangerous situation. If aides are available, part of their responsibilities should be to make sure all students remain safely seated and secure. With or without aides, make periodic checks yourself. Knowing each student's specific behavior patterns will enable you to avoid potentially dangerous situations during transport. Before transporting any student with special needs, it is critical to understand the disability and potential behavior each student may exhibit.

### Unloading Procedures

- Unloading procedures are similar to loading procedures, but in the reverse order.

- Never leave students unless a parent or other responsible person is there. Since policies differ from area to area, local school district officials must establish specific procedures to follow when no responsible person is present where the student is to be unloaded.

## MODIFIED VEHICLES AND SPECIAL EQUIPMENT

Depending on the needs of students with disabilities in each school district, various modifications can be made to vehicles and special equipment can be obtained. You will be given additional training by the local school district or intermediate unit in the operation of modified vehicles and special equipment (e.g., wheelchair securement devices, car seats, child safety restraints, etc.) you will need to use.

### Modified Vehicles

Because students with disabilities have a wide variety of needs, there is a wide range of vehicles available for their transportation. State law (Section 4551 of Title 75) requires modified vehicles to conform to standards set by regulations in Chapter 171 of Title 67. These regulations may be found at www.pacode.com.

### Special Equipment

State law (Title 75, Section 4581) requires children under four years of age and transported in a school vehicle (which is a vehicle originally designed to transport 10 or fewer passengers, including the driver) must be fastened securely in a child safety seat. The law also requires children four years of age or older, but under eight years of age, must be fastened securely in a child booster seat. Always follow the child safety seat and child booster seat installation instructions, particularly for seating positions that are equipped with a lap belt only. Any children transported over the age of eight, but less than 18 years of age, must be fastened in a seat

belt. NOTE: The above provisions are for school vehicles, not school buses. The law is silent regarding school buses on this issue. If you are in a situation where you are transporting pre-school age children in school buses, follow your local school district's policies on this issue and refer to the National Highway Traffic Safety Administration's (NHTSA) Guideline for the Safe Transportation of Pre-school Age Children in School Buses (http://www.nhtsa.dot.gov).

Other special equipment you may have to use includes ramps, lifts, seat belts, positioning belts, safety vests, or harnesses. Some students with physical disabilities often use wheelchairs, and a general description of the lifts and ramps used to load and unload passengers is presented below. The specific procedures for using all special equipment will be provided as a part of your local training.

**Ramps for Bus or Vans –** Some vehicles carry ramps to allow aides to manually roll wheelchairs into a van or bus or to allow students who can walk to enter without climbing steps; a combination ramp and shallow step may also be available. These should be securely stored while the bus is in motion. You may also have to secure the ramp in place on the vehicle to use it for loading or unloading. You may need to use special techniques to push the wheelchair and the passenger up the ramp and to lower them down without straining yourself (or the attendant) and without endangering the security of the student.

**Lifts –** Buses and other vehicles designed or converted to carry students who use wheelchairs are often equipped with a lift. In these cases, guide the wheelchair onto the lift platform so the wheelchair is facing outside the bus, lock the wheelchair's brakes, and secure the safety strap. Make sure the rider's hands and arms are inside the armrests. After you secure the rider, stand back from the platform at a position where you can operate the lift controls and safely hold onto the wheelchair with one hand. As the lift rises, the front kick plate should flip up to secure the front. When the wheelchair has been raised to the bus floor level, unlock the brakes and push the wheelchair inside the bus as far as you can, then secure the brakes again, and inform your passenger you are going inside the bus.  Enter the vehicle, unlock the brakes and secure the wheelchair into position. Always position the wheelchair and secure it to the floor using four tie downs, a lap/shoulder belt, and the independent wheelchair seat belt, if it has one. Check with your supervisor for the correct method of tie downs.

Here are a few additional tips for working with wheelchairs:

- There are separate brakes for each side of the wheelchair – use them both.
- Always make sure the wheelchair brakes are engaged when the wheelchair is unattended and when the student is moving in and out of the wheelchair.
- Never lift a wheelchair by its arms or footrests (as they may come off of the chair) or by the wheels – always use the frame.
- Keep loose clothing away from the wheels.
- Always secure the passenger with a three-point seat belt system attached to the wall of the bus. The seat belt on the wheelchair is NOT a proper occupant restraint.
- If assisting a student in a wheelchair, don't forget to use the tilt bars, when necessary.

Note: Lifts should be operated in accordance with manufacturer's recommendations. No standees should be permitted on the lift while in operation and the operator should not be on the lift during operation.

EMERGENCY PROCEDURES AND EVACUATION DRILLS

The procedures to follow in case of a crash or any serious incident forcing you to stop and seek assistance are generally the same as those outlined in Unit H (Crash and Emergency Procedures) and Unit I (Student Emergencies). Carry a copy of First Aid procedures in the vehicle and make sure your vehicle has the required and optional emergency equipment listed and described in Unit H.

When planning emergency procedures, keep these points in mind:

- If immediate assistance is needed, contact 911 for assistance.

- Under no circumstances should you leave the students being transported.

- An able student can sometimes serve as a second-in-command in emergency situations, if an aide is not available. Consult with the parents and teachers in advance about the abilities of particular students to decide whether this would work.

- Assign those students who are blind and/or deaf to a partner who can assist them in case of an emergency.

- Because many students with mental impairments have trouble remembering, evacuation drills should be limited to simulations at the school, where school supervisory personnel can assist in performing the drill and help train those students capable of taking responsibility. Bus evacuation procedures and drills are described in Unit H.

- Ambulatory students with disabilities are evacuated in the same manner as students in general education, whenever possible.

- In a crisis, non-ambulatory students may be placed on the floor and pulled by their clothing or drag cloth out of any available exit. Ramps may be used to roll or slide students to the ground, if necessary. Contact your employer regarding training in these specialized areas.

- Students with disabilities who have been involved in a crash or an emergency evacuation should be examined by qualified medical personnel even if they appear uninjured. Refer to local guidelines and procedures regarding the notification of parents or guardians.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# UNIT E -
# PREVENTATIVE MAINTENANCE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-2

PRE-TRIP INSPECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-3
   VEHICLE OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-4
      Engine Compartment Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-5
      Inspect the Inside of Bus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-7
      Driver Compartment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-7
      Passenger Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-12
      Passenger Compartment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-12
   Inspect Outside of Bus:  Walk-Around Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-13
      Tires, Wheels, and Rims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-13
      Check Right Front. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-14
      Check Front Side . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-15
      Check Left Front. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-16
      Check Left Side . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-16
      Check Left Rear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-16
      Check Rear Side . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-17
      Check Right Rear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-17
      Check Brake System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-17
      Automatic Brake Adjusters (ASAs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-18

PREVENTIVE MAINTENANCE WHILE ON THE ROAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-19
   Detecting Abnormal Vehicle Behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-19
      Continuous Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-19
      Check Parking Brake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-19
      Check Service Brakes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-20
      Check Transmission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-20
      Check Steering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-20
      Check Suspension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-20
      Check Engine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-20
      Check Your Tires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-20
   Good Driving Habits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-21
      Starting the Bus and Basic Operations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-21
      Proper Use of the Clutch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-21
      Proper Use of the Brakes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-22
      Protection of the Rear Axle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-22
      Proper Use of the Transmission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-22

POST-TRIP PREVENTIVE MAINTENANCE PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . E-23
   Importance of Reporting Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-24
   Five Basic Items Mechanics Want You to Know . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-24

# UNIT E -
# PREVENTATIVE MAINTENANCE

# INTRODUCTION

The life of a school bus and the dependable service it can provide to you as an operator as well as to the pupils you are transporting is directly related to how you care for your bus. Central to this is a planned, budgeted and proactive preventative maintenance system. This system involves such items as service, adjustments, replacements, inspections based on pre-determined intervals, and tolerances. These minimize failures and costs, and maximize safe and comfortable operations. Most significantly, safety is the most important and obvious reason for performing inspections: inspecting your vehicle helps you to know your vehicle is safe. You should never operate a vehicle that is not running properly, is not safe or does not have the proper equipment on board.

As a school bus operator, you have significant responsibility in the preventive maintenance program, especially in the proactive component of preventive maintenance. Remember: with an effective preventive maintenance system, service begins with the pre-trip inspection. With an ineffective preventive maintenance system, breakdowns and complaints control the service. From an operator's standpoint, preventive maintenance includes the following items:

1.  Pre-trip inspection;
2.  Operational inspection; and
3.  Post-trip inspection.

As indicated in this unit, as an operator, you should NOT be making repairs yourself; this is the role of your maintenance team. Report, don't diagnose. However, since you are on the road with your vehicle for several hours each day, you are in the best position to observe how it performs under all conditions. Learn to recognize defects both during the pre-trip inspection and while on the road, and immediately report problems to your supervisor or the bus maintenance department. Problems cannot be repaired, if they are not reported.

This unit covers each of these items as part of your normal daily preventive maintenance tasks. Responsibility for these tasks may vary due to differences in buses and/or local policy. If you are ever unsure of the preventive maintenance duties assigned to you, ask your supervisor.

# PRE-TRIP INSPECTION

The purpose of a pre-trip inspection is to identify problems that could cause a crash or breakdown. Each school bus operator may have unique methods or procedures for completing and documenting a pre-trip inspection, so work with your supervisor to review system-specific policies and/or checklists. The key for you, the operator, is to complete your pre-trip inspection the same way each time. In this fashion, you will learn all the correct steps, improve the efficiency of your inspection and will be less likely to forget something important.

The following is a pre-trip inspection that should take an operator about 15 minutes to complete. This is only a recommended procedure that makes logical sequential sense. If you have a more efficient process that still covers the requirements in 49 CFR Section 396.13 (Driver Inspection), or if your school district or contractor requires something different, use their procedures. Remember, federal regulations require you to ALWAYS be satisfied your bus is in good operating condition and you review the last driver inspection report.

It is also good practice to always complete your pre-trip inspection the same way each time so you will be less likely to forget a step. A few items to have on hand when you complete your pre-trip inspection include:

- Work gloves to keep your hands clean;
- Rags for removing caps and checking fluid levels under the hood;
- Paper towels for cleaning small spills;
- Window cleaning fluid for washing windows, mirrors and headlights. It is good practice to clean all lights, reflectors and glass, as you go along; and
- A checklist provided by your employer (may be company-specific) for making sure you check all important items.

Remember federal regulations require that before driving your bus, you shall:

1. Be satisfied it is in safe operating condition;
2. Review the last driver vehicle inspection report; and
3. Sign the report, only if defects or deficiencies were noted by the driver who prepared the report, to acknowledge the driver has reviewed it and there is a certification the required repairs have been performed. The signature requirement does not apply to listed defects on a towed unit, which is no longer part of the vehicle combination.

There are also specific federal requirements for post-trip inspection in 49 CFR Section 396.11 (Driver Vehicle Inspection Reports) as discussed later in this unit.

# 1.   VEHICLE OVERVIEW

As you approach the vehicle, note its general condition, and look for damage or whether the vehicle is leaning to one side. Look under the vehicle for fluid, which may be fresh indicating oil coolant, grease, or fuel leaks. If any of these are noted, contact your supervisor or maintenance professional. Recognize what items are critical to operating a bus safely. If the fluid is condensation from the air conditioner, there is no need to report a problem, but if it is a fuel leak, the bus should be immediately removed from service until the problem is repaired. Also, check the area around the vehicle — above and below — for hazards to vehicle movement (people, other vehicles, objects, low hanging wires or limbs, etc.). This is of particular importance for homeland security issues.

If your vehicle has recently been in for service, pay particular attention to the problem areas to determine whether they have been adequately repaired. Review the bus repair report and/or last bus inspection report. This is particularly important if you are driving a bus that is not your own.



**Figure E-1. Pre-Trip Inspection**

## 2.   ENGINE COMPARTMENT INSPECTION

Some contractors and school districts do not require drivers to perform under-the-hood checks, but all drivers should be trained in the proper procedure. Make your first set of checks under the hood while the engine is cool and the various fluid systems have had time to stabilize.

Ensure the parking brakes are on and/or wheels chocked. You may have to raise the hood, secure loose items so they don't fall and break something, or open the engine compartment door.

Check the following while the engine is not running:

- **Engine oil level –** Remove the oil dipstick, wipe the dipstick clean with a rag and look at the indicator at the bottom of the dipstick. Push the dipstick back into the hole, making sure to push it all the way back in until it seats. Pull out the dipstick again and see where the oil has left a residue in relationship to the indicators.  Make sure the level is between the 'add' and the 'full' line.
- **Coolant level in radiator –** While the engine may not be running, you may be doing this check after someone else has used your bus, and it has not completely cooled yet. Because of this, never remove the radiator cap when the engine is hot. The fluid is under pressure, and you can be burned seriously.
  - ❖ Indentify the full hot and full cold level markings on the opaque white plastic coolant overflow tank located right next to the radiator. If the engine is hot, fill to the hot line. If the engine is cold, fill to the cold line. If you're low, top it off with a 50/50 mixture of coolant and water. There is more than one type of coolant. Only use the type of coolant specified by the mechanic. To add the coolant, unscrew or pop the top of the opaque plastic reservoir, and add your mixture until it reaches the full mark. Replace the cap tightly. If you spill any coolant on the ground, wipe it up. Certain coolants are deadly to animals, but they like to drink it because it tastes sweet. If there is no fluid in the reservoir, notify the mechanic for instructions before starting the bus.
- **Condition of hoses –**
  - ❖ To check the condition of the hoses, when the engine is cold, squeeze each hose. If the hose feels crunchy or brittle, it's old and needs to be replaced.
  - ❖ Visually inspect the hoses for cracks, tears, frayed ends, and damp or wet areas. Check the clamps at ends of the hoses.
- **Power steering fluid level. Make sure it is above the "fill" mark –**
  - ❖ Wipe the power steering fluid reservoir cap with a clean rag or paper towel before opening.
  - ❖ Visually inspect the hose for cracks, tears, frayed ends, and damp or wet areas (if any).
  - ❖ Some tanks require this to be checked when hot. Refer to your bus manual for specific details.
- **Windshield washer fluid level –**
  - ❖ The windshield washer fluid reservoir is a large, clear plastic container that may be labeled with words or a symbol on the cap showing two sprits of water.
  - ❖ Check the fluid level. You can fill this reservoir all the way to the top.
- **Battery fluid level, connections and tie downs (battery may be located elsewhere) –**
  - ❖ No smoking and extinguish all open flames. Batteries produce hydrogen gas when charging. Hydrogen is extremely flammable and explosive.
  - ❖ Clean the top surface to remove any dirt and debris with a rag before removing the caps.
  - ❖ Remove the vent caps by prying them up or turning them counter clockwise and look inside each cell. The fluid level should be level with the filler ring for each cell.
  - ❖ Use a battery fill jug. Fill any low cells with distilled water up to the proper level.

❖ Replace the vent caps and clean up any spills.

❖ Warning – battery fluid is sulfuric acid.  Do not get any on your skin or clothing. If battery fluid does make contact with your skin, flush with fresh water immediately.

❖ Only use distilled water in your battery. Anything else will cause the battery to fail.

• **Automatic transmission fluid level (may require engine to be running and be fully warmed up) –**

❖ Be careful around the running engine. The fan might come on suddenly and catch any lose clothing or jewelry and may cause serious injury.

❖ Pull out the dipstick and wipe it clean with a rag.

❖ Put the dipstick back in the hole. Make sure to push it all the way back in until it seats.

❖ Pull out the dipstick and ensure the fluid level is between the full and low levels.

❖ Use a long, thin funnel to add transmission fluid through the dipstick hole if required.

❖ There is more than one type of transmission fluid. Only use the type of transmission fluid specified by the mechanic or as shown on the dipstick or engine manual.

• **Tightness and excessive wear on belts on the alternator, water pump, and air compressor –**

❖ Learn how much "give" the belts should have when adjusted right, and check each one. Press lightly with your thumb on each belt at the belt's longest part between pulleys. In general, there should be no more than ½" to 1" of movement. The belt should not be cracked. As mentioned earlier, this portion of your pretrip will normally be done when the engine is cool. If for some reason it is not, let the engine cool before checking belts, and be careful around hot engine parts and sharp edges.

• **Inspect for leaks in the engine compartment (fuel, coolant, oil, power steering fluid, hydraulic fluid, brake fluid, windshield washer fluid, gear oil, automatic transmission fluid, battery fluid).**

❖ Except for windshield washer fluid and fuel, the fluids in your bus shouldn't get used up or go anywhere.

❖ As brake linings wear, brake fluids will drop slightly.

❖ If you notice any other fluids are low, you probably have a leak.

❖ Inspect underneath the bus looking for wet areas or drips clinging to the underside of the bus.

❖ Sticky sweet smelling fluid is coolant. The old color for coolant was green, now it comes in yellow, as well as other colors. Dark slick greasy fluid is engine oil. Honey or dark colored thick fluid with a chestnut smell is gear oil. Clear slippery fluid is brake fluid. Slippery red fluid is transmission fluid or power steering fluid. Fuel is easily identified by its odor. Windshield washer fluid comes in several colors – blue and orange are typical. Battery fluid could be on top of the battery. Don't touch this. It is acid.

❖ If you are running the air conditioner expect to see water dripping, which is just condensation and is nothing to worry about.

❖ Look for cracked worn insulation around electrical wiring. Look for bare wire spots where the insulation has broken, burnt or worn away.

❖ Don't tug on the wires. You might pull them out of the connections and disconnect the wire.

When the engine compartment inspection is complete, carefully lower and secure hood latches or the engine compartment door.

## 3.   INSPECT INSIDE OF BUS

Once the engine compartment has been checked, inspect the inside of the bus. This task can be separated into three areas: the driver compartment, the passenger entry and the passenger compartment. It is recommended you start the vehicle engine and complete this portion with the engine turned on. For diesel engines, make sure the injector pump is engaged before starting.

Refer to Unit F for starting and driving a diesel vehicle. At a minimum:

- Make sure parking brake is on;

- Put gearshift in neutral (or park, if available);

- Turn off the heaters before starting, so the engine will reach operating temperature more quickly; and

- Start the engine and listen for unusual noises.

**Driver Compartment**

At the start of your in-bus check, activate the four-way flashers and amber lights from the operator's seat. From the seated position, you can see in your mirrors whether the front ambers are working and can see the turn signals both flashing. Later, when you walk through the bus and open the back door, you can see whether the back turn signals are flashing and the amber lights in the back are flashing.

**1)  Inspect the Gauges. Check all of the following gauges:**

- Oil pressure should come up to normal within seconds after engine is started. If it does not, shut down the engine and notify the mechanic.

- Ammeter and/or voltmeter should be in normal range(s).

- Coolant temperature should begin gradual rise to normal operating range.

- Oil, coolant and charging circuit warning lights should go out right away.

- Fuel gauge should indicate a safe margin for the day's trip.

- Buses equipped with hydraulic brakes with vacuum assist have a vacuum gauge and low vacuum warning light. If the gauge reads less than normal or the warning light starts to blink, report the condition.

- Air gauges with warning buzzers on buses with air brakes stop buzzing when air pressure increases above 60 psi. Do not drive the bus, if the pressure is less than 60 psi.

**2)  Check Controls. Check all of the following for looseness, sticking, damage, or improper setting:**

- Steering wheel;

- Clutch;

- Accelerator (gas pedal);

- Brake Controls; and

  ❖  Foot brake,

  ❖  Parking brake,

  ❖  Retarder controls (if vehicle has them),

  ❖  Transmission controls.

- Horn: Horn should be heard approximately 200' away.

- Windshield wiper/washer. Spray the washer fluid before turning on the wipers, to avoid damaging the windshield.
- Lights.
    - ❖ Headlights;
    - ❖ Dimmer switch;
    - ❖ Turn signal;
    - ❖ Four-way flashers;
    - ❖ Clearance, identification, marker light switch(es);
    - ❖ School bus eight-way light system; and
    - ❖ Strobe light, if applicable.

**3)  Check All Mirrors.** Mirrors play a critical role in the safe operation of your vehicle because they allow an operator to observe the zone around the bus and look for students, traffic and other objects in this area (Refer to Unit B). For example, children standing in front of the bus may not be visible in any other way. Therefore, all mirrors must be secure, clean and unbroken. Check mirrors to make sure they are clean and adjusted so you can see all areas around the bus from the driver's seat and you can obtain the maximum viewing area consistent with the vision requirements of Federal Motor Vehicle Safety Standard No. 111, "Rearview Mirrors." Refer to 49 CFR 571.111. See Figure E-2 below. The interior rearview mirror must provide a good view of passengers and the area directly behind the bus. The right and left side mirrors must provide a clear view past the right and left rear of the bus. The right and left front fender-mounted rear mirrors (convex mirrors) must provide a clear view from the forward-most point of the front fenders past the rear of the bus. The left front fender-mounted crossover mirror (convex) must provide a view of the blind area directly in front of the bus.



Figure E-2. Location of Test Cylinders for School Bus Field-of-View Test
All Dimensions in Meters (m)/

**Outside Left and Right Side Flat Mirrors.**

These mirrors are mounted at the left and right front corners of the bus at the side or front of the windshield. They are used to monitor traffic, check clearances and students on the sides and to the rear of the bus. There is a blind spot immediately below and in front of each mirror and directly in back of the rear bumper. The blind spot behind the bus could extend up to 400 feet depending on the width of the bus. Ensure the mirrors are properly adjusted so you can see:

- 200 feet or four bus lengths behind the bus;
- Along the sides of the bus; and
- The rear tires touching the ground.



Figure E-3. Left and Right Side Flat Mirrors

LEFT AND RIGHT SIDE FLAT MIRRORS

200 Feet          200 Feet

SCHOOL BUS

Blind spot can be up to 400'

**May use in conjunction with the left and right side convex mirrors to obtain the desired visibility.**

**Outside Left and Right Side Convex Mirrors.**

The convex mirrors are located below the outside flat mirrors. They are used to monitor the left and right sides at a wide angle. They provide a view of traffic, clearances and students at the side of the bus. These mirrors present a view of people and objects that does not accurately reflect their size and distance from the bus. Ensure the mirrors are properly adjusted so you can see:

• The entire side of the bus up to the mirror mounts;

• Front of the rear tires touching the ground; and

• At least one traffic lane on either side of the bus.



Figure E-4. Left and Right Side Convex Mirrors

**May use in conjunction with the left and right side standard (flat) mirrors to obtain the desired visibility.**

**Outside Left and Right Side Cross View Mirrors.**

These mirrors are mounted on the left and right front corners of the bus. They are used to see the "danger zone" area directly in front of the bus not visible by direct vision, and to view the "danger zone" areas to the left side and right side of the bus, including the service door and front wheel areas. The mirror presents a view of people and objects that does not accurately reflect their size and distance from the bus. The driver must ensure these mirrors are properly adjusted. Ensure the mirrors are properly adjusted so you can see:

- The entire area in front of the bus from the front bumper at ground level to a point where direct vision is possible. Direct vision and mirror view vision should overlap;
- The right and left front tires touching the ground; and
- The area from the front of the bus to the service door.

These mirrors, along with the convex and flat mirrors, should be viewed in a logical sequence to ensure a child or object is not in any area of the danger zone.



**Figure E-5. Left and Right Cross View Mirrors**

LEFT CROSS VIEW MIRROR   RIGHT CROSS VIEW MIRROR

**Overhead Inside Rearview Mirror.**

This mirror is mounted directly above the windshield on the driver's side area of the bus. This mirror is used to monitor passenger activity inside the bus. It may provide limited visibility directly in back of the bus, if the bus is equipped with a glass-bottomed rear emergency door. There is a blind spot area directly behind the driver's seat as well as a large blind spot area beginning at the rear bumper and could extend up to 400 feet or more behind the bus. You must use the exterior side mirrors to monitor approaching traffic and enter this area. Ensure the mirrors are properly adjusted so you can see:

- The top of the rear window in the top of the mirror; and
- All of the students, including the heads of the students right behind you.

**Passenger Entry**

1) **Check Service Doors –** Open and close your service door to ensure it operates smoothly, and there is no broken or obscure glass.

2) **Check the Stairwell –** Ensure the skid resistant tread is in good operating condition and the stairs themselves are not bent or rusting. Some stairwells are lighted. If this is the case, the lens cover should not be broken. Make sure if a light is present, it operates correctly.

3) **Check the Handrail –** This item is required in a school bus, and it should be secure and undamaged. This is of particular importance so it does not snag a student's clothing and drag them, if the bus is in motion.

**Passenger Compartment**

A walk-through examination of the passenger compartment should be completed next. You should examine seats to ensure they are secure to the floor with no broken parts, and the condition of the upholstery is adequate. This includes making sure the seat bottoms are secure on the way down the aisle and also check for vandalism. Correct any problems, if possible, and report any hazardous conditions to your supervisor. Also be sure the compartment is free of clutter or trash, which could cause a student to slip or fall.

At the end of the walk-through, be sure the emergency door(s) is unlocked and opens and closes properly, and the warning buzzer works properly. While the door(s) must be shut to prevent carbon monoxide fumes from entering, it must not be locked at any time during operation of the bus. In addition, the door and aisle should never be blocked. The rear emergency door and side emergency door exits must open and close properly from outside the bus.

When you walk through the bus and open the back door, you can see that the back turn signals are flashing, and the amber lights in the back are flashing.

Check emergency exit windows on sides and emergency escape hatches in the roof to see they are operational and the warning buzzer works properly.

Lastly, check the school bus emergency equipment. This includes:

• Spare electrical fuses, unless vehicle has circuit breakers;

• Three red reflective triangles;

• Properly charged and rated fire extinguisher. This is a fire extinguisher with a total rating of not less than two A-10 BC for electrical and liquid-fuel fires. Ensure the pin is in place. You need to make sure the fire extinguisher is inspected at least once a year to ensure it is fully charged, properly filled and operable. Upon approval, the fire extinguisher shall be tagged, signed and dated. Check to make sure your extinguisher is tagged, signed and dated as part of your inspection. Refer to Section 171.51, 171.122, 171.132, and 171.147 of Title 67 for additional details on fire extinguishers;

• Complete First Aid Kit (refer to Unit I) including a Body Fluid Clean-Up Kit;

• Pry bar;

• Tire chains (Optional: where winter conditions require them);

• Tire changing equipment (optional);

• List of emergency phone numbers; and

• Crash reporting packet (Refer to Unit I).

Refer to state regulations in Title 67, Chapter 171 for additional regulatory information regarding safety equipment: www.pacode.com.

Don't forget to check the interior signal pilot and dashboard lights. Make sure the headlight dimmer switch is working, and check the dome and stepwell lights. Lastly, activate the school bus eight-way light system. While it is on, the red flashing lights will be activated once you open the service door of the bus. Leave all lights on at this point so you can check them from the outside during your walk-around inspection.

# 4.    INSPECT OUTSIDE OF BUS: WALK-AROUND INSPECTION

Walk around the bus for the next set of checks. Leave the engine running with the parking brake set, transmission out of gear, and lights and signal devices left on. To save time, it is a good idea to team up with another driver when checking mirrors, headlights, the red and amber flashing lights of the school bus eight-way light system, side marker lights, brake lights, and back-up lights.

**Tires, Wheels, and Rims**

Tires, wheels and rims operate together. Tires should be of the same size, evenly matched, and of the same type (radial or bias type). The recaps are permitted on rear tires unless they are single wheels, but not on the front. If using recapped tires, they must be stamped as "regroovable." Refer to Section 171.36 of Title 67 for additional details. The tread should not be separating from the tire. Rims should not be bent or damaged, and should have no welding repairs. Look for rust trails, which may indicate the rim is loose on the wheel. Rust around lug nuts may also indicate looseness. You may need to tighten with a wrench. Also, the hub oil seals, axle seals, and wheel bearing seals should not be leaking. Look for any other signs of misalignment or missing lug nuts.

When walking around, carry your pry bar or tire buddy, and strike each tire; the bar should bounce back adequately, if properly inflated. If you have any indication a tire is not properly inflated, check the tire with a tire gauge. Also check for tread depth: A minimum depth of 4/32" is required on the front tires and 2/32" on the rear tires as per Section 171.36 of Title 67. The valve stem and cap should be in place and undamaged. Also, there should be no obstructions between the dual wheels.



**Figure E-6. ABNORMAL TIRE WEAR PATTERNS**

SMOOTH    SMOOTH    CHEWED

OVER
INFLATED    UNDER
INFLATED    OUT OF
ALIGNMENT

Develop the habit of observing tires for abnormal wear patterns, which may be a symptom of suspension problems. Figure E-6 shows several types of abnormal wear that can cause steering problems, shimmy conditions and premature tire wear. Do not operate the bus, if the tire has such defects as bubbles, cracks or significant abnormal tire wear patterns.

**Check Right Front**

- Right fender-mounted mirror (previously outlined in this unit);
- Right front tires, wheels and rims (previously outlined in this unit);
  - ❖ Condition,
  - ❖ Hub oil level adequate,
  - ❖ 4/32" tread depth.
- Right front suspension;
  - ❖ Spring, spring hangers, shackles, U-bolts: Mount should be secure, not broken or cracked, without missing or loose bolts. Bushings and axle mounting parts should not be damaged, broken, or missing. Check for missing or broken leaves; leaves that have shifted and may be nearly in contact with the tire, rim, brake drum, frame, or body. For a coil spring, look for breaks or distortions.
  - ❖ Shock absorbers should be secure, unbroken and have no leaks.
  - ❖ A key with this inspection is to give valid information on important parts, and to know what constitutes an unsafe condition. YOU are responsible for safety.



**Figure E-7. Suspension System**

- Crossing arm control should be secure and not broken;
- Right front brake;
  - ❖ Brake drum – The brake drum should have no cracks, dents or holes, and no missing or loose bolts. Brake linings should not be worn thin.
  - ❖ Condition of hoses – Hoses should not be cracked, worn, or frayed, and couplings should be secure.
  - ❖ Slack adjuster (for air brakes) – The slack adjuster should have no broken, loose or missing parts. The angle between the push rod and the adjuster arm should be about 90 degrees when the parking brake is applied. When pulled by hand, brake push rod should move no more than about 1" (front brake).
  - ❖ Brake chamber (for air brakes).
  - ❖ NOTE: Valves and brake shoes cannot be checked by the operator during the pre-trip inspection.

**Check Front Side**
- Condition of front axle;
- Condition of steering system (See Figure E-8);
  - ❖ No loose, worn, bent, damaged, or missing parts.
  - ❖ Grab the steering wheel to test for looseness. Steering wheel play should not be more than 10 degrees or two inches of movement at the rim of a 20-inch diameter steering wheel.
  - ❖ Steering box and steering linkage: Look for missing nuts, bolts, fluid leaks, and damage to the power steering hose. No connections to the front wheels should be cracked.



**Figure E-8. Steering System**

- Condition of windshield;
  - ❖ Check for damage.
  - ❖ Clean it if dirty. Never wipe a dry window or mirror; this can cause fine scratches. When cleaning the windshield, never move the wiper arms from side to side because this breaks the gear in the motor. You can lift the wiper straight off of the windshield and then drop it back into place after cleaning.
  - ❖ Check the windshield wiper arms for proper spring tension.
  - ❖ Check wiper blades for damage, "stiff" rubber, and secure attachment.
- Lights and reflectors;
  - ❖ Parking, clearance and identification lights are clean, operating and proper color (amber at front).
  - ❖ Reflectors are clean and proper color (amber at front).
  - ❖ Front turn signal light is clean, operating and proper color (amber or white on signals facing forward).
  - ❖ Left school bus eight-way light system – is clean and operating.

**Check Left Front**

· Check all items as for right front;

· Check left side stop arm and wing guard. The Stop sign should come out with the lights and indicators flashing alternately; and

· Check left front fender rear and crossover mirrors as the right front.

**Check Left Side**

· Left fuel tank(s);

  ❖ Securely mounted, not damaged or leaking,

  ❖ Cap(s) on and secure.

· Battery check;

  ❖ Securely mounted,

  ❖ Adequate fluid level,

  ❖ No leaks.

· Condition of visible parts;

  ❖ Transmission not leaking,

  ❖ Exhaust system is secure, not leaking, not touching wires, fuel, or air lines,

  ❖ Frame and cross members have no bends or cracks,

  ❖ Air lines and electrical wiring are secured against snagging, rubbing and wearing;

  ❖ Spare tire carrier or rack is not damaged (if equipped),

  ❖ Spare tire and/or wheel is securely mounted in rack, and

  ❖ Spare tire and wheel adequate (proper size, properly inflated).

**Check Left Rear**

· Check left rear tires, wheels and rims (previously outlined in this unit);

  ❖ General condition,

  ❖ Hub oil level adequate,

  ❖ 2/32" tread depth,

  ❖ Make sure there are no obstructions between the dual wheels.

· Suspension: Same as front right suspension (previously outlined in this unit);

  ❖ Condition of spring, spring hangers, shackles, U-bolts,

  ❖ Axle is secure.

· Brakes – Same as front right suspension (previously outlined in this unit);

  ❖ Condition of brake drum(s),

  ❖ Condition of hoses,

  ❖ Slack adjuster (for air brakes),

  ❖ Brake chamber (for air brakes).

· Lights and Reflectors;

  ❖ Side-marker lights are clean, operating and proper color (red at rear, others amber),

  ❖ Side-marker reflectors are clean and proper color (red at rear, others amber),

**Check Rear Side**

- Lights and Reflectors;
  - ❖ Rear clearance and identification lights are clean, operating and proper color (red at rear),
  - ❖ Reflectors are clean and proper color (red at rear),
  - ❖ Tail lights are clean, operating and proper color (red at rear),
  - ❖ Rear turn signal is operating and proper color (white, red or amber at rear).
- License plate(s)is present, clean and secured;
- Splash guards are present, not damaged, properly fastened, not dragging on ground or rubbing tires;
- Rear emergency door and side emergency door exits open and close properly from outside the bus;
- Exhaust system;
  - ❖ Pipes, muffler, tailpipe and hangers are securely mounted without cracks, holes, or severe dents,
  - ❖ Muffler and pipes should not be touching wires, fuel hoses or air hoses,
  - ❖ No excessive smoke, hissing, vibration, or noise,
  - ❖ The tailpipe does not extend beyond two inches from the rear of the vehicle.

**Check Right Rear**

- Check all items as on left side and fuel tank area including straps, cap, and signs of fuel leaks:

# 5.   CHECK BRAKE SYSTEM

Brakes are the most critical piece of safety equipment on your vehicle. You will need to make sure they are working properly before taking your bus on the road. This includes the parking brake and the service brake.

To test the parking brake:

1. Fasten seat belt;
2. Allow bus to move slowly forward; and
3. Apply parking brake.  If the bus doesn't stop, it's faulty, and you must get it fixed before taking your bus on the road.

If your bus is equipped with hydraulic brakes, test for hydraulic leaks:

1. Pump the brake pedal three times;
2. Apply firm pressure to the pedal and hold for five seconds; and
3. The pedal should not move. If it does, there may be a leak or other problem. Get it fixed before operating the vehicle.

If your bus is equipped with air brakes, refer to Sections 5 and 10 of the Commercial Driver's License Manual for testing. The manual is available on PennDOT's Driver and Vehicle Services website, www.dmv.pa.gov under the Commercial Driver Information Center.

Here are some procedures for an air brake test:

- With the engine running, build the air pressure to the governed cut out (typically 100-125 psi) and shut off the engine. Turn the key, but do not start the engine; chock your wheels and release the parking brake. Check the air gauge to see if the pressure drops more than two psi in one minute. If the air loss is greater, check for leaks and fix before driving.
- Then fully apply pressure to the foot brake and hold for one minute. Check the air gauge to see if the pressure drops more than three psi. If the air loss is greater, check for leaks and fix before driving.
- Begin fanning off the air pressure by rapidly applying and releasing the foot brake. The low air warning devices (buzzer, light, flag) should activate before the pressure drops below 60 psi.
- Continue to fan off the air pressure. At approximately 40 psi to 20 psi, the parking brake valve should close by popping out.
- Check the air pressure build-up rate by starting the engine. When the engine is at operating RPM, the pressure should build from 85 to 100 psi within 45 seconds in dual air systems. If the vehicle has larger than minimum air tanks, the build-up time can be longer and still be safe. Check the manufacturer's specifications.

Regardless of what type of brake system your school bus is equipped with:

1. Release the parking brake;
2. Move forward at about five MPH;
3. Push brake pedal firmly; and
4. Watch for "pulling" to one side or any unusual brake pedal "feel" or delayed stopping action. These may indicate trouble, and you should have the bus serviced.

**Automatic Slack Adjusters (ASAs)**

All airbrake vehicles manufactured since Oct. 20, 1994, are required to have automatic slack adjusters (ASAs). ASAs should not have to be manually adjusted except when performing maintenance on the brakes and during the installation of the brake adjusters. In a vehicle equipped with ASAs, when the pushrod stroke exceeds the legal brake adjustment limit, it is an indication a mechanical problem exists in the adjuster itself, a problem with the related foundation brake components or the adjuster was improperly installed.

The manual adjustment of an ASA to bring a brake pushrod stroke within legal limits is generally masking a mechanical problem and is not fixing it. Further, routine adjustment of most ASAs will likely result in premature wear of the adjuster itself. It is recommended when brakes equipped with ASAs are found to be out of adjustment, you take the vehicle to a repair facility as soon as possible to have the problem corrected. The manual adjustment of an ASA should only be used as a temporary measure to correct the adjustment in an emergency situation, as it is likely the brake will soon be back out of adjustment since this procedure usually does not fix the underlying adjustment problem. ASAs are made by different manufacturers and do not all operate the same. Therefore, the manufacturer's service manual for the specific ASA being used should be consulted prior to troubleshooting a brake adjustment problem.)

Once everything has been completed, check for all required papers, trip manifests, permits, etc., and secure all loose articles in driver's compartment.

# PREVENTIVE MAINTENANCE WHILE ON THE ROAD

The previous section detailed checks you should make before leaving on your daily route. This section deals with preventive maintenance while on the road. The section is divided into two parts: detecting abnormal vehicle behavior, and following good driving habits that will extend the life of the vehicle and its components.

# DETECTING ABNORMAL VEHICLE BEHAVIOR

Detecting abnormal vehicle behavior requires you to use most of your senses: sight, sound, smell, and touch. As a first step, you must learn to recognize the normal running condition of the vehicle while at the wheel so you can compare normal conditions with unusual steering, rattles, odd smells, or other conditions. For this reason, and as a vital safety practice, it is important to road test the vehicle every morning before picking up the first passenger. This is not to say that after the road test, your preventive maintenance responsibilities are over. Throughout a trip, you should constantly monitor the engine gauges and the general operating condition of the vehicle in the same manner as during the road test.

**Continuous Checks**

- Watch gauges and instruments for trouble:
  - ❖ Instruments;
  - ❖ Air pressure gauge (if you have air brakes);
  - ❖ Temperature gauges;
  - ❖ Pressure gauges;
  - ❖ Ammeter/voltmeter;
  - ❖ Use your senses (sight, sound, smell, feel) to check for problems.
- Check critical items when you stop:
  - ❖ Tires, wheels, and rims;
  - ❖ Brakes;
  - ❖ Lights.
- Watch your mirrors.
- If you see, hear, smell, or feel anything that might mean trouble, check it out.

**Check Parking Brake**

Check the parking brake again before pulling out onto the road.

- If your bus is equipped with a ratchet-type lever, you should feel a distinct clicking of the ratchet pawl and the lever should lock firmly into place when you apply the brake. When properly adjusted, this brake should be capable of holding the bus on a hill. If you detect excessive looseness or lever travel, the lever slipping out of locked position, the lever binding, or the brake not holding the bus on a hill, have the parking brake adjusted.

- If the parking brake is an over-center type, it should not take excessive effort to apply, but it should still prevent the vehicle from rolling on a grade or with the transmission in gear.

- If the bus is equipped with air brakes, pull out the parking brake control knob to engage the parking brake. Put the bus in low gear and pull against the parking brake. If the vehicle does not hold with the parking brake knob in the engaged position, have the rear brakes adjusted.

**Check Service Brakes**

Check the service brakes after the parking brake, preferably before reaching the highway. Test at low speeds by bringing the bus smoothly to a complete stop. Your bus should stop in a straight line without skidding, swerving, pulling to either side, grabbing, locking, or making excessive noise.

- For buses with hydraulic brakes, the brakes should not need to be pumped to have braking power and should not need excessive pedal effort to engage. If they need either, have the brakes adjusted.
- With air brakes, the bus should stop as described above, but you have an additional check. Since air pressure is being used to apply the brakes, you will see some loss of pressure (as indicated on the air pressure gauge). In general, a brake adjustment is required, if the gauge pressure drops by more than 10 lbs. during a single brake application.
- Check the air pressure gauge, and vacuum the gauge periodically while on the road.

**Check Transmission**

Automatic transmissions should not slip or produce harsh, jerking shifts. With a manual transmission, ensure all forward and reverse gears engage smoothly with no unusual metallic clashing noises, burning clutch smells or shifting difficulties. The clutch should engage easily and smoothly, without jerking, slipping excessively, or chattering. Also, with a properly adjusted clutch, the pedal should move freely for approximately the first 1 to 1½ inches. Greater or lesser amounts of free clutch travel, or freeplay as it is commonly called, may indicate clutch wear.

**Check Steering**

While the bus is moving straight ahead, check the steering for the amount of play or looseness in the wheel. Check for a binding feel or any unusual noises when making full turns. As with the other checks above, report any unusual conditions at once.

**Check Suspension**

To ensure safe control of the bus while on the road, check the suspension. The suspension may have a malfunction, if the bus sags at one end or corner or if it bounces excessively. Also check that the bus tracks properly and does not weave or sway when turning.

**Check Engine**

In addition to periodic gauge checks, especially oil pressure, temperature and ammeter/ voltmeter, listen for any unusual engine noises. Note any hesitation in acceleration or any power loss when going uphill. This behavior can indicate cylinder misfires, damaged valves, a restricted exhaust system, or inaccurate engine timing. All of these problems can cause early engine wear and excessive fuel consumption.

As stated earlier in this section, you should continually check the items mentioned above while on the road. However, it is especially important to make these checks before picking up your first passenger. Report any abnormal operating condition immediately.

**Check Your Tires**

As mentioned in the pre-trip inspection, pay particular attention to your tires: proper inflation, no unusual wear, and proper tread depth, 4/32" on front tires and 2/32" on rear tires.

# GOOD DRIVING HABITS

The second part of your on-the-road preventive maintenance responsibility is operating the vehicle properly through good driving habits. Most of the procedures to be covered in this section will have no immediate effect on the vehicle's operation, but if practiced regularly, they will significantly increase the lifespan of the vehicle components.

**Starting the Bus and Basic Operations**

When starting your bus, don't engage the starter for more than 10 seconds. This could cause damage to the flywheel or other parts. Never operate a bus with an overheated engine or with low oil pressure. This can cause serious engine damage – pay attention to your gauges.

To ensure proper service length for tires and to avoid damage while driving, never operate your bus with flat or under-inflated tires. Driving over curbs, objects and into potholes can damage tires quickly as can rubbing tires against curbs.

Don't idle excessively. A diesel bus gets warm by driving it. You won't get heat until the bus is operating on the road. It will not get warm sitting and idling no matter how long you let it idle.

**Proper Use of the Clutch**

The clutch is the most abused component in the bus because of frequent use and because many drivers do not understand its function. A clutch assembly will give many miles of trouble-free operation, if you drive properly and maintain the clutch properly.

Here are some pointers:
- Don't use the clutch as a brake. Many drivers incorrectly use the clutch as a brake. For example, they will stop on an incline and, by feathering the clutch (letting the clutch partially out), hold the bus from rolling. By so doing, they force the slipping clutch to hold the entire weight of the bus and passengers. This severe friction generates excessive heat, which greatly shortens the life of the clutch.
- Don't ride the clutch. The throw-out bearing is a component of the clutch that does not turn when the clutch pedal is released, its normal position during driving. "Riding the clutch" is when the weight of a driver's foot resting on the clutch pedal is enough to move the throw-out bearing forward until it makes contact with the pressure plate and spins at the same speed as the engine. This serves no purpose except to increase wear and cause premature destruction of the bearing. The bearing is engineered to last a certain length of time and is factory packed in enough grease for this usage. Excessive use will use up this grease and will burn out the bearing. When shifting, use the clutch briefly and smoothly to achieve maximum durability.
- Make sure the clutch is adjusted properly. Another term you may have heard is toeboard clearance or freeplay. This refers to the amount of travel of the clutch pedal between its highest position and the point where you can feel contact being made. This clearance must be maintained in order to prevent the throw-out bearing from turning. On most equipment, clearance should be approximately 1 to 1½ inches. Due to normal wear of the clutch, clearance decreases gradually. The clutch should be adjusted frequently to maintain freeplay. Alert your supervisor or mechanic, if the clutch needs to be adjusted.

**Proper Use of the Brakes**

Brakes are another commonly abused vehicle component. You can extend brake life if you follow a few pointers. By watching the traffic ahead, you can observe when you may have to stop; slow the bus by letting up on the gas pedal prior to the stop so the brakes will be used lightly and only for a short time. You can use the engine's braking power to slow the bus prior to making a stop and to control your speed on downgrades. When stopping, apply the brakes gently whenever possible and ease up on pedal pressure as speed drops so you are using very light pressure at the end of the stop. Do not:

- Disengage the clutch until the bus has almost stopped; and
- Brake quickly or harshly or for extended periods of time on downgrades.

Both of these actions cause excessive brake heat and shorten brake life and braking effectiveness. Delayed braking can result in abrupt stops and ultimately in crashes. For buses with automatic transmissions, refer to the section on shifting procedures in Unit F (Driving Fundamentals).

**Protection of the Rear Axle**

Protection of the rear axle is a third good driving habit. For long rear axle life, never spin the rear wheels on slippery surfaces (such as snow or ice) or loose surfaces (such as sand or gravel). If the rear wheels spin for a long time, the high speed will throw the lubricant out from between the gears, which can damage the differential assembly. In more extreme cases, the internal gears may seize and break the shaft. Also, if a spinning wheel suddenly hits dry pavement or solid ground, the resultant shock can totally destroy the differential.

**Proper Use of the Transmission**

Proper use of the transmission can save wear and tear on gears, clutch, engine, and brakes. Maintain a constant speed whenever possible to save fuel and reduce wear on drive line components.

**Manual Transmission.**

With a manual transmission, always start the vehicle moving in low gear, moving at a slow rate of speed. This will ensure proper lubrication of internal transmission and rear axle parts, and will avoid the possibility of lugging the engine or slipping the clutch. As you move faster, progressively shift the transmission to the gear that will maintain the desired road speed. When driving a vehicle with a manual transmission:

- Always start off in first gear when carrying a heavy load;
- With a four-speed transmission, use first through fourth gears on level ground;
- With a five-speed transmission under light load conditions, use second through fifth gears for normal driving;
- When going up hills, downshift to avoid lugging the engine;
- When going down a hill, use one gear lower than would be required to go up the hill. Using lower gears will help slow the bus down and prevent the brakes from overheating due to excessive use; and
- Stop completely before shifting into first gear or reverse.

**Automatic Transmission.**

For vehicles equipped with automatic transmissions, proper selection of the correct gear provides better control without undue wear on the transmission. Avoid using the accelerator to hold a vehicle with an automatic transmission on a hill. When driving a vehicle with an automatic transmission, use the gearshift as described in the owner's manual for better vehicle control. Shifts are especially helpful when approaching hills and grades. Before driving a bus equipped with an automatic transmission for the first time, consult the owner's manual for detailed operating instructions. While the preventive maintenance on-the-road checks and driving habits presented in this section are vitally important to the safe operation and long life of the vehicle, your single most important preventive maintenance responsibility is to immediately and accurately report any malfunctions.

# POST-TRIP PREVENTIVE MAINTENANCE PROCEDURES

Your maintenance responsibilities are not over until you stop the vehicle, check it over, and report its condition to your supervisor or maintenance department. Complete the following steps at the end of every trip:

- If possible, fill the fuel tank in the evening rather than waiting until the following morning, if this is one of your responsibilities. This will reduce the overnight condensation of water vapor inside the fuel tank.

- When parking your bus, after you set the parking brake and put the transmission in neutral, allow the engine to idle slowly as per manufacturer's recommendations. This will permit proper lubrication of all engine parts, and is of particular importance for diesel vehicles.

- While the engine is idling, check the interior for broken windows, ripped seats or other damage that should be repaired before the bus is used again. Check on and under the seats for sleeping students, books, clothes or other materials that may have been left by the students.

- Sweep the floor and steps of the bus. Enforcing a clean bus policy with your students will help you maintain your bus. Also, periodically washing the interior of the bus including seats, windows and windowsills is good practice.

- Check the exterior of the bus for burned out bulbs or other damage that needs to be repaired. Re-enter the bus, turn off all electrical equipment, shut off the engine, remove the keys, and secure the bus.

- Generally, drivers should remove the key from the ignition. Check with your supervisor for your local policy on this issue.

Remember that federal regulations in 49 CFR Section 396.11 require every motor carrier require its drivers to report, and every driver shall prepare a report in writing at the completion of each day's work on each vehicle operated, and the report shall cover at least the following parts and accessories:

- Service brakes, including trailer brake connections;

- Parking (hand) brake;

- Steering mechanism;

- Lighting devices and reflectors;

- Tires;

- Horn;

- Windshield wipers;

- Rear vision mirrors;

- Coupling devices;
- Wheels and rims; and
- Emergency equipment.

The regulation also details report contents, corrective actions and exceptions.


# IMPORTANCE OF REPORTING PROBLEMS

Clearly, your responsibilities as a school bus operator include reporting any and all abnormal conditions encountered during the day to your supervisor or maintenance department. This could be something you discovered in the pre-trip inspection, while the bus was in service, or after your trip. Failure to inspect equipment before each trip and failure to report defects and needed repairs cannot only create costly maintenance problems, it can also create an unsafe condition for you and your passengers. Remember, problems cannot be repaired, if they are not reported.

When reporting, be accurate in describing the problem; you do not needed to diagnose. Mechanics will need accurate information on:

1. Location;
2. Timing;
3. Sounds; and
4. Other descriptive characteristics.

Write it down, pass it on, get it fixed.

Report anything affecting safety or possibly leading to mechanical breakdown. The vehicle inspection report tells the vehicle owner about problems that may need to be fixed. Keep a copy of your report in the vehicle for one day. That way, the next driver can learn about any problems you have found. Federal regulations outline additional recordkeeping requirements and timeframes. Refer to 49 CFR Sections 396.3 and 396.21.


# FIVE BASIC ITEMS MECHANICS WANT YOU TO KNOW

1. Understand and learn to read your gauges. Knowing your voltage meter, oil pressure and water temperature readings could save your engine.

2. When you first notice any type of repair that needs to be done, write it up immediately. This could prevent a major repair later and be less costly to fix.

3. If you drive a diesel bus, remember to let your bus idle as per manufacturer's recommendations in the lot before you turn it off. This will cool down the turbocharger and may extend engine life.

4. If you have a flat tire in a rear wheel, do not drive on it. A minor cost can turn into an expensive replacement.

5. The glow plug (if equipped with one) on the dash on a diesel bus will go out when the bus is ready to start.

# UNIT F -
# SAFE DRIVING

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-3

THE DRIVING TASK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-5
  Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-5
  Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-6
  Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-6

DRIVER CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-7
  Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-7
  Expectancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-8
  Skills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-8
  Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-8
    Illness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-8
  Drugs and Driving:  Alcohol. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-9
    The Truth about Alcohol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-9
    What is a Drink?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-9
    How Does Alcohol Work?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-10
    What Determines Blood Alcohol Concentration (BAC)?. . . . . . . . . . . . . . . . . . . . . . . . . . .F-10
    How Does Alcohol Affect the Brain?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-10
    How Does Alcohol Affect Driving? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-10
  Drugs and Driving:  Other Drugs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-11
  Concentration and Attitude . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-11
    Aggressive Driving . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-11
  Attention and Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-13
  Driver Fatigue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-15
    Warning Signs of Driver Fatigue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-15
    At-Risk Groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-15
    Avoiding Consequences of Driving While Fatigued . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-16
  Cell Phones and Texting While Driving . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-16

VEHICLE CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-17
  Pre-Trip Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-17
  On-The-Road Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-18

ENVIRONMENTAL AND ROADWAY CONDITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-18
  Scanning Ahead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-18
    Importance of Scanning Ahead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-19
    Know How Far to Scan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-19
    Look for Traffic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-19
    Check Mirrors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-19
  Driving on Slippery Surfaces. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-19
    Before Your Trip . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-19
    While on the Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-20
    After Your Trip. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .F-21

Reduced Visibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-21
    Weather Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-21
    Bright, Glaring Sunlight. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-21
    Night Driving. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-21
Equipment Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-22
Heavy Wind. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-23
Highway Hazards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-23
    Road Geometry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-23
    Intersections and Right-of-Way . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-24
    Unregulated Intersection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-24
    Regulated Intersection:  Yield Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-24
    Regulated Intersection:  Stop Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-24
    Regulated Intersection:  Traffic Signals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-25
    Circular Intersections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-25
    Uniformed Police Officer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-26
    Private Drive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-26
    Crossing Main Highways . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-26
    Road Surface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-26
    Roadside Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-26
Pedestrian Hazards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-27
Vehicle Hazards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-27
    Drivers in a Hurry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-27
    Losing Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-27
    Lack of Communication by Other Drivers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-28
    Failure of the Other Driver to Observe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-28
    Inadequate Adjustment by the Other Driver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-28
    Aggressive Driving by Other Motorists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-29
    Slow-moving or Stopped Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-29
    Multiple Vehicle Hazards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-29
    Work Zones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-30
    Motorcycles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-30

CONTROLLING SPEED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-30
    Following Distances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-31

STOPPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-32
    Stopping Distance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-32
    Speed and Traffic Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-33

# UNIT F-
# SAFE DRIVING

# INTRODUCTION

The social and economic cost of traffic crashes in the United States is tremendous. Over the last few years, the country has experienced millions of reportable crashes per year in which thousands of persons have been killed and millions injured. These are not just statistics; the numbers represent real people who are our families, friends and co-workers. The economic loss is estimated to be in the billions every year.

One piece of good news is school bus transportation is the safest mode of ground transportation. In Pennsylvania, for example, school bus crashes account for less than a ½ percent of the total number of vehicular crashes. In striving for the elimination of all crashes involving school buses, there needs to be an understanding of what causes them so that we can implement better, safer driving techniques as countermeasures. One way to understand crashes is to identify three primary contributing factors to crashes:

- The driver;
- The vehicle; and
- The road and its environment.

According to police crash reports, the following diagram represents these factors and the relative frequency of their occurrence.



**Figure F-1. Crash Factors and Relative Frequency of Occurrence**

As shown, driver error is the cause of most crashes, followed by road condition, and vehicle defect or malfunction. A human factor may be speeding while operating a vehicle. In fact, Pennsylvania school bus crash statistics show the top five driver actions implicated when the school bus was the prime unit in the crash were: failure to stop; improper turn; speeding; tailgating; and other improper driving. "Distracted driving" and "careless backing" were other significant factors. All of these are human factors.

Vehicle factors may be mechanical failures, such as bad brakes or tires. Road-related factors can be limited sight distance, poorly marked roads or missing road signs, or sudden changes in roadway width. Weather is also a major factor affecting road conditions. Too often, drivers fail to consider wet roads or fog when they drive. Pennsylvania school bus crash statistics indicate school bus drivers were more likely to be noted for driving too fast for conditions in crashes occurring in rain-fog conditions and especially snow-sleet conditions, than in clear weather conditions. Remember: Safety first, schedule second!

When you consider road transportation as a system, it is clear that as school bus operators, you can directly control some factors, but not others. For example, you can control driver factors (how you operate a vehicle), and to a certain degree vehicular factors (practicing good preventive maintenance techniques as discussed in Unit E). On the other hand, as a school bus operator there is not much you can control in the roadway environment. You cannot engineer a roadway to eliminate shoulder edge drop-offs, nor can you control the weather. However, you can learn how to safely operate your bus, if you encounter dangerous roadway conditions.

Therefore, safe driving techniques can be applied to counteract many crash causes, especially those involving driver error and even some involving roadway and vehicular issues. Crashes can be reduced through the knowledge and practice of safe driving techniques. Learning safe driving procedures and techniques designed to help you, the driver, avoid getting yourself, your vehicle, and your passengers into hazardous situations are a critical part of your job as a school bus operator. A number of short courses on the basics of defensive driving are offered throughout the state. You should consider enrolling in one of these courses to improve your driving skills and to become aware of your limitations as a driver. There is nothing new or magical about the concept of defensive driving. The formula is simply:



**Figure F-2. Safe Driving Formula**

Recognize Potential Hazards **+** Decide on the Defense **+** Act in Time **=** Safety

This unit considers how you can apply these steps to the following types of normal and unusual conditions you must face while driving a school bus.

This unit will focus on safe driving techniques for school bus operators geared towards reducing the number of crashes in the categories listed previously in this unit.  It will focus on:

• The driving task;

• Your condition to drive (Driver);

• The condition of your vehicle (Vehicle);

• The weather and road conditions (Environmental and Roadway); and

• Road construction, pedestrians and other obstacles (Other).

Note that Unit H (Crash and Emergency Procedures) covers procedures and techniques for emergency and crash situations where the driver did not or could not avoid a potential hazard.

# THE DRIVING TASK

Although most of us take it for granted, driving is hard work because it requires us to do several things at the same time. This is especially true for school bus operators who have additional responsibilities, such as student management and discipline; loading and unloading students; monitoring traffic, etc. When you drive a bus, you control the vehicle: slowing down, speeding up, and turning; anticipating what other road users might do; and deciding whether evasive actions are necessary. These tasks are to be accomplished simultaneously to steering the vehicle to get from where you were to where you need to be. Unfortunately, there are limits to how much information you can process at a time. When there is too much information to accurately and safely process, mistakes can happen.

**Figure F-3. The Driving Task**

There are three distinct phases to the task of driving: information, decision and action. Roadway information leads the bus operator to decide to do something and take action. The results of that action provide more information, which then starts the process over again. This can be shown graphically in Figure F-3.

## INFORMATION

School bus operators, indeed ALL drivers, need good information to perform the driving task safely. In this fashion, operators can properly PERCEIVE the information and RECOGNIZE its meaning. As the following points indicate, how drivers get information is important to safety:

- Signs have standardized shapes and colors to help drivers easily recognize their message. Most agencies rely on the Manual on Uniform Traffic Control Devices (MUTCD) for information on sign design and messages. For example, studies on human factors have shown most drivers can read only three or four familiar words at a glance, so signs are designed and installed to avoid overloading drivers with information. They also consider information needs of both older and novice drivers. If there are confusing sign messages, report them to your supervisor who can follow up with the appropriate entity responsible for traffic control devices in the area.

- Signs should be placed at locations where drivers expect them and can see them. Often the message is repeated for emphasis. As a school bus driver, pay attention to these messages that relay critical safety information. For instance, using chevron signs along the outside of a curve can reinforce a curve warning sign. Learn about the basics of traffic control devices so you can readily absorb and react to the information provided.

- Engineers avoid designing roads with sharp curves just over hillcrests to improve sight lines for drivers. Similarly, they use consistent design curve radii so drivers are not surprised by curves that are too sharp or too gradual.



**Figure F-4. Chevron Signs on Outside of Curve**

## DECISION

As a school bus driver, you combine the information you gather with your driving experience to make driving decisions. It takes skill and experience to make the right decision. You must pay attention so you can process several information messages at once, and ignore what you do not need. These are skills that novice drivers are still learning and older drivers sometimes find difficult to process.

Hopefully, information and decision points are spread at sufficient distances on the roadway. It is easier to make several simple decisions, one after the other, than it is to make one complex decision in a hurry.

## ACTION

Action happens when you make a decision and act on it. The results of the action provide more information, which, as indicated above, starts the process over again.

For your trip to be a safe one, you need time to respond to different conditions. Reaction time is the time it takes for you to notice a condition, decide what to do about it and then act on it. The more information you must process, or the more complex the decision required, the longer it takes you to react. This concept is discussed in detail below.

While a perception-reaction time of 2.5 seconds is commonly used in highway design, driver response times can range from 1 second for a simple decision like initiating a panic stop to 15 seconds for a complex decision like choosing the correct exit in a convoluted highway interchange.

Further complicating the task of driving for the bus operator are distractions inside and outside the vehicle. Maybe you hear a cell phone ring or students are being unruly on the bus. Maybe you get a call on the radio from your dispatcher. Perhaps a student is talking to you or pointing out something of interest along the roadside. Maybe you are a bit behind schedule, and your students are slow to get onto the bus and get seated. Maybe the trip must be made during a severe rain or snowstorm. Possibly it is just a beautiful day to drive through a scenic area, and you are tempted to focus on something other than the road.

Whatever it is that draws your attention from the road, it is clear that driving a school bus requires the operator's full attention. This will be discussed later in this unit.

"Better late than never" is an old saying that applies to all drivers. You can't rush and drive cautiously at the same time. Establish a pattern for driving cautiously and stick with it, late or not. Drive according to the motto "Safety first…schedule second." Plan your schedule, so you always have plenty of time.

# DRIVER CONDITIONS

Human factors refer to people and the things they do, or fail to do, that can cause a crash. Human factors cover drivers whose attention is distracted, are tired or ill, (and may have taken medication that makes them drowsy), or use alcohol or drugs. Age also affects a driver's ability to be safe on the roadway. For example, older drivers often have vision problems at night, while younger drivers tend to take more risks on the road.

Therefore, you must be mentally and physically prepared to drive every minute of every trip. Your general attitude toward driving, whether you look upon driving a school bus as a privilege and high responsibility or as a chore to be done in as little time and with as little effort as possible, will determine, more than anything else, your safety record. Some temporary conditions, such as anger, worry or fear, can take your mind off of the road. A tendency to daydream can be just as dangerous, because driving requires concentration at all times.

Before operating a school bus, take mental stock of yourself: Are you mentally and physically ready to drive? Safe drivers are aware of their own deficiencies and constantly strive to overcome them. YOU are in control of these elements.

## KNOWLEDGE

Your experience in driving automobiles can provide a basis for learning to drive a school bus. Automobile and bus operation require similar knowledge, including rules of the road and general safe driving habits. The skills needed to operate the steering, transmission, lights, wipers, and other mechanical components of a bus are similar to those for an automobile. There is usually, however, a difference in scale. Most differences between automobile and bus operation are due to the relatively large size and weight of the bus. Always remember a bus has a longer stopping distance, slower acceleration, wider turning radius, and higher and wider clearances. Another difference is while school bus drivers sit higher and have a better forward view, there is much more reliance on mirrors for adequate rear and side viewing.

Evaluate your knowledge of state and local driving rules and regulations, driving fundamentals, emergency procedures, and defensive driving habits. If you are uncertain or have questions, ask before it's too late. As described above, school bus drivers need good information to operate their vehicles safely. Since much of the information is communicated through traffic control devices, learn about traffic control devices and methods by which they communicate information.

**Also, state laws applicable to all drivers (both cars and school buses) are not described in this manual. For information on these laws, check the following references:**

1. Pennsylvania Driver's Manual (Publication 95), available at www.dmv.pa.gov.
2. The Pennsylvania Vehicle Code (Title 75), available at www.dmv.pa.gov.
3. Commercial Driver's Manual (Publication 223), available at www.dmv.pa.gov.
4. Chapter 71 of Title 67 – Transportation (Pennsylvania Code), available at www.pacode.com.
5. Chapter 104 of Title 67 – Transportation (Pennsylvania Code), available at www.pacode.com.
6. Chapter 171 of Title 67  - Transportation (Pennsylvania Code), available at www.pacode.com.

## EXPECTANCY

As all drivers gain experience, they expect things to happen as they always have. For example, you would expect a green light on a traffic signal will be followed by a yellow light. Another example would be you adjust your speed as you perceive an upcoming curve, because it looks similar to other curves you have driven, and your experience tells you that you need to slow down. This is called expectancy. If a signal changes from green to red, or a curve becomes suddenly tighter halfway through, your expectancy is violated, and you may react in an erratic or incorrect way.

The more experienced you become, the greater the level of expectancy, which leads to quicker and more accurate reactions as long as your expectancy is met. A sudden change in road conditions, which violates your expectancy tends to increase your reaction time and increases the likelihood of you making an error because you take longer to understand the situation and respond to it. If extra time is not available, the result may be a crash. That is why expectancy violations cause problems, and removing expectancy violations helps improve safety.

Keep in mind, however, not to become complacent. Most likely you are on the same route day after day, and it can be easy to become complacent regarding driving habits. Defensive driving techniques and anticipating hazardous conditions is critical.

## SKILLS

If you need practice in driving maneuvers, operating safety equipment, or other driving-related skills, ask your certified school bus driver instructor or supervisor for help, then practice with your supervisor or on your own. If you have been involved in a crash, some school districts and/or employers will require you to complete remedial training with an instructor. Always practice in an empty bus rather than in one filled with students. Unit G and H provide you with descriptions of the many skills you will need to acquire to safely operate a school bus.

## HEALTH

Check yourself for fatigue, sickness, deficient eyesight, and deficient hearing. If you have any of these health problems, you should not drive until cleared by health services or your doctor.

For example, if you have problems with judging distance, or you know your depth perception is not as good as it might be or used to be (this is a normal eye-aging condition), it does not mean you may have to give up driving. You must be aware of the problem, however, and adjust your driving to it.

### Illness

Once in a while, you may become so ill you cannot operate your bus safely. If this happens to you, you must not drive. However, in case of an emergency, you may drive to the nearest place where you can safely stop.

# DRUGS AND DRIVING: ALCOHOL

Alcohol and drugs affect the driver and make them unfit to drive. Driving under the influence of alcohol is a serious violation of state law and a very dangerous mistake. People who drive under the influence are involved in crashes resulting in over 20,000 deaths every year. As a school bus driver, your personal decisions affect the lives of many others. You should know:

- How alcohol works in the human body;
- How alcohol affects driving;
- Laws regarding drinking and driving;
- Note that Pennsylvania has zero tolerance for drug and alcohol use by school bus and school vehicle drivers. Refer to Sections 1612, 1606 and 3802 of Title 75; and
- Legal, financial, and safety risks of drinking and driving.

If you have questions about the law, ask your supervisor to provide clarification.

**The Truth about Alcohol**

There are many dangerous ideas about alcohol use. The driver who believes in these wrong ideas is more likely to get into trouble. Here are some examples:

| TABLE F-1. Statements About Alcohol ||
| --- | --- |
| **FALSE** | **TRUE** |
| Alcohol enhances your ability to drive. | Alcohol is a drug that will make you less alert and reduce your ability to drive safely. |
| Some people can drink a lot and not be affected by it. | Everyone who drinks is affected by alcohol. |
| If you eat a lot first, you won't get drunk. | Food will not keep you from getting drunk. |
| Coffee and a little fresh air will help a drinker sober up. | Only time will help a drinker sober up; other methods just don't work. |
| Stick with beer – it's not as strong as wine or whiskey. | A few beers are the same as a few shots of whiskey or a few glasses of wine. |

**What is a Drink?**

It is the alcohol in drinks that affects human performance. It doesn't make any difference whether that alcohol comes from "a couple of beers," two glasses of wine, or two shots of hard liquor. All of the following drinks contain the same amount of alcohol:

- A 12-ounce glass of 5 percent beer.
- A 5-ounce glass of 12 percent wine.
- A 1½-ounce shot of 80 proof liquor.

## HOW DOES ALCOHOL WORK?

Alcohol goes directly from the stomach into the blood stream. A drinker can control the amount of alcohol he or she takes in by having fewer drinks or none. However, you cannot control how fast your body gets rid of alcohol. If you have drinks faster than your body can get rid of them, you will have more alcohol in your body and your driving will be more affected. The amount of alcohol in your body is commonly measured by the Blood Alcohol Concentration (BAC).

## WHAT DETERMINES BLOOD ALCOHOL CONCENTRATION (BAC)?

BAC is determined by the amount of alcohol you drink (more alcohol means higher BAC), how fast you drink (faster drinking means higher BAC) and your weight (a small person doesn't have to drink as much as a large person to reach the same BAC).

## HOW DOES ALCOHOL AFFECT THE BRAIN?

Alcohol affects more and more of the brain as BAC builds up. The first part of the brain that is affected controls judgment and self control. One of the bad things about this is it can keep drinkers from knowing they are getting drunk. And of course, good judgment and self control are absolutely necessary for safe driving.

As blood alcohol concentration continues to build up, muscle control, vision, and coordination are affected more and more. Eventually, a person will pass out. Alcohol can increase the effects of other drugs.

## HOW DOES ALCOHOL AFFECT DRIVING?

All drivers are affected by drinking alcohol. Alcohol affects judgment, vision, coordination, and reaction time. It causes serious driving errors, such as:

- Slower reactions to hazards;
- Driving too fast or too slow;
- Driving in the wrong lane;
- Running over the curb;
- Weaving;
- Straddling lanes;
- Quick, jerky starts;
- Not signaling, failure to use lights;
- Running stop signs and red lights; and/or
- Improper passing.

All of these increase the chances of a crash, losing your driving privilege, or injuring or killing yourself and/or others. Crash statistics show that the chance of a crash is much greater for drivers who have been drinking than for drivers who have not.

# DRUGS AND DRIVING: OTHER DRUGS

Besides alcohol, other legal and illegal drugs are common in our society. Laws prohibit you from possessing or using certain drugs while on duty.  These same laws prohibit you from being under the influence of any "controlled substance," including amphetamines, such as "pep pills" and "bennies," narcotics, or any other substance that can make you unsafe.

While illegal drugs are always unlawful to possess and use, you should be aware that many medicines, prescribed and over-the-counter (e.g., cold medicines), can affect your eyesight, hearing and judgment. They may make you drowsy or otherwise affect your safe driving ability. While possession and use of a drug given to a driver by a doctor is permitted if the doctor informs the driver it will not affect safe driving ability, you should always read the labels on patent medicine bottles to check for possible side effects. Ask your doctor or pharmacist about prescriptions or over-the-counter medications you are taking to get a clear understanding of their effects and whether they will impair your ability to perform the task at hand. Also, keep in mind the interactions of different drugs can cause impairment.  Ask your doctor or pharmacist.

The safest rule is not to mix drugs with driving at all. Mixing the use of alcohol and drugs while operating a school bus can lead to crashes resulting in death, injury and property damage. Drug abuse can lead to arrest, fines and jail sentences in addition to the loss of a person's driving privilege.

# CONCENTRATION AND ATTITUDE

Being under emotional stress from home or work will often affect your ability to control the students on a loaded bus, so you will have to be extra cautious as you drive. You may be tired, dejected or depressed, making it hard to cope with a bus full of young, spirited children. During times of stress, ordinarily good drivers may miss stop signs and red lights, and may fail to yield the right-of-way. Under normal conditions, they would be less likely to commit these serious errors.

You must be alert to your own attitude. If you are under emotional stress and are unable to concentrate on your driving, or fear you cannot control your temper under stress, don't drive. Under normal day-to-day stresses, your attitude can affect your good driving judgment. You must be aware of your attitude so you can be alert, think positively, keep yourself under control, and keep your mind on the job at hand.

It is extremely important you remain alert and attentive at all times. Even the shortest lapses into daydreaming or inattention can cause severe crashes to occur. Always be aware of what is happening in your surroundings and anticipate what other drivers will do and what road conditions will be in order to act appropriately.

### Aggressive Driving

One component of driving with the right attitude is not to engage in aggressive behavior while operating your bus. Speeding and other aggressive driving behaviors are among the leading causes of highway crashes and fatalities in Pennsylvania. However, many motorists don´t realize they in fact, aggressive drivers. Here are some questions to help you determine if you are an aggressive driver:

- Do you speed excessively?

- Do you tailgate slower vehicles?

- Do you race to beat red lights or run stop signs?

- Do you weave in and out of traffic?

- Do you pass illegally on the right?

- Do you fail to yield the right of way to oncoming vehicles?

If you answered yes to any of these questions, you may be an aggressive driver and are putting yourself, your passengers, and other people on the road with you at increased risk of a crash.

While a driver must commit two or more of the following 16 offenses to be categorized as an aggressive driving violation and/or crash, ANY of these behaviors is aggressive and not acceptable for school bus operators:

1. Making an illegal u-turn;
2. Improper/careless turning;
3. Turning from the wrong lane;
4. Proceeding w/o clearance after stop;
5. Running a stop sign;
6. Running red light;
7. Failure to respond to other traffic control device;
8. Tailgating;
9. Sudden slowing/stopping;
10. Careless passing or lane change;
11. Passing in a no passing zone;
12. Making improper entrance to a highway;
13. Making improper exit from a highway;
14. Speeding;
15. Driving too fast for conditions; and
16. Driver fleeing police (Police chase).

As illustrated by Pennsylvania school bus crash data, any of these behaviors is unacceptable when operating a school bus.

- For example, Pennsylvania school bus crash data indicated drivers involved in rear end collisions are very likely to be noted as tailgating.
- In fact, drivers noted as tailgating were 61 times more likely to be involved in a rear-end collision than drivers involved in collisions who were not noted as tailgating.
- Similarly, drivers noted as failing to stop were 33 times more likely to be involved in an angle collision than drivers who were not. (An angle collision occurs when two vehicles approaching from non-opposing angular directions collide.) These typically result from one vehicle failing to either stop or yield right of way from a Stop or Yield sign, running a red light, or not clearing an intersection when the conflicting movement's signal turned green.

The line is aggressive driving leads to a higher risk of crashing.

To mitigate this, follow these guidelines:

- **Plan ahead –** Allow yourself enough travel time to prevent a time crunch. Safety first, schedule second.
- **Concentrate –** Don't allow yourself to become distracted by students. Do NOT talk on your cell phone, eat or drink while driving.
- **Relax.**
- **Drive the posted speed limit –** Fewer crashes occur when vehicles are travelling at or about the same speed. Driving too fast can lead to "bottle-necking," bringing traffic to a standstill and frustrating drivers.
- **Be late rather than unsafe –** Obviously schedule is important, but just be late, if safety will be compromised.
- **Set an example for younger passengers –** Children are keenly observant. Educating them at an early age through your actions will teach them the importance of being courteous.

While many people associate aggressive driving with road rage, they are two different behaviors. Road rage, which is a criminal offense, is often the result of aggressive driving behavior escalating into an assault with a vehicle or other dangerous weapon. NEVER take your anger out on someone else on the road. Sometimes incidents of road rage are caused by simple misunderstandings between drivers. One driver may make a momentary error in judgment that another driver sees as aggressive, though none was intended.

## ATTENTION AND MONITORING

As mentioned earlier, there are many things you must be aware of when you are driving a school bus. You must be able to divide your attention between the students, the road, other vehicles, and your own bus. At each point on your trip, you must focus your attention on the most important factor at that time. For example, you must carefully focus on the students crossing the street at loading and unloading zones.

First, <u>determine what you need to observe, inside and outside the bus,</u> while driving the bus. Inside the bus, you must be aware of the students and their behavior, the dashboard, your inside mirror, and the steering wheel. Outside the bus, you must observe other traffic, pedestrians, your outside mirrors, the road in all directions, and the surrounding area.

Next, <u>prioritize your monitoring and attention</u>. For example, it is critical to monitor student behavior especially when they are misbehaving, and before and after student pickup and dropoff as described in detail in Unit C. If behavior is taking too much attention away from your driving, stop the bus, and get control of the students.

On the dashboard, you must check the fuel gauge, oil gauge, temperature gauge, and speedometer. It is best to look at the gauges carefully at the start of the trip, and occasionally during the trip, especially if there seems to be a problem with the bus. The speedometer should be monitored throughout the entire trip to maintain a safe speed.

There is usually one inside mirror you must monitor, although a rearview mirror may be present on some Class C buses. The interior mirror is used to monitor the students, most frequently when there are behavioral problems. If you have a rearview mirror, monitor it frequently throughout the trip to watch the behavior patterns of the traffic behind the bus.

You should always be aware of and monitor your hand position on the steering wheel. As indicated in Unit G, your hands should be placed on opposite sides of the wheel, and the hand-over-hand method or the push-pull method should be used for turning.

Constantly monitoring the traffic in front of the bus is a necessity. Your eyes should move back and forth across the road, scanning the activity. Always be on the lookout for pedestrians, especially at intersections, near parks, houses, and parked cars. Use efficient eye scanning habits and a systematic search pattern to search for conflict situations.

There are many ways to pay attention to your surroundings while driving the bus. Use the method that is most comfortable to you and allows you to be more aware of everything around you. For example, when stopped at a bus stop and loading passengers, you should concentrate on the students outside the bus. Most of your time should be spent focusing on the cross view mirrors and directly at the students through the front and side windows, while monitoring other traffic through the side mirrors. When the bus is in motion, your attention is focused less on the cross view mirrors, and more on the road in front of the bus. Your view must alternate between the front window of the bus, the side mirrors, the rearview mirror (if present), the interior of the bus, and the dashboard. While looking at each of these in a systematic order, it is important you always remember to check everything.

More attention is needed on areas more critical for student's safety. It may be helpful to follow the guidelines presented in the following table for how often you should check things.

| TABLE F-2. Attention and Monitoring Guidelines | | |
|---|---|---|
| **How Often?** | **While Driving** | **At a Bus Stop** |
| Constantly | Other traffic; road in front of the bus. | Side mirrors; crossover mirrors; road in front and to the side of the bus; students loading the bus. |
| Frequently | Side mirrows; rearview mirrors; interior of the bus; area near road for pedestrians. | Interior of the bus; surrounding area. |
| Occasionally | Speedometer; controls on dashboard. | Control on dashboard. |

Watching all of your mirrors, controls and surroundings is a lot to remember. Distractions while driving can affect your attention. The most common thing that will distract your attention is the students riding the bus. Be prepared for this, and be sure to know the guidelines for managing students discussed in Unit B. The road conditions also affect your ability to concentrate; however, drivers usually will concentrate better on days when the weather is bad. Remember, the highest rate of injury in Pennsylvania school bus crashes involved crashes where drivers were speeding and distracted, or speeding and tailgating. Pay attention and monitor your behavior.

Don't forget to pay careful attention when the weather is good, too; others will be enjoying the nice weather and may not be paying attention either. Surprisingly, Pennsylvania school bus crash data reveals head-on, backing, angle, and hit fixed object crashes are more likely to occur with no adverse weather conditions and on dry pavement than in adverse weather conditions. It appears from this that data drivers may be complacent in better weather. It is important to pay attention and be vigilant at all times.

# DRIVER FATIGUE

Illness, exhaustion or weariness from hard work or lack of sleep also can rob a driver of the extra edge of alertness is necessary for greatest safety in driving. If you feel you are unable to operate the school bus safely, do not drive, and ask your supervisor for a replacement.

Statistics from the National Highway Traffic Safety Administration (NHTSA) estimate there are over 100,000 fatigue-related crashes each year in the United States. In most cases, these driving fatigue crashes occur because drivers don't recognize the dangers of drowsy driving.

According to research by NHTSA, the sleep-wake cycle determines when we get tired. In spite of individual variations, a specific amount of uninterrupted sleep is necessary for each 24-hour period, usually about eight hours, and subsequent alertness will be compromised without that amount of sleep. Additionally, sleeping less than four consolidated hours can impair performance for tasks requiring strict vigilance, like driving. When we begin to get drowsy, our reaction time slows, and it takes us longer to process information. As a result, fatigue can result in impaired performance for basic tasks needed for driving, and could ultimately lead to a driver veering off of the road or into oncoming traffic.

Note that because of the body's natural rhythms, there are two periods of maximal sleepiness in a 24-hour day—one roughly from 3 a.m.–5 a.m., and a second, less pronounced period, from 3 p.m.–5 p.m.

**Warning Signs of Driver Fatigue**

The National Sleep Foundation warns there are numerous signs of driver fatigue including:

- Your eyes feel heavy;
- You blink and yawn frequently;
- You become less attentive to the road (miss your exit, don't activate your eight-ways when approaching a bus stop, etc.);
- Your head feels heavy, and you have trouble keeping your head up;
- You can't remember the last few miles driven;
- You drift from your lane or hit a rumble strip;
- You experience wandering or disconnected thoughts;
- You have difficulty focusing or keeping your eyes open;
- You tailgate or miss traffic signs; and
- You have to jerk your vehicle back into the lane.

**At-Risk Groups**

Several groups are more likely to be involved in driving fatigue crashes, according to NHTSA. Men under the age of 30, shift workers and people who are chronically sleep deprived are more likely to drive drowsy and suffer driver fatigue injuries. Many school bus operators have second jobs. If fatigued from the first, it could lead to problems when operating a bus.

**Avoiding Consequences of Driving While Fatigued**

There are ways to prevent driver fatigue, starting even before you get behind the wheel:

- Get a good night's sleep. While this varies from individual to individual, the average person requires about eight hours of sleep a night;

- Be alert and recognize early warning signs of fatigue;

- Avoid alcohol and medications (over-the-counter and prescribed) that may impair performance;

- Don't rely on your students, the radio or opening a window to keep you awake;

- Eat sensibly and avoid heavy meals; and

- Remember not to use any drug that hides fatigue - the only cure for fatigue is rest.

Clearly, your physical condition affects your ability to drive safely. Be sure to get plenty of sleep and only drive the school bus if you are in good physical and mental health. Finally, be as familiar with the route as possible. The better you know the roads, the more time you will be able to spend concentrating on the important things.

# CELL PHONES AND TEXTING WHILE DRIVING

Cell phones have grown enormously in popularity in the past decade, and research continues to quantify how cell phone calls and texting contribute to crashes. For example, a study conducted by the Insurance Institute for Highway Safety found motorists who use cell phones while driving are four times more likely to get into crashes serious enough to injure themselves. Along the same lines, according to the Human Factors and Ergonomics Society, drivers talking on cell phones are 18 percent slower to react to brake lights and take 17 percent longer to regain the speed they lost when they braked. A Virginia Tech study* looked at the relative levels of distractions caused by various cell phone tasks and found the following:

| TABLE F-3. Relative Levels of Distraction Caused by Various Cell Phone Tasks | |
|---|---|
| **CELL PHONE OR OTHER RELATED TASKS** | **RISK OF CRASH OR NEAR CRASH EVENT** |
| **Light Vehicle/Cars.** | |
| Dialing Cell Phone. | 2.8 times as high as non-distracted driving. |
| Talking/Listening to Cell Phone. | 1.3 times as high as non-distracted driving. |
| Reaching for an Object (i.e. electronic device, other) | 1.4 times as high as non-distracted driving. |
| **Heavy Vehicles/Trucks** | |
| Dialing Cell Phone. | 5.9 times as high as non-distracted driving. |
| Use/Reach for Electronic Device. | 6.7 times as high as non-distracted driving. |
| Text Messaging. | 23.2 times as high as non-distracted driving. |

It is clear driver inattention is a leading cause of crashes, and talking on the phone and texting behind the wheel lead to distraction. In fact, anything your cell phone can do – hands free, texting, downloading music, navigation, etc., is distracting. The primary responsibility of the bus driver is to operate their bus safely.  As described above, the task of driving requires full attention and focus. Using a cell phone can distract drivers from this task, risking harm to themselves and others. Available research indicates whether it is a hands-free or hand-held cell phone,  the cognitive distraction is significant enough to degrade a driver's performance. This can cause a driver to miss key visual and audio cues needed to avoid a crash.

* Information on the Virginia Tech Study can be found at:
http://www.vtti.vt.edu/pdf/7-22-09-VTTU-Press_Release_Cell_Phonesand_Driver_Distraction.pdf

As of March 8, 2012, it is illegal in Pennsylvania to use a wireless communications device to send, read or write a text-based communication while driving and while the vehicle is in motion.  The law allows drivers to be pulled over and cited just for the texting offense and the penalty is a $50 fine plus other costs.  In addition, the use of hand-held mobile telephones for all drivers engaged in the operation of a commercial motor vehicle is prohibited in Pennsylvania except when it is necessary to communicate with law enforcement officials or other emergency services. Both the ban on texting for all drivers and the ban on cell phone use for commercial vehicle drivers were enacted by the Federal Motor Carrier Safety Administration in 49 CFR 392.80 and 392.82 and have been adopted in their entirety in Pennsylvania through 67 Pa.Code 231.

In summary, at times when the distractions are the greatest, you will need to find ways to maintain your concentration. Listed below are a few suggestions that may help. Your own methods for keeping your mind on safe driving or methods you learn from other drivers may work just as well.

- Observe traffic defensively — always be on the lookout for what the other driver might do;
- Visualize the route and what you are going to do;
- Make a concentrated effort to keep extra space between you and the vehicle ahead of you;
- Have a systematic pattern of mirror checks you always follow;
- Keep watch to maintain a safety circle around the bus;
- Remind yourself of the responsibility you have transporting students;
- Drive mindfully, not mindlessly — keep tuned in to the bus, all the sounds it makes and how it feels;
- Count the students as they get off the bus, and watch where they all go. Make sure the same number reach safe zones before proceeding; and
- Do not talk/text on your cell phone while driving.

# VEHICLE CONDITIONS

You must be aware of vehicle conditions before driving and constantly monitor your vehicle as you drive. This is discussed in detail in Unit E. Identifying a problem with your vehicle quickly can prevent a failure, which can result in a crash.

## PRE-TRIP CONDITIONS

The purpose of a pre-trip inspection is to identify problems that could cause a crash or breakdown. Each school district or contractor may have unique methods or procedures for completing and documenting a pre-trip inspection, so work with your supervisor to review system-specific policies and/or checklists. The key for you, the operator, is to complete your pre-trip inspection the same way each time to identify potential problems. Be sure you can adequately answer the following questions:

- Is the school bus you are assigned to drive in safe operating condition?
- Will it respond instantly and effectively to all controls?
- Have you checked it over?
- Did you report deficiencies to your supervisor and have they been corrected?

You are the driver and are responsible for the vehicle you are driving. Refuse to drive an unsafe bus. Remember, if these reported deficiencies are not corrected, you can report them to the area supervisor, school principal, school superintendent, state board of education, or state police.

You have to use and take advantage of all vehicle components. It is your responsibility to see they are complete, operational and safe. Correct deficiencies before your route, or if you are suspicious of a potential mechanical problem, report it, and have it checked.

## ON-THE-ROAD CONDITIONS

Mechanical problems that will create potentially hazardous conditions may develop during your route. Safe drivers use all their senses to constantly check the mechanical operation of the bus.

- Sight – Constantly check all gauges for proper readings, check lights, and watch for smoke or fire.
- Smell – Constantly check for telltale odors of smoke, exhaust fumes, gasoline, oil, and burning rubber.
- Sound – Listen for unusual noises, such as engine knocking or clashing gears.
- Touch – Often you will feel the first sign of trouble. Be alert for loss of steering, brakes, transmission, power, or other vehicular functions.

If you identify a mechanical problem during your route, be prepared to act. If you are at all uncertain whether the problem constitutes a safety hazard, stop the bus, call your supervisor and follow school district guidelines or procedures.

# ENVIRONMENTAL AND ROADWAY CONDITIONS

During the course of a school year, you will face a variety of environmental and roadway conditions demanding alert and skillful action. These conditions may include rain, ice, snow, mud, fog, flood waters, bright sun, and high winds, as well as potholes, edge drop-offs, missing or malfunctioning traffic control devices, and roadside hazards. While these conditions rarely cause crashes by themselves, they can make driving more hazardous than normal, especially when combined with human and/or vehicle factors.

Most likely, you will be driving over the same route twice a day during the school year. You'll become thoroughly acquainted with the route and, after a short time, may begin to take the road for granted. But conditions change rapidly: potholes develop during the spring thaw; grades can wash away; shoulders can become soft; railroad crossing approaches appear different depending on the time of day; loose gravel can accumulate; and slick spots can develop through accumulations of snow and ice, or oil deposits. Conditions are different each day, and you must be alert to detect these changes so as not to be caught unaware. Road conditions do not generally cause crashes by themselves. However, crashes related to road conditions often occur because drivers fail to adjust their driving behavior to road conditions. Your responsibility is to be ready for changing conditions, anticipate problems and adjust your driving behavior to match conditions.

## SCANNING AHEAD

To be a safe driver you need to know what's going on all around your vehicle.

All drivers must scan ahead and search for potential conflicts or hazardous conditions. Use a systematic search pattern and efficient eye scanning habits to identify conflict situations. To properly scan ahead:

- Have a clean windshield and properly adjusted mirrors;
- Develop the habit of scanning 360 degrees around the bus – front, sides and rear;
- Don't stare too long at a particular object, as you will be less aware of clues from your larger field of indirect vision; and
- Focus farther ahead as your speed increases, and slow down if your view becomes limited by hills or curves.

**Importance of Scanning Ahead**

Because stopping or changing lanes can take a lot of distance, knowing your vehicle and what traffic is doing on all sides of you is very important. You need to look far enough ahead to make sure you have room to maneuver your bus safely.

**Know How Far to Scan**

You should look 12 to 15 seconds ahead. That means looking ahead the distance you will travel in 12 to 15 seconds. At lower speeds, that's about one block; at highway speeds, it's about a quarter of a mile. If you're not looking that far ahead, you may have to stop too quickly or make quick lane changes. Looking 12 to 15 seconds ahead doesn't mean ignoring conditions that are closer. You need to shift your attention back and forth, near and far.

**Look for Traffic**

Look for vehicles coming onto the highway, coming into your lane or turning. Watch for brake lights from slowing vehicles. By identifying these conditions far enough ahead, you can change your speed or change lanes, if necessary, to avoid a problem.

**Check Mirrors**

When using your mirrors while driving on the road, check quickly. This means about 3 to 5 seconds of scanning time. Look back and forth between the mirrors and the road ahead. Check your mirrors every 5 to 8 seconds. Don't focus on the mirrors for too long. Otherwise, you will travel quite a distance without knowing what's happening ahead. Refer to Unit E for more information on mirror positioning and usage.

The use of your mirrors will greatly extend the view outside and around the bus. For example, the side mirrors allow you to see the traffic approaching from behind your bus and those passing you, in addition to the surroundings at loading and unloading zones. The crossover mirrors also allow a further view in front of the bus, most often at a loading or unloading zone. Carefully checking and rechecking these mirrors for students that may be in front of the bus during loading or unloading is essential.

You must be alert to all hazards. The key to your defense is timely recognition and avoidance. Always try to leave yourself an escape route.

# DRIVING ON SLIPPERY SURFACES

A roadway condition drivers often encounter is a slippery road surface. This may be the result of rain, snow, ice or even wet leaves, or standing water on the roadway. Expert drivers can safely control a vehicle on slippery surfaces. Also, by following proper procedures before, during and after your trips, you can help keep your vehicle in the best condition to operate as safely as possible on slippery surfaces, and maintain control while driving.

**Before Your Trip**

- Start on time, but adjust driving to conditions; safety first...schedule second; and
- Ensure chains are secure for snow and icy conditions, if applicable.

**While on the Road:**

- Use windshield wipers at all times in rain, snow, sleet, and heavy fog;

- Use of headlights is mandatory;

- Check brakes immediately after driving through deep puddles or standing water. If they fail to work properly, pump the brakes to help dry them while the vehicle is moving. For air brakes, cautiously apply steady pressure;

- Set a regular speed, and drive slower than posted speed limit or what you would normally drive in dry road conditions, especially on bridges and in tunnels;

- Start the bus in the lowest appropriate gear for better traction, if ice or wet snow is on the driving surface. Loss of traction due to spinning the wheels during starting may cause the drive wheels to become stuck even more firmly. If on a crowned road or hillside, the bus may start to slide or fishtail off of the road under these conditions;

- To avoid getting stuck or spinning the wheels, try to keep the bus moving slowly and steadily forward in gear. If the wheels start to spin, let up slightly on the accelerator to allow them to take hold. If the bus stops, do not continue to spin the wheels in the hope of pulling out. In mud and soft sand, this will only dig the wheels in deeper;

- When approaching intersections and when stopping, pump the brakes once or twice so the wheels won't lock on the ice. With air brakes, use gentle, but steady pressure. Make turns smoothly and avoid applying the brake;

- Avoid skidding;

- Plan ahead for expected hazardous areas of the route. These include: icy bridges, stretches of road that have been slippery in the past, uphill stops, and intersections;

- For buses with manual transmissions, do not disengage the clutch until the bus is almost completely stopped;

- Maintain a greater than normal safe following distance from other vehicles; and

- When pulling onto the highway, allow for longer acceleration time required for school buses.


Estimate depth and extent of standing water partially or totally covering the roadway. When driving on snow- or ice-covered highways, judge the effect of traffic and temperature on road surface friction by noting whether other vehicles are skidding. Remember, bridges freeze before the road surface. If ice is melting on the highway, be alert for ice patches near underpasses, tree-lined areas, buildings or other shaded areas. Note spots where direct sunlight may have accelerated melting, and look for additional ice patches ahead on the highway.

You must drive slower to be able to stop in the same distance as on a dry road. Wet roads can double the stopping distance of your bus. Reduce speed by about one third (e.g., slow from 55 mph to about 35 mph) on a wet road. On packed snow, reduce speed by one half or more. If the surface is icy and impassable, stop driving as soon as you can safely do so and call for assistance.

**Black Ice –** Black ice is a thin layer clear enough you can see the road underneath it. It makes the road look wet instead of icy. Any time the temperature is below freezing and the road looks wet, watch out for black ice.

**Hydroplaning –** In some weather, water or slush collects on the road. When this happens, your vehicle can hydroplane. Hydroplaning occurs when a layer of water builds between the rubber tires of your bus and the road surface, leading to the loss of traction, and thus preventing the vehicle from responding to steering, braking or accelerating. It becomes, in effect, an unpowered and unsteerable sled. It does not take a lot of water to cause hydroplaning. Hydroplaning can occur at speeds as low as 30 mph, if there is a lot of water. Hydroplaning is more likely, if tire pressure is low or the tread is worn. (The grooves in a tire carry away the water; if they aren't deep, they don't work well.) Be especially careful when driving through puddles. The water is often deep enough to cause hydroplaning.

Remember to inspect your tires as outlined in Unit E for a tread depth of 4/32" on the front tires and 2/32" on the rear tires as per Section 171.36 of Title 67, and avoid standing water.

**After Your Trip:**
- Sweep water or snow from the bus, including the steps;
- Clear mud or snow from windows, mirrors, lights, roof, and reflectors; and
- Don't forget to complete your post-trip inspection procedures.

## REDUCED VISIBILITY

**Weather Conditions**
When you think of bad weather you probably think of slippery road conditions, but rain, snow, fog, and smog also reduce visibility. Adjust your driving accordingly, and take the following precautions:

- Follow local pre-trip inspection guidelines;
- Keep the windshield clear. If snow or ice builds up on front or rear windows, stop the bus and remove it; and
- Don't hesitate to leave the roadway at a safe spot to sit out a heavy shower, snow squall or thick fog. However, always remember to keep in contact with your supervisor.

**Bright, Glaring Sunlight**
While bright sun or glare may not be considered bad weather, they can create serious hazards for motorists. Don't be caught unprepared. Take the following special precautions for safe driving in bright sun:

- Carry sunglasses and use them when necessary;
- Adjust visors to block out direct sun;
- Avoid looking directly at the sun, bright reflections, or glare since they can affect your vision for several seconds; and
- Clean the windshield inside/outside.

**Night Driving**
When examining national crash data for ALL vehicles, about half of traffic fatalities occur at night, although only about one quarter of travel occurs after dark. Although intoxication and fatigue contribute to the high rate of nighttime crashes, nighttime driving is inherently hazardous because of decreased driver visibility.

In Pennsylvania, approximately 6 percent  of crashes involving a school bus occurred at night. While most of your trips as a school bus operator occur during daylight hours, there may be several times when you will be driving during hours of darkness. These may be during field trips or special events, or just early morning routes

during the winter. As nighttime hours increase, so does your exposure to the perils of night driving. Unlike the temporary hazards associated with snow and ice, the dangers of night driving exist all winter and, to a lesser extent, all year.

Why is night driving particularly challenging? The challenges are greater than during the day because many of the visual cues necessary for safe driving, such as warning signs and pavement markings, are harder to see. In addition, even drivers with the best visual acuity have reduced visual efficiency at night. Namely, your peripheral vision is sharply reduced, your depth of field is reduced and the low light makes it more difficult to focus on objects. Further, artificial light can't compare in efficiency to natural light, and the narrow beams of light from headlights give you an automatic case of tunnel vision. Daytime visual cues, such as colors, are nearly worthless at night.

At night, take the following driving precautions:

- **SLOW DOWN.** Just because the speed limit is 40 mph, it doesn't mean you have to drive that fast. Remember, the speed limit is an indication of the maximum safe speed during optimal driving conditions.
- Change other driving techniques. For example, don't overdrive your headlights. If you are driving at 55 mph, it will take you up to 300 feet to stop, while the average headlights will illuminate only 250 feet ahead.
- Increase your following distance behind the vehicle in front of you because distance perception is more difficult to judge at night.
- Exercise caution. It takes time for the average eye to adjust to night vision. Drive with special caution during this critical adjustment period. Avoid highway hypnosis caused by prolonged and forced staring.
- Don't look directly at oncoming lights. Visibility is affected considerably by oncoming headlights at distances of 3,000 feet or more. Staring at oncoming headlights will also distort your vision for up to seven seconds. That translates to a distortion lasting a distance of 565 feet when traveling at 55 mph.
- Don't look off into the darkness, because your eyes will have trouble adjusting to the road lights again. You may be able to learn to steer by the side light cast by cars ahead of you.
- Use pavement markings and delineators as guidance devices. Often, they form a corridor of reflected light in which a stalled car or pedestrian will show up as a blank spot.
- Your eyes need to adjust to night lighting and driving in dark conditions. If you are exposed to bright sunlight during the day, it will take your eyes longer to adjust, and it can impair your night vision considerably. Therefore, wear your sunglasses, if exposed to bright sunlight during the day.

## EQUIPMENT ADJUSTMENTS

- Keep headlights clean and make sure your windshield is clean inside and outside. Any reduction in the amount of light available to your eyes reduces your night vision.
- Always use low beams on sharp curves and when traffic is approaching. Your bright lights can blot out the warning glow of cars coming around the curve toward you. Also, keep headlights on low beam in cities or towns, and in fog or haze.
- Keep your instrument panel lights dim. If too bright, they produce unnecessary glare and distraction.
- If oncoming drivers fail to dim their lights, don't blind them with your high beams. This creates a hazard to yourself and your passengers.
- Don't tailgate.

• If it is necessary to stop the bus on the shoulder of an open highway, choose a spot visible for at least 500 feet to oncoming and following traffic (see Figure F-5). Turn off the headlights, but leave parking lights and/or hazard warning lights on.

**Figure F-5. Parking on a Hill**



# HEAVY WIND

While loss of traction and limited visibility are the most common roadway and weather-related problems you will face, you should also be aware of and ready for potential hazards caused by heavy wind. Because of the height of a vehicle, the side of the bus acts like a sail, and a strong crosswind at the top of a hill or at the end of a tunnel, or even gusting winds on an open straight section of highway, can cause an unprepared driver to lose control of the bus. Passing large vehicles also may expose you to a sudden burst of a crosswind. Large vehicles can cause drafts; be careful when driving near them on the open highway.

# HIGHWAY HAZARDS

The shape, surface and roadside conditions of the highways you drive on each day can cause potential hazards. Whether you drive on major highways, country roads, city streets, or some combination of these, you must be prepared for potential hazards arising from these conditions.

You should be able to identify potential hazards arising out of the interaction between vehicles and highway. Any point in the highway where drivers are confronted with decisions represents a potential point of conflict. For example, a vehicle starting to exit from a freeway may suddenly return to the freeway, or drivers unfamiliar with route signs may be in the wrong lane and change lanes suddenly as two major routes split. A point where the highway becomes narrower also represents a potential source of conflict. At points where four lanes become two, other vehicles may change lanes suddenly.

**Road Geometry**

The geometry of a highway describes features that affect or relate to its operational quality and safety. These features, which are visible to the driver and affect driving performance, include: roadway curvature; intersections and interchanges; number of lanes and lane width, presence of shoulders and curbs; channelization and medians; and other miscellaneous elements like driveways and bridges.

As a driver, pay attention to the shape of the road and the potential for unseen hazards around curves, over hills or in dips. By scanning the road ahead, and watching and heeding road signs and pavement markings, good drivers can detect and plan ahead, for such roadway geometric changes by slowing down to get a better view. When entering a curve or down shifting for a long downgrade, increase your following distance and travel at a reduced speed. Reduce speed and keep to the right when approaching the crest of hills and at highway dips.

**Intersections and Right of Way**

School buses often come into conflict with other vehicles and pedestrians because their intended courses of travel intersect, and thus interfere with each other's routes. This occurs at points where roads and streets join, meet or cross — intersections.

Pennsylvania school bus crash data indicate over 60 percent of crashes, school bus the prime unit, occurred at intersections. One factor that might explain this is navigating through an intersection requires careful driving technique and experience, especially in a larger vehicle like a school bus. Another fact is simply there are many conflict points at an intersection, so your exposure is much higher.

Intersections can be different sizes and shapes depending on the angle(s) by which the roadways meet. Be prepared to stop each time you approach virtually any intersection.

The general principle establishing who has the right to go first at an intersection is called "right-of-way." This concept legally establishes who has the right to use the conflicting part of the road and who has to wait until the other does so. Right-of-way laws are designed to prevent collisions by prescribing what vehicle must move last. The law only names the vehicle that must yield right of way; it never states any vehicle expressly has the right to proceed.

In terms of right-of-way, there are basically two types of intersections: regulated and unregulated. Regulated intersections have traffic control devices, such as a signal or sign. Unregulated intersections have no traffic signals or signs. Use caution, even if a signal or a stop sign controls other traffic. Remember the clearance your bus needs, and watch for poles and tree limbs. Know the size of the gap your bus needs to accelerate and merge with traffic. When pulling out, never assume other drivers will brake to give you room.

**Unregulated Intersection**

When approaching an unregulated intersection, you are required by law to reduce speed, check traffic to see you can proceed and continue to move only when others have yielded right of way to you. If another vehicle is already in or very near the intersection, you must yield right of way to that vehicle. When two vehicles arrive at an unregulated intersection at the same time, the vehicle on the left always yields right of way to the vehicle on the right.

**Regulated Intersection: Yield Control**

Because of the restricted visibility, slow acceleration and length of a school bus, you must use extreme caution as you approach a yield sign. Approach the intersection where you must yield at a speed reasonable for the existing conditions, but slow enough to allow you to stop the bus and yield right of way to another vehicle in the intersection or to avoid a collision.

**Regulated Intersection: Stop Control**

Drivers' responsibilities at stop-controlled intersections are stated in Section 3323(b) of Title 75, The Pennsylvania Vehicle Code.  This section states "Duties at stop signs -- Except when directed to proceed by a police officer or appropriately attired persons authorized to direct, control or regulate traffic, every driver of a vehicle approaching a stop sign shall stop at a clearly marked stop line or, if no stop line is present, before entering a crosswalk on the near side of the intersection or, if no crosswalk is present, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering. If, after stopping at a crosswalk or clearly marked stop line, a driver does not have a clear view of approaching traffic, the driver shall, after yielding the right-of-way to any pedestrian in the crosswalk, slowly pull forward from the stopped position to a point where the driver has a clear view of approaching traffic. The driver shall yield the right-of-way to any vehicle in the intersection or approaching on another roadway so closely as to constitute a hazard during the time when the driver is moving across or within the intersection or junction of roadways, and enter the intersection when it is safe to do so."

Simply put, you must completely stop at every intersection where there is a stop sign for your lane of traffic. Stop at the stop line or four feet in advance of the crosswalk. If neither are there, stop at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. Enter only when you have the best line of sight and can move the bus without interfering with the movement of another vehicle. Before proceeding you should look in all directions at least twice to check for approaching traffic. If the intersection is clear, proceed to move ahead or turn with caution.

**Regulated Intersection: Traffic Signals**
Approach each traffic signal expecting it could change color at any moment. Always obey the color of the traffic signal:

- **Red light –** Stop completely at the stop line and wait for the green light before proceeding. Consult your district guidelines and procedures regarding making the "right on red". This is a legal maneuver in Pennsylvania, but it might not be the safest to make in a school bus.
- **Yellow light –** Prepare to stop for the red light that will follow.
- **Green light –** Check to be sure approaching traffic is stopped and proceed with caution.
- **Flashing yellow light –** Slowly proceed with caution.
- **Flashing red light –** Stop completely, check for approaching traffic and proceed with caution when it's safe to move (same as stop sign).



**Figure F-6. Modern Roundabout**

**Circular Intersections**
Circular intersections, such as the modern roundabout, are becoming more common on Pennsylvania highways.

Here are a few tips for travelling through circular intersections:

1. Slow down as you approach the intersection.
2. Keep to the right of the painted or raised island separating entering traffic from exiting traffic. There may be a truck apron on which you may operate your bus.
3. Look left for traffic approaching in the circle.
4. Enter the roundabout (circle) by turning right when there is a safe gap in traffic approaching from your left. Yield to traffic already in the roundabout. If there is no traffic approaching, you may enter without stopping.
5. Do not pass bicyclists or other vehicles when in the roundabout.
6. When in the roundabout, do not stop (except to avoid a crash) – you have the right-of-way over entering traffic.
7. Use your right turn signal to indicate where you plan to exit the roundabout. Turn it on after you have passed the exit just before the one you plan to use.
8. If you miss your exit, just continue around the circle until you reach it again.
9. As you exit, yield to pedestrians who are in the crosswalk or are waiting to cross the exit lane.

**Uniformed Police Officer**

A uniformed traffic officer always has authority above regular traffic signs and signals. You must follow the officer's instructions regardless of the regular traffic devices. When an officer is directing traffic, there is usually a specific problem or hazard. There could be a crash ahead, malfunctioning traffic signal or missing sign. Always obey the officer's instructions, even if the regular traffic devices appear to be functioning properly.

**Private Drive**

When leaving a driveway, you must always yield right of way to the approaching vehicles on the roadway where you are entering. Check for approaching traffic and proceed with caution when it's safe to move (same as stop sign). Whenever possible, never back out of a driveway onto a highway.

**Crossing Main Highways**

Use extreme caution while crossing or entering a major highway. When moving from a complete stop, a school bus normally requires at least six seconds to cross and clear an average two-lane highway. Multi-lane highways, especially divided highways, require even more time. An automobile traveling at 55 mph can move 485 feet in six seconds. Before you move the bus onto a highway be certain you have enough time to safely clear the intersection. Always **check and recheck for approaching traffic,** before entering or crossing any road. Look first to the left, where the hazard of approaching traffic is closer. **The slogan for the school bus driver must be:** *"The school bus driver never has right of way."*

While driving the bus you must never take a risk. You should be a courteous driver, and remember the law requires you and all drivers to yield right of way to pedestrians and vehicles on narrow bridges, on the roadway, at intersections, and in any hazardous situation.

**Road Surface**

Another type of potential highway hazard is the road surface. Always scan ahead for changes in surface conditions that may require evasive maneuvering to avoid the loss of steering or braking control. The three most common problems are loose, rough and slippery surfaces.

- **Loose Surfaces –** Slow down for loose surfaces such as gravel, soft sand, soft shoulders, and wet leaves.

- **Rough Surfaces –** Detect surface irregularities on asphalt and concrete, such as potholes or cracked pavement. On a wooden surface, look for holes, bumps, cracks, loose boards, and slippery spots. Approach metal bridges slowly, as they tend to reduce steering control.

- **Slippery Surfaces –** Slippery surfaces were discussed earlier. Anticipate the smoothness of concrete or asphalt road surfaces at intersections, or other steering or stopping areas. Recognize areas of the highway soaked with oil or grease. Remember, the early part of a rainfall is the most dangerous.

**Roadside Conditions**

Another type of potential highway hazard is caused by conditions on the side of the road. Physical features of the roadside include: barriers (e.g., guiderail); obstacles (e.g., noise barriers, trees, utility poles, signs), and other miscellaneous features (embankment slopes, ditches, etc.). Under normal driving circumstances, these should pose no problem. They should, however, be included in your scanning as you drive and they should be evaluated for potential hazards, if you leave the highway suddenly.

# PEDESTRIAN HAZARDS



**Figure F-7. Rural Pedestrian Hazards**



**Figure F-8. Urban Pedestrian Hazards**

The presence of pedestrians, bicyclists, roller skaters, skateboarders, and animals on or near the highway increases the need for vigilant scanning. School bus stops are particularly dangerous areas as outlined in Unit C - approach them cautiously and alertly. When near playgrounds, residential areas and schools, be alert for children playing or darting into the path of your bus from behind vehicles, structures, or trees and bushes.

When driving on side streets, be alert for pedestrians entering or crossing your path from any direction. When making left and especially right turns at intersections, check carefully for pedestrians crossing the street into the path of the bus and for vehicles making right turns on red lights.

Be alert for animals that may cross into the path of the bus. Animals are much like children in their unpredictable behavior along roads. Wherever possible, slow down to avoid hitting animals; do not swerve to avoid them unless they are working horses pulling a buggy. Such action may cause partial or complete loss of control of the bus. (See Figures F-7 and F-8)

## VEHICLE HAZARDS

In general, when sharing the road with other vehicles, observe the driving behaviors of the other drivers. Scan 360 degrees around your bus for clues to any potentially hazardous conditions.

**Drivers in a Hurry**

Drivers may feel your school bus is preventing them from getting where they want to go on time. Such drivers may pass you without a safe gap in the oncoming traffic, cutting too close in front of you. Other drivers entering the road may pull in front of you in order to avoid being stuck behind you, causing you to brake quickly. Be aware of these situations, and pay particular attention to drivers who are in a hurry.

**Losing Control**

Recognize clues indicating another driver may lose control of their vehicle. Surface conditions that are slippery, or have loose gravel, ruts, or deep snow might reduce the oncoming driver's control (as well as your own). Notice movements of the other vehicles. For example, you notice if an oncoming driver turns too sharply after an off-road recovery, or a driver approaching too fast from the side to stop or turn. Movements of your bus or another vehicle also may affect other drivers (such as stopping too quickly to allow a following vehicle enough time to stop).

**Lack of Communication by Other Drivers**

Look for clues to situations where the driver of another vehicle may execute a maneuver without signaling:

- A vehicle slowing down may be about to turn;
- A parked car with a driver in the driver's seat, engine running, or turned wheels may be about to pull out from the curb;
- A parked car with a driver in the driver's seat may be getting ready to exit his vehicle; and
- Pickup and delivery vehicles with backup lights on may be about to back into another street or driveway.

When another driver does signal, check other clues to verify it is the proper signal because a turn signal may have been left on from a previous maneuver. This is especially true of motorcycles.

Remember you, too, can fail to communicate. Always signal your intentions.

**Failure of the Other Driver to Observe**

Watch for clues another driver has not observed the bus and therefore may not be prepared to yield the right-of-way. These clues include the following:

- Other driver not responding to an upcoming intersection or to your signals;
- Other driver not looking at the road or what is in front of him/her (distracted by something in their own vehicle);
- Dirty windows, posts, trees, buildings, bright sunlight, or other objects obscuring or restricting the other driver's view; and
- Other driver's vehicle being detectable to you only by reflection, headlight glow or dust cloud.

**Inadequate Adjustment by the Other Driver**

Look for indications another driver is not adjusting properly to a situation. Be aware of hazardous situations arising when another driver fails to adjust for the following:

- Obstructions;
- Surface conditions;
- Pedestrians;
- Other vehicles; and
- Shape of the road.

Failure to adjust for these conditions may cause another driver to make potentially hazardous maneuvers. Know areas of your route where these situations are likely to occur, and exercise caution in these places.

**Aggressive Driving by Other Motorists**
NEVER take it personally when someone cuts you off or pulls in front of you. People don't want to be caught behind the school bus, so expect people to pull in front of you. Just let it go, and ignore it. If you encounter an aggressive driver, here are a few tips:

- Get out of their way and do not challenge them;

- Stay relaxed, avoid eye contact and ignore rude gestures;

- Don´t block the passing lane, if you are driving slower than most of the traffic;

- Put your pride in the back seat and DO NOT RETALIATE. Do not challenge them by speeding up or attempting to hold-your-own in your travel lane.  It is a serious distraction to focus your attention on a "contest" with another driver.  You are less able to respond to traffic signals, signs and the actions of other vehicles or pedestrians as needed to avoid a crash;

- Do not try to teach another driver a lesson and do not insist on being right, even if you are right;

- Wear your seat belt as required by Section 171.144 of Title 67 and federal law in 49 CFR Section 392.16 (Use of Seat Belts). It will hold you in your seat and behind the wheel in case you need to make an abrupt driving maneuver, and it will protect you in a crash;

- Report aggressive drivers to the appropriate authorities by providing a vehicle description, license number, location and, if possible, driver and direction of travel;

- If you have a cell phone, and can do it safely, pull to the side of the road and call the police and/or your supervisor – many have special numbers (e.g. 911); and

- Do NOT discharge any students, if an aggressive driver pursues you. Call for help.


While many people associate aggressive driving with road rage, they are two different behaviors. Road rage, which is a criminal offense, is often the result of aggressive driving behavior that escalates into an assault with a vehicle or other dangerous weapons.

**Slow-moving or Stopped Vehicles**
Watch for indications another vehicle is slowing or may stop suddenly. Examples of slow-moving vehicles are farm vehicles, under-powered vehicles, horse-drawn vehicles, and trucks on hills. Frequently stopping vehicles include: buses, trucks carrying flammables at railroad crossings, garbage trucks, and postal and other delivery vehicles. Also watch for vehicles engaged in turning, exiting or entering the roadway, merging with other vehicles, or approaching controlled intersections or railroad crossings.

Amish buggies are dark in color and difficult to see in poor light and bad weather. After stopping, a horse and buggy often roll backward. When you pass a horse, do not drive too fast or blow your horn, as this may spook the horse. Also, to avoid scaring the horse after passing, leave enough space between your vehicle and the horse before pulling back into the right lane.

**Multiple Vehicle Hazards**
You should be able to recognize clues in a traffic pattern that may indicate potential conflict. Vehicles entering the highway from side roads, driveways, ramps, or parking spaces may cause another driver to change lanes or stop suddenly. A vehicle slowing or stopping may prompt another driver to steer around it. One vehicle may limit another's visibility, allowing the other driver to enter a potential conflict, as when an oncoming driver turns left.

**Work Zones**
Whenever people are working on the road, it is a hazard. Road construction may cause narrower lanes, sharp turns or uneven surfaces. Other drivers are often distracted and drive unsafely. Workers and construction vehicles may get in the way. Drive slowly and carefully near work zones. Use your four-way flashers or brake lights to warn drivers behind you.

There should be traffic control devices to help you navigate through work zones.  These devices are typically repetitive in nature, especially signing practices. For example, in a typical road work sign series, the first sign, ROAD WORK AHEAD, is a general warning to motorists. The second sign, ONE LANE ROAD AHEAD, alerts drivers what exactly they should expect. The third sign, FLAGGER AHEAD, tells what they need to do.

**Motorcycles**
One vehicle you should pay particular attention to is the motorcycle. They are smaller and more narrow than a car, can be hard to see, and can hide in a blind spot. Keep these simple rules in mind:

1.  Look for motorcycles…then look again. Look twice at intersections, especially when turning left;

2.  Respect motorcyclists' rights. Motorcycles have all the privileges of any vehicle on the road. Give motorcycles a full lane, and treat them with courtesy and respect;

3.  Anticipate a motorcyclist's maneuvers. Motorcyclists may change lane positions in response to road conditions, weather or other factors. Anticipate evasive actions. Small objects in a road you may not need to avoid in a bus may require evasive action by a motorcycle;

4.  Allow plenty of following distance. Allow an extra second of following distance and room to respond to conditions on the road. Slow down in poor driving conditions; and

5.  Check your blind spot. Make a visual check for motorcycles in your mirrors and check your blind spot before changing lanes.

# CONTROLLING SPEED

Driving too fast is a significant cause of crashes. Pennsylvania school bus crash data indicates speeding and tailgating are listed as factors in 18 percent of crashes involving school buses as the prime vehicle. In addition, the highest fatality rates for school bus incidents were associated with crashes involving the combination of speeding and other improper driving action, and driving on the wrong side of the road (often associated with speeding). Not surprisingly, the highest rate of injury in school bus crashes involved crashes where drivers were speeding and distracted, and speeding and tailgating. The common theme here is speeding.

You must adjust your speed depending on driving conditions. These include: traction, curves, visibility, traffic, weather conditions and hills. Data shows school bus drivers in crashes were more likely to have speeding indicated as a factor during adverse weather conditions than if there were no adverse conditions. You must make adjustments when you drive – different conditions require different techniques. Similarly, bus drivers in rear-end crashes are significantly more likely to be noted as tailgating. Rear end collisions involving a bus tend to be associated with a high number of injuries per crash.

You must drive safely when operating your bus and that means not driving too fast for conditions.

## FOLLOWING DISTANCES

Knowing the stopping distances required for different road conditions and speeds will help you determine safe following distances when driving. You must keep adequate distance between you and the vehicle in front of you. A good general rule for determining a safe following distance on the highway is to allow an absolute minimum of four seconds between the bus and the vehicle ahead under normal conditions. For each additional adverse condition, add another second. So, add a second if:

- You are traveling over 40 mph;
- You are driving on a wet or loose surface or other poor roadway condition;
- You are following motorcycles or large vehicles;
- You are following another school bus;
- You are driving at night;
- You are driving in adverse weather conditions; and
- You are being tailgated.

To adequately judge this, select a fixed object on the road or roadside ahead. When the vehicle ahead of you passes that mark, start counting until you reach that same spot. If you reach the same spot before your count is complete, you are following too closely.

Also keep in mind that in a large vehicle, it's often hard to see whether a vehicle is close behind you. You may be tailgated:

- **When you are traveling slowly –** Drivers trapped behind slow vehicles often follow closely, and
- **In bad weather –** Many car drivers follow large vehicles closely during bad weather, especially when it is hard to see the road ahead.

If you find yourself being tailgated, here are some things you can do to reduce the chances of a crash:

- **Avoid quick changes –** If you have to slow down or turn, signal early and reduce speed very gradually;
- **Increase your following distance –** Opening up room in front of you will help you avoid having to make sudden speed or direction changes that could surprise the driver behind you. Leaving room ahead also makes it easier for the tailgater to get around you;
- **Don't speed up –** It's safer to be tailgated at a low speed than a high speed; and
- **Avoid tricks –** Don't turn on your tail lights or flash your brake lights. Follow the suggestions above.

# STOPPING

Stopping a school bus smoothly and within the limits of safety is the sign of an expert driver. Good drivers have their vehicles under control at all times and know braking distances increase greatly as speed and vehicle weight increase. In addition to knowing the distance required to safely stop their bus under all driving conditions, skillful drivers use correct stopping procedures, which increase bus life and lower maintenance costs.

## STOPPING DISTANCE

Three components comprise total stopping distance:

- Perception Distance;
- Reaction Distance; and
- Braking Distance.

It is important to note that for buses equipped with air brakes, there is additional brake lag distance to account for. This makes the formula:

Perception Distance
Reaction Distance
Braking Distance
+ Brake Lag Distance
Total Stopping Distance

Briefly, these components are:

- **Perception Distance –** The distance your vehicle travels from the moment your eyes see a hazard until your brain recognizes it. For an alert driver, that moment occurs in about three fourths of a second. The distance traveled in that three fourths of a second varies directly with the vehicle's speed of travel. For example, a vehicle moving at 55 miles per hour travels about 60 feet in three fourths of a second. Therefore, the average perception distance for an alert driver moving at 55 mile per hour is 60 feet.

- **Reaction Distance –** The distance traveled from the time your brain decides what to do and tells your foot to move from the accelerator until your foot pushes the brake pedal. The average, alert driver has a reaction time of about three fourths of a second, which also translates to 60 feet at 55 mph.

- **Braking Distance –** The distance it takes to stop once you have pressed the brake pedal and engaged the brakes. Assuming good brakes in normal driving conditions (dry pavement, level roadway, etc.), a bus moving at 55 mph usually will require about 170 feet of braking distance (over 4 and a half seconds).

- **Brake Lag Distance –** For vehicles with air brakes, there is approximately a half second delay in brake response time from the moment when you press the brake pedal to the point when the brakes engage. At 55 mph, this translates to 32 feet.

This braking distance is higher than what you experience in a car. The reason for this is a heavy vehicle requires more braking power to stop than a lighter one because the heavier vehicle creates more friction and heat for the brakes to absorb. The brakes, tires, springs and shock absorbers for heavy vehicles are designed to work best when the vehicle is fully loaded.

Looking at the above figures, the total stopping time at 55 mph is at least six and a half seconds under the BEST conditions. More significantly, the total stopping DISTANCE is about 322 feet at 55 mph.

| | | |
|---|---:|---|
| Perception Distance | 60 | feet |
| Reaction Distance | 60 | feet |
| Braking Distance | 170 | feet |
| + Brake Lag Distance | + 32 | feet |
| Total Stopping Distance | 322 | feet |

In other words, your bus will easily travel the length of a football field in this time. If you double your speed, it will take about four times as much distance to stop. The vehicle will also have four times the destructive power in a crash.

By slowing down, you can greatly decrease the stopping distance of a school bus, and greatly increase the safety of pupil transportation.

The bottom line is whenever you are driving, plan to keep enough space in front of you so you can stop quickly, if necessary. If brakes and/or tires are not in proper working order, the braking distance, and thus the stopping distance, will be greater. Because stopping distance increases as speed increases, you must leave more space at faster speeds. Adverse weather conditions also increase stopping distance. Stopping a vehicle on roads covered with ice or sleet requires a distance at least five times greater than required in dry conditions. When driving in bad weather, further increase your following distance to compensate for increased stopping distances.

## SPEED AND TRAFFIC FLOW

When you're driving in heavy traffic, the safest speed is the speed of other vehicles. Vehicles going the same direction at the same speed are less likely to run into one another. Drive at the speed of the traffic, if you can do this without going at an illegal or unsafe speed. Keep a safe following distance.

The main reason drivers exceed speed limits is to save time. But anyone trying to drive faster than the speed of traffic will not be able to save much time. The risks involved are not worth it. Going with the flow of traffic is safer and easier. If you go faster than the speed of other traffic:

- You'll have to keep passing other vehicles. This increases the chance of a crash.
- It is more tiring. Fatigue increases the chance of a crash.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# UNIT G -
# FUNDAMENTALS OF DRIVING A SCHOOL BUS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-3

PREPARING TO DRIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-3
   Vehicle Types . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-3
   Types of School Buses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-3
      Type A (Cutaway Van) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-3
      Type B (Integrated). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-3
      Type C (Conventional) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-3
      Type D (Transit Type) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-4
   Reference Point Driving . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-4

KNOW YOUR ROUTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-5

FIELD TRIP / ATHLETIC TRIP CONCERNS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-5

STARTING AND OPERATING A DIESEL VEHICLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-7
   Diesel-Powered Motor Vehicle Idling Act:  Act 124 of 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . .G-7
   Pedal Misapplication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-7

STEERING AND TURNING YOUR BUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-8
   Steering Techniques . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-8
   Turning Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-8
      Rounding Curves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-8
      Making Left and Right Turns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-9
      Left Turn Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-9
      Right Turn Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-10

BACKING  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-11
   Keep Students on the Bus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-11
   Back and Turn Toward the Driver's Side. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-11
   Look at Your Path . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-11
   Back Slowly and Smoothly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-11
   Use a Helper Whenever Possible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-12
If No Helper Is Available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-12

MAKING A TURN-AROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-12

STOPPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-13
   Anti-lock Braking Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-13
      How ABS Helps You . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-13
      Braking with ABS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-13
      Braking if ABS is Not Working . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-14
      Safety Reminders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-14
   General Stopping Technique. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-14
   Stopping Procedures for Standard Transmissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-15

Low Speed Stopping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-15
Stopping at Speeds Greater than 10 MPH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-15
Stopping on an Upgrade. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-15
Stopping on a Downgrade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-15

CHECKING OVERHEAD CLEARANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-15

APPROACHING RAILROAD CROSSINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-16
When a Bus Must Stop at a Railroad Crossing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-16
Procedures for Stopping at a Railroad Crossing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-17
Prepare to Stop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-17
Stop the Bus. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-17
Look and Listen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-17
No Approaching Train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-18
Approaching Train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-18
Multi-Track Crossings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-18
Other Pointers for Dealing with Railroad Crossings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-18

CROSSING DRAWBRIDGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-19

ENTERING AND EXITING THE FLOW OF TRAFFIC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-20
General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-20
Entrance and Exit Ramps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-20

USING LANES AND POSITIONING ON THE HIGHWAY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-21
General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-21
Changing Lanes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-21
Being Overtaken and Passed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-22
Don't Direct Traffic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-22
Overtaking and Passing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-22

MOUNTAIN DRIVING AND STEEP DOWNGRADES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-23
Before Starting the Downgrade. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-23
Using Gears Going Downhill. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-23
Use Lower Gears When Going Downhill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-23
Be in the Right Gear Before Starting Downhill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-23
Be Observant When Going Downhill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-23
Proper Braking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-24
Using Runaway Truck Ramps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .G-24

# UNIT G
# FUNDAMENTALS OF DRIVING A SCHOOL BUS

## INTRODUCTION

Unit F provided you with some basic safe driving techniques for school bus operators geared towards reducing the number of crashes related to driver error, vehicle failure and hazardous roadway conditions. As you well know, operating a school bus requires additional, often specialized knowledge and skills to transport your students safely and efficiently to and from their destinations.

In addition to learning a pattern of special driving skills, you must practice each skill correctly until it becomes a habit. If you can minimize and eliminate crashes resulting from driver error, safe student transport will continue to be a hallmark of the school bus mode of transportation. The following procedures have been developed to assist you in driving a school bus safely. Remember, as a professional school bus operator, you are entrusted with the lives and safety of human cargo that cannot be measured in financial terms. Study, learn and practice the techniques.

## PREPARING TO DRIVE

As mentioned in previous units, your experience in driving automobiles can provide a basis for learning to drive a school bus. However, there is a significant difference in scale. To help prepare for this, you must recognize the differences in your vehicle and prepare to operate your vehicle BEFORE you pick up any student and remember safety is first and schedule is second.

## VEHICLE TYPES

One factor as to why school buses are the safest means of ground transportation in the United States is the stringent vehicle body design and construction standards they are built under and must adhere to. School buses are built so they sit above the crash line, are compartmentalized with high seat backs with padding to absorb full body impact, and have emergency exits to provide added safety. As a school bus operator, you do not need to become an expert on the construction of the vehicle you operate, but a general working knowledge of how your bus is built and the standards it must meet will give you a greater understanding and assist you in answering questions from the general public concerning "how safe" your passengers really are.

## TYPES OF SCHOOL BUSES

**Type A (Cutaway Van)**
A Type A school bus is a school bus converted from or having a body constructed upon a van-type truck or front-section vehicle chassis, with a left side driver's door and the entrance doors behind the front wheels. This definition includes two classifications: Type A1, with a Gross Vehicle Weight Rating (GVWR) less than or equal to 10,000 pounds; and Type A2, with a GVWR greater than 10,000 pounds.

**Type B (Integrated)**
A Type B school bus is a school bus constructed utilizing a stripped chassis with the entrance door behind the front wheels. This definition includes two classifications: Type B1, with a GVWR less than or equal to 10,000 pounds; and Type B2, with a GVWR greater than 10,000 pounds.

**Type C (Conventional)**
A Type C school bus is a school bus constructed utilizing a chassis with a hood and front fender assembly without a left side driver's door and with the entrance door behind the front wheels.

**Type D (Transit Type)**

A Type D school bus is a school bus constructed utilizing a stripped chassis with the entrance door ahead of the front wheels.

Most differences between automobile and bus operation are due to the relatively large size and weight of the bus. Always remember a bus has a longer stopping distance, slower acceleration, wider turning radius, and higher and wider clearances. Another difference is while school bus drivers sit higher and have a better forward view, there is much more reliance on mirrors for adequate rear and side viewing.

In preparing to drive, refer to Unit E; "Preventive Maintenance" procedures for a detailed review of the pre-trip inspection. Getting the bus ready for your daily run is an important part of safe driving. Always check your vehicle for safety defects or problems. State law and regulation require passengers and drivers in vehicles equipped with seat belts to wear them whenever the vehicle is in motion.

In summary:

- Complete your pre-trip inspection;
- Adjust your mirrors;
- Adjust your seat; and
- Fasten your seat belt.

# REFERENCE POINT DRIVING

A reference point is some fixed object or point on your bus that when lined up with points outside the bus will give you consistent reference to judge when to turn, move, stop, line up your bus, or judge the amount of space available around your bus. Any point on the bus such as the door, outside mirrors, windshield center post, bus hood, front and rear bumpers, etc., can be used as a reference point. These points are easily detectable and readily seen by you in the driving position. The distance or guidelines outside the bus are then predetermined by direct measurement or observation before you use your bus for the first time. Once these points are determined and you are comfortable with the understanding of what each reference point is telling you, these points should remain constant.

Here are a few simple steps for determining reference points on your bus (get some help at first, if possible):

1. Position yourself comfortably in your driver's seat;
2. Pick an easily observable point on the hood or windshield of your bus;
3. With the help of someone outside your bus (if possible), on a conventional style bus, find the point on the ground where the edge of the hood lines up with the point on the ground directly in front of it. For a transit style bus, use some point on the windshield to mark your point on the ground in front of the bus;
4. Once you determine this point, note it in your mind and remember it for future reference; and
5. Remember to do this in your own bus, since the point of reference may change from bus to bus depending on the height of the driver's seat and the model of the bus.

For example, if the distance from your reference point to your front bumper measures 18 feet, you will know that whenever you are sitting in the driver's seat, the point on the ground you see directly in front of the hood of your bus is 18 feet from the front bumper. This will be helpful for determining the proper distance to stop at railroad grade crossings.

For determining reference points to the side or rear of your bus, make sure you are seated comfortably in your seat with seat belt attached. Then, mark points on the various outside rear view mirrors on either side of your bus.

To determine the point directly below your rear bumper, use a point in your left (or right) rear view mirror that lines up directly over the bottom of your left rear wheel well and your rear bumper. Now measure the distance from this point on the ground to the edge of your rear bumper. Remember this distance. You should use reference points on both left and right rear mirrors.

This rear reference point can be helpful when estimating the distance from your rear bumper to some point on the ground and can be especially helpful at a railroad grade crossing when determining the distance of your rear bumper from the track.

Finally, remember these measurements should be made and will only be applicable on level ground. Adjust your front and rear measurements when your bus is stopped on a sloped surface.

# KNOW YOUR ROUTE

You'll be more confident and be a safer driver when you become completely familiar with the route you drive. You must know what to do with hazards on your route. For example, some intersections are more hazardous due to limited sight or an area with poor drainage that floods.

Follow the local policy and procedures for reporting hazardous stops/routes. If possible, come up with a solution to the problem. Changing the bus route or bus stop location might solve the problem. The township road supervisor might be able to make some changes to the roadway to correct the problem. You could designate a place for your students to stand when the snow is piled up.

There are some hazards that are unavoidable. By being aware of the potential hazards on your route, you will be better prepared for the challenge.

On the route schedule you keep in your bus, make notes of the route hazards, so if there is ever a substitute bus driver on your route, they will have this knowledge, too.

# FIELD TRIP / ATHLETIC TRIP CONCERNS

Field trips can present some new situations you haven't experienced, if you are a new driver. Particular situations that might arise could include the following:

- Wondering if the bus will fit (on a street, in a parking area);
- One-way streets;
- Fueling;
- Tolls;

- Parking areas;

- Loading/unloading areas;

- Food and rest room availability;

- Security of area to park bus;

- Weather;

- Chaperones;

- Discipline;

- Medical problems and first aid;

- Terrain;

- Nighttime driving;

- Directions;

- Low clearance;

- Weight limit on bridges;

- Laws in other states; and

- Break downs.

If you are traveling out of state, make sure you have the proper credentials. This includes that you be at least 21 years of age, have the U.S. DOT physical (if employed by a contractor), and carry your log book (if applicable).

Here are some steps to help you be prepared for the field trip/athletic trip.

1. Become familiar with the route.
   a. Look at a map, take a map with you, ask other drivers who have previously made the trip.
   b. Drive the route in a car prior to the trip.
   c. Find out if there are any detours or closed roads. You can call 511, which allows you to instantly access updated road and weather conditions, traffic information, and construction reports for specific routes, regions and cities. Also, refer to www.511pa.com.
   d. Plan an alternate route.
2. Know where parking is and ensure it is secure.
3. Have a full tank of fuel.
4. Make sure you cover the emergency evacuation procedures with students and chaperones.
5. Keep aisles and exits clear of baggage and equipment.
6. Carry emergency phone numbers for school personnel.
7. Know what to do and who to call, if you break down or have an emergency.
8. Communicate with the person in charge of the trip.
   a. Get the name of the person in charge and their cell phone number.
   b. Give the person in charge your name and cell phone number.
   c. Agree on loading and unloading places and times.
   d. Make sure you and the person in charge know how to get in touch with each other.
   e. Make sure the person in charge knows where the bus will be parked.

# STARTING AND OPERATING A DIESEL VEHICLE

Guidelines for starting and driving your diesel bus, as well as proper gear shifting techniques are detailed in The Commercial Driver's Manual (Publication 223). Refer to this manual when practicing and refining your techniques. Keep in mind that smoothness in driving is one key to safe driving and good relations with your students. Gear shifting requires knowledge, skills and practice.You must learn the best range of speed for changing gears upward and downward, and you must shift gears without losing your view of the road. Over the course of your driving experiences, you may be required to shift gears in vehicles with standard transmissions and vehicles with automatic transmissions. No matter what transmission type you have, remember to always engage your parking brake when your vehicle is not in use.

## DIESEL-POWERED MOTOR VEHICLE IDLING ACT: ACT 124 OF 2008

Diesel vehicles are a significant source of emissions that contribute to elevated ozone and fine particulate concentrations in Pennsylvania. Diesel exhaust from school buses poses a health risk, particularly to children and drivers. Diesel exhaust contains small particles as well as smog-forming and toxic air pollutants. Exposure to diesel exhaust can cause lung damage and respiratory problems and can exacerbate asthma and existing allergies. Buses that idle outside schools can pollute the air inside the school building as well as outdoors.

In 2008, Act 124 (Diesel-Powered Motor Vehicle Idling Act) was passed, which reduces unnecessary idling of the main propulsion engine in diesel-powered motor vehicles, including trucks and buses. Essentially, Act 124 prohibits the owners and drivers of any diesel-powered motor vehicles with a gross weight of 10,001 pounds or more engaged in commerce from allowing the engine of the vehicle to idle for more than five minutes in any continuous 60-minute period. However, 35 P.S. Section 4603(c)(10) allows a school bus to idle a total of 15 minutes in a continuous 60-minute period to provide heat or air conditioning to students. This section also allows school buses transporting students with special needs to idle for an unlimited amount of time when it is necessary to maintain a safe temperature.

Keep in mind that while Act 124 preempts and supersedes local anti-idling ordinances or rules, more stringent idling restrictions imposed by counties of the first and second class (Allegheny and Philadelphia counties), continue in full force and effect, provided they are not amended, suspended or rendered invalid. Here are a few good tips:

- As a general rule, buses should be moving whenever the engine is on;
- The engine should be turned off as soon as possible after arriving at loading or unloading areas;
- The school bus should not be restarted until it is ready to depart; and
- Limit idling time during early morning warm up to what the manufacturer recommends (generally no more than five minutes).

## PEDAL MISAPPLICATION

Pedal misapplication occurs when the bus operator applies the accelerator instead of the brake. This error can result in serious crashes. The school environment presents a unique risk with respect to unintended acceleration from pedal misapplication. A typical loading or unloading operation at the school involves multiple vehicles and many children. Often, the children line up, wait or congregate near the buses exposing them to possible danger. Every bus at the loading area can introduce an opportunity for pedal misapplication, and the large number of children represents a potential increase in the severity of the outcome should pedal misapplication and unintended acceleration occur.

There are a few things you can do to help prevent pedal misapplication.

1.  Become familiar with your vehicle. Be sure you practice operating your bus before picking up and dropping off students. This will give you familiarity with the location of your accelerator and brake. This is especially important if you are operating a bus that is not your regular bus. If you are unfamiliar with the pedal configuration of an alternate bus, practice first.
2.  The National Transportation Safety Board (NTSB) recommends that at locations where you are boarding a large number of students at once (like a school), start your bus only after loading is complete.

# STEERING AND TURNING YOUR BUS

You must know the proper techniques for steering a school bus and must be able to make all turning maneuvers correctly and smoothly.

## STEERING TECHNIQUES

Proper steering requires the proper positioning of your hands on the steering wheel. Grip the wheel securely with both hands, putting your hands on opposite sides of the wheel. For example, this may mean placing your hands at the ten o'clock and two o'clock positions. One hand on the wheel is less than half as safe. Your hands should be on the outside of the steering wheel with your thumbs on the front of the wheel.

Two steering methods are recommended for school bus drivers. In the push-pull steering method, one hand pulls, and the other hand pushes. The hand-over-hand method also may be used, but you should be careful not to catch your thumb on the safety chain of your wristwatch, bracelet or clothing while steering. Never palm the steering wheel or turn it with a finger or thumb. If you have to steer quickly or jerkily, you are going too fast – slow down.

## TURNING PROCEDURES

To drive your school bus you must use the steering techniques described above while executing a number of different turning maneuvers. These maneuvers include rounding curves, and making left and right turns. The average speed limits on freeways and other roads on your route force you to use practiced skills and judgment to perform these maneuvers properly and safely. This includes being aware of the pivot or turning point of the bus while following the various turning procedures. For large school buses, the pivot point is located at the rear axle. The procedures described below are applicable in most driving situations. You always need to be aware of traffic around you before you make your turn.

### Rounding Curves

Judge beforehand if you will be able to negotiate an upcoming curve at your present rate of speed. If you must brake, do so before entering the curve. Never plan to brake in the middle of a curve as this can cause skidding and loss of control. Use the following procedures when steering through curves (see Figure G-1):

1.  Slow down, and look ahead for the sharpest point in the curve;
2.  Brake, if necessary, before getting into the curve;
3.  For curves to the right, move as close to the center line as is safe, and use the width of the lane while rounding the curve. This will help to smooth out the curve;
4.  For curves to the left, enter the curve from the right edge of your lane; and
5.  When you reach the midpoint of the curve, resume power and accelerate through the remainder of the curve.



**Figure G-1. Stay in Lane**

AIM HIGH IN STEERING AND SMOOTH OUT CURVES, BUT ALWAYS STAY IN YOUR OWN LANE.

**Making Left and Right Turns**

The procedures listed below will enable you to prepare for and make turns and to reenter the traffic pattern while maintaining proper lane positions. When making either a left or right turn, start signaling at least 100 feet before turning, if you are travelling at speeds of 35 mph or less, and at 300 feet if you are travelling at speeds over 35 mph. (See Figures G-2 and G-3.)

WHETHER MAKING A RIGHT OR LEFT TURN, BE AWARE THAT THE REAR OF YOUR BUS WILL PROJECT OUTWARD AS YOU ARE MAKING THE TURN. BE CAREFUL WHEN MAKING A LEFT OR RIGHT TURN WHEN YOU ARE NEXT TO ANOTHER VEHICLE OR OBJECT.

Keep in mind that Pennsylvania school bus crash statistics show improper turning was indicated as the third most common driver action in crashes when the school bus was the prime unit. Data also indicates that 38 percent of school bus prime unit crashes were angle crashes, which most commonly occur at intersections.

**Left Turn Procedures**

Left turns in a school bus are generally not as difficult technique-wise to make as right turns, but they are more dangerous. Left turn collisions at intersections tend to be severe crashes. Be sure you have adequate gaps in opposing traffic to make your maneuver. Acceleration rates are different in a school bus than for a passenger vehicle, and you are driving a longer vehicle.

1. Get into the proper lane well in advance of the turn.

2. Give left turn signal early (at least 100 feet away, if you are travelling at speeds of 35 mph or less, and at 300 feet, if travelling at speeds over 35 mph).

3. Reduce speed and downshift to the proper gear needed to execute the turn. The speed through the turn will depend on the geometry of the intersection as well as traffic conditions.



**Figure G-2. Left Turns**

LEFT TURN

4. Check traffic conditions to the front, rear and sides.

5. Position the bus to the left edge of the traffic lane.

6. Because you do not have the right-of-way (unless at a protected left turn phase at a signalized intersection), re-check traffic signals, signs, pedestrians, or vehicles for a clear right-of-way. Use both outside mirrors and check especially for vehicles attempting to pass the bus on the left side.

7. If you must stop before making the turn, keep the front wheels straight and the brake pedal pressed. This stopping procedure will prevent your bus from being shoved into the path of oncoming traffic, if you are struck from the rear. Also, leave a space of a few feet between your bus and the vehicle in front of you. You should be able to see the rear wheels of the vehicle in front of you. If not, you are too close.

8. Check your left mirror and execute the turn smoothly without strain on the engine. Enter the highway in the left-most lane available. If multiple left-turn lanes exist, be mindful of proper lane usage, and stay in your lane as you make the turn. Steer wheels back into position; do not let the steering wheel spin wheels back.

9. After completion of turn, ensure that your turn signal is off.

10. After completing a left turn onto a multilane highway, pick up speed and move into the right lane as soon as possible.

**Right Turn Procedures**

Right turns are more difficult because of the length of the bus and require practice. Knowing the pivot or turning point (located at the rear axle) of the bus is critical for right turns. This responsibility is the bus operators.

For right turns:

1. Get into the proper lane well in advance of the turn.

2. Give right turn signal early (at least 100 feet away, if you are travelling at speeds of 35 mph or less, and at 300 feet, if travelling at speeds over 35 mph).

3. Reduce speed and downshift to the proper gear needed to execute the turn. The speed through the turn will depend on the geometry of the intersection as well as traffic conditions.

4. Position the bus to the right edge of the traffic lane about four feet from the curb. The bus should not be far enough away from the curb to allow a vehicle to pass on the right between the bus and the curb.

5. Check for traffic signals, signs, pedestrians, and vehicles to determine clear right-of-way. Be sure to check for vehicles between right side of the bus and the curb. Use your mirrors!

6. Check your right mirror and execute the turn smoothly without strain on the engine. This is accomplished as soon as the front wheels pass the corner, turn wide to the right, swinging over the center of the side street (if necessary) in order for the rear wheels to clear the curb. Never shift gears during a turn. Keep an eye on the right mirror while turning. Be mindful of any pedestrians who may be standing at or near the curb. Also, watch out for parked cars.

7. Enter the right-most lane available, but leave enough room to make your turn. If your bus must cross into another lane in order to make the turn, make the lane crossover in the road that you are entering.

8. Steer wheels back into position; do not let steering wheel spin back.

9. Ensure your turn signal is off.



**Figure G-3. Right Turns**

While Pennsylvania law allows all vehicles to make "right turn on red," unless otherwise designated, this maneuver may not be recommended when operating a school bus because of the size of the vehicle and its acceleration characteristics. Check with your contractor or local school district guidelines and procedures.

# BACKING

Because you cannot see everything behind your vehicle, **backing is always dangerous, even in the best circumstances.** This is supported by Pennsylvania school bus crash data, which indicates backing is a crash cause in over 5 percent of crashes involving school buses as the prime vehicle. This seems high considering the number of times backing is required, which supports the notion it is a dangerous maneuver. Pennsylvania school bus crash data shows backing crashes are four times as likely to occur in clear weather conditions as in adverse weather conditions. This may indicate drivers are complacent with this maneuver when weather conditions are good. ANY time you have to backup, be careful and follow the recommendations below.

Avoid backing whenever you can and avoid backing a bus from a side road to a main road. Unfortunately, there may be situations where backing is necessary, such as when you are at the end of your route and there is no better designated turn around area, or if you get lost on a road and encounter a bridge weight limit. If you know of a better area to turn around that would avoid backing, talk to your transportation coordinator about modifying your route.

School buses are also most often parked by backing into their location. When you park, try to park, so you will be able to pull forward when you leave. When you have to back, follow these rules:

**1.  Keep Students on the Bus –** Keep all students on the bus. State regulation (Section 104.3(d) of Title 67) requires that if backing is required at or near a loading or unloading zone, all students must be seated on the bus during the backing. Never back a bus when students are outside, so either back up before drop-off or after-pick up. Be particularly aware of students who may be late and running to catch the bus.

**2.  Back and Turn Toward the Driver's Side –** Plan your maneuver. Whenever possible, back toward the driver's side, so you can see better. Backing toward the right side is very dangerous because you can't see as well. If you back and turn toward the driver's side, you can watch the rear of your vehicle by  looking out the side window and in the mirror.

When backing a bus, turn the top of the steering wheel toward the direction you want to go. This may take practice.

**3.  Look at Your Path –** Look at your line of travel to be sure you know what is behind you before you begin. Don't take chances. Sometimes you can't see enough with your mirrors; it's much safer to get out and look, even if it means walking to the rear of the bus to determine whether the way is clear. By so  doing, you may prevent a serious incident. If you need to walk to the rear of the bus, set the parking brake, turn off the motor and take the keys with you. Walk to the rear of the bus to determine whether the way is clear. Also check your clearance to the sides and overhead both in and near the path your vehicle will take. Then reenter the vehicle, check your mirrors and start backing.

**4.  Back Slowly and Smoothly –** Always back as slowly as possible so you may make corrections before you get too far off course. Go slowly, so you can correct any steering errors more easily before you get too far off course. Going slowly means you can also stop quickly, if necessary.

**5.  Use a Helper Whenever Possible –** If possible, have an adult (not a student) stationed on the driver's side rear of the bus, so you can see him/her at all times in your mirror to warn traffic and act as your guide. If a helper is available:

• Agree on hand signals ahead of time, especially "Stop";

• Position the helper out of the travel path, so you can see the helper and the helper can see the path of travel;

• Back slowly; and

• Stop immediately, if you lose sight of your helper.

Verbally communicate with the helper before you begin and while backing.

**6.  If No Adult Helper is Available –** It may be necessary to use portable emergency warning devices to block off the lane of traffic the vehicle is backing into. Use the following procedure:

a.  Stop the bus in the correct position to back and activate the four-way hazard warning lights. If the bus does not have automatic back-up signals, use the horn. Remember, approaching traffic may not know you are backing, so using the four-way hazard lights and blowing the horn will help alert them to your maneuver;

b.  Signal for quiet on the bus;

c.  Using mirrors, ensure the way is clear to the rear and sides;

d.  Put transmission in reverse; and

e.  Using mirrors, back slowly and smoothly.

# MAKING A TURN-AROUND

Most bus routes are planned to eliminate turn-arounds and backing because they are extremely hazardous maneuvers. Unfortunately, there may be situations where turning around is necessary. Much like with backing, if you must turn your bus around at a loading zone, always load passengers being picked up before making the turn-around, and always unload passengers being discharged after making the turn-around. If at all possible, make a turn-around in twilight or darkness when an adult helper is present to stop traffic on any roadway used for the maneuver.



**Figure G-4. Turn-Arounds**

TURN-AROUNDS

Because backing the bus is an extremely dangerous procedure, the safest way to turn around is to avoid backing and use a forward turn-around. Ideally, a turn-around should be made by selecting an adequately sized, safe area away from the road, such as a parking lot, where you can slowly move the bus forward in a wide circle to turn around. Otherwise, a turn-around should be made in the following manner (see Figure G-4):

1.  Activate the four-way hazard warning lights at least 200 feet before your stopping point;

2.  Stop the bus in the proper position on the highway, which is one full bus length ahead of the area into which you are backing;

3. Check traffic to the front and rear, as well as roadside obstacles such as poles, trees, mailboxes and culverts. Clearance on all sides of the bus is important. You should have traffic visibility for at least 500 feet in either direction;

4. Use all mirrors and look carefully in all directions to observe traffic and obstacles, back slowly and cautiously into the designated area (see backing information above); and

5. Make sure to check traffic both ways, reenter the highway, deactivate the hazard warning lights, and proceed with extreme caution.

# STOPPING

Unit F included detailed information on stopping requirements for school buses. Stopping a school bus smoothly and within the limits of safety is the sign of an expert driver. Good drivers have their vehicles under control at all times and know braking distances increase greatly as speed and vehicle weight increase. In addition to knowing the distance required to safely stop their bus under all driving conditions, skillful drivers use correct stopping procedures, which increase bus life and lower maintenance costs.

### Anti-lock Braking Systems
The U.S. DOT requires that anti-lock braking systems be on air brakes vehicles, (trucks, buses, trailers, etc.) built on or after March 1, 1998 and hydraulically braked trucks and buses with a gross vehicle weight rating of 10,000 lbs or more built on or after March 1, 1999. Many buses built before these dates have been voluntarily equipped with ABS. Your school bus will have a yellow ABS malfunction lamp on the instrument panel, if it is equipped with ABS.

### How ABS Helps You
When you brake hard on slippery surfaces in a vehicle without ABS, your wheels may lock up. When your front steering wheels lock up, you lose steering control. When your other wheels lock up, you may skid or even spin the vehicle. ABS helps you avoid wheel lock up and maintain control. You may or may not be able to stop faster with ABS, but you should be able to steer around an obstacle while braking, and avoid skids caused by over braking.

### Braking With ABS
ABS is designed to help the driver maintain control of the bus during emergency braking situations, not make the bus stop more quickly.  ABS may shorten stopping distances on wet or slippery roads, and many systems will shorten stopping distances on dry roads. On very soft surfaces, such as loose gravel or unpacked snow, an ABS system may actually lengthen stopping distances. In wet or slippery conditions, you should still make sure you drive carefully, always keep a safe distance behind the vehicle in front of you, and maintain a speed consistent with the road conditions.

When you drive a vehicle with ABS, you should brake as you always have. In other words:

• Use only the braking force necessary to stop safely and stay in control; and

• Brake the same way, regardless of whether you have ABS on the bus.

However, in emergency braking, do not pump the brakes on a bus with ABS.

As you slow down, monitor your bus and back off of the brakes (if it is safe to do so) to stay in control.

**Braking if ABS is Not Working**

Without ABS, you still have normal brake functions. Drive and brake as you always have. Vehicles with ABS have yellow malfunction lamps to tell you if something is not working. The yellow ABS malfunction lamp is on the bus's instrument panel. As a system check on newer vehicles, the malfunction lamp comes on at start-up for a bulb check and then goes out quickly. On older systems, the lamp could stay on until you are driving over five mph. If the lamp stays on after the bulb check, or goes on once you are under way, you may have lost ABS control at one or more wheels. Remember, if your ABS malfunctions, you still have regular brakes. Drive normally, but get the system serviced soon.

**Safety Reminders**

- ABS does not compensate for bad driving habits, such as driving too fast, following too closely or driving less carefully;

- ABS won't prevent power or turning skids – ABS should prevent brake-induced skids, but not those caused by spinning the drive wheels or going too fast in a turn;

- ABS won't necessarily shorten stopping distance. ABS will help maintain vehicle control, but not always shorten stopping distance;

- ABS won't increase or decrease ultimate stopping power – ABS is an "add-on" to your normal brakes, not a replacement for them;

- ABS won't change the way you normally brake. Under normal brake conditions, your vehicle will stop as it always stopped. ABS only comes into play when a wheel would normally have locked up because of over-braking; and

- ABS won't compensate for bad brakes or poor brake maintenance.


Remember: The best vehicle safety feature is still a safe driver.

Remember: Drive so you never need to use your ABS.

Remember: If you need it, ABS could help to prevent a serious crash.

Remember: If your bus is equipped with ABS, do not pump the brakes in emergency situations.


# GENERAL STOPPING TECHNIQUE

Use the right foot for all normal braking. A school bus is much heavier than smaller vehicles and requires the driver to begin braking sooner in order to stop smoothly. Feather the brake by reducing pressure on the brake pedal slightly just before the wheels stop rolling. This creates a smoother stop and happier passengers. A good driver anticipates stops as much as possible. This increases the margin of safety and helps save brake shoes. Avoid sudden stops.

## STOPPING PROCEDURES FOR STANDARD TRANSMISSIONS

Different procedures are required for stopping at low and high speeds or on an upgrade or downgrade. If you stop the bus for more than several minutes in a non-traffic situation, turn off the engine. This not only conserves fuel, but eliminates the possibility of poisonous carbon monoxide exhaust fumes entering the bus.

**Low Speed Stopping**

When you are in a low gear or are traveling 10 mph or less, use the following stopping procedures:

1. Release the accelerator and when speed decreases to 3 to 5 mph, press the clutch pedal;
2. Apply the brakes gradually by increasing pressure;
3. To prevent the bus from jerking, reduce the brake pressure slightly, but not completely just before coming to a stop;
4. Place the gear shift lever into the neutral position; and
5. Release the clutch and remove foot from the clutch.

**Stopping at Speeds Greater than 10 MPH**

When traveling in a higher gear, the procedure for stopping is as follows:

1. Release the accelerator and press the brake pedal;
2. When you reach the minimum speed for the next lower gear, downshift to that gear. Using the lower gear will reduce the buildup of heat and avoid excessive brake wear. This is also the case for automatic transmissions; and
3. Downshifting can be very effective and smooth if you use third gear for the slowing action in five-speed transmissions, and second gear in four-speed transmissions.

**Stopping on an Upgrade**

When coming to a stop on an upgrade, you should:

1. Be aware of the traffic behind you;
2. Apply pressure on the foot brake lightly for a smooth stop;
3. Press clutch with left foot; shift into neutral;
4. Hold bus with hand brake, if necessary. Don't use the clutch as a brake; and
5. Allow an extra safety margin of space between the bus and the vehicle ahead.

**Stopping on a Downgrade**

When coming to a stop on a downgrade, stop as you would on an upgrade, except downshift to reduce speed as necessary. If the downgrade is quite long and/or steep, use the "snub" braking technique discussed later in this unit.

# CHECKING OVERHEAD CLEARANCE

Hitting overhead objects is a danger. A typical school bus is not more than 12 feet in height, so make sure you always have enough room overhead. This not only includes on-the-road hazards, such as low hanging wires, overhanging branches, etc., but overhead hazards in your bus storage location such as wash bays and garage entrances. The clearance requirement for wires over a roadway is 18 feet, but over driveways is only 15 feet. This is a significant difference and one to be aware of if you have to turn a bus around, especially if the wires appear to be hanging low.

A few other points to keep in mind:

- If you aren't sure you have safe space to pass under an object, go slowly and watch carefully. This will allow you to stop, if you cannot make it. If you doubt you can make it, take another route. Pay attention to warnings posted in advance of and on low bridges or underpasses. These should be posted where the vertical clearance is less than 14'6 feet. A typical school bus is not more than 12 feet in height, so pay attention.

- Don't assume the heights posted at bridges and overpasses are correct. Repaving or packed snow may have reduced clearances since heights were posted.

- Some roads are narrow and are crowned such that it can cause a vehicle to tilt. This may result in problems for the bus clearing objects along the edge of the road, such as signs or trees. Where this is a problem, drive a little closer to the center of the road as long as you keep adequate side clearance from the center of the road.  You do not want to sideswipe a vehicle travelling in the opposite direction with your mirrors or bus body.

- If you have to turn a bus around and back into an area, get out and check for overhanging objects, such as trees, branches or electric wires. It's easy to miss seeing them while you are backing. Also check for other hazards like culverts or mailboxes at the same time. Remember to turn off the bus and remove the keys from ignition, if students are on board.

- If you notice low overhanging branches along your route, consider reporting them to your supervisor who can notify the proper entity responsible for removing them. This can be important, especially with dead limbs overhanging the route, which are typically the ones to fall on the roadway after the first snow/ice storm.

- Know the height of your vehicle, including roof hatches and strobe lights.

# APPROACHING RAILROAD CROSSINGS

Crossing railroad tracks represents one of the greatest hazards in terms of mass injuries and fatalities for students riding in school buses. Planned safety procedures for vehicles crossing railroad tracks can help eliminate these crashes. Practice the procedures discussed below until they become automatic actions. At the same time, don't let repetition create a false sense of security.

Trains cannot stop quickly as its response is limited by its size, weight and the engineer's view down the track. A train cannot swerve to avoid a school bus. Also, due to their large size, trains appear to be moving more slowly than their actual speed. Drivers often mistakenly judge they have enough time to safely cross before the train reaches the crossing. Be aware of this fact and, whenever in doubt, wait for the train to pass. You have a number of young lives depending on you; always use extra caution when making decisions at railroad crossings.

## WHEN A BUS MUST STOP AT A RAILROAD CROSSING

State law (Section 3342 of Title 75, the PA Vehicle Code) requires all school buses, whether carrying passengers, to stop at all railroad crossings. The exceptions are:

- Crossings controlled by a police officer or flagman;

- Crossings regulated by a functioning highway traffic control signal transmitting a green light;

- Any crossing marked by the former rail operator with a "tracks out of service" sign; and

- An industrial or spur line crossing marked with an "exempt" sign.

## PROCEDURES FOR STOPPING AT A RAILROAD CROSSING

When you must stop your bus at a railroad crossing, Pennsylvania regulations (Section 71.4(2)(ii)(B) of Title 67) require you to always follow these procedures:

1.  When approaching, activate 4-way hazard lights;

2.  Stop between 15 and 50 feet from nearest the rail;

3.  Apply parking brake, transmission in neutral;

4.  Open door and window;

5.  Look and listen;

6.  Close door;

7.  If clear, put in gear and release parking brake;

8.  Proceed across tracks without shifting gears; and

9.  Deactivate four-way hazard lights after crossing tracks.

What follows is a more detailed discussion of these steps.

**Prepare to Stop**

1.  Request complete silence from passengers, so you have minimal distractions. If necessary, turn off heaters to further reduce noise;

2.  Turn off any AM-FM, 2-way or CB radios, or any other noise emitting devices not necessary for the safe operation of the bus;

3.  As you approach, get the big picture: check traffic control devices; visibility of the crossing, tracks, terrain, and roadways on either side of the tracks; volume, type, and position of other traffic; sight distance down the tracks; and the amount of space on the other side of the track should you have to stop your vehicle shortly after crossing the track; and

4.  Activate four-way hazard lights 100 to 200 feet in advance of the tracks.

**Stop the Bus**

1.  Follow stopping procedures described earlier in this unit;

2.  Stop in a position permitting you to have a clear view of the tracks in both directions. The front bumper must be clear of tracks, at least 15 feet away and at most 50 feet away from the nearest rail;

3.  Pull up, so you can see the tracks in both directions, if needed;

4.  Remember to allow extra distance at any railroad grade crossing since trains overlap the track by about three feet.

5.  Apply the parking (emergency) brake and shift into neutral.

**Look and Listen**

1.  Open service door and driver's window; make sure that you do not activate the eight-way light system;

2.  Turn off any AM-FM, 2-way or CB radios, or any other noise emitting devices not necessary for the safe operation of the bus;

3.  Look and listen through the open door and window; and

4.  Never leave a bus to check for a train.

**No Approaching Train**

If you see and hear no signs of an approaching train, do the following:

1. <u>Close service door</u>;
2. Put the bus <u>in low gear and release the parking (emergency) brake</u>;
3. Look and listen a second time;
4. If clear, <u>proceed across the track without shifting gears</u>; and
5. <u>Deactivate four-way hazard lights after clearing the tracks</u>.

**Approaching Train**

A train cannot stop quickly. Trains always appear to be moving slower than they actually are. Follow these procedures when a train is approaching the crossing:

1. Hold bus in position and use the parking (emergency) brake;
2. After the train passes, proceed across the tracks as described above.

**Multi-Track Crossings**

At crossings with more than one set of tracks, do the following:

1. Check the crossbuck for a sign indicating the number of tracks at the crossing, if there is more than one;
2. Make sure no train is approaching on any of the tracks;
3. Only make one stop – not one stop per track; and
4. After a train passes, wait until other tracks become visible before proceeding. A second train may be approaching from the opposite direction.

## OTHER POINTERS FOR DEALING WITH RAILROAD CROSSINGS

Here are a few additional safety tips to learn when driving over railroad grade crossings:

1. Learn about the various types of highway/rail grade crossing warning devices. Not only are you risking arrest, if you fail to respond properly to these devices, you are risking your life and the lives of your passengers. For example,

   a. The "crossbuck" is a passive or "non-active" sign identifying a rail crossing. Always use extreme caution when passing over a crossing. You may proceed across a railroad highway/rail grade crossing only after a train has passed and/or you determine no train is approaching.

   b. At multiple-track crossings, the number of sets of tracks governed by the crossing device is indicated by a number under the cross buck sign. If there are multiple tracks, there will be a number to indicate how many sets of tracks will be crossed.



**Figure G-5. Railroad Crossbuck**

2.  REMEMBER, no person shall drive any vehicle through, around or under any crossing gate or barrier at a railroad crossing while such gate or barrier is closed or is being opened or closed. If you encounter a situation where an automatic flashing light signal with gate is operating and no train has arrived after an extended period of time, report the lowered gate immediately, check for an alternate route or wait for assistance. No student can exit the bus to lift the gate.

3.  Always follow directions of a police officer or flag person directing traffic at any highway/rail grade crossing.

4.  Cross the tracks only after the train has cleared a position to cancel any warning devices activated, or at crossings with no automatic warning devices.

5.  The drivers of manual transmission buses should place the gear in low starting gear. The driver should close the service door, look again in both directions, check for flashing signal lights, and then proceed across the tracks without stopping or changing gears.

6.  The drivers of automatic transmission buses should proceed over the tracks using the normal driving gear. A good rule of thumb is to proceed in the lowest gear until you are clear of the tracks. This prevents the gear from changing while crossing the tracks.

7.  Never drive onto a railroad track until you are certain there is adequate room ahead for your ENTIRE vehicle to clear the tracks completely. Know the length of your bus. It can be life threatening to begin to cross a set of tracks only to find you must stop your vehicle for traffic before you have completely cleared the tracks.

8.  Never stop and backup the bus while crossing the tracks.

9.  Hazard lights need to be activated approximately between 100 and 200 feet before and after stopping at the highway/rail grade crossing. Cancel your hazard lights when you have completely cleared the tracks, and your vehicle has traveled at least 100 feet from the tracks.

If for any reason your bus should become stalled on the tracks and a train is approaching, **IMMEDIATELY EVACUATE** your bus. The quickest method of evacuation would be the front- and rear-door method. The driver should assign a responsible student in each group to keep the children together. The driver must be able to see both groups of children. Students should be instructed to move away from the bus in a direction toward the train, but at a right angle to the train. (This is important, since upon impact, the bus and debris will be pushed down the track.) If the bus is stalled on the tracks and no train is in sight, the driver should evacuate the children from the front or back of the bus. The children should move to a safe place at least 200 feet away from the bus. They must not cross the tracks. All evacuation procedures need to be cleared by the district personnel.

# CROSSING DRAWBRIDGES

School buses are required to stop at drawbridges without a signal light or traffic control attendant at the gate. Stop at least 50 feet before the draw of the bridge. Look to make sure the draw is completely closed before crossing. After stopping, proceed when it is safe to do so. It is recommended you cross in low gear, so there will be no necessity for changing gears while traversing the drawbridge. Therefore, like railroad crossings, do not shift gears while crossing the draw span of any draw bridge.

You do not need to stop, but you must slow down and make sure it's safe when:

•  A traffic light on the bridge is showing green; and

•  The bridge has an attendant or traffic officer who controls traffic whenever the bridge opens.

# ENTERING AND EXITING THE FLOW OF TRAFFIC

While driving, you will frequently leave one traffic stream and become part of another or cross through a second stream of traffic. This may occur at intersections, or even simply picking up or discharging your students. In many cases, your vehicle movements will be regulated by traffic signs or signals. In other cases, the merging points will be controlled by your good judgment.

## GENERAL

Observe the following procedures when entering the flow of traffic:

1. Turn on the appropriate turn signal well before the point of entry;
2. If appropriate, stop just before the point of entry. In many cases you will already be stopped. If you are on a freeway acceleration lane marked with a yield sign, see the next section on ramps;
3. Check your mirror to ensure all passengers are seated;
4. Ensure no pedestrians are in the path of the bus;
5. Look left and right to see if there are any moving vehicles on the road you will enter;
6. Check all mirrors for clear space around the bus including behind you. If necessary, turn your head to check blind spots;
7. Yield the right-of-way to vehicles already on the road;
8. Look for a suitable gap in traffic and, with reasonable safety, accelerate smoothly into the roadway as quickly as possible; and
9. Turn off the turn signal after you are safely in your lane.

Observe the following procedures when exiting the flow of traffic:

1. Turn on the appropriate turn signal well before the point of exit;
2. Look left and right to see if there are any moving vehicles on the road you will be merging onto, especially if it is a deceleration lane;
3. Check all mirrors for clear space around the bus, including behind you. If necessary, turn your head to check blind spots;
4. Decelerate smoothly and, remember, school buses will take longer to stop; and
5. Turn off the turn signal after you have safely exited.

## ENTRANCE AND EXIT RAMPS

Observe the following procedures when driving on entrance or exit ramps. A school bus is slower to respond to changes in acceleration and deceleration, so you will need to adjust your driving habits accordingly. Enter or exit the expressway as safely and quickly as possible while accelerating or decelerating to the flow of traffic as needed.

1. Check and re-check the traffic ahead when entering the driving lane on an entrance ramp. Look specifically for vehicles stopped or slowing down.
2. When driving on a long entrance ramp with an acceleration lane marked with a yield sign, check the traffic ahead, and, if possible, allow the vehicles ahead to leave the acceleration lane before attempting to merge into the roadway. Use the acceleration lane to match speed with the main stream of traffic before entering a suitable gap.
3. Always use turn signals when merging.

4.  If you are entering the main roadway from an entrance ramp without an acceleration lane or one with a stop control, stop before merging. Through the side window, observe the main stream of traffic and do not proceed until you detect a gap large enough for accelerating and merging safely and smoothly.

5.  When approaching and entering an exit ramp, observe the speed of traffic and adjust your speed appropriately. Remember, posted speed limits for off ramps and on ramps are for automobiles, but may not be safe for larger vehicles. Watch for other vehicles that may be stopped or waiting in line at the end of the exit ramp.

6.  Be prepared to stop.

# USING LANES AND POSITIONING ON THE HIGHWAY

Changing lanes, being passed by other vehicles, and passing other vehicles are maneuvers you will execute often while driving a school bus. The size of a school bus and the safety of your passengers require the use of proper procedures when executing these maneuvers.

## GENERAL

Follow these procedures:

• Always drive in the lane of traffic giving you the best maneuverability for your route (especially when making turns) and allows you the best defensive position for weather, traffic, and road conditions;

• Stay within one lane for normal driving; do not straddle lane markers;

• To maintain proper lane position, get the "big picture" of the road ahead. Always aim high in steering; don't use white lines or other steering guides too close to the bus. Activate your four-way hazard warning lights when your speed is below the posted speed on open highways;

• Use parking lane for stopping and parking only;

• Where there is more than one lane for traffic in the same direction, travel in the right-most lane unless you intend to pass or turn left. Do not drive in the parking lane; and

• Drive at a safe following distance from other vehicles. A discussion of safe following distances can be found earlier in this unit.

## CHANGING LANES

When you drive a school bus in an urban/suburban area, you may have to change lanes frequently. Changing lanes with a school bus requires greater concentration and more careful use of mirrors than changing lanes with a car. If a lane change is necessary, always use extreme care.

On highways and streets with multiple lanes of traffic in the same direction, use these procedures to change lanes:

• When changing lanes, always signal your intention to change lanes with your turn signal.  You must always use your turn signals at least 100 feet before turning, if you are driving less than 35 mph.  If you are driving 35 mph or more, you must signal at least 300 feet before turning. Look for traffic approaching from behind you in the new lane.

• If your vision in the mirror is obscured by a blind spot, move your head and look up and down (vertically) or back and forth (horizontally) until you can see around the blind spot. If it helps, turn your head to view any possible blind spots at your side and rear.

• On multilane roads, look for vehicles in your lane and adjacent lanes about to enter the lane you wish to enter. Note their speeds, and be sure you can execute your lane change maneuver safely.

- Continually check your mirrors.
- Remember to disengage your turn signal.

## BEING OVERTAKEN AND PASSED

State law (Section 3345 of Title 75, the PA Vehicle Code) prohibits motor vehicles from passing a school bus when the bus has their red four-way flashers activated. Refer to Unit C. However, school buses are often overtaken and passed by other vehicles while operating on a roadway. In this situation, keep the following in mind:

- When there is no potential hazard, stay in right-hand lane and maintain your speed. Shadow the brake pedal and be prepared to stop quickly, if a hazardous situation arises from the passing vehicle.
- When on a narrow road, if following traffic builds up and a regular stop is not close by, you can consider pulling completely off of the road, using the right turn signal, and stop. Allow vehicles to pass, but never signal for them to pass. Keep your four-way flashers off. When traffic has passed and there is a sufficient gap to reenter the flow of traffic, use your left turn signal and resume your position on the road. If you cannot pull completely off of the highway, use this procedure only in legal passing zones.

## DON'T DIRECT TRAFFIC

Some drivers try to help out others by signaling when it is safe to pass. You should not do this; you could cause a crash.

## OVERTAKING AND PASSING

Usually you won't have to overtake and pass other vehicles, and school bus drivers should avoid passing other vehicles as much as possible. A driver usually will gain very little or nothing at all by passing, because any vehicle moving more slowly than a school bus is not likely to go very far before turning off. But, when it is necessary, use extreme caution and follow these procedures:

1. Observe the traffic ahead, and do not pass, if the lead vehicle is signaling a left turn, changing lanes in order to pass another vehicle, or passing pedestrians, cyclists, or animals;

2. Wait until your view of the road ahead and behind is clear and there is an acceptable gap in traffic;

3. On a two-lane road, check to be sure there is no oncoming traffic, and check traffic signs and road markings to determine, if passing is allowed;

4. Turn on the left turn signal at least 100 feet before turning, if you are driving less than 35 mph. If you are driving 35 mph or more, you must signal at least 300 feet before turning;

5. It is most dangerous to pass at night because you cannot see as far ahead, and it is more difficult to accurately judge distances and speed of approaching vehicles. If you can only see the headlights of an oncoming vehicle, you are likely to think it is further away than it really is. When clear, pull smoothly into the passing lane;

6. After moving past the vehicle at a safe speed, turn on the right turn signal, and then move back into the right lane when you are at least one and one-half bus lengths ahead of the passed vehicle; and

7. Turn off the right turn signal.

# MOUNTAIN DRIVING AND STEEP DOWNGRADES

In mountain driving, the force of gravity plays a major role. If you have a heavy load, you will have to use lower gears and go slower to climb hills. In coming down steep hills, gravity will tend to speed you up. You must go slow enough your brakes can hold you back without getting too hot. If the brakes become too hot, they may start to "fade." This means you have to apply them harder and harder to get the same stopping power. If you continue to use the brakes hard, they can continue to fade until you can't slow down or stop at all. You can avoid these dangers by going slow when going downhill.

## BEFORE STARTING THE DOWNGRADE

Two key elements for your driving procedures before you start the downgrade are:

1. Downshift as necessary to help control engine speed; and

2. Test your brakes by gently applying the foot brake to ensure they are functioning properly.

## USING GEARS GOING DOWNHILL

**Use Lower Gears When Going Downhill**
No matter how big your vehicle is, going down long, steep grades can cause your brakes to fail, if you go too fast. Using lower gears will help you keep from going too fast. Lower gears allow engine compression and friction to help slow the vehicle. This is true whether you have an automatic transmission or a manual transmission.

**Be in the Right Gear Before Starting Downhill**
If you have a large vehicle with a manual transmission, don't wait until you have started down the hill to shift down. You might get hung up in neutral and lose the benefit of engine braking. You would find yourself coasting, which would be illegal and dangerous.

YOU MAY HAVE TO USE LOWER GEARS GOING DOWN A HILL THAN WOULD BE REQUIRED TO GO UP THE HILL.

With older buses, a rule for choosing gears is to use the same gear going down a hill you would need to climb up the hill. However, new buses have low friction parts and streamlined shapes for fuel economy. They may also have more powerful engines. This means they can go up hills in higher gears and have less friction and air drag to hold them back going down hills. Find out what is right for your bus.

**Be Observant When Going Downhill**
As your bus moves down the grade, continue checking traffic in all directions and stay in the right-most lane. Don't forget to increase your following distance. Based on your observations of existing conditions, select a safe speed for going downhill based on the weight of your bus, length and steepness of grade, weather and road conditions. To maintain that speed, refer to the braking section below.

## PROPER BRAKING

When going downhill, brakes will always heat up. They are designed so brake shoes or pads rub against the brake drum or disks to slow the vehicle, which creates heat. Brakes are designed to take a lot of heat. However, brakes can be made to fail from excessive heat by attempting to slow down from too high a speed too many times or too quickly. Brakes will fade (have less stopping power) when they get very hot, and they can get to the point where they will no longer slow the vehicle.

The right way to use your brakes for long downhill grades is to go slow enough (use your gears) that a fairly sparing use of the brakes will keep your speed from increasing. If you go slowly enough, the brakes will be able to get rid of the heat, and they won't get too hot.

Forceful, intermittent braking (snubbing) is safer than light, continued braking. Letting up on the brakes from time to time will allow them to cool enough, so they don't become overheated. Light, continued pressure causes hot-spotting and in general makes the brakes run hotter, leading to increased probability of brake fade. Light, continued pressure also causes the brakes to wear faster, which is both a safety problem and a maintenance problem.

Therefore, select the right gear, go slow enough, and use forceful, intermittent braking (snubbing). This can be summarized in the following steps:

1. Select the right gear;
2. Go slow;
3. Apply the brakes just hard enough to feel a definite slowdown;
4. When your speed has been reduced to approximately 5 mph below your "safe" speed, release the brakes; and
5. When your speed has increased to your "safe" speed, repeat steps 1 and 2. This is also known as "snub" braking.

## USING RUNAWAY TRUCK RAMPS

Runaway truck ramps have been built on many steep mountain grades. These ramps are made to stop runaway vehicles safely without injuring drivers and passengers. Runaway truck ramps use a long bed of loose, soft material (pea gravel) to slow a runaway vehicle, sometimes in combination with an upgrade.



**Figure G-6. Runaway Truck Ramp**

Know runaway truck ramp locations on your route. Look for signs indicating where ramps are located and use them if you lose your brakes. Also see the section "Loss of Brakes" in Unit H (Crash and Emergency Procedures).

# UNIT H -
# CRASH AND EMERGENCY PROCEDURES

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-3

EMERGENCY DRIVING TECHNIQUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-3
   Skid Control and Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-3
      Hydroplaning  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-4
   Tire Blowout  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-5
      Sound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-5
      Vibration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-5
      Feel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-5
   Loss of Brakes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-5
      Finding an Escape Route on Level Terrain or Upgrades . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-6
      Finding an Escape Route on Downgrades: Runaway Truck Ramps . . . . . . . . . . . . . . . . . . . . .H-6
   Sudden Loss of Visibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-7
      Water Splashed on Windshield  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-7
      Windshield Wiper Failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-7
      Headlight Failure  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-7
      Hood Flying Up. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-7
      Patch of Fog. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-8
      Whiteout from Snow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-8
   Obstructions in the Path of the Bus  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-8
      Proper Braking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-8
      Steering to Avoid Collision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-9
      Choosing a Lesser Collision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-10

EMERGENCY PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-10
   Crash Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-11
   Bus-Related Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-11
   Crash Scene Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-12
   Reporting Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-13
   Incident Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-13
   Mechanical Failure or Breakdown. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-13

EVACUATING THE BUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-14
   When to Evacuate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-14
      Existing or Imminent Smoke or Fire Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-14
      Presence of Hazardous Materials  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-14
      Unsafe Position  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-14
      Bus Submersion or Immersion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-14
   Evacuation Drills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-15
   Front Door Evacuation Drill. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-15
      Rear Emergency Door Evacuation Drill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-16
      Front and Rear Door Evacuation Drill. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-18
      Other Emergency Evacuation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .H-18

USE EMERGENCY EQUIPMENT.................................................................H-19
   Portable Emergency Warning Devices.............................................H-19
   Pry Bar...........................................................................................H-20
   Fire Extinguisher.............................................................................H-20
      Engine Fires...............................................................................H-20
      Other Fires.................................................................................H-20
      To Operate a Fire Extinguisher.................................................H-20
   List of Student Names.....................................................................H-21
   Spare Electrical Fuses....................................................................H-21
   Seat Belt Cutter...............................................................................H-21
   Optional Equipment........................................................................H-21

SCHOOL BUS SECURITY....................................................................H-22
   Why School Buses Can be Targets..................................................H-22
   School Bus Drivers..........................................................................H-22
   Characteristics of Suspicious Items................................................H-22
   School Bus Safety and Security Checklist.......................................H-23
   Identifying Suspicious Behavior or Activities...................................H-23
      Reporting Suspicious Items and Unusual Activities..................H-23

HOSTAGE AWARENESS.......................................................................H-24
   Emotional Stages............................................................................H-24
   Things "To Do" in a Hostage Situation.............................................H-24
   Things "Not to Do" in a Hostage Situation.......................................H-24
   Tips to Help You in a Hostage Situation...........................................H-25

# UNIT H
# CRASH AND EMERGENCY PROCEDURES

## INTRODUCTION

Professional drivers don't depend on their skills to get them out of potentially dangerous situations. They depend on their judgment to avoid these situations. It's a lot easier to avoid of potentially dangerous situations than to get out of them. This was the focus in Units F and G. However, if you are involved in a crash or emergency situation, you will need to take certain emergency actions.

This unit is divided into two major sections. The first describes emergency driving techniques you can use as a last effort to avoid crashes. The second covers crash and emergency procedures, except for First Aid, which is covered in Unit I (Student Emergencies).

## EMERGENCY DRIVING TECHNIQUES

As you learned in previous units, driving factors such as light, weather, road, traffic, vehicle, and drivers are not usually all adverse at the same time; they come at the driver in groups. Weather conditions affect the amount of light available and the condition of the road. Light, especially too much light, can irritate a driver, and traffic conditions can do the same. Weather can affect traffic, slowing it down and making it more congested. Weather can affect vehicles as well, with the possibility of overheating in summer heat or having brittle parts break in the cold of winter. The school bus driver who adjusts his speed to adverse conditions, inspects the bus, keeps his bus in top mechanical condition, and remains alert and ready, has a better chance of remaining safe.

As a safe driver, you will be able to avoid most potentially dangerous situations through good driving habits, use of safety equipment, and proper observation. However, you may find yourself confronted with one of these five emergency driving conditions:

- Skid;
- Tire blowout;
- Loss of brakes;
- Sudden loss of visibility; or
- Objects, pedestrians and obstructions in the path of the bus.

Under these conditions, you must know what emergency driving techniques to use. Your responses must become automatic – you will not have much time to think about what you should do. The procedures in this unit are "last ditch" measures to prevent a crash, if at all possible.

## SKID CONTROL AND RECOVERY

Many factors can cause a school bus to go into a skid. During a skid, the tires lose proper traction with the road surface. Normal means of controlling the bus, including steering, braking and accelerating, won't work as usual — you must learn specific anti-skid techniques. Therefore, you must be able to detect a loss of traction in time to maintain or regain control of the bus.

Loss of traction may include:

- Skids caused when tires fail from under-inflation or from a blowout;
- Front wheel skids resulting from faulty brakes, slippery road surfaces or driving too fast for conditions;
- Rear wheel skids resulting from faulty brakes, driving too fast, accelerating too quickly on curves, or rough or slippery surfaces;
- A four-wheel locked brake skid resulting from jamming too hard on the brakes;
- Hydroplaning resulting from traveling too fast on a water-covered highway or from driving in water with under-inflated or worn tires; or
- Skidding resulting from oil film, wet leaves, loose surfaces, ice, or other slippery conditions.

Once you lose traction and the bus goes into a skid, you must be able to regain directional control. Controlling a skid requires controlled steering, smooth deceleration and controlled braking. If your school bus has lost traction and begins to skid, you will need to do the following:

1. Keep both hands on the steering wheel;
2. Stop braking to allow your rear tires to start rolling again;
3. If you have your foot on the accelerator, gradually lift your foot from the accelerator smoothly, not suddenly;
4. Turn quickly in the direction you want the vehicle to go;
5. Countersteer as your vehicle turns back on course. If you do not turn the steering wheel quickly in the other direction, you will skid in the opposite direction; and
6. Keep your eyes in the direction you want to go.

**Hydroplaning**
Hydroplaning is a unique situation where your bus loses traction on a slippery surface. If your bus is traveling straight, it may begin to feel slightly loose. If there was a high level of road feel in normal conditions, it may suddenly diminish. If the drive wheels hydroplane, there may be a sudden audible rise in engine RPM and indicated speed as they begin to spin. In a broad highway turn, if the front wheels lose traction, the bus will suddenly begin to drift toward the outside of the bend. If the rear wheels lose traction, the back of the bus will begin to slide out sideways into a skid. If all four wheels hydroplane at once, the bus will slide in a straight line, again toward the outside of the bend if in a turn. When any or all of the wheels regain traction, there may be a sudden jerk in whatever direction that wheel is pointed.

To recover while traveling in a straight line, you should not turn the steering wheel of the bus or apply the brakes. Either action could put the bus into a skid from which recovery would be difficult or impossible. Instead, with no change in steering input, gently ease pressure off of the accelerator and engage the clutch. This will slow your vehicle and let the wheels turn freely; control should then return. If braking is unavoidable, lightly pump the brakes until hydroplaning has stopped.

If the rear wheels hydroplane and cause oversteer, you should steer in the direction of the skid until the rear tires gain traction, and then rapidly steer in the other direction to straighten the bus.

Do not accelerate again until you regain steering control.

Remember, on a bus with anti-lock brakes (ABS), don't pump the brakes.  Apply the brakes as needed, allowing the ABS system to automatically pump the brakes. If you don't have ABS, don't panic and jam on the brakes. Don't brake at all or apply only light breaking pressure until you regain steering control. On a bus with hydraulic brakes, light braking requires you to pump the brakes softly to slow the bus in a controlled manner.

On a bus with air brakes, use no brakes at all in a skid if possible — never pump the brakes. The brakes may catch or come on too quickly, further adding to the problem. You should learn what types of brakes your bus has and the proper method of fanning the brakes to gain control.

## TIRE BLOWOUT

You must recognize a tire blowout quickly because you only have a few seconds to react. If your front tire has a blowout, your bus will pull in the direction of the flat. If your rear tire blows out, the bus will swerve. Fortunately, most school buses have dual rear wheels, which can minimize swerving in case of a tire blowout, but you will still feel a pull. The major signs of tire failure are:

**Sound –** The loud "bang" of a blowout is an easily recognized sign. Because it can take a few seconds for your vehicle to react, you might think it is some other vehicle. But any time you hear a tire blow, you must assume it is yours and prepare to stop.

**Vibration –** If the vehicle thumps or vibrates heavily, it may be a sign one of the tires has gone flat. With a rear tire, it may be the only sign you get.

**Feel –** If the steering feels "heavy," it is probably a sign one of the front tires has failed. Sometimes, failure of a rear tire will cause the vehicle to slide back and forth or "fishtail." However, dual rear tires usually minimize this.

If a tire blows out:

1. Grip the steering wheel firmly and steer your vehicle straight down the center of your traffic lane;

2. Accelerate for a short period to help maintain steering. Once steering is controlled, let up on the accelerator and let the bus slow down;

3. Do not jam on the brakes – apply them slowly only after you have regained control of the steering;

4. If the bus starts to skid, follow skid control procedures outlined above;

5. Activate right turn signal, move slowly toward the right (out of the traffic lane), and stop;

6. Be sure to activate the hazard warning lights, not the school bus eight-way warning system; and

7. Set up portable emergency warning devices to warn other motorists of your position on the road. This is discussed below.

## LOSS OF BRAKES

Anytime you lose your brakes, slow down as described below and attempt to maneuver the bus out of traffic before it comes to a stop, steering to avoid a crash. If this is impossible and the bus stops on the highway, activate hazard warning lights, place appropriate warning markers on the roadway, and evacuate the bus to a place of safety where the students can wait for help. Emergency parking and evacuation procedures are described later in this unit.

If you have brake failure:

• Downshift.  Putting the bus into a lower gear will help to slow the bus;

• Sound the horn; and

• DO NOT TURN OFF THE ENGINE.

If your bus has a hydraulic braking system and you experience a partial or total loss of brakes:

- Pump the brake pedal firmly and very rapidly several times; and
- Use the parking brake. On a hydraulic brake bus, the parking brake is separate from the hydraulic brake system. It can be used to slow the bus, if the hydraulic system fails. Gradually apply the parking brake by pressing the release button or pulling the release lever at the same time you use the parking brake, so you can adjust the brake pressure and keep the wheels from locking up.

If your bus has air brakes, a warning buzzer will alert you to the loss of air pressure and to the possibility of the rear brakes locking when air pressure drops to approximately 30 psi. If locking should occur, causing the bus to go into a skid, follow skid control procedures.

**Finding an Escape Route on Level Terrain or Upgrades**

While slowing the bus, look for an escape route — an open field, wide shoulder, side street or escape ramp. Turning uphill is a good way to slow and stop the bus. Make sure the bus does not start rolling backward after you stop. Put it in low gear, apply the parking brake and, if necessary, roll back into some obstacle that will stop the bus.

**Finding an Escape Route on Downgrades: Runaway Truck Ramps**

Going slowly enough and braking properly will almost always prevent brake failure on long downgrades. Once the brakes have failed, however, you are going to have to look outside your bus for something to stop it.


**Figure H-1. Runaway Truck Ramp**

Your best hope is a runaway truck ramp provided on many highways with dangerous downgrades (see Figure H-1). If there is one, there will be signs telling you about it. Use it. Every year, hundreds of drivers avoid injury to themselves, their passengers and others as well as damage to their vehicles by using these runaway truck ramps.

Some runaway truck ramps use soft gravel that resists the motion of the vehicle and brings it to a stop. Others turn uphill, using the hill to stop the bus and soft gravel to hold it in place. Be prepared to use the ramp if necessary. If your route includes a long downgrade with a runaway truck ramp, be sure you know where it is.

If there is an upgrade within the clear distance ahead, stay on the road and allow the upgrade to slow the bus; then select a path for leaving the highway. If no upgrade is within the clear distance ahead, select a path for leaving the highway that will minimize injuries and property damage.

If no runaway truck ramp is available, and no upgrade is within clear distance ahead, take the least hazardous escape route you can — such as an open field, or a side road that flattens out or turns uphill. Make the move as soon as you know your brakes don't work. The longer you wait, the faster the bus will go and the harder it will be to stop.

# SUDDEN LOSS OF VISIBILITY

The following can cause a sudden loss of visibility while driving:

- Water splashed on the windshield;

- Windshield wiper failure;

- Headlight failure;

- Hood flying up;

- Patch of fog; and

- White out from snow.

Until you regain normal visibility, you must use cues other than normal visual ones to help you control the bus.

**Water Splashed on Windshield**

If water is splashed on the windshield:

1. Remove your foot from the accelerator and turn on the wipers;

2. While doing so, apply the brakes cautiously; and

3. Look out the side windows to keep sight of the road.

**Windshield Wiper Failure**

If windshield wipers fail during rain, sleet or snow:

1. Look out the side windows to keep sight of the road;

2. Apply the brakes cautiously; and

3. Activate your turn signal to get off of the road and stop. Activate hazard warning lights.

**Headlight Failure**

If the headlights fail, immediately:

1. Hit the dimmer switch to determine if a portion of your lights may be functional;

2. Activate the hazard warning lights;

3. Try to keep sight of the road;

4. Brake slowly; and

5. Steer out of traffic lane, and stop.

Try to use available light along the way to keep sight of the road. In an extreme emergency, a good source of available light would be the flashing hazard lights on the school bus.

**Hood Flying Up**

If the hood flies up:

1. Look out the left and right windows to help keep your sense of direction;

2. Apply brakes moderately;

3. Activate your turn signal;

4. Steer out of the traffic lane to stop; and

5. When stopped, activate the hazard warning lights, not the school bus eight-way warning lights.

**Patch of Fog**

If you enter a patch of thick fog limiting your vision:

1. Activate the low beams and hazard warning lights and slow down;

2. Use the center or edge lines on the highway to guide you;

3. If the fog is severe, stay in your lane, use your 4-ways, and proceed cautiously; and

4. Activate strobe light, if equipped.

Under no circumstances should you park your vehicle on the highway. In fog it is especially important to watch for other vehicles that have slowed abruptly or stopped on or near the road.

**Whiteout from Snow**

If snowfall is creating a condition where your visibility is severely restricted:

1. Remove your foot from the accelerator and turn on the wipers;

2. While doing so, apply the brakes cautiously;

3. Look out the side windows to keep sight of the road; and

4. Steer out of the traffic lane to stop, if necessary, and activate the hazard warning lights.

# OBSTRUCTIONS IN THE PATH OF THE BUS

Occasionally, objects may suddenly cross your path while you are operating the bus, such as a pedestrian, vehicle, construction barrier, bicyclist, etc. If these are in your direct path, you must take evasive action. Always remember you are more likely to avoid hitting anything, if you have been practicing good scanning patterns, anticipating problem areas and mentally practicing taking effective evasive action repeatedly until it becomes completely automatic.

You must instantly choose between trying to stop in time and selecting an "escape route," which is free from other, more hazardous obstacles. Evasive action is simply the exercise of your fundamental driving maneuvers under conditions of stress — limited time, space and distance.

You must decide which of the following evasive actions you should perform:

• Proper use of brakes;

• Steering to avoid collision;

• Quick maneuvering, with or without braking;

• Leaving the highway for an escape route free from other more hazardous obstacles; or

• Choosing a lesser collision.

**Proper Braking**

Generally, drivers tend to apply the brakes at the first sign of trouble. While effective in most instances, braking can lock the wheels and cause loss of steering control, making it impossible to steer away from a collision. For effective evasive action, you must sometimes avoid the temptation to jam on the brakes.

On the other hand, you may decide that braking to a stop is the best evasive action you can take to avoid the obstruction. This will depend on how fast you are going, how far away you are from the object, how good your tires are, and whether the road is wet or dry.

For example, if someone suddenly pulls out in front of you, your natural response is to hit the brakes. This is a good response if there's enough distance to stop and you use the brakes correctly.

You should brake in a way that will keep your vehicle in a straight line and allow you to turn if it becomes necessary. Braking methods were discussed in Unit G.

With controlled braking, you apply the brakes as hard as you can without locking the wheels. Keep steering wheel movements very small while doing this. If you need to make a larger steering adjustment or if the wheels lock, release the brakes. As soon as the wheels start rolling, apply the brakes fully again. It can take up to one second for the wheels to start rolling after you release the brakes, Re-apply the brakes as soon as you can.

On a bus with anti-lock brakes (ABS), don't pump the brakes. Apply the brakes firmly, allowing the ABS system to automatically pump the brakes.

**Steering to Avoid Collision**

Stopping is not always the safest thing to do in an emergency. When you do not have enough room to stop, you may have to steer to avoid a crash. In many cases, you can turn to miss a hazard faster than you can stop. Therefore, if it's not instantly obvious you can stop in time; you must choose to steer the bus in an alternative path. In order to accomplish this, you must be able to quickly recognize the best escape route. At a glance, decide if a possible escape path is free from other, more hazardous obstacles.

You should avoid swerving the bus, as sudden swerves can be very dangerous, risking your passengers' safety. Because the bus is so big and heavy, it can't swerve sharply to avoid an object or leave the pavement with any great degree of control. Swerving risks overturning the bus. Steer firmly and as gradually as possible to clear the obstruction, and use the brakes, when necessary, as outlined in the previous sections. If possible, avoid steering left, into the opposite lane of traffic. Here are a few tips:

1. **Keep both hands on the steering wheel –** To turn quickly you must have a firm grip on the steering wheel with both hands. The best way to have both hands on the wheel in the event of an emergency is to keep them there all of the time.

2. **Know how to turn quickly and safely –** A quick turn can be made safely, if it is done the right way. Here are some points safe drivers use:

   a) Do not apply the brake while you are turning. It is very easy to lock your wheels while turning. If that happens, you may skid out of control;

   b) Do not turn any more than needed to clear whatever is in your way. The more sharply you turn, the greater the chances of a skid or rollover; and

   c) Be prepared to "countersteer," that is, to turn the wheels back in the other direction, once you have passed whatever was in your path.

3. **Know where to steer –** If an oncoming driver has drifted into your lane, moving to the right is best. If that driver realizes what has happened, the natural response will be to return to his or her own lane.

   a) If something is blocking your path, the best direction to steer will depend on the situation;

   b) If you have been using your mirrors, you'll know what lane is empty and can be safely used;

   c) If the shoulder is clear, going right may be best. No one is likely to be driving on the shoulder but someone may be passing you on the left. You will know if you have been using your mirrors; and

   d) If you are blocked on both sides, a move to the right may be best. At least you won't force anyone into an opposing traffic lane and a possible head-on collision.

4.  **Leaving the road –** In some emergencies, you may have to drive off of the road. It may be less risky than facing collision with another vehicle. Most shoulders are strong enough to support the weight of a large vehicle and, therefore, may offer an available escape route. Here are some guidelines to follow if you do leave the road.

   a)  Avoid Overbraking – If possible, avoid using the brakes until your speed has dropped to about 20 mph. Then, brake very gently to avoid skidding on a loose surface;

   b)  Keep One Set of Wheels on the Pavement if Possible – This will help maintain control; and

   c)  Stay on the Shoulder – If the shoulder is clear, stay on it until your vehicle has come to a stop.

5.  **Returning to the road –** If you are forced to return to the road before you can stop, do the following:

   a)  If at all possible, stop the bus first. Be careful of fixed objects such as utility poles, mail boxes and parked cars that may be blocking your path;

   b)  Hold the wheel tightly and turn sharply enough to get right back on the road safely;

   c)  Be aware your tires might grab unexpectedly and you could lose control; and

   d)  When both front tires are on the paved surface, "countersteer" immediately. The two turns should be made as a single "steer-countersteer" move.

**Choosing a Lesser Collision**

In any case where collision is absolutely unavoidable, try to reduce speed as much as possible. Also, avoid a head-on collision; collision at an angle reduces the force of impact. Remember, you're more likely to avoid hitting any obstruction in the path of the bus, if you always anticipate the unexpected. Mentally practice effective evasive action until it becomes automatic.

# EMERGENCY PROCEDURES

Crashes are events that can cause injury, death or property damage. If you have a crash or find yourself in some other emergency situation, you should know the proper procedures to follow and the proper use of emergency equipment on the bus.

As a bus driver, you must be prepared for any kind of emergency situation. It doesn't happen very often, but there is always the possibility of a crash, mechanical breakdown or other emergency. In any case, your first priority is to see all students are as safe as possible. It is important in an emergency to remain calm. Some rules to remember if your bus is involved in a crash are represented by the word **"KNOW."**

**K = Keep** all students on the bus calm. It is safer for the students to remain on the bus if there is no other immediate danger.

**N = Notify** authorities. Always call for help. Use an available cellular phone, two-way radio or other communication device on your bus; know who you should call and how to do so. If you do not have any means of communication on the bus, you may need to identify a responsible bystander to make a call for assistance. **Only in EXTREME EMERGENCIES should older, responsible students be sent for help. Refer to your school district policy and Unit I for additional information.**

**O = Off** of the road. If you break down, try to position the bus completely off of the road and away from other dangers. If it is not possible to do this, remember to evacuate the students and take them to a safer location.

**W = Warning** devices. Use portable emergency warning devices that satisfy current state regulations (at least three portable emergency reflective triangles) to warn other motorists of your position on the road.

# CRASH PROCEDURES

The Pennsylvania Vehicle Code requires that the driver of a vehicle involved in an accident shall immediately by the quickest means of communication give notice to the nearest office of a duly authorized police department if the accident involves:  1) injury to or death of any person; or 2) damage to any vehicle involved to the extent that it cannot be driven under its own power in its customary manner without further damage or hazard to the vehicle, other traffic elements, or the roadway, and therefore requires towing.

With careful driving habits, you may never be involved in a crash. However, the fact remains a percentage of school bus drivers will be involved in a crash sometime in their driving career. Pennsylvania crash statistics show of the approximately 40,000 Pennsylvania school bus operators, about 13 percent have been involved in one or more crashes.

If you have a crash, **CARRY OUT THE LOCAL POLICY AND PROCEDURES AS QUICKLY AS POSSIBLE**. These include bus-related and scene-related procedures. The following should serve as a guide.

**Bus-Related Procedures**
Immediately after a crash, your first actions take place in and around the bus.

1. **Assess the situation.** You should immediately do the following:
   a. Stop the bus in as safe a place as possible;
   b. Set the parking brake, turn off all lights and electrical switches and turn off the ignition switch; and
   c. Remain calm, assess the situation, plan your actions, and reassure the students. Refer to Unit I on Student Emergencies.

2. **Be alert for fire.** If a smoke or fire condition is present or imminent, evacuate the students. Do NOT fight the fire unless all of your students have been evacuated safely, are in a secure location and you feel comfortable re-approaching the bus to fight the fire. Evacuation procedures and use of fire extinguishers are described later in this unit. In determining the potential for fire, check for the following:
   a. Ruptured fuel tank or fuel lines;
   b. Hot tires, which may catch fire;
   c. Presence of smoke; and
   d. Possible electrical fire or sparks.

3. **Be alert for hazardous materials.** Check for and identify any possible hazardous materials that present or may present a danger to you and your passengers. Evacuate the students, if a danger exists from the following hazardous materials:
   a. Chemicals;
   b. Vapors; and
   c. Other toxic substances.

4. **Assess the students.** Check for injury to students. Keep the students on the bus unless conditions such as the possibility of fire or other dangers warrant their removal. This is the easiest way to account for all students.

# CRASH SCENE PROCEDURES

Once you have taken the above procedures, your next steps should consider the crash scene.

1. **Notify authorities.** Notify state or local police and summon medical aid, if required; notify school administrators as required by local school policy. In most cases, you should not leave the bus unattended to go for help. Ask several passing motorists or pedestrians to notify the proper authorities, if necessary. In an emergency, always follow local school policy, especially in regard to sending students to obtain assistance. You should use the "Three W's" when communicating:

   • Who: bus number, number of students and types of vehicles involved;

   • Where: location of bus or directions to the scene; and

   • What: what kind of help is needed and nature of the problem(s).

2. **Protect the scene.** Protect the students and the bus, from further crashes and injuries by placing warning devices to warn other drivers, and evacuate the bus, if necessary, or both. Protect the scene from traffic and people, so evidence is not destroyed.

3. **Cooperate with the crash investigation.** After you have handled all potential dangers to your passengers, cooperate with officials investigating the crash. You should ONLY discuss the facts of the crash with those officially concerned (police, school officials, insurance personnel). Do not discuss the crash with other motorists or passers-by. Be patient, evaluate questions, and give clear and concise answers to any questions asked by officials. Only respond to the questions asked; don't add your own opinion.

   State law requires you to carry a list of every student passenger's name on the bus in case of a crash or emergency. Provide this information, along with any relevant information about the school bus (e.g., make, model, vehicle number, owner, insurance information), to officials investigating the crash. All such information, including emergency telephone numbers, a seating chart of all passengers (if applicable), and local directives covering crashes and emergencies should be contained in an emergency packet carried on the bus. Contact your insurance carrier to obtain a proper packet.

   A driver involved in a crash is required to give his or her own name, address, driver's license number, and other pertinent information to any other driver involved, and to obtain the same information from any other driver(s) involved in the crash. Get the names, addresses and license numbers of all witnesses' – both for and against you.

   A school bus driver involved in a crash meeting Federal Highway post-crash testing thresholds is also required to submit to testing for alcohol and controlled substances. Note: Pennsylvania state law requires testing after any reportable crash in a school bus.

4. **Keep students at the scene.** During the crash investigation, do not release any of your students to anyone unless instructed by school administration officials or unless medical aid is required. Always keep students on the bus unless the situation requires emergency evacuation.

**Keep the following in mind when speaking with others involved in the crash or bystanders:**

   • **ADMIT NOTHING;**
   • **PROMISE NOTHING; AND**
   • **DO NOT ARGUE.**

## REPORTING PROCEDURES

**Every crash must be reported to your supervisor. There are no minor crashes involving a school bus!**

Remember the information you need for your crash report:

- School bus ID number;
- Driver's name, address and driver's license number;
- Date, time, weather, and direction of travel;
- Damage to vehicle;
- Name of owner of other vehicle or property, address, license number, make and model of vehicle, and damage to other vehicle;
- Injuries to persons involved, their names, addresses, extent of injuries;
- List of passengers on the bus and in other vehicle(s);
- Names and addresses of passengers in other vehicles;
- Name of insurance companies involved;
- Name of police at scene; and
- Diagram of crash scene.

In addition to any local crash reports, the owner or operator of any school bus involved in a crash is required by state law:

- Within 24 hours, to report the crash to the chief school administrator or the authorized representative of the school district, private school, or parochial school that either employs or contracts the service of the owner or operator.
- Within five days, School Bus Crash Report (DL-739) must be completed whenever there is any injury or property damage, regardless of how slight. Complete the form even when students aren't on the bus at the time of the crash. After completing the form, submit it to PennDOT. You should check with your employer and school district regarding who will fill this form out. In some cases, the driver will fill this out, in others, the safety director.

**Incident Reporting**

Because of the possibility of liability suits, drivers are responsible for reporting all incidents occurring in or around their buses during their runs. Remember, your passengers are your first responsibility in any incident. You should report all incidents to your supervisor. He or she will take any appropriate action, if necessary.

## MECHANICAL FAILURE OR BREAKDOWN

In the event of a mechanical breakdown, know what to do, how to do it and when it should be done. The following is a suggested procedure:

1. Stop the bus as far to the right of the road as possible or on the shoulder of the road;
2. Keep the students on the bus. However, if the location of the bus is unsafe, evacuate the students to a safer location (see evacuation procedures in the next section);
3. Activate hazard warning lights and place warning devices on the highway (see the section on using emergency equipment later in this unit);
4. Contact the proper school authorities and give the location of the bus and a description of the breakdown; and
5. See that arrangements are made for all students to be delivered to their destination.

# EVACUATING THE BUS

In certain crash and emergency situations, you may need to evacuate the students from the bus. You should know when to evacuate the bus and the procedures for evacuating a bus. These procedures are practiced in required evacuation drills. In any situation requiring evacuation, remain calm and take charge of the situation. As the bus driver, YOU are the leader. Review procedures below for guidance in situations where you are incapacitated.

## WHEN TO EVACUATE

Usually, students remain on the bus during an emergency. Four situations, however, require that you evacuate the bus — existing or imminent smoke or fire condition, presence of hazardous materials, unsafe position of the bus, or vehicle submersion or immersion.

### Existing or Imminent Smoke or Fire Condition

Stop the bus and evacuate it immediately, if the engine or any portion of the bus is smoking or on fire. An existing fire near the bus or the presence of gasoline or other combustible material is considered as "danger of fire." Evacuate students as described below.

- Evacuate students through the door farthest from the fire or potential source of fire;
- Evacuate students closest to the danger first;
- Give the students a specific location to go to that is far away from the bus but still within your visual range; and
- Give clear, concise and EXACT instructions.

### Presence of Hazardous Materials

If any hazardous materials are present in or near the bus, evacuate the students. This includes vapors or fumes, which may enter the bus from outside sources and may be dangerous to the passengers.

### Unsafe Position

In the event the bus is stopped due to a crash, mechanical failure, road conditions, or human failure, determine immediately whether it is safer for the passengers to remain in the bus or to evacuate. You must evacuate when:



Figure H-2. Potentially Dangerous Location Around

- The final stopping point of the bus is in the path of any train or adjacent to any railroad tracks.
- The position of the bus might change and increase the danger. For example, evacuate if a bus comes to rest near a body of water or cliff where it could still move and go into the water or over the cliff.
- The location of the bus creates the danger of collision. In normal traffic conditions, the bus should be visible for a distance of 300 feet or more. A position over a hill or around a curve where such visibility does not exist should be considered reason for evacuation (see Figure H-2).

### Bus Submersion or Immersion

In the very unlikely event the bus has driven off of the roadway and into a body of water and is submerged or immersed, evacuate students out of the nearest most usable exit.

In all these cases, carry out the evacuation as safely as possible.

# EVACUATION DRILLS

In an emergency, the students may panic and rush to the exit causing the emergency door to become jammed by everyone trying to get out at the same time. So that students know what to expect during an evacuation, State law requires each student who is transported in a school bus to participate in emergency evacuation drills in the first week of school and in March of every school year. This includes all students even if they may only ride a bus on special trips. In fact, drills should be conducted more frequently. While state law does not require evacuation drills for school vehicles, they are highly recommended as a matter of safety preparedness for both students and drivers alike.

Everyone involved in drills should keep these points in mind:

- Safety of the students is of the utmost importance and must be considered first. Getting them off of the bus safely, quickly and in an orderly fashion is the objective.

- All drills should be supervised by the principal or by persons assigned to act in a supervisory capacity and held on school property. You are responsible for conducting the drill in an organized manner.

- In a real emergency, you might be incapacitated and unable to direct the student emergency evacuation. During the drill, be sure to review procedures with students, so they know what to do if you are unable to help. Don't assign a student as a leader without written consent from a parent or legal guardian.

- During the drill, students should be instructed how and where to get help if the driver is unable to do so. Instructions and telephone numbers should be posted or otherwise carried in the bus. Students should be instructed to enlist several bystanders to go for help, since some of those asked might not want to get involved in the situation.

- Students should be instructed on how to use the radio, and the location of emergency equipment on the bus.

- Follow local policies in conducting evacuation drills and emergency procedures.

- Explain to all passengers the procedures to be followed if an evacuation is necessary. The following recommended procedures may be adapted to your local situation.

**Front Door Evacuation Drill**

In the interest of safety, all drivers should regularly conduct an emergency evacuation drill through the front door with each bus load of students, when they unload at school (see Figure H-3).

Follow these steps:

1. Stop the bus at the normal unloading location or pre-selected location on the school grounds;

2. Set parking brake, turn off engine and remove ignition key;

3. In buses with a manual transmission, select either the first gear or reverse position. In buses with automatic transmissions, select either the park position or neutral with the parking brake on;

4. Stand, open the front door, face the students, and get their attention;

5. Tell them, "Do what I say — remain absolutely quiet";

6. Then say, "Front door emergency evacuation drill—remain seated";

7. Direct two student helpers (appointed at the beginning of the year or each month) to their positions. Assign one helper to lead the students to a designated location away from the bus where the students quietly remain in order. Assign the other helper to stay outside the front door to count and assist passengers as they leave;

8. Instruct students to leave all belongings such as books and lunch containers on the bus and tell them they can be retrieved after the drill is completed;

9. Turn and face the front of the bus, standing between the first row of occupied seats;

10. Starting with the right-hand seat, tap the shoulder of the student nearest the aisle to indicate that those occupants should move out. Say, "Walk — don't run. Use hand rails." At the same time, hold your hand before the occupants in the left-hand seat in a restraining gesture;

11. When the students in the right-hand seat have moved far enough to clear the aisle, dismiss the occupants of the left-hand seat;

12. Continue this procedure as described, right and left seats alternately, until the bus is empty;

13. When the last seat is empty, walk to the front of the bus and check to be sure everyone is out;

14. Leave the bus and take the helper at the front door with you and join the passengers and the other helper;

15. Evaluate the evacuation drill, pointing out improvements needed and commending students on activities well done;

16. Have students return to the bus in an orderly manner to retrieve their belongings before entering the school. Have students who are to continue to another school remain on the bus, and proceed on your route; and

17. Complete any reports as required by local policy.



**Figure H-3. Front Door Evacuation**

**Rear Emergency Door Evacuation Drill**

The rear emergency door evacuation drill should be practiced as often as possible with elementary and secondary students (see Figure H-4). In some cases, the rear emergency door evacuation drill may be used for demonstration purposes only and not practiced by students in order to prevent unnecessary injury performing the drill.

1. Follow steps 1-3 of the Front Door Evacuation Drill;

2. Stand facing the students, get their attention and tell them, "Do what I say — remain absolutely quiet";

3. Then say, "Rear door emergency evacuation drill — remain seated";

4. Instruct students to leave all belongings such as books and lunch containers on the bus and tell them they can be retrieved after the drill is completed;

5. Walk to the rear of the bus and face rear door;

6. Use left hand to restrain occupants of right rear seat;

7. Open the rear emergency door;

8. Assign two helpers to sit in the left rear seat. Have the helpers exit out the rear emergency door. Assign the helpers to assist passengers getting out of the bus: one helper assists the passengers as they exit the bus, and the other leads passengers to a designated location away from the bus where they remain quietly in order;

9. Face the doorway and move between the left rear seats to clear the aisle;

10. Instruct students in right rear seats to leave the bus. Have them assume a semi-squat position as they exit the bus. Instruct helpers to grasp a passengers' wrist or forearm with one hand and to place their other hand under a passengers' shoulder as the passenger exits the bus. Caution students not to bump their heads when leaving through the rear door;

11. Tell students in the next left seat to leave the bus. Keep control at the rear door to prevent any pushing or shoving. Students who are injured, disabled or in a condition that may be aggravated by exiting out the rear door (e.g., overweight, pregnant) should not be required to participate in the drill. They should leave the bus with the driver through the front door and join the other students when the drill is completed;

12. Continue the above procedure, alternating left and right seats until the bus is empty;

13. When the last student has exited, walk to the front of the bus and check to make sure everyone is out; and

14. Join the students and conclude the drill as described in steps 15-17 of the Front Door Evacuation Drill.



**Figure H-4. Rear Door Evacuation**

( ● **Designates Helper** )

100 Feet

**Front and Rear Door Evacuation Drill**

A combination of the procedures used for the front door and rear door evacuations also can be used for an evacuation drill in which students leave the bus through the front and rear doors (see Figure H-5). Procedures for the front door evacuation are used for students in the front half of the bus; and procedures for the rear door evacuation are used for students in the rear half of the bus. The only exception to using these procedures as described above would be the command given at the beginning of the drill: "Front and rear door emergency evacuation drill — remain seated." In a real emergency, this type of evacuation would require the shortest amount of time to get the passengers off of the bus. However, it is dependent upon both doors being available for safe evacuation. This drill should be used for elementary and secondary students. Student helpers should be properly instructed on how to assist students out of the rear of the bus. Helpers should reach up and lift students down as they exit the rear emergency door. Again, this drill may be performed as a demonstration only.



**Figure H-5. Front and Rear Door Evacuation**

**Other Emergency Evacuation Procedures**

In an actual emergency, it might be necessary to evacuate students through the bus windows or roof vent. Maintain order as much as possible in these situations and work to evacuate all passengers as quickly and safely as possible. Before leaving the bus, you should always check under all seats to make sure no students are on the floor. This applies to all types of evacuations. Also keep in mind the fastest way to evacuate the bus may be to have half the students exit through the front door and half through the rear, if feasible.

# USING EMERGENCY EQUIPMENT

When an emergency or crash happens, it's too late to learn how and where to use emergency equipment. All school buses are required to carry the following:

- First Aid Kit;
- Portable emergency warning devices (at least three portable emergency reflective triangles);
- Pry bar;
- Fire extinguisher;
- List of student names with their assigned pick-up and delivery times;
- Spare electrical fuses unless the bus has circuit breakers;
- Seat belt cutter (also known as a web cutter) is required in every school bus equipped with passenger seat belts; and
- Body Fluid Clean-Up Kit.

You should know the location and operation of this equipment. The use of emergency devices is discussed below. The First Aid Kit is discussed in Unit I.

## PORTABLE EMERGENCY WARNING DEVICES



Figure H-6. Placement of Warning Devices

Buses in service are equipped with at least three triangular reflectors, which serve as warning devices as per Section 171.83 of Title 67. They are encased in a container in the driver's compartment. You will use three reflectors to warn oncoming vehicles of a disabled bus as per Section 167 of Title 67. Older buses may be equipped with round reflectors, red flags, or flares, which should be placed according to the procedures given below for reflectors (see Figure H-6). Use of flares is not recommended unless placed by first responders.

1. **First Reflector –** Place the first reflector along the roadway side of the bus within 10 feet of the front or rear corner to mark the location of the bus.

2. **Second Reflector –** Place the second reflector about 100 feet behind the bus on the shoulder or lane you are stopped in. If there is a hill or curve preventing oncoming traffic from seeing the bus, place the reflector up to 500 feet behind the bus.

3. **Third Reflector –** Place the third reflector about 100 feet in front of the bus again using greater distances if conditions warrant.

## PRY BAR

The pry bar is located close to the driver's compartment as per Section 171.65 of Title 67. Use it to pry open doors, windows or other parts in the event of a crash where damage to the vehicle prevents easy exit by normal means.

## FIRE EXTINGUISHER

A portable fire extinguisher must be located in an accessible location in the driver's compartment of every school bus as per Section 171.51 of Title 67. Fire extinguishers work by either cooling the burning substance or by cutting off the supply of oxygen to it. Before using a fire extinguisher, make sure it is properly charged. A gauge is mounted at the top of the extinguisher to indicate it is fully charged. If the needle on the indicator stays in the charged area, the extinguisher is properly charged. If the needle is in the overcharged or undercharged areas, report it to your mechanic. This should be checked as part of your pre-trip inspection (refer to Unit E).

Only try to extinguish a fire, if you know what you are doing and it is safe.  Your first priority is to evacuate all students and quickly get them somewhere safe. Do NOT waste your time fighting a fire when you need to get students off the bus.

If you do have to fight a fire, here are a few tips:

**Engine Fires –** With an engine fire, turn off the engine as soon as you can. DO NOT open the hood, if you can avoid it. Aim extinguishers through louvers, radiator or from the underside of the vehicle.

**Other Fires –** Only try to extinguish a fire, if you know what you are doing and it is safe:
- If possible, stand upwind from the burning material to prevent standing in smoke and heat;
- Do not walk into unburned material that could catch fire in a back flash and cause injury to you;
- When using the extinguisher, stay as far away from the fire as possible;
- Point the fire extinguisher at the base of the fire and use a sweeping motion. Do not aim the extinguisher at the flames;
- Position yourself upwind. Let the wind carry the extinguisher to the fire rather than carrying the flames to you; and
- Continue until whatever was burning has been cooled. Absence of smoke or flame does not mean the fire is completely out or cannot restart.

**To operate a fire extinguisher:**
1. Remove it from the bracket;
2. Pull the safety pin by breaking the seal;
3. Hold it in an upright position;
4. Aim it at the base of the fire;
5. Squeeze the handle to discharge the extinguisher; and
6. Squeeze and release as necessary to control the fire.

The extinguisher will only last approximately eight seconds. No matter how much you use it, you must recharge the fire extinguisher or replace it with a substitute before the next run.

These instructions are applicable to most fire extinguishers, but you should check and be familiar with the instructions for the extinguisher on your bus. You should try to have actual hands-on use of the fire extinguisher during training.

## LIST OF STUDENT NAMES

Every bus must have a list of names for all students who ride the bus and the appropriate pick-up and delivery time for each student. This list can be used to account for the students in an emergency. Although not required, a seating chart for students on the bus is strongly recommended. It can also be helpful in emergency situations.

## SPARE ELECTRICAL FUSES

All buses should carry the proper spare electrical fuses in case a fuse is blown. The location of these varies by bus type and manufacturer. If the bus is equipped with circuit breakers, this is not necessary.


**Figure H-7. Seat Belt Cutter**

## SEAT BELT CUTTER

If your school bus is equipped with one, the seat belt cutter will be mounted in a visible location in the driver's compartment. See Figure H-7.

## OPTIONAL EQUIPMENT

Although not required, the following equipment may be carried on every school bus, especially those used to transport students with disabilities. This is not an all-inclusive list.

- Vomit odor absorbent, basin or pail (water in jug), sponge, and plastic bags;
- Tissues and paper towels;
- Plastic or other waterproof material for seats;
- Blankets and sheets to use as protection in cold weather;
- Sand or other substance for traction on ice; and
- Clean rags, gloves, or pads for motor check-up en route in case of suspected trouble.

These all must be securely fastened in the vehicle and not blocking the aisle way.

# SCHOOL BUS SECURITY

## WHY SCHOOL BUSES CAN BE TARGETS

1. They are relatively unprotected and vulnerable;

2. They have predictable routes and schedules;

3. They have the potential for a large number of casualties;

4. There are schools all over the nation;

5. They have unquestioned access to high-value destinations;

6. They represent an emotional target; and

7. The effects of a terrorist attack on school buses would be demoralizing.

## SCHOOL BUS DRIVERS

You, as a school bus driver, are the eyes, ears and protectors of your communities the same as the Neighborhood Watch Program. You know your routes and know what is usual and unusual. Therefore, you need to be informed on how to react in security-related situations.

1. Learn state and school district security guidelines;

2. Be aware of suspicious activity or behavior in areas around school buses, school bus facilities and schools;

3. Notice and report any unusual conditions of vehicles, those belonging to the school district and those vehicles that may enter into parking lots or facilities. Pay attention to suspicious people or vehicles in the school bus area outside a school or at school bus stops;

4. Be vigilant with respect to strange packages, items or substances, which are brought on or around school buses;

5. Know who your supervisory contacts are in the school district and have their phone numbers immediately available;

6. Recognize threats and how to properly handle them;

7. Learn emergency operating plans and procedures, and stay familiar with the operation of emergency equipment. For example, remove keys from the ignition when your bus is unattended;

8. Inspect your bus whenever you have left it unattended for any length of time; and

9. Keep a clean bus.

## CHARACTERISTICS OF SUSPICIOUS ITEMS

1. Items that are abandoned or hidden in an unusual place;

2. Items having leaking gas, vapor, odor, or suspicious substance, including excessive grease;

3. Any items containing exposed wires or timer;

4. Any items having an attached message with a threatening note or suspicious markings; and

5. Any canister, propane style tank, metal box, bottle, or out of place items.

# SCHOOL BUS SAFETY AND SECURITY CHECKLIST

You need to be vigilant when checking the following items in a pre-trip inspection, or anytime you have left the bus unattended for any length of time.

1. **Seats:** Look for lumps, bulges, damaged upholstery, and any suspicious packages on a seat;

2. **Floor Surface:** Look for modifications to material/unusual thickness;

3. **Passenger Compartment:** Smell for strange odors, raised floor, unusual welds, unusual items, or excessive weight;

4. **Exterior Surface:** Look for missing screws, unusual scratches, welds, signs of tampering, or recent paint;

5. **Undercarriage:** Look for items taped or attached to the frame or fresh undercoating;

6. **Engine Compartment:** Look for odd wires or liquids, unusual welds or new tape;

7. **Tires:** Look for unusual odor from air valve;

8. **Fenders:** Look for unusual thickness.

# IDENTIFYING SUSPICIOUS BEHAVIOR OR ACTIVITIES

Suspicious activities are anything you may feel is unusual or out of place. In addition, pay particular attention to the following:

1. Anyone appearing interested in school facilities, vehicles or their surroundings;

2. Anyone who has been sighted within a school, or school bus stop numerous times;

3. Anyone who has put a package in a public place and left quickly;

4. Anyone soliciting information on school facilities, buses or schedules;

5. Anyone taking pictures or videotaping areas of school bus facilities, schools or school bus stops;

6. Anyone looking lost or wandering around at school bus stops or school grounds, or anyone who seems to be somewhere they are not supposed to be;

7. Anyone showing disruptive or potentially distracting behavior; anyone showing an unusual interest in employees or students, the school or school bus locations; anyone wearing a uniform who appears to not be part of the setting;

8. Anyone wearing clothing that is not appropriate for the weather;

9. Any person possessing a weapon or dangerous item; and

10. Using a vehicle in a suspicious way (illegally parked, erratic driving, following).

**Reporting Suspicious Items and Unusual Activities**

1. Remain alert and calm. Be as observant as possible, paying attention to the location of the item or device;

2. **IMMEDIATELY** report suspicious items and behavior to your dispatcher or local authorities. If you suspect a serious situation, call 911 right away;

3. Be able to report the location, color, year, make, model, and license plate number. Be sure to include the direction of any suspicious vehicles;

4. Never touch a suspicious item. You need to move as far away as possible and be aware you could be injured by flying glass or debris; and

5. **DO NOT USE** your radio or cell phone within 300 feet of the timer or device.

**YOU CANNOT IDENTIFY SUSPICIOUS BEHAVIOR BASED ON STEREOTYPES OF RACE, COLOR OR ETHNICITY.**

# HOSTAGE AWARENESS

## EMOTIONAL STAGES

If you find yourself in a hostage situation, you need to understand the feelings you will experience:

1. **Denial:** It is common for the victim to feel that "this can't be", "this is not happening to me," or "it is just a joke."

2. **Belief of immediate rescue:** Do not mislead yourself by thinking you will be rescued right away. It is to your advantage for the situation to take time to resolve. There is more of an opportunity for negotiation with the captor, which can lead to a peaceful resolution; and

3. **Loss of immediate reality:** Make a determined effort to stay focused. Avoid the temptation to let your thoughts center around your family/loved ones, and what might become of them if something should happen to you.

## THINGS "TO DO" IN A HOSTAGE SITUATION

1. **Bond with your captor:** Try to relate to them and build a relationship of understanding and sympathy;

2. **Be human:** Do not allow the captor to view you as an object instead of a person. Let your captor know you are a father or mother and there are people who depend on you, even if there are none. Avoid having your face covered. This dehumanizes a person;

3. **Take mental notes:** Without being obvious to the captor, note hair color, any scars, tattoos, or other identifying marks. Estimate height and weight;

4. **Expect to be arrested:** Law enforcement personnel will detain everyone until identification can be verified. Captors have exchanged clothing with hostages in an effort to escape. Your district will have officials on the scene to identify you;

5. **Keep a low profile:** Speak only when spoken to; do not initiate conversation;

6. **Think pleasant thoughts:** The incident could go on for hours. Avoid falling into depression, and remain confident you will be released;

7. **Remain strong for your students:** Even though you may have had a difficult time with the students all year, they will look to you for leadership in an emergency. If you maintain your composure, it will help them to do the same; and

8. **Remember you are a primary witness for investigators:** It is vital you write down everything that occurred during the hostage situation from onset to resolution. Do this as soon as possible while the events are still fresh in your mind. Do not speak to the media. Your district officials on the scene should shield them from you. Follow district policy regarding any future media contact.

## THINGS "NOT TO DO" IN A HOSTAGE SITUATION

1. **Do not make any threats:** Remember the captor is holding you against your will with some type of weapon. Do not behave, or speak in a manner that may be perceived by the captor as threatening;

2. **Do not stare or glance at your captor:** Keeping your eyes down will give the appearance of submission. Do not appear aggressive in your body language or facial expressions;

3. **Do not interfere:** Do not volunteer to assist the captor in any way. Do not interfere with the actions of the captor. For instance, he/she may be irritated with crying students and strike the students to quiet them. Remember you are being held at gun/knife point. Challenging the captor will increase the risk of further harm to yourself and/or the students;

4. **Do not negotiate for your own release:** Only the police will conduct negotiations. If you involve yourself, you may jeopardize a peaceful resolution to the hostage situation;

5. **Do not negotiate for the release of the students:** Do not make offers or promises of money or possessions in exchange for the release of the students. Only the police can negotiate; and

6. **Do not be arrogant:** Give the captor whatever they want. Do not resist. It could result in harm to yourself and/or the students.

## TIPS TO HELP YOU IN A HOSTAGE SITUATION

1. **Help keep the peace:** Prevent anyone from getting hurt. Consider your actions, so as not to put yourself or your passengers at risk;

2. **Be patient:** If you as the driver show patience, then your students will be more prone to follow your lead;

3. **Remain calm:** Try not to show fear, the students are looking to you as an example;

4. Know that 99 percent of all situations are resolved through negotiations: **Negotiations may take time, but remember time is on your side;**

5. **Do not be confrontational:** Don't be a hero, unnecessary harm to you or your passengers may result from your actions;

6. **Communicate:** If possible, try to make your location and situation known as soon as possible, if the hostage taker has not made contact. (Microphone keyed open);

7. **Be a good witness:** Make a mental picture of the hostage-taker(s) and any weapons. The driver preferring to stay with their students may not have the choice. This information may be vital for the police in determining the next move to help the remaining hostages;

8. **Attempt to get along:** You should cooperate with your captor and do as you are told. Comply with reasonable demands, but the key is not to offer help;

9. **If the police try to enter the bus:** Try to avoid giving away police positions or actions, by your actions or facial expressions. Captors could pickup on them. Be prepared for loud noise and follow instructions quickly;

10. **Help avoid getting caught in a hostage situation:** Report any suspicious person immediately. Do not wait for something to happen or get out of control;

11. **Call the police:** This is the best action a driver can do. Avoid becoming caught in the situation before it occurs; and

12. **Know your passengers:** Knowing your passengers and their needs can be vital in such emergencies. Their medical needs may allow for you to communicate with emergency medical personnel in a hostage situation.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# UNIT I -
# STUDENT EMERGENCIES

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-2

MEDICAL LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-3
    The Good Samaritan Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-3

FIRST AID PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-4
    Setting Priorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-4
        Hazard Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-4
        Specific Hazards in an Emergency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-4
        Obtaining Emergency Medical Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-5
        Use Responsible Helpers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-5
        Treatment Priorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-6
        Performing Triage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-6
    Treatment Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-6
        Seizures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-6
        Fractures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-7
        Allergic Reaction: Bites and Stings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-8
        Allergic Reaction: Anaphylactic Shock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-8
        Asthma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-9
        Bites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-10
        External Bleeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-10
        Internal Bleeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-10
        Choking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-11
        Dehydration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-11
        Diabetes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-12
        Heat Stroke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-13
        Hyperventilation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-13
        Nose Bleeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-13
        Traumatic Brain Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-13

REPORT ALL INCIDENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14

FIRST AID EQUIPMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14
    First Aid Kit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14
    Body Fluid Clean-Up Kit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-15
        Cleaning Body Fluid Spills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-15

# UNIT I -
# STUDENT EMERGENCIES

# INTRODUCTION

Part of your responsibility as a school bus driver requires you to be prepared to act appropriately in emergency and crash situations. Your actions in these situations can mean the difference between life and death for one or more of the students on your bus. Contact your employer for a copy of your school district's guidelines and procedures for handling student emergencies.

**CONTAINED IN THIS UNIT ARE ONLY GENERAL GUIDELINES. YOU MUST FOLLOW YOUR LOCAL SCHOOL DISTRICT PROCEDURES AND GUIDELINES REGARDING RECEIVING FIRST AID TRAINING AND ADMINISTERING FIRST AID ON YOUR SCHOOL BUS.**

**FIRST AID AND EMERGENCY CARE ARE ONLY TEMPORARY STEPS TAKEN UNTIL MORE ADVANCED TREATMENT CAN BE OBTAINED, EITHER AT THE SCENE OF AN INCIDENT OR AT A HOSPITAL.**

You are not expected to be a paramedic; however, your company or district may require you to take First Aid courses, when available. Regardless, it is your responsibility to check the First-Aid Kit and Body Fluid Clean-Up Kit on a regular basis to assure it is present and sealed. Make sure to familiarize yourself with its contents and how each item is used. If you feel the medical emergency is beyond your knowledge, immediately call for emergency assistance.

First Aid is defined by the American National Red Cross as the immediate and temporary care given to the victims of crashes and sudden illness until the services of a physician can be obtained.

Emergency care is a process involving assessment, priority setting and continual reassessment. Other important aspects of emergency care include clearly describing what happened and knowing how to use the supplies and equipment used in performing this care.

Your top priority in the event of a crash or sudden illness is to keep the situation from getting worse until help arrives. You must perform only those emergency procedures for which you are properly trained, but remember your most important responsibility is to manage the overall scene until help arrives. In some situations, the time it takes for help to arrive may allow you to maintain the scene and provide emergency care to one or more injured persons. However, do not become so involved in specific problems you are unable to manage the entire scene. You need to learn procedures that will enable you to do the following:

- Control hazards at the scene;
- Evaluate injuries or illnesses;
- Enlist the help of others;
- Contact the emergency medical services system in your area;
- Maintain control of non-injured students during the crisis; and
- Control access to your students. Release students only to authorized persons. Keep students at the scene until evaluated.

While this unit provides a basic overview of emergency care procedures, local guidelines and procedures should always be followed.

# MEDICAL LIABILITY

## THE GOOD SAMARITAN ACT

Anyone who gives First Aid should be concerned about their liability when emergency care is necessary. The basic legal principle, which most directly applies to you as a bus driver is the Good Samaritan concept. In Pennsylvania and many other states, specific legislation has been passed to provide first-aiders with an exclusion from civil liability. A copy of Pennsylvania's Good Samaritan Act is reprinted here for your reference.

| Figure I-1. Pennsylvania Good Samaritan Act |
| --- |

### PENNSYLVANIA GOOD SAMARITAN ACT
### PUBLIC LAW 697, NUMBER 122

Section 8332, Nonmedical good Samaritan civil immunity.

a) General Rule – Any person who renders emergency care, first aid or rescue at the scene of an emergency, or moves the person receiving such care, first aid and rescue to a hospital or other place of medical care shall not be liable to such person for any civil damages as a result of any acts or omissions in rendering the emergency care, first aid or rescue, or moving the person receiving the same to a hospital or other place of medical care, except any acts or omissions intentionally designed to harm or any grossly negligent acts or omissions which result in harm to the person receiving the emergency care, first aid or rescue or being moved to a hospital other place of medical care.

b) Exceptions –

　　1) This section shall not relieve a driver of an ambulance or other emergency or rescue vehicle from liability arising from operation or use of such vehicle.

　　2) In order for any person to receive the benefit of the exemption from civil liability provided for in subsection (a), he shall be, at the time of rendering the emergency care, first aid or rescue or moving the person receiving emergency care, first aid or rescue to a hospital or other place of medical care, the holder of a current certificate evidencing the successful completion of a course in first aid, advanced life saving or basic life support sponsored by the American National Red Cross or the American Heart Association or an equivalent course of instruction approved by the Department of Health in consultation with a technical committee of the Pennsylvania Emergency Health Services Council and must be performing techniques and employing procedures consistent with the nature and level of the training for which the certificate has been issued.

**As you can see, the legal protection provided by Pennsylvania's Good Samaritan Act requires you to be currently certified in emergency care by the American National Red Cross, the American Heart Association or, in a similar course, approved by the Pennsylvania Department of Health.**

This unit is intended only to present some basic guidelines concerning your actions in a medical emergency; **IT IS NOT A FIRST-AID COURSE.** To meet the criteria described in the Good Samaritan Act, you need to successfully complete a course approved by the Pennsylvania Department of Health in consultation with the Pennsylvania Emergency Health Services Council (PEHSC) for Layperson and Good Samaritan.

The following organizations offer approved courses:

- American Academy of Pediatrics
- American Red Cross
- American Safety and Health Institute
- Carey Program
- Coyne First Aid, Inc.
- EMS Safety Services
- Emergency First Care Program

- Hart Fitness Consulting
- Life Emergency Safety Training
- Medic First Aid
- National Safety Council of Western PA
- National Ski Patrol
- US Army, Department of Combat Medic
- Western PA Safety Council

It is recommended that you also refer to Pennsylvania Department of Health EMS Information Bulletin #051. This bulletin may be accessed via the following link:

http://www.dsf.health.state.pa.us/health/lib/health/ems/bulletin/emsib_51_state_recognized_cpr_programs.pdf

# FIRST AID PROCEDURES

This section describes priority setting and procedures in emergency situations.

## SETTING PRIORITIES

First Aid and emergency care are techniques applied to one or more victims of a crash or illness. As a school bus driver, you cannot focus all of your attention solely on the ill or injured student(s). You must consider many other factors including:

- Hazards that could make the situation worse;
- Obtaining emergency medical assistance, if necessary;
- The seriousness of the injuries or illnesses;
- The safety of all healthy passengers; and
- Your own safety.

**Hazard Control**

In Unit H (Crash and Emergency Procedures), you learned about many situations, which could affect the health and safety of everyone on your bus. Prevention and prompt action are the key elements in keeping minor emergencies from developing into serious problems. Remember what you have already learned about safely parking and evacuating the bus (if there is no other option), fire control and safety in maneuvering the bus.

**Specific Hazards in an Emergency**

Be aware of these hazards:

- **Existing or Imminent Fire –** Few crashes result in fire or explosion, but you must always be alert to the presence of combustible fuel and ignition sources. Electrical fires may also start in the engine compartment due to faulty wiring or conditions other than a crash;
- **Hazardous Materials –** Identify any chemicals, vapors or other toxic substances, which present a danger to you and the others involved. Refer to Unit E on Preventive Maintenance, which identify a few of these materials found in the engine compartment;
- **Unsafe Site –** If an injury or crash occurs, be sure to park the bus in the safest position possible to avoid another crash. If at all possible, get the bus off of the roadway; and
- **Distractions –** If other circumstances don't prevent it, keep all passengers on the bus to make it easier to control them.

**Obtaining Emergency Medical Assistance**

Once hazards have been identified and controlled to the best extent, you need to get an idea of the nature of the crash, a rough estimate of how many students or others are injured, and the relative seriousness of their injuries. You should do this quickly and call for help, so it can get to the scene as soon as possible. Just about every school bus should be equipped with a two-way radio, and most likely there will be a cellular phone in your bus (your own or a student's). You may need to use these to call for ambulance, rescue, fire, or police services.

If you don't have one of these in your bus or if they have been damaged in a crash, or if you are in a "dead spot" with no service, calling for help can be more difficult. Who is going to make the call? Where will the call be made and what will be said? Since you should avoid leaving the bus and its passengers, you may need to identify a responsible bystander to make a call for assistance. Sometimes it's a good idea to send two bystanders to call the emergency services system. This increases the chance an accurate call will be made. Sometimes the second person may provide a calming influence.

It may be helpful to use your cell phone to call 911 for help so that emergency personnel can pinpoint your location using GPS. When calling for help, give specific instructions concerning the items below. The following is a priority listing:

1. The exact location of or precise directions to your location;
2. The exact nature of the problem, illness or injury (to the extent possible);
3. The number of people injured; and
4. A description of the type of vehicles involved (in the case of a crash).

**Use Responsible Helpers**

It should be clear by now you have many areas of concern in an emergency situation. Adult bystanders and responsible students can be very important resources you may need to use. Knowing your passengers can be a big advantage, if you find yourself in a situation requiring immediate assistance. Make it a point to know the students on your bus. Selecting the right helper in an emergency is always difficult, but the more you know about your students, the better your chances are of making a good choice. **You should follow local School District procedures and guidelines when using student helpers in emergency situations. This is especially important when making the decision to send students to get assistance in an emergency. Do so only if local procedures and guidelines permit and the situation warrants it. Only in EXTREME EMERGENCIES should older responsible students be sent for help.**

Never send an elementary school student. You should also consider sending two students, rather than just one. This will increase their safety and security, they can support each other, and the chances of accurate information being passed on are increased. Ambulance crews often need the help of bystanders, so it is reasonable to think you might need help, too.

**Treatment Priorities**

Once help has been summoned, assess the injuries or illnesses of each student. **YOU MUST FOLLOW YOUR LOCAL SCHOOL DISTRICT PROCEDURES AND GUIDELINES REGARDING RECEIVING FIRST AID TRAINING AND ADMINISTERING FIRST AID ON YOUR SCHOOL BUS. Keep in mind, provisions of the Good Samaritan Act may not apply if you are not** certified through one of the previously mentioned courses.

You will find two situations where it is necessary to help set treatment priorities:

- When you have one student with more than one injury, the injury treated first may be important; and
- When you have more than one student injured, you must select the order in which you can begin to help everyone in need. You must be organized and do one thing at a time.

**Performing Triage**

In either case, you need to evaluate all injuries or illnesses quickly to determine where help is needed most. This process is called triage and is necessary in evaluating multiple problems in one individual or in evaluating multiple injured/ill persons. After a brief evaluation of each injury or illness, you can decide what to do first.

While performing triage, it is important you do not treat any injury until you have found all problems requiring help. If more than two or three students are injured, you should spend no more than 15 or 20 seconds in the evaluation of each injured person.

**DON'T FORGET TO CALL YOUR SUPERVISOR/DISPATCHER TO REPORT ALL INCIDENTS.** Use your best judgment when following local school district procedures and guidelines. In general, if injuries are minor, treat them yourself; when in doubt, call. If they are major, get emergency medical help. The following procedures should help you recognize issues and provide you with some basic procedures to follow. Remember, reporting incidents is important from a liability point of view as well.

# TREATMENT PROCEDURES

**Contact your employer for a copy of your school district's policies and procedures for handling student emergencies and your role in treatment. WHAT IS CONTAINED IN THE FOLLOWING SECTION ARE ONLY GENERAL GUIDELINES. YOU MUST FOLLOW YOUR LOCAL SCHOOL DISTRICT PROCEDURES AND GUIDELINES REGARDING RECEIVING FIRST AID TRAINING AND ADMINISTERING FIRST AID ON YOUR SCHOOL BUS.**

**Seizures**

Seizures often are a symptom of a variety of central nervous system problems including epilepsy. There are several levels of seizure activity, but the type of seizure most important to you is when the student becomes unconscious. In addition to losing consciousness, the muscles of the person experiencing the seizure alternately flex and contract. This creates the jerking, sometimes violent, motion often described as "fits."

Your main concern is to maintain an open airway so the student can breathe and to protect the student from injuring themselves or others around them. If a student has a seizure, allow it to run its course and perform the following steps:

1. Lay the student down if they are not already on the floor;
2. Protect them from injury as much as possible by moving any possible objects the student could injure themselves on, and cushion their head;
3. Monitor their airway and position their body to permit the adequate exchange of air; and
4. Do not put fingers or other objects in the student's mouth during a seizure.

Most seizures are brief and may only last a minute or two. After the seizure is over, check their breathing if they are still unconscious.

When consciousness returns after a seizure, the student may be quite confused and disoriented. Be very considerate of their emotional state by providing as quiet and private a recovery environment as possible, given the circumstances. It is important to manage the other students around them.

After the seizure, always call your dispatcher. They will help determine whether further medical treatment is necessary. If the student has a history of seizures, they may be quite familiar with their own seizures and post seizure behaviors and may be able to help you.

**Fractures**

Any break or crack in a bone is defined as a fracture. While fractures may cause other complications like bleeding and shock, any fracture by itself is not a life threatening emergency. The location of a fractured bone may complicate other important body functions like breathing. When any part of the spine is fractured, there is a danger of paralysis as a result of associated spinal cord damage.

If you see any of the following signs or symptoms, suspect the underlying bone might be fractured:

- Pain at the site of injury;
- Pain on movement;
- Swelling;
- Discoloration; and
- Crooked or misaligned bones.

Remember, even if someone can walk on an injured ankle or move an injured arm, a bone may still be fractured. The only sure way to determine if a bone is fractured is to X-ray the area of injury and to have the X-ray and the injury evaluated by a physician.

If you suspect a fracture of a bone, which makes it difficult or impossible for the individual to move, always call your dispatcher and 911 for emergency medical help. Without proper training and splint materials, your options are limited until further help arrives.

Since fractures are not generally life threatening, you have time to take control of the situation and to keep it from worsening. The basic objective of fracture care is to prevent the movement of joints above and below a fracture site. In most cases, you don't need splint materials to accomplish this, as long as you do not have to move the injured person. If help is on the way and the injured person is in a safe location, there is no immediate threat to life and no reason to move them.

If there is great urgency to move an injured student, as in the case of a fire, drag them along the long axis of their body. Pull the student by their outstretched hands or shoulders. If possible, place the injured person on a coat or blanket to make dragging him or her easier.

**Allergic Reaction: Bites and Stings**

Bites and stings are treated as ingested poisons and can result in allergic reactions. Snakes, bees, spiders and wasps are some of the creatures that can bite or sting a student. These bites and stings can sometimes cause violent reactions in some students who may be allergic to them.

1. **Signs and symptoms:**

- Puncture marks;
- Anxiety;
- Pale, cool skin with progressive onset of sweating;
- Rapid, weak pulse;
- Rapid, shallow breathing or breathing difficulties;

- Difficulty swallowing and speaking;
- Blurred vision;
- Abdominal pain;
- Nausea and/or vomiting;
- Headache;
- Intense pain at site of bite; and
- Localized redness and swelling.

2. **Care and treatment:**

- Apply direct pressure over bitten area;
- Find out if the student has any allergies to stings or bites; and
- Use cold compress, if available, to reduce swelling.

**Allergic Reaction: Anaphylactic Shock**

There are many types of shock, caused by a variety of circumstances ranging from emotional crisis to massive blood loss. One of the most unusual and fast-acting types of shock is the type occurring after an extremely allergic reaction. This type of shock is called anaphylactic shock and is commonly caused by bee stings.

If a student experiences an allergic reaction of any kind, it may quickly turn into a life threatening emergency. Anaphylactic shock can cause, within minutes, swelling in the airway to a degree an individual will not be able to breathe. The only way this condition can be corrected is through medication. Many seriously allergic people always carry their own medication with them. If this medication is not present, you must do everything possible to see the allergic person immediately gets to an emergency department or to paramedics. A few minutes may mean the difference between life and death. Learn local procedures and guidelines regarding what to do in the case of allergic reactions.

One method of treating anaphylaxis is injection of epinephrine using an autoinjector. Each school district and employer should have their own procedures and guidelines on your role in the use of an autoinjector – if you don't know your district/employer's procedures and guidelines, ask. What you CAN do is the following:

- Know all appropriate emergency numbers to call and request an Advanced Life Support Unit, if a reaction occurs;
- Use those numbers as quickly as possible, if you have not been trained on the use of an autoinjector or it is not within your district's procedures and guidelines for drivers to use them;
- Consider having the food-allergic child sit near the driver;
- Enforce the "no food on the bus" policy;
- If you have received training, know which children carry an autoinjector and where they carry it; and
- Consider working with your school district to implement an epinephrine hand-off system. Some parents pass the epinephrine to the driver who gives it to the school nurse once the bus arrives at school. The process is reversed for the ride home in the afternoon. CAUTION NOTE: Due to the number of hand-offs and people involved in this process, there is a greater risk of leaving the epinephrine either   at school or on the bus.

Anaphylactic shock is somewhat unusual as compared to most other shock conditions you may encounter. Most shock conditions are more gradual in their onset and should be anticipated in all injuries. Listen to your students, if they warn you of an onset of symptoms. By being aware shock may develop; you may be able to prevent it before you see clear signs or symptoms. In summary:

1. **Signs and symptoms:**

   · Itching;

   · Red, raised, blotchy skin (hives);

   · Wheezing;

   · Confusion;

   · Weakness;

   · Pale color;

   · Unconsciousness;

   · Unable to speak more than one or two words;

   · Sitting straight up or with hands on knees;

   · Gasping for breath;

   · Pursing lips to breathe; and

   · Using neck muscles to take breaths.

2. **Care and treatment:**

   · Call your dispatcher and report the situation;

   · Call 911 immediately; and

   · If you district procedures and guidelines allow, you are qualified and you have received training administer epinephrine.

**Asthma**

Asthma is a respiratory condition in which the student suffers constricted passages in the lower airway and it becomes progressively more difficult to breathe. Asthma can be a life threatening condition that may develop suddenly, or over several days.

Students with asthma are subject to unexpected severe attacks. Minor respiratory infections such as colds, flu and seasonal changes can cause the condition to worsen.

1. **Signs and symptoms:**

   · Pale, cool, clammy skin;

   · Shortness of breath, using all the chest and diaphragm muscles to breathe;

   · Wheezing-a high pitched raspy sound when breathing;

   · Anxiety, exhaustion, a rapid or weak pulse; and

   · Severe asthma attack-collapse, leading to eventual respiratory arrest.

2. **Care and treatment:**

   · Call your dispatcher and report the situation;

   · Sit the student comfortably upright;

   · Be calm and reassuring;

   · Assist the student with locating their inhaler and allow them to use inhaler, if they are able; and

   · Know and follow your school district procedures and guidelines!

**Bites**

Bites from other children are one of the most common First-Aid problems on a bus. For care and treatment:

1. Clean bite with antiseptic wipe and place a band aid on the bite; and

2. Report biting incident to your supervisor.

**External Bleeding**

After a serious incident like a crash, there are several types of bleeding that can occur. External bleeding is associated with wounds caused by cutting, perforating or tearing the skin. Serious wounds involve damage to blood vessels.

1. **Types of wounds:**

   • **An incision –** is the type of wound made by "slicing" with a sharp knife or sharp piece of metal;

   • **A laceration –** is a deep wound with associated loss of tissue;

   • **An abrasion –** is a wound where the skin layers have been scraped off;

   • **Puncture sore –** wounds are perforations, and may be due to an object like a pencil; and

   • **Amputation –** is the loss of a limb by trauma.

2. **Care and treatment:**

   • Make sure you have called your dispatcher and emergency medical personnel for serious wounds;

   • Use universal precautions to protect yourself from bloodbourne pathogens;

   • Apply pressure to the wound to stop bleeding by using a sterile bandage; and

   • Raise and support the injured part above the level of the heart. Elevation of an injured limb forces the blood to flow to the heart and keeps the blood from pooling in the lower part of the affected limb.

**Internal Bleeding**

Internal bleeding can be visible or concealed, and may occur after a crash. If there is no evidence of bleeding, this can be very serious and medical attention is required immediately.

• Visible internal bleeding: Self evident;

• Bleeding in the lungs: Frothy, bright red blood coughed up by the student; and

• Bleeding in the stomach: May look like dark coffee grounds or red blood in vomit.

1. **Signs and symptoms (if none of the above are present):**

   • Pale, cool, clammy skin;

   • Thirst;

   • Rapid, weak pulse;

   • Rapid, shallow breathing;

   • Guarding of the abdomen, in fetal position;

   • Pain or discomfort;

   • Nausea and/or vomiting; and

   • Swelling.

2. **Care and treatment:**

- Get expert medical help.
- If you can, position the student on his/her back; elevate legs, if possible;
- Give nothing by mouth.

## Choking

Younger children often put things in their mouth, which may result in choking. The first sign may be coughing. Coughing with an object in the airway will generally dislodge it. **If you have a student who is choking, do not slap them on the back.**

1. **Signs and symptoms:**

- Difficulty or absence of breathing;
- Inability to speak or cough;
- Agitation and distress – grabbing the throat and eventual collapse.

2. **Care and treatment:**

- Check mouth and clear any obstructions that may have come loose.
- Stand behind the student and wrap your arms around the student's waist.
- Make a fist with one hand.
- Place the thumb side of the fist against the student's abdomen in the midline and slightly above the navel.
- Grasp the fist with the other hand and press the fist into the student's abdomen with a quick upward thrust.
- Each new abdominal thrust should be a separate and distinct movement.
- Repeat thrusts until student expels the obstruction.

## Dehydration

Dehydration is a condition caused by the loss of fluids from perspiration and prolonged exposure to heat and humidity. Sometimes a student may be dehydrated on your bus, especially in your afternoon runs when students are returning home and/or returning from field trips. When fluid loss exceeds input through drinking, dehydration occurs. Prolonged dehydration will lead to shock and could be fatal.

1. **Signs and symptoms:**

- Pale, cool, clammy skin;
- Rapid breathing;
- Profuse and prolonged sweating;
- Thirst;
- Loss of skin elasticity;
- Sunken eyes in children.

2. **Care and treatment:**

- Give cool water to drink, if available.

**Diabetes**

Diabetes is a condition caused by an imbalance of sugar or glucose in the blood. Because all human cells require sugars as food, the body takes in complex sugars in a normal diet. So the body's cells can use these sugars, the body, through an organ called the pancreas, secretes a protein hormone called insulin, which attaches to the sugars. This allows the cells to recognize the sugars as food and absorb the necessary glucose. Unfortunately, this condition is becoming more and more prevalent among school-aged children. Students with Type 1 diabetes and some students with Type 2 diabetes require insulin to survive. It is not expected that you check students' blood glucose levels or administer insulin or glucagon, but you may be able to recognize students for symptoms of high and low blood glucose, and assist the student in an emergency.

Understand and be aware that although hypoglycemia normally occurs at the end of the day, it may happen at the beginning of the day, if the student has not eaten breakfast.

1. **Signs and Symptoms:**

   - Hot, dry skin;
   - Smell of acetone (nail polish remover) on the breath;
   - Drowsiness or change in mood;
   - Unconsciousness, progressing to coma;
   - Profuse sweating;

   - Grayish skin color;
   - Hunger;
   - Confused or aggressive behavior;
   - Rapid pulse;
   - May appear drunk;
   - Seizures.

2. **Care and treatment:**

   - If conscious, give sweet drink, if available (avoid diet sodas).
   - Repeat, if student responds.
   - Assist with medication and encourage ingestion of food high in carbohydrates.
   - **DO NOT** attempt to give an insulin injection.
   - At the beginning of the school year, identify any students on the bus who have diabetes, if possible.
   - Sometimes you will be provided a copy of the student's Quick Reference Emergency Plan, which a parent or school nurse may have. This can contain important treatment information that can help a student in distress. Keep it on the bus in a known, yet secure, place, and work with your school district to make sure substitute drivers know about the plan.
   - Be aware of where the students with diabetes normally keep their supplies.
   - Treat the student with diabetes the same as other students, except to respond to medical needs and perhaps allowing them to eat snacks on the bus.
   - Provide input to the student's school health team when requested.
   - Communicate with the parents, school nurse and/or trained diabetes personnel regarding any concerns about the student.
   - Respect the student's confidentiality and right to privacy.

**Heatstroke**

Heatstroke should not be confused with sunstroke. Sunstroke is a common ailment suffered by those who remain in the sun too long. Heatstroke is potentially fatal. The body's temperature regulation center in the brain has been rendered inoperable, and the temperature continually rises, causing eventual brain damage. Be aware of this on your bus runs in warmer weather, especially in the afternoon.

1. **Signs and symptoms:**

   - Flushed, hot, dry skin;
   - The student has stopped sweating;
   - Rapid pulse, gradually weakening;
   - Irrational or aggressive behavior;

   - Staggering;
   - Fatigue;
   - Visual disturbances, headache, vomiting; and
   - Collapse and seizures.

2. **Care and treatment:**

   - Give fluids and water, if the person is conscious.
   - Cool the student as much as possible.

**Hyperventilation**

Hyperventilation can be stress related or deliberate over-breathing. By deliberately over-breathing, the student causes the blood's carbon dioxide level to fall, resulting in distressing symptoms. There have been incidents of students hyperventilating on purpose for the "rush." Be aware of this behavior, and put a stop to it.

1. **Signs and symptoms:**

   - Rapid respirations;
   - Rapid pulse;
   - Shortness of breath;
   - Pressure, tightness or pain across the chest;
   - Anxiety;

   - Blurred vision;
   - Tingling in fingers and toes;
   - Hand and finger spasms;
   - Fainting.

2. **Care and treatment:**

   - Reassurance;
   - Remove the cause of anxiety, if possible;
   - If the student has fainted, lay the student down with their legs elevated.

**Nose Bleeds**

When a student's nose bleeds, there are some immediate things you can do to stop the bleeding: Keep the trunk of the body so it is higher than the heart, tilt the head forward, and compress the nostril for five to 10 minutes.

**Traumatic Brain Injury or Concussion**

Traumatic brain injury is characterized as either closed head injury or open head injury.  Open head injuries occur when the skull has been fractured or the tissue around the brain has been pierced.  Closed head injuries or concussions, which can be harder to detect, do not pierce the tissue around the brain or fracture the skull. Closed head injuries or concussions generally occur from an impact to the head.

Traumatic brain injuries or concussions can result from a sudden jarring or impact within the bus, regardless of whether or not the student strikes their head.  However, it is of particular concern if a student hits his or her head during the jarring or impact.  Any time a student hits his or her head, traumatic brain injury or a

concussion may occur, such as in a crash, or if the bus has run over a curb or large rock, or has been on an extra bumpy road and has been violently jarred.

Depending on the severity of the injury, damage to the brain can be mild, moderate or severe. A key point is that a person suffering from traumatic brain injury may show no symptoms at all, but if symptoms are present, they can vary and may include headache, slurred speech, dilated pupils, hearing loss, seizures, paralysis, loss of consciousness, memory loss, coma, nausea or vomiting, dizziness, confusion and blurred vision.

If the bus you are driving has been impacted or intensely jarred, it is important to stop the bus in a position of safety, ask the students if anyone was hurt and if anyone hit their head during the incident. Any time a student indicates to you or a fellow student that they hit their head on the bus, call for medical assistance. Do not  move the student or your bus -- unless you need to move your bus to a safer location -- to prevent possible further injury to the student, as traumatic brain injury, no matter how slight, could have serious, life-altering effects. It is extremely important not to ignore instances where a student has hit his or her head while on your bus.

# REPORT ALL INCIDENTS

**It is critical to report all medical problems, which occur on your bus to the proper authorities as dictated by local procedures and guidelines.** Reporting incidents is important from a liability point of view because students may fail to tell the school nurse or their parents of problems requiring attention. Know your students and any pre-existing problems, which they might have so you may be better prepared to deal with them. Careful observation of your students may indicate the presence of medical problems of which you have not been informed. While many parents will inform you of their child's medical problems, others wish to keep such information confidential. Follow local procedures and guidelines when trying to obtain information about student medical conditions. When possible, inform substitute drivers of any medical problems of students on your route, but keep confidentiality in mind. Work with your supervisor regarding the release of information.

# FIRST-AID EQUIPMENT

First-aid supplies and equipment are important in providing the best care possible. Remember to follow your local school district procedures and guidelines regarding administering first aid on your school bus.

## FIRST-AID KIT

The First-Aid Kit on your bus should be removable and supplied with anything you might need in an emergency. The contents of your First-Aid Kit may vary according to local procedures and guidelines; however, current state regulations (Section 171.52 of Title 67) require that the First-Aid Kit on a school bus must contain at least 10 items including:

1. Two, 1-inch x 2 1/2-yard rolls of non-latex adhesive tape;

2. 24 sterile gauze pads, 3 inches x 3 inches;

3. 100, 3/4 inch x 3 inches adhesive bandages;

4. Eight, 2-inch bandage compresses;

5. Ten, 3-inch bandage compresses;

6. Two, 2 inches x 6 yards sterile gauze roller bandages;

7. Two, non-sterile triangular bandages approximately 40 inches x 36 inches x 54 inches with two safety pins;



**Figure I-2. First-Aid Kit**

8. Three sterile gauze pads, 36 inches x 36 inches;

9. Three sterile eye pads;

10. One pair rounded end scissors.

In addition to the items above, the First Aid Kit or Body Fluid Clean-up Kit (discussed below) must contain:

1. One pair of non-latex surgical gloves;

2. One mouth barrier.

The kit should be mounted in accordance with manufacturer's instructions in full view and in an accessible place in the driver's compartment. Its location should be clearly marked, and you should check its contents often. The pre-trip inspection described in Unit E (Preventive Maintenance) calls for a daily check of the First Aid Kit. It is your responsibility to replace any of the contents immediately after you use them or after noticing something has been removed. Consult your supervisor about procedures for obtaining new First Aid supplies.



**Figure I-3. Body Fluid Clean Up Kit**

**BODY FLUID CLEAN UP KIT**

Every school bus is required to have a removable and moisture proof Body Fluid Clean Up Kit. It must be securely placed or mounted in an easily accessible location and labeled as a Body Fluid Clean Up Kit. Take all steps to protect yourself from exposure. Keep in mind that you are not automatically infected, if you are exposed to blood or other bodily fluids; the amount needs to be large enough to overcome your immune system. If you feel you have been exposed, consult a medical professional.

**Cleaning Body Fluid Spills**

Thorough hand washing is the best tool to prevent the spread of infectious diseases. When cleaning up body fluid spills, you need to do the following:

1. Always wear disposable gloves. You need to wear disposable gloves whenever you might come in contact with blood or potentially infectious materials. If gloves are not available, or unanticipated contact occurs, hands and other affected areas should be washed with soap and running warm water immediately after contact. If not possible, wipe your hands thoroughly with the germicidal wipe provided in the Body Fluid Clean Up Kit.

2. Small spills can be cleaned with paper towels or tissues. After the bodily fluid is removed, use clean paper towels, soap and water or disinfectant wash to clean the area. For larger spills you can use the packet of solution to solidify body fluids in your Body Fluid Clean Up Kit.

3. Remove gloves and place into the plastic bag with the waste and other cleaning materials. Upon returning to the bus garage, remove the plastic bag and dispose in accordance with school district procedures and guidelines.

4. The driver must wash their hands with soap and running warm water for at least 30 seconds.

5. It is always a good idea to carry hand sanitizer, extra gloves and band aids as long as they are properly secured in the bus.

**WHEN HANDLING BODY FLUIDS, ALWAYS REMEMBER TO PROTECT YOURSELF!**



# PENNSYLVANIA SCHOOL BUS DRIVER'S MANUAL

**Pennsylvania Department of Transportation**
**Harrisburg, PA**

# EXHIBIT

# B

**1**

```
 1            IN THE COURT OF COMMON PLEAS
 2          OF ALLEGHENY COUNTY, PENNSYLVANIA
 3                    ------
 4
 5   M.M., parent and natural guardian)
     of K.M., a minor,                )
 6                                    )
                   Plaintiff,)  G.D. No.
 7                           )  18-003257
     vs.                     )
 8                           )
     PITTSBURGH PUBLIC SCHOOL )
 9   DISTRICT and BRIMAR TRANSIT, )
     INC.,                    )
10                           )
                   Defendants.)
11                    ------
12
13      Deposition of MARCIANO NESBETH - VOLUME I
              Friday, November 1, 2019
14
15          Filed on behalf of Defendant
           Pittsburgh Public School District
16
17          Counsel of Record for this Party:
18            Jaime N. Doherty, Esquire
                Goehring, Rutter & Boehm
19         1424 Frick Building, 437 Grant Street
                  Pittsburgh, PA  15219
20
21          LaGAMBA REPORTING SERVICES
                 302 Maxwell Street
22              Pittsburgh, PA  15205
                Phone:  (412) 458-0439
23
24   REPRODUCTION OR TRANSMISSION OF THIS TRANSCRIPT
     IN ANY FORM IS PROHIBITED WITHOUT AUTHORIZATION
25            FROM THE CERTIFYING AGENCY
```

**2**

```
 1        DEPOSITION OF MARCIANO NESBETH - VOLUME I,
 2   taken pursuant to the Pennsylvania Rules of Civil
 3   Procedure, by and before Debra D. LaGamba, a
 4   Registered Professional Reporter/Certified
 5   Realtime Reporter and a Notary Public in and for
 6   the Commonwealth of Pennsylvania, at the offices
 7   of Goehring, Rutter & Boehm, 1424 Frick Building,
 8   437 Grant Street, Pittsburgh, Pennsylvania
 9   15219, on Friday, November 1, 2019, scheduled to
10   commence at 10:00 o'clock a.m.
11
12                  - - - - -
13
14   COUNSEL PRESENT:
15   For the Plaintiff:
        Fred C. Jug, Esquire
16      Brandt, Milnes & Rea, P.C.
        1109 Grant Building
17      310 Grant Street
        Pittsburgh, PA  15219
18      fjug@bmr-law.com
19   For the Defendant Pittsburgh Public School
     District:
20      Jaime N. Doherty, Esquire
        Matthew C. Fergus, Esquire
21      Goehring, Rutter & Boehm
        1424 Frick Building
22      437 Grant Street
        Pittsburgh, PA  15219
23      jdoherty@grblaw.com
24
25
```

**3**

```
 1   For the Defendant Brimar Transit, Inc.:
 2      Tara L. Maczuzak, Esquire
        DiBella Geer McAllister Best
 3      20 Stanwix Street, 11th Floor
        Pittsburgh, PA  15222
 4      tmaczuzak@dgmblaw.com
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                 I N D E X
 2
 3          WITNESS:  MARCIANO NESBETH
 4
 5   EXAMINATION BY:                    PAGE:
 6   Ms. Doherty                        5
 7   Mr. Jug                            256
 8
 9      Deposition               Marked for
10      Exhibit No.              Identification
11   Exhibit 22                        8
12   Exhibit 23                        19
13   Exhibit 24                        79
14   Exhibit 25                        122
15   Exhibit 26                        140
16   Exhibit 27                        148
17   Exhibit 28                        182
18   Exhibit 29                        193
19   Exhibit 30                        223
20   Exhibit 31                        257
21   Exhibit 32                        268
22                  - - - - -
23
24
25
```

65

1    A.   If she called to complain about a driver.
2  So that's not a report that we send in to the
3  school.  We will take care of that there
4  in-house.  We will talk to the driver, find out
5  necessarily what transpired, what happened.  If
6  she missed a stop or didn't go to a stop or if
7  she talked to the parent unprofessionally, or
8  whatever the situation is.  That's documented and
9  goes into the driver's file.
10    Q.   So that's part of the driver file.
11  That's what I was trying to get at.
12    A.   Right.
13    Q.   And do you have any specific memory of
14  M.M. doing that at all in the 2015/'16 school
15  year, or at any time?
16    A.   No, ma'am.
17    Q.   Did anyone from the District call you in
18  the 2015/'16 school year about this incident?
19  This incident being the subject -- that's the
20  subject of this lawsuit?
21    A.   I spoke to -- a lady called from
22  Classical, which was that Friday, I think it was
23  morning, and claimed that she was the principal
24  and telling me about the incident; and I told her
25  I would talk to her -- talk to the driver and get

66

1  back to her.  I think she called early that
2  Monday morning.
3    Q.   I was just going to ask you, you
4  initially said Friday morning.
5    A.   Right.  I got it.  It was so far back.
6    Q.   But it was a Monday morning, correct?
7    A.   It was early Monday morning, probably
8  about 7 in the morning.  I spoke to the driver.
9  The driver said nothing happened on her bus on
10  Friday.  So I called her back and told her the
11  information, and she said she was going to report
12  it, make the one call, and that's...
13    Q.   So you're referring to Val Merlo?  Is
14  that her name, do you remember?
15    A.   That's the principal, yes.
16    Q.   And did you have the opportunity -- I was
17  going to ask you this at the end, but it seems
18  like a good spot to ask now:  Did you have the
19  opportunity to review any of the deposition
20  transcripts that have been taken in this case
21  prior to today?
22    A.   Yeah.  I've seen them.
23    Q.   Did you review Ms. Merlo's transcript?
24    A.   No.  I haven't reviewed hers at all.
25    Q.   She testified, in response to some

67

1  questioning, that she had made a call to somebody
2  at your company who had identified himself as a
3  manager on May 2, which was a Monday morning.
4    A.   Right.
5    Q.   That manager, that would have been you,
6  sir?
7    A.   That would be me.
8    Q.   And I think she said when she made her
9  initial report, you had said to her, I'll call
10  the driver and call you back.  Do you have a
11  memory of that?
12    A.   Yes, ma'am.
13    Q.   And then you did call her back, she said.
14    A.   I spoke to the driver.
15    Q.   After you had spoken to the driver.
16    A.   Right.
17    Q.   And you told her that your driver had
18  told you that she didn't have any memory of
19  anything happening on that transport.
20    A.   Yes, ma'am.
21    Q.   That Friday afternoon, correct?
22    A.   Yes, ma'am.
23    Q.   How was Ms. Merlo when you spoke with her
24  on the phone?
25    A.   She was very professional, if that's the

68

1  question you're asking.
2    Q.   Was she upset?
3    A.   I couldn't tell if she was upset or not.
4  I don't know her in that manner.
5    Q.   Was she yelling?
6    A.   No, ma'am.
7    Q.   What did she say to you?
8    A.   I can't remember word for word.  I just
9  told you, answered your question as to that she
10  called me and what was said.
11    Q.   Did you write that conversation down
12  anywhere?
13    A.   Yeah.  I wrote it down and then I talked
14  to -- what the driver said to me.
15    Q.   Where would that have been written down,
16  sir?
17    A.   It would be written down.  I didn't put
18  that in her file, because I didn't think anything
19  of it.
20    Q.   Well, Ms. Merlo told you -- what did
21  Ms. Merlo tell you had happened?
22    A.   She said something in the nature of
23  another student molested another student on the
24  vehicle, on the van.
25    Q.   And you didn't think anything of that?

213

1    A.   Well, as you know, Ms. Johnson is nowhere
2   to be found.  I spoke to her right after, very
3   shortly after she went into the maternity,
4   somewhere there, I'm not sure what time, and
5   after that, she cannot be found.
6        Q.   She's coming on Monday with your lawyer
7   for a deposition, so we found her.
8        A.   All right.
9        Q.   If we look, sir -- and I think we have
10  your answers, let me just see -- just give me one
11  second here.
12            Did you understand that when you answered
13  these interrogatories, you were answering them on
14  behalf of the company, Brimar Transit, not you
15  individually?
16       A.   Exactly.
17       Q.   You did understand that?
18       A.   Yes, ma'am.
19       Q.   Let's look at Interrogatory No. 27.  And
20  I think we talked about some of your answer to
21  that Interrogatory already, but I'm interested in
22  the last sentence of your answer, "The male
23  student was assigned to a different bus route
24  after April 29, 2016."  Do you see that?
25       A.   The female student was assigned to a

214

1   different bus after that.
2        Q.   So you think this answer is wrong?
3        A.   Yeah, it might be wrong.  M.M. was
4   assigned to a different bus.
5        Q.   K.M.
6        A.   K.M.  Or it might have been both of them
7   was off the bus.  I'm not sure.
8        Q.   Do you remember specifically?
9        A.   Not specifically.
10       Q.   I will tell you that there has been other
11  testimony in this case that it was the minor male
12  who was moved to a different bus, but I just
13  wondered what you looked at.
14       A.   We have never rode or transported her
15  after that day.  After that Friday, that was it.
16  She's never been back on the bus.
17       Q.   K.M.?
18       A.   K.M.
19       Q.   And by "that day," you mean April 29,
20  2016?
21       A.   That Friday, yes.  That was the last day
22  she'd been on that bus.
23       Q.   So from April 29, 2016, until now, you're
24  telling me you've never had K.M. on one of your
25  vans?

215

1        A.   Until the end of the school season.
2        Q.   That would be the school year, the
3   '15/'16 school year?
4        A.   Yes, ma'am.
5        Q.   If you look at your answer to
6   Interrogatory No. 32.  "To the extent that the
7   students may have been sitting together,
8   Ms. Demby was not aware of such at the time.
9   Brimar Transit does not know what might have
10  prompted the children to sit together.  Ms. Demby
11  never gave permission for the children to sit
12  together or attempted to stop them from sitting
13  together..."
14            So this goes back to kind of an earlier
15  question I asked you.  If students were moving up
16  and moving out of their seats during the course
17  of your van moving, that would have been a
18  problem, correct?
19       A.   Yeah, if the driver is aware of it.
20       Q.   How long are these vans?
21       A.   Well, from where they say that M.M. was
22  sitting, it's about 11 feet.
23       Q.   So how could a driver not see 11 feet,
24  that some kid is up walking while the van's
25  moving?

216

1        A.   Well, she's got a bus full of kids and
2   she got to look and she got to drive.  She can't
3   look in her rearview mirror the whole time she's
4   driving.
5        Q.   Not to be overly difficult, but she
6   doesn't have a bus, she has a van that's 11 feet
7   long with eight kids on it, correct?
8        A.   The van is 25 feet.  Inside the bus, it's
9   11 feet from the driver's seat to the backseat
10  where those two that were sitting.
11       Q.   So if the student got up and moved while
12  the van was moving, your drivers are trained to
13  do what?
14       A.   If they -- if she saw that.  If she saw
15  that, because she's operating a school vehicle.
16       Q.   Does it strike you as odd that somebody
17  operating a van wouldn't know if a kid got up and
18  moved in the middle of the van moving?
19       A.   A van route, a kid could move and you
20  don't see.  Yes, it can happen.  It does happen.
21       Q.   That seems perfectly reasonable to you?
22       A.   Yes.  It can happen.  It happens.
23       Q.   Let's look at your answer to
24  Interrogatory No. 39 and 40.  They're together on
25  the same page.

MARCIANO NESBETH - VOLUME I

277

1      Q.   Did she tell you that she told K.M.'s
2  mother that she would keep an eye on the
3  students?
4      A.   No, sir.
5      Q.   She did not tell you that?
6      A.   No.
7      Q.   Did she tell that you she told K.M.'s
8  mother that she would keep these two students
9  separated?
10     A.   No, sir.
11     Q.   Is that the last time that you talked to
12 Ms. Johnson, or did you talk to her again prior
13 to signing an affidavit --
14     A.   Well, she came back to work, then she
15 moved away, and then I haven't heard from her
16 since.
17     Q.   When she came back to work following her
18 return from maternity leave, did you speak with
19 her about this incident?
20     A.   Briefly, because there was no need,
21 because I already did talk to her while she was
22 on maternity leave about the situation.
23     Q.   When you talked to her, would it have
24 been just upon her return from maternity leave?
25 And are you able to tell us approximately when

278

1  that was, how long was Ms. Johnson on maternity
2  leave?
3      A.   A little bit longer because when she came
4  home, she wasn't ready to come back to work yet,
5  when she visited the office.  So I'm not sure.
6      Q.   Was Ms. Johnston's child born just after
7  she left for maternity leave, which you believe
8  was in late March of 2016?
9      A.   I'm not sure.
10     Q.   Do you think that Ms. Johnson returned
11 from maternity leave after two months?
12     A.   It's a possibility.
13     Q.   Do you recall her being off longer than
14 two months?
15     A.   I can't remember.
16     Q.   Do you believe, then, that it's most
17 likely that you next talked to Ms. Johnson,
18 relative to this incident, sometime in either May
19 or June of 2016?
20     A.   No.  Like I said, she had came back to
21 work briefly and something went on and she had to
22 move away, and she never returned.
23     Q.   Do you know what that was?
24     A.   No, I don't know.
25     Q.   Do you know if that was the last time you

279

1  talked to Ms. Johnson about this incident, at
2  all?
3      A.   That was the last.
4      Q.   So would I be correct in understanding
5  that if your affidavit, which Ms. Doherty marked
6  as Exhibit 30, is dated March 24, 2017, that you
7  did not talk to Ms. Johnson at the same time that
8  you produced this affidavit?
9      A.   I talked to her earlier, like I said.
10     Q.   Right.  My question was, did you talk to
11 her in March of 2017, if this is when this
12 affidavit was signed?
13     A.   No.
14     Q.   You did not talk to her.
15     A.   Hum-mm.
16     Q.   In looking at Exhibit 31, which are the
17 photographs of the van which you indicated your
18 insurance company obtained, would you agree with
19 me, sir, this is a ten-passenger van?
20     A.   It's a nine-passenger van.  It's a
21 ten-passenger van, but carrying school students,
22 it's a nine-seat capacity.
23     Q.   You would agree it's ten-passenger van,
24 correct?
25     A.   We don't call it a ten-passenger van.

280

1      Q.   If you look at Exhibit 30, which is your
2  affidavit, this affidavit was produced in front
3  of a notary public, correct?
4      A.   Okay.
5      Q.   And above the signature line, "Sworn to
6  and subscribed before me, this 24th day of March,
7  2017."  You agree with me that by signing this
8  affidavit, and it being sworn and subscribed,
9  that you're representing this is the truth,
10 correct?"
11     A.   For PennDOT, it's a ten passenger.  For
12 the school district, it's a nine passenger.
13     Q.   Do you understand the question that was
14 pending, sir?  You understood that when you
15 signed this in the presence of a notary, and as
16 evidenced by the line that says "Sworn to and
17 subscribed," your understanding was that you were
18 signing this and affirming the statements
19 contained therein are true, correct?  Yes, sir?
20     A.   Yes.
21     Q.   Do you agree with me that when you turn
22 to page 2 of Exhibit 30, the first sentence at
23 the top of the page reads, "The bus in question
24 is a 2006 Ford Econoline 150 which seats 10
25 people."

# EXHIBIT

# C

1

1                IN THE COURT OF COMMON PLEAS
           OF ALLEGHENY COUNTY, PENNSYLVANIA
2
   M.M. parent and natural     CIVIL DIVISION
3  Guardian of K.M.,
   a minor,
4
                Plaintiffs,    GD 18-003257
5
           -vs-
6
   PITTSBURGH PUBLIC SCHOOL    TRANSCRIPT OF:
7  DISTRICT and BRIMAR         DEPOSITION OF
   TRANSIT, INC.,              THEODORE R. VASSER, III
8
                Defendants.
9
                              DEPOSITION DATE:
10                            August 21, 2019
                              Wednesday, 1:01 p.m.
11

12
                              PARTY TAKING DEPOSITION:
13                            Defendant Brimar
                              Transit, Inc.
14

15                            COUNSEL OF RECORD
                              FOR THIS PARTY:
16                            Jason H. Peck, Esq.
                              DIBELLA GEER McALLISTER
17                                & BEST
                              20 Stanwix Street, 11th Floor
18                            Pittsburgh, PA  15222
                              412-261-2900
19

20
                              REPORTED BY:
21                            Ed Fulesday, RDR, CRR
                              Court Reporter/Notary Public
22                            AKF REPORTERS, INC.
                              436 Boulevard of the Allies
23                            Pittsburgh, PA  15219
                              412-261-2323
24
                              AKF Reference No. EF53254A
25

M.M. v.
Pittsburgh Public School District

VASSER
August 21, 2019

Page 54

1  A.   For the total contract?
2  Q.   Yes, sir.
3  A.   That's what it, yeah, says.
4  Q.   And when we refer to the carrier in this
5       contract, we're referring to Brimar Transit,
6       Inc., a defendant in this case, correct?
7  A.   That's correct.
8  Q.   And I see on Page 4, in Paragraph 16, it
9       provides: Carrier agrees that all six- to
10      eight-passenger capacity vehicles have been
11      eliminated by the School District's use
12      beginning with school year 2011-2012, except
13      when the School District specifically requests
14      that type of vehicle.
15          Did I read that correctly?
16  A.   Yes, you did.
17  Q.   Would my understanding be correct that
18      following or as of the 2011-2012 school year,
19      the District was no longer contracting for six-
20      to eight-capacity vehicles?
21  A.   No, you would not be totally correct with that.
22  Q.   Okay.
23  A.   Some six- to eight-passenger vehicles were
24      still on the road.  One good reason is that a
25      lot of the special needs children couldn't step

Page 55

1       up on a nine-passenger.  So we had to make it
2       easier for them, and different other physical
3       scenarios that might have taken place that the
4       six- to eight-passenger was still needed.
5           So we did not totally eliminate them
6       because it was sort of impossible to transport
7       the children that had special needs that have
8       special physical needs and a few other
9       situations.
10  Q.   What prompted the question, the document that
11      has not been attached to your deposition
12      transcript, nor will it be because it hasn't
13      been redacted -- and I'm not going to refer to
14      any of the students' names -- that document
15      indicates that this particular vehicle had
16      eight students assigned to it.  Would you agree
17      with that?
18  A.   I would agree with that.
19  Q.   Okay.  And to your knowledge, this vehicle, all
20      of the seats were not filled by these eight
21      passengers; is that correct?
22  A.   That's correct.
23  Q.   In fact, this vehicle was larger than that;
24      isn't that correct?
25  A.   That's correct.

Page 56

1  Q.   And so, this was not a six- to eight-passenger
2       van as referenced in Paragraph 16 of the
3       contract; correct, sir?
4  A.   That's correct.
5  Q.   This van or this vehicle exceeded ten
6       passengers; isn't that correct?
7  A.   That's not correct.
8  Q.   What is your understanding --
9  A.   This was a nine-passenger vehicle.
10  Q.   And what do you base that on?
11  A.   The vehicle number, VA24, A stands for nine
12      passengers in the code.
13  Q.   So nine was the number of passengers, to your
14      understanding?
15  A.   No, nine was the total amount of children that
16      we could have carried on that vehicle.  Because
17      if you carried ten or more, you do need a CDL.
18      It changes the whole law when you have that
19      many more kids on there.
20  Q.   The Answer filed by the defendant Brimar
21      indicated this was a 2006 -- well, let me --
22      before I ask that question, as you sit here
23      today, do you have an understanding or do you
24      know what make and model number this particular
25      vehicle was?

Page 57

1  A.   I do not.
2  Q.   Okay.  And we agree this document doesn't
3       identify that, correct?
4  A.   Correct.
5  Q.   The Answer filed by the defendant Brimar
6       indicates this is a 2006 Ford Econoline 150
7       passenger van.
8           Assuming that to be correct, are you
9       familiar with that vehicle?
10  A.   If it was a Ford Econoline 150, I believe it
11      was a nine-passenger vehicle.
12  Q.   If there's information on the internet that
13      says that the 2006 Ford Econoline 150 can hold
14      up to 12 passengers, would you agree or
15      disagree with that, or you don't know?
16  A.   I agree with that, but by state law we could
17      not put twelve passengers on there.  And a lot
18      of times, the state troopers, when they would
19      come in, they would make us take that extra
20      seat out the back.
21  Q.   Do you know if, in your personal knowledge, a
22      Ford Econoline 2006 150 is a vehicle that can
23      hold -- I'm not asking that you put nine or
24      more passengers on it, but if a Ford 2006
25      Econoline 150 van is a vehicle that can hold

M.M. v.
Pittsburgh Public School District

VASSER
August 21, 2019

---

Page 58

1   more than ten passengers; would you agree with
2   that?
3  A.  I will say that if you were a church and it was
4   not a school vehicle, you could put twelve
5   children or twelve people on it.  But by the
6   laws of Pennsylvania, that twelve-passenger
7   can't hold no more than nine children.
8  Q.  Right, I understand it, and I appreciate your
9   explanation.  What I was simply interested in
10   -- and I'm not suggesting that the School
11   District violated any state law --
12  A.  Oh, I understand.
13  Q.  -- by loading more kids than this vehicle was
14   designated for.
15  A.  Correct.
16  Q.  My question was a little more specific, and
17   that is:  Would you agree with me that a 2006
18   Ford Econoline van 150, in fact, is a vehicle
19   designed to hold more than ten passengers?
20  A.  Yes.
21  Q.  Thank you.  That's what I was interested in.
22  A.  Sure, okay.
23  Q.  Moving on in the contract itself, would the
24   carrier, in this case Brimar, be required to
25   follow certain rules relative to the safe

---

Page 59

1   transportation of these students, would this
2   contract require them to do certain things to
3   ensure the safety of the students?
4  A.  I think that's why the contract was developed,
5   to give guidelines to the carrier.
6  Q.  To your knowledge, would the school bus driver
7   legally be permitted to be on a cell phone
8   while she was driving your students?
9  A.  Not at all.
10  Q.  And so, to your knowledge, that would be
11   illegal; is that correct, sir?
12  A.  I believe it's -- well, in that era in '16 -- I
13   think it's illegal now in Pennsylvania.  I'm
14   not sure.  But we definitely would have frowned
15   upon it.  We definitely would have made inquiry
16   if a parent or a citizen or whomever would have
17   called and said I've seen this vehicle with the
18   driver on the cell phone, and which I have, and
19   I've inquired personally.
20  Q.  And all of the questions that I'm asking you,
21   unless I state specifically, will be for the
22   spring months or early winter, January through
23   the end of April 2016, since that's the date of
24   our incident.  Is it your understanding that it
25   was illegal for a driver transporting school

---

Page 60

1   students, as of April 29, 2016, to be on a cell
2   phone when she was transporting these students?
3  A.  I would say so.
4  Q.  Is it your understanding that a driver of
5   students as of the same date, April 29, 2016,
6   it would be illegal if she had in earphones
7   while she was transporting these students?
8  A.  I wouldn't say it would be illegal, but we
9   would not condone it, and we would frown upon
10   it.
11  Q.  Do you know if the contract at all included any
12   language relative to the use of the cell phone
13   being prohibited, or earphones, if you know,
14   sir?  The contract that's in front of you,
15   which is marked as Exhibit 13.
16  A.  Well, I'll explain a little bit to you.  At
17   that time, in '16, some of the carriers were
18   using Nextel phones, where it looked like a
19   cell phone and they would get their information
20   or call their carrier with that.  So carrying a
21   conversation with your personal phone or call
22   your dispatcher with the Nextel phone, that's
23   basically all that Nextel phone could do is go
24   to the dispatcher.  We would have to
25   investigate to see what transpired.

---

Page 61

1  Q.  Actually the contract at Paragraph 23, if you
2   refer to the second paragraph down on Page 5,
3   Mr. Vasser, includes a contractual provision
4   that the carrier agrees that all vehicles will
5   be equipped with a two-way radio or mobile
6   phone in good working order which provides
7   contact at all times with carrier's
8   administrative offices.
9      Did I read that correctly?
10  A.  That's correct.
11  Q.  Was that a requirement of the contract in 2016,
12   sir?
13  A.  Oh, definitely.
14  Q.  And therefore, would I be correct in
15   understanding, Mr. Vasser, that at all times
16   relevant to Brimar carrying out this contract,
17   it would have been possible to contact the
18   driver by and through either a two-way radio or
19   a mobile phone in good working order?
20  A.  That's how it's set up, yes.
21  Q.  In other words, if someone had seen something
22   going on on a bus that raised suspicion, the
23   contract required there to be a means of
24   communication, so if someone wanted to
25   contacted the administrative office of Brimar

---

Page 94

1          MS. DOHERTY: One second.  I don't
2     want interrupt your flow here.
3          MR. JUG: Sure.
4          MS. DOHERTY: I think I would prefer,
5     just to keep our record clear, if we mark these
6     but don't attach them.
7          MR. JUG: Okay.
8          MS. DOHERTY: Are you all right with
9     that, just so we don't lose count as we're
10    going through this?  Does that work?
11         MR. JUG: That's fine, yeah.
12         MS. DOHERTY: So KM PPS 305 would be
13    17.  305 is 17.
14         We're going to mark but not attach KM
15    PPS 305 as 17, and KM PPS 307 as 18.
16         MR. JUG: Jaime, you can mark them
17    and attach them.  And if I need a copy, I'll
18    follow up with you, if somehow it doesn't end
19    up on the bottom of Ed's pile.
20         MS. DOHERTY: Okay.  Why don't we go
21    ahead and mark them, Ed.
22              - - - -
23    (Exhibits 17 & 18 marked for identification.)
24              - - - -
25    BY MR. JUG:

Page 95

1  Q.   Mr. Vasser, do you believe that a memo in this
2       form, as has been marked as Exhibits 17 and 18,
3       were sent to each of the carriers, including
4       Brimar, prior to April 2016?
5  A.   I do believe so.
6  Q.   Document 349 produced by the Pittsburgh Public
7       Schools appears to be a memo dated January
8       23rd, 2015 to all carriers.
9            MS. DOHERTY: We can mark that as 19.
10              - - - -
11         (Exhibit 19 marked for identification.)
12              - - - -
13    BY MR. JUG:
14  Q.  Did you author this memo, sir?
15  A.  Yes, sir.
16  Q.  And this would have been about a year and three
17      months before the April 29, 2016 incident?
18  A.  Yes.
19  Q.  And would this have gone to all carriers,
20      including Brimar?
21  A.  Yes.
22  Q.  Do you recall why you sent this, if there was
23      any particular reason?
24  A.  Because kids were being put on the wrong bus at
25      the schools, and drivers were -- some drivers,

Page 96

1       not many drivers, were not handling it
2       properly.  And I told them that, basically, if
3       you have something out of the ordinary, hold
4       that child on the vehicle, call your
5       dispatcher.
6            And also another fact is that there
7       was some sleeping kids on vehicles.
8  Q.   Is it safe to say the incident that caused you
9       to author this, a little guy's falling asleep
10      on a ride home, not similar to what brings us
11      here today?
12           Have you reviewed the ChildLine
13      report and the police report in this case as to
14      what exactly was reported on the van my client
15      was riding?
16  A.  No.
17  Q.  This memo references if a driver notices
18      anything out of the ordinary on a particular
19      route, such as a kid not getting off at the
20      right stop, the driver should call the
21      dispatcher who will then contact the office.
22           If the ChildLine report or the police
23      statement or a police report reflect that the
24      male student and my client had their pants
25      down, and that my client was on the male

Page 97

1       student's lap, and my client was saying no and
2       hitting him, would that be something you would
3       consider out of the ordinary?
4  A.   Yeah, if I saw it.
5  Q.   I'm not suggesting that you --
6  A.   I'm just saying as a driver, if I saw it.
7  Q.   Right.  And you're free to look at this, the
8       ChildLine, which had previously been marked as
9       Exhibit 9 (handing the witness a document).
10           It includes the report that the
11      student's pants were down.  He told her to take
12      hers down, and she did.  She says he put
13      himself in her butt.  He says he put his
14      fingers in her and kissed her.  He says she was
15      hitting him and saying no.
16           It further says:  Male student
17      admitted he touched my client sexually even
18      though she was saying no and hitting him.
19           That was the ChildLine report.
20      Similar language is in the police report.
21  A.  Okay.
22  Q.  Which referenced the pants being down and the
23      female student being on the lap.  Would that be
24      something out of the ordinary that, in your
25      experience as the director of transportation,

Page 98

1  the driver would have been required to report,
2  sir?
3  A.  I'll say this:  If the driver had knowledge of
4  it, definitely.
5  Q.  You said you were familiar with this van.
6  A.  Mm-hmm.
7          MS. DOHERTY:  Is that a yes?
8          THE WITNESS:  Yes.  Thank you.
9  BY MR. JUG:
10 Q.  How many rows of seats are there, Mr. Vasser,
11     as you recall?
12 A.  Well, it depends how it was modified.  There
13     was probably three rows:  the front seat where
14     the driver is, there's a second and there's a
15     third.
16 Q.  Some of those vans modified to include a fourth
17     row of seats?
18 A.  Yes, there are.
19 Q.  And in this particular case, do you know, by
20     each row, is there a middle that separates
21     them?  Are there seats on each side?
22 A.  I would believe a 2006, it's a bench seat.
23 Q.  Okay.  And assuming the very last row, which is
24     where the report of this incident occurred,
25     from the driver's seat to that very last row,

Page 99

1  are you able to estimate for us the distance?
2  A.  From that wall to maybe me.
3          MS. DOHERTY:  Okay, so --
4  BY MR. JUG:
5  Q.  So Jaime is going to point out that we won't
6     have the benefit of seeing how big that is, so
7     would you please tell me, and I appreciate it's
8     just an estimate, the distance in feet.  Is it
9     less than ten feet?
10 A.  I'd say maybe twelve feet, about ten to twelve.
11 Q.  Twelve feet at the most?
12 A.  Well, see, also, it depends that where the
13     vehicle was modified.  Do they keep the back
14     row way in the back, or do they take out the
15     back row and just leave these three?  Or did
16     they take out -- or did they take out the
17     middle row and kept the back seat in the back?
18          So it's kind of hard without seeing
19     the vehicle to make a determination.
20 Q.  You believe it wouldn't be any more than twelve
21     feet depending on the modification.  And just
22     by your estimating -- your knowledge and your
23     estimating, you're not saying precisely, but in
24     your opinion or belief, would it be less than
25     twelve feet?

Page 100

1  A.  Around twelve.  I don't think it would be less.
2  Q.  Okay.
3  A.  I don't think it would be less.
4  Q.  And if it was modified where the back row was
5     taken out, would it have been less than twelve
6     feet then, sir?
7  A.  Yeah, it might have been less.
8  Q.  If this vehicle had the last seat in the back
9     row, would you agree this would have been a
10     twelve-passenger vehicle then, even though you
11     weren't transporting --
12 A.  Oh, yes, it's a twelve-passenger vehicle, the
13     F-150.
14 Q.  Okay.  Let me ask you some questions based on
15     your understanding as the director of
16     transportation.  And these questions are going
17     to reference the Answer that's filed by Brimar,
18     okay, not the School District.
19          As an initial question, if there was
20     an agreement these two kids needed to be in
21     assigned seats, would that agreement have been
22     made by someone at the school level, the
23     principal or the teacher rather than yourself,
24     someone at the District?
25 A.  Oh, yeah, we talked about that.

Page 101

1  Q.  And who would the other parties to that
2     agreement be, in your understanding?  Would
3     that obviously include Brimar --
4  A.  Yes.
5  Q.  -- since they provide the drivers?  Is that
6     consistent with your understanding?
7  A.  Yes.
8  Q.  Would the student's mother have been a party to
9     that, if the mother was told we're going to
10    keep them apart?
11         MS. DOHERTY:  I'm just going to
12    object on the basis that it could be construed
13    that you're asking him for legal conclusions.
14    He's not a lawyer.
15 BY MR. JUG:
16 Q.  Sure.  And with that objection noted, I can
17    rephrase.
18         In your experience, if there was an
19    agreement to keep kids apart, would the parents
20    be contacted and notified of that, if you know?
21 A.  Would they or should they?
22 Q.  Would they have been, if you know?
23 A.  I don't know.
24 Q.  Okay.  I take it from your response you think
25    they should have been, but it's just a question

# EXHIBIT

# D

1

```
 1                 IN THE COURT OF COMMON PLEAS OF
                     ALLEGHENY COUNTY, PENNSYLVANIA
 2
                              -  -  -  -
 3
    M.M., parent and natural    )CIVIL DIVISION
 4  guardian of K.M., a minor,  )
                                )
 5         Plaintiffs,          )CASE NO. GD-18-003257
                                )
 6         vs.                  )
                                )
 7  PITTSBURGH PUBLIC SCHOOL    )
    DISTRICT and BRIMAR         )
 8  TRANSIT, INC.,              )
                                )
 9         Defendants.          )

10

11                             DEPOSITION OF:
                               CANDICE MILLER
12

13                             DEPOSITION DATE:
                               July 18, 2019
14                             Thursday, 9:16 a.m.

15                             PARTY TAKING DEPOSITION:
                               Defendant Brimar
16                             Transit, Inc.

17

18                             COUNSEL OF RECORD FOR
                               THIS PARTY:
19                             DIBELLA, GEER,
                               MCALLISTER & BEST, P.C.
20                             Jason H. Peck, Esq.
                               20 Stanwix Street
21                             11th Floor
                               Pittsburgh, PA  15222
22

23                             REPORTED BY:
                               JoAnn M. Brown, RMR, CRR
24                             Notary Public
                               Reference No. JB52782
25
```

**AKF Reporters**
**412-261-2323**

M.M. v.
Pittsburgh Public School District

MILLER
July 18, 2019

Page 18

1  A.  Yes.
2  Q.  Now, within the multiple disabilities support
3       classroom, is there like a general curriculum
4       that's taught there, like math, science,
5       whatever?
6  A.  Yes, it's an alternative curriculum --
7       curricula.
8  Q.  And what does alternative curricula mean?
9  A.  It is alternative to what is being taught in
10      the general education classrooms, different
11      reading curriculum, a different math
12      curriculum that is specific to the learning
13      styles and needs of the students in the
14      multiple disabilities classroom.
15 Q.  So is that alternative curricula, is that
16      developed generally for the multiple
17      disabilities classroom or is it specifically
18      designed for each student within the
19      classroom?
20           Is each student going to have their
21      own alternative curricula, or is there a
22      curricula that they're all participating in
23      within the multiple disabilities support room?
24 A.  Both occur.  There are times in which whole
25      group instruction occurs, and there are times

Page 19

1       in which identified individualized educational
2       goals are addressed as per outlined in the
3       IEP.
4  Q.  Now, are there any occasions where children in
5       the multiple disabilities support classroom
6       will intermingle during the school day with
7       children from the autistic support classroom?
8  A.  Yes, during related arts classes, which
9       include Spanish, art and gym, and during
10      breakfast, lunch and recess during any regular
11      scheduled school day.
12 Q.  And I'm pretty sure that breakfast, lunch and
13      recess would be daily?
14 A.  Yes.
15 Q.  Back in 2015-2016, how often were the Spanish,
16      art and gym class taking place on a weekly
17      basis?
18 A.  One time a day.
19 Q.  So they're daily as well?
20 A.  Yes, one related art class per day.
21 Q.  Oh, one related art class.
22           So those children aren't taking
23      Spanish, art and gym on the same day?
24 A.  No, they have one of those related arts
25      classes per day, which at that time each class

Page 20

1       period was 45 minutes.
2  Q.  And then the gym class, at that time
3       2015-2016, how many times per week was that
4       class occurring?
5  A.  We run on a six-day schedule, so --
6  Q.  So it's going to vary?
7  A.  -- sometimes it was two times per week, but it
8       would depend on, you know, where the days ran
9       if it was day one.  I believe, at that point,
10      we had gym days three and four, maybe.  So it
11      was two consecutive days out of six each
12      related arts class ran.
13 Q.  So if I get this, over a six-day period then,
14      the children would have two Spanish classes,
15      two art classes, and two gym classes?
16 A.  Correct.
17 Q.  And I understand that K.M. was in your
18      multiple disabilities support classroom?
19 A.  Yes, she was.
20 Q.  And for what school years was that was she in
21      that classroom with you?
22 A.  2000 -- is this mine?  I mean, I'd have to
23      look.  So she came to me in 20 -- did I write
24      this one -- 15.  So 2015 -- September 2015 she
25      came to my classroom, and she was in my

Page 21

1       classroom during her 6th grade year and 7th
2       grade year.
3  Q.  Okay.  So her 6th grade year would have been
4       the 2015-2016 school year?
5  A.  Mm-hmm.
6  Q.  And then her 7th grade then would have been
7       the 2016-2017 school year?
8  A.  Yes.
9  Q.  And why was K.M. assigned to the multiple
10      disabilities classroom?
11 A.  She had multiple diagnoses of intellectual
12      disability and mild cerebral palsy.
13 Q.  What was the first one you said?  I'm sorry.
14           Cerebral palsy.  What was the one
15      before that?
16 A.  Intellectual disability, ID.
17 Q.  And what was it that caused her to be
18      diagnosed with the intellectual disabilities?
19      How did that manifest itself?
20           MS. DOHERTY: If you know.
21 A.  I know that she was tested by a school
22      psychologist.  That was before I had her.  As
23      to the part of your question how that
24      manifested, I don't know how that was
25      initiated.

Page 22

1  Q.  So it would have been some time prior to
2      entering the classroom, she would have taken
3      some sort of test that would have revealed
4      intellectual disabilities?
5  A.  Correct.
6  Q.  And then as a consequence, she's put into the
7      multiple disabilities support classroom?
8  A.  Yes, that is the process.
9  Q.  And what is an individualized education plan
10     or an IEP?
11 A.  It states the student's present levels,
12     outlines individualized goals, progress,
13     strengths, needs, specially-designed
14     instruction, related services, specifically
15     physical therapy, speech therapy, occupational
16     therapy.  It goes through least restrictive
17     environment and -- did I already say goals?
18     Yeah, I did.  That's about it for IEPs.
19 Q.  And how often are they created?
20 A.  Yearly, annual updates, but they can be, I
21     mean, opened at any time.  If there's a
22     request by family or if the educational staff
23     feel like there's a need for an update or
24     revision, they can be opened at any time.
25     Typically, they are reviewed annually.

Page 24

1      and a general education teacher.
2  Q.  So would these all be individuals who were
3      involved in writing this IEP?
4  A.  They are individuals who are involved in
5      K.M.'s educational planning.
6  Q.  They're not necessarily writing this
7      particular IEP then?
8  A.  No.
9  Q.  And would you have written this IEP?
10 A.  I did write this IEP.
11         MR. PECK: We got a little bit ahead
12     of ourselves.  I'm going to have the court
13     reporter mark this as Exhibit 1.  Do Miller
14     Exhibit 1 just so we don't forget to do it.
15         MS. DOHERTY: Do you want to number
16     consecutively throughout the depositions,
17     Jason, as opposed to specific to the witness?
18     That might be easier so that we're not
19     confused later.
20         MR. JUG: That's fine with me.
21         MR. PECK: Yeah, I'm fine with that.
22     So this will just be Exhibit 1 then as opposed
23     to Miller Exhibit 1.
24             - - - -
25     (Exhibit No. 1 was marked for identification.)

Page 23

1  Q.  Take a look at the IEP with the meeting date
2      of 3-15-2016.
3  A.  Which one is that included in, this
4      (indicating) one?
5          MS. DOHERTY: KM PPS 124 down at the
6      bottom right.
7  A.  Is it this (indicating) one?
8  Q.  Yep.
9  A.  What page do you want me to turn to?
10 Q.  If you would just identify this document for
11     the record here.
12 A.  This is K.M.'s IEP dated 3-15-2016.
13 Q.  If you look at page 3, it's going to be Bates
14     number -- and when I say Bates number, I'm
15     referring to these numbers here (indicating).
16 A.  Oh, okay.
17         MR. JUG: The last three digits
18     being 126?  Is that what you're looking at?
19         MR. PECK: Yes.
20 A.  Okay.  Mm-hmm.
21 Q.  And who are these people who are listed in
22     that spreadsheet there?
23 A.  They outline members of the IEP team,
24     including K.M.'s mom, the speech therapist,
25     myself, the physical therapist, the principal,

Page 25

1             - - - -
2   BY MR. PECK:
3  Q.  Go back to page 3 there.
4  A.  Mm-hmm.
5  Q.  Some you're saying that you wrote this IEP
6      that's in Exhibit 1.
7          Was there anybody else who would
8      have contributed to writing this IEP?
9  A.  The physical therapist and speech therapist
10     also contributed with regard to present levels
11     and goals.
12 Q.  And why was K.M. assigned a speech therapist?
13 A.  We would have to go to the page where her
14     needs are, and it should be outlined very
15     specifically as to what her needs are with
16     regards speech.  So if we look at page -- what
17     page are her needs?
18         MS. DOHERTY: Two up, maybe.
19 A.  Is it that?  That would be progress.  Needs
20     are a separate section.  That's progress,
21     present levels, secondary.
22         MS. DOHERTY: If you speak out loud,
23     she's going to type everything you say, so --
24 A.  Okay.  So on page --
25         MR. JUG: Unless we go off the

M.M. v.
Pittsburgh Public School District

MILLER
July 18, 2019

Page 26

1   record.
2 A.   -- 134, it says Speech and Language. Under
3   Academic, developmental, and functional needs,
4   there are her needs as outlined by the speech
5   therapist.
6       Would you like me to read them or --
7       MS. DOHERTY: It's the teeny, tiny
8   print, Jason.
9 A.   Right here (indicating).
10 Q.   With the sentence that begins K needs to
11   continue working to correct the S and S
12   blends?
13 A.   Correct, those are the speech.
14 Q.   And then the line below Revision there as
15   well: K needs to understand stuttering,
16   identify strategies, so on?
17 A.   Yes. Okay?
18 Q.   Then a similar question then, do you know why
19   K.M. would have been assigned a physical
20   therapist?
21 A.   So with regards to that, the needs are
22   typically related directed to the goals, so I
23   instruct you to look at page -- wait. I
24   thought it was just consult that she had
25   physical therapy. Hold on. I have to look

Page 27

1   back in the related arts section.
2       So she has consult four times per
3   year. That means with me. If I would have
4   concerns about her ambulation or mobility, I
5   consult with the physical therapist. When
6   students have consultation, there are not
7   goals outlined in the IEP with respect to
8   physical therapy and there are not needs
9   outlined either. As they arise or become a
10   situation or issue, I would consult with the
11   physical therapist.
12 Q.   Okay. And what page were you looking at a
13   Exhibit 1?
14 A.   149 has the level of service that K.M.
15   received for related services. It's at the
16   top.
17 Q.   Okay. The service Physical Therapy:
18   Individual?
19 A.   Correct.
20 Q.   And so she would be -- you would be consulting
21   four times per year with the therapist?
22 A.   Correct.
23 Q.   Were there any ambulation problems or physical
24   problems with K.M. that gave you any concern?
25 A.   No, none.

Page 28

1 Q.   Back up to page 2, and it's Bates No. 125.
2 A.   Okay.
3 Q.   And I see at the top there, you see like a
4   spreadsheet with four lines. They look to be
5   revisions. There's one dated 5-18-2016 and
6   5-5-2016.
7 A.   Yes, I see.
8 Q.   These appear to refer to the April 29th bus
9   incident that we are here on today.
10 A.   Correct.
11 Q.   Do you know why this would have found their
12   way into K.M.'s IEP?
13 A.   Any time there's a change in programming, the
14   team meets and a revision is made in the
15   student's individualized education plan or
16   when there's an incident that the team feels
17   they need to come together and meet, and that
18   is what we did. The information we felt
19   needed to be reflected in her -- in this
20   document.
21 Q.   And when you say the information, are we
22   talking about the need was the incident itself
23   or what the School District's response to the
24   incident was going to be?
25       Do you understand the distinction

Page 29

1   I'm making?
2 A.   I understand the distinction.
3       We've had to make changes in her --
4   in programming with regards to interactions
5   with a specific peer, and we felt that that
6   needed to be documented in her IEP.
7 Q.   And then based on the IEP, then that change
8   would have been keeping K.M. and the male
9   completely separated?
10 A.   Correct. Yes.
11       MR. JUG: And just so our record is
12   clear, the page, the Bates stamp that you're
13   referring to?
14       THE WITNESS: 125.
15       MR. JUG: 125. Thank you.
16       THE WITNESS: You're welcome.
17   BY MR. PECK:
18 Q.   If you turn to page 6 of Exhibit 1, and it's
19   going to be Bates stamp 129, I refer you
20   specifically to the very last paragraph that
21   begins with K functioning significantly below,
22   and then even more specifically to the next to
23   the last sentence, it says: K demonstrates
24   below grade and age level functional skills.
25 A.   Mm-hmm. Yes, I see it.

Page 46

1   children as to no-touch areas, teaching them
2   what body parts of private.
3 A.   Mm-hmm.
4 Q.   Were there any concerns -- I know you don't
5   have any direct knowledge about the male
6   student because he wasn't in your classroom,
7   but in your discussions with any --
8   discussions amongst the team, particularly
9   with the aides and teachers that had the male,
10   are you aware of any issues with the male
11   student with respect to concerns about his
12   ability to understand no-touch areas or
13   incidents where he would touch people in
14   no-touch areas?
15       MS. DOHERTY: When?
16 Q.   Do you understand where --
17       MS. DOHERTY: When?
18 A.   I understand, but --
19       MS. DOHERTY: When?  Before the
20   incident or after, because I think that's
21   significant?
22       MR. PECK: It would be before the
23   incident.
24 A.   No.
25 Q.   And the incident I'm talking about is the

Page 47

1   April 29th bus incident.
2 A.   Oh, you're talking about that incident?
3 Q.   Before then?
4       MS. DOHERTY: Before the van
5   incident.
6       Do you understand what he's asking?
7 A.   Okay.  There was an incident that occurred,
8   yes.
9 Q.   And that incident you're referencing, is that
10   an incident in gym class?
11 A.   Yes.
12 Q.   Are there any other incidents -- prior to the
13   bus incident in April and other than that gym
14   incident that we just referenced, are you
15   aware of any other incidents where the male
16   would have inappropriately touched another
17   student, again, touching in a no-touch zone or
18   something along those lines?
19 A.   No, there were none.
20 Q.   Prior to that gym incident that we had
21   discussed or that you had identified, did you
22   have any opportunity to observe any
23   interactions between K.M. and the male --
24 A.   Yes.
25 Q.   -- during the school day?

Page 48

1 A.   I don't recall any specific observations, but
2   they were together sometimes and I would see
3   them together or see, you know, my classroom
4   with the autistic support classroom.
5 Q.   When you would see them together, what type or
6   what part of the day are we talking about?
7   Like, what classes?
8 A.   Yeah, I do not attend related arts classes
9   when they would be together because that's my
10   prep, but there have been times that I would
11   go during my prep to those related arts
12   classes just to make sure my students were
13   accessing the instruction that the related
14   arts teacher was providing to them.  So my
15   answer to your question is simply that I was
16   around and saw them together.  I don't recall
17   any critical incidents occurring during any
18   time that I would see them together.
19 Q.   And I want to exclude the gym class incident
20   for the moment and exclude the bus incident
21   for the moment.
22 A.   Okay.
23 Q.   Okay?
24       Prior to the bus incident, are you
25   aware through any avenue of the male

Page 49

1   attempting to inappropriately touch K.M.?
2 A.   Prior to the van incident?
3 Q.   Yes, and excluding the gym incident.  We'll
4   talk about that a little later.
5 A.   No, I'm not.
6 Q.   The same criteria, excluding both the gym and
7   the van incident, prior to the van incident,
8   are you aware of any information with respect
9   to the male making any inappropriate comments
10   towards K.M.?
11 A.   No, I am not.
12 Q.   Again, the same criteria, excluding both
13   incidents and prior to the bus incident, are
14   you aware of any conduct by the male directed
15   towards K.M. that could be interpreted in any
16   sexualized nature?
17 A.   No, I'm --
18       MS. DOHERTY: Object to the form.
19   You can answer.
20 A.   Sorry.  No.  It's no anyway.
21 Q.   In that gym class incident, when did you first
22   learn of that?
23 A.   Immediately following gym class.
24 Q.   Do you recall what the date of that incident
25   was?

Page 50

1 A.   No, it's in January.  January 27th, maybe, I
2      believe is what the date was.  January 27th,
3      2017.
4              MS. DOHERTY: I actually think it's
5      '16.
6              MR. JUG: It's not a memory test --
7              THE WITNESS: Oh, I'm sorry.
8              MR. JUG: -- but it's Bates stamp
9      document 177.
10             THE WITNESS: I'm sorry.
11             MR. JUG: No, that's okay.
12             THE WITNESS: It's '16.
13             MR. JUG: There's an e-mail of
14     January 28th, 2016, which is Bates stamp
15     document 177 which references an incident.
16     Yes, you were exactly correct on the day.
17             THE WITNESS: I get points for that
18     then.
19  BY MR. PECK:
20 Q.   And from whom did you hear about the gym class
21      incident?
22 A.   Classroom Assistant Michelle Stanton.
23             MR. JUG: Her last name, please?
24             THE WITNESS: Stanton,
25     S-T-A-N-T-O-N.

Page 51

1  BY MR. PECK:
2 Q.   And did Ms. Stanton tell you how she learned
3      about the incident?
4 A.   She was told by a student -- another student
5      that K.M. and male student were in the gym
6      supplies room.  She went in and saw them in
7      there.  That is what she observed.
8 Q.   Did Ms. Stanton relay anything else that the
9      student told her?
10 A.   She told me that K.M. said he touched her
11      breast.
12 Q.   Did she describe any other further
13      circumstances of that incident as far as what
14      the student told her, just --
15 A.   No.
16             MS. DOHERTY: Let him finish his
17     question.
18             THE WITNESS: Sorry.  I'm sorry.
19  BY MR. PECK:
20 Q.   So that all that Ms. Stanton then relayed to
21      you with respect to the specifics of that
22      incident is that the male touched K.M.'s
23      breast?
24 A.   Yes.
25             MS. DOHERTY: I think she said a

Page 52

1      student told her.
2 A.   The student.
3 Q.   Yeah, the student told Ms. --
4 A.   K.M. told Ms. Stanton, not another student.
5 Q.   So K.M. told Ms. Stanton -- to your
6      understanding, told Ms. Stanton that the male
7      touched her breast, and Ms. Stanton relayed to
8      you that K.M. told her that the male had
9      touched K.M.'s breast?
10 A.   Yes.
11 Q.   During your conversation with Ms. Stanton, was
12      there any description as to how?
13             I mean, was it a brush by the
14      breast?  Was it a grab of the breast?
15 A.   There was no conversation as to those types of
16      specifics.
17 Q.   Did you speak at all with K.M. about the gym
18      class incident?
19 A.   I did.
20 Q.   And when was that?
21 A.   Immediately after Ms. Stanton told me of the
22      incident.
23 Q.   And that would have been here in school then?
24 A.   Yes.
25             MR. JUG: Why don't we have a brief

Page 53

1      break.  Off the record.
2             - - - -
3      (There was a discussion off the record.)
4             - - - -
5  BY MR. PECK:
6 Q.   So you said that you spoke with K.M. about the
7      gym class incident immediately after learning
8      about it from Ms. Stanton.
9             How was K.M. approached about this
10      incident?
11 A.   I asked her to tell me what happened.  I asked
12      her how she felt about what happened.
13 Q.   Anything else that you would have asked her
14      that you can recall?
15 A.   I instructed her to tell an adult when
16      something like that would happen immediately.
17      That's it.
18 Q.   And when you asked K.M. to tell you what
19      happened, what was her response to that?
20 A.   She said that male student -- excuse me, male
21      student touched her I believe she indicated or
22      put her -- like touched her here (indicating)
23      is what she --
24             MS. DOHERTY: You're indicating the
25      breast area?

Page 54

1    THE WITNESS: Yes, I'm indicating
2 the breast. My breast.
3  BY MR. PECK:
4 Q. And did she explain at all how the male
5    touched her, again, a brush or a grab or
6    something like that?
7 A. She did not explain that any further.
8 Q. Did she tell you why she and the male were in
9    the gym supply closet?
10 A. They were retrieving supplies. The closet --
11    it's not really a closet. I don't know if
12    you've seen it. It's actually a room that
13    holds gym equipment, including basketballs,
14    scooters, hula hoops. It is not uncommon for
15    students to be going in and out of that room.
16 Q. You said not uncommon?
17 A. It is not uncommon. They regularly will be
18    playing with a basketball, and then decide
19    they want a scooter. So they go inside the
20    room, put the basketball back and grab a
21    scooter, and they're permitted to do that.
22    They don't need to request permission to
23    access items in the gym supply room.
24 Q. Did K.M. say whether there was any
25    conversation between her and the male student

Page 55

1    either immediately before, during or after the
2    incident -- or immediately after the incident?
3 A. No, she did not indicate any conversation.
4 Q. Now, when you approached K.M. to ask her what
5    happened, did she freely speak about this
6    incident or did she need some encouragement or
7    cajoling or anything like that?
8 A. I don't recall having to encourage her to
9    speak of it, no.
10    K.M. trusted -- K.M. and I had a
11    trusting relationship, so there was no -- she
12    wasn't -- she didn't require to be encouraged,
13    because she -- we had a good relationship and
14    she would know that she could tell me anything
15    like that.
16 Q. And what was K.M.'s response when you asked
17    her to tell you how she felt?
18 A. I recall her saying that she was okay. She
19    sort of downplayed it like it didn't really
20    upset her. She knew, because of our previous
21    instruction around private parts and how
22    others shouldn't touch them, that it wasn't a
23    right thing to do, but she did not seem
24    overly affected by it. She was not upset.
25 Q. And did you -- when you're speaking with K.M.,

Page 56

1    was there anybody else present?
2 A. I don't recall if Ms. Stanton was in the room
3    or not. There were no students in the room.
4 Q. Now, after the gym incident, did you speak at
5    all with the male student about the incident?
6 A. I did not.
7 Q. And did you speak at all with M.M. or K.M.'s
8    mother about the gym incident?
9 A. Yes, I did.
10 Q. When was that first contact?
11 A. First, I went to speak to Ms. Merlo about the
12    incident, and then I called M.M. and notified
13    her what happened.
14 Q. And what was M.M.'s response when you told
15    her?
16 A. I left a message on her voice mail. I did not
17    hear back from her until an e-mail the next
18    day.
19 Q. This is going to be in the middle of your
20    packet here, but it's going to be Bates 177.
21    MS. DOHERTY: That's his. Yours is
22    in here (indicating).
23    THE WITNESS: Oh, sorry.
24    MR. PECK: It's in your packet.
25    MS. DOHERTY: Can we put 1 aside for

Page 57

1    a moment, Jason?
2    MR. PECK: Yeah.
3    MR. JUG: It's right after the two
4    larger documents.
5    THE WITNESS: Is it right there
6    (indicating)?
7    MR. PECK: 177. Yep.
8    Why don't we have this marked,
9    before we forgot, number 2.
10    - - - -
11    (Exhibit No. 2 was marked for identification.)
12    - - - -
13    MS. DOHERTY: Can you give the Bates
14    numbers one more time?
15    MR. JUG: 177 and 178.
16  BY MR. PECK:
17 Q. If we look at what's been marked as Exhibit 2,
18    Bates 177, a little more than halfway down on
19    that first page, I see an e-mail from M.M.
20    from Thursday, January 28th, 2016 at
21    11:07 a.m. and it's directed to me.
22    Is that the e-mail we were just
23    talking about?
24 A. Yes, it is.
25 Q. And did you have any follow-up conversations

M.M. v.
Pittsburgh Public School District

MILLER
July 18, 2019

Page 58

1  with M.M. about the gym incident after this
2  e-mail?
3  A.  I did.  I called her after I went to speak
4      with Ms. Merlo about how to proceed.
5  Q.  Then we'll go with the conversation you had
6      with Valerie Merlo.
7          You said that was about how to
8      proceed?
9  A.  Yes.
10 Q.  Were any decisions made during that
11     conversation?
12 A.  Yes.
13 Q.  What was that decision?
14 A.  We decided that we would come up with a plan
15     to keep male student and K.M. from any close
16     contact, for example, sitting beside each
17     other during breakfast, lunch or related arts
18     classes, a plan that they would have assigned
19     seats on their school bus, a plan that all the
20     members of the team who come into direct
21     contact when the two said students are
22     together, so that would have included every
23     classroom assistant in the multiple
24     disabilities support classroom and the two
25     autistic support classrooms.

Page 59

1  Q.  And when was that conversation with Ms. Merlo
2      coming up with a plan?
3  A.  Right after I received this e-mail.
4  Q.  So that would have been on January 28th then?
5  A.  Yes.
6  Q.  Now, in that conversation, was a plan put
7      together or was it just more of we're going to
8      develop a plan?
9  A.  A plan was put together to do as I said
10     immediately.
11 Q.  So, in short, that plan then was during the
12     school day and during the classes where these
13     two children would potentially come into
14     contact, the school personnel in charge or the
15     supervisory personnel would need to keep these
16     two children separated?
17 A.  Yes, so that they wouldn't sit beside each
18     other or have close proximity like that -- of
19     that nature.
20 Q.  Were there any specific procedures put into
21     place during the school day to make sure that
22     happened, or, I mean, how was that policy
23     going to be enforced?
24 A.  That happened by supervision of the staff who
25     were in charge of her at that time -- at said

Page 60

1  times, specifically the classroom assistants
2  when she's in related arts and lunch, recess,
3  breakfast.
4  Q.  Then you said you had -- during that
5      conversation with Ms. Merlo, that you
6      discussed keeping these children separated on
7      the school bus?
8  A.  Correct, we did.
9  Q.  And what was the -- or what was that
10     discussion?
11         What was the plan that was developed
12     during that discussion with Ms. Merlo?
13 A.  For K.M.'s assigned seat to be directly behind
14     the driver and for said male student to be in
15     the very last seat.
16 Q.  Was there anybody else participating on that
17     call with Ms. Merlo on January 28th?
18         MS. DOHERTY: Objection.  I don't
19     know that she said it was a call.
20 Q.  Or a meeting?
21 A.  When I met with Ms. Merlo?
22 Q.  Yeah.  Sorry.
23         Yeah, it was the meeting with
24     Ms. Merlo on the 28th where you developed the
25     plan.

Page 61

1  A.  It was just Ms. Merlo and I.
2  Q.  So the call was with M.M.?
3  A.  After I spoke with Ms. Merlo, I called M.M.,
4      yes.
5  Q.  If you look at Exhibit 2 --
6  A.  Yes.
7  Q.  -- at the bottom of 177 and running onto 178,
8      it appears that M.M. writes that K and I don't
9      feel comfortable of that student being in gym
10     class with her and that same student riding
11     the same van to school and home with her.
12 A.  Mm-hmm.
13 Q.  And then a little further down, 13 lines down
14     on 178, you see could you please tell me if
15     the student can you assigned to another van.
16         Do you see that?
17 A.  I do see that.
18 Q.  During your meetings -- or meeting with
19     Ms. Merlo, did you discuss the potential of
20     having either the male or K.M. assigned to a
21     different van?
22 A.  Before such a drastic measure would take place
23     and a disruption as such would take place, we
24     like to be as non-invasive in the disruption
25     of our students' schedules and van services,

M.M. v.
Pittsburgh Public School District

MILLER
July 18, 2019

---

Page 62

1  so we felt -- we discussed a plan to keep them
2  apart on the school van and assign seats to
3  them.  When I spoke with M.M. about the plan
4  that we devised with regards to the school
5  van, she was in agreement with that plan, and
6  I spoke to her after this e-mail.
7  Q.  All right.  So the call where you advised M.M.
8      of that plan, that would have been when you
9      called her after your meeting with Ms. Merlo?
10 A.  Correct.  Yes.
11 Q.  So it would still have been on January 28th
12     then?
13 A.  Yes.
14 Q.  During that conversation, you said that M.M.
15     was in agreement with the plan.
16          Did she express any reservation with
17     not putting either one of the children on a
18     different route?
19 A.  She did not.
20 Q.  Do you recall any other conversations that you
21     were a part of with any other school personnel
22     about developing a plan to keep the two
23     children separated while on the bus?
24 A.  I discussed the plan with all of the
25     paraprofessionals like I said before.

---

Page 63

1  Q.  Now, those discussions, I mean, was this to
2      get their input or was this to essentially
3      tell them this is what Ms. Merlo and I
4      decided?
5  A.  It was to tell them.
6  Q.  Do you know if any reports were made with
7      respect to the gym class incident?
8          MS. DOHERTY: Do you mean written
9      reports?
10         MR. PECK: Yes.
11 A.  No, I do not recall any written reports.
12 Q.  Do you recall --
13 A.  I don't know if anyone else wrote a report
14     about male student's behaviors.  That could
15     have occurred.
16 Q.  But if it did, you're not aware of any?
17 A.  I am not.
18 Q.  And you yourself did not draft any such
19     reports with respect to the gym class
20     incident?
21 A.  I did not write a report.
22 Q.  Do you know if any written statements were
23     taken with respect to the gym class incident
24     either from K.M., the male, anybody they might
25     have told about the incident?

---

Page 64

1  A.  No.
2          MS. DOHERTY: No, you don't know or,
3      no, there weren't any?
4          MR. JUG: The question was whether
5      she knew.
6  A.  No, there were no written statements.  Sorry.
7      There were no written statements taken.
8  Q.  And I understand that you had a conversation
9      with K.M.'s and the male student's bus driver?
10 A.  I did.
11 Q.  Do you know when that would have occurred?
12 A.  That very day.
13 Q.  On January 28th?
14 A.  Mm-hmm.  Correct, January 28th at dismissal.
15 Q.  What time is dismissal?
16 A.  3:51.
17 Q.  Was it 3:51 back in January 2016?
18 A.  It could have been 3:45.  I'm not sure.  I
19     don't want you to quote me on that.
20         MS. DOHERTY: That was very precise.
21     That's why he asked.
22 A.  Our dismissal time is 3:51.  It was around
23     that time.
24 Q.  So it's 3:51 as we sit here today?
25 A.  Our dismissal time is 3:51 every day, correct,

---

Page 65

1  and I won't lie and tell you that we don't go
2  up a little early every day to avoid the mass
3  rush up there.
4  Q.  Do you know who that bus driver was?
5  A.  It was the regular driver that K.M. always
6      had.  I do not know her name.
7  Q.  The female?
8  A.  Yes, female.  Pregnant.
9  Q.  Any other distinguishing characteristics of
10     the driver that you can think of?
11 A.  No.
12 Q.  Was she African-American?
13 A.  Yes.
14 Q.  And what was that conversation with the bus
15     driver on January 28th, 2016?
16 A.  I explained to her that from this point
17     forward that K.M. should be seated directly
18     behind her and that male student should be
19     seated in the last seat on the van, and I
20     explained that this was being done because we
21     wanted to make sure that there was no touching
22     occurring between male student and K.M. and
23     that there was a situation that occurred that
24     led to us to make this decision.
25 Q.  Did you explain the specifics of that

---

M.M. v.
Pittsburgh Public School District

MILLER
July 18, 2019

Page 74

1  A.   I don't.
2          You have not -- we have many, many
3       vans, I just want to tell you that, I mean,
4       all the way down, like 20 -- in the 20's, so I
5       don't recall.
6  Q.   When this male driver was -- had replaced the
7       original driver, did you have any discussions
8       with him in which you would relay the
9       directive to put K.M. in the seat behind him
10      and the male in the far rear seat?
11 A.   I did not have to, because he was already
12      following the directive given to the pregnant
13      driver.  I had observed him making sure K.M.
14      was in the seat behind him and male student
15      was in the last seat, and I also spoke with
16      K.M. each day to make sure that that was what
17      was happening.
18 Q.   And when you observed that male driver making
19      sure the two children were separated, what did
20      you observe him doing?
21 A.   Well, to be honest, there wasn't much that he
22      had to do, because K.M. and male student
23      already knew the rules by the time he had
24      come, but he knew that that was where they sit
25      every day.

Page 75

1  Q.   But I guess the question is did you see him
2       like directing K.M. to sit in a particular
3       seat, directing the male to sit in a
4       particular seat?
5  A.   There was no need for him to necessarily do
6       that.  I did not see that happen, no.
7  Q.   Okay.  Because I'm just trying to get
8       behind -- because you said you observed him
9       making sure the kids were separated.
10          I'm trying to get behind then what
11      you saw that told you that he's making sure
12      the kids are separated?
13 A.   I guess I just saw them sitting where they
14      were supposed to sit.  So the making sure
15      part, probably I didn't see him make sure.  I
16      shouldn't have said that.  I just saw the
17      procedure being followed.
18 Q.   Essentially because K.M. and the male knew
19      that procedure had to be followed?
20 A.   Correct.  He also -- I was also told that he
21      knew of it, because the pregnant driver
22      assured me that she would communicate that
23      with him before she went on leave.
24 Q.   And then was the male bus driver the driver at
25      the time of the bus incident?

Page 76

1  A.   No.
2  Q.   And who was the -- do you know the name of the
3       person who took the place of the male bus
4       driver?
5  A.   I do not.  It was the female substitute driver
6       for the male.  He was not replaced I don't
7       think.  I think it was just a substitute for
8       that day, I think, if my memory serves me
9       correctly.
10 Q.   So do you recall seeing the male driver
11      driving that bus at any time after the bus
12      incident?
13 A.   I can't remember, to be honest.
14 Q.   Okay.  That female substitute driver who at
15      least took the male's place on that day --
16 A.   Yes.
17 Q.   -- do you have any physical characteristics to
18      identify her, anything like that, again, skin
19      color, hair color, height?
20 A.   I don't remember.
21 Q.   And on that day, did you have any discussions
22      was that substitute female driver with respect
23      to the directive to keep K.M. and the male
24      separated while on the bus?
25 A.   I did not.

Page 77

1  Q.   Did you actually observe K.M. and/or the male
2       get on the bus that day after dismissal?
3  A.   I don't remember being the one that took them
4       to their bus.
5  Q.   So the follow-up is, do you remember if K.M.
6       and the male got in their assigned seats when
7       they got on the bus at dismissal that day?
8  A.   They did.  To my knowledge, they did.  Another
9       classroom assistant/paraprofessional made sure
10      of that.
11 Q.   And who was that paraprofessional?
12 A.   Kayla Reynolds.
13 Q.   But you don't recall one way or the other if
14      you actually physically observed them getting
15      into their assigned seats, K.M. and the male
16      student?
17 A.   I don't recall that particular day if I was
18      with a different student putting them on vans.
19      I know that Kayla put them on their van and
20      observed them sitting in their assigned seats.
21 Q.   And your statement that Kayla observed them
22      sitting in their assigned seats, did you learn
23      that through discussions with Kayla?
24 A.   Yes.
25 Q.   And when did you first learn of the incident

Page 78

1    on the bus?
2  A.   Kayla contacted me some time around 4:30 on
3       the phone and told me that she happened to be
4       behind K.M.'s school bus on Liberty Avenue and
5       saw that K.M. had moved to the back seat with
6       male student.
7  Q.   During this conversation that you said was at
8       4:30 p.m., would it have been on the same day
9       of the incident?
10 A.   Yes.
11 Q.   Do you recall what that date was?
12 A.   April 26th, I think.
13         MS. DOHERTY: It was April 29th.
14         THE WITNESS: Okay.  I'm sorry.
15         MS. DOHERTY: It's really sort of an
16       unfair question to ask you to pick it out of
17       thin air, but, yeah, it was April 29th.
18         THE WITNESS: April 28th, 29th.
19       Okay.
20  BY MR. PECK:
21 Q.   When you said Kayla told you that she saw
22       K.M., was it in the back seat with the male or
23       did she tell you that she actually saw K.M.
24       moving back to the back seat?
25 A.   She said she saw K.M. in the back seat with

Page 79

1    male student.
2  Q.   Did she tell you if she saw anything else?
3  A.   No, that was it.
4  Q.   Did she tell you she saw, you know, what was
5       specifically happening between the male and
6       K.M. at that time?
7  A.   No.
8  Q.   Did you and Kayla discuss at all during that
9       conversation as to how you would respond or
10      what a plan might be moving forward?
11 A.   We decided that we would talk with K.M. on
12      Monday about not following the rule of her
13      sitting in the seat she was assigned to.
14 Q.   Okay.  Prior to that following Monday, did you
15      relay that incident to anybody else affiliated
16      with the school district?
17 A.   I did not.
18 Q.   How about, again, prior to that upcoming
19      Monday, did you relay that incident to M.M.?
20 A.   I did not.
21 Q.   Do you know if --
22 A.   Oh, I'm sorry.
23 Q.   Do you know if Kayla Reynolds, prior to that
24      Monday, relayed the incident either to anybody
25      affiliated with the school district or to

Page 80

1    M.M.?
2  A.   I am not aware.
3         MS. DOHERTY: You mean other than
4       Ms. Miller?
5  Q.   Other than you, yes.
6  A.   I'm not aware of her relaying that to anybody
7       besides to me.  Kayla only saw that she wasn't
8       in her assigned seat.
9  Q.   And then on that Monday, did you speak with
10      K.M. about her sitting -- or her not being in
11      her assigned seat?
12 A.   Yes, I did.
13 Q.   Was there anybody else present for that
14      conversation?
15 A.   At first, there was not.
16 Q.   And during that part of the conversation where
17      it was just you and K.M., what was that
18      discussion?
19 A.   I asked K.M. -- let me start over.  I told
20      K.M. that Ms. Kayla had seen her on the van on
21      her way home from school on Friday, and that
22      she saw that K.M. was not in her assigned
23      seat.  So I asked K.M., why weren't you in the
24      seat that you were assigned to be in, and she
25      replied that male student told her to come

Page 81

1    back into his seat and sit with him, and I
2    said, you know mom wants you to follow the
3    rules, we want you to follow the rules to be
4    safe, how do you think mom would feel if she
5    knew that you didn't follow the rule that she
6    wants you to follow, and K.M. became upset,
7    crying and said, well, he told me to come back
8    there, and then she started talking about how
9    her pants were down and his pants were down,
10   and I immediately stopped her and asked for
11   Michelle Stanton to come in the classroom with
12   me because I did not want to be the only one
13   to have this conversation with K.M. I could
14   tell that it was going to be much more serious
15   than simply moving her seat.
16      So Ms. Stanton has a good
17   relationship with K.M. also.  I knew she would
18   be comfortable relaying the information to her
19   also, so I had Ms. Stanton come in the room.
20   All of my other students had already been in the
21   other autistic support classroom.
22      And then K.M. told Ms. Stanton and I
23   that her pants were down, male student's pants
24   were down and something was put in her butt.
25   She was not able to communicate whether that

Page 82

1    was -- no, she did tell me it was a finger.
2    She said she thought it was his finger.
3         And then I took K.M. up to Ms. Merlo
4    and in front -- and told Ms. Merlo about what
5    happened.  I gave her the information.  She
6    contacted special ed office, I believe it was
7    David May-Stein, to see how to proceed since
8    both students have special needs, and at that
9    point both students were identified as
10   students with intellectual disabilities too.
11 Q.  Now, when you took K.M. to see Valerie Merlo,
12   who was it that relayed to Ms. Merlo what had
13   happened?
14 A.  Me.  I did.
15 Q.  Do you know if Ms. Merlo spoke at all with
16   K.M. during that interaction?
17 A.  I don't recall.
18 Q.  Now, you mentioned that K.M. had said that
19   both her pants and his pants -- the male
20   student's pants were down.
21        Did K.M. say how that came to be?
22        I mean, was it her that pulled her
23   pants down?  Was it the male that pulled her
24   pants down?
25 A.  I recall her saying he told me to pull my

Page 83

1    pants down.
2  Q.  And did K.M. tell you how she reacted to this
3    incident?
4         MS. DOHERTY: What do you mean?
5  Q.  And I'm saying during and immediately
6    afterwards?
7  A.  The only thing I recall her saying is that she
8    asked him to stop.
9  Q.  And did she say whether or not the male
10   stopped when she asked him to?
11 A.  No, she did not indicate that he stopped.
12 Q.  At any time after the school bus incident, did
13   you speak with the male student about the
14   incident?
15 A.  I don't recall speaking to the male student.
16 Q.  Were you ever in his presence when he was
17   talking to someone else about the incident?
18 A.  I was not.  Typically, that would be the
19   classroom -- his teacher would have been
20   involved with his disclosure.
21 Q.  At any time after the incident, have you
22   spoken with any of the other children on the
23   bus about the incident?
24 A.  With another male student, yes, I did.
25 Q.  And what did that student relay about the

Page 84

1    incident?
2  A.  From what I recall, he said that K.M. moved to
3    the back with male student and K.M. was
4    hitting male student and telling him to stop.
5    This male student reporting said that he was
6    telling him -- was telling the other male
7    student to stop also, but he wouldn't, and
8    that's all I recall him saying.  It should be
9    noted that he also is a student with special
10   needs, so --
11 Q.  Did the reporting male student tell you if he
12   saw anything that the male student was doing
13   to K.M.?
14 A.  He said something about the male student
15   touching her like by her breast I recall.
16 Q.  Did he indicate whether or not the male
17   student was touching K.M. anywhere else?
18 A.  I do not recall him saying that.
19 Q.  Have you spoken -- since the incident, have
20   you spoken with anybody at Brimar Transit with
21   respect to the incident that occurred on the
22   bus?
23 A.  I have not.
24 Q.  You did not speak to the driver that was
25   driving the bus that day?

Page 85

1  A.  I did not.
2  Q.  Did you speak at all with any police officer
3    with respect to the bus incident?
4  A.  Ms. Merlo called the police to report it to
5    the police.
6  Q.  You weren't part of that report then?
7  A.  I was not.
8  Q.  Okay.  At any time since the incident have you
9    given any written statements with respect to
10   the bus incident?
11 A.  I have not.
12 Q.  And I understand that Ms. Merlo has submitted
13   a Childline Support Report?
14 A.  Yes.
15 Q.  Did you have any participation in developing
16   or producing that report?
17 A.  I did not.
18 Q.  There's going to be several written statements
19   in the packet I gave you.
20        MR. JUG: 01 through 05.
21 Q.  Yeah, it's going to be 1 through 5, 164.
22        MR. JUG: 165.
23 Q.  165, yes.  Well, 164, 165 and 166.
24        MR. JUG: 166.
25 Q.  They should all be in order there.

Page 86

1      And then start with the packet --
2  A.  Mm-hmm.
3  Q.  Start with the packet that begins with 1.
4  A.  Yes.
5      MR. PECK: Give that to the court
6      reporter and we'll mark that. I think we're
7      on 3.
8      - - - -
9      (Exhibit No. 3 was marked for identification.)
10     - - - -
11  BY MR. PECK:
12  Q.  If you look at the written statement on 1, and
13      then it looks like the first one goes down
14      most of the way on page 2 to the squiggly
15      line.
16  A.  Mm-hmm. Yes.
17  Q.  Were you present when this written statement
18      was given?
19  A.  This is my writing. I wrote this from K.M.'s
20      words.
21  Q.  And when was this statement written then?
22  A.  Monday it would have been.
23      MS. DOHERTY: Was it the Monday
24      following the incident?
25  A.  It was the Monday following the incident. I

Page 87

1      think it's actually May 1st, maybe. Monday
2      following the incident.
3  Q.  I'm not going to hold you to specific calendar
4      dates. I know it was a while ago.
5  A.  Yeah.
6  Q.  Now, was this written as K.M. was speaking
7      with you and Ms. Stanton or was this some time
8      after that conversation?
9  A.  No, this is when Ms. Stanton and I were
10     sitting with K.M.
11  Q.  And was this a verbatim recitation of what
12     K.M. was telling you --
13  A.  Yes.
14  Q.  -- or was this a summary of what she said?
15  A.  No, it's verbatim.
16  Q.  Do you know if Ms. Stanton was taking any
17     notes or writing anything down during this
18     meeting?
19  A.  No, only me.
20  Q.  And then if we look at 2 onto 3 down to that
21     second squiggly line, again, is this you
22     writing what K.M. was telling you?
23  A.  Yes, it is.
24  Q.  And was this on the -- during that same
25     statement as the first statement that was

Page 88

1      given?
2  A.  Yes, it was. She volunteered this
3      information.
4  Q.  And when you say Tuesday -- Thursday or
5      Tuesday of last week --
6  A.  Those were her words.
7  Q.  -- is that your understanding that it was
8      Tuesday or Thursday of the same week of the
9      bus incident or the week before that?
10  A.  I'm not sure what she meant. It was the
11      Monday after, so I don't know if she meant
12      last week being before that Friday or the week
13      before. I'm not sure.
14  Q.  And then finally at the bottom of 3, you see
15      the five lines there, and again that's your
16      handwriting?
17  A.  It is my handwriting.
18  Q.  And would this be a verbatim recitation of
19      what K.M. was telling you?
20  A.  It was verbatim.
21  Q.  And this is taken at the same time as the
22      other two statements on this document?
23  A.  Yes, it was.
24  Q.  Did she by any chance at any time tell you
25      when this -- in this third statement here on

Page 89

1      page 3, did she tell you when that occurred?
2  A.  I would have written that.
3      MS. DOHERTY: Let him finish before
4      you answer.
5  Q.  That last statement on page 3 or Bates 3, did
6      she tell you when that incident occurred?
7  A.  She did not.
8      MR. PECK: And then look at the next
9      page Bates 4 and we'll have that marked.
10     - - - -
11     (Exhibit No. 4 was marked for identification.)
12     - - - -
13  BY MR. PECK:
14  Q.  Do you recognize this statement at all in
15      Exhibit 4?
16  A.  No.
17  Q.  And do you know who it would be?
18      MS. DOHERTY: Don't give a name.
19      You can say yes or no, but don't give a name.
20  A.  Yes.
21  Q.  And do you know if that student would have
22      written this or if it's somebody else writing
23      down what that student said?
24  A.  It appears that the student wrote this. I was
25      not present for this, so I can't say for sure,

Page 90

1    but it looks like a student's writing.
2        MR. PECK: Look at Bates 5.
3        - - - -
4    (Exhibit No. 5 was marked for identification.)
5        - - - -
6  BY MR. PECK:
7  Q.  And in Exhibit 5, do you recognize this
8       statement?
9  A.  Yes, I do.
10 Q.  Were you present when it was given?
11 A.  I was not present.
12 Q.  And, again, do you know whether or not this
13      was the student or whoever it was writing it
14      or reciting it to someone else who was writing
15      it?
16 A.  I recognize the handwriting to be
17      Ms. Ringold's.
18        MR. JUG: Spelling of her name?
19 A.  R-I-N-G-O-L-D, and it appears as if, similar
20      to mine, this is verbatim from male student
21      that she took.
22 Q.  But you weren't present for this?
23 A.  I was not present for it, but I know her
24      handwriting.
25 Q.  Did you discuss this statement at all with

Page 91

1    Ms. Ringold after it was produced at any time?
2  A.  I don't recall discussing it.
3        MR. JUG: So Ms. Ringold was the
4      male student's teacher?
5        THE WITNESS: Yes.
6        MR. JUG: I saved you a question.
7        MR. PECK: I appreciate it.
8    Anything to make my job easier.
9        MR. JUG: We're off the record.
10        - - - -
11    (There was a discussion off the record.)
12        - - - -
13        MR. PECK: Okay.  We'll move to
14    what's Bates 164 and have that marked.
15        - - - -
16    (Exhibit No. 6 was marked for identification.)
17        - - - -
18  BY MR. PECK:
19 Q.  Exhibit 6, do you recognize that statement at
20      all?
21 A.  No.
22 Q.  So I take it that you were not present when
23      this statement was given?
24 A.  I was not present when this statement was
25      given, no.

Page 92

1        MR. PECK: And we'll move to 165 and
2      166 Bates numbers.
3        - - - -
4    (Exhibit No. 7 was marked for identification.)
5        - - - -
6  BY MR. PECK:
7  Q.  Do you recognize this statement?
8  A.  I do.
9  Q.  Okay.  It looks like you were present for that
10      interview?
11 A.  I was present for this interview.
12 Q.  Do you know who would have typed up this
13      statement?
14 A.  Joel Shaul would have typed up this statement.
15 Q.  Who is Joel Shaul?
16 A.  He is -- was a contracted therapist from the
17      Watson Institute that we used on a regular
18      basis to work on social skills with our
19      students.
20 Q.  And it looks like this interview was with a
21      student on the bus?
22 A.  Yes, it was.
23 Q.  Was that student able to describe the bus
24      incident at all?
25 A.  Yes, he was.

Page 93

1  Q.  What did he describe?  He or she?
2  A.  That he had seen male student touch K.M.'s
3      boobs on several occasions on the bus.
4  Q.  Do you know whether he was able to relay
5      anything about the specific incident on the
6      bus on April 29th?
7  A.  It's the same student as that -- as number 4.
8  Q.  Okay.
9  A.  So --
10 Q.  And then we saw on the IEP that we looked at
11      earlier that the male student and K.M. were
12      completely separated after the bus incident?
13 A.  Yes.
14 Q.  What was done to make sure that happened?
15 A.  Separate vans were issued, a new van for male
16      student.  We wanted to keep K.M. as least
17      disrupted as possible with her regular
18      routine, so the male student did not go to the
19      same related arts classes that K.M. went to,
20      they did not eat the same lunch, he did not
21      eat breakfast in the same room as K.M., he did
22      not attend the same recess, and any special
23      activities -- end-of-the-year activities that
24      K.M. would be participating in, he would not.
25 Q.  What type of activities would that be?

Page 94

1  A.  End-of-year activities like -- it's different
2      every year, but sometimes we have a picnic,
3      luau, those types of special activities.
4  Q.  There have been allegations in this case that
5      K.M. suffered like anxiety and distress as a
6      result of the incident -- the school bus
7      incident, so the question is, after the school
8      bus incident, did you see any of this anxiety
9      or distress manifest itself in K.M.?
10         MS. DOHERTY: I'm going to object on
11     the basis that she's not a medical
12     professional, but I think that I understand
13     what you're asking and I think she can answer
14     it, so I'm going to let her go ahead and do
15     that with the understanding that she's not a
16     medical professional.
17 A.  I did not see any anxiety or extra stress in
18     K.M. when she would come to school.  She was
19     confident that all of us would make sure that
20     she would never see male student.
21 Q.  Were there any occasions after the bus
22     incident, at least within the school context,
23     that K.M. ended up coming into contact with or
24     in the vicinity of the male student?
25 A.  I do not recall any times at which she came

Page 95

1      into contact with male student after the van
2      incident and to the end of the school year.
3  Q.  Do you recall any incident at a Pittsburgh
4      Penguins practice?
5  A.  The following school year?
6  Q.  Yes.
7  A.  Yes, I was there.
8  Q.  Okay.  And do you know if K.M. ever came into
9      contact or saw the male student during that
10     field trip or during that activity?
11 A.  She saw him across sections at Consol Energy
12     with about 300 students in between them
13     seated, probably.
14 Q.  And how did K.M. react to that?
15 A.  She was observed to be crying because the
16     other students were saying hi and excited to
17     see male student because they hadn't seen him
18     since the year before, so there was waving and
19     things of that nature going on.  I think she
20     was most upset, if I recall, because some
21     students were saying, hey, say hi and she
22     didn't want to, which was understandable.  The
23     other students were not made aware of what
24     occurred, so they were not doing it to be
25     malicious or anything, the students --

Page 96

1  Q.  Right.
2  A.  -- they were just saying, you know -- so that
3      was it.
4  Q.  During that activity, are you aware of any
5      direct interaction between the male and K.M.?
6  A.  There was no direct interaction between the
7      male and K.M.
8  Q.  And did you speak with K.M. after the
9      Pittsburgh Penguins practice?
10 A.  I did.
11 Q.  And what did she tell you?
12 A.  She just said that she didn't like having to
13     see him and her friends telling her to say hi,
14     because she didn't want to say hi.
15 Q.  Did she say at all how she was feeling other
16     than not liking seeing him and not liking
17     having the students say hi?
18 A.  No, that was all she said.
19 Q.  After the bus incident, were there any
20     conversations between you and K.M. as to how
21     the bus incident might have affected her or
22     how she felt because of it?
23 A.  I don't recall any specific conversations, no.
24     There might have been.  I don't know.
25 Q.  I don't remember is a perfectly fine answer if

Page 97

1      that's what it is.
2  A.  No, I don't remember.
3  Q.  How about do you recall any conversations with
4      M.M. at any time after the bus incident with
5      respect to how the bus incident affected K.M.
6      or how K.M. was feeling because of it?
7  A.  I would regularly e-mail K.M. -- or M.M. when
8      K.M. came to school between, you know, the bus
9      incident and the end of that school year and
10     let her know how K.M.'s day had gone and if
11     there was any increased stress or, you know,
12     nervousness or issues or if there was any
13     situation that occurred that she would need to
14     know.  That was done daily.
15 Q.  Do you recall relaying to M.M. anything that
16     would have indicated increased stress in K.M.?
17 A.  I do not recall relaying anything.
18 Q.  Do you recall relaying anything to M.M. that
19     might have required any specific or greater
20     attention with respect to K.M. due to the bus
21     incident?
22 A.  No, I do not.
23 Q.  Do you know if K.M. missed any school as a
24     result -- or after the bus incident?
25 A.  She did miss school.

Page 106

1  discussions with M.M. concerning the incident
2  with the gym class would have been by phone
3  rather than in person?
4  A.  Yes, it was by phone.
5  Q.  Okay.  So at no time following the incident in
6  the gym class or shortly thereafter did the
7  school sit down with M.M. personally; these
8  discussions were by phone, correct?
9  A.  They were both by phone.
10  Q.  As of the time of your initial report, which
11  would have been January 27th, 2016, and your
12  discussion with Ms. Merlo, am I correct in
13  understanding your testimony is that as of
14  that date, there was not an agreement yet to
15  have the two students separated on the bus,
16  rather, that agreement came about the
17  following day on January 28th of 2016?
18  A.  Yes.
19  Q.  With that said, do you know or can you tell me
20  who would know that on the day of the incident
21  of the school bus, if that day was January
22  27th, 2016 --
23       MR. PECK: The school bus or the gym
24  incident?
25       MS. DOHERTY: The school bus?

Page 107

1       MR. JUG: The gym incident.  Thank
2  you, Jason.  I'll rephrase.
3       I get to say strike that.  She'll
4  take that right out of there.  I think I'm
5  down to only five minutes over.
6  BY MR. JUG:
7  Q.  Am I correct in understanding then that as of
8  January 27th, 2016, the day of the incident in
9  the gym, there would not have been any
10  direction that afternoon to keep K.M. and the
11  male student separate, rather, that discussion
12  did not occur until the following day?
13  A.  That discussion occurred the following day,
14  yes.
15  Q.  So you agree with my question and the
16  statement contained therein, the bus company
17  or anyone else, they weren't told to keep
18  these two students apart until the following
19  day?
20  A.  That is correct.
21  Q.  And would you agree with me that the decision
22  to keep these two students apart was made at
23  the request of M.M., mom of K.M., as reflected
24  in the e-mail of January 28th, 2016 which is
25  Bates stamp document 178?

Page 108

1       Would you agree M.M. made that
2  request?
3  A.  M.M. made a different request.
4  Q.  Well, let's look at then Bates stamp document
5  178 which is the second page --
6  A.  Mm-hmm.  Yes.
7  Q.  -- of the e-mail from M.M. to you on January
8  28th, 2016 at 11:06 a.m.  I'm referring right
9  to this portion the second page.
10       Do you agree that M.M. at that time
11  stated in her e-mail:  Could you please tell
12  me if this student can be assigned to another
13  van; is that correct?
14  A.  That's correct.
15  Q.  And so you would agree M.M. had asked about
16  having this student assigned to another van or
17  bus or some other mode of transportation than
18  the one her daughter was on, correct?
19  A.  Correct.
20  Q.  Would you agree with me in the next sentence,
21  M.M. states:  I am not comfortable being that
22  there might not have been any action taken nor
23  parents weren't contacted?
24       Do you agree that M.M. had expressed
25  to you, as of January 28th, 2006, that she

Page 109

1  wasn't comfortable with her daughter and this
2  young man being on the same bus or van?
3  A.  Yes.
4  Q.  And would you agree that after M.M. had made
5  the school aware of these feelings, there was
6  an agreement reached in which the school --
7  I'm sorry, in which the male student and K.M.
8  would no longer be allowed to sit next to each
9  other on the van?
10  A.  Yes.
11  Q.  Okay.  And that would have been communicated
12  to M.M. at the time of a phone call that
13  occurred shortly after this e-mail, correct?
14  A.  Yes.
15  Q.  What can you recall about that phone call with
16  M.M. that occurred on or about January 28th?
17  A.  From what I recall, M.M. voiced concerns, as
18  she did in that e-mail, and I let her know
19  that I consulted with Ms. Merlo about a plan
20  to come up with that would keep K.M. and male
21  student apart on the bus, have assigned seats,
22  that I would communicate that to the bus
23  driver, that it would be followed.  M.M. had
24  some questions about the student who allegedly
25  touched her daughter, and when I answered

Page 110

```
1    those questions, she sounded relieved that it
2    was a student who actually had disabilities
3    like K.M., because I think -- not I think.  I
4    know that when she wrote this e-mail, she
5    thought that the student who allegedly touched
6    K.M. was actually part of our general
7    education population, but when I explained
8    that it was a student with similar
9    disabilities to K.M., she was more
10   understanding to the situation.  When I said
11   that male student asserted that it was an
12   accident, she seemed very much more
13   comfortable with the plan that we had
14   discussed, which would include keeping them
15   apart on the school bus and keeping them from
16   sitting near each other and being in close
17   proximity during any related arts classes,
18   lunch, breakfast, recess.  She was in
19   agreement to the plan.
20 Q. Isn't it true that M.M. at that time indicated
21   she didn't think this was an accident?
22 A. I don't recall her saying that.
23 Q. Do you recall that upon being told that K.M.
24   and the male student would be kept separate,
25   whether M.M. at that time indicated that would
```

Page 111

```
1    be acceptable to her and she wouldn't take any
2    further action or demands?
3  A. That is exactly what she said, that she was
4    agreeable to that, trusted that we would
5    proceed as discussed, and was comfortable with
6    it.
7  Q. And as you testify here today, you're not
8    aware of any facts that would suggest that
9    M.M. did not, in fact, rely on that agreement
10   that these two kids would be kept separate,
11   correct?
12 A. Ask me in a different way.  I'm confused what
13   you're asking.
14 Q. Okay.  You would agree that M.M. relied on
15   this arrangement that these two kids would be
16   kept separate on the van to and from school,
17   correct, following the incident on April 29th,
18   2016?
19 A. April, is that what you want?
20 Q. Or following the incident in the gym class on
21   January 27th, 2016?
22 A. Yes.
23 Q. Thanks for that.
24          Counsel had asked if you were aware
25   of any other incidents with the young man
```

Page 112

```
1    touching K.M. prior to the incident in gym
2    class.
3          Am I correct you personally were not
4    aware of any such incidents, correct?
5  A. That's correct.
6  Q. Were you aware of any incidents involving any
7    other students that were inappropriately
8    touched by this young man?
9  A. No, I'm not aware.
10 Q. There was some discussion concerning the
11   regular bus driver.
12          And as we do this, Jaime, would have
13   the pleadings here?
14          MS. DOHERTY: Yes, I think they're
15   here.  Yes, you gave me copies.  Well, either
16   of you did.
17          MR. JUG: Yes.  Right.
18          MS. DOHERTY: I have a couple of the
19   answers that.  Is that what you're --
20          MR. JUG: That's awesome.  Okay, and
21   our complaint is one of the exhibits.  I'm not
22   going to refer to your answer, Jaime.
23          MR. PECK: Yeah, I did give the
24   complaint in the packet.
25          THE WITNESS: Yes.
```

Page 113

```
1          MR. PECK: It's the third amended.
2          MR. JUG: When I talk about the
3    complaint, I'm referring to this (indicating)
4    document, and then I'll refer to specific
5    paragraphs.
6          MS. DOHERTY: Did you want this?
7          MR. JUG: No, I have one.  Just so
8    the witness has it accessible.
9          THE WITNESS: This (indicating)?
10         MR. JUG: Yes.  Mm-hmm.
11         THE WITNESS: Okay.  I have it.
12         MR. JUG: Okay.
13         MS. DOHERTY: That's the complaint.
14         THE WITNESS: I thought's what he
15   wanted me to pull out.
16         MR. JUG: Right.  I'm going to refer
17   to complaint and also to the answer to the
18   third amended complaint filed by Brimar.
19   Okay?
20         THE WITNESS: Where is this?
21         MR. JUG: Counsel has that?
22         MS. DOHERTY: You don't have it.
23         THE WITNESS: Oh, okay.
24         MR. JUG: Counsel is going to show
25   you that.
```

Page 114

1         THE WITNESS: Okay.
2         MR. JUG: And I'm only going to
3   refer to two paragraphs, 8 and 73, Jaime, when
4   we get to that one.
5   BY MR. JUG:
6   Q.  I'm asking you to look at these two documents
7       to address some of the questions that were
8       asked concerning the regular driver, who was
9       the lady who was described as being pregnant
10      and then went off, and then the driver on the
11      day in question.
12        Have you prior to today had an
13      opportunity to review the amended complaint
14      which was filed on behalf of K.M. and M.M.?
15  A.  No.
16  Q.  Okay.  And so when I refer to specific
17      paragraphs, please take as much time as you
18      need.
19  A.  Okay.
20  Q.  The first one that I'm going to ask you about
21      is paragraph 8 of the complaint, and if you
22      flip ahead, these are numbered paragraphs.
23        You're already on that page?
24  A.  Yes.
25  Q.  Thank you.

Page 116

1   the day of April 29th, 2016 --
2   A.  Was not adhered to --
3         MS. DOHERTY: Let him finish.
4   Q.  -- April 29th, 2016?
5   A.  Was not adhered to by whom?
6   Q.  I'm going to follow up with that, but you
7       would agree these two students were not kept
8       separate?
9         The agreement to keep the two
10      students separate and apart on the van or bus
11      was not adhered to on April 29th, 2016, and
12      then I'll follow up?
13  A.  No, it was not.
14  Q.  Okay.  So you agree with each of the last
15      three statements or sentences in paragraph 8
16      of the complaint, correct?
17  A.  Yes.
18  Q.  I'd like you to please turn to paragraph 8 of
19      the answer which was filed by Brimar Transit,
20      the bus company, on or about January 2nd,
21      2019.
22  A.  Oh, I don't have that.  I'm sorry.  Okay.
23  Q.  All right.  And there is a rather lengthy
24      response, but I'm going to focus on some
25      specific aspects of it and I'll, in fact,

Page 115

1   A.  Mm-hmm.
2   Q.  Looking at the second part of paragraph 8,
3       which is at the top of the next page, there's
4       a sentence that begins:  In the case at
5       hand -- do you see it there -- the school bus
6       company and the school district agreed to a
7       plan in which the male student would be kept
8       away from K.M. on the bus.
9         You agree with that statement,
10      correct?
11  A.  Yes.
12  Q.  And then:  This plan was agreed to following
13      an incident that occurred earlier and which is
14      described herein.
15        I'll reference that as the gym class
16      incident.
17  A.  Okay.
18  Q.  And you agree with that statement, correct?
19  A.  Yes.
20  Q.  And then the last sentence says:  This duty
21      was breached on the date in question.  I'll
22      rephrase that.
23        You'll agree that the plan to keep
24      these two students separate -- the agreement
25      to keep them separated was not adhered to on

Page 117

1   rephrase and point exactly in this paragraph
2   where I'm reading if that's okay with you.
3         Brimar, in this answer right here,
4   says:  Brimar Transit denies that it entered
5   into any agreement with K.M., M.M. or the
6   school district under which the male student
7   would be kept away from K.M. on the bus.
8         Based upon your firsthand knowledge
9   and experience, would you disagree with
10  Brimar's position that they weren't part of an
11  agreement to keep the male student and K.M.
12  separate on the bus?
13  A.  Yes, I disagree with that statement.
14  Q.  And is that based on your firsthand knowledge,
15      as you've described for Brimar's attorney,
16      that you specifically had that discussion with
17      the driver who ultimately went on maternity
18      leave, and that she assured you that that
19      agreement would be followed?
20  A.  Yes.
21  Q.  Okay.  The second thing, at the very end of
22      this page right here (indicating) --
23  A.  Yes.
24  Q.  -- the last sentence of Brimar's answer to
25      paragraph 8 on this page reads:  To the extent

Page 118

1   that plaintiff, that's K.M. and M.M., referred
2   to the alleged incident in the gym class,
3   Brimar Transit denies that it knew or was
4   informed of and that it should have known of
5   such incident until after April 29th, 2016.
6          Based on your personal knowledge and
7   experience, do you disagree with Brimar's
8   answer as I just read in the last sentence of
9   paragraph 8?
10  A.  I disagree.
11  Q.  And so our record is clear, what is that
12  disagreement based on?
13  A.  My conversation with Brimar's bus driver
14  regarding a specific plan for K.M. to sit in
15  the first seat directly behind the driver and
16  male student to sit in the last seat.
17  Q.  Understood.
18         Anything else?
19  A.  No.
20  Q.  Okay.  I only ask because I thought I might
21  have cut you off.
22         Then I'm going to refer right up
23  to -- and the third question involving this
24  paragraph, and this is a little convoluted
25  from my perspective to read.

Page 119

1          Brimar transit admits that a
2   highly-qualified driver -- that's what,
3   Candice, they call the driver who was driving
4   on April 29th throughout this answer -- was
5   operating the subject vehicle a April 29th,
6   and that that person had replaced the original
7   driver of the subject vehicle as the original
8   driver was on maternity leave.  Okay?
9          That's a little difficult to follow,
10  but I read that as saying that the lady who
11  was operating the bus on April 29th was the
12  first person to act as a substitute driver for
13  the driver who went on maternity leave.
14         Based on your firsthand knowledge
15  and experience, would you disagree with that
16  statement in Brimar's answer?
17  A.  I disagree with that statement.
18  Q.  So if Brimar were to take the position in this
19  case that the lady who was operating the bus
20  on April 29th, 2016 was the first and/or only
21  person to act as a substitute for the original
22  driver who went on maternity leave, would that
23  be contrary to your own knowledge that you
24  personally have experience with?
25  A.  Yes.

Page 120

1   Q.  Okay.  I'm going to ask you then to refer to
2   paragraph 73 of the complaint.
3          MS. DOHERTY: Are we going to mark
4   these?  I would prefer to do that.
5          MR. JUG: Since they're just the
6   complaint and answer --
7          MS. DOHERTY: Oh, right.
8          MR. JUG: -- I had no intention to.
9   They're of record, and so our record is
10  crystal clear, I'm referring to, since there
11  was an amended complaint or two in this case,
12  the amended complaint and civil action filed
13  in response to preliminary objections, which
14  was filed in December of 2018, and the answer
15  that I'm referring to has a certificate of
16  service signed by Mr. Peck on January 2nd,
17  2019 of this year.
18         MS. DOHERTY: That clears it up.
19  Thank you.
20         MR. JUG: Yep.
21  A.  So 73 in both documents?
22  Q.  Yes, ma'am.
23         And 73 is a lengthy paragraph, and
24  I'm going to focus on the very end of it.
25         MS. DOHERTY: Just take a read of

Page 121

1   it, because I don't know that you would have
2   seen that.
3          THE WITNESS: Okay.
4   BY MR. JUG:
5   Q.  Why don't you take a moment -- well, I'm going
6   to go through their answer line by line,
7   actually.
8          Why don't you take a moment for
9   now -- and you're free to do whatever you'd
10  like to do --
11  A.  Read this (indicating) one?
12  Q.  -- read 73, the complaint, which begins with
13  following the incident which occurred during a
14  gym class.
15  A.  Okay.
16  Q.  Okay?  And we'll do this together, okay?
17         The first sentence of paragraph 73:
18  Following the incident which occurred during a
19  gym class, the parties entered into an
20  agreement in which the minor male student
21  would be kept separated from K.M.
22         You don't disagree with that
23  statement; in fact, you agree with it,
24  correct?
25  A.  Yes, I agree with that.

Page 122

1 Q. And do you also agree -- and you can take your
2    time to read the next sentence, but I'll
3    paraphrase -- that agreement occurred after
4    the incident in the gym class, correct?
5 A. I don't agree with that (indicating).
6        MS. DOHERTY: She's pointing to the
7    word sexually assaulted.
8        THE WITNESS: Do I have to agree?
9        MS. DOHERTY: You don't have to
10   agree with anything you don't agree with.
11 A. I don't agree with that at all.
12 Q. Okay.  That the -- you don't agree -- and,
13   honestly --
14 A. Who wrote this?
15 Q. Me.  Okay.
16 A. Which one of you?
17 Q. So your disagreement is that touching K.M.'s
18   breast is not a sexual assault, correct?
19       You don't consider that a sexual
20   assault?
21 A. No.
22 Q. Okay.  Do you consider what -- your
23   understanding of what occurred on the bus on
24   April 29th, 2016 to be a sexual assault?
25 A. Yes.

Page 123

1 Q. Okay.  And we kind of got off from the path,
2    but, honestly, I wasn't asking you to agree to
3    each word in this --
4 A. Okay.
5 Q. -- and that's why I said I'd paraphrase.
6        I was simply asking whether you
7    agree that the agreement in paragraph 1 was
8    entered into following an incident earlier in
9    the year in the gym class?
10       You agree with that, correct?
11 A. I agree with that, yes.
12 Q. Okay.  So I won't ask you anything further
13   about that.
14 A. Okay.
15 Q. Do you agree that thereafter the school
16   district informed K.M.'s mother that the
17   agreement was reached with the bus company
18   that K.M. and the student would be kept apart?
19 A. Yes.
20 Q. Okay.  And then I'll go down, and I'm not
21   going to ask you to agree to legal
22   conclusions, so I'm going to skip ahead.
23       Right here where it says:  This
24   agreement was followed for a period of time by
25   the regular driver, do you agree with that

Page 124

1    sentence in the complaint?
2        The agreement to keep K.M. and the
3    male student apart was followed for a period
4    of time by the regular driver, who is the lady
5    that went on maternity leave, correct?
6 A. Yes.
7 Q. Okay.  Do you agree with the next sentence
8    which provides:  After the regular driver went
9    on maternity leave, the agreement was again
10   followed by a substitute driver?
11 A. Yes, I do.
12 Q. And that substitute driver was not the lady
13   who was driving the bus on April 29th, 2016,
14   but that was a male driver, correct?
15 A. Yes.
16 Q. And do you agree with the next sentence then:
17   The substitute driver was replaced by the
18   driver who was working on the day of the
19   incident, which is April 29th, 2016?
20 A. Yes.
21 Q. Okay.  And do you agree with the last part of
22   that sentence that the lady who was driving on
23   that day failed to keep these two students
24   apart and breached that agreement?
25       MS. DOHERTY: Well, she's not a

Page 125

1    lawyer.  She's not going to talk about
2    breaching agreements.
3 Q. As a lay person, do you agree with me that the
4    lady -- based on your knowledge, information
5    and belief, the lady who was driving the bus
6    on April 29th, 2016 did not keep those two
7    students apart?
8 A. Based on what?
9 Q. Based on what your understanding of the facts
10   are.
11 A. Based on what Kayla Reynolds informed me of
12   with regards to what she saw on Liberty
13   Avenue, yes, that driver apparently
14   breached -- or did not -- the driver failed to
15   keep them separate.
16 Q. Okay.
17 A. She allowed K.M. to get up and move.
18 Q. Okay.  I'd ask that you please turn to
19   paragraph 73 of the answer which Brimar filed
20   in response to the paragraph that we just
21   reviewed.
22       The first part talks about
23   conclusions of law, but right after that,
24   Brimar's answer provides:  Brimar Transit
25   denies that it had any knowledge of the

Page 126

1　alleged incident in the gym class as of and
2　prior to April 29th, 2016 and denies that it
3　should have known of the alleged incident in
4　the gym class as of and prior to April 29th,
5　2016.
6　　　Based on your firsthand knowledge,
7　information and belief, is that statement by
8　Brimar in their answer inaccurate?
9　A.　It is inaccurate.
10　Q.　Is that because of the conversation you had
11　with the driver and that she assured you that
12　that agreement would be followed?
13　A.　Yes.
14　Q.　Okay. The next sentence says: Brimar Transit
15　denies it was a party to any agreement to
16　separate K.M. and the male student while on
17　the bus and otherwise ensure that the children
18　were kept separated on the subject vehicle.
19　　　Based on your personal knowledge and
20　experience, is that statement by Brimar in
21　their answer inaccurate?
22　A.　Yes, it's inaccurate.
23　Q.　Okay. We'll skip ahead a little. This is a
24　very long reply.
25　　　The last sentence on this page right

Page 127

1　here (indicating), it begins: Brimar Transit
2　denies that any driver of the subject vehicle
3　took any steps to separate the male and K.M.
4　while on the subject vehicle pursuant to any
5　agreement to do so and denies that Brimar ever
6　assumed or undertook an obligation to keep the
7　male and the female K.M. separate.
8　　　Based on your personal knowledge and
9　information, is that statement in Brimar's
10　answer inaccurate?
11　A.　It is inaccurate.
12　Q.　And we'll continue on. Brimar then says:
13　They deny that M.M. or K.M. reasonably relied
14　on this agreement.
15　　　You acknowledge, though, that M.M.
16　was aware of this agreement. She was told on
17　January 28th, 2017 the school and the bus are
18　going to keep these two students, K.M. and the
19　male student, separate and apart on the bus,
20　correct?
21　A.　Yes.
22　Q.　Okay.
23　A.　And from M.M.'s e-mail, she stated that she
24　spoke to the driver that day who reassured her
25　that would happen, so --

Page 128

1　Q.　And so our record is clear, would you refer to
2　that portion of the e-mail.
3　A.　Actually, it's numbered, I think.
4　Q.　And when you review these, Candice, if you'd
5　refer to the Bates stamp number so everyone is
6　aware.
7　A.　No, that's not it.
8　　　Oh, here it's over here
9　(indicating). Sorry. It's 2.
10　　　Oh, wait, you have it.
11　　　MS. DOHERTY: I didn't know that's
12　what you were talking about.
13　A.　Yes, it's Exhibit 2.
14　Q.　Okay. What's the Bates stamp?
15　A.　Oh, wait, maybe it's not on here.
16　Q.　Do you see the 177 and 178 at the bottom?
17　　　Which page are you looking at?
18　A.　177 at the top.
19　Q.　Here (indicating)?
20　A.　Yep.
21　Q.　Yep. Okay.
22　　　Where on this e-mail are you
23　specifically referring?
24　A.　At the top, there's an e-mail --
25　Q.　Got'cha.

Page 129

1　A.　-- from M.M. to me the next -- well, two days
2　later, it's a Saturday, telling me that the
3　driver told her that she was concerned and
4　will have K.M. sit behind her just to reassure
5　me she is in good hands.
6　Q.　Correct.
7　　　And the document that we're
8　referring to is Bates stamp 177, and that's an
9　e-mail from M.M. to you on January 30th, 2016
10　at 10:03 p.m., correct?
11　A.　Yes, sir, and it's 2.
12　Q.　Yes.
13　　　MS. DOHERTY: Exhibit 2.
14　A.　Exhibit 2. Sorry.
15　Q.　You're getting pretty good at this.
16　　　The final sentence of Brimar's
17　answer, 73.
18　　　MS. DOHERTY: Give us one second,
19　Fred.
20　　　MR. JUG: Uh-huh.
21　A.　What page? The final sentence?
22　Q.　Right.
23　A.　Okay.
24　Q.　Brimar Transit denies that any driver replaced
25　the highly-qualified driver of the subject

Page 134

1    to K.M. -- and that's IEP a little bit cut
2    off, correct --
3  A.  Yes.
4  Q.  -- were made due to an incident that occurred
5    on April 29th, 2016 while riding school
6    transportation.
7        What were the specific changes that
8    were made as a result of the incident on April
9    29th --
10  A.  The students -- I'm sorry, did I cut you off?
11  Q.  No, that's okay.  I was going to say what I
12    think you're about to say.
13        Would they have been the changes
14    described in the next box above:  Due to the
15    incident, K.M. will be kept completely
16    separate from specific identified student?
17  A.  Correct.
18  Q.  Is that the change?
19  A.  Yes.
20  Q.  But you would agree with me that change --
21    that agreement had already taken place back on
22    January 28, 2016 or thereabouts that these two
23    students would be kept separate on the bus?
24  A.  No.
25  Q.  Or is the change referring to -- or that is

Page 135

1    referred to in the IEP now these kids wouldn't
2    even be on the same bus?
3  A.  This is that they wouldn't be on the same bus.
4  Q.  Okay.  But there's no question it was agreed
5    to prior to April 29, as a result of the
6    incident that occurred at the end of January
7    2016, the arrangement was K.M. and the male
8    student wouldn't be seated next to each other
9    on the bus, correct?
10  A.  Correct.
11  Q.  Was that change ever noted in K.M.'s IEP?
12  A.  No, it was not.  Typically, those things --
13  Q.  Aren't included in the IEP?
14  A.  Not -- that wouldn't necessitate a revision of
15    the IEP is what I'm trying to say.
16  Q.  Understood.
17        And I think you would -- and, again,
18    if I'm putting words in your mouth that you
19    don't agree with, you let me know.
20        I think you had said it happens
21    quite often where the buses are told these two
22    kids shouldn't be sitting together?
23  A.  It does.  Correct, it does.
24  Q.  Okay.  And so you're just simply saying that
25    doesn't require a note in the IEP?

Page 136

1  A.  It does not.
2  Q.  Okay.  Am I correct in understanding that you
3    had exchanged a number of e-mails with M.M.
4    from January 2016 forward?
5  A.  Yes.
6  Q.  You had a pretty good relationship with M.M.?
7  A.  Yes.
8  Q.  And with K.M., correct?
9  A.  Yes.  Correct.
10  Q.  K.M. was fond of you?
11  A.  Yes, and I am of her also.
12  Q.  Understood.
13        At some point later on in December
14    of 2016 or January of 2017 had M.M. asked you
15    to find out the driver's name?
16  A.  Yes.
17  Q.  Do you recall that?
18  A.  I do recall that.
19  Q.  Do you recall what you told her?
20  A.  I believe I told her that I did not know the
21    driver's name and that -- do you have my
22    correspondence in front of you?
23  Q.  No, that's okay.
24  A.  I don't know if I encouraged her to contact
25    Brimar or our legal at that point.

Page 137

1  Q.  There's an e-mail of January 30th, 2017 which
2    suggests, it's not in your stack --
3  A.  Okay.
4  Q.  -- that she contact the Office of
5    Transportation.
6        Do you recall doing that?
7  A.  (Witness nods head up and down.)
8  Q.  Okay.  Yes?
9        MS. DOHERTY: Is that a yes?
10  A.  Sorry.  I nodded my head.  Yes, that's a yes.
11  Q.  That's okay.
12  A.  I recall, after I got that e-mail, asking
13    Ms. Merlo how to respond to her, and Ms. Merlo
14    had told me to tell her to contact
15    transportation.
16  Q.  Do you recall telling mom or M.M. in January
17    of '17 that you spoke with Ms. Kayla and that
18    Kayla -- Kayla would be Kayla Reynolds,
19    correct?
20  A.  Correct.
21  Q.  -- did not remember the name of the driver,
22    but that Kayla informed Candice the pregnant
23    driver trained the male substitute driver, and
24    that during that time period, the kids were
25    kept separate and apart?

**Page 138**

1  A.  Yes, that's correct.
2  Q.  Do you know if M.M. was ever told the names of
3      the other students who were on the bus on
4      April 29th, 2016?
5  A.  She was not told their names by me.  I don't
6      know if someone else told her.
7  Q.  Right.
8  A.  I did not.
9  Q.  Do you have any understanding or recollection
10     as to the number of students who were on the
11     van or bus on that day?
12 A.  Possibly four to six.
13 Q.  Were you aware of there being a policy or had
14     there been a policy that you're aware of of
15     there being a monitor on the buses in addition
16     to the driver?
17 A.  I'm not aware of a policy.
18 Q.  Are you aware as to whether a monitor has ever
19     been assigned to a van or a bus as a result of
20     an incident?
21 A.  Monitors are assigned to buses or vans after
22     information has been collected that would
23     indicate students are unsafe on a van.  None
24     of that information was given to me or to any
25     other district employee.

**Page 139**

1  Q.  So --
2  A.  The plan to keep them apart was adhered to,
3      and I wasn't given any information contrary to
4      that.
5  Q.  I was asking more generally, Candice, relative
6      to, as of April 2016 or January 2016, based on
7      your experience, you would agree that the
8      school district did have the option to assign
9      a monitor to any particular vehicle if they
10     wished to, correct?
11 A.  A bus monitor can be assigned to any vehicle,
12     but it impedes on least restrictive
13     environment guidelines and laws, and when
14     there are not situations that cause us to
15     think that students are unsafe, we would not
16     put a bus monitor on a bus.
17 Q.  But with that explanation, you would agree
18     that option was available as of January 2016
19     to have a monitor assigned to this particular
20     vehicle?
21 A.  It was not discussed by anyone.
22 Q.  I'm asking in a more general sense, that prior
23     to January 2016, you agree that option was
24     available, if someone wanted to assign a
25     monitor to this bus or van, it certainly could

**Page 140**

1      have occurred, correct?
2  A.  Speaking hypothetically, it could happen to
3      any bus we have, but there was no discussion
4      from anyone involved that the students' safety
5      was at risk, so there was no discussion of a
6      bus monitor.
7  Q.  Are you aware, prior to January '16, of there
8      being monitors assigned to other vehicles?
9  A.  Personally, I am not.  I don't recall
10     particular monitors.  I haven't had a monitor
11     on any of my students' buses.
12 Q.  What about cameras on the buses?
13         Do you recall if cameras have been
14     installed on the buses or vans?
15 A.  They're not installed on the small vans, on
16     any of them that I know of.
17 Q.  Do you recall having any conversations with
18     M.M. about cameras being installed after this
19     incident?
20 A.  No.
21 Q.  You don't recall those discussions?
22 A.  I do not.
23 Q.  Okay.
24         You okay?  Do you need a break?
25 A.  No, I don't need a break.

**Page 141**

1          MS. DOHERTY: You know what, I just
2      need a minute.  I can see Sara bebopping out
3      in the hallway there.
4          - - - -
5      (There was a recess in the proceedings.)
6          - - - -
7  BY MR. JUG:
8  Q.  I'm going to refer to Bates stamp document
9      165.  I just wanted to follow-up.
10 A.  Is that one of the exhibit ones?
11 Q.  Yeah, it's the second statement.  It looks
12     like this (indicating) without my writing on
13     it.
14         MS. DOHERTY: It's Exhibit 7.
15 A.  Okay.
16 Q.  Okay.  I thought I understood your testimony
17     to be that you were not aware of there being
18     any prior incidents involving this student and
19     K.M.
20         In reviewing this particular
21     exhibit, it appears that there was an
22     interview with a student and with Mr. Shaul,
23     S-H-A-U-L, of Watson Institute on or about May
24     6th, 2016, correct?
25 A.  Yes.

M.M. v.
Pittsburgh Public School District

MILLER
July 18, 2019

Page 142

1  Q.   And this student is a 14-year-old 8th grader
2       who was a friend of K.M. who was sitting in
3       the seat directly in front of K.M. and the
4       male student, correct?
5  A.   Yes.
6  Q.   The reference to, and since you were at this
7       meeting, that he has a strong and trusting
8       relationship with Drexler and Meyer who have
9       been debriefing and supporting, the next word
10      is blacked out, do you believe that to be the
11      name of this young person or the other
12      students, do you know?
13 A.   That's of the student being interviewed.
14 Q.   Okay.  And as you sit here today, you can
15      recall this young man's name, correct?
16 A.   Yes.
17 Q.   All right.  I'm not going to ask you about
18      this young man's counseling or his own
19      difficulty, but the next paragraph, the first
20      word that's blanked out, would this be the
21      young man that you're interviewing?
22 A.   Yes.
23 Q.   Okay.  He offered certain information
24      regarding inappropriate behavior, and would I
25      be correct that the names that are blacked

Page 143

1       out, this young man reported he had seen the
2       male student touch K.M.'s, in his word, quote,
3       boobs on several occasions on the bus?
4  A.   Yes.
5  Q.   So just to clarify, whenever you said you
6       didn't know about prior incidents, you didn't
7       know about prior incidents prior to April
8       29th, 2016, but you did know of alleged prior
9       incidents the incident with K.M.
10      occurred on the bus, because you were in this
11      interview in which this young man told you
12      about prior incidents in which the male
13      student touched K.M.'s breast, correct?
14 A.   This was the first time I heard on May 6th of
15      any indication of any prior incidents
16      occurring.
17 Q.   Right, and honestly, Candice, I'm trying to be
18      fair.
19 A.   Yes.
20 Q.   As I understood, you said you didn't know
21      about prior incidents, and I'm only pointing
22      this out because you did learn of prior
23      incidents, but that was after the incident
24      with K.M. Occurred on the bus on April 29,
25      2016, correct?

Page 144

1  A.   Yes.
2  Q.   Okay.
3  A.   I think that he asked me if I was aware of any
4       incidents prior before the bus incident is
5       what I had thought --
6  Q.   Okay.  Fair.
7  A.   -- but I could be wrong.
8  Q.   After you and Mr. Drexler -- and who is
9       Mr. Drexler?
10 A.   He is a classroom assistant --
11 Q.   Okay.
12 A.   -- that is in male student's classroom.
13 Q.   After you and Mr. Drexler learned of this, did
14      you inform the principal or anyone else that
15      it had been reported that this young man said
16      that previously the male student had been
17      touching K.M.'s breast on several occasions on
18      the bus?
19 A.   Ms. Merlo was made aware of these reports and
20      given them -- a copy of them.
21 Q.   Okay.
22 A.   So, yes.
23 Q.   Do you know if anyone followed up with the bus
24      company relative to what had been reported as
25      of May 6, 2016?

Page 145

1  A.   I do not know if anyone followed up with the
2       bus company with regards to this allegation.
3  Q.   Okay.  And then this document, which is, as I
4       understand, part of Exhibit 7, which is Bates
5       stamp document 165, indicates that we all
6       decided that it does not seem optimal at the
7       present time to debrief all of the van
8       occupants at once.  The reason for this:  Some
9       students have no clear idea of what occurred
10      and such a meeting might facilitate sharing of
11      sensitive information.
12          Am I correct that other than the
13      male student and K.M., none of the other
14      students on the bus were then asked to provide
15      a statement or asked about the incident with
16      K.M. and the male student?
17 A.   That is correct.  And can I say one thing
18      more --
19 Q.   Sure.
20 A.   The reason is as specified there, but in
21      addition to that, it is because of their very
22      severe and profound cognitive disabilities and
23      limitations, there would be -- it would be --
24      we felt like it would have been more
25      detrimental to those students to revisit and

Page 150

1   had -- so she's employed by like Central
2   Office Specialists and she has several schools
3   that she visits -- at that time that she
4   visited and consulted with teachers like
5   myself or Ms. Ringold about behaviors of
6   concern.
7  Q.  Your name does not appear on this document.
8        I trust you weren't present at this
9   interview, correct?
10 A.  That is correct, I was not.
11 Q.  Therefore, I won't ask you about the specifics
12  of this interview, but I will ask you if you
13  have knowledge about some of the statements
14  that are found in this document which has been
15  marked as Exhibit 6.
16       Had you heard from anyone that the
17  young man, the male student, as reflected in
18  the last sentence of the third paragraph, had
19  stated on May 6, 2016, approximately a week
20  after the incident on the bus, that he had put
21  his finger in K.M.'s vagina?
22       Had you heard that from anyone?  Has
23  anyone told you that?
24 A.  No, I don't recall being made aware of this
25  specific interview done.

Page 151

1  Q.  Two paragraphs down, I assume this is the
2   young male student reports that he had come to
3   think of K.M. as his girlfriend for some time.
4        Had anyone told you that he had
5   stated that or had you heard that?
6  A.  I don't recall hearing that either, no.
7  Q.  Okay.  And then in the larger paragraph, which
8   is the next to the last paragraph, the young
9   man was apparently asked if he had been
10  exposed to unwanted sexual contact in the past
11  and he described an incident in the school
12  year two years earlier, 2013-2014, in which he
13  described an incident in the boy's restroom
14  where he was touched inappropriately allegedly
15  by another student.
16       Had you ever heard that before just
17  now?
18 A.  I was not made aware of that.
19 Q.  So you do not recall any discussions with
20  anyone that you work with or the school
21  district about this prior alleged incident of
22  inappropriate touching of the male student by
23  another male student, correct?
24 A.  That's correct, I was not aware.
25 Q.  He then says he told his teacher, Ms. Gamrat,

Page 152

1   G-A-M-R-A-T, and this references an incident
2   at Linden Elementary School.
3        Do you know who Ms. Gamrat is?
4  A.  I do not.
5  Q.  Okay.  And the statement further indicates he
6   believes that Ms. Gamrat told the principal.
7        Do you know who the principal at
8   Linden Elementary School would have been
9   during the 2013 or 2014 school year?
10 A.  I do not.
11 Q.  Fair enough.
12 A.  I do not.  Our district is very large.
13 Q.  Understood.
14                - - - -
15       (There was a discussion off the record.)
16                - - - -
17  BY MR. JUG:
18 Q.  We talked about the e-mails with M.M.
19       To your knowledge, do you have any
20  other e-mails to anyone other than M.M.
21  concerning K.M. or these incidents in the gym
22  class or on the bus?
23 A.  I do not recall any other e-mails to anyone
24  regarding --
25 Q.  Okay.

Page 153

1  A.  -- the bus or gym.
2        MS. DOHERTY:  When you trail off,
3   the court reporter has a difficult time
4   getting --
5  A.  The bus or gym.  Sorry.  I shouldn't have
6   trailed off.
7  Q.  Have you shared with Mr. Peck during the time
8   of his questions everything you can remember
9   about the conversations with the regular bus
10  driver -- regular being the lady who went on
11  maternity leave -- concerning the need to keep
12  the students separated?
13 A.  Yes.
14 Q.  Okay.  And am I correct in understanding you
15  did not speak with anyone else at Brimar
16  Transit concerning that agreement to keep the
17  students separated, only the bus driver who
18  went on maternity leave?
19 A.  That is correct.
20 Q.  Am I correct in understanding you spoke with
21  Ms. Merlo first before you contacted M.M.
22  about the incident in the gym class?
23 A.  Yes.
24 Q.  All right.  And did Ms. Merlo suggest to you
25  or did you suggest to her that you should

Page 154

1    contact M.M. and inform her of this, if you
2    recall?
3 A.   Yes.
4 Q.   Which one was it, Candice, did she tell you to
5    do it or did you say to her I think we ought
6    to call mom?
7 A.   One question at a time.
8 Q.   Yeah.
9 A.   Well, I spoke with her about what happened,
10   and then we decided that I should contact
11   mom --
12 Q.   Okay.
13 A.   -- and notify her of what happened.
14 Q.   And you indicated that the plan -- and I wrote
15   down some of your testimony that you provided
16   in response to Mr. Peck's question -- the plan
17   called for all members of the team who came
18   into contact --
19 A.   Yes.
20 Q.   -- to assist with carrying it out.
21         Would that be a fair summary of what
22   the plan involved?
23         It was not just you who took on that
24   responsibility, but those assistants who would
25   walk the kids to the bus also were made aware

Page 155

1    of the need to keep these two students
2    separated, correct?
3 A.   Yes.
4 Q.   And can you share with us the names of those
5    individuals?
6        MS. DOHERTY: I think she's pointing
7    to Jason.  She gave them already --
8 A.   I gave them already.
9        MS. DOHERTY: -- but go ahead and
10   give them one more time.
11 A.   Justin Drexler, Patty Lou Devine, Michelle
12   Stanton, Kayla Reynolds, Kim Manning, Linda
13   Drexler.
14 Q.   Are all those employees still employees of the
15   school district?
16 A.   Yes, they are.
17       MS. DOHERTY: I have to tell you
18   that Justin Drexler is not.
19 A.   Oh, wait, Justin is not.  I forgot.  Oops.
20       MS. DOHERTY: He's a former
21   employee.  He currently works for the
22   Allegheny County Jail, and that's why Jason
23   had to send me a subpoena for him for his
24   deposition.
25 A.   He's not.  He left.  He left us.

Page 156

1          MR. JUG: Okay.  Off the record.
2          - - - -
3    (There was a discussion off the record.)
4          - - - -
5 BY MR. JUG:
6 Q.   And then is it your sworn testimony, Candice,
7    that the bus driver did agree with the plan to
8    keep these two separated and that occurred --
9    that conversation occurred after you had the
10   telephone conversation with M.M.?
11 A.   Yes, that is correct.
12 Q.   And did you specifically inform M.M. that K.M.
13   would be assigned to the seat directly behind
14   the bus driver and that the male student would
15   be in the last seat?
16 A.   Yes, I did.
17 Q.   And is that what you specifically agreed to
18   with the driver of the bus, who would be the
19   driver who was on maternity leave thereafter?
20 A.   Yes.
21 Q.   Now, relative to the incident on April 29th,
22   can you tell us when you recall first becoming
23   aware of that incident?
24 A.   When I first became aware of the incident on
25   the bus?

Page 157

1 Q.   Right.  Yes.
2          MS. DOHERTY: And just as a point of
3    clarification, Fred, I'm not trying to get in
4    the way here, but when you speak about the
5    incident, do you mean the alleged sexual
6    assault or the fact that the children are
7    sitting next to each other in the same seat,
8    because that would change her answer?
9          MR. JUG: Okay.  Well, thank you for
10   the clarification, and actually I was going to
11   follow up in a way to simply determine.
12 BY MR. JUG:
13 Q.   You first heard about either of those
14   incidents from Kayla Reynolds; is that
15   correct?
16 A.   Yes.
17 Q.   Okay.  When did Kayla first contact you
18   regarding what occurred on the bus on April
19   29th, 2016?
20 A.   At approximately 4:30 on April 29th, 2016.
21 Q.   On that Friday?
22 A.   Yes.
23 Q.   Correct?
24 A.   Correct.
25 Q.   Did Kayla contact you by phone or by text

Page 158

1    message or by e-mail or in some other manner?
2 A.    By phone.
3 Q.    I had asked you about e-mails.
4        Have you looked back?  Do you have
5    any text messages concerning K.M. or any of
6    the matters which bring us here today?
7 A.    No, I do not.
8 Q.    No.  Okay.
9        You'd be surprised how many people
10   do when you get into text messages.
11       MS. DOHERTY: Typically, not
12   teachers with sensitive information, but --
13       MR. JUG: Off the record.
14       - - - -
15   (There was a discussion off the record.)
16       - - - -
17  BY MR. JUG:
18 Q.    And so what did Kayla tell you by phone at
19   approximately 4:30 on that Friday, April 29th,
20   2016?
21 A.    Kayla said that she saw the two of them
22   sitting together in the back seat of van.
23 Q.    And am I correct in my understanding of the
24   testimony you provided for Mr. Peck that as of
25   Friday at 4:30, you were not aware of an

Page 159

1    alleged sexual assault, rather your awareness
2    was limited to the two kids were not sitting
3    next to -- were sitting where they weren't
4    supposed to be?
5 A.    That is correct.
6 Q.    How is it that you became aware of a sexual
7    assault or alleged sexual assault?
8 A.    How is it?
9 Q.    Mm-hmm.  Was it the conversation with M.M.
10   that you testified about, or was it a
11   conversation directly with K.M. at school?
12 A.    A conversation directly with K.M. Monday
13   morning.
14 Q.    Okay.  Whenever Kayla told you that the male
15   student and K.M. were sitting next to each
16   other, do you recall her saying anything else?
17 A.    Just that we need to talk to K.M. and make
18   sure K.M. remembers she is to sit where she's
19   supposed to.
20 Q.    Okay.
21 A.    A plan for Monday.
22 Q.    And you did so Monday morning?
23 A.    Yes.
24 Q.    I'm going to ask about Bates stamp 199 which
25   is an e-mail from M.M. to you on May 10th,

Page 160

1    2016 at 11:50 a.m.
2        Do you have that?
3 A.    I do have it.
4        MR. PECK: I don't think this one
5    was marked.
6        Do you want to mark that?
7        THE WITNESS: Oh, it needs an
8    exhibit mark.
9        MS. DOHERTY: Mark it as Exhibit 8.
10       THE WITNESS: Eight.
11       - - - -
12   (Exhibit No. 8 was marked for identification.)
13       - - - -
14  BY MR. PECK:
15 Q.    Did you arrange for the kids in K.M.'s class
16   to send her cards in early May?
17 A.    Apparently I did, yes.
18 Q.    Do you recall if that was as a result of what
19   happened?
20       Why was she receiving cards from the
21   kids in her class?
22 A.    Because she had been absent for an extended
23   amount of time, so they sent cards that said
24   miss you.
25 Q.    Right.  Obviously, I wasn't suggesting you got

Page 161

1    into it with the other kids why she was
2    absent, but I'm just trying to establish you
3    would agree with me that after K.M. returned
4    to school that Monday, she was out for an
5    extended period of time?
6 A.    Yes.
7 Q.    And your understanding is K.M. went to
8    Children's Hospital and was evaluated that
9    afternoon and there were tests done at that
10   time?
11 A.    That's my understanding, yes.
12 Q.    And then it says:  I talked to Mr. Rhea,
13   R-H-E-A.
14 A.    I see that.
15 Q.    Do you know who that is?
16 A.    He was our program director for the
17   classrooms, Program for Students with I think
18   it's Low Incidence.  He was our like
19   program -- he supervises -- when he was here,
20   he supervised all the classrooms, the autistic
21   support, the life skill support, and the
22   multiple disabilities support classrooms.
23 Q.    Do you recall if M.M. spelled his name
24   correctly?
25 A.    I think it's R-E-A.

M.M. v.
Pittsburgh Public School District

**MILLER**
July 18, 2019

Page 170

1  recall walking with K.M. to the bus on
2  April -- the afternoon of April 29th, 2016,
3  correct?
4  A.  Correct, I did not.
5  Q.  And am I correct you never personally had any
6      conversations about these claims with the lady
7      who was driving the bus on April 29th, 2016?
8          You yourself did not have such
9      conversations that you can share with us now?
10 A.  I have not had any conversations with that
11     driver.
12 Q.  What about anyone else who was an employee of
13     Brimar Transit, have you discussed these
14     claims with anyone from Brimar that you can
15     recall?
16 A.  No, I have not.
17 Q.  Have you ever heard from anyone allegations
18     that the employee who was operating the bus on
19     April 29th, 2016 was on her phone or texting
20     while she was operating the van?
21          Have you heard that from anyone?
22 A.  I was not aware of that, no.
23 Q.  You would agree this van is not very big,
24     correct?
25 A.  I would agree that it is smaller than the

Page 171

1  large-sized school bus, yes.
2  Q.  Would you agree that the distance from the
3      driver to the rear seat is less than 15 feet?
4  A.  Yes, I would think that it's less than 15
5      feet.
6  Q.  Are you able to estimate for us what you
7      believe the distance from the driver to the
8      rear seat is?
9  A.  Probably 10 feet.  I don't know for sure.
10 Q.  Okay.  And so --
11 A.  10 to 12 feet, maybe.
12 Q.  -- the statements that Mr. Peck questioned you
13     about which were Bates stamp documents 1
14     through 5, as well as Bates stamp documents
15     164 and 165, there was a statement in 164 in
16     which the male student reported that their
17     naked bodies were pressed together with hers
18     on top.
19          In your experience with the children
20     who are on that van, if such an incident
21     occurred, would this, in your experience,
22     result in those other students becoming verbal
23     and bringing this to the attention of the van
24     driver?
25          MR. PECK:  I'd just object to the

Page 172

1  form.
2  Q.  Go ahead, you can answer.
3  A.  I would imagine that they would have said
4      something, but I don't know for sure.
5  Q.  And Kayla Reynolds, she did not indicate to
6      you that she saw the students' pants down when
7      she contacted you at 4:30 on that Friday,
8      correct?
9  A.  That is correct.
10 Q.  Kayla Reynolds, when she contacted you, did
11     she indicate to you that she was behind the
12     bus or the van?
13 A.  Yes.
14 Q.  And did she indicate to you that she saw K.M.
15     and the male student seated next to each other
16     in the rear seat of the van?
17 A.  She said, I can see that K.M. is in the back
18     with male student.
19 Q.  And when she contacted you, Candice, was this
20     after she got home or was she still following
21     the van when she called you at about 4:30 that
22     day?
23 A.  I'm not sure.
24 Q.  These students, K.M. and the male student, do
25     you know how long their bus commute was?

Page 173

1  A.  I'm not sure.  I don't know.
2  Q.  And you honestly don't personally recall right
3      now, so that would be something I'd have to
4      ask Kayla, whether she made that call from her
5      car as she was still following the van,
6      correct?
7  A.  Yes, that would be a question for her.
8  Q.  Are you certain that she told you she was
9      behind the van at that time?
10 A.  I think she did from my memory, what I can
11     remember.
12 Q.  Okay.  Can you remember anything else about
13     it?
14 A.  She said they were in the same seat in the
15     back.
16 Q.  Okay.  Did she indicate to you whether she
17     tried to get the attention of the driver once
18     she saw that K.M. and the male student were
19     seated next to each other.
20 A.  No.
21 Q.  Did she indicate whether or not she thought to
22     contact the bus company and notify them that
23     these two should not be in the same seat?
24 A.  No.
25 Q.  Do you have a good recollection as to

M.M. v.
Pittsburgh Public School District

MILLER
July 18, 2019

Page 174

1    specifically where she said she observed this?
2        I believe your testimony was along
3    Liberty Avenue?
4  A.   Yes.
5  Q.   Do you know where along Liberty Avenue, or is
6    that something I'd have to ask Kayla?
7  A.   I would ask Kayla, but my memory, I think it
8    was near Bloomfield.
9  Q.   If you take a look at Bates stamp document
10    159, it was the Childline report.
11        Am I correct --
12        MR. PECK: Is this going to be 9
13    then?
14        MR. JUG: Yes, it will.
15        MS. DOHERTY: Off the record.
16        - - - -
17    (There was a discussion off the record.)
18        - - - -
19    (Exhibit No. 9 was marked for identification.)
20        - - - -
21  BY MR. JUG:
22  Q.   Did you make the Childline report?
23  A.   I did not.
24  Q.   Do you know who did?
25  A.   I believe Mrs. Merlo did.  It should say on

Page 175

1    there.  It does.
2  Q.   It indicates that the call was at May 2nd,
3    1:41 p.m., and then referral name is Valerie
4    Merlo?
5  A.   Right.
6  Q.   That's on page 159.
7        Referring three pages ahead to 161
8    and 162, at the bottom of 161, this indicates
9    that on Friday, April 29th on the way home
10    from school, a teacher's aide was pull up on
11    Liberty Avenue beside the bus.  She noticed
12    blank sitting on blank lap.
13        Do you see that?
14  A.   I do.
15  Q.   Did Kayla indicate to Ms. Merlo in your
16    presence that she saw K.M. on the male
17    student's lap?
18  A.   I wasn't there when Kayla and Ms. Merlo spoke.
19    I don't recall being present.
20  Q.   Okay.  This further provides that today when
21    they got to school, I, in reference to Valerie
22    Merlo, was informed about what she saw, and so
23    is it your understanding Ms. Merlo's first
24    knowledge of some type of incident was the
25    following Monday morning, correct?

Page 176

1  A.   Yes.
2  Q.   As we sit here today, did you have -- do you
3    have any recollection of Kayla telling you
4    while she was on the phone with you Friday
5    afternoon that she saw K.M. on this male
6    student's lap?
7  A.   She said something about them being in the
8    same seat, and from what I can remember, she
9    said maybe she was on his lap, but it was
10    difficult for her to see too.
11  Q.   This continues at page 161 and on to the top
12    of page 162 that when we asked the kids, who
13    are both significantly disabled, what was
14    going on.
15        Were you present when the two kids
16    were asked on this date, Candice?
17        Were you yourself present when
18    Ms. Merlo was in a room and asked these kids
19    what was going on that Monday?
20        Were you present then?
21  A.   I don't recall being present when Ms. Merlo
22    asked anybody.
23  Q.   Do you agree with the statement, who are both
24    significantly disabled, that Ms. Merlo gave?
25  A.   Where is that?

Page 177

1  Q.   At the bottom.
2  A.   Yes, they are.
3  Q.   Yeah.  Okay.  Here's (indicating) where I'm
4    at.
5  A.   Yes. I'm sorry.  I see it.
6  Q.   I'm on 161.
7  A.   Right.
8  Q.   I don't think you're --
9  A.   I am.
10        MR. PECK: It says in two places.
11    That's why.
12        MR. JUG: Oh, okay.  Got'cha.
13        MS. DOHERTY: I was on the other
14    page.
15        MR. PECK: So was I.
16  A.   I was on the right page.
17  Q.   Yeah.
18  A.   Yes, I agree with that statement, they are
19    both significantly disabled.
20  Q.   Had you heard from the kids, as described in
21    here, because you were present at least for
22    one of those statements --
23  A.   Yes.
24  Q.   -- K.M.'s, whenever you wrote it by hand, that
25    the children reported their pants were down?

Page 178

1   Do you agree with that, that's
2 consistent with what you heard from the kids?
3 A. Yes, it is.
4 Q. And had Kayla indicated that she saw their
5   pants down?
6 A. No, absolutely not.
7 Q. And was it consistent with what you heard from
8   K.M. and set forth on page 162 at the top:
9   She says he put himself in her butt?
10   Is that what she said?
11 A. Yes.
12 Q. The young man, you would agree he had been
13   reported to say he stuck a finger in her
14   vagina, correct?
15   MS. DOHERTY: Objection. I don't
16   think she's ever testified to vagina today.
17 Q. You would agree that the statement that the
18   young man provided which you were asked to
19   testify about specifically stated --
20 A. I wasn't present for that.
21 Q. Right.
22   You don't have anything to refute
23   that's what the young man said, correct?
24   Your position is you weren't
25   present, so you don't know what he said at

Page 179

1   that time, correct?
2 A. I wasn't present for that, correct. That's
3   correct.
4 Q. Fair enough.
5   Had you heard from others that the
6   young man had stated he placed his finger in
7   K.M.'s vagina?
8 A. I don't recall discussing that with anybody.
9 Q. Had you heard from others that the young man
10   had said that K.M. was hitting him and saying
11   no when this was going on?
12   Had you heard that from anyone?
13 A. I did not hear that from anyone.
14 Q. Did K.M. tell you that she told him no when he
15   was engaged in this activity on the bus that
16   afternoon?
17 A. She did say that in her report.
18 Q. Had the other student, in fact, indicated that
19   K.M. was saying no at the time this assault
20   was going on?
21   MS. DOHERTY: What other student?
22   MR. JUG: The other student who
23   provided the --
24   MS. DOHERTY: The witness? The
25   student witness?

Page 180

1   MR. JUG: Yeah, student witness, not
2   the male student.
3   BY MR. JUG:
4 Q. Did that other student -- and so we're
5   precise, I said not the male student. The
6   other student that we're referring to is a
7   male student, but not the male student that we
8   referred throughout who --
9 A. He said that she was hitting him.
10 Q. And did he also indicate that K.M. was saying
11   no while this was going on?
12 A. I wasn't present for his report either --
13 Q. Okay.
14 A. -- so I would have to look at it again.
15 Q. Can you explain to us, please, why you were
16   tasked with writing K.M.'s statement?
17   It appears that at least the second
18   male student, whose statement is 004, that is
19   in his own handwriting, correct?
20 A. It appears that it is. I didn't do that.
21 Q. And then you believe that the --
22 A. I wasn't a part of that.
23 Q. -- teacher of the male student that we've been
24   referring to in 005, that statement was in her
25   hand, correct?

Page 181

1 A. That is in her handwriting, right.
2 Q. And K.M.'s statement, which is documents 1
3   through 3, that is in your hand.
4   Why is it that you wrote this
5   statement rather than asking K.M. to write it
6   out? If you can, explain that for us.
7 A. I believe that I wrote it because it was
8   easier for her to speak freely and have a
9   conversation about what happened rather than
10   have to write it herself.
11 Q. Do you have an understanding as to whether
12   K.M. and the male student continued to sit
13   next to each other after their pants were
14   pulled up?
15   Do you have an understanding or have
16   you heard from anyone?
17 A. I have no idea.
18 Q. Okay. As you sit here today, would I be
19   correct in understanding you don't know
20   exactly where Kayla and the bus were at the
21   time she called you, and you don't know if
22   Kayla was still following the bus at the time
23   that she made that call?
24 A. I do not know.
25 Q. Do you recall if Kayla called from her cell

Page 182

1    phone?
2 A.  I believe she called me from her cell phone,
3    yes.
4 Q.  Do you know if Kayla called your cell phone?
5 A.  She did.
6 Q.  Okay.  Do you have the same cell phone number
7    that you had back in 2016?
8 A.  I don't.
9 Q.  What was that cell phone number?
10 A.  412-596-9667.
11 Q.  And who was the provider?
12 A.  Hold on a minute.  Let me think.  Sprint.
13 Q.  Oh, okay.  When did you switch?
14 A.  My husband made me switch --
15 Q.  I'm not going to get into that.
16 A.  -- my phone number.
17 Q.  Okay.  You're quite certain that was your
18    number and Sprint was the provider as of --
19 A.  Yeah, I had that number for like 30 years.
20    I'm sure that was my phone number.
21 Q.  -- 4-29-16?  Okay.
22        Do you happen to know Kayla's cell
23    phone number?
24        Is she on your phone?
25 A.  She's in my phone.

Page 183

1 Q.  Okay.  Would you provide that to me, please?
2        MS. DOHERTY: We're going to -- we
3    should probably put this on the record.  We're
4    going to protect those numbers.  I don't want
5    those out in the free world.
6        MR. JUG: Oh, that's fine.  No, no,
7    that's fine.
8        We're off the record.
9        - - - -
10    (There was a discussion off the record.)
11        - - - -
12        THE WITNESS: 412-390-8052 is
13    Kayla's.
14   BY MR. JUG:
15 Q.  And that would not have been your phone in
16    April of 2016?
17 A.  No.
18 Q.  Different phone, different number?
19 A.  Correct.
20        MR. PECK: You went all the way,
21    huh?
22        THE WITNESS: That was so many years
23    ago.  So, yeah, I definitely have a new phone
24    by now.
25   BY MR. JUG:

Page 184

1 Q.  So we don't know -- or you don't know as you
2    sit here today if Kayla was still following
3    the bus or beside the bus at the time of that
4    phone call on the afternoon of April 29th?
5 A.  I do not know.
6 Q.  Therefore, would I be correct in understanding
7    that your testimony is that as of the time of
8    this phone call, you don't know one way or the
9    other whether the time Kayla called you was
10    before or after the students' pants had come
11    off and the incident occurred?
12 A.  I would have no idea as to that information.
13 Q.  What you recall today is that Kayla called you
14    and told you the two students were seated next
15    to each other, right?
16 A.  Yes, they were in the back seat together and
17    she couldn't see very clearly, but that's what
18    she indicated to me.
19 Q.  You also indicated to Mr. Peck that at least
20    as of the next fall, or at some time when the
21    Penguins were practicing at Consol Energy
22    Center, would I be correct in understanding,
23    when K.M. saw the other male student, she was
24    upset just by seeing him?
25 A.  She was upset because her peers were telling

Page 185

1    her to say hi and wave to him.
2        MR. JUG: Those are the questions I
3    have for you.
4        THE WITNESS: Okay.
5        MS. DOHERTY: I have no questions
6    for you.
7        THE WITNESS: Really?
8        MR. PECK: I just got a couple
9    follow-ups, and I promise they will be quick.
10        - - - -
11        EXAMINATION
12        - - - -
13   BY MR. PECK:
14 Q.  This statement shown in Exhibit 3 --
15 A.  Mine?  My writing?
16 Q.  Yes, the one that you wrote.
17        -- do you know was that given before
18    or after K.M. spoke with Ms. Merlo?
19 A.  I don't know.  I don't recall.  I'm not sure
20    when she spoke with Ms. Merlo that day.
21 Q.  And then when you spoke with Kayla on the
22    phone on that Friday, the day of the incident,
23    did she make any mention of the driver being
24    on her cell phone?
25 A.  She did not.

# EXHIBIT

# E

1

1          IN THE COURT OF COMMON PLEAS
        OF ALLEGHENY COUNTY, PENNSYLVANIA

2

M.M. parent and natural      CIVIL DIVISION
3 Guardian of K.M.,
a minor,

4
                Plaintiffs,    GD 18-003257
5
        -vs-
6
PITTSBURGH PUBLIC SCHOOL     TRANSCRIPT OF:
7 DISTRICT and BRIMAR         DEPOSITION OF
TRANSIT, INC.,               MICHELLE STANTON
8
                Defendants.
9
                             DEPOSITION DATE:
10                            August 21, 2019
                             Wednesday, 9:19 a.m.
11

12
                             PARTY TAKING DEPOSITION:
13                            Defendant Brimar
                             Transit, Inc.
14

15                            COUNSEL OF RECORD
                             FOR THIS PARTY:
16                            Jason H. Peck, Esq.
                             DIBELLA GEER McALLISTER
17                             & BEST
                             20 Stanwix Street, 11th Floor
18                            Pittsburgh, PA  15222
                             412-261-2900
19

20
                             REPORTED BY:
21                            Ed Fulesday, RDR, CRR
                             Court Reporter/Notary Public
22                            AKF REPORTERS, INC.
                             436 Boulevard of the Allies
23                            Pittsburgh, PA  15219
                             412-261-2323
24
                             AKF Reference No. EF53254
25

**AKF Reporters**
**412-261-2323**

Page 14

1   bottom-right corner, like these (indicating on
2   document).
3 A.  148? Okay.
4 Q.  And the bottom of the grid there in the
5   bottom-left corner, I see social skills
6   instruction.
7 A.  Oh, okay.  What are you asking me?
8 Q.  First of all, what is that?
9 A.  I don't know what that particularly was for
10   this.  I don't know.  I don't want to say that
11   I know what her social skill actually was
12   supposed to be because I'm not really sure what
13   hers was for her.
14 Q.  That was the follow-up question, if you knew
15   anything that might have qualified KM for that
16   or deficits in social skills that she might
17   have had.
18 A.  I don't know.
19 Q.  When I refer to the male student, I'm referring
20   to the male student that was involved in this
21   incident --
22 A.  Yes.
23 Q.  -- that was alleged in the Complaint, do you
24   understand who I'm talking about?
25 A.  Yes.

Page 15

1 Q.  During the 2015-2016 school year, would you
2   have had any opportunity to interact with him
3   either informally or as a supervisor?
4 A.  He would be out with us with other classes, but
5   he wasn't in my particular classroom, but we
6   did do things together collectively as the
7   special ed classes together.  But he wasn't in
8   Miss Miller's room with me per se.
9      But if we were in art together, I
10   could be there along with others in his
11   classroom, and they would just be in there
12   together because they all took that class at
13   the same time together.
14      So at that point, he could ask me,
15   Ms. Stanton, would you give me crayons or could
16   I go to the bathroom, then yes, I would be
17   directly involved with him.  But that would be
18   the only way.
19 Q.  Would you have any information as to the
20   disabilities that qualified him for special
21   education?
22 A.  No.
23 Q.  Do you have any information as to the
24   educational track he was placed into or his
25   curriculum?

Page 16

1 A.  No.
2 Q.  And you understand he was in the autistic
3   support classroom, correct, or do you know?
4 A.  Yes, he was in the room right next door to my
5   classroom.
6 Q.  Did you have any opportunity to observe any of
7   his interactions with KM at any time during the
8   school day that they would intermingle?
9 A.  Yes.
10 Q.  When would they have had opportunity to
11   intermingle?
12 A.  At lunch, at recess, special classes, riding to
13   and from school, in the morning for breakfast,
14   those would be the times that they would have
15   interacted.
16 Q.  At least when they're at lunch, recess, and
17   specials, you would have been present for that?
18 A.  Yes.
19 Q.  There's been allegations that the male student
20   was particularly infatuated with KM.  Did you
21   see any of their interactions that would have
22   suggested that to you?
23 A.  That he was infatuated with her?
24 Q.  Yes.
25 A.  Or it was mutual or just him being infatuated

Page 17

1   with her?
2 Q.  Either way, mutual or him being infatuated with
3   her.
4 A.  I wouldn't say that he was infatuated with her.
5   I would say that it was mutual.
6 Q.  And what makes you say that?
7 A.  Because I personally have had to separate them
8   from being too close together, which I would do
9   for any other student if they weren't
10   appropriately close.
11 Q.  When you're saying they weren't appropriate
12   close, I mean, was there a particular conduct
13   that you were worried about?
14 A.  Physically touching, being in each other's
15   personal space.
16 Q.  When you saw them physically touching, let's
17   start with the male.  Did you see him -- where
18   was he physically touching KM?
19 A.  He wasn't.
20 Q.  And how about the other way around, KM
21   physically touching the male?
22 A.  The thing that sticks out in my head was in the
23   cafeteria, I had to have KM move over just for
24   personal space.  There's no other really way to
25   say it besides give him some space so that he

1  can eat his lunch and you can eat your lunch.
2 Q. So is this more like she's too close to him
3  versus maybe like an inappropriate touching on
4  the leg or something like that?
5 A. Legs touching.
6 Q. In this particular instance, do you recall when
7  that would have been?
8 A. It was at lunchtime.  They were eating lunch,
9  and I only remember is because I was sitting
10  across from them.  'Cause we sat at lunch -- we
11  stayed with our kids at lunch.  So that's why
12  when I said I go -- we went to specials, we
13  went to lunch, we went to recess, we were with
14  them.  And I could see across the table at
15  them, and so I was able to say move over.
16 Q. This particular incident, would that have been
17  -- I mean, was that during the 2515-2016 school
18  year, if you can recall?
19 A. Yes, it was during the --
20 Q. And when I refer to you the gym incident, do
21  you know what I'm talking about?
22 A. Yes.
23 Q. Do you know whether that -- where you had to
24  separate them that we've just been talking
25  about, do you know whether that would have been

1  before or after the gym incident?
2 A. Before.
3 Q. Are there any other instances that you can
4  recall where you thought there might have been
5  inappropriate contact between the two of them
6  or one of them being inappropriately close to
7  the other?
8 A. Other than the gym incident or the bus
9  incident?
10 Q. Yes.
11 A. Specifically, no.  I've talked to the kids
12  day-to-day every day on this behavior or that
13  behavior.  So specifically, no.  That just
14  stuck out at the lunchtime just because it was
15  them.  But no.
16 Q. Was it just that one occasion, or were there
17  multiple occasions where you felt you had to
18  separate the two of them, that you felt there
19  was something inappropriate there?
20 A. It was more than one occasion.  I just wouldn't
21  be able to specifically say what transpired on
22  that occasion, but there was more than one.
23 Q. But at least there were something there that
24  suggested to you that they needed to be
25  separated?

1 A. Yes.
2 Q. Would that have been multiple times before the
3  gym incident?
4 A. Yes.
5 Q. Okay, other than the gym incident and other
6  than the bus incident, are you aware of any
7  other incidents in which the male ever touched
8  KM in a sexual manner?
9 A. You said the gym incident?
10 Q. Excluding the gym incident and excluding the
11  bus incident.
12 A. Where he touched her sexually?
13 Q. Are you aware of any incidents?
14 A. No.
15 Q. Again, excluding those two incidents, are you
16  aware of any inappropriate comments in a
17  sexualized nature or otherwise that the male
18  might have made to KM?
19 A. No.
20 Q. And we'll expand this beyond just KM, and again
21  excluding those two incidents.  Are you aware
22  of any incidents in which the male touched any
23  other student in a sexualized or inappropriate
24  manner?
25 A. Not that I know of, no.

1 Q. And again, as to any other student aware of any
2  incidents other than the bus and gym incidents
3  in which the male made any comments either
4  sexual in nature or otherwise inappropriate to
5  any other student?
6 A. No.
7 Q. So I want to talk about the gym class incident.
8  Do you recall when that occurred?
9 A. I couldn't tell you, like, the day and time.  I
10  remember the incident, but I don't remember the
11  moment.
12 Q. And did you actually witness that incident?
13 A. Technically, no.
14 Q. And how did you first come to learn of it?
15 A. Another student brought it to my attention.
16 Q. And was that student, was that in the MDS
17  classroom?
18 A. Yes.
19 Q. Are you able to provide initials for that
20  student?  I don't want a name, but initials.
21 A. No.
22 Q. What did that student tell you?
23 A. That -- use his initials, T for him?
24 Q. Yeah, you can use his initials or the male
25  student, either one.  But we do want to avoid

M.M. v.                                                                                   STANTON
Pittsburgh Public School District                                            August 21, 2019

Page 22

1    names.
2  A.  Right, okay.  The male student brushed up
3      against KM in the supply closet -- supply,
4      yeah, closet.
5  Q.  That would be the gym supply closet?
6  A.  Yes.
7  Q.  Did that student tell you where exactly the
8      male brushed?
9  A.  He brushed across her breast.
10 Q.  Did that student offer any information
11     suggesting how the male student came to brush
12     across KM's breast?
13 A.  He said they were putting the equipment away
14     and he brushed across her boob.
15 Q.  During that conversation, did that student
16     offer any information as to any conversation or
17     comments that had been made by the male student
18     or by KM during or immediately prior to that
19     incident?
20 A.  No.
21 Q.  And did that student, when he's relaying this
22     incident to you, you said brush, is that the
23     student's word or is that your word?
24 A.  That was his word.  He came and told me what
25     happened.

Page 23

1  Q.  Did that give you any indication that the male
2      student, you know, grabbed KM's breasts or
3      anything of that nature?
4  A.  No, 'cause what he did was kind of acted out as
5      he was saying it to me.  So, as they were
6      putting the balls away, he said that he brushed
7      against her boob putting the balls away.
8  Q.  So the male student was putting balls away?
9  A.  Yeah.  They were cleaning up the gym, so --
10 Q.  Had they just had gym class or --
11 A.  Yes.
12 Q.  So after the student relays this to you, what
13     do you do next?
14 A.  I called KM over and I called the other young
15     man over and went back over the conversation
16     that I had with them before gym had started.
17 Q.  Now, when you say other young man, is that the
18     male student that was involved in the incident?
19 A.  Yes.
20 Q.  Okay, and you said you went over with them the
21     conversation you had before --
22 A.  Gym had started.
23 Q.  And what was that conversation?
24 A.  That no one was to be in the supply closet at
25     the same time.  One person at a time.

Page 24

1  Q.  So you had instructed both KM and the young
2      male to not be in the same --
3  A.  I instructed the whole class.
4  Q.  Was there anything in particular that prompted
5      that instruction?
6  A.  Because of the conversations and the different
7      incidents that had been going on, just for
8      being pro-active for everyone's safety, make
9      sure no one's touching anyone else, known's
10     inappropriately in anyone else's space, no one
11     is to be in that closet by themselves.  One
12     person takes something in, then someone else
13     can take something in, that was the
14     conversation.  Even when they took things out,
15     one person could take something out but no one
16     is in there at the same time.
17         So when the other student came up and
18     said it to me, I immediately went back to them
19     and said we just had this conversation, no one
20     was supposed to be in there at the same time,
21     precisely so that we wouldn't have this
22     situation where no one was touching anyone, no
23     one was interacting in the wrong space, and now
24     we have a situation.
25 Q.  You said prior incidents had prompted you to

Page 25

1      give that instruction.  Did any of those prior
2      incidents involve the male student?
3  A.  The prior incident was the cafeteria, which is
4      why it was very important to, okay, we need to
5      make sure we're pro-active with these kind of
6      things because they are teenagers and you guys
7      have hormones, so it was constant to keep your
8      eye out for touching, inappropriate touching.
9      And that was just because we were in the middle
10     school, and that was consistent all of the
11     time.
12         But because they are our kids with
13     special ed and those kind of things, we kind of
14     will reiterate that kind of stuff so that way
15     it was in the front of your head type of thing.
16 Q.  Any other incidents involving the male other
17     than that cafeteria that you spoke about that
18     at least helped to prompt that instruction?
19 A.  Not that I specifically remember.  I just
20     remember being pro-active because of it was
21     girl-boy and because of the things that I had
22     seen in the building, just regular ed hormones.
23         So it was always kind of more of an
24     alert that we would have that conversation.  If
25     there was children that were physically being

Page 34

1   next class after that.  But I know it was
2   within that day.
3 Q. That conversation -- or when Miss Miller
4   relayed to you whatever she did about her
5   conversation with MM --
6 A. Mm-hmm.
7 Q. -- do you recall when that conversation
8   occurred?
9 A. Oh, the conversation between myself and Candice
10  Miller?
11 Q. Yes, where she relayed to you what MM told her.
12 A. At the end of the day.
13 Q. Of the same day as the gym incident?
14 A. Yes.
15 Q. And then you said Miss Miller told you that she
16  told MM the precautions that had been taken?
17  Do you know what these precautions were?
18 A. The talking to both students.  Specifically,
19  no.  I just know that she had talked to both
20  students, both teachers talked to the students.
21  But all I know is that she just used the words
22  precautions have been taken and mom was aware.
23 Q. Are you aware of any requests made by KM's
24  mother that the male student be placed on
25  another bus as a result of the gym incident?

Page 35

1 A. I don't know.  I wasn't part of that
2   conversation.  So I can't say that I do.
3        As a classroom assistant, you kind of
4   get information -- I don't want to say need to
5   know, but I want to say when it's necessary.
6   So we don't get everything, do you know what I
7   mean?  It's more of, okay, you need to know
8   this, you need to know that; I need you to
9   handle this, I need you to handle it that way.
10  So I wouldn't have been privy to everything.
11 Q. So at least as we sit here today, you don't
12  recall ever being given any information from
13  any source that MM had requested that the male
14  student be placed on a different bus as a
15  result of the gym incident?
16 A. No.
17 Q. And to whatever extent that may have happened,
18  you would not have been a part of --
19 A. No.  I would have been told to do so.  I
20  wouldn't have been part of the conversation to
21  make it happen.
22 Q. Okay.  There's been testimony that it was
23  ultimately decided as a result of the gym
24  incident that KM and the male student would be
25  given assigned seats on their bus.

Page 36

1 A. Yes.
2 Q. Are you aware of that arrangement?
3 A. Yes.
4 Q. How did you first become aware of that
5   arrangement?
6 A. I was told.
7 Q. By whom?
8 A. Candice.
9 Q. And do you recall when that would have been?
10 A. I'm not sure within the day -- how many days in
11  between that that took place.  I just know that
12  it took place, and we had the kids separated on
13  the bus.
14 Q. And did Miss Miller tell you specifically what
15  those arrangements were?
16 A. Yes.  The young man was in the very back of the
17  bus, and KM sat in the very front of the bus
18  directly behind the bus driver.  I don't know
19  if it was -- when I said directly behind the
20  bus driver, I don't know if it was the seat
21  behind the bus driver or the seat -- the angle
22  behind the bus driver, but I just know she was
23  in the front row of the bus.  But there are
24  seats on both sides of the aisle.
25 Q. So she was in the front row, but you're not

Page 37

1   sure on the right or the left of the bus?
2 A. Yes.
3 Q. And were you present for any conversations and
4   meetings in which that arrangement was decided
5   upon?
6 A. No.  I was just told this is what we're doing.
7 Q. So then you would not have had any input in the
8   decision to separate the children on the bus?
9 A. No.
10 Q. Do you know whether or not any representative
11  from Brimar Transit, the bus company, would
12  have had any input into that decision?
13 A. I didn't discuss it with the bus driver, but I
14  know the bus driver was aware of the seating
15  arrangement.  But I didn't verbally discuss it
16  with the bus driver myself as being part of the
17  decision.
18 Q. So there would have been no point in time where
19  you would have told the bus driver at all that
20  the two children were to be separated on the
21  bus?
22 A. Not that particular day.  I would have done it
23  if I was taking her to the bus.  Because we
24  just had different bus days, everybody had to
25  take the kids to the bus a different day.  So I

Page 38

1  would have said, okay, you know, this is where
2  you're supposed to sit, and your seat's in the
3  back, that type of deal.
4       But it wouldn't have been, like, part
5  of a meeting or something of that nature. The
6  bus driver was already told before I took
7  anybody to the bus.
8  Q.  How do you know that the bus driver had been
9      told?
10 A.  Because I was told the bus driver knew.
11 Q.  Who told you that the bus driver knew?
12 A.  Candice.
13 Q.  You were not present for whenever that bus
14     driver was told of the seating arrangements
15     that Candice informed you about?
16 A.  No.
17 Q.  Did Candice relay to you what exactly the bus
18     driver had been told?
19 A.  Yes.
20 Q.  Okay, what did Candice say?
21 A.  That KM sat in one spot and they were not to
22     sit together. And he was to sit, the other
23     male student, in the back of the bus, and they
24     were not supposed to sit together at any time.
25 Q.  Did Miss Miller tell you as to whether or not

Page 39

1  she had told the bus driver why those
2  arrangements were made?
3  A.  That, I don't know.
4  Q.  Okay, at that time, in the January 2016 period,
5      what time was dismissal?
6  A.  We brought our kids up at 3:30.
7  Q.  And what was your role in making sure kids got
8      from the classroom to their particular bus for
9      dismissal?
10 A.  Bringing the kids up as a group. Our classroom
11     would get on the elevator, we would come
12     upstairs, and we would divvy the kids to their
13     buses accordingly. Different kids went to
14     different buses, so we would divvy the kids up
15     accordingly.
16 Q.  So would there be times that you would have
17     escorted KM and/or the male student directly to
18     their bus or their van?
19 A.  Now or prior to this incident?
20 Q.  At all during the 2015-2016 school year.
21 A.  Well, they weren't in the same classroom, so I
22     would be coming upstairs with my class, and
23     they would be coming with their class and their
24     classroom assistants and their teachers.
25       So I personally wouldn't have been

Page 40

1  escorting the two of them at the same time to
2  the buses. I would have had KM because she was
3  just in my room.
4       Now, if it was my bus day, I would
5  have told KM to go to her bus, or whatever
6  other students that would have been on that
7  bus, I would have told them to go to that bus.
8  But I wouldn't have been bringing the male
9  student from his classroom with her to their
10 bus, no.
11 Q.  And so you say it's your bus day. What are
12     your responsibilities on a bus day?
13 A.  So that we all didn't have to say if our buses
14     were late, because we had so many vans and
15     little school buses for special ed kids.
16     Everybody would have a different day, and we
17     had a calendar. And if it was my particular
18     day to stay, 'cause if the buses were late that
19     day, there would be a chance that we might not
20     get out of there until 4 o'clock.
21       But everyone didn't have to stay,
22     just that particular person's bus day was.
23 Q.  Now, after the gym incident, I believe you
24     testified earlier that you would tell the
25     children, or at least KM, that she would have

Page 41

1  to be separated on the bus or that she'd have
2  to sit in the front row?
3  A.  That was at the end of the day is when those
4      things took place.
5  Q.  Okay. And that would have been to KM, correct?
6  A.  I told KM?
7  Q.  Yes.
8  A.  That she would be separated on the bus?
9  Q.  Well, that she would have to sit in the front
10     row of the seat -- or front row of the bus.
11 A.  For their assigned seats -- their new assigned
12     seats?
13 Q.  Right, after the gym class incident.
14 A.  After the gym class incident, Miss Miller would
15     have been the one that -- she told us as the
16     classroom assistants. I'm not sure who sat
17     down and told KM.
18 Q.  Okay.
19 A.  But we take them up to the buses so you're
20     going to -- we'll tell you you sit here and
21     this is your assigned seat.
22 Q.  So, would there have been times, then, where
23     you would have escorted KM to the bus and then
24     pointed out her assigned seat to her?
25 A.  Yeah. If I didn't that day, then the other

Page 54

1     conversations with Miss Miller about what had
2     happened on the bus?
3 A.  Just to be very clear on what KM told me, that
4     was our conversations, because I didn't have
5     any firsthand knowledge about the bus. It that
6     point, it Kayla and it was them. Besides that,
7     no.
8 Q.  Okay. So when you call Miss Miller over, do
9     you tell that KM told me that he touched me,
10    but beyond that there's no other conversations
11    with Miss Miller about what had happened on the
12    bus?
13 A.  With me, no.
14 Q.  And just to be clear, I'm not talking
15    necessarily just that day, Monday --
16 A.  Right, because at that point --
17 Q.  -- I'm talking about from that day to the
18    present.
19 A.  Right. We were told not to talk about it, and
20    we were told not to discuss anything with KM or
21    with the male student involved because we
22    didn't want to add any information or to jar
23    anything or anything like that, so we weren't
24    even permitted to discuss that situation in any
25    earshot of any children, or they didn't want us

Page 55

1     discussing it at all, because they said, well,
2     if you have to talk about it or write about it
3     or whatever, we just need your information. So
4     we didn't talk about it anymore at all.
5 Q.  Do you have any -- speak with Valerie Merlo
6    about what had happened on the bus?
7 A.  No. I wasn't part of it, so I wasn't the go-to
8    person.
9 Q.  I mean, Ms. Merlo never approached you about
10    your conversation with KM or anything related
11    to the bus incident?
12 A.  No, because I really didn't have one. So as
13    soon as she said she touched me, I immediately
14    got up. So at that point there was no more
15    information given to me.
16        And those kind of things, for us, we
17    like them to say it to the people who have to
18    know instead of constantly going over it or
19    changing it or reliving it. So once things
20    like those are brought up to us, it immediately
21    goes to the person who needs to know. And
22    Candice being the head teacher, she was the
23    need-to-know.
24 Q.  I do apologize for these questions, and they're
25    a little bit repetitive.

Page 56

1 A.  No, that's fine.
2 Q.  I've just got to go through each check mark
3    here.
4 A.  Mm-hmm.
5 Q.  Did anybody in law enforcement speak with you
6    about the bus incident?
7 A.  No.
8 Q.  Did you speak with any of the other students on
9    the bus about the bus incident?
10 A.  No, I didn't, no.
11 Q.  Were you ever asked to give any written
12    statements or any written reports regarding the
13    bus incident?
14 A.  No.
15 Q.  I'm going to refer you in your packet here.
16    The first 30-some pages are all part of Exhibit
17    1. We're going to look past that.
18 A.  Okay.
19 Q.  Exhibit 3, it would be the next one in your
20    packet, I believe. Yep, that one.
21 A.  Okay.
22 Q.  Do you recognize this document at all?
23 A.  I didn't write it.
24 Q.  Is it something that you've seen before today?
25    And I want to exclude any conversations you

Page 57

1     might have had with your attorney.
2 A.  No.
3 Q.  So then, would you have any information as to
4    the circumstances under which this statement
5    was made?
6 A.  No.
7 Q.  And certainly you were not present when this
8    statement was made?
9 A.  No.
10 Q.  We'll move to Exhibit 4. The same questions:
11    Do you recognize this statement?
12 A.  No.
13 Q.  Have you seen it at all before today?
14 A.  No.
15 Q.  And then you would not have been present when
16    it was given?
17 A.  No.
18 Q.  And then on Exhibit 5, same exact questions.
19    Do you recognize this document?
20 A.  No.
21 Q.  Have you seen it before today?
22 A.  No.
23 Q.  So then you would not have been present when it
24    was given?
25 A.  No.

Page 58

1 Q.   That's it for that then.
2         Are you aware of what the School
3       District did in response to this bus incident
4       relative to KM and/or the male student?
5 A.   Yes.
6 Q.   What was that?
7 A.   They were put on separate buses, and KM would
8       be -- no, the male student would be brought up
9       and he was taken to the cafeteria at the gifted
10      center, and KM would be taken to her bus so
11      that she would be on her bus and they would not
12      interact.
13 Q.  At any time after the bus incident, did you
14      have any conversations with KM as to how she
15      might have been reacted to the bus incident?
16 A.  I'm sorry, say that again?
17 Q.  Well, I'll rephrase it.
18        There's allegations that KM suffered
19      anxiety, distress as a result of the bus
20      incident.  At any time since the bus incident,
21      has she had any conversations with you that
22      suggested her reaction to the bus incident,
23      suggests that she was feeling distressed, that
24      she was feeling anxious --
25 A.  No.

Page 59

1 Q.   -- or anything along those lines?
2 A.   No.
3 Q.   At any time after the bus incident, was there
4       anything you observed from KM that suggested
5       that she was feeling distressed and anxious or
6       anything along those lines?
7 A.   No.
8 Q.   Did you see any visible changes in her behavior
9       or anything subsequent to the bus incident?
10 A.  No.
11 Q.  Are you aware of any incidents in which other
12      students at the school -- let's go on to a
13      different question here.
14        After the bus incident, are you aware
15      of any interactions between KM and the male
16      student?
17 A.  No.  We -- no.  They were kept apart.
18 Q.  There's been some testimony that in February of
19      27, KM and the male student were both present
20      for a Pittsburgh Penguins practice.
21 A.  I wasn't there.
22 Q.  Okay, you weren't there.  Did you hear anything
23      about --
24 A.  Yes.
25 Q.  -- what happened there?

Page 60

1 A.   I remember that, but I wasn't there.  They said
2       they were in the same building, but I wasn't --
3       I didn't go to the practice.
4 Q.   Now, when you said they said they were in the
5       same building, who is they?
6 A.   Just staff who had seen him with his other
7       school.
8 Q.   Did anybody relay to you that KM might have saw
9       the male student during that practice?
10 A.  I don't remember.
11 Q.  And then I probably know the answer to this
12      question, but do you know whether or not
13      anybody relayed to you how KM might have
14      reacted to seeing the male student there?
15 A.  I don't recall.  I don't recall if she saw him
16      or if she said anything about him at all.  I
17      don't know.
18 Q.  After the Pittsburgh Penguins practice, did KM
19      ever relay any information to you about what
20      had happened there?
21 A.  No.
22 Q.  Okay, I think that's all I have.
23        MR. JUG: Do you need a break?
24        MS. DOHERTY: Yes, I need a break.
25          - - - -

Page 61

1         (There was a recess taken at 10:45
2       a.m. and reconvened at 10:52 a.m.)
3          - - - -
4         EXAMINATION
5          - - - -
6 BY MR. JUG:
7 Q.   Good morning.
8 A.   Good morning.
9 Q.   My name is my name is Fred Jug.  I represent KM
10      and her mother MM in this case.  I'm going to
11      follow-up on some of the questions which Mr.
12      Peck, who represents the bus company, asked
13      you.
14 A.  Okay.
15 Q.  If at any time you need to take a break, you
16      need to take a drink of water, stretch your
17      legs or confer with your counsel, please just
18      let me know and we'll stop and do that, okay?
19 A.  Okay.
20 Q.  The only thing I'd ask, and you did a really
21      good job, it's really hard for our court
22      reporter to take down while both of us are
23      talking at the same time.  And so, we try to
24      avoid that, and I'll also try to do the same.
25 A.  Okay.

Page 86

1    the kind of nature and it was just an
2    altercation, and it would have been two boys or
3    two girls or whatever, and I would have said
4    you guys aren't permitted to be in the same
5    area, one person do this, somebody come out.
6    If I would have said any of that, the situation
7    would have been the same for it to be a brush.
8    You weren't supposed to be in that area
9    together, I would have handled it the exact
10   same way.
11 Q.   You would have handled it the same way, but you
12      agree the school policy would have been to do
13      more as we just described --
14 A.   If it had would have been more.
15 Q.   -- in a sexual --
16        MS. DOHERTY: Let him finish.
17        THE WITNESS: Okay.
18   BY MR. JUG:
19 Q.   If it was sexual in nature such as a male
20      middle school student grabbing the breast of a
21      female middle school student, correct?
22 A.   Yes.
23 Q.   Okay. And the school responded to the bus
24      incident in April by separating these two kids
25      on different buses. Was that your

Page 87

1    understanding?
2 A.   Yes.
3 Q.   And relative to the policy as you understood it
4      as an employee back in the spring semester of
5      2016, would the school have had a policy that
6      if there was sexual contact between a male
7      middle school student and a female middle
8      school student with special needs that they
9      should put them on separate transportation?
10 A.   Say that again?
11 Q.   Was it your understanding back in the spring
12      semester of 2016 that the school policy was if
13      there was contact of a sexual nature between a
14      male student with special needs and a female
15      middle school student, that they would be
16      placed on separate transportation?
17 A.   I didn't know that was a policy.
18 Q.   Okay. Was it your understanding that these two
19      students were separated after the bus incident
20      by being placed on separate buses after the
21      incident in April on the bus?
22 A.   Yes.
23 Q.   Okay. If you look at the police report, on the
24      second page, did Kayla tell you that she
25      reported to Principal Merlo what she observed

Page 88

1    on the bus that Friday afternoon?
2 A.   Did she tell me on Monday?
3 Q.   Did she tell you at any time that she told
4      Principal Merlo what she knew about this?
5 A.   I don't think those actual words were said to
6      me. I think that was just common knowledge
7      things for us, but it wasn't said after I hung
8      with you I'm calling Ms. Merlo.
9 Q.   Okay. I'm going to be looking right here, okay
10      (indicating on document)?
11 A.   Okay.
12 Q.   Did Kayla tell you ever that she called Ms.
13      Merlo that Friday?
14 A.   Not that I remember.
15 Q.   Okay. And the sentence that I referred you to
16      begins with Merlo stated that witness Kayla
17      Reynolds was driving home from school on
18      Friday, April 29th, and was at the intersection
19      of Liberty Avenue and Main Street when she saw
20      school van VA No. 24 from her school.
21        Is that consistent with what Kayla
22      had told you?
23 A.   Yes.
24 Q.   And did Kayla tell you she told Ms. Merlo what
25      she had seen at some point in time, whether it

Page 89

1    be Friday, whether it be the next Monday or at
2    any time?
3 A.   I still don't remember if she specifically said
4      the words I called Ms. Merlo or not.
5 Q.   Okay. And this next sentence says: Reynolds
6      noticed victim KM in the last row of the van
7      sitting on the male student's lap.
8        Is that consistent with what Kayla
9      had said to you what had been reported to the
10      police?
11 A.   What Kayla said to me was that she was in his
12      seat.
13 Q.   And based on your understanding, the decision
14      had been made that these two students would not
15      be seated next to each other after the incident
16      in gym in January, correct?
17 A.   Yes.
18 Q.   And was it your understanding the bus company
19      was informed of that, that these two students
20      shouldn't be sitting next to each other?
21 A.   Now, you say the bus company. Does that --
22 Q.   Let's say the bus driver.
23 A.   You mean the bus driver?
24 Q.   Yes.
25 A.   Yes.

Page 90

1  Q.  Thank you.  All right, and that was based on
2      what you had told Mr. Peck that you personally
3      knew that the driver who went on maternity
4      leave was aware that these two students needed
5      to be separate, correct?
6  A.  Yes.
7  Q.  And likewise, the driver who replaced the lady
8      who went on maternity leave, they were also
9      aware of that agreement to keep these two
10     students separated, correct?
11 A.  Yes.
12 Q.  Do you recall ever speaking with KM's mother
13     about this -- either of these incidents, the
14     gym incident or the incident on the bus?
15 A.  No.
16 Q.  Do you recall whether or not Ms. Meyer had ever
17     told you that she had been in communication
18     with KM's mother?
19 A.  Yes.
20 Q.  And what do you recall Ms. Meyer saying about
21     those communications?
22 A.  That after the gym incident, she spoke with
23     mom, informed mom what happened, they were both
24     special needs students, and informed mom I
25     guess what precautions would be made.  But I

Page 91

1      was not there when she had the conversation
2      with mom.
3  Q.  I think you had said that you don't recall KM
4      exhibiting any anxiety after the bus incident;
5      is that your testimony, ma'am?
6  A.  After the bus incident, the only time KM
7      said --
8  Q.  KM.
9  A.  KM, I'm sorry.  Said anything to me was, like I
10     said, I took her for breakfast that morning,
11     and we were sitting there.  Then when I did
12     talk to her and said we know that you weren't
13     in your seat, she started to cry.  I said I'm
14     going to let your mom know that you got out of
15     your seat, and she started to cry and said he
16     touched me, and that was the end of my
17     communication with her.
18 Q.  Okay.  So as of that following week when -- or
19     after the incident with the bus, whenever that
20     discussion occurred, KM did show signs of being
21     upset and that she cried when discussing the
22     incident, correct?
23 A.  KM cried when I told her I was going to tell
24     her mother.
25 Q.  KM was also upset, to your understanding, the

Page 92

1      following fall whenever these two students
2      ended up at the Penguins practice together?
3      Although you weren't there, that's what you had
4      heard; isn't that correct?
5          MS. DOHERTY:  Fred, I think that
6      mischaracterizes her testimony on the issue a
7      bit.  So I'll object on that basis.
8  A.  I wasn't there.  I don't know.
9  Q.  No one told you that KM was upset by seeing the
10     other student at the Pens practice the
11     following school year, ma'am?
12 A.  I don't recall someone telling me that she was
13     upset from seeing him.
14 Q.  Do you recall if weeks after the incident, such
15     as the week of May 23rd, 2016, that KM would be
16     upset to just hear the male student's name?  Do
17     you recall that?
18 A.  Yes.
19 Q.  Okay.  And what is your recollection concerning
20     that?
21 A.  She just -- she would say somebody said his
22     name.
23 Q.  Okay.  And so she --
24 A.  And we don't -- I don't want to speculate and
25     say that she's saying that because she was told

Page 93

1      to or not.  I don't know.  I just know that she
2      would just make it clear.  But I don't know if
3      mom said if someone says his name or anything,
4      let somebody know.  I don't know those things.
5  Q.  Did the principal or Ms. Meyer tell you that
6      you or the other employees should be careful
7      not to say the male student's name following
8      the incident on the bus?
9  A.  I was told not to bring him up.
10 Q.  Okay.  And --
11 A.  Not to discuss the situation at all.
12 Q.  Was your understanding that bringing up the
13     male student's name would upset KM?
14 A.  No.
15 Q.  If Ms. Meyer had sent KM's mother an email on
16     May 23rd that said we are making sure the male
17     is not coming into contact with KM at all, and
18     we will do everything possible to make sure
19     that nobody says his name in front of KM.
20          Would you have been told not to say
21     this young man's name in front of KM as of that
22     time?
23 A.  I don't know.
24 Q.  You don't recall?
25 A.  I don't recall.  And the reason why is because

Page 118

1    couldn't do it on Fridays or you couldn't do it
2    on -- like that.  But it was just names on the
3    calendar.
4 Q.  I'm sure you recognize why I asked that
5    question.  Since we know this occurred on a
6    Friday, that doesn't necessarily mean any
7    particular employee was assigned.
8 A.  Exactly.
9 Q.  Okay.  You recall that the regular driver went
10    on maternity leave at some point in time?
11 A.  Yes.
12 Q.  Do you recall, was the lady who went on
13    maternity leave working regularly just after
14    the gym incident in January 2016?
15 A.  Yes.
16 Q.  Do you recall that she was replaced by a male
17    driver?
18 A.  Yes.
19 Q.  Do you recall that the driver, on the afternoon
20    in which the assault occurred, was not a male
21    driver?
22 A.  A female driver.
23 Q.  Correct.  If the bus company took the position
24    in this case that there was not more than one
25    substitute driver, there was not a male

Page 119

1    substitute driver, would you disagree with that
2    based on your firsthand knowledge in which you
3    observed?
4 A.  In between the second -- yes, I would disagree.
5 Q.  To your knowledge, was there at least the male
6    driver and then the lady who was driving on the
7    date our client was assaulted?
8 A.  Yes.
9 Q.  Do you recall there being any other
10    substitutes, or you don't recall as we sit here
11    today?
12 A.  I don't recall there being any other
13    substitutes.
14 Q.  Based on your firsthand knowledge, not just on
15    the two dates that we talked about, but was it
16    your understanding that the bus company agreed
17    to carry out the plan to keep these two
18    students separated for some period of time?
19 A.  Yes.
20 Q.  And was that based on conversations you had
21    with the substitute driver or the regular
22    driver?
23 A.  It was based on conversations that I had had
24    with Ms. Meyer, not particularly with the bus
25    company.

Page 120

1 Q.  Okay.
2 A.  Yes.
3 Q.  Have you had any conversations after April 29,
4    2016 until today with anyone from the bus
5    company about these claims?
6 A.  No.
7 Q.  Do you know if anyone asked the driver who was
8    working on Friday, April 29th, 2016 how did
9    this happen?
10 A.  Do I recall if anyone --
11 Q.  Do you know if anyone asked that particular
12    driver or anyone else from the bus company how
13    this could have happened?
14 A.  Personally, I don't know if that question was
15    asked.
16 Q.  Are you aware of any information that someone
17    did ask it or if you heard of anything relative
18    to what that driver might have said as to how
19    this could have happened?
20 A.  No.
21 Q.  The driver who was working on April 29, 2016,
22    have you seen her drive for the school after
23    that day?
24 A.  I wouldn't recognize her.
25 Q.  Do you know her name?

Page 121

1 A.  No.
2 Q.  Based on what you had seen from the incident in
3    the gym up until the end of April 2016, did the
4    bus company keep these two kids apart up until
5    that Friday?
6 A.  To my knowledge.
7 Q.  And the van in question, do you recall it?  Are
8    you familiar with these vans?  And I'll tell
9    you why I'm asking.  If the driver was at her
10    seat, are you able to estimate for us, if this
11    incident occurred in the back row, how far that
12    is in feet?
13 A.  I'm going to estimate, probably about 20 feet.
14 Q.  Do you recall how many students would have been
15    on that route that Friday, on KM's bus?
16 A.  I'm not sure how many students were on her bus.
17    I want to -- around five, maybe more.
18 Q.  Do you recall if these drivers ever had
19    earphones in?
20 A.  I don't recall.
21 Q.  In your experience, would these students, if
22    you know, have been loud on the bus?
23 A.  Could they have been loud?
24 Q.  Yes.
25 A.  Oh, I don't know.

Page 138

1 A.   Yes.
2 Q.   Did anybody specifically tell you that seating
3     chart had been made?
4 A.   No.
5 Q.   Did anyone tell you specifically that that
6     seating chart had been produced to the bus
7     driver?
8 A.   I know I had the information, but I'm not sure
9     why. Like, I can't give you the detail on how
10     I -- the chain of events how I got it, but I
11     know I had it. It was that type of thing that
12     this is what we're doing type of thing. It
13     wasn't like a meeting. It wasn't a sit-down.
14     It was this what we're doing, this is how
15     they're sitting, and we just went on with our
16     day, just because we just really don't have
17     kind of timing to call a meeting. It's more
18     of, okay, this is what's going on, this is what
19     you need to do, and we just would carry it out.
20 Q.   Okay. You had testified for Mr. Jug that you
21     knew that the driver on April 29th was a
22     female. How do you know that information?
23 A.   At the end of one of the days, I had came past
24     KM's bus, and the driver had a woman in the
25     passenger seat. And it threw me because why is

Page 139

1     there another adult on the bus? And for
2     whatever reason, I asked is everything okay,
3     something I had asked. And he said: She's
4     taking over the route. And I just -- okay,
5     because we -- he had known everything. He had
6     been told about the buses. He had been
7     debriefed on everything that needed to be done
8     because the one who was on maternity leave had
9     went through all of that. She had done all
10     that with him.
11         So there wasn't a second thought of
12     having to go through all of this with anybody
13     because it was already done. I just -- only
14     reason why I remembered her is because she was
15     on the bus. And by all rights, you are out of
16     place. You shouldn't be there. And that's the
17     only reason why I knew that he wasn't on the
18     bus and she had taken over.
19         I don't know how long she was there.
20     I just knew that particular thing was off
21     because you shouldn't be here, who are you.
22 Q.   So you saw -- this is when you saw a female in
23     the passenger seat of the bus?
24 A.   It was a different day, and he just said that
25     she was taking over for him.

Page 140

1 Q.   So when you said he, you're talking about the
2     bus driver had taken over for the woman on
3     maternity leave?
4 A.   Yes.
5 Q.   Okay. Do you recall how long before the bus
6     incident that was?
7 A.   Days, because she had only been gone days. She
8     hadn't been gone long.
9 Q.   So I understand, then, you spoke to the male
10     bus driver, you know, what's this other woman
11     doing on the bus?
12 A.   I was just like, is everything okay? Did we
13     get a monitor? Just in talking, just regular,
14     just, what's going on. And oh, well, she's
15     taking over this route. Oh, okay. And that
16     was just that conversation. But it was just
17     something that just you weren't in place, so it
18     was just like who are you? You have another
19     person on the bus. And that's the only reason
20     why I knew that she was taking over the route.
21 Q.   And then after the bus incident, for the rest
22     of that school year, do you know who was
23     driving the bus?
24 A.   No, I don't because KM very seldom came.
25 Q.   On the Monday after the bus incident when

Page 141

1     you're speaking with KM, when you asked her
2     initially what happened, was she crying?
3 A.   No.
4 Q.   And she tells you this she was on -- she came
5     back to me or something along those lines?
6 A.   It was what happened on the bus, and it was,
7     oh, nothing, we were just sitting. I know you
8     weren't in your seat; so, what? And at that
9     point, she knew that I'm going to be in
10     trouble; I wasn't in my seat. And I said: I'm
11     going to tell your mom that you weren't.
12     Because these are things that we put in place
13     to keep you guys safe, and you got out of your
14     seat, so I'm going to tell your mom that you
15     got out of your seat. And that's when she
16     started crying and said he touched me.
17 Q.   Was it your impression that she started crying
18     because you told her you were going to tell her
19     mom?
20 A.   Yes.
21         MR. JUG: Object to the form.
22 BY MR. PECK:
23 Q.   There was some testimony that KM was upset to
24     hear the male's name after the bus incident.
25     Did you ever personally see that?

# EXHIBIT

# F

1

1          IN THE COURT OF COMMON PLEAS OF
                ALLEGHENY COUNTY, PA,

2

3  M.M., parent and natural       CIVIL DIVISION
   guardian of K.M., a minor,

4

          Plaintiffs,
5                                  No.  18-003257
       - v -

6

   PITTSBURGH PUBLIC SCHOOL        DEPOSITION OF:
7  DISTRICT and BRIMAR             VALERIE MERLO
   TRANSIT, INC.,

8

          Defendants.

9

10

                                   DEPOSITION DATE:
11                                 July 25, 2019
                                   Thursday, 10:10 a.m.

12

13                                 FILED ON BEHALF OF:
                                   Defendant Brimar Transit

14

15                                 COUNSEL OF RECORD FOR
16                                 THIS PARTY:
                                   Jason H. Peck, Esq.
17                                 DIBELLA, GEER,
                                   MCALLISTER & BEST
18                                 20 Stanwix Street
                                   11th Floor
19                                 Pittsburgh, PA  15222
                                   412-261-2900

20

21                                 REPORTED BY:
22                                 Sheila Stauffer, RPR
                                   Notary Public
23                                 Ref. No. SS53019A

24

25

**AKF Reporters**
**412-261-2323**

Page 38

1   information whether the male inappropriately
2   touched another student prior to May 2016?
3 A.   No.
4 Q.   How did that gym incident you just referenced,
5   how did you come to learn of that?
6 A.   I can't remember which female in the MD room,
7   I don't know whether it was Candice,
8   Michelle -- it was either Candice or Michelle
9   reported to me that allegation had been made.
10   At some point I had a conversation with
11   Candice. Candice contacted the mom to let her
12   know what happened, and then had told me she
13   was going to make sure they were kept separate
14   on the bus and separate in school. So Candice
15   thought it was a good idea to keep them
16   separate. Not allow them to hang out at
17   lunch, just the two of them, or sit side by
18   side in the lunch room.
19 Q.   So just to that get the timeline down, Candice
20   or Michelle --
21 A.   I don't remember which one.
22 Q.   Candice Miller or Michelle Stanton?
23 A.   Yes.
24 Q.   One of those two reported the incident to you?
25 A.   Yes.

Page 39

1 Q.   Then you mentioned that Ms. Miller contacted
2   K.M.'s mom. That would have been after your
3   initial notification.
4 A.   Correct, yes.
5 Q.   After Ms. Miller contacted the mom, is that
6   when you talked to Ms. Miller again?
7 A.   Yes. I guess she, Candice, had a conversation
8   with mom about how we would keep K.M., how
9   would we keep K.M. safe.
10 Q.   I want to go to that first conversation you
11   had with Ms. Miller or Ms. Stanton.
12 A.   Yes.
13 Q.   What exactly did that person report to you?
14 A.   All I recall, and I am just going to tell you
15   after three and a half plus years, it is very
16   difficult. But that there had been an
17   allegation that one of the students had
18   reported to one of paras that he saw the young
19   man brush against her breast area while they
20   were in -- her boobies, brush her boobies in
21   the equipment room.
22   And so at the time we had a conversation,
23   did anyone else see it? What are kids saying?
24   And I think K.M. said, yes, he did do that,
25   and the young man at the time denied it and

Page 40

1   said it was accident when he was putting
2   something away.
3   So at that point was it on purpose, was it
4   not, I don't know. But at that point we
5   thought it would be prudent to make sure that
6   they would not be in the equipment room --
7   over on the side to put the equipment away or
8   in any kind of way alone where it could have
9   on purpose.
10 Q.   When Ms. Miller or Ms. Stanton is reporting
11   this to your recollection, did she just say
12   that a student had told her that he witnessed
13   the male brush against K.M.'s breast?
14 A.   Yes, boobies. Boobies, yes.
15 Q.   Do you know if Ms. Miller or Ms. Stanton went
16   into any further detail other than just brush
17   against her breast?
18 A.   No.
19 Q.   Again, you had mentioned some conversations
20   with K.M. and the male. Were they
21   conversations that you specifically had with
22   them?
23 A.   I did not have a conversation with them, no.
24   Their teacher did. Or the para. I'm not sure
25   which one. I did not.

Page 41

1 Q.   So during that first conversation, would Ms.
2   Miller have related to you that she had spoken
3   with K.M.?
4 A.   I don't recall.
5 Q.   But at some point she did relay that to you?
6 A.   Yes. After the -- yes. When Candice -- the
7   seconds conversation I had was with Candice
8   and it was about here is what we are going to
9   do. K.M. is saying, yes, it happened. The
10   boy is saying it did, but it was an accidental
11   touch, and at that point, like I said, we
12   thought it was prudent to keep them separated,
13   to keep our eyes on them, to not allow there
14   to be any access of that kind.
15 Q.   So did Ms. Miller relate to you how K.M.
16   described the incident to her?
17 A.   Other than what I just told you, that's all I
18   know.
19 Q.   At any time did you speak directly with K.M.
20   or the male about this gym class incident?
21 A.   No.
22 Q.   Do you know when you first spoke with Ms.
23   Miller and Ms. Stanton, do you know whether or
24   not either one of them had contacted M.M. at
25   the time?

M.M. v.
Pittsburgh Public School District

MERLO
July 25, 2019

Page 42

1  A.  The mother?

2  Q.  Yes.

3  A.  When they initially told me, no.  I mean,
4      initially what generally happens here is
5      something happens and someone runs in to me
6      right away, and says here is what happened,
7      here is what I am doing, I just want you to
8      know.  That happens about 400 times a day.
9      Okay, let me know, and keep me in the loop,
10     and that's generally what they do.

11 Q.  What then did Ms. Miller or Ms. Stanton say
12     they were going to do next?

13 A.  I don't recall.

14 Q.  Then at some point Ms. Miller contacts the
15     mother and you have a second conversation with
16     Ms. Miller?

17 A.  Yes.

18 Q.  And at that point I think you testified that
19     you start making decisions of how to handle
20     the situation?

21 A.  Correct.  Candice basically told me what she
22     wanted to do and what she thought was a good
23     idea to keep that from happening on purpose.

24 Q.  What did she say she wanted to do?

25 A.  That we were going to make sure the paras all

Page 43

1      knew so that when they went out to their
2      related arts they would not be sitting
3      together.  At lunch he would not be seated
4      near her and that on the bus we would keep
5      them separate.

6  Q.  Was this a course of action that you agreed
7      to?

8  A.  Yes.

9  Q.  Do you recall any conversation with any of the
10     paras or the teacher or with mom in which it
11     was requested that the male student be placed
12     on a different bus route?

13 A.  No.

14 Q.  Do you have any knowledge as to whether or not
15     that request was ever made by K.M.'s mother?

16 A.  No.

17 Q.  Then during that conversation, that second
18     conversation with Ms. Miller, was that ever
19     placed out there as an option?

20 A.  I have a question.

21         MS. DOHERTY: Do you want to take a
22     break?

23         THE WITNESS: Yes.  But I know you
24     started another question, I am sorry.

25         MR. PECK: You can speak with Ms.

Page 44

1      Doherty.  Feel free.

2      (There was a recess in the proceedings.)

3  BY MR. PECK:

4  Q.  Are you aware of any request made by K.M.'s
5      mother to place the male on another bus route?

6  A.  No.

7  Q.  Was the option of placing the male on another
8      bus route ever raised as an option during
9      either one of your conversations with Ms.
10     Miller?

11 A.  No, it wasn't.

12 Q.  So during that second conversation I
13     understand that you and Ms. Miller made -- Ms.
14     Miller presented that the children should be
15     separated during school and then separated on
16     the bus, and you agreed to that, correct?

17 A.  Yes.

18 Q.  With respect to the separation on the bus,
19     were there any specifics on how these kids
20     were to be separated?

21 A.  I know what the specifics were.  I mean, at
22     the time we didn't decide that, but at the end
23     of the day when Candice went outside and spoke
24     to the bus driver, then it was decided.

25 Q.  So during that second conversation with Ms.

Page 45

1      Miller, you made the decision that generally
2      the kids would be separated on the bus?

3  A.  Yes.

4  Q.  But you did not address any specifics as to
5      how that was to happen?

6  A.  I did not.

7  Q.  After that second conversation with Ms.
8      Miller, do you know whether Ms. Miller ever
9      contacted K.M.'s mother again with respect to
10     the gym incident and this plan to separate the
11     children on the bus?

12 A.  I don't recall.

13 Q.  At dismissal when the kids are being brought
14     to the bus, do have any roles in that?

15 A.  No.  So during dismissal I am down here.  Kids
16     turn in their phones into their bus boxes, and
17     my job at the end of the day is to talk to the
18     bus -- the guy who directs the parking of the
19     buses.  He calls me and let's me know which
20     buses are here.  I yell into my counselor to
21     call the bus, and then I give them their
22     phones.  That's my role in dismissal.

23 Q.  During the 2015-2016 school year, at no time
24     you are going to be outside with the buses
25     during dismissal?

Page 46

1  A.   Very rarely.  On the occasion that a bus
2       driver might call and say can you come talk to
3       me I go up, but other than that, no.
4  Q.   Do you know whether or not on the day of the
5       gym incident and we will do the next three
6       school days, do you know of any of those days
7       you were actually outside during dismissal?
8  A.   No, I was not.  Can I rephrase that, too?
9  Q.   Yes.
10 A.   So I am going to say no, I was not, but even
11      if I was, it was not in direct relation to
12      this.  If I was outside it was in relation to
13      something else.  I had no direct with this.
14      I'm not going to tell you I remember the exact
15      day in 2015 or 2016 that this happened, and I
16      was outside.  I may have been.  Someone might
17      have called me a bus, but I was not called to
18      this particular van for any reason.
19 Q.   You anticipated my follow-up question.  Do you
20      recall any conversations with the bus driver
21      of K.M.'s bus and the male's bus with respect
22      to this plan to keep the children separated
23      while on the bus?
24 A.   No.
25           MS. DOHERTY: One point of

Page 47

1       clarification.  We are talking about before
2       April 29?
3  Q.   Yes.
4  A.   After the gym incident, no, I was not the one
5       that had the conversation with the bus driver.
6  Q.   So that I understand, prior to April 29, 2016,
7       you never told the bus driver that K.M. and
8       the male student were to be separated while on
9       the bus, correct?
10 A.   I did not.
11 Q.   At any time prior to -- after the gym incident
12      and prior to April 29, 2016, did you have any
13      conversations or communications with anyone at
14      Brimar Transit related to the gym class
15      incident and/or the subsequent plan to keep
16      the two children separated while on the bus?
17 A.   I did not.
18 Q.   During that same period, do you recall if you
19      had any contact of any nature with Brimar
20      Transit or anyone associated there with?
21 A.   I don't recall.
22 Q.   We were talking about talking with the bus
23      driver about keeping the kids separated, and
24      you clarified it was not you who had that
25      conversation.  Who would have had that

Page 48

1       conversation?
2  A.   Candice Miller.
3  Q.   Do you know when it occurred?
4  A.   The same day that the incident occurred.
5  Q.   And that would -- would that have been at
6       dismissal?
7  A.   Yes.
8  Q.   Do you know what time that would have been?
9  A.   Those kiddos and their teachers head out
10      between 3:30 and 3:40.  They go up a little
11      bit ahead of the general ed kids because they
12      come out en masse.
13 Q.   And so to your understanding that conversation
14      then that Candice Miller and the bus driver
15      had would have occurred sometime around
16      dismissal, and would that have been after both
17      conversations you had with Ms. Miller?
18 A.   Yes.
19 Q.   And that would have been after at least the
20      very first time that Ms. Miller contacted mom?
21 A.   Yes.
22 Q.   Prior to that conversation between Ms. Miller
23      and the bus driver, are you aware of any other
24      communications that Ms. Miller may have had
25      with anybody associated with Brimar Transit?

Page 49

1  A.   She wouldn't have none.
2  Q.   Why is that?
3  A.   Well, she is not in charge of the buses, and
4       when you call the company, you can't get ahold
5       of the drivers because they are not there all
6       day.  So they pick up their bus and they come
7       here.  So on the occasion that I have had to
8       call any bus company, you can't talk to the
9       driver.
10 Q.   On the occasions you've had to talk to Brimar
11      Transit, do you know if they have a dedicated
12      person you can talk to?
13 A.   I only have one recollection of talking to
14      Brimar, and that was after the April incident,
15      and I spoke to a manager.  First they put a
16      dispatch on and then I requested the manager.
17 Q.   Do you know who that manager was?
18 A.   I don't know his name.
19 Q.   Do you know what that conversation was between
20      Ms. Miller and the bus driver?
21 A.   I can tell you that Candice said she told the
22      bus driver there had an allegation in gym
23      class and she wanted the students seated
24      separately, and that she wanted K.M. to sit in
25      the front passenger seat and the young man to

Page 50

1      sit in the rear of the van. There is the
2      front seat and then two rows behind the
3      driver. It was a small passenger van.
4 Q.  I am sorry, where did Candice say she wanted
5      K.M. to sit?
6 A.  In the front passenger seat. So she would be
7      beside the driver, so that the driver could
8      see anything going on with her and make sure
9      she was safe, and the young man would be
10     seated in the last row.
11 Q.  Did that information you just gave me -- this
12     is all based on a conversation you had with
13     Ms. Miller?
14 A.  Yes.
15 Q.  When did that conversation occur?
16 A.  The very next day, the next morning. When she
17     came in, she informed me about what she had
18     done.
19 Q.  Did Ms. Miller say whether or not she gave any
20     specifics or details regarding the allegation?
21 A.  No, I don't recall. I don't -- not no. I
22     don't recall.
23 Q.  Did Ms. Miller tell you how the bus driver
24     responded?
25 A.  No, she didn't.

Page 51

1 Q.  That student that witnessed the gym class
2     incident and saw the male brush against K.M.'s
3     boobies, did you ever speak with him about the
4     gym class incident?
5 A.  No.
6 Q.  Prior to April 29, 2016, did you ever report
7     this gym class incident to anybody else?
8 A.  No.
9 Q.  Do you know anybody else at the school
10     district who might have contacted Brimar
11     Transit about this decision to keep the
12     students separated as a result of this gym
13     class incident? And this was before April
14     2016.
15 A.  No.
16 Q.  Do you understand that certain incidents,
17     particularly child abuse, have to be reported
18     to the state?
19 A.  Yes.
20 Q.  And is there any particular reason why the gym
21     incident was not reported?
22 A.  Because it was an allegation that was denied
23     and it was not of a significant -- I didn't
24     deem it to be reportable.
25 Q.  What about it was not reportable in your eyes?

Page 52

1 A.  Well, if someone accidentally brushes against
2     you, have they sexual assaulted you? I don't
3     think that falls under the category.
4 Q.  So is it accurate then to say, at least based
5     upon the information that was presented to
6     you, that you felt this incident was
7     accidental, the gym class incident?
8 A.  Yes. Based on the information that I had, I
9     didn't think there was anything reportable,
10     the information that was reported to me.
11 Q.  Was there any discussion with respect to the
12     option of placing a monitor on the school bus
13     as a result of the gym class incident?
14 A.  No.
15 Q.  Is there a particular reason for that?
16 A.  It is a van with four kids and two rows, and
17     if one is seated in the front and one is in
18     the third row, I can't imagine the need for
19     the presence of another adult. Especially the
20     child -- I mean, no one on that bus ever
21     displayed any kind of bus behavior that would
22     require -- generally to get a bus monitor, you
23     have to display some type of disruptive bus
24     behavior. No one on that bus ever displayed
25     those types of behaviors. Placing a monitor

Page 53

1      on a bus is a restriction of somebody,
2      depending on whom I am assigning that monitor
3      to. That's a least restrictive is what I have
4      to go by. To put a monitor on a bus is
5      restricting somebody's IEP.
6 Q.  Do you know if the school district has any
7     formal policies with respect to assigning
8     seats to a -- assigning students to particular
9     seats on the bus?
10 A.  The bus drivers are allowed to assign seats.
11     Most times when -- I many times assign seats.
12     I make seating charts for my larger buses to
13     kind of avoid issues. I give those seating
14     charts to the drivers, but I have had drivers
15     who told me I am sitting so and so in the
16     front, or I am sitting so and so here, and
17     this is why.
18      Part of the policy is that bus drivers can
19     and should assign seats for safety during
20     their route.
21 Q.  Do you know is there a written policy?
22 A.  There is a written policy about bus drivers
23     and seating. I can't quote it, but there
24     is. But like I said, the majority of the time
25     I -- not on smaller vans where there are only

Page 66

1  A.  Yes.
2  Q.  If you would look at Exhibit 4, please. Do
3       you recognize this statement?
4  A.  Yes.
5  Q.  I don't want any names. Do you know the
6       student that gave this statement?
7  A.  Yes, uh-huh.
8  Q.  Were you present when he gave that statement?
9  A.  No.
10 Q.  Again, was this provided to you afterwards?
11 A.  Yes.
12 Q.  Would that have been on the day of the
13      incident?
14 A.  Yes.
15 Q.  Then Exhibit 5, do you recognize this
16      statement?
17 A.  Yes.
18 Q.  Do you recognize this as being a statement
19      given by the male?
20 A.  Yes.
21 Q.  Were you present when he was giving the
22      statement?
23 A.  No.
24 Q.  This, again, would have been given to you at
25      the time this statement was given?

Page 67

1  A.  Yes.
2        MS. DOHERTY: Please let him finish
3       the question so that we can get the record
4       straight.
5  Q.  In Exhibit 6, we have a statement May 6 and we
6       see it is given at the request of Joyce
7       Dzadovsky -- do you know how to say that?
8  A.  No.
9  Q.  And Ms. Ringold and Joel Shaul. It appears to
10      be a statement from the male. Were you
11      present when the statement was given by the
12      male?
13 A.  No.
14 Q.  Was this provided to you afterwards?
15 A.  Yes.
16 Q.  And then Exhibit 7, same sort of questions.
17      Again, do you recognize the statement?
18 A.  Yes.
19 Q.  Again, no names, but do you recognize who it
20      is from?
21 A.  Yes.
22 Q.  Again, would you have been present when this
23      statement was given?
24 A.  No.
25 Q.  Look at Exhibit 9. What is this document?

Page 68

1  A.  This is the Childline report.
2  Q.  Would this have been a document that you
3       completed?
4  A.  Yes.
5  Q.  If we look at the third page of the exhibit,
6       and it starts at the bottom, Bates 161 and it
7       runs over to 162.
8  A.  Okay.
9  Q.  Is that your own narrative? You wrote that
10      narrative?
11 A.  Yes. After listening to the teacher and
12      looking at the student statements, that's what
13      I compiled and turned in.
14 Q.  This is a conglomeration of your conversations
15      with Ms. Miller and Ms. Stanton?
16 A.  Yes.
17 Q.  The written statements that we just discussed?
18 A.  Except that I didn't have Joel's statement at
19      this time. His came later.
20 Q.  Those three written statements that we
21      discussed then?
22 A.  Yes.
23 Q.  Any other information you would have used to
24      compile this narrative?
25 A.  No.

Page 69

1  Q.  So in that third line, at the very last line
2       of the narrative, "when we asked the kids,"
3       okay?
4  A.  Okay.
5  Q.  Who does that "we" include?
6  A.  Well, it would include me and the teachers and
7       paras. I was condensing it. I have their
8       statements. The teachers spoke to them.
9  Q.  So you are not saying there you directly asked
10      the kids?
11 A.  No. I don't know that I did. I don't recall.
12 Q.  After the incident on the school bus, how did
13      the school district respond? What plans were
14      put in with respect to the male and K.M.?
15 A.  So when this incident happened, because it was
16      a large incident, and I wanted to make sure I
17      was handling it appropriately, I put a call in
18      to my assistant superintendent, David May-
19      Stein, and then he also suggested looping in a
20      man named Tom Spickler who deals with students
21      with IEPs and discipline.
22        So after looking at both of the students
23      needs and both of the students safety, it was
24      determined that they would no longer travel
25      together for related arts. That the male

Page 70

1　　 student would be moved to another -- they
2　　 would secure different transportation for him,
3　　 and their lunch times would also -- the male
4　　 student was moved to a different lunch period
5　　 so that he and K.M. would have no interaction
6　　 at all on their way to school, during their
7　　 school day or after school.
8　Q.　 So the male students was put on a different
9　　 bus route?
10　A.　 He was.
11　Q.　 Based upon any of your observations of K.M. at
12　　 any time after the bus incident up to and
13　　 through the rest of her tenure at Pittsburgh
14　　 Classical, did you see her exhibit any signs
15　　 of anxiety or distress?
16　A.　 No.
17　Q.　 Did you learn from any source of any anxiety
18　　 of any sort she may have exhibited during that
19　　 time period?
20　A.　 No.
21　Q.　 There was some testimony that K.M. observed
22　　 the male during a Pittsburgh Penguins practice
23　　 in 2017.
24　A.　 Yes.
25　Q.　 Were you present for that practice?

Page 71

1　A.　 No.
2　Q.　 Did you come to learn of that information
3　　 about that practice and K.M. seeing the male?
4　A.　 Yes.
5　Q.　 From whom did you learn that information?
6　A.　 Candice Miller.
7　Q.　 What did Candice tell you?
8　A.　 That while they were at the practice, that the
9　　 students several sections away had observed
10　　 the young man, and that the students were
11　　 yelling and waving.
12　Q.　 Did Candice tell you how K.M. reacted to that?
13　A.　 She didn't really say much. I know that
14　　 Candice let mom know that we had seen him and
15　　 K.M. had seen him.
16　Q.　 But Candice didn't tell you how K.M. had
17　　 reacted to that situation?
18　A.　 I don't think there was a big reaction.
19　Q.　 Other than these measures to make sure that
20　　 the male and K.M. were kept separated from
21　　 each other after the bus incident, were any
22　　 alterations made to K.M.'s curriculum as a
23　　 result of the bus incident?
24　A.　 No. The only thing that we did was offer
25　　 counseling through the Watson Institute and

Page 72

1　　 that's where Joel Shaul came in.
2　Q.　 Do you know if K.M. engaged in that
3　　 counseling also?
4　A.　 For the remainder of that year, yes. He also
5　　 does social skills groups for our kids during
6　　 the year. So the kids were familiar with him.
7　Q.　 Do you know if K.M. continued with the
8　　 counseling after that school year?
9　A.　 I don't know. Not here at school. I don't
10　　 know whether mom pursued anything.
11　Q.　 Any other changes to K.M.'s curriculum
12　　 resulting from the bus incident other than
13　　 what we discussed?
14　A.　 Not that I recall.
15　Q.　 Based upon your observations, do you know
16　　 after the bus incident were there any notable
17　　 changes in K.M.'s performance at school?
18　A.　 No.
19　Q.　 After bus incident, did K.M. ever express any
20　　 anxiety or distress as to being in the male's
21　　 presence?
22　A.　 She was never in the male's presence after
23　　 that. Other than that Penguin game where she
24　　 saw him a few sections away.
25　Q.　 Do you know if K.M. missed any school after

Page 73

1　　 the bus incident?
2　A.　 She missed a lot of school and the following
3　　 year mom kept her out for a few weeks over a
4　　 bus stop issue.
5　Q.　 That bus stop issue, that was after the bus
6　　 incident?
7　A.　 It was. Mom didn't like where the bus stop
8　　 was and was arguing with the district to
9　　 change it. Which is not my area, but
10　　 eventually the district changed it. But mom
11　　 kept her out of school for like the first
12　　 three or four weeks. She missed 20 days or 18
13　　 days. The first month of school she missed
14　　 almost the entire month.
15　Q.　 As to specifically after the bus incident
16　　 during 2015-2016 year, do you recall whether
17　　 or not K.M. missed any school?
18　A.　 I don't recall. Like I said, her attendance
19　　 that year was poor prior to the incident, and
20　　 so if it was still poor after the incident, it
21　　 wouldn't have been a change. Mom did write
22　　 notes that year for different health issues.
23　　　　 MR. PECK: That's all I have for the
24　　 moment.
25　　　　 MR. JUG: Ma'am, do you need a

Page 74

1   break?
2          THE WITNESS: Yes.  I would like to
3   go the restroom.
4   (There was a recess in the proceedings.)
5          -----
6          EXAMINATION
7          -----
8   BY MR. JUG:
9   Q.   Good afternoon, Ms. Merlo.  My name is Fred
10      Jug, and I am the attorney for M.M. and K.M.
11      I would like to follow-up with some questions
12      on many of the same topics that counsel for
13      Brimar just asked you about.
14         As an initial matter, one of the things we
15      discussed at length, Candice Meyer or Miller,
16      was an agreement being reached after the
17      incident in the gym class in late January 2016
18      to have these two students, K.M. and the male
19      student, kept separate on the bus.
20  A.   Yes.
21  Q.   When is it that you first learned of that
22      agreement, ma'am?
23  A.   On the same day of the incident.
24  Q.   On the same day of the gym class incident?
25  A.   Yes.

Page 75

1   Q.   That would have been some time in late
2       January?  The emails that we have are dated
3       January 28, I believe.  So sometime around
4       that time period?
5   A.   Yes.
6   Q.   Were you in consultation with anyone other
7       than Candice relative to that agreement?
8   A.   No.
9   Q.   Was that agreement done at your directive or
10      was that something that Candice or the
11      paraprofessionals decided upon and then
12      reported it back to you?
13  A.   They reported it back to me.  Their classrooms
14      are so small, and generally when there is an
15      issue, since they are so self-contained, they
16      generally address the issue and let me know,
17      and we agree.
18  Q.   Another issue to follow up on was relative to
19      testimony that Ms. Ringold, who was a teacher
20      here at Pittsburgh Classical Academy, that no
21      longer is at the current time, she was deposed
22      a few days ago, and if her testimony on Monday
23      was that another male student blurted out when
24      he walked into her classroom that Monday
25      morning, would your understanding of that male

Page 76

1   student be the same male who provided the
2   statement to Mr. Shaul which is Bates stamped
3   document No. 165?
4          MR. PECK: Exhibit 7.
5   Q.   Yes.
6   A.   Can repeat your question?
7   Q.   When I refer to a Bates stamp number I am
8       referring to the last three digits in the
9       lower right.
10  A.   Yes.
11  Q.   So we are looking at the same page.  If Ms.
12      Ringold testified when she was deposed a
13      couple of days ago that another male student
14      who was seated on the bus in front of K.M. and
15      the male student, came in and blurted out
16      something about this incident Monday morning,
17      would your understanding be that the male
18      student that Ms. Ringold testified about was
19      the same student who provided this statement
20      that is set forth on Bates stamp document 165,
21      the report of Mr. Shaul?
22  A.   I'm not sure.  I can't testify to that.  I
23      don't have that knowledge of someone blurting
24      it out.
25  Q.   Do you have an understanding as to whether the

Page 77

1   male student who provided the statement that
2   Mr. Shaul prepared on Bates stamp document 165
3   is the same male student who provided in his
4   own hand this statement which is Exhibit 4,
5   also marked as Bates stamp document 00004?
6   Simply I am asking, is the male student that
7   you had testified for Mr. Peck who wrote
8   this statement, Exhibit 4, in his own hand,
9   the same student that is referenced in Mr.
10  Shaul's report which is Bates stamp document
11  165?
12  A.   Yes.
13  Q.   Did Candice Meyer indicate to you that the
14      male student -- we have used his initials --
15      as you sit here today, do you recall what this
16      male student who authored that, what his
17      initials are?
18  A.   Yes.
19  Q.   What are they?
20  A.   M.W.
21  Q.   Did Candice report to you that M.W. first made
22      her aware of the incident on the bus?
23  A.   No.
24  Q.   Did Ms. Ringold report to you that M.W. had
25      made her aware of the incident on the bus?

Page 90

1 then pregnant bus driver to let her know the
2 kids had had an incident and where the
3 students should be seated on the bus.
4 Q.  When Candice told you that, did she say what
5 the bus driver had said in response to this?
6 A.  She didn't, but I know the bus driver followed
7 that directive.
8 Q.  You had also testified or described a
9 handbook.  Who is it that receives the
10 handbook?
11 A.  You mean a student handbook?
12 Q.  No.  You made reference to a handbook during
13 your testimony for Mr. Peck.  Does the school
14 have a handbook that is distributed to the
15 teachers?
16 A.  I don't recall that handbook testimony.  I do
17 make a teacher handbook every year.  I make a
18 student handbook.  I make a teacher handbook.
19 Q.  Relative to the teacher handbook, is that
20 something that you create or author or do you
21 hand that book out to the teachers and it's
22 something that is provided by the school
23 district to you to do so?
24 A.  So I have -- I don't get one from district,
25 no.  I create my own teacher folder every year

Page 91

1 with different directives and things about our
2 school.
3 Q.  Would that teacher handbook for 2015-2016 --
4 would that have been your practice at that
5 time period then to distribute a handbook to
6 the teachers at the beginning of the school
7 year?
8 A.  Yes.
9 Q.  And would the handbook that you distributed in
10 2015-2016 be the same handbook that was
11 distributed during the 2018-2019 school year?
12 A.  No.
13 Q.  Would you still have a copy of the handbook
14 that was distributed for the 2015-2016 school
15 year?
16 A.  I possibly might have the document -- it's not
17 a handbook.  It's a folder of different
18 documents, and I would possibly have copies on
19 my computer.
20      MS. DOHERTY: We will look and
21 produce whatever there is.
22 Q.  Does the folder that you would provide to the
23 teachers, would it include information
24 relative to getting the students onto the
25 buses or vans?

Page 92

1 A.  No.
2 Q.  Relative to the students being separated, do
3 you agree with me, Ms. Merlo, that would have
4 been an option for the students if there was a
5 need to place these two students on different
6 vehicles, that was an option that was
7 available as of January of 2016?
8 A.  So that is an option that's outside of my
9 hands.  That's when a student has significant
10 difficulties and the IEP team says it is.
11 Q.  I understand from your testimony that the
12 incident with the gym class, your
13 understanding of that was that the male
14 student brushed up against K.M.'s breast
15 during the gym class or while the two of them
16 were in or near the equipment room, correct?
17 A.  Yes.
18 Q.  I think your testimony was that that was not
19 really a serious incident; is that correct?
20 A.  Yes.
21 Q.  And would I be correct in understanding you
22 didn't believe it was a serious incident
23 because it's reasonable to believe that two
24 students can brush up against each other
25 during gym class or matters related to gym

Page 93

1 class, dodge ball or basketball or anything
2 like that?
3 A.  Yes.
4 Q.  You would agree with me though, Ms. Merlo,
5 would you not, that if it was reported as not
6 being just brushed up against such as during a
7 game or participating in a sport, but rather
8 specifically reported that a male student
9 grabbed a female student's breast, that would
10 be a serious incident, correct?
11 A.  Yes.
12 Q.  If you direct your attention then please to
13 the exhibit which is an email exchange with
14 M.M., and this particular exhibit, the Bates
15 stamp document -- you have it in front of you,
16 don't you?
17 A.  Which number is it?
18 Q.  The one in front of you, 177, 178.
19      MS. DOHERTY: It is Exhibit 2.
20 Q.  You would agree with me that this email is
21 dated January 28, 2016, correct?
22 A.  Yes.
23 Q.  And this email is to Candice Meyer, correct?
24 A.  Yes.
25 Q.  Have you seen this document before today?

Page 94

1 A.   Well, yes.
2 Q.   Did Ms. Meyer inform you that this document or
3      this email was received by mom, M.M., sometime
4      in January of 2016?
5 A.   No.
6 Q.   Did Ms. Meyer inform you she had this email
7      exchange with M.M. sometime after the incident
8      on the bus in April 2016?
9 A.   She did not tell me specifics, no.
10 Q.  When is it that you first became aware of this
11     email and the content of it?
12 A.  When I saw it in a binder and I reviewed it
13     with my attorney.
14 Q.  I don't want to ask you anything about that.
15 A.  Prior to that, I have no knowledge of this.
16 Q.  That would have been sometime in 2019?
17 A.  Correct.
18 Q.  You agree with me this email specifically
19     provides and refers to an incident yesterday
20     about the seventh grader in gym class grabbing
21     her breast in the second line of the email,
22     correct?
23 A.  Yes.
24 Q.  Your sworn testimony is you were not told that
25     it had been reported the male student had

Page 95

1      grabbed K.M.'s breast until years later?
2 A.   Yes.
3 Q.   You would agree that grabbing the breast would
4      be a serious incident, and that would require
5      a different follow-up than a report of two
6      kids brushing up against each other during a
7      gym class, correct?
8 A.   Yes.
9 Q.   What would that protocol have been, Ms. Merlo,
10     if there was a report that a middle school
11     male student had grabbed the breast of a
12     female middle school student?  What would the
13     protocol have been as of January 2016 here in
14     the Pittsburgh Public School District?
15 A.  So that would -- it would fall under the
16     category of a sexual harassment packet which
17     is when we would conduct an investigation, I
18     would interview the students, have them write
19     a statement, interview any witnesses, fill out
20     the packet for the district, and then the
21     student services department.  I probably would
22     notify school police as well who, if they
23     believed it, would advise me whether or not to
24     turn it into Childline.  There is a packet
25     that gets completed and turned into the board.

Page 96

1 Q.   That would have been the procedure that exists
2      not only today but as of January 2016,
3      correct?
4 A.   Yes, yes.
5 Q.   Were the teachers informed of that procedure?
6 A.   The procedure is to turn it into me, any
7      incident that's of a --
8 Q.   Would the teachers have been aware as of
9      January 2016 that if a report such as a male
10     middle school student grabbed the breast of a
11     female middle school student, they were to
12     turn that into you?
13 A.  Yes.
14 Q.  Would that be something that was included in
15     the folder or handbook that you referenced or
16     something that you told the teachers or would
17     they have learned that from some other source,
18     and if so, what is that?
19 A.  It would be in the handbook under -- I mean,
20     there are different categories of discipline.
21     In the discipline section, it wouldn't list
22     grabbing a boob specifically, but it lists
23     which levels are referable.  Teachers deal
24     with some levels of incidents.  There are
25     different levels.

Page 97

1 Q.   And clearly as of January 2016, inappropriate
2      touching or grabbing the breast of a female
3      student by another would have been something
4      that the teachers knew they should have
5      reported to you, correct?
6 A.   Yes.
7 Q.   And in this case, you agree that Ms. Meyer --
8      or your recollection or testimony is Ms. Meyer
9      never informed you of a seventh grader in gym
10     class grabbing K.M.'s breast even though this
11     email from mom on January 28, 2016
12     specifically states just that, correct?
13 A.  Yes.
14 Q.  And then following up, I think you provided
15     some information for Mr. Peck relative -- you
16     provided some testimony for Mr. Peck, and I
17     believe your testimony was you don't recall
18     there ever being a discussion after the gym
19     class incident of assigning the male student
20     to another van?
21 A.  Correct.
22 Q.  And you would agree with me that this exhibit,
23     Bates stamp document 178 -- and I will show
24     you specifically where I am referencing --
25     right here on the page, Ms. Merlo --

Page 98

1  A.  Uh-huh.
2  Q.  M.M. specifically stated to Ms. Meyer, "I
3      don't like the fact that this student is
4      riding on the same van as K.M.," correct?
5  A.  Yes.
6  Q.  Did Ms. Meyer ever report that to you that
7      M.M. had stated she did not like the male
8      student being assigned to the same van as of
9      January 28, 2016?
10 A.  She may have.
11 Q.  You would agree this email further states, "I
12     am not comfortable being that there might not
13     have been any action taken or parents weren't
14     contacted."  Did I read that correctly?
15 A.  Yes.
16 Q.  Did Ms. Meyer report that to you at that time?
17 A.  She may have.
18 Q.  Do you have any specific recollection about
19     those conversations?
20 A.  No, but I have 10,000 -- she might have.
21     Because in my mind, the nature of the incident
22     was of an accidental nature, she might have
23     said mom wanted all this, and I may have said,
24     yeah, but I can't incarcerate a kid -- do you
25     know what I am saying?  In my mind it was this

Page 99

1      accidental incident.  And if mom is asking
2      well, she wants him off of bus, yeah, okay.
3          Just I am trying to understand.  Like I
4      said, she probably did say that, mom wants him
5      on another bus, and I might have said, oh,
6      yeah, well.  I mean, in the course of a day
7      kids are touching, and I go through 100
8      different touch things every day.  I can't put
9      every kid on a separate bus because he or she
10     may have touched somebody incidentally.
11 Q.  How many kids would you have in '15-'16?
12 A.  Probably about 330.
13 Q.  They come from all over?
14 A.  They do.
15 Q.  Do you know how long these two kids were on
16     the bus, how their commutes home were?
17 A.  Those kiddos are from further out in the east
18     end.  So I am going to guess it is at least a
19     half hour ride.
20 Q.  Do you agree with me that just after the
21     sentence on Bates document 178 where M.M. says
22     she does not like the fact the student is
23     riding the same van as K.M., M.M. had stated
24     to Ms. Meyer "could you please tell me if this
25     student can be assigned to another van."  Did

Page 100

1      I read that correctly?
2  A.  Yes.
3  Q.  When is it that you first learned that M.M.
4      had asked Candice in this email could the male
5      student be assigned to another van?
6  A.  I don't recall.
7  Q.  Do you recall if Candice would have asked you
8      back in January if this kid could have been
9      assigned, the male student, could have been
10     assigned to another van?
11 A.  I don't know.
12 Q.  Do you have or still have the series of emails
13     between you and Candice regarding anything
14     related to K.M.'s claims?
15 A.  I don't recall them, but I am sure there are
16     some.
17 Q.  Do you recall if Candice consulted with you as
18     to how she should respond to M.M.?
19 A.  I am sure she did.
20 Q.  Do you recall there being an email between you
21     and Candice in which she would have asked you
22     how do I response to this mother?
23 A.  I don't recall, but I am sure she would have
24     asked before responding to something like
25     this.

Page 101

1  Q.  Do you think that based on that testimony that
2      M.M.'s email is dated and time stamped January
3      28, 2016 at 11:06 a.m., and Candice Meyer's
4      follow-up is January 29 the next day at 9:44
5      a.m., that during that time period between
6      receipt of M.M.'s email and responding, it is
7      more likely than not that Candice would have
8      followed up with you and asked you how do I
9      respond to this email from M.M.?
10 A.  Probably.
11 Q.  I think earlier during my questioning, you
12     said you made the decision -- you were
13     reasonably upset with Brimar that this company
14     wouldn't be transporting your kids anymore,
15     the kids of this school anymore?
16 A.  Right.
17 Q.  So was that a decision then school-wide Brimar
18     would no longer service --
19 A.  It was flipping out because I really have no
20     control over it.
21          MS. DOHERTY:  Let him finish before
22     you start answering.  I know you can
23     anticipate the questions, and I understand
24     this is long time to sit and do this, but we
25     have to have a clear record.  It helps all of

Page 102

1    us.

2  Q.  I think you were anticipating my question.  I

3     heard you say, you said I don't want those --

4     that particular company driving my students

5     anymore, correct?

6  A.  Yes.

7  Q.  Ultimately, did Brimar no longer transport

8     students from Pittsburgh Classical or was it

9     that ultimate decision that Brimar would still

10    transport kids, they just wouldn't transport

11    K.M. and the male anymore?

12  A.  So, yes, the decision was above me, that I

13    don't get to make, so they did not transport

14    those students anymore.

15  Q.  Just those two or all of them?

16  A.  Not all of them.  You mean all the ones on

17    that bus in particular?

18  Q.  No, I meant the whole school.

19  A.  I know this past year we had Brimar for a

20    route, I believe, so, no, not the whole

21    school.

22  Q.  I will ask it this way.  It was unclear, and I

23    appreciate it, my intent was finding out.

24    After April 26 until the end of the school

25    year, Brimar continued to transport students

Page 103

1    here at Pittsburgh Classical Academy; is that

2    correct?

3  A.  I believe so.

4       MR. PECK: It was April 29.

5  Q.  April 29.  And then May 2.  Thank you.  After

6    Friday, April 29 -- and all of my references

7    to April 26 were intended to be April 29 --

8    that Friday you learned about the incident.

9    After the incident on that Friday, April 29,

10    2016, to your knowledge did Brimar transport

11    K.M. or the male student anymore through the

12    end of that school year?

13  A.  I don't believe so.

14  Q.  And then when the new school year resumed,

15    2016-2017 school year in late August or early

16    September of 2016, did Brimar no longer

17    transport any student here at Pittsburgh

18    Classical Academy?

19  A.  I don't recall.

20  Q.  You are not certain?

21  A.  No.

22  Q.  That decision, if it was made, would have been

23    made by someone in administration other than

24    yourself, correct?

25  A.  Yes.

Page 104

1  Q.  Do you know who would have made that decision?

2    Would it have been the director of

3    transportation?

4  A.  That was Ted Vasser at the time.  Somebody or

5    someone in his office.

6  Q.  The information for the discussion with

7    Candice following the gym class incident, have

8    you shared with us everything you can recall

9    about those?

10  A.  Yes.

11  Q.  Do you recall if anyone else was present when

12    Candice had told you about the gym class

13    incident?

14  A.  No.

15  Q.  Did you have any discussions with the gym

16    teacher, Sara Boggess?

17  A.  No.

18  Q.  Did you have any discussions with the male

19    student's teacher about the gym class

20    incident, Ms. Ringold?

21  A.  No.

22  Q.  Did you have any discussion with the male

23    student about the gym class incident?

24  A.  No.

25  Q.  Did you have any discussions with K.M. about

Page 105

1    the gym class incident?

2  A.  No.

3  Q.  Am I correct in understanding you had no

4    discussions with M.M. about the gym class

5    incident?

6  A.  Correct.

7  Q.  Would all of your discussions relative to the

8    gym class incident have been only with Candice

9    Meyer or Miller?

10  A.  She and Michelle Stanton Booker I believe.

11  Q.  Same series of questions relative to the

12    incident on the bus on April 29, 2016.  What

13    can you recall discussing with Candice about

14    that incident?

15  A.  Which incident?

16  Q.  The incident on the bus of April 29, 2016.

17  A.  So she is the one that initially -- I am

18    answering the same questions.  I mean, I

19    answered this already.  She, Candice, had come

20    to me or maybe -- I don't know if it was

21    Candice or if it was Michelle -- had come to

22    me and said there was an incident on the bus.

23    Kayla pulled up on her way home and saw the

24    bus and saw what she believed to be K.M. on

25    top of the male student seated in the van.

Page 106

1 Q. That's everything you can recall about that
2    conversation?
3 A. And then she said after talking to the kiddos,
4    that K.M. was saying that the boy told her to
5    take down her pants. She took down hers, and
6    he took down his, and at some point he placed
7    a finger in or around her butt.
8 Q. Did Candice tell you at that time that Kayla
9    told her she observed K.M. being on top of the
10   male student at a time when Kayla was either
11   beside the bus or in close proximity, driving
12   on her way home after school or somewhere
13   after school?
14 A. That's why what I was told.
15 Q. Did Candice tell you that Kayla had called her
16   from her cell phone when she observed this
17   Friday afternoon?
18 A. No.
19 Q. Have you ever heard that Kayla called Candice
20   while driving in proximity to the bus and
21   reported this to Candice?
22 A. No.
23 Q. If you had been so informed, what would your
24   reaction have been?
25        MS. DOHERTY: Object to the form.

Page 107

1 Q. Another way of asking it, what would your
2    policy be if that call was to you? Kayla
3    Reynolds had called you instead of Candice and
4    said I am here beside the bus, and I see K.M.
5    sitting on the lap of the male student, and we
6    had agreed back in January that they are not
7    to be seated together. What would your
8    response have been?
9 A. I would have immediately called the bus
10   company and asked them to radio that driver to
11   find out what was going on.
12 Q. So you had not heard of Kayla calling Candice
13   on her cell phone until I just asked you just
14   a minute ago?
15 A. Correct.
16 Q. Is there anything else concerning
17   conversations you would have had with Kayla
18   about this incident that you haven't shared
19   with us today? Did you speak with Kayla?
20 A. I don't recall.
21 Q. You knew as of May 2 to the time you made the
22   Childline request, which is Exhibit 9, that
23   Kayla had seen K.M. sitting on the lap of a
24   male student while in the van together,
25   correct?

Page 108

1 A. That is what was reported to me.
2 Q. Did you ask Kayla why she did not call the bus
3    company?
4 A. No.
5 Q. Did you discuss with Kayla anything else about
6    this incident?
7 A. No.
8 Q. After you learned that Kayla had seen K.M. on
9    the lap of the male student, did you have any
10   conversations with Kayla as to exactly what
11   she saw?
12 A. No.
13 Q. So am I correct in understanding that you
14   never followed up with Kayla and asked her to
15   provide a report or a statement or any
16   description of what she saw that afternoon,
17   Friday, April 29, 2016?
18 A. Not that I recall.
19 Q. Do you know if anyone else made that request
20   of Kayla?
21 A. No.
22 Q. Did you yourself have conversations with M.M.
23   after the bus incidence of April 29, 2016?
24 A. Yes.
25 Q. Have you shared with us about what you can

Page 109

1    recall about those conversation? How many did
2    you have?
3 A. I don't recall.
4 Q. Do you recall if they were in person or by
5    phone?
6 A. They were all by phone.
7 Q. Do you recall M.M. asking at that time whether
8    the male student could be placed on another
9    bus?
10 A. No, I don't recall.
11 Q. Can you recall anything about those
12   conversations as you testify for us here
13   today?
14 A. Yes.
15 Q. What can you recall?
16 A. I remember calling mom to inform her about
17   what happened, and I remember mom being upset
18   and wanting her child to be sent home. I
19   remember having another conversation with her
20   where I told her that I wanted to talk about
21   K.M.'s safety and that I wanted to meet. At
22   that meeting, our special ed supervisor was
23   there and my assistant superintendent. We had
24   a phone conversation with mom about how we
25   would proceed for the remainder of the year to

Page 114

1   struggled socially?
2  A.   Yes.
3  Q.   Would the male student in your personal
4       experience have difficulty understanding what
5       is right and wrong?
6  A.   Potentially, yes.
7  Q.   Have you reviewed the interview with the male
8       student which Mr. Shaul completed?
9  A.   Yes.
10 Q.   In May of 2016?
11 A.   Yes.
12 Q.   Would you refer please to Bates stamp document
13      164 which is dated May 6 of 2016.  If you need
14      a copy, I will provide you with a copy.
15           MS. DOHERTY: It is Exhibit 6.
16 Q.   You do have that?
17 A.   Yes.
18 Q.   Am I correct in understanding you were not
19      present during this interview with Ms. Ringold
20      and Mr. Shaul and Joyce Dzadovsky?
21 A.   Yes, that's correct.
22 Q.   When is it that you first saw this document?
23 A.   When Mr. Shaul gave it to me.
24 Q.   Sometime in May 2016?
25 A.   Yes.

Page 115

1  Q.   You would agree that at the time the male
2       student was interviewed he had admitted
3       pulling down his pants and underwear and
4       urging K.M. to do the same?
5  A.   Yes.
6  Q.   You would agree that this report indicates the
7       male student reported their naked bodies were
8       pressed together with hers on top?
9  A.   Yes.
10 Q.   You would agree that the male student at that
11      time reported he put his fingers in her vagina
12      rather than in her butt?
13 A.   Yes.
14 Q.   And the male student then was asked to
15      identify where he put his fingers on a
16      diagram; is that your understanding?
17 A.   Yes.
18 Q.   You also had an opportunity to speak with the
19      male student; is that correct?
20 A.   On that day?
21 Q.   On some day prior to this, whenever.
22 A.   I don't recall.
23 Q.   Your understanding as of the time of the
24      Childline report, which is Exhibit 9, was that
25      the male student had indicated that he had

Page 116

1       placed his fingers in her vagina?
2  A.   I put he placed his fingers in her.  According
3       to the written statements, K.M. was saying he
4       put something in her butt, and he was saying
5       he put his fingers in her.
6  Q.   What is reported on Childline, Bates stamp
7       document 162, and these are your words,
8       correct?
9  A.   Yes.
10           MS. DOHERTY: It's Exhibit 9.  I
11      want them in front of her, Fred.
12 Q.   Top of the page of 162.  In your words, as of
13      May 2, the male students had acknowledged that
14      he put his fingers inside her and kissed her,
15      correct?
16 A.   Yes.
17 Q.   That was your understanding as of May 2,
18      correct?
19 A.   Yes.
20 Q.   It was further your understanding as reflected
21      in the next sentence that the male student
22      said she was hitting him and saying no; is
23      that correct?
24 A.   Yes.
25 Q.   And finally it was your understanding as of

Page 117

1       May 2, 2016 the male student admitted he
2       touched K.M. sexually even though she was
3       saying no and hitting him, correct?
4  A.   Yes.
5  Q.   You agree that's a serious incident?
6  A.   Yes.
7  Q.   And isn't that, in fact, what you told
8       Brimar's manager when you spoke to him on the
9       phone?
10 A.   Yes.
11 Q.   Your testimony is that Brimar was indifferent
12      to that and just said the bus driver said that
13      never happened?
14 A.   Yes.
15 Q.   If you think about that for a second, Ms.
16      Merlo, you had described the bus during your
17      testimony for Mr. Peck, and as I understood
18      it, the bus is only a few rows of seats,
19      correct?
20 A.   Yes.
21 Q.   And you had seen this type of vehicle hundreds
22      of times, correct?
23 A.   Yes.
24 Q.   And was it your understanding the agreement
25      that was reached following the gym class

Page 118

1    incident in January 2016 was that K.M. would
2    be seated in the seat directly behind the bus
3    driver?
4  A.  No.
5  Q.  What was your understanding of the agreement?
6  A.  That she would be seated in the passenger seat
7    beside the driver.
8  Q.  Right next to the driver?
9  A.  Correct.
10 Q.  And so would that understanding be K.M. would
11    be within approximately, as a lay person, how
12    many feet from the driver?
13 A.  Two, three.
14 Q.  Based on your firsthand knowledge and
15    experience with this vehicle, or this type of
16    vehicle, if this incident with the pants being
17    down and K.M. on the lap of the male student
18    and him penetrating her occurred in the rear
19    seat, would you agree with me that would have
20    been less than 10 feet from where the bus
21    driver was seated?
22 A.  Probably.
23 Q.  Are you able to approximate for us the
24    distance of where the students would be seated
25    in the rear seat of the van from where the

Page 119

1    driver was seated?  I am asking in feet rather
2    than by looking at one of these tables.  That
3    is the logical thing to do, but when we look
4    at this transcript --
5  A.  I don't know.  I know I drive an SUV, and it
6    has the front row and then two rows, and I can
7    see what is going on in my rear row.
8  Q.  Would you agree with me that it's most likely
9    less than 10 feet from the where the driver
10    is?
11 A.  Yes.  Probably a human, five and half, six
12    feet from my dashboard to the rear seat.
13 Q.  Do you have an understanding as the principal
14    of the Pittsburgh Classical Academy as to who
15    is responsible for monitoring those students
16    when they are on the bus?
17 A.  I would think the bus company has some
18    responsibility to safely transport my kiddos
19    from this door to their door.
20 Q.  And your students, understanding some have
21    needs, and as I understand, one of the
22    students who provided a statement in this
23    case, you had testified for Mr. Peck that the
24    student who provided Bates stamp document 165,
25    Exhibit 4, that that particular student, he

Page 120

1    was able to verbalize things quite well,
2    correct?
3  A.  Quite well?
4  Q.  Better than the others.
5  A.  Better than the others in his classroom, yes.
6    But compared to a typical child, not very
7    well.
8  Q.  And this student was who you identified as
9    having the initials M.W.?
10 A.  Yes.
11 Q.  Did you know him very well?
12 A.  No more or less than any other student.
13 Q.  Do you have any information or are you able to
14    provide us with any information that the young
15    man with the initials M.W. would not be
16    credible?
17        MR. PECK: Object to form.
18        THE WITNESS: Yes, no?
19        MS. DOHERTY: You can answer.
20 A.  Do I think he is a credible kid?  Do I think
21    he would lie?
22 Q.  Yes.
23 A.  No, he wouldn't lie.
24 Q.  The male student that admitted that he engaged
25    in this -- as Exhibit 9 referred to it --

Page 121

1    touching K.M. sexually, even though she was
2    saying no, based on his limitations,
3    disabilities, would you agree this male
4    student would have difficulty understanding
5    that he should keep his hands to himself?
6  A.  He could.
7  Q.  Would you agree that M.M. had reported to
8    Candice Meyer that the male students had
9    grabbed K.M.'s breast as of the date of this
10    email, January 28, 2016?
11 A.  Yes, she did.
12 Q.  And based on the male student's situation,
13    should he have been receiving instructions on
14    what, in your words, a good touch or bad touch
15    involved?
16 A.  Wouldn't be a bad thing for him.
17 Q.  Based upon your knowledge of his situation,
18    would he have understood that and likely
19    carried out that directive?
20 A.  That's very hard for me to --
21 Q.  You think there would have been some question
22    as to whether he would be capable of
23    understanding that as of the spring of 2016?
24 A.  I don't know.  I mean, all kids -- any middle
25    schooler I wonder if they are capable of

Page 130

1    which is in front of you, Exhibit 6, Bates
2    stamp document 000164, correct?
3  A.  Yes.
4  Q.  When you learned of this, did you follow-up to
5    find out if that incident had been reported to
6    the principal of Linden Elementary School or
7    anyone else?
8  A.  So the principal is no longer the same
9    principal at that time that had been there
10    when he was in that grade, but, no, I did not
11    follow-up with that school.
12  Q.  Was your understanding, as was reported in
13    this document, that the principal for the
14    2013-2014 school year that supposedly was
15    involved, who would that principal for that
16    school year have been?
17  A.  I don't recall right now.  I would have to
18    look it up.  But I do remember looking because
19    I wondered if they know, but it wasn't the
20    same principal.
21  Q.  Do you know or would you have any idea where
22    that principal who was the principal of Linden
23    elementary school in 2013-2014 school year,
24    where he or she currently works?
25  A.  No, but it would very, very easy to look it

Page 131

1    up.
2  Q.  You agree that according to this report the
3    male reported to Mr. Shaul that he told his
4    teacher, Ms. Gamrat, about this incident in
5    the boys room where he said he was
6    inappropriately touched?
7  A.  Yes.
8  Q.  I guess you don't know who Ms. Gamrat is?
9  A.  I might.  I don't know.  I'm not sure.  I did
10    have a Gamrat who worked for me at Arlington.
11    She was a special ed teacher.  She was just an
12    inclusion teacher.
13  Q.  Do you recall her first name?
14  A.  I think her name was Barbara, but I'm not 100
15    percent sure.
16  Q.  Do you know, and understanding you are not
17    quite certain if this is the same Ms. Gamrat,
18    do you know if Mr. Barbara Gamrat is still an
19    employee of the Pittsburgh Public School
20    District?
21  A.  I'm not sure.
22  Q.  To follow up on the conversations you might
23    have had with the manager from Brimar, would I
24    be correct in understanding those two
25    conversations didn't result in any emails

Page 132

1    being sent back and forth between you and
2    Brimar or the manager?
3  A.  No.
4  Q.  So there were no such emails?
5  A.  There were not.
6  Q.  Also correct you never recall asking Kayla
7    when she saw K.M. on the lap of the male
8    student if she tried to stop the bus when she
9    was alongside the bus?
10  A.  No, I -- no.
11  Q.  Do you recall if you asked her if she had said
12    to you or explained to you that if she blew
13    her horn or tried to get the attention of the
14    bus driver or do anything else?
15         MS. DOHERTY: Objection.  She says
16    she doesn't remember talking to Kayla, but go
17    ahead.  You can answer.
18  Q.  Just so the record is clear, I think the last
19    question was pretty specific so --
20  A.  No.
21  Q.  When would be the last time you talked to
22    Kayla about what she saw on the afternoon of
23    April 29, 2016?
24  A.  I don't recall.
25  Q.  Do you believe it would have been after 2016?

Page 133

1  A.  I don't remember.  I don't remember.
2  Q.  Can you tell us what Joyce's position with the
3    district is or was as of 2016?
4  A.  She was some type of support to these low
5    incidence classrooms.  There are so many of
6    them that I don't know all of their titles.
7    They are people that show up at my building
8    and go in and work with these teachers.  She
9    had some type of support position with these
10    low incidence classrooms.  I don't know what
11    her title was.
12  Q.  I wanted to follow-up and discuss a little
13    more detail your understanding of
14    conversations of the other male student whose
15    statement was obtained from a student with the
16    initials M.W., and that's 165 Bates stamp
17    number as well as his statement which is Bates
18    stamp document 4.
19         MR. PECK: Exhibits 4 and 7.
20  Q.  Would I be correct in understanding when you
21    testified for Mr. Peck that at the time M.W.
22    provided Exhibit 7, which is Bates stamp
23    document 165, the level of concern wasn't as
24    much because he had reported touching boobs
25    but nothing about her pants being down and the

Page 134

1    male student's pants being down. Did I
2    understand your testimony?
3 A.  That M.W. --
4 Q.  Whenever M.W.'s statement was provided --
5 A.  His statement is Exhibit 4.
6 Q.  Correct, but the report from Mr. Shaul, that's
7    exactly --
8 A.  That was days later. That wasn't on the same
9    day.
10 Q.  Wasn't it your testimony for Mr. Peck that
11    M.W. did not report that their pants were down
12    but rather only touching and I think your
13    words were boobies?
14 A.  Yes.
15 Q.  To refresh your recollection, you would agree
16    with me M.W.'s statement to Mr. Shaul was
17    obtained on May 6 because that's the first
18    line Mr. Shaul puts in his report?
19 A.  Yes.
20 Q.  In that statement and what Mr. Shaul wrote
21    down, you agree there is no reference to the
22    pants being down, correct?
23 A.  Yes.
24 Q.  Referring now to Exhibit 4 which is Bates
25    document 4, you would agree this was a

Page 135

1    statement that was obtained by M.W. in his own
2    hand at the school district on or about May 2,
3    2016, correct?
4 A.  Yes.
5 Q.  You would agree with me that this statement in
6    his own hand does expressly reference --
7 A.  He does.
8 Q.  -- the pants being pulled done?
9 A.  Yes.
10 Q.  So whenever you testified that way for Mr.
11    Peck, I am sure you just forgot.
12 A.  Yes.
13 Q.  And so now upon further reflection and
14    reviewing of the actual documents, you would
15    agree with me that M.W. did, in fact, report
16    the students' pants were down and K.M. was
17    saying no, correct?
18 A.  Yes.
19 Q.  Do you know if Mr. Shaul would have been
20    provided this Exhibit 4 at the time he would
21    have done this typed report on May 6, 2016?
22 A.  I don't know.
23 Q.  As you sit here today, are you able to --
24 A.  I know he was verbally told about the incident
25    which is why he had to come here.

Page 136

1       MS. DOHERTY: Let him finish his
2    question before you give the answer.
3 Q.  To your knowledge, information and belief, Mr.
4    Shaul would have been told before he sat down
5    with M.W. and the male student that the
6    students' pants were down, correct?
7 A.  Yes.
8 Q.  This is long shot, and I am prefacing it, as
9    you sit here today, do you have any
10    recollection as to whether Mr. Shaul
11    interviewed the male student first or M.W.
12    first on May 6, 2016?
13 A.  No.
14 Q.  Clearly Mr. Shaul would have been aware that
15    the male student had admitted the pants were
16    down as of May 6, 2016 because he says that in
17    his statement, correct?
18 A.  Mr. Shaul says that?
19 Q.  No. Mr. Shaul's report of May 6, 2016
20    references the pants being down in the third
21    paragraph of his, I call it statement, let's
22    call it report of May 2016. I will rephrase.
23       Based upon your review of the documents
24    you would agree that Mr. Shaul's report of May
25    6, 2016 refers to the pants being down, naked

Page 137

1    bodies being pressed together, because that's
2    what it says in the third paragraph, correct?
3       MS. DOHERTY: You are looking at
4    Exhibit 6.
5 A.  Yes.
6 Q.  164 is the Bates stamp document. You
7    described for Mr. Peck generally some of the
8    limitations the students would have. Do you
9    recall precisely how many students would have
10    been on the bus or van that day?
11 A.  It would have been four or five.
12 Q.  Do you know at --
13 A.  I know for certain there was one other
14    student, that was it.
15 Q.  If Candice would have testified a decision was
16    made not to talk to the other students, would
17    you have recalled that being a decision that
18    was made in May 2016?
19 A.  Yes.
20 Q.  Would that have been a decision that you had
21    made?
22 A.  That I would have made jointly with them based
23    on their abilities, yes.
24 Q.  Based on your experience with these particular
25    students, if two students on a smaller school

# EXHIBIT

# G

1

1           IN THE COURT OF COMMON PLEAS OF
               ALLEGHENY COUNTY, PA,
2

3   M.M., parent and natural      CIVIL DIVISION
    guardian of K.M., a minor,
4
            Plaintiffs,
5                                  No.  18-003257
        - v -
6
    PITTSBURGH PUBLIC SCHOOL       DEPOSITION OF:
7   DISTRICT and BRIMAR           KAYLA REYNOLDS
    TRANSIT, INC.,
8
            Defendants.
9

10

11                                 DEPOSITION DATE:
                                   July 25, 2019
                                   Thursday, 2:30 p.m.
12

13                                 FILED ON BEHALF OF:
                                   Defendant Brimar Transit
14

15

16                                 COUNSEL OF RECORD FOR
                                   THIS PARTY:
                                   Jason H. Peck, Esq.
17                                 DIBELLA, GEER,
                                   MCALLISTER & BEST
18                                 20 Stanwix Street
                                   11th Floor
19                                 Pittsburgh, PA  15222
                                   412-261-2900
20

21                                 REPORTED BY:
22                                 Sheila Stauffer, RPR
                                   Notary Public
23                                 Ref. No. SS53019B

24

25

**AKF Reporters**
**412-261-2323**

Page 6

1   will try to let you give a complete answer
2   before I move on to the next question.
3        This isn't intended to be an endurance
4   contest.  If at any time you do need a break
5   for whatever reason, talk to your attorney or
6   anything else, please let me know.  The only
7   caveat I do have is that if there is a
8   question pending, I would ask that you answer
9   the question before we take the break.
10       During the deposition, I am going to ask
11  bad questions, and there are going to be times
12  you don't necessarily understand what I am
13  asking or where I am doing, so please feel
14  free to let me know and ask me to restate the
15  question or clarify something for you.  If you
16  do answer a question of mine without
17  indicating that you don't understand, I am
18  going to assume you've understood what I am
19  asking.
20       Then finally, I will be asking you about
21  conversations that you have had with other
22  people.  I would appreciate it if you would
23  just assume that those questions exclude any
24  conversations you have had with Ms. Doherty or
25  anyone at her office or any conversations you

Page 7

1   had with anybody at the city solicitor's
2   office.  I don't want to know about those?
3        Can you please state your name for the
4   record.
5   A.   Kayla Reynolds.
6   Q.   Where do you live?
7   A.   North Side, 2641 Shelton Avenue.
8   Q.   Where is that?
9   A.   On the North Side.
10  Q.   Are you married?
11  A.   No.
12  Q.   Were you ever married?
13  A.   No.
14  Q.   Do you have any children?
15  A.   Yes.
16  Q.   How many children do you have?
17  A.   Two.
18  Q.   Sons, daughters?
19  A.   One son, one daughter.
20  Q.   Can you give me your educational background.
21  A.   I have an Associate's Degree in business
22       management.
23  Q.   Where did you obtain that?
24  A.   Kaplan Career Institute.
25  Q.   When did you obtain that?

Page 8

1   A.   2010.
2   Q.   Any other education?
3   A.   No.  I am going to back to school in the fall.
4   Q.   What are you going to school for?
5   A.   Social work.
6   Q.   Where is that?
7   A.   Pitt.
8   Q.   Where did you graduate high school?
9   A.   Schenley High School.
10  Q.   When was that?
11  A.   2001.
12  Q.   During the 2015-2016 school year, did you hold
13       any licenses or certificates that would have
14       been pertinent or relevant to your employment
15       with Pittsburgh Public Schools?
16  A.   I can't remember that.
17  Q.   What was that?
18  A.   A lot, I can't remember.  We do trainings all
19       the time.
20  Q.   So there were licenses or certificates that
21       you held at the time that you just don't
22       remember?
23  A.   We have training, PDs if that's what you are
24       talking about.  Like professional development
25       that we have during the school year.  That's

Page 9

1   the only certificates we receive.
2   Q.   Where are you currently employed?
3   A.   Conroy Education Center.
4   Q.   Is that part of the Pittsburgh Public School
5       District?
6   A.   Yes.
7   Q.   How long have you been employed at Conroy?
8   A.   It will be my second year -- I am doing one
9       year.
10  Q.   You are in the middle of your second?
11  A.   I will start it in August will be my second
12       year.
13  Q.   So you would have started in August 2017?
14  A.   No, I transferred in February.
15  Q.   2017?
16  A.   No.  This year, 2019.
17  Q.   Where were you employed prior to Conroy?
18  A.   Pittsburgh Classical Academy.
19  Q.   What years were you employed at Pittsburgh
20       Classical?
21  A.   I came back here three years ago.  I think it
22       was 2016 or '15.  I can't remember.
23  Q.   Would that have been at the beginning of the
24       school year when you started?
25  A.   Uh-huh.

Page 10

1  Q.  That would have been up to February 2019?
2  A.  Yes.
3  Q.  Where were you prior to Pittsburgh Classical?
4  A.  I don't know.  I've been everywhere.  I
5      can't --
6  Q.  Was it within education?
7  A.  Yes.  Still in the school.  I don't just don't
8      remember where I was.
9  Q.  Still with the Pittsburgh School District?
10 A.  I have been here 13 years.
11 Q.  When you were with Pittsburgh Classical, what
12     position were you holding?
13 A.  I was a paraprofessional in their multiple
14     disabilities classroom.
15 Q.  Were you a paraprofessional the entire time
16     you were at Pittsburgh Classical?
17 A.  Yes.
18 Q.  In the multiple disabilities classroom the
19     entire time?
20 A.  Yes.
21 Q.  What were your responsibilities in that role?
22 A.  The needs of the kids.  Anything as far as
23     going to the bathroom, assisting the teacher
24     with work materials, going to specials,
25     recess, lunch.

Page 11

1  Q.  So you would accompany the kids to recess and
2      lunch?
3  A.  Yes.
4  Q.  Going to specials, what are specials?
5  A.  Gym, art, music.  Well, there wasn't music
6      here.  There was Spanish.
7  Q.  Gym, art and Spanish?
8  A.  Yes.
9  Q.  Would you accompany the kids to gym, art and
10     Spanish then?
11 A.  Yes.
12 Q.  You were with the kids all the time when they
13     were at gym, all the time at art, all the time
14     at Spanish?
15 A.  Yes.
16 Q.  I understand you would have been assigned to
17     Candice Meyer, now Candice Miller's classroom?
18 A.  Yes.
19 Q.  When I reference K.M., do you know who I am
20     talking about?
21 A.  Yes.
22 Q.  She would be the young woman involved in the
23     incident in this litigation on the bus?
24 A.  Yes.
25 Q.  When I reference the male student, I will be

Page 12

1      talking about the young male who was involved
2      in that same incident.
3  A.  Okay.
4  Q.  So can you describe what the multiple
5      disabilities support classroom is?
6  A.  It is kids with different multiple
7      disabilities.
8  Q.  I understand that K.M. was part of that
9      classroom?
10 A.  Yes.
11 Q.  Do you know what year she was part of that
12     classroom?
13 A.  I can't remember.
14 Q.  This incident on the bus, do you recall what
15     school year this occurred in?
16 A.  Like it was two years ago.  I can't remember.
17 Q.  Do you know what disabilities K.M. had that
18     would have placed her in the multiple
19     disabilities classroom?
20 A.  No, I don't remember.  I can't remember.
21 Q.  Can you take a look at Exhibit 1 there.  Do
22     you recognize this document?
23 A.  It is an IEP.
24 Q.  If you look at page 3, in the bottom right
25     corner you will a Bates stamp that says KM PPS

Page 13

1      000126.
2  A.  Yes.
3  Q.  So I don't see your name in that grid there.
4      So am I to understand you would have no role
5      in developing the IEP for K.M.?
6  A.  No, that's the teacher's job.
7  Q.  I see reference, if you want to look at, it is
8      going to be on page 25 I believe, Bates 148.
9      At the bottom where it says social skills
10     instruction, do you know what that is?
11 A.  I think that's when they used to talk at the
12     table about learning how to be interact with
13     your peers, talk with your peers.  Because a
14     lot of kids with disabilities don't know how
15     to interact with one another.  Even walking in
16     the room, saying hello, teaching them stuff
17     like that.
18 Q.  Do you recall any instruction K.M. might have
19     received in that area, social skills, social
20     interactions?
21 A.  I mean, it was the whole group.  I don't know.
22     It was part of the curriculum.  Every kid
23     basically did it, so yes.
24 Q.  Would that instruction, would that include
25     what would be a good touch versus what would

Page 18

1 Q.   So this alleged incident in the gym class, you
2      did not witness yourself --
3 A.   No, I did not.
4          MS. DOHERTY: Let him finish the
5      question.
6 Q.   Who told you about that incident?
7 A.   I think it was my teacher, Candice.
8 Q.   When was that?
9 A.   I don't remember.
10 Q.  What did Candice tell you about the gym
11     incident?
12 A.  She said those two couldn't be around each
13     other, and if you see them around each other
14     keep them apart if they were ever around each
15     other.
16 Q.  Did Candice ever describe to you what she
17     understood to have happened during the gym
18     incident?
19 A.  I can't remember if she did or not.
20 Q.  After January 2016, had anybody told you what
21     they understood to have happened during the
22     gym incident?  And just to be safe, again not
23     anything with Ms. Doherty.
24 A.  No, you are not allowed to be talking about
25     stuff like that.  Once the teacher tells you,

Page 19

1      it is over basically.
2 Q.   So as we sit here today, do you have any
3      understanding what might have happened during
4      the gym incident?
5 A.   Like what occurred, I don't know, no.  I
6      wasn't there, so no.
7 Q.   But different sources of information at some
8      point -- I am trying to find out what you
9      know.  Even if you heard it from someone else.
10 A.  I can't remember.
11 Q.  If at one point you did have information as to
12     what might have happened in the gym incident,
13     as you sit here today --
14 A.  I can't remember if anybody told me.  Is that
15     what you are asking?  I am confused on what
16     you are saying.  Like are you saying do I know
17     what happened?  No, I don't because I wasn't
18     there.  I don't know because I wasn't there.
19        I am confused what he is asking me.
20        MR. JUG: I think, ma'am, what
21     counsel is asking, at least as I understand
22     it, what did they tell you what happened in
23     the gym?
24 A.  And, yeah, they might have said, I don't know
25     who it was, but they might have told me he

Page 20

1      touched her inappropriately.  She might not
2      have liked it.  I don't know like verbatim
3      what they said to me.
4 Q.   After this gym incident, do you know what the
5      school's responsibility was as far as keeping
6      K.M. and the male separated?
7 A.   They just couldn't be by each other.
8 Q.   Do you know whether or not any steps were
9      taken to make sure that K.M. and the male were
10     kept separated while they were on the school
11     bus?
12 A.  Yes, I knew they couldn't sit by each other,
13     to keep them apart when they got on the bus.
14 Q.  How did you come to know that?
15 A.  The teacher told me.
16 Q.  Was that Ms. Miller?
17 A.  Yes.
18 Q.  Do you know when she told you that?
19 A.  No.
20 Q.  Did Ms. Miller tell you how the kids were to
21     be separated?
22 A.  No.
23 Q.  Did she tell you that either one of them were
24     supposed to sit in a particular seat?
25 A.  I know there was one in the front and one in

Page 21

1      the back.  I can't recall her saying who was
2      in the front, who was in the back.
3 Q.   Would that information -- did that come from
4      Ms. Miller as well?
5 A.   Yes.
6 Q.   During the 2015-2016 school year, did you have
7      any responsibilities with respect to making
8      sure the children get to their bus at
9      dismissal?
10 A.  Yes.
11 Q.  What was that responsibility?
12 A.  You bring them up on the elevator and make
13     sure everyone gets on the bus.  If the bus
14     isn't there, until the van arrived.
15 Q.  Did you have responsibility for making sure
16     they got to the door of the van?
17 A.  Yes.  I would walk -- yes, I would walk them
18     to the bus, to the van, yes.
19 Q.  Did you do that for K.M. specifically do you
20     recall during that school year?
21 A.  What did you say?
22 Q.  Did you do that for K.M. specifically, to make
23     sure she got to the door of the bus?
24 A.  I did before, but not every day.
25 Q.  Do you recall having any conversations with

Page 22

1     the bus -- K.M.'s bus driver about the plan to
2     keep K.M. and the male separated while on the
3     bus after --
4  A.  The one that was pregnant --
5          MS. DOHERTY: Let him finish.
6  Q.  I will repeat it.  Did you have any
7     conversations with K.M.'s bus driver after the
8     gym class incident with respect to the plan to
9     keep K.M. and the male separated on the bus?
10  A.  What driver?
11  Q.  Are you talking about more than one driver?
12  A.  What driver are you asking me?
13  Q.  The Brimar Transit driver for K.M.
14  A.  I only spoke to one driver from Brimar, and
15     that was the one that was pregnant.
16  Q.  How many times did you speak to that one
17     driver?
18  A.  I only told her one time.
19  Q.  What did you tell her?
20  A.  That they were to be separated on the bus.
21     They were not to sit together.
22  Q.  Did you tell the bus driver why they were
23     supposed to be --
24  A.  No, it is none of her business.
25  Q.  Did you tell the bus driver as to how they

Page 23

1     were to be separated?
2  A.  No.
3  Q.  Was there any discussion as to what child was
4     supposed to sit in a particular seat?
5  A.  One in the front or back.  It wasn't -- there
6     wasn't no plan on who was where or what was
7     what.
8  Q.  You told the bus driver to put one child in
9     the front?
10  A.  One is to be in the front, one is to be in the
11     back.
12  Q.  Were you telling them there was specific seats
13     identified?
14  A.  There wasn't, but one person in the front of
15     the bus, one person in the back.
16  Q.  Is that the only conversation you can recall
17     with the pregnant bus driver?
18  A.  Yes.
19  Q.  Do you recall between the gym class incident
20     and the incident on the bus, do you recall if
21     the bus driver ever changed?
22  A.  Yes.
23  Q.  What other bus drivers do you recall seeing?
24  A.  I don't know.  It was a man after the one that
25     was pregnant.

Page 24

1  Q.  It went from the pregnant woman to the man?
2  A.  I don't know how it changed.  When she wasn't
3     driving no longer, it was a man.
4  Q.  Do you recall -- I mean, was this man on one
5     occasion or multiple occasions?
6  A.  He was just a driver I seen for the time
7     being.
8  Q.  Was the man the driver on the day of the bus
9     incident?
10  A.  No.  It was a sub driver that day.
11  Q.  Do you have any identification for that
12     driver?
13  A.  No.
14  Q.  Do you have a name?
15  A.  No.
16  Q.  Any physical identification?
17  A.  Just a woman.
18  Q.  After you learned about the incident at gym
19     class, did you ever speak with K.M. about that
20     incident?
21  A.  No.
22  Q.  You never had any conversation with K.M. in
23     which she described the gym class incident?
24  A.  No.
25  Q.  Again, after learning about the incident, have

Page 25

1     you ever spoken with the male student about
2     what happened during that the incident?
3  A.  No.
4  Q.  Are you aware whether or not there were any
5     other witnesses to this gym class incident?
6  A.  I don't know who the witnesses were.
7  Q.  Do you know how Ms. Miller or Ms. Meyer would
8     have come to learn of the gym class incident?
9  A.  Someone had to tell her.
10  Q.  You don't know who?
11  A.  No.
12  Q.  Did you have any involvement into the decision
13     to make sure that K.M. and the male were
14     separated or was that just something that was
15     told this needs to happen?
16  A.  That was something that I was told that was
17     supposed to happen.
18  Q.  That was told to you by Ms. Miller?
19  A.  Yes.
20  Q.  Have you ever spoken with K.M.'s mother about
21     the gym class incident?
22  A.  No.
23  Q.  Do you know whether or not K.M.'s mother ever
24     asked that male student be placed on a
25     different bus?

# EXHIBIT

# H

1

1          IN THE COURT OF COMMON PLEAS

2        OF ALLEGHENY COUNTY, PENNSYLVANIA

3               - - - - -

4
   M.M., a parent and natural    )
5  guardian of K.M., a minor,    )
                     Plaintiff,) No. 18-003257
6                                )
          vs.                    )
7                                )
   PITTSBURGH PUBLIC SCHOOL      )
8  DISTRICT and BRIMAR TRANSIT,  )
   INC.,                         )
9                  Defendants.)

10

                - - - - -

11

12          Deposition of MELISSA RINGOLD
              Monday, July 22, 2019

13

14

            Filed on behalf of Defendant
15             Brimar Transit, Inc.

16

17       Counsel of Record for this Party:
             Jason H. Peck, Esquire
18       DiBella Geer McAllister Best, PC
           20 Stanwix Street, 11th Floor
19            Pittsburgh, PA  15222

20

21

22

23

24

25

Page 22

1  become aware of any information or incidents in
2  which the male made any sexual contact against
3  another student?
4      A.  No.
5      Q.  We've had allegations in this lawsuit
6  about an incident in which the male student is
7  alleged to have grabbed K.M.'s breasts, have you
8  ever learned of that incident?
9      A.  No.
10     Q.  As we sit here today is that the first
11  time you've heard of it?  Again, nothing between
12  you and Ms. Doherty.
13     A.  Then, no.
14         MS. DOHERTY: That's why she's
15  looking at me.
16         MR. PECK: I figured as much.
17         MR. JUG: Was the first time just
18  recently, today or so, that you learned of that
19  incident, within the last week?
20     Q.  Excluding Ms. Doherty.
21     A.  Today is the first day I've heard of it
22  excluding my attorney.
23         MR. JUG: That clarifies, thank
24  you.  Sorry to interrupt, Jason.
25         MR. PECK: That's quite all right.

Page 23

1      Q.  So I'm assuming then before April 29,
2  2016 that you've had no conversations with the
3  male student, M.M. or K.M. regarding this alleged
4  gym incident?
5      A.  Correct.
6      Q.  Were you aware of any plan that was
7  developed by the School District or personnel to
8  keep K.M. and the male student separated while on
9  the bus at any time during January 2016 through
10  the end of the 2015-2016 school year?
11     A.  After the April 29th incident.
12     Q.  That's when you first learned of the
13  plan?
14     A.  Correct.
15     Q.  And from whom did you learn of that
16  plan?
17     A.  Candace Miller Meyer.
18     Q.  What was your understanding of what that
19  plan was?
20     A.  That we were to keep the students
21  separated at all times.
22     Q.  Now your understanding of keeping the
23  children separated at all times, was it your
24  understanding that that plan was instituted after
25  the gym class incident or after the bus incident?

Page 24

1      A.  The bus incident.
2      Q.  Between those two instances, between the
3  gym incident and the bus incident, are you aware
4  of any plan to keep the children separated either
5  at school or on the bus?
6      A.  No, I was not aware of anything until
7  the bus incident.
8      Q.  So then are you aware of any
9  communications to Brimar Transit, who was the
10  company who was operating K.M. and the male's bus,
11  are you aware of any communications after the gym
12  incident and before the bus incident, any plan to
13  keep the children separated while on the bus?
14     A.  No.
15     Q.  And likewise, would you have any
16  information of whether Brimar Transit had any
17  participation in making that decision to keep K.M.
18  and the male separated while on the bus?
19     A.  I have no information about that.
20     Q.  Now on April 29th of 2016 would you,
21  again, have been at dismissal, would you have been
22  watching the students that were not taken to their
23  buses?
24     A.  Correct.
25     Q.  Did you happen to see either K.M. or the

Page 25

1  male get on the bus that day?
2      A.  I can't recall specifically.
3      Q.  So would you know one way or the other
4  whether K.M. and the male were sitting in
5  different seats when the bus left that day?
6      A.  I would not know.
7      Q.  When did you first learn of the incident
8  on the bus?
9      A.  The following Monday morning.
10     Q.  And from whom did you learn of that
11  incident?
12     A.  Candace.
13     Q.  And what did Candace tell you?
14     A.  That there had been an incident
15  involving one of my students and one of her
16  students and we needed to have a more private
17  conversation outside of the classroom.
18     Q.  And was that Monday morning then?
19     A.  Correct.
20     Q.  Did she describe the incident during
21  that conversation?
22     A.  No.  We went to another classroom with
23  both students, just she, myself and both students
24  and she prompted K.M., state what had happened,
25  and the male student confirmed what had happened.

Page 26

1    Q.  How did Ms. Miller prompt K.M. to tell
2  her what happened?
3    A.  Tell Ms. Ringold what happened on the
4  bus.
5    Q.  And then what was K.M.'s response?
6    A.  She said that the male student had made
7  her sit on his lap and put something inside of
8  her.
9    Q.  Was she able to identify what was put
10  inside of her?
11    A.  She was not.
12    Q.  Was she able to identify where that was
13  put in her?
14    A.  She stated, in her butt.
15    Q.  Did she describe how she responded to
16  all of this?
17    A.  She said, I kept saying no.
18    Q.  Did she say she did anything else?
19    A.  I don't recall.
20    Q.  Did she say anything about the bus
21  driver using a cell phone at any time during that
22  trip home on April 29th of 2016?
23    A.  No.
24    Q.  At any time since have you heard any
25  information suggesting that the driver was using a

Page 27

1  cell phone?
2    A.  Yes.
3    Q.  What was that?
4    A.  One of my other students who also rode
5  that bus stated that she had been using her cell
6  phone the entire time.
7    Q.  During this conversation with K.M. what
8  was Ms. Miller doing?
9    A.  Listening.
10    Q.  Was she taking any statements or
11  anything like that?
12    A.  Not at that point.
13    Q.  Do you know if Ms. Miller ever wrote a
14  statement taken from K.M.?
15    A.  Yes, she did write one later.
16    Q.  Do you know when she wrote it?
17    A.  Later the same day.
18    Q.  Do you know whether when she wrote it
19  was she in K.M.'s presence?
20    A.  She was.
21    Q.  And were you present for that as well?
22    A.  Yes.
23    Q.  Do you know whether that was a verbatim
24  statement or whether Ms. Miller was essentially
25  summarizing what K.M. told her?

Page 28

1    A.  I believe it was verbatim.
2    Q.  So what, did Ms. Miller then prompt K.M.
3  to again tell her what happened?
4    A.  Correct.
5    Q.  And then when K.M. was done giving her
6  statement what did the male say?  This is back
7  when all four of you were together.
8        MS. DOHERTY:  So before the written
9  statement and the first meeting?
10        MR. PECK:  Yes.
11    A.  He responded to my direct question, what
12  happened on the van?  And his response was, what
13  she said.
14    Q.  Did he give any further details to what
15  happened?
16    A.  Not at that point.
17    Q.  Did you end up speaking with the male
18  again or in his presence when he gave his
19  statement?
20    A.  Correct.
21    Q.  When was that?
22    A.  Later that same day.  He gave a
23  statement and I transcribed it word for word.
24    Q.  Was anybody else in your and the male's
25  presence during that statement?

Page 29

1    A.  Justin Drexler.
2    Q.  And do you recall what the male said
3  during that statement?
4    A.  That I don't recall word for word, but
5  generally that he made K.M. sit on his lap and I
6  believe he said he put his fingers in her, but I
7  don't recall exactly what his words were.  I
8  recall that the general gist was confirming what
9  K.M. had said.
10    Q.  I'm going to show you what we previously
11  marked as an exhibit (indicating).
12        MR. JUG:  Can you refer to the
13  Bates stamp number.
14    Q.  Exhibit 5, and it's Bates stamped 005.
15  Are you able to identify that statement?
16    A.  Yes, that is my transcription of the
17  male student's statement.
18    Q.  So this is the one that you would have
19  made the second time you spoke with him?
20    A.  Correct.
21    Q.  And again, how did you prompt this
22  statement when you were speaking with the male?
23    A.  Tell me what happened on the bus.
24    Q.  Were there any other questions that you
25  asked him?

Page 30

1      A.   None.
2      Q.   Were you in K.M.'s presence when she
3   gave any other statement other than the two that
4   we've discussed so far?
5      A.   No.
6      Q.   How about other than the two statements
7   that we've discussed with respect to the male,
8   were you in his presence during any other
9   statements?
10     A.   On that day, no.
11     Q.   After that day?
12     A.   Yes.
13     Q.   And when was that?
14     A.   I made arrangements for him to receive
15   therapy and I participated in the initial session.
16     Q.   Was that with the Watson Institute with
17   Joel Shaul?
18     A.   Correct.
19     Q.   And I'll show you Exhibit 6, Bates 164
20   (indicating).  Do you recognize this statement?
21     A.   Yes.
22     Q.   What is this?
23     A.   This is a summary that Joel shared with
24   us after his interaction with the male student.
25     Q.   So to your understanding then this would

Page 31

1   not be a verbatim recitation of what the male told
2   him?
3      A.   This is not a verbatim statement.
4      Q.   Now what he relates in this statement,
5   is there anything in this writing that is
6   inaccurate or might not reflect your recollection
7   of the statement?
8      A.   No, it all appears accurate.
9      Q.   Do you have a name or a description of
10   the bus driver that typically drove K.M. and the
11   male's bus?
12     A.   I do not.
13     Q.   Would you have any information as to
14   whether or not that bus driver changed at any time
15   during 2016?
16     A.   I would have no idea.
17     Q.   I'll now show you what's been marked as
18   Exhibit 4, Bates stamp 4 (indicating).  Do you
19   recognize that statement?
20     A.   I do.
21     Q.   Now I don't want a name, but do you
22   recognize the student, know the student who gave
23   this?
24     A.   I do.
25     Q.   Is this the same student that identified

Page 32

1   the bus driver of having used the cell phone?
2      A.   Correct.
3      Q.   And that student, did he draft this
4   statement or was this again something he talked
5   and someone else drafted it?
6      A.   He wrote this independently.
7      Q.   And were you present when he wrote that?
8      A.   I don't know if I was sitting next to
9   him while he wrote it, but he handed it to me when
10   he finished.
11     Q.   And were you present when he gave any
12   oral statements?
13     A.   I'm not aware of him giving any oral
14   statements.
15     Q.   You testified earlier then that he had
16   said that the bus driver had been using the cell
17   phone, when did that come out?
18     A.   He came in that Monday morning upset
19   about the incident and blurted it out.
20     Q.   So was he prompted at all to blurt it
21   out?
22     A.   No.
23     Q.   What did he say when he blurted it out?
24     A.   He said something about, I hate our bus
25   ride home, we never know if we're going to get

Page 33

1   there safely.  The drivers are all different and
2   they're all on the phone.
3      Q.   And what was your response once you
4   heard that?
5      A.   I said, did anything happen this
6   morning?  He said, no.  I said, are you safe?  He
7   said, yes.  And then we moved on.  This was prior
8   to my knowing about the actual incident.
9      Q.   And did you follow-up with this child
10   after you learned of the incident?
11     A.   Yes.
12     Q.   And what was that follow-up?
13     A.   Did you see anything that happened on
14   the bus on Friday?
15     Q.   And what was his response?
16     A.   Yeah.  And he started to say, I can tell
17   you exactly what happened, and I said, please
18   write it down for me.
19     Q.   And is that the genesis then of the
20   statement in Exhibit 4?
21     A.   Yes.
22     Q.   At any time did he specifically identify
23   the driver of the bus on April 29, 2016 as having
24   been on her phone on that day?
25     A.   Yes.  After he handed this to me he

Page 46

1  left your employ in 2018, but to your knowledge
2  are both of them still employed by the Pittsburgh
3  Public School District?
4      A.  To my knowledge, yes.
5      Q.  And you had told Mr. Peck you had no
6  knowledge prior to April 29th of a male student
7  ever touching another student inappropriately;
8  correct?
9      A.  Correct.
10     Q.  So therefore you were never informed of
11  the incident in the gym class which was reported
12  in January of 2016; correct?
13     A.  Correct.
14     Q.  Nor were you informed of an agreement to
15  keep those two students, K.M. and the male
16  student, separate; correct?
17     A.  Correct.
18     Q.  And you only became aware of the need to
19  keep those two students separate, if I understand
20  correctly, Monday after April 29, 2016, which
21  would have been on or about May 2, 2016; correct?
22     A.  Correct.
23     Q.  You were asked about a document, which
24  is Bates stamped Document 164, which is the
25  Exhibit 4, do you have that in front of you?

Page 47

1      A.  Yes.
2          MS. DOHERTY: I think it's Exhibit
3  6.
4          MR. JUG: Oh, I'm sorry, you're
5  absolutely right.  I have six on the bottom of my
6  paper and four on my mind.
7      Q.  This document begins with, "At the
8  request of Joyce Dzadoesky," D-Z-A-D-E-O-S-K-Y --
9  actually it's D-Z-A-D-O-E-S-K-Y.  Who was Joyce?
10     A.  Joyce Dzadoesky at that point in time
11  was a member of the Low Incident Support Team.
12     Q.  What is the Low Incident Support Team?
13     A.  That is the team that I moved into when
14  I went to administration.
15     Q.  And what is their function, Ms. Ringold?
16     A.  They provide instructional coaching and
17  support to students in our Low Incident
18  Classrooms, which encompasses Autistic Support,
19  Life Skills Support and Multiple Disabilities
20  Support across the District.
21     Q.  So both K.M. and the male student would
22  have been within that program?
23     A.  Correct.
24     Q.  In looking at this, the male student was
25  also present at the time of this memo being

Page 48

1  drafted; is that correct?
2      A.  Correct.  Well, he was present during
3  the activities this memo described, I believe Mr.
4  Shaul drafted this later.
5      Q.  Do you know if the male student and
6  Joyce and you along with Mr. Shaul, S-H-A-U-L,
7  were together on Monday, May 2nd, or if it was
8  sometime between Monday and the date that Mr.
9  Shaul drafted this memo on May 6th?
10     A.  Ms. Dzadoesky was only contacted by
11  phone, she was not present.
12     Q.  Oh, okay.  Do you know if the male
13  student's parent or guardian were contacted prior
14  to this information being obtained?
15     A.  Yes.
16     Q.  Do you recall if his mother, father or
17  some other guardian were contacted and
18  specifically who that contact was with?
19     A.  It was with his mother.
20     Q.  What is his mother's name?
21     A.  (Name stricken.)
22     Q.  On this day when the information was
23  obtained were you physically present in the room
24  while Joyce was on the phone?
25     A.  Joyce was not on the phone throughout

Page 49

1  the entire interaction.
2      Q.  Was Mr. Shaul physically present with
3  the young male student?
4      A.  Yes.
5      Q.  And did the young male student indicate
6  that K.M. and he were sitting together in the rear
7  seat of the school van on the way home?
8      A.  Yes.
9      Q.  Did he admit that he urged K.M. to pull
10  down her pants and her underwear?
11     A.  Yes.
12     Q.  Did he admit that she did that?
13     A.  Yes.
14     Q.  Did he admit that he pulled down his own
15  pants and underwear?
16     A.  Yes.
17     Q.  Did he admit that their naked bodies
18  were pressed together with hers on top?
19     A.  He said, she was sitting on my lap.
20     Q.  Did he report then that he placed his
21  finger in her vagina?
22     A.  He said he put his finger in her.
23     Q.  Okay.  This specifically states her
24  vagina.  Did he say her vagina or did Mr. Shaul --
25  and I'm just referring to this as we go.

Page 50

1    A.  I don't --
2    Q.  This next indicates Diagram No. 1 shows
3  a body outline.
4          MS. DOHERTY: Hang on, I don't know
5  that she answered the question about the word
6  vagina.
7    A.  I don't recall.  I recall him saying, I
8  put my finger in her.
9    Q.  Okay.  Did Mr. Shaul show the male a
10  diagram and body outline with Xs placed on the
11  body showing where he described touching K.M. with
12  his hands?
13    A.  He showed the student a blank diagram
14  and asked the student to place the Xs.
15    Q.  Okay.  Did the male student at that time
16  indicate that he came to think of K.M. as his
17  girlfriend?
18    A.  Yes.
19    Q.  Did he also at this time to your
20  recollection describe an experience he had while a
21  fifth grader, inappropriate touching in a boy's
22  room by another student?
23    A.  Yes.
24    Q.  Did he inform you and Mr. Shaul that at
25  that time his pants were pulled down and another

Page 51

1  student touched him inappropriately?
2    A.  Yes.
3    Q.  Did he tell you at that time that he
4  told his teacher, Ms. Gamrat, G-A-M-R-A-T, of that
5  incident that he experienced in the boy's room
6  while a fifth grader?
7    A.  Yes.
8    Q.  And he was a seventh grader at the time
9  of this incident, so the prior incident he was
10  referring to would have been approximately two
11  years earlier?
12    A.  Correct.
13    Q.  Are you familiar with Ms. Gamrat?
14    A.  I know her name, I have not met her.
15    Q.  What is her first name?
16    A.  I believe it's Lois, but I'm not
17  certain.
18    Q.  You're not quite certain?
19    A.  No.
20    Q.  To your knowledge did anyone follow-up
21  with Ms. Gamrat and ask if in fact this incident
22  had been reported to her?
23    A.  I don't know.
24    Q.  Did the male student in early May of
25  2016 further indicate that he believes Ms. Gamrat

Page 52

1  informed the principal of the school where this
2  incident occurred, the prior incident?
3    A.  He stated that.
4    Q.  Are you aware of the name of the school
5  where this young man was a student for his fifth
6  grade?
7    A.  Yes.
8    Q.  And what is the name of that?
9    A.  Linden Elementary.
10    Q.  And do you know the name of the
11  principal for the 2013-2014 school year at Linden
12  Elementary?
13    A.  I do not.
14          MS. DOHERTY: And just for point of
15  clarification with other counsel, the name of the
16  minor male student's mother should also be blanked
17  out of the record.  We're not going to put the
18  children's mothers or the children's names in this
19  record.  Any objection, counselors?
20          MR. JUG: Let's go off the record.
21          (A brief discussion was held off
22  the record.)
23          MR. JUG: I have no objection.
24          MR. PECK: I have no objection
25  either.

Page 53

1          (A brief discussion was held off
2  the record.)
3    Q.  Next up, please turn your attention to
4  it's Exhibit 4, it's Bates stamped 00004.  What
5  are the initials of the student who authored this?
6    A.  M.W.
7    Q.  And was M.W. a student in your
8  classroom?
9    A.  Correct.
10    Q.  And am I correct in understanding the
11  document, which is marked as Bates stamp 4, is in
12  the hand of this student?
13    A.  Yes.
14    Q.  And am I correct this student is a male?
15    A.  Yes.
16    Q.  And were you present when the male
17  student provided this statement?
18    A.  I don't recall watching him write it,
19  but he handed it to me.
20    Q.  Okay.  Do you recall who else would have
21  been present at the time?
22    A.  Justin Drexler.
23    Q.  And where was this interaction with the
24  male student whose initials are M.W.?
25    A.  In my classroom.

Page 54

1    Q.   Were you and Mr. Drexler alone with this
2  student in your classroom or were the other
3  students also present?
4    A.   The other students were present.
5    Q.   How many students were in that class,
6  seven to ten?
7    A.   Yes.
8    Q.   Was the male student who we had been
9  talking about as being involved in the touching of
10  K.M., was he also present at the time the male
11  student wrote this?
12    A.   Yes.
13    Q.   This statement, Exhibit 4, Bates stamped
14  Document 4, do you have that in front of you,
15  ma'am?
16    A.   Yes.
17    Q.   "Every time," and it's redacted, that
18  would be in reference to the male student to your
19  understanding?
20    A.   Yes.
21    Q.   "Touched," is it K.M.?
22    A.   Yes.
23    Q.   "Inappropriately.  I told the male
24  student to stop."  Is that what he reported?
25    A.   Yes.

Page 55

1    Q.   And did he indicate where this
2  inappropriate touching was?
3    A.   He said that he was writing down what
4  happened on the bus on Friday.
5    Q.   Okay.  Did he indicate that the male
6  student responded to M.W. that he should leave him
7  alone?
8    A.   He did not.
9    Q.   Do you recall -- that's the second
10  line.
11    A.   I'm sorry, maybe I misunderstood your
12  question.  I thought you asked if the male student
13  responded to him?
14    Q.   No.  My specific question, as I recall,
15  was did he, M.W., indicate that when he told the
16  male student to stop touching K.M. that the male
17  student told M.W. to leave him alone?
18    A.   Yes.
19    Q.   Did he then indicate that the male
20  student touched K.M.'s, in his words, boobs?
21    A.   Yes.
22    Q.   Did he indicate that at that time K.M.
23  did not like that?
24    A.   Yes.
25    Q.   Did he then indicate that K.M. said no?

Page 56

1    A.   Yes.
2    Q.   Did he indicate that the male student
3  then begged K.M. to allow him to touch her?
4    A.   Yes.
5    Q.   But that she sounded unhappy and said in
6  a sad way, yes?
7    A.   Correct.
8    Q.   The last line that's redacted, right
9  after the words, "That all I got."  To your
10  knowledge would that be his name, did he sign
11  this?
12    A.   He did.
13    Q.   Okay.  The male student who you
14  indicated his initials were M.W.?
15    A.   Correct.
16    Q.   Do you find him to be credible?
17    A.   Very.
18    Q.   Would his disability at all have
19  impacted his ability to be truthful here and
20  provide you with an accurate understanding of what
21  occurred a couple of days earlier that Friday on
22  the bus?
23    A.   No.
24    Q.   To your knowledge is this student still
25  in the Pittsburgh Public Schools?

Page 57

1    A.   I don't know.
2    Q.   Now would this statement which he
3  provided in his own hand, M.W., the other male
4  student, would this have been written down after
5  he had told you that he did not like the bus ride
6  home, the driver was always on the cell phone?
7    A.   Yes.
8    Q.   Did he specifically tell you, Ms.
9  Ringold, that the driver was on the cell phone the
10  whole ride home on Friday, April 29, 2016?
11    A.   He did not specify a date.
12    Q.   Did he indicate to you as of that Monday
13  that the driver had been on the phone at least at
14  some point on April 29, 2016?
15    A.   He did not specify that.  He said, she's
16  always on the phone.
17    Q.   Said, she's always on the phone.  Did he
18  say to you or did anyone ask him whether the other
19  students had cried out while this incident with
20  K.M. and the male student was going on?
21    A.   I don't have any knowledge of that.
22    Q.   Do you know if anyone else spoke with
23  the male student who authored Document 4 other
24  than yourself and Mr. Drexler?
25    A.   No.

# EXHIBIT

# I

1

1            IN THE COURT OF COMMON PLEAS OF
                ALLEGHENY COUNTY, PA,
2

3    M.M., parent and natural      CIVIL DIVISION
     guardian of K.M., a minor,
4
            Plaintiffs,
5                                   No.  18-003257
          - v -
6
     PITTSBURGH PUBLIC SCHOOL       DEPOSITION OF:
7    DISTRICT and BRIMAR           JUSTIN DREXLER
     TRANSIT, INC.,
8
            Defendants.
9

10

11                                  DEPOSITION DATE:
                                    July 26, 2019
                                    Friday, 10:00 a.m.
12

13                                  FILED ON BEHALF OF:
                                    Defendant Brimar Transit
14

15

16                                  COUNSEL OF RECORD FOR
                                    THIS PARTY:
17                                  Jason H. Peck, Esq.
                                    DIBELLA, GEER,
                                    MCALLISTER & BEST
18                                  20 Stanwix Street
                                    11th Floor
19                                  Pittsburgh, PA  15222
                                    412-261-2900
20

21
                                    REPORTED BY:
22                                  Sheila Stauffer, RPR
                                    Notary Public
23                                  Ref. No. SS53065

24

25

**AKF Reporters**
**412-261-2323**

Page 70

1  A.  Honestly I'm not.
2  Q.  Fair enough.  The next sentence is, today when
3      they got to school, I was informed about what
4      she saw.  Would your understanding have been
5      Kayla would have told Ms. Merlo what she saw
6      that next Monday.
7           MS. DOHERTY: Objection to form.  If
8      you know.
9  Q.  Is that your understanding?
10 A.  That she told Ms. Merlo?
11 Q.  Yes.
12 A.  I don't recall.  She could have went and told
13     Candice.  I don't recall what happened.  I
14     didn't see the whole thing.
15 Q.  It says, when we asked the kids, who were both
16     significantly disabled, what was going on,
17     K.M. said -- it's hard to see -- one of them
18     said someone else's pants were down, and he
19     told her to take hers down, and she did.
20      Had you heard that version before from
21     anyone else?  Was that said at the time of the
22     interview you were present, when the male
23     student, M.W., provided his statement?
24 A.  Yeah, I don't recall.
25 Q.  If you refer to Exhibit 4 which is the male

Page 71

1      student's statement, the student identified as
2      M.W., do you agree that when he was asked to
3      write down what he saw, he makes reference to
4      pants being pulled down in the middle of that
5      statement?
6  A.  Yes, it says that.
7  Q.  And that male student, M.W., you were present
8      you believe when he wrote this statement which
9      is Exhibit 4 as well as for the statement that
10     he had provided to Mr. Shaul in Exhibit 7.
11 A.  Yes.
12 Q.  Do you recall that the male student, M.W.,
13     ever saying that following week that he hates
14     the bus ride to and from school because that
15     driver is always on the phone?
16 A.  I don't recall that.
17 Q.  The male student, M.W., you had a good
18     relationship with him?  I think it is
19     referenced on the statement.
20 A.  Yes.
21 Q.  You were the paraprofessional in Ms. Ringold's
22     class.  Was the male student, M.W., in Ms.
23     Ringold's class or in Ms. Meyer's class?
24 A.  Ms. Ringold.
25 Q.  And the statement, which is Exhibit 7, if you

Page 72

1      could turn to that please.  This was a
2      statement from M.W., correct?
3  A.  Yes.
4  Q.  Or a report involving an interview with M.W. I
5      guess to be more precise.  In the middle
6      paragraph there, Mr. Drexler, do you agree at
7      this time when you were present M.W. offered
8      certain additional information regarding
9      inappropriate behavior?  Is that what occurred
10     when Mr. Shaul, you and Ms. Meyer met with
11     M.W.?
12 A.  Yes.
13 Q.  Do you know why Ms. Meyer was at this
14     interview rather than Ms. Ringold if M.W. was
15     a student in Ms. Ringold's class instead of
16     Ms. Meyer's class?
17 A.  I don't recall.
18 Q.  And do you agree as reported in the second
19     sentence of the middle paragraph, that M.W.
20     reported he had seen the male student touch
21     K.M.'s "boobs" end quotes on several occasions
22     on the bus, correct?
23 A.  Yes, it says that here.
24 Q.  And so was it your understanding being at that
25     interview that he wasn't referring to the male

Page 73

1      student touching K.M.'s breast several times
2      on Friday, April 29, 2016, but rather several
3      times prior to April 29, 2016?
4  A.  Yes.
5  Q.  You would agree that after the incident with
6      the gym you were never asked by Ms. Merlo
7      exactly what you knew about that incident,
8      correct?
9           MS. DOHERTY: Which incident?
10 Q.  The gym incident.
11 A.  Yes, because I didn't see it.
12 Q.  Following the incident with the bus on April
13     29, you agree you were never brought in by Ms.
14     Merlo or anyone else to ask what you knew
15     about that particular Friday afternoon,
16     correct?
17 A.  Yes.
18 Q.  Am I correct you never talked to anyone at the
19     bus company, the driver or anybody else, about
20     the incident on the bus?
21 A.  No.
22 Q.  And after April 29, 2016, do you recall if
23     Brimar continued to provide transportation for
24     the students of Pittsburgh Classical?  Did
25     they still keep driving for the school after

Page 74

1    April 29, 2016?
2 A.  The company just for like the whole school or
3     for their bus?
4 Q.  For the whole school.
5 A.  I think, yes.
6 Q.  Do you have an understanding if Brimar's
7     contract was ever terminated after this
8     incident?
9 A.  I don't recall that.
10 Q.  You don't know one way or another if Brimar
11     ever quit driving for these students as a
12     result of this incident, correct?
13 A.  Yeah, I don't recall.
14 Q.  And then finally, Mr. Drexler, I think you
15     said there were 19 buses?
16 A.  Yes.
17 Q.  Can you recall the names of the other bus
18     companies who would have served Pittsburgh
19     Classical Academy other than Brimar in the
20     '15-'16 school year?
21 A.  First Student, Roenigk.  I am trying to think
22     of who else.  I think there was more, but
23     that's all I can remember right now.
24       MR. JUG: Those are all I have.
25       MR. PECK: I don't have anything.

Page 75

1       MS. DOHERTY: I have a few for you,
2     Justin.
3          -----
4       EXAMINATION
5          -----
6   BY MS. DOHERTY:
7 Q.  You were asked with respect to Exhibit 12, get
8     that in front of you.  Did you ever provide a
9     statement to or an interview to the Pittsburgh
10     school police or the city police relative to
11     the van incident?
12 A.  No.
13 Q.  Did you ever talk to or contribute any
14     information to anyone in order to get Exhibit
15     12 generated?
16 A.  No, I never seen this.
17 Q.  This is the first time you saw Exhibit 12
18     sitting here today?
19 A.  Yes.
20 Q.  You were asked about whether you knew if Kayla
21     had met with Ms. Merlo.  Did Kayla ever tell
22     you she met with Ms. Merlo about the van
23     incident or the gym incident?
24 A.  If she told me?  I am assuming she told her.
25 Q.  Don't assume.  I am asking you if you have a

Page 76

1     specific memory of Kayla Reynolds telling you
2     she met with Valerie Merlo about the van
3     incident?
4 A.  No, I don't.
5 Q.  Or the gym incident?
6 A.  No, I don't.
7 Q.  Do you a specific memory of Valerie Merlo
8     telling you she met with Kayla Reynolds about
9     the van incident?
10 A.  No, I don't.
11 Q.  Or the gym incident?
12 A.  No, I don't.
13 Q.  Do you remember seeing Kayla Reynolds meet
14     with Val Merlo about the van incident?
15 A.  I don't.
16 Q.  Or the gym incident?
17 A.  (Witness shakes head.)
18 Q.  Is that a no?
19 A.  Yes.
20 Q.  You were asked about the gym incident and what
21     the school did in response to it.  You gave
22     some testimony about the students sitting
23     separately on the bus and the seating chart;
24     do you remember that?
25 A.  Yes.

Page 77

1 Q.  Were there any other steps the school took
2     with these two students following the gym
3     incident for during the school day?
4 A.  During the school day they were separated at
5     recess, stuff like that.  They tried to keep
6     them separated if they could.
7 Q.  How do you know that?
8 A.  This is after the gym?
9 Q.  After the gym.
10 A.  I am sorry, after the gym.  Well, they
11     definitely -- I don't recall.  I don't
12     remember.
13 Q.  After the van incident, do you remember if
14     there is anything -- other than putting them
15     on separate buses, is there anything the
16     school did with these two students?
17 A.  I know that the male student basically stayed
18     in the room, like it was jail, and K.M. was
19     out in and doing the classes and stuff like
20     that.  So he was kind of stuck in our class
21     all day, you know.
22 Q.  With you?
23 A.  No, with Ms. Ringold sometimes.
24 Q.  Where did he eat lunch?
25 A.  In our room.

Page 78

1  Q.  Every day?
2  A.  Yes.
3  Q.  Where did he have recess?
4  A.  Sometimes he would be outside.  He would come
5      out after the other kids would come in.
6  Q.  So he was out there by himself?
7  A.  Yes.
8  Q.  And what about the specials or related arts
9      after the van incident, what happened with the
10     male student then?
11 A.  He was in the classroom.  He didn't go to the
12     specials.
13 Q.  At all?
14 A.  At all.
15 Q.  For the rest of that school year?
16 A.  Yes.
17          MS. DOHERTY: I think that's all I
18     have for you, sir.  Somebody else might have
19     something else.
20          MR. PECK: I don't have anything.
21          MR. JUG: I do.
22          -----
23          EXAMINATION
24          -----
25  BY MR. JUG:

Page 79

1  Q.  Counsel had asked you if have a specific
2      recollection of Kayla speaking with Ms. Merlo,
3      and you don't; is what your testimony?
4  A.  Say it again, I am sorry.
5  Q.  Ms. Doherty asked you if you have a specific
6      recollection of Kayla Reynolds speaking with
7      Ms. Merlo, the principal, about the incident
8      on the bus, and is it your testimony you don't
9      have a specific recollection of that?
10 A.  No.
11 Q.  Were you present when Kayla Reynolds ever
12     discussed this incident with Ms. Merlo?
13 A.  I don't.
14 Q.  So if you weren't present, it is certainly
15     possible that Kayla Reynolds was asked by Ms.
16     Merlo about what she saw; isn't that correct?
17 A.  I don't remember.
18 Q.  Do you find Ms. Merlo the principal to be
19     credible?
20          MS. DOHERTY: Object to the form.
21 Q.  You can answer.
22 A.  Yes.  Ms. Merlo, she is a great person.  She
23     would do anything to keep the kids safe, and I
24     worked with her for a long time.  She was
25     definitely a great person.

Page 80

1  Q.  If Ms. Merlo reported to the police that Kayla
2      Reynolds told her that these students were
3      seen in the last row with K.M. sitting on the
4      lap of a male student, if that didn't come
5      from Kayla Reynolds, do you have any idea as
6      to who that could have come from?
7          MS. DOHERTY: Object to form.
8  A.  I don't recall or don't know.
9          MR. JUG: Nothing further.
10         MS. DOHERTY: We will read.
11         -----
12 (Thereupon, at 12:00 p.m., the deposition was
13 concluded.  Signature was not waived.)
14         -----

Page 81

1  COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
2  COUNTY OF ALLEGHENY          ) S H E E T
3          I, JUSTIN DREXLER, have read the
   foregoing pages of my deposition given on July
   26, 2019, and wish to make the following, if
4  any amendments, additions, deletions or
   corrections:
5
6  Page/Line     Should Read        Reason for Change
7
8
9
10
11
12
13
14
15
16
17
18 In all other respects, the transcript is true
   and correct.
19  _____
20  JUSTIN DREXLER
21  Subscribed and sworn to before me this
22  _____day of _____, 2019.
23  _____
    Notary Public
24  Ref No. SS53065
25

# EXHIBIT

# J

THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

M.M., parent and natural guardian,
of K.M., a minor,

       Plaintiff,

   v.

PITTSBURGH PUBLIC SCHOOL
DISTRICT, and BRIMAR TRANSIT, INC.

CIVIL DIVISION

Case No. GD-18-003257

**PLAINTIFF'S ANSWER TO
INTERROGATORIES AND REQUESTS
FOR PRODUCTION**

FILED ON BEHALF OF:

Plaintiff

COUNSEL OF RECORD:

Fred C. Jug, Jr., Esquire
Pa. I.D. No. 58285

Brandt, Milnes & Rea, P.C.
Firm No. 032

310 Grant Street, Suite 1109
Pittsburgh, PA 15219

(412) 255-6500
(412) 255-6504 (Fax)

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

M.M., parent and natural guardian,     CIVIL DIVISION
of K.M., a minor,

     Plaintiff,     Case No. GD-18-003257

   v.

PITTSBURGH PUBLIC SCHOOL
DISTRICT, and BRIMAR TRANSIT, INC.

### PLAINTIFF'S ANSWER TO INTERROGATORIES AND REQUESTS FOR PRODUCTION DIRECTED TO PLAINTIFF

AND NOW, comes the Plaintiff, above-named, by and through the undersigned counsel, Fred C. Jug, Jr., Esquire and Brandt, Milnes & Rea, P. C., who files the following Answers to Interrogatories and Response to Request for Production of Documents:

### GENERAL OBJECTIONS

1.    To the extent that any discovery request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, Plaintiff objects to same.

2.    Plaintiff objects to the Interrogatories of Brimar to the extent they are vague, ambiguous, overly broad and burdensome.  Brimar has already been provided with the records and information they are now requesting.

3.    Plaintiff objects to the Interrogatories to the extent that they require the Plaintiff to make inquiry and give answers and responses regarding information that is in the possession of the parties and exceeds the requirements of the applicable Rules of Civil Procedure.

4.    Plaintiff objects to any and all Interrogatories which request information that is protected by the work product doctrine, any applicable privilege, protection or restriction and/or is protected by the attorney-client privilege.

5.    Plaintiff objects to any discovery requests which seek Plaintiff to divulge information outside of the time-table that is consistent with the Pennsylvania Rules of Civil Procedure.

6.    Plaintiff objects to providing information that is a matter of public record and is equally accessible to the Defendant Brimar through the examination of the public record on the grounds that providing such information is unduly burdensome.

7.     Plaintiff's investigation of facts related to the claims at issue is continuing.  Accordingly, Plaintiff's responses to the discovery requests of Brimar are based only upon such information and documents that are available and known to the Plaintiff as of the time of these responses.  Plaintiff reserves the right to supplement these responses or provide additional information in the Pre-Trial Statement which is filed pursuant to Local Rule 212.

8.     Each of these General Objections is incorporated by reference to the following responses.

## ANSWERS TO INTERROGATORIES

1.     Please identify each individual by name, address, and telephone number who has answered these Interrogatories and Requests for Production, or who has provided any information or documents in response to these Interrogatories and Requests for Production.

**Response:**

**M.M. for K.M.:  5715 Rural Street, Unit #2, Pittsburgh, PA 15206.  Plaintiffs object to the request for a telephone number as these individuals are parties in the litigation and are represented by legal counsel.  Accordingly, all communications with these parties should be by and through legal counsel.**

2.     Did K.M. or M.M., or anyone on either of their behalf, conduct any inspections or investigations related in any way to the accident alleged in the Third Amended Complaint?

**Response:**

**Plaintiff objects to a request for work product of their counsel.  The knowledge of K.M. and/or M.M. of the incidents which are the subject of this litigation was obtained through their first hand experience, rather than through an investigation.  Plaintiff is aware that the school district conducted an investigation and also the City of Pittsburgh Police.  These documents were previously provided to counsel for Brimar as a result of an Authorization being signed by M.M. and the school district producing these documents.**

3.     If your answer to Interrogatory No. 2 is affirmative, as to each such inspection or investigation, please:

  a.     Identify by name, address, and telephone number of the individual(s) that conducted the inspection or investigation;

  b.     State the date of the inspection or investigation;

  c.     State the purpose of the inspection or investigation; and

  d.     If any oral report was produced or provided to you pursuant to such inspection or investigation, state the substance of such oral report.

**Response:**

**Plaintiff objects to this Interrogatory to the extent that it requests information which is privileged and/or the attorney work product. By way of further response, the school district previously provided the police and childline reports to counsel for Brimar on July 6, 2018.**

4.     Please identify by name, address, and telephone number of all individuals known or believed to have information relevant to any of K.M.'s and/or M.M.'s claims in this litigation.

**Response:**

**Plaintiff objects to providing a telephone number for M.M. and K.M. as they are parties in this litigation and represented by legal counsel. Those individuals who are believed to have knowledge of these claims in addition to M.M. and K.M. include:**

**Valerie Merlo, Candice Meyer, Kayla Reynolds, Michelle Stanton, Michelle Ringgold, Sara Boggess, Justin Drexler and Mr. Ted Vasser who are identified in the school district's response to Interrogatories. The relationship of these parties are identified by the school district in response to Interrogatory #4 which was served on them. Mr. Vasser's position with the transportation department is also identified in the school district's discovery responses. In addition, students who were interviewed following the incident would also have knowledge and their statements have been provided in the documents produced by the school district.**

In addition to these individuals, the regular driver assigned to the bus as well as the substitute drivers identified in Brimar's discovery responses have knowledge of the subject incidents.  Shaniece Johnson, the original driver and also Shidale Demby.

5.      For each witness identified in Interrogatory No. 4:

(a)      Produce a brief testimony of their expected testimony;

(b)      State the witness's relationship to you; and

(c)      Describe the nature and extent of the witness's acquaintanceship with you.

**Response:**

**(a) – (c)      Plaintiff objects to this Interrogatory as it is overly broad, burdensome, not limited in scope and requires disclosure of information beyond that required by the Pennsylvania Rules of Civil Procedure.  By way of further response and without waiving this objection, those individuals identified in Interrogatory #4 are employees of either the Defendant school district and/or Brimar and have knowledge based on their experience as either the principal of the school which K.M. attended, her teacher, classroom assistant, physical education teacher and the classroom assistant and teacher of the male student who assaulted K.M.**

**In addition, discovery is on-going and additional witnesses may be identified within the time permitted by Local Rule 212 and any individuals who Plaintiff intends to call as witnesses at the time of trial will be identified in the Pre-Trial Statement.**

6.      Have K.M. or M.M., or anyone on their behalf, taken any statements of any party to this litigation, any witness to the events alleged by any party in this litigation, or of any individual with knowledge relevant to any claims set forth in this litigation, or are you in possession of any such statements taken by others?

**Response:**

**To date, Plaintiff has not obtained a statement of any party to this litigation or any witness. Plaintiff and Brimar are both in possession of statements which were provided by the school district, and the school district's response to Interrogatory #6 is incorporated herein by reference. These documents were**

**previously produced to Brimar as a result of an Authorization signed by M.M.  The statements include a statement from the young man involved, K.M. and another student who was present on the bus at the time of the assault.**

7.     If your answer to Interrogatory No. 6 is affirmative, as to each such statement, please:

      a.     Identify by name, address, and telephone number the person who gave such statement;

      b.     Identify by name, address, and telephone number the person to whom such statement was made;

      c.     State the date upon which the statement was made;

      d.     State whether the statement was given orally or in writing;

      e.     If the statement was given orally, state whether a recording or transcription of such statement was made;

      f.     If the statement was transcribed, identify by name, address, and telephone number the individual that transcribed the statement; and

      g.     State the substance of such statement.

**Response:**

**See response to Interrogatory No. 6 above.**

8.     Have K.M. or M.M. given any statements to anyone that are in any way related to the accident, the injuries or damages caused by the accident, or to the claims set forth in this litigation?

**Response:**

**M.M. has not provided a statement to anyone.  An objection is made to any statements which would be subject to the attorney-client privilege.  The statement**

**of K.M was previously produced by the school district to counsel for Brimar as a result of an Authorization being signed by M.M.**

9.     If your answer to Interrogatory No. 8 is affirmative, as to each such statement, please:

      a.     Identify by name, address, and telephone number the person to whom such statement was made;

      b.     State the date upon which the statement was made;

      c.     State whether the statement was given orally or in writing;

      d.     If the statement was given orally, state whether a recording or transcription of such statement was made;

      e.     If the statement was transcribed, identify by name, address, and telephone number the individual that transcribed the statement; and

      f.     State the substance of such statement.

**Response:**

**See response to Interrogatory No. 8 above.**

10.     State the complete name of the court, term, number and the names of the parties and their attorneys to any lawsuit that has been filed by M.M. or K.M. or on their behalf for the recovery of money damages for any injuries which may have been sustained at any time.

**Response:**

**N/A**

11.     Have K.M. or M.M. ever made a claim for personal injuries against any person, company, or governmental agency in which legal proceedings were not instituted?  If so, for each claim state:

      (a)     The identity of the person or agency against whom the claim was made;

      (b)     The date of the claim;

      (c)     A description of the injury on which the claim was based; and

      (d)     Whether the claim was allowed or denied and if allowed the recovery obtained, and if denied the reasons that were given for the denial.

**Response:**          **No.**


12.     If M.M. has ever been charged with any criminal offense, please state:

      (a)     The nature of the offense;

      (b)     The date of the offense;

      (c)     The county and state in which the alleged events occurred; and

      (d)     The sentence imposed, if applicable.

**Response:**

**Plaintiff objects to this Interrogatory.  Without waiving this objection, the answer is no.**


13.     If K.M. or M.M. have ever been involved in any legal action other than those previously identified, either as a defendant, plaintiff, claimant, or witness, please state:

      (a)     The date and place each such action was filed, giving the name of the forum, the name of the other party or parties involved, the number of such action, and the names of the attorneys representing each party; and

      (b)     A description of the nature of each such action.

**Response:**

(a)     Plaintiff objects to this Interrogatory and incorporates by reference the General Objections above.  Without waiving this objection, Plaintiff is not involved in any other civil action or criminal proceeding.

(b)     N/A.


14.     Please identify by name, address (the address should be the address at which you received treatment), telephone number, and dates of treatment, all of the following:

      a.     All medical providers from whom K.M. has received any treatment as a result of the incident alleged in the Third Amended Complaint;

      b.     All medical providers with whom K.M. is currently treating as a result of the incident alleged in the Third Amended Complaint; and

      c.     All medical providers from whom K.M. has received treatment in the ten (10) year period preceding the incident alleged in the Third Amended Complaint.

**Response:**

(a)     These records were previously provided to counsel for Brimar.  They include the Children's Hospital records.  In addition, K.M. received treatment at Children's Hospital (UPMC) Primary Care Physicians.

(b)     Plaintiff's pediatrician is with Children's Hospital (UPMC) Primary Care Physicians.

(c)     K.M.'s pediatrician has been the same for the ten-year period preceding the incidents which are the subject of this litigation and that is UPMC Primary Care Physicians at Children's Hospital.

15.     Please identify by name, address, telephone number, and dates of treatment, all of the following:

      a.     All psychologists, psychiatrists, counselors, and any other mental healthcare provides from whom K.M. has received any treatment as a result of the incident alleged in the Third Amended Complaint;

      b.     All psychologists, psychiatrists, counselors, and any other mental healthcare providers with whom K.M. is currently treating as a result of the incident alleged in the Third Amended Complaint; and

      c.     All psychologists, psychiatrist, counselors, and other mental healthcare providers from whom K.M. has received treatment in the ten (10) year period preceding the incident alleged in the Third Amended Complaint.

**Response:**

**(a)     The Center for Victims therapist was named Angelina.**

**(b)     Adaptive Behavioral Services located at North Highland Avenue in the East Liberty section of Pittsburgh.**

**(c)     N/A**

16.     Please provide an itemized list of all damages that you claim in this litigation.

**Response:**

**Damages are defined within the Complaint.  The Plaintiff's medical expenses have been satisfied.  The minor Plaintiff suffers with anxiety and prior to trial, Plaintiff anticipates obtaining an expert to provide a report and testimony at trial relative to the damages associated with the sexual assault of a child.**

17.     Please describe in as much detail as possible those disabilities with which

K.M. was diagnosed, and which are alleged in the Third Amended Complaint.

**Response:**

**Plaintiff objects to this Interrogatory and incorporates by reference the General Objections set forth above.  Without waiving said objection, the records of the school district have already been provided to counsel for Brimar.  By way of further response, Plaintiff's disabilities include speech, muscle weakness, cognitive skills and learning disabilities.**

18.     Please describe in as much detail as possible the emotional distress alleged

to have been suffered by K.M. as a result of the incident alleged in the Third Amended

Complaint.

**Response:**

**Plaintiff objects to this Interrogatory and incorporates by reference the General Objections set forth above. Without waiving said objection, Plaintiff suffers with anxiety and has experienced emotional distress as a result of the sexual assault. The emotional distress and post-traumatic stress that victims of child sexual assault experience are well established and as referenced above, Plaintiff will identify an expert and produce a report within the time required by Local Rule 212. In addition, this assault has resulted in the Plaintiff experiencing fear when seeing the young man in question and she remains fearful to this day as a result of the experiences she had with this young man. Following the incident in the gym class, the male student remained in the same school and on the same bus which allowed the sexual assault to occur. Thereafter, the young man was moved to another school and the Plaintiff encountered him at a field trip which caused her distress. K.M.'s fear of the young man continued and she was fearful as recently as the mediation which occurred on April 5, 2019, because she did not wish to encounter this young man again.**

19.     Please describe in as much detail as possible each way in which any

post-traumatic stress as a result of the incident alleged in the Third Amended Complaint

has manifested itself with respect to K.M.

**Response:**

**Plaintiff objects to this Interrogatory and incorporates by reference the General Objections set forth above.  Without waiving said objection, please see the response to Interrogatory No. 18 above.**

20.    To the extent that you allege that a contract or agreement existed to keep K.M. and the male student separated while on the bus:

    a.    Identify each of the parties to such contract or agreement;

    b.    Identify by name, address, and telephone number each individual that participated in negotiations for such contract or agreement on behalf of their respective principal, and each individual that entered into such contract on behalf of their respective principal;

    c.    State each date upon which negotiations for such contract or agreement took place;

    d.    State the date upon which such contract or agreement was entered;

    e.    State whether such contract or agreement was oral or in writing;

    f.    If such contract or agreement was oral, describe in as much detail as possible each of the terms of such contract or agreement; and

    g.    If you allege that K.M. was a third-party beneficiary of such contract or agreement, describe all facts that establish K.M. as a third-party beneficiary thereof.

**Response:**

**(a)-(b) The Plaintiffs, M.M. and K.M., the school district and Brimar had an agreement to keep K.M. and the male student separated. This was agreed to by M.M. and the school district and was further agreed with Brimar.  The specifics of this agreement are set forth in the school district's response to Interrogatories 11, 14, 15 and 16.  In addition, the school district has produced copies of e-mails with**

M.M. following the incident that occurred in the gym class.  In addition, M.M. and the regular bus driver confirmed the agreement to keep these two students separated. These agreements were valid. The agreement between the school district and Brimar is a written contract which Brimar has possession of. As special needs students, written guidelines and policies also apply, including those defined in the Pa. School Bus Driver's Manual.  Brimar has a copy of this document as it was attached to the Amended Complaint they were served with.

(c)     See the school district's response to request for production of documents, the e-mails produced as well as the school district's response to Interrogatories 11, 14, 15, 16 and 17.

(d)     An agreement was entered following the incident which occurred in gym class.  The time-period is referenced above and in the school district's response to Interrogatories as well as the school district's response to Request for Production of Documents.

(e)     Oral agreement between the Plaintiff and Defendants as described herein.

(f)     See above as well as the school district's response to Interrogatories and the Response to Request for Production of Documents.  In addition, the agreement was to assign seats for K.M. and the male student so that they were separated on the bus.  As set forth in the Complaint and in the Pennsylvania School Bus Driver's Manual, Brimar had obligations related to the assigned seats and breached these obligations, which allowed the assault to occur.

(g)     K.M. was the intended beneficiary to the agreement to assign seats and to keep these two (2) students separated.


21.     Identify by name, address, and telephone numbers all individuals associated in any way with the Pittsburgh Public School District that represented to K.M. and/or to M.M. that the subject male student and K.M. would be separated while on the bus, or that there was an agreement in place to keep K.M. and the male student separated while on the bus.

Response:

Candace Meyer, the principal.  It is also believed the director of transportation made this representation.  By way of further response, see the school district's response to Interrogatory 17.

22.   As to each individual identified in your response to Interrogatory No. 21:

    a.   State the date upon which each such representation was made;

    b.   Describe in as much detail as possible the substance of the conversation in which such representation was made, including the representation itself; and

    c.   Identify by name, address, and telephone number any witnesses to any such representation.

**Response:**

**(a)-(c) See answer to Interrogatory No. 21 above and also the school district's response to Interrogatory 17.**

23.   Identify by name, address, and telephone numbers all individuals associated in any way with Brimar Transit, Inc. that represented to K.M. and/or to M.M. that the subject male student and K.M. would be separated while on the bus, or that there was an agreement in place to keep K.M. and the male student separated while on the bus.

**Response:**

**Following the incident in the gym class, this representation was made by the driver who was regularly assigned to this route. Brimar's discovery responses identify this driver as Shaniece Johnson.**

24.   As to each individual identified in your response to Interrogatory No. 23:

    a.   State the date upon which each such representation was made;

b.      Describe in as much detail as possible the substance of the conversation in which such representation was made, including the representation itself; and

c.      Identify by name, address, and telephone number any witnesses to any such representation.

**Response:**

(a)     This discussion occurred at the bus stop shortly after the incident in gym class and the conversations and e-mails which the school district records identify to be in late January 2016.

(b)     A representation was made to M.M. that K.M. and the male student would have assigned seats and would be separated on the bus as a result of the incident that occurred in school.

(c)     Other than K.M. and the regular driver, the witnesses would have been the other students on the bus.

25.     To the extent that you allege that Brimar Transit was notified that K.M. and the male student were to be separated while they were on the bus, please:

a.      Identify by name, address, and telephone number any and all individuals that notified Brimar Transit of such requirement;

b.      Identify by name, address, and telephone number any and all individuals in any way associated with Brimar Transit that were notified of such requirement;

c.      State the date upon which each such notification was made;

d.      Describe in as much detail as possible the substance of the conversation in which such notification was made, including the notification itself; and

e.  Identify by name, address, and telephone number any and all individuals that witnessed such notification.

**Response:**

**(a)-(e) The pleadings of the school district as well as the school district's response to discovery include this information. Specifically, the school district's response to Interrogatories 11 and 15.**

26.  Identify by name, address, and telephone number all individuals that witnessed the incident alleged to have occurred in gym class, and all individuals to whom M.M. or K.M. reported, or whom they otherwise advised of, the incident alleged to have occurred in gym class.

**Response:**

**The address and telephone number of the individuals with such knowledge would be known by the school district. These individuals would include K.M., the male student who was involved, the gym teacher who is identified as Ms. Sara Boggess. It is also believed a classroom assistant, Michelle Stanton, has such knowledge, along with the other students in the gym class.**

27.  As to each individual identified in your response to Interrogatory No. 26:

a.  State whether such individual is associated with the Pittsburgh Public School District or Brimar Transit, Inc.;

b.  State the date upon which each such report or advice was made;

c.  Describe in as much detail as possible the substance of the report or advice; and

d.  Identify by name, address, and telephone number any witnesses to any such report or advice.

**Response:**

**(a)** **Ms. Boggess and Ms. Stanton are or were employees of the school district at the time;**

**(b)** **A report was made shortly after the incident in the gym class.**

**(c)** **As a result of the school district being aware of inappropriate contact of the male student fondling K.M., the school district then contacted M.M. and an agreement was reached to separate the two students.**

**(d)** **Unknown.**

28.    Please describe all issues and inappropriate behavior demonstrated by the male student and K.M. (including the incident in gym class) that occurred prior to April 29, 2016, and which is alleged in the Third Amended Complaint.

**Response:**

**The male student inappropriately touched K.M. as he fondled her breasts while the students were in gym class.**

29.    As to each issue or inappropriate behavior identified in your response to interrogatory No. 28:

   a.    State the date upon which each such issue or inappropriate behavior occurred;

   b.    State where such issue or inappropriate behavior occurred;

   c.    Identify by name, address, and phone number each individual that witnessed each such issue or inappropriate behavior, and, as to each such person, state whether the person was associated with the Pittsburgh Public School District or Brimar Transit, Inc.

    d.      If such issues or inappropriate behavior were reported to anyone else by M.M. and/or K.M., as to each such report:

        i.     Identify by name, address, and telephone number of the person that reported such issues or inappropriate behavior;

        ii.    Identify by name, address, and telephone number the person to whom such issues or inappropriate behavior were reported, including whether such person was associated with the Pittsburgh Public School District or Brimar Transit, Inc.;

        iii.   Identify the issue(s) or inappropriate behavior(s) that was reported; and

        iv.   State the date upon which such report was made.

**Response:**

**(a)    Late January 2016;**

**(b)    Gym class**

**(c)    See Answer to Interrogatory No. 28 above.**

**(d)    After the teachers and the school became aware of it, the incident was reported to M.M. by the school district, rather than M.M. reporting the incident to the school district.**

30.    If you allege that Brimar Transit otherwise knew, or was aware, of the incident alleged to have occurred in gym class, or of any issues or inappropriate behavior described in your response to Interrogatory No. 28, please:

    a.      Identify those events, issues, or inappropriate behavior of which Brimar Transit was aware;

b.      Describe how Brimar Transit became aware of such events, issues, or inappropriate behavior, including whether anyone associated with Brimar Transit witnessed such events, issues, or inappropriate behavior or whether anyone associated with Brimar Transit was advised of such events, issues, or inappropriate behavior;

c.      If you allege that anyone associated with Brimar Transit was advised of such events, issues, or inappropriate behavior:

      i.      Identify by name, address, and telephone number any and all individuals that told Brimar Transit of such events, issues, or inappropriate behavior;

      ii.      Identify the individual associated with Brimar Transit that was advised of such events, issues, or inappropriate behavior; and

      iii.      State each date upon which each individual associated with Brimar Transit that was advised of such events, issues, or inappropriate behavior.

**Response:**

**See the school district's response to Interrogatory No. 11. By way of further response, M.M. and the regular bus driver had a conversation referenced above in which this incident was acknowledged and it was agreed that K.M. and the male student would be separated. Therefore, Brimar was aware of this incident as a result of the school district informing them and M.M. also having this conversation.**

31.      To the extent that you allege that Brimar Transit, Inc. contracted or agreed to provide a safe environment for K.M. and to take steps to prevent the male student from accessing or having contact with K.M., as to each such contract or agreement:

a.   Identify by name, address, and telephone number each individual associated with Brimar Transit that entered into such contract or agreement;

b.   Identify by name, address, and telephone each individual with whom Brimar Transit entered into such contract or agreement;

c.   State the date upon which such contract or agreement was made;

d.   Was such contract or agreement in writing or oral;

e.   If such contract or agreement was oral, describe the terms of the contract or agreement in as much detail as possible; and

f.   Describe the steps that Brimar Transit contracted or agreed to take to provide a safe environment for K.M., or to otherwise prevent the male student from accessing or contacting K.M.

**Response:**

(a)   **The regular driver, Ms. Johnson, as set forth above, is identified in the school district's response to Interrogatory No. 11 and also at the time of the conversation with M.M. described above.**

(b)   **The school district response to Interrogatory No. 11 refers to the winter of 2016 and M.M. had this discussion shortly after the incident in late January 2016.**

(c)   **See response to (b) above.**

(d)   **Oral. In addition, discovery is on-going and it is not known whether the school district has additional documents or e-mails which reference the agreement or contract. In addition, a written agreement exists by and between the school district and Brimar relative to Brimar's obligations to provide a safe environment. Certain other written documents/policies apply to the special needs students and these include those defined in the Pa. School Bus Driver's Manual which was previously served on the Defendant Brimar. By way of example, these written responsibilities and requirements are defined in Units B and D of that manual.**

(e)   **See (b) above.**

**(f)     M.M. was told by the regular driver that there would be assigned seats and that K.M. would be seated next to the driver and the male student would be in the rear seat of the bus/van.**

32.     Describe the steps that the original bus driver took to ensure that K.M. and the subject male student were separated while on the bus.

**Response:**

**See answer to Interrogatory 31(f) above.**

33.     Identify by name, address, and telephone number all individuals with any knowledge that the driver of the bus on April 29, 2016, was texting or otherwise using her cell phone.

**Response:**

**K.M.  In addition, discovery is on-going.**

34.     Please state the names, home addresses, and business addresses of all persons whom you expect to call as expert witnesses at trial.

**Response:**

**Plaintiff has not yet retained an expert.  Plaintiff will identify an expert and produce a report which complies with Local Rule 212.**

35.     For each of the experts identified in your response to Interrogatory No. 34, please state the expert's occupation and any areas of specialization.

**Response:**

**See Answer to Interrogatory No. 34 above.**

36.     For each of the experts identified in your response to Interrogatory No. 34, please state:

      a.    The school that the expert attended, including the years of attendance, the course of study the expert pursued, and degrees received;

      b.    The expert's experience in particular fields, including the names and addresses of employers with inclusive years of employment and positions held with each such employer;

      c.    A list of all publications, including but not limited to books, articles, and reports, issued, authored, co-authored, or edited by the expert, including the title of the work, the name of the periodical or book in which it was printed, and the date of its printing;

      d.    Any other education, training, or experience that each expert has had in his or her field of expertise, setting forth the nature of the education, training, or experience, where or from whom the expert received, and when the expert received it;

      e.    Each state in which the expert has been licensed or certified, and for each such license or certification, the name of the entity that issued it, the date it was issued, the number of, and any other identifying information with respect to the license or certification, and, if the license or certification was ever suspended or revoked, the date upon which it was suspended or revoked and the reasons therefor;

      f.    The names and addresses of the professional associations, societies, or organizations of which the expert has been, or is, a

member, the positions that the expert held with each such
organization, and the dates the expert held each such position.

g.   The court, term, and number of each case in which the expert has
testified, and for each such case, the party on whose behalf the
expert testified.  If full captions are unavailable, give the names of
the cases and state the names of each court in which they were tried,
as well as the approximate date of trial.

**Response:   See Answer to Interrogatory No. 34 above.**


37.   For each of the experts identified in your response to Interrogatory No. 34,
please set forth the facts to which the expert is expected to testify.

**Response:   See Answer to Interrogatory No. 34 above.**


38.   For each of the experts identified in your response to Interrogatory No. 34,
please set forth the opinion to which each expert is expected to testify.

**Response:   See Answer to Interrogatory No. 34 above.**


39.   For each of the experts identified in your response to Interrogatory No. 34,
please set forth in detail the factual information and materials supplied to each expert by
Plaintiffs or their agents, attorneys, or other representatives that was used as a basis for
the expert's opinion, including any and all documents, reports, or records furnished, all
testimony, statement, and reference materials reviewed, and all physical evidence,
objects, test results, inspection reports, photographs, plans or other tangible things

provided to each expert for review or inspection, including the place and date of each such review or inspection.

**Response:   See Answer to Interrogatory No. 34 above.**

40.    For each of the experts identified in your response to Interrogatory No. 34, please set forth a summary of the grounds for the expert's opinion to which the expert is expected to testify, including but not limited to, any tests or experiments conducted, and any text, statute, regulation, or industry standard upon which the expert will rely.  Identify all such texts, including by name, author, edition, and page, and all such statutes, regulations, or industry standards.

**Response:   See Answer to Interrogatory No. 34 above.**

41.    For each of the experts identified in your response to Interrogatory No. 34, please attach copies of the expert's current curriculum vitae and all reports related to the expert's testimony.

**Response:   See Answer to Interrogatory No. 34 above.**

42.    Please describe in as much detail as possible all occurrences and events, in chronological order, leading up to, at the time of, and immediately preceding the incident alleged in the Third Amended Complaint.

**Response:**

**Plaintiff objects to this Interrogatory to the extent it is overly broad, burdensome and vague.  Without waiving this objection, the occurrences and events are described in the Complaint as well as in the statements which the school district has produced.  By way of brief summary and without waiving the objection, an incident occurred in gym class in which the male student assaulted K.M.**

**Thereafter, the male student continued to demonstrate an infatuation with K.M. and his interest in K.M. and attempts to touch her inappropriately continued on the bus. An agreement was made prior to April 29, 2016 wherein the male student and K.M. would be separated on the bus and these students were assigned seats. On April 29, 2016, the substitute bus driver did not follow this agreement, and this resulted in the sexual assault occurring. In addition, the bus driver breached her duties by not being aware of what was occurring and failing to respond to the assault as it occurred, including the pants being off the male student and K.M. when the students were feet away from her and/or for not recognizing what was going on or responding to the children on the bus.  All of this constitutes a breach of the driver's duties relative to the operation of the bus and results in Brimar being liable for the actions/inactions of their employee.**

43.    Have K.M. or M.M. had any conversations with anyone else regarding the events alleged in the Third Amended Complaint, the incident alleged therein, the injuries and/or damages alleged in the Third Amended Complaint, and/or any other matter that in any way relates to the allegations set forth in the Third Amended Complaint?

**Response:**

**Yes.  See the above responses and the responses of the school district which confirm a conversation with the principal, Candace Meyers, as well as the conversation M.M. had with the driver who was regularly assigned to the bus route.**

44.    If your response to Interrogatory No. 43 is affirmative, as to each such conversation please:

a.    Identify by name, address, and telephone number the individual with whom you had such conversation;

b.    Identify any other individuals by name, address, and telephone number that were witnesses to such conversation;

c.    State the date upon which the conversation occurred; and

d.    Set forth the substance of the conversation.

**Response:**

**See the above responses which identify these conversations.**

45.     Does any entity hold any liens through which such entity would have a claim to any amounts paid to you as a result of this litigation (such as Medicare and DPW liens)?

**Response:**

**K.M.'s medical bills were satisfied by Gateway and this insurance is provided through DPW.  To date, notice of a lien has not been provided.**

46.     If your response to Interrogatory No. 45 is affirmative, as to each such lien, please:

      a.     Identify the entity by name, address, and telephone number the entity that holds such lien;

      b.     State the amount of such lien.

**Response:**

**See Answer to Interrogatory No. 45 above.**

## Requests for Production

1.     Please produce all documents to which you refer in your responses to the Interrogatories above.

**Response:**

**All documents relied on were previously produced by the school district and/or Brimar.  In addition, the school records as well as K.M.'s medical records were previously provided to counsel for Brimar.**

2.     Please produce copies of all photographs that are in any way related to your claims in this litigation.

**Response:**

**The only photographs in the possession of Plaintiffs relative to this incident are the photographs of the bus which were produced by the defendant.**

3.     Please produce a copy of any documents, including, but not limited to, reports and pictures, created pursuant to, or as a result of, any inspection or investigation that you identified in your responses to Interrogatory No. 2 and Interrogatory No. 3.

**Response:**

**N/A**

4.     Please produce a copy of all statements, including all transcripts and recordings thereof, identified in your responses to Interrogatory No. 6, Interrogatory No. 7, Interrogatory No. 8, and Interrogatory No. 9.

**Response:**

**The only statements the Plaintiffs are aware of are the statements which were produced by the school district as a result of an authorization M.M. signed.**

5.      Please produce copies of all medical records, including all images produced by any imaging studies, related to any and all treatment that you have identified in response to Interrogatory No. 14 and Interrogatory No. 15.

**Response:**

**The medical records have previously been produced and they include the Children's Hospital records.  The pediatrician records have been requested and will be provided upon receipt of same.**

6.      Please produce copies of all documents, including all medical bills, evidencing any medical expenses that you allege that you incurred as a result of the accident and for which you seek recovery in this lawsuit.

**Response:**

**The medical records have previously been produced and they include the Children's Hospital records.**

7.      Please produce copies of all reports or other documents showing any diagnose or treatment of, or that otherwise evidence, K.M.'s disabilities as alleged in the Third Amended Complaint.

**Response:**

**Records related to K.M.'s disability were previously produced by the school district as a result of the authorization M.M. provided.**

8.      Please produce copies of all contracts and agreements that are alleged in the Third Amended Complaint, including any contract to keep K.M. and the male student separated while on the bus, to provide a safe environment for K.M., and/or to take steps to prevent the male student from accessing or contacting K.M.

**Response:**

A copy of the written agreement between Brimar and the school district was produced by the defendant. The Pa. School Bus Driver's Manual has also been produced. The agreement to keep the male student and K.M. separated is evidenced in the e-mail exchange between Ms. Meyer and M.M. which has been produced. This agreement was also verbal.

9.      Please produce copies of all reports or other documents evidencing the emotional distress and/or post-traumatic stress that K.M. is alleged to have suffered as a result of the incident alleged in the Third Amended Complaint.

**Response:**

Plaintiff agrees to produce expert reports within the time permitted by Local Rule 212.

10.      Please produce copies of any and all other documents that evidence, or relate in any way, to the damages that you claim in this lawsuit.

**Response:**

Plaintiff will produce documents related to damages within the time permitted by Local Rule 212.  In addition, medical records from Children's Hospital have already been produced.

11.      Please produce all documents evidencing any liens that you identified in response to Interrogatory No. 45 and Interrogatory No. 46, including all documents showing complete breakdowns of each such lien.

**Response:**

Plaintiff will supplement this response if notice of a lien is obtained.

12.     Please produce copies of all written correspondence or communications, and all attachments and enclosures, between K.M. and/or M.M. on one part, and anyone associated with Brimar Transit, Inc., on the other part, which relate in any way to any of the following:

    a.     K.M.'s disabilities;

    b.     The male student's disabilities;

    c.     Any issues or inappropriate behavior demonstrated by the male student towards K.M., including, but not limited to, the alleged incident in gym class, or any response thereto;

    d.     Any agreement(s) or directive(s) to keep the male student and K.M. separated while on the bus, to provide K.M. with a safe environment, or to keep the male student from accessing or contacting K.M.;

    e.     The incident alleged in the Third Amended Complaint;

    f.     Any treatment, emotional distress, or other injuries or damages alleged in the Third Amended Complaint;

    g.     Anything else related to your claims in this matter.

**Response:**

**Correspondence with counsel for Brimar, Mr. Lebovitz, which Brimar previously produced.**

13.     Please produce copies of all written correspondence or communications, and all attachments and enclosures, between K.M. and/or M.M. on one part, and anyone associated with Pittsburgh Public School District, on the other part, which relate in any way to any of the following:

    a.    K.M.'s disabilities;

    b.    The male student's disabilities;

    c.    Any issues or inappropriate behavior demonstrated by the male student towards K.M., including, but not limited to, the alleged incident in gym class, or any response thereto;

    d.    Any agreement(s) or directive(s) to keep the male student and K.M. separated while on the bus, to provide K.M. with a safe environment, or to keep the male student from accessing or contacting K.M.;

    e.    The incident alleged in the Third Amended Complaint;

    f.    Any treatment, emotional distress, or other injuries or damages alleged in the Third Amended Complaint;

    g.    Anything else related to your claims in this matter.

**Response:**

**The e-mails between Ms. Meyer and M.M. as well as communications directed to legal counsel for the school district were previously produced.**

14.    Please produce copies of any other documents that relate in any way to the events alleged in the Third Amended Complaint, the incident alleged in the Third Amended Complaint, the injuries and damages alleged in the Third Amended Complaint, or to your claims in this matter.

**Response:**

**All documents in the possession of the Plaintiff related to the injuries and damages have previously been produced.**

15.     Please produce copies of any documents provided to, and of any reports authored by, each expert identified in your responses to Interrogatory No. 34 through Interrogatory No. 41.

**Response:**

**Plaintiff has not yet obtained an expert.  An expert report will be produced within the time permitted by Local Rule 212.**

Respectfully submitted,

BRANDT, MILNES & REA, P.C.


 /s/ Fred C. Jug, Jr.
Fred C. Jug, Jr., Esquire
Pa. ID #58285
Counsel for Plaintiff

## **VERIFICATION**

I, Michelle Monroe, on behalf of K.M., a minor, hereby verifies that the facts set forth in the foregoing Plaintiff's Response to Defendant's Interrogatories and Request for Production of Documents are true and correct to the best of her knowledge, information and belief and further states that false statements herein are made subject to the penalties of 18 Pa.C.S.§ 4904 relating to unsworn falsification to authorities.

DATE:_____4/11/2019_____          /s/ Michelle Monroe_____
                                        Michelle Monroe

## CERTIFICATE OF SERVICE

I, Fred C. Jug, Jr., Esquire, certify that a true and correct copy of the within Answers to Interrogatories and Responses to Requests for Production has been served by Electronic Mail (e-mail) and U.S. Mail, First Class, this 11th day of April, 2019, upon:

Jason H. Peck, Esquire
DiBella Geer McAllister Best
20 Stanwix Street, 11th Floor
Pittsburgh, Pennsylvania 15222
*Counsel for Brimar Transit, Inc.*

Jamie Doherty, Esquire
Goehring, Rutter & Boehm
Frick Building
437 Grant Street, 14th Floor
Pittsburgh, PA 15219
*Counsel for Defendant Pittsburgh School District*

Respectfully submitted,

BRANDT, MILNES & REA, P.C.

 /s/ Fred C. Jug, Jr.
Fred C. Jug, Jr., Esquire
Pa. ID #58285
Counsel for Plaintiff

# EXHIBIT
# K

K█████ M█████                    (1)

On Friday when we were going home ██████████ touched me. He tried to hug me. I pushed him off of me. I hit him in the back. Then ███████ started talking to ██████ about me and him in bed together. I asked him what he was talking about. Then I hit him for talking about me inappropriate. Then he told me to lay on him. I said no. Then he said please. I said no. Then he forced me to lay on him.

(2)

He told me to pull my pants down. And he pulled his pants down too. Then he stuck his finger or something else in my butt. And I pushed him off of the seat. When I was getting off of the bus, he slapped my butt and said hey. Then I hit him back in in the hand hard.

~~~~~~~~~~~~~~~~

On thursday or Tuesday last week when I was sitting on the bus. He told me to

(3)

A ██████ ██████ lay down on the space on bus. I said no. Then he touched my leg. I kicked him. Then I asked my friends to tell ██████ to stop. Then he wanted me to kiss him. So I hit him in the elbow. Then when I was almost home, he said bye in a funny voice

One more time, I was watching videos w/ ██ ████████, and ██████. Then ██████ tried to touch my waist. I pushed him towards the window.

every time ███ touch k███ inappropriatly
I tal █████ to stop But he Said leave me alone
then ████ touch her boobs she do not like
it. And when k███ no ████ Beg her and
k███ said yes but not in a happey Voice
it sounded in a sad way ████ █ her pull his
pants down and ███ tall me and i leah back
like me and ████ friend But he Should not
do that to k███ he likes her But why do he
do that to her She my friend and no one should
do that to a friend so that all i got