**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Nora Barry Fischer |
| | ) | Civil Action No. 18-1129 |
| BRIMAR TRANSIT, INC., | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| PITTSBURGH PUBLIC SCHOOL DISTRICT, | ) | |
| | ) | |
| Intervenor Defendant. | ) | |

## MEMORANDUM OPINION

### I.     INTRODUCTION

This insurance coverage dispute returns to the Court on a contested motion for judgment on the pleadings pursuant to which Plaintiff National Liability & Fire Insurance Company, ("National"), seeks a declaration that it does not owe a duty to defend or indemnify Defendant Brimar Transit, Inc., ("Brimar"), or Intervenor Defendant Pittsburgh Public School District, (the "District"), in the underlying action styled *M.M., parent and natural guardian of K.M., a minor v. Pittsburgh Public School District and Brimar Transit, Inc.*, Case No. GD-18-003257, ("underlying action"), which is on the May 2020 trial list in the Court of Common Pleas of Allegheny County. (Docket No. 53).  National is providing a defense to Brimar in the underlying action under a reservation of rights but is not defending the District.  (Docket No. 46 at ¶¶ 15-16).  Brimar and the District contest the instant motion and assert that they are both entitled to a defense and indemnification in the event they are ultimately found liable.  (Docket Nos. 57-58).  The motion

for judgment on the pleadings has been fully briefed, (*see* Docket Nos. 53-54; 57-59; 65-66), and was argued at a motion hearing, (*see* Docket No. 75), the official transcript of which has been received and reviewed by the Court, (*see* Docket No. 82).  At the Court's direction, the parties also submitted supplemental briefing addressing whether this federal insurance coverage case should be stayed pending the trial of the underlying action.  (Docket Nos. 80; 83; 84; 89).

After careful consideration of the parties' submissions, and for the following reasons, the Court makes the following rulings.  First, the rule to show cause, (Docket No. 77), is vacated because the Court agrees with the parties that a stay of these proceedings is not appropriate at this time.  Second, National's motion for judgment on the pleadings as to the District, (Docket No. 53), is denied because there are material issues of fact as to whether the District was named an additional insured under the Policy or is entitled to coverage under a separately issued commercial general liability policy, ("CGL Policy").  Third, the District qualifies as an "insured" under the Policy as the underlying action contains allegations that it is vicariously liable for Brimar's negligence.  Fourth, National's motion for judgment on the pleadings arguing that it has no duty to defend or indemnify the underlying action, (Docket No. 53), is denied because National has failed to demonstrate that the factual allegations set forth in the underlying action are not potentially covered by the Policy and/or subject to an exclusion.  Therefore, National has a duty to defend Brimar and the District in the Court of Common Pleas and any further determinations as to the duty to indemnify either Defendant are premature given the procedural posture of the state tort action and this federal insurance coverage case.

II.     BACKGROUND

*A.  Parties*

The District and Brimar are parties to a contract pursuant to which Brimar agreed to provide student transportation services for the District during several school years. (*See* "Agreement", Exhibit A, Docket No. 46-1). The relevant terms and conditions of the parties' contract state that Brimar was expected to perform such services using safe vehicles and qualified drivers in accordance with the Pennsylvania Vehicle Code and other highway standards. (*Id*.). Brimar was also required to maintain insurance coverage for its vehicles and to provide a certificate of insurance to the District each year naming the District "as additional insured, verifying coverage of $1,000,000 per accident and a $5,000,000 umbrella." (*Id*. at ¶¶ 17-19; 2.f). Brimar further agreed "to indemnify, defend and hold harmless" the District "against any and all loss, damage, cost and expenses which the [District] may hereafter suffer or incur arising from [Brimar's] obligations under this Agreement." (*Id*. at ¶ 8).

### B. Commercial Auto Policy

As required under its agreement with the District, Brimar obtained Policy No. 73 APB 001185 from National for the policy period of January 11, 2016 through January 11, 2017, ("Policy"). (*See* "Commercial Policy", Docket No. 46-2). The Business Auto Coverage Declarations ("Declarations") note that Brimar is the named insured and in the business of "school buses"; Burns & Wilcox, Inc. is listed as the producer or broker on the transaction; and the form indicates that this is a new policy, meaning that it was not renewed from a prior time period. (Docket No. 46-2 at 55). The Declarations state that the Policy provides $1,000,000 in liability coverage for a premium of $69,654 as well as smaller premium amounts for additional coverage for personal injury protection; uninsured motorists; and underinsured motorists. (*Id*.). The Schedule of Covered Autos lists 26 separate vehicles covered under the Policy, all of which are described as "passenger vans" with listed seating capacities of 7 or 9 seats. (*Id*. at 57-58).

3

The relevant terms and conditions of the Policy include the following.

## BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we" and "us" and "our" refer to the company providing this insurance.

…

## SECTION II-LIABILITY COVERAGE

**A.** **Coverage**
We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

…

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

…

**B.** **Exclusions**
This insurance does not apply to any of the following:

…

**2.** **Contractual**
Liability assumed under any contract or agreement.
But this exclusion does not apply to liability or damages:
a. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or
b. That the "insured" would have in the absence of the contract or agreement.

(Docket No. 46-2 at 59-61).

…

## PENNSYLVANIA CHANGES – DEFENSE COSTS

4

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART

…

A.  The provisions of Paragraph B. are added to all Insuring Agreements that set forth a duty to defend under:

…

1.  Section II – Liability Coverage in Paragraph A. Coverage under the Business Auto …

B.  If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that none of the claims ("claims"), for which we provided a defense or defense costs, are covered under this insurance, we have the right to reimbursement for the defense costs we have incurred.
    The right to reimbursement under this provision will only apply to the costs we have incurred after we notify you in writing that there may not be coverage and that we are reserving our rights to terminate the defense or the payment of defense costs and to seek reimbursement for defense costs.

(Docket No. 46-2 at 85).

…

## ABUSE OR MOLESTATION EXCLUSION

PLEASE READ THIS ENDORSEMENT CAREFULLY

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

The following exclusion is added to the Policy:

This insurance does not apply to bodily injury or property damage arising out of:

    (a)    the alleged, actual or threatened abuse, molestation or sexual contact, whether or not intentional, by anyone or any person; or
    (b)    the negligent:
        (i)      employment;
        (ii)     investigation;
        (iii)    supervision; or
        (iv)     retention,

5

> of anyone or negligent entrustment to anyone whose conduct would be excluded by (a) above; or
>
> (c) the reporting to authorities or failure to report to authorities the alleged actual, or threatened abuse, molestation or sexual contact by anyone or any person.

> All other terms and conditions remain unchanged.

(Docket No. 46-2 at 90).

The Policy also contains definitions of important terms and phrases quoted throughout the policy, endorsements, and exclusions.  (*See* Docket No. 46-2 at 59 ("Other words and phrases that appear in quotation marks have special meaning.  Refer to Section V-Definitions.")).  These definitions are relevant.

SECTION V – DEFINITIONS

A.      "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

B.      "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

…

F.      "Employee" includes a "leased worker".  "Employee" does not include a "temporary worker."

G.      "Insured" means any person or organization qualifying as an insured in the Who is An Insured provision of the applicable coverage.  Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

H.      "Insured contract" means:

…

5.      That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

…

J.      "Loss" means direct and accidental loss or damage.

6

> …
> N.   "Suit" means a civil proceeding in which:
>     1.   Damages because of "bodily injury" …
>                     …
>         to which this insurance applies, are alleged…

(Docket No. 46-2 at 68-69).

> 1.   Who is an Insured
>     The following are "Insureds"
>     a.   You for any covered "auto".
>                     …
>     c.   Anyone liable for the conduct of an "insured" described above but
>         only to the extent of that liability.

(Docket No. 46-2 at 61).  Again, an earlier portion of the Policy notes that "You" means the named insured listed on the Declarations.  (*Id*. at 59).

### C.  Allegations Concerning the District's Status as an Additional Insured

National and the District seek competing declarations concerning whether the District is covered as an additional insured under the Policy or entitled to coverage under a separately issued CGL Policy.  (*See* Docket Nos. 46; 47; 48; 52).  They also dispute the underlying facts concerning the existence of the CGL Policy.  (*See id*.).  To this end, National alleges that the District does not have the status of an insured under the Policy, "is a stranger to the Policy and has no rights of any kind thereunder."  (Docket No. 46 at ¶ 55; *see also* ¶ 23).  Brimar and the District deny these assertions.  (Docket Nos. 47 at ¶¶ 23, 55; 48 at ¶¶ 23, 55).  The District pleads both an affirmative defense and a counterclaim against National stating that it is an additional insured under the Policy and also alleges it is entitled to coverage under an alleged CGL Policy.  (Docket No. 48 at ¶¶ 63-78, p. 16 at ¶¶ 7-8).  National denies that the District is an insured and that a separate CGL Policy exists.  (Docket No. 52 at ¶¶ 2, 7-11, 24).  The District further asserts that its contract with Brimar constitutes an insured contract under the Policy.  (Docket No. 48 at p. 16, ¶ 6).  National again denies such allegation.   (Docket No. 52 at ¶ 6).

*D.  Allegations Against Brimar and the District in the Underlying Action*

The services rendered by Brimar under the Agreement with the District included transporting minor students to and from their homes and the Pittsburgh Classical Academy Middle School.   (*See* Agreement; *see also* Docket No. 46-1 "M.M. Complaint" at ¶ 5).  M.M., the mother of a minor student passenger, K.M., and the minor child have sued the District and Brimar in the Court of Common Pleas of Allegheny County asserting six causes of action: Count I - negligence; Count II - breach of contract; Count III - third party beneficiary; Count IV - intentional infliction of emotional distress; Count V - common carrier liability; and Count VI - intentional misrepresentation.  (*See M.M. Complaint* at ¶¶ 56-124). The underlying plaintiffs set forth the following factual allegations against the District and Brimar in their extensive, 124-paragraph pleading.  (*Id.* at ¶¶ 1-124).

K.M. suffers from disabilities which were known by the District and Brimar prior to the events in question.  (*M.M. Complaint* at ¶ 6).  During 2016, the District and Brimar assigned K.M. transportation on a smaller school bus operated by Brimar which carried, at most, seven students. (*Id.* at ¶ 12).  Among the students assigned to this bus was a 12-year old male student whom the District and Brimar knew suffered from disabilities and had behavioral issues.  (*Id.* at ¶¶ 6; 13). The District and Brimar were also aware that the male student sexually assaulted K.M. during gym class by grabbing her breasts and understood that the male student remained a threat to engage in similar behavior toward K.M. in the future.  (*Id.* at ¶¶ 12-13; 15-17; 58).  After the gym class incident was reported to the principal and teachers at the school, the District and Brimar agreed to and implemented a seating plan for the bus with the express purposes of separating the male student and K.M. and to protect K.M. from being subject to additional assaults by the male student.  (*Id.* at ¶¶ 8; 58).  Specifically, pursuant to the agreement, K.M. would be required to sit near the bus

driver, the male student would not be permitted to sit next to K.M. and the two students would always be separated when riding the bus. (*Id*. at ¶¶ 12; 15; 17; 21-22). M.M. relied upon the assurances of the District and Brimar that the agreement would be followed and declined to pursue alternative transportation for K.M. (*Id*. at ¶¶ 12; 15).

The underlying plaintiffs assert that the agreement was enforced for an unspecified period of time with the students being separated while on the bus by both the regular bus driver and a replacement bus driver who picked up the regular bus driver's route after she went on maternity leave. (*M.M. Complaint* at ¶¶ 18-20). On an unspecified date prior to April 29, 2016, a different bus driver was assigned to operate the school bus on the route in question. (*Id*. at ¶ 21). According to the underlying plaintiffs, this individual did not adhere to the separation plan and permitted the male student and K.M. to sit together on the bus while transporting the students to and from school. (*Id*.). This individual also engaged in a pattern of inattentiveness toward the students on the bus and texted and/or otherwise used her cell phone rather than supervising the students. (*Id*. at ¶¶ 26-27). The underlying plaintiffs contend that Brimar failed to inform the bus driver of the separation plan and to properly train and supervise this individual during the operation of the bus in accordance with the Pennsylvania School Bus Manual and other standards applicable to common carriers to ensure safety of the passengers, including K.M. (*Id*. at ¶¶ 22; 24-25; 62). They further assert that the District had duties to inform Brimar and its driver of the separation plan; to monitor the activities on the bus; and to ensure safety of the student passengers, including K.M. (*Id*. at ¶¶ 22-23; 43). They also maintain that the contract between Brimar and the District establishes an agency relationship such that the District is responsible for Brimar's actions and inactions. (*Id*. at ¶ 11).

On the afternoon of Friday, April 29, 2016, the bus driver did not enforce the separation plan and the male student and K.M. were seated together in the last row of the bus. (*M.M. Complaint* at ¶¶ 14; 32). A teacher driving in a separate vehicle observed the bus near Liberty Avenue and Main Street and saw that the students were in a seat together and that K.M. was sitting on the male student's lap. (*Id*. at ¶ 32). At some point, the male student pinned down K.M. on the seat and positioned himself on top of her. (*Id*. at ¶ 27). K.M. yelled for him to stop. (*Id*.). Other students on the bus yelled out to the bus driver to get her attention. (*Id*. at ¶¶ 27-28). The bus driver, who was only a few feet away in the small bus, failed to respond to these calls for help and did not do anything to intervene or separate the students. (*Id*.). Undeterred, the male student pulled down his pants and K.M.'s pants were also pulled down. (*Id*. at ¶ 29). K.M.'s calls for the male student to stop and the other students' cries to get the driver's attention continued but no action was taken by the bus driver. (*Id*.). The male student then sexually assaulted K.M. and penetrated her from behind. (*Id*.). The assault ended when K.M. pushed the male student off the seat. (*Id*. at ¶ 46). When she exited the bus, the male student slapped her in the rear end. (*Id*.).

The bus driver did nothing to prevent the assault despite having been alerted by K.M. and the other student passengers yelling to get the bus driver's attention and having an opportunity to intervene. (*M.M. Complaint* at ¶ 30). The bus driver allegedly ignored the students' calls for help; was generally inattentive; or was too busy texting or utilizing her cell phone to respond. (*Id*. at ¶¶ 26; 30; 58). K.M. sustained physical and emotional injuries from the assault and her emotional injuries were exacerbated by her having to subsequently re-live it through reporting the events to school officials, medical providers and others, and from having subsequent contact with the male student. (*Id*. at ¶¶ 40-42).

10

Despite the fact that a teacher observed the incident, it was not reported to the District or M.M. until the following Monday. (*M.M. Complaint* at ¶ 32). After being informed of the assault, M.M. took K.M. for treatment at Children's Hospital and she was subject to physical examination, including for sexually transmitted diseases. (*Id*. at ¶¶ 37-38). K.M. provided a detailed description to medical providers which confirmed penetration and a sexual assault, as well as the male student kissing her chest. (*Id*. at ¶ 39). The District assessed the male student an out-of-school suspension and informed him that he would not be permitted back on the bus. (*Id*. at ¶ 32). The District then conducted an investigation and received statements from K.M., the male student and another student who was on the bus. (*Id*. at ¶ 46). K.M. reported additional incidents which occurred on the bus including one that took place one week before the April 29, 2016 assault, at which time the male student told K.M. to lay down and touched her leg, wanted to kiss her and she resisted; and that on another occasion the male student touched her waist. (*Id*. at ¶¶ 46-47). In his statement, the male student admitted that on April 29, 2016, K.M. kept saying no and hitting him but he kissed her and penetrated her when their pants were down. (*Id*. at ¶ 48). The other student reported that she would tell the male student to stop when he touched K.M. inappropriately and that he touched her breast and she did not like it. (*Id*. at ¶ 49).

K.M. received follow-up treatment at Children's on May 17, 2016, at which time it was reported that a new bus company had been hired for the route in question and the male student had returned to school but no longer rode the same bus as K.M. (*M.M. Complaint* at ¶ 40). Although K.M. and the male student did not have class together, she would see him at other times during the school day which caused her emotional distress. (*Id*.). During the next school year, the male student transferred to another school within the District but K.M. encountered him at a District-wide field trip to P.P.G. Paints Arena at which time she once again suffered emotional distress.

(*Id*. at ¶¶ 33; 51). The underlying plaintiffs admit that the male student was unable to appreciate that his actions were wrong due to his disabilities and that he was neither criminally charged nor named as a defendant in the civil action because of his mental incapacities. (*Id*. at ¶ 35). As noted, they seek to hold Brimar and the District liable for their actions and inactions prior to, during and after the April 29, 2016 incident on the school bus involving K.M. and the male student. (*See generally M.M. Complaint*). They also assert that the contract between Brimar and the District created an agency relationship such that the District is liable for the negligence of Brimar and its driver. (*Id*. at ¶ 11).

### E. Relevant Procedural History

National initiated this insurance coverage lawsuit against Brimar, only, on August 24, 2018. (Docket No. 1). After denying Brimar's motion to dismiss National's Amended Complaint, the Court granted the District leave to intervene. (Docket Nos. 19; 28). An initial case management conference was held on January 28, 2019, at which time the parties were ordered to complete discovery by September 13, 2019 and the matter was referred to mediation with Patricia Dodge, Esq., who now sits as a U.S. Magistrate Judge in this District. (Docket Nos. 38; 40-41). Unfortunately, the matter did not resolve at the mediation session. (Docket No. 56).

As to the operative pleadings, National filed its Second Amended Complaint on February 11, 2019. (Docket No. 46). Brimar answered on February 25, 2019. (Docket No. 47). On the same day, the District answered and asserted counterclaims against National and cross-claims against Brimar. (Docket No. 48). Brimar and National answered these pleadings on March 11, 2019 and March 25, 2019. (*See* Docket Nos. 51; 52).

Over the subsequent months, the parties proceeded to engage in the instant litigation on National's motion for judgment on the pleadings and conduct some discovery, which was

12

subsequently stayed at the parties' joint request until the resolution of the motion. (Docket Nos. 70; 76). As noted, the Court accepted pre-hearing briefing from the parties, (Docket Nos. 53-54; 57-59; 65-66), heard oral argument at a motion hearing, (Docket No. 75), the official transcript of which has been reviewed by the Court, (Docket No. 82), and accepted supplemental briefs on the pertinent issues, including whether a stay of the entire case pending disposition of the underlying action was appropriate, (Docket Nos. 80; 83-84; 89). The Court has also been provided with status reports concerning the underlying litigation, the most recent of which disclosed that the matter has been placed on the May 2020 trial list in the Court of Common Pleas of Allegheny County. (Docket Nos. 81; 90). The Court considers this matter to be fully briefed and ripe for disposition.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "after the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings will be granted only if "the movant clearly establishes there are no material issues of fact, and he or she is entitled to judgment as a matter of law." *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005); *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 257 (3d Cir. 2012) (same); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1367 (2019) ("The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court."). "A material issue of fact that will prevent a motion under Rule 12(c) from being successful may be framed by an express conflict on a particular point between the parties' respective pleadings. It also may result from the defendant pleading new matter and affirmative defenses in his answer." *Morris v. West Manheim Twp.*, 2014 WL 582265, at *2 (M.D. Pa. Feb. 14, 2014) (quoting Wright & Miller § 1367); *Republic Franklin*

*Ins. Co. v. Travelers Cas. Ins. Co. of America* , 2018 WL 1420495 at *2 (D.N.J. Mar. 22, 2018)

(quoting *Gen. Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989) ("[A] plaintiff is not entitled to judgment on the pleadings when the answer raises issues of fact that, if proved, would defeat recovery. Similarly, if the defendant raises an affirmative defense in his answer it will usually bar judgment on the pleadings.")).

"In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party." *Allstate Property and Cas. Ins. Co. v. Squires*, 667 F.3d 388, 390 (3d Cir. 2012). As in the Rule 12(b)(6) context, the complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court of Appeals for the Third Circuit has prescribed a three-step analysis to determine whether a claim is plausible. First, the court should "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Second, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Third, the court should assume the veracity of all well-pled factual allegations and then "'determine whether they plausibly give rise to an entitlement to relief.'" *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content from which to draw a "reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," but the law does not impose a "probability requirement." *Id.* "Although factual allegations must be enough to raise a right to relief above the speculative level, a plaintiff need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (internal quotations, citations, and alterations omitted). This third step of the analysis is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679).

## IV.    DISCUSSION

National seeks the entry of judgment on the pleadings arguing that it does not have a duty to defend or indemnify the District or Brimar under the Policy. (Docket Nos. 53-54; 59). National maintains that the District is not an insured under the Policy and otherwise contends that the claims asserted in the underlying litigation are either not covered by the Policy or excluded under same. (*Id.*). The District counters that the entry of judgment on the pleadings against it is inappropriate because it disputes National's claim that it has no rights as an insured under the Policy and has advanced its own counterclaim against National asserting that it is an insured under the Policy, both of which it intends to prove after completing necessary discovery. (Docket Nos. 58; 66). Brimar and the District advocate that National's motion should be denied because its duty to defend was triggered by the allegations in the underlying complaint and it is premature to determine if indemnification is required since that case remains ongoing and is presently set for a May 2020 trial in the Court of Common Pleas. (Docket Nos. 57-58; 65-66). After careful

15

consideration of the parties' positions, National's motion for judgment on the pleadings will be denied.

      A.     *Governing Legal Principles*

At the outset, the Court agrees with the parties that Pennsylvania law governs this diversity action. *See Allegrino v. Conway E & S, Inc.*, 2010 WL 4052923, at *6 n. 16 (W.D. Pa. Oct. 14, 2010) (declining to engage in choice-of-law analysis where parties agreed that Pennsylvania law applied to insurance coverage dispute). As the Court of Appeals recently recounted, the following legal principles are well established under Pennsylvania law:

> First, a liability insurer's duty to defend an insured and its duty to indemnify are distinct, though related obligations. *See Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888, 896 n.7 (2006). Both are creations of contract. *See Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 938 A.2d 286, 290–91 (2007); *Genaeya Corp. v. Harco Nat. Ins. Co.*, 991 A.2d 342, 347 (Pa. Super. Ct. 2010).

> Second, in the context of a declaratory judgment action to determine an insurer's obligations, Pennsylvania courts consistently apply what is known as the "four-corners rule." *See Lupu v. Loan City LLC*, 903 F.3d 382, 389–90 (3d Cir. 2018) (collecting cases). That is, when a policyholder is sued, "an insurer's duty to defend is triggered, if at all, by the factual averments contained in [the underlying] complaint[.]" *Kvaerner*, 908 A.2d at 896; *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584, 2 A.3d 526, 541 (2010); *Mut. Ben. Ins. Co. v. Haver*, 555 Pa. 534, 725 A.2d 743, 745–46 (1999) ("A carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage."); *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016). And "[i]f the allegations of the underlying complaint *potentially* could support recovery under the policy, there will be coverage at least to the extent that the insurer has a duty to defend its insured in the case." *Ramara*, 814 F.3d at 673; *see Jerry's Sport Ctr.*, 2 A.3d at 541. If triggered, the duty to defend also carries "a conditional obligation to indemnify in the event the insured is held liable for a claim covered by the policy." *Gen. Accident Ins. Co. of Am. v. Allen*, 547 Pa. 693, 692 A.2d 1089, 1095 (1997). Both

duties are at issue until the underlying "claim is confined to a recovery that the policy does not cover." *Id.*

Third, because the duty to defend is "broader" than the duty to indemnify, if a court determines that the former does not exist, neither does the latter. *See Kvaerner*, 908 A.2d at 896 n.7; *Ramara*, 814 F.3d at 673.

*Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 249–50 (3d Cir. 2019) (emphases in original) (footnotes omitted).

[I]n insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does.

*State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (citation omitted).

"Where the language of an insurance policy is clear and unambiguous, a court must enforce that language." *Amer. Auto. Ins. Co.*, 658 F.3d at 321; *see also Pennsylvania Manufacturers' Ass'n Insurance Co. v. Aetna Casualty & Surety Insurance Co.*, 426 Pa. 453, 233 A.2d 548, 551 (1967). "Words of common usage must be 'construed in their natural, plain, and ordinary sense, with a court free to consult a dictionary to inform its understanding of terms.'" *Amer. Auto. Ins. Co.*, 658 F.3d at 320 (quoting *Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 495 (E.D. Pa. 2006), citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999)). "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983).

*Marks v. Utica First Ins. Co.*, Civ. A. No. 16-1671, 2017 WL 4867597, at *5 (W.D. Pa. Oct. 27, 2017). "'Exclusionary clauses generally are strictly construed against the insurer and in favor of the insured.'" *Doe 1 v. Liberty Mut. Fire Ins. Co.*, No. 3:18-CV-1513, 2019 WL 4412437, at *6

(M.D. Pa. Sept. 13, 2019) (quoting *Swarner v. Mutual Benefit Group*, 72 A.3d 641, 645 (Pa. Super. Ct. 2013)).

With these principles in mind, the Court turns initially to the dispute between National and the District as to its status as an insured under the Policy and will then address the contest between all of the parties regarding National's duty to defend under the Policy.

> B.      *The District's Status as an Insured under the Policy*

In this Court's estimation, National has failed to meet its burden to demonstrate that there are no material factual disputes and that it is entitled to judgment as a matter of law on either its own claim that the District is not an "insured" under the Policy or the District's counterclaim asserting rights as an "insured." While purely legal issues concerning insurance coverage may be decided on a motion for judgment on the pleadings, such a motion is only an appropriate vehicle to resolve matters when the material allegations are admitted by the nonmoving party. *See Sikirica*, 416 F.3d at 220. Stated another way, "[w]hen a nonmoving defendant denies a material allegation in its answer, that denial creates a question of fact that prevents judgment on the pleadings." *Citizens Ins. Co. of Am. v. Selective Way Ins. Co.*, 98 F. Supp. 3d 782, 788 (E.D. Pa. 2015) (citing *Inst. for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1008 (3d Cir. 1991)).

National posits that its motion raises purely legal issues of contract interpretation, but a careful review of the parties' pleadings demonstrates that there are several material allegations in dispute between the parties, precluding the entry of judgment on the pleadings as to the District's status as an additional insured under the Policy and whether it is entitled to coverage under a CGL Policy. *See Sikirica*, 416 F.3d at 220. Although the parties concur that the District is not specifically listed as a named insured on the Declarations of the Policy, they dispute whether the

District was named as an additional insured by Brimar, if the District and Brimar have an "insured contract" or if the District is otherwise entitled to coverage as an "insured," as that term is defined under the Policy. (*See* Docket Nos. 46 at ¶¶ 55; 47 at ¶¶ 23, 55; 48 at ¶¶ 23, 55; 48 at p. 16, ¶ 6; 52 at ¶ 6). At this stage of the proceedings, the Court must accept as true the District's allegations that it was named an additional insured under the Policy and that a separate CGL Policy extends coverage to the District. (Docket Nos. 48 at ¶¶ 63-78, p. 16 at ¶¶ 7-8). Because such allegations rely upon matters outside the pleadings and the Policy and are denied by National, judgment on the pleadings is inappropriate on these disputed contentions. *See Citizens Ins.*, 98 F. Supp. 3d at 788.

With that said, the Court is presently able to decide the separate issue of whether the District qualifies as an "insured" under § II.A.1.c of the Policy as a matter of law by interpreting the insurance contract and applying the "four-corners rule" to the M.M. Complaint. *See Lupu*, 903 F.3d at 389–90. In this regard, the plain language of the Policy does not confine the definition of "insured" to the named insured listed on the Declarations but also includes "[a]nyone liable for the conduct of an 'insured' […] to the extent of that liability." (*See* Docket No. 46-2 at 61). Courts have interpreted such provisions to extend coverage to additional parties alleged to have been vicariously liable for the conduct of the named insured. *See e.g., Belser v. Rockwood Cas. Ins. Co.*, 791 A.2d 1216, 1222 (Pa. Super. Ct. 2002) (interpreting such a provision to mean that a party qualified as an insured if the party was vicariously liable for the insured's actions); *Diamond State Ins. Co. v. Ranger Ins. Co.*, 47 F. Supp. 2d 579, 585 (E.D. Pa. May 17, 1999) (court held that party qualified as an insured based on allegations he was vicariously liable for conduct of the insured). Reviewing the M.M. Complaint in the light most favorable to the District reveals that, among other theories, the underlying plaintiffs allege that there is an agency relationship between the District

and Brimar and seek to hold the District responsible for the negligent acts and omissions of Brimar and its driver. (*See e.g., M.M. Complaint* at ¶¶ 10-11, 22, 30, 72-104). Therefore, the Court finds that the District is an "insured" under the Policy for the underlying claims asserting it is vicariously liable for conduct of the named insured, Brimar, or its driver.

Overall, the Court rejects National's arguments that it is entitled to judgment on the pleadings that the District is not an insured under the Policy as the Court holds that the District qualifies as an insured for any vicarious liability claims asserted against it in the underlying action. However, as to any claims for direct liability against the District, there are factual disputes between the parties precluding a determination as to whether it qualifies as an insured at this time. Therefore, the parties will be permitted to conduct discovery as to whether the District was named as an additional insured under the Policy and the alleged existence of a separate CGL Policy.

C.      *National's Duty to Defend*

Having considered the parties' arguments in light of the prevailing legal standards, the Court finds that the M.M. Complaint contains allegations against Brimar and the District which are potentially covered by the Policy and are not otherwise excluded. *See Ramara*, 814 F.3d at 673. Since the parties agree that Brimar is an insured under the Policy, and the Court has held that the District qualifies as an insured under § II.A.1.c of the Policy, the Court concludes that National has a duty to defend both Brimar and the District in the underlying litigation. The Court reaches these decisions for several reasons.

1.      <u>Coverage Disputes</u>

Initially, National's coverage arguments are largely premised on its narrow characterization of the underlying claims as seeking damages for an alleged sexual assault committed by the male student. (Docket Nos. 53-54; 59). However, that approach ignores the

relevant standard which requires the Court to consider the entirety of the factual allegations of the lawsuit, rather than the specific causes of action identified therein, to determine if any claims are potentially covered by the Policy. *See Sapa Extrusions, Inc.*, 939 F.3d at 252 ("Pennsylvania law is clear that facts matter more than labels."). Reviewing the factual allegations within the "four-corners" of the M.M. Complaint, in the light most favorable to the insured, as is required, leads the Court to conclude that there are potentially claims stated against the Defendants which are covered by the Policy. *See Lupu*, 903 F.3d at 389-90. Simply put, K.M. and M.M. assert various causes of action which collectively claim that Brimar and the District were negligent and breached various duties causing them harm, separate and apart from the actions of the male student, who is neither a defendant in the underlying lawsuit nor seeking coverage under the Policy. (*See M.M. Complaint* at ¶¶ 1-124). National's duty to defend "'persists until an insurer can limit the claims such that coverage is impossible,'" *QBE Ins. Corp. v. Walters*, 148 A.3d 785, 788 (Pa. Super. Ct. 2016) (quoting *Selective Way Ins. Co. v. Hosp. Grp. Serv. Inc.*, 119 A.3d 1035, 1046 (Pa. Super. Ct. 2015)), and the underlying action is at a procedural posture where the claims have not been limited by any judicial rulings or otherwise.

Next, the Court disagrees with National's interpretation of the Policy's grant of coverage including the undefined term "accident" and the phrase "resulting from the […] use of a covered auto." To reiterate, the Policy states the following as to the scope of coverage:

> SECTION II-LIABILITY COVERAGE
> A.    Coverage
> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".
>
> …
>
> We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit"

> seeking damages for "bodily injury" or "property damage" or a
> "covered pollution cost or expense" to which this insurance does not
> apply.

*See Policy* at § II.A.  After adhering to the applicable tenets of Pennsylvania insurance law and

prevailing caselaw interpreting same, the Court concludes that the Policy extends coverage to the

claims in the M.M. Complaint.  (*See M.M. Complaint* at ¶¶ 1-124).  Stated succinctly, K.M. and

M.M. allegedly sustained "bodily injury," i.e., physical and/or mental harm; caused by an

"accident," i.e., Brimar and the District's negligence; "resulting from" K.M.'s occupancy or "use"

of the bus, triggering National's duty to defend such claims.

The Court initially assesses the parties' disputes surrounding the correct interpretation of

the term "accident," which is undefined in the Policy.  (*See* Docket Nos. 53-54; 57-59; 65-66).

National maintains that "accident" should be interpreted narrowly to mean an "auto accident"

while Brimar and the District proffer a broader construction covering the claims asserted against

them in the underlying litigation.  (Docket Nos. 53-54; 59).  As the Court commented at the motion

hearing, "accident" is not specifically defined by the Policy which operates to expand the definition

of "accident" to "include[ ] continuous or repeated exposure to the same conditions resulting in

bodily injury."  *See Policy* at § V.A.  If National wanted to confine the term "accident" to mean

only "auto accidents," as its counsel suggested, it certainly could have written this Policy that way.

It did not.  Hence, the plain meaning of "accident" controls.  As the Court of Appeals explains:

> [i]n *Donegal Mutual Insurance Co. v. Baumhammers*, the Supreme
> Court of Pennsylvania said that, when "accident" is undefined in an
> insurance policy, Pennsylvania courts should treat the term as
> "refer[ing] to an unexpected and undesirable event occurring
> unintentionally ...." 595 Pa. 147, 938 A.2d 286, 292 (2007).
>
> [T]he key term in the definition of the "accident" is "unexpected"
> which implies a degree of fortuity.  An injury therefore is not
> "accidental" if the injury was the natural and expected result of the
> insured's actions.... *See also Minnesota Fire and Cas. Co. v.*

> *Greenfield*, 579 Pa. 333, 855 A.2d 854, 870 (2004) ("'Accident' has been defined in the context of insurance contracts as an event or happening without human agency or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens.")

> *Id.* (internal citations omitted). That definition comports with the basic purpose of insurance: "to cover only fortuitous losses." *United Servs. Auto. Ass'n v. Elitzky*, 358 Pa.Super. 362, 517 A.2d 982, 986 (1986).

> The intentional conduct of third parties may still be a covered "accident" under that definition. By way of example, *Baumhammers* involved a killing spree perpetrated by the son of the insured. 938 A.2d at 288. The estates of several of the victims sued both the son and his parents, alleging, among other claims, negligence on the part of the parents "in failing to take possession of [his] gun and/or alert law enforcement authorities or mental health care providers about [their son's] dangerous propensities." *Id.* at 291. The parents sought coverage under their insurance, which covered claims for bodily injury caused by an "accident." *Id.* at 288. The Supreme Court of Pennsylvania held that, with respect to the insured parents, the shootings qualified as an "accident" under the policy. *Id.* at 293. "The extraordinary shooting spree embarked upon by [the son] resulting in injuries to [the victims] cannot be said to be the natural and expected result of [his parent's] alleged acts of negligence." *Id.* The "injuries were caused by an event so unexpected, undesigned and fortuitous as to qualify as accidental within the terms of the policy." *Id.*

*Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 405-06 (3d Cir. 2016); *see also Estate of Mehlman*, 589 F.3d at 111. "[I]t is well established that the test of whether the injury or damage is caused by an accident must be determined from the perspective of the insured and not from the viewpoint of the person who committed the injurious act." *Nationwide Mut. Fire Ins. Co. of Columbus v. Pipher*, 140 F.3d 222, 226 (3d Cir. 1998) (citations omitted).

Courts applying these principles of Pennsylvania law have held that negligence claims were covered as accidents or occurrences in several factual scenarios wherein it was alleged that the insured's negligence resulted in a third party's intentional tortious act.   As noted, in

*Baumhammers*, the Pennsylvania Supreme Court concluded that the insurance company did not have a duty to defend Baumhammers, who acted intentionally and was convicted of several counts of murder but had a duty to defend the victims' negligence claims brought against his parents alleging that their errors and omissions led to their son's criminal acts. *See Baumhammers*, 938 A.2d at 288. Similarly, in *Phipher*, the Court of Appeals found that the insurance company had a duty to defend the insured property owner from negligence claims related to her hiring of a painter who murdered the tenants of the apartment he was hired to paint. *See Phipher*, 140 F. 3d at 228. More recently, in *State Farm Fire and Cas. Co. v. Motta*, 356 F. Supp. 3d 457, 470 (E.D. Pa. Dec. 11, 2018), the U.S. District Court for the Eastern District of Pennsylvania determined that the insurance company had a duty to defend a child and his mother against claims alleging that the child's cyberbullying led to another child committing suicide. In each of these cases, the deciding courts reasoned that the third party's intentional tortious act as well as the suicide represented an "accident" from the perspectives of the insureds. *See Pipher*, 140 F.3d at 225 (quoting *Mohn v. American Cas. Co. of Reading*, 458 Pa. 576, 326 A.2d 346, 348 (1974)) ("Under Pennsylvania law, "the fact that the event causing [bodily injury or damage to property] may be traceable to an intentional act of a third party does not preclude the occurrence from being an 'accident.'"). The same is true here.

Among other things, M.M. and K.M. allege that Brimar failed to:

- safely transport K.M. from school to her home, breaching heightened duties owed to her given its role as a common carrier and her status as a minor with special needs;

- separate the male student from K.M. to protect her from the male student, who also has special needs and had previously assaulted K.M. during gym class;

- implement and enforce the agreed-upon seating plan for the bus which was put in place; and,

24

> - supervise and train the bus driver as to the implementation and enforcement of the seating plan and the duties to monitor and supervise minor students with special needs.

(*See M.M. Complaint* at ¶¶ 58; 62). They further assert that Brimar is responsible for the bus driver's inability to: supervise the male child who committed the sexual assault; adhere to its heightened duty of care owed to the female child victim with special needs; pay attention to the students while driving the bus instead of texting and ignoring the student passengers' calls for assistance to stop the offensive conduct; and, intervene before the sexual assault took place. (*Id.*).

The underlying plaintiffs contend that the District was similarly negligent by breaching its duties to: provide safe transportation to K.M. by a responsible common carrier given her special needs; separate her from the male student due to the prior assault in gym class; inform Brimar and its drivers of the seating plan and enforce same on the day in question; and, monitor or supervise Brimar and/or its driver. (*See M.M. Complaint* at ¶¶ 8; 12; 23; 45; 72-104). They also allege that the District is liable for the actions and inactions of Brimar and its driver given their agency relationship established by their separate contractual agreement. (*Id.* at ¶ 11). All told, K.M. and M.M. allege that Brimar and the District are liable for various negligent acts and omissions which took place during the bus ride, starting with the moment that the male student entered the bus and was permitted to sit next to K.M. and continuing until she exited the bus. (*Id.* at ¶¶ 1-124). The Court holds that such allegations, when properly viewed from the perspective of Brimar, its driver, and the District, broadly assert negligence theories against them such that the male student's actions constitute an "accident" under the Policy. *See Pipher*, 140 F.3d at 225.

Moving on, the parties do not dispute the meaning of "bodily injury," a phrase which is specifically defined in the Policy. (*See* Docket Nos. 53-54; 57-59; 65-66). To this end, National agreed to cover claims for "'[b]odily injury' mean[ing] bodily injury, sickness <u>or</u> disease sustained

by a person including death resulting from any of these." *See Policy* at § V.B (emphasis added).

Persuasive caselaw recognizes that when "bodily injury" is defined in the disjunctive listing bodily

injury, sickness <u>or</u> disease sustained by a person, physical harm is not needed to trigger coverage

and an emotional injury alone will suffice. In *Doe 1 v. Liberty Mutual Fire Ins. Co*., 2019 WL

4412437 (M.D. Pa. Sept. 13, 2019), the U.S. District Court for the Middle District of Pennsylvania

persuasively explains:

> [w]here an insurance policy lists sickness, illness, or disease as
> among several, separable kinds of "bodily injury," illnesses,
> sicknesses, or diseases can constitute "bodily injury," even if the
> insured suffered no physical harm or injury first (referred to herein
> as "independent disease"). Where the term "bodily injury" is defined
> to include independent diseases, coverage is triggered if an ailment
> or condition that qualifies as a sickness, illness, or disease results
> from an incident, to the same extent as if a bruise, cut, or broken
> bone results from an incident. Because a physical harm is not
> required to trigger coverage, conditions caused by mental distress
> can qualify as "bodily injury."

*Id.* (quoting *Allstate Property and Cas. Ins. Co. v. Winslow*, 66 F. Supp. 3d 661, 673 (W.D. Pa.

Dec. 15, 2014)). The *Doe* Court relied upon *Glikman v. Progressive Cas. Ins. Co.*, 917 A.2d 872

(Pa. Super. 2007), which reasoned that:

> [a]s the policy language clearly states that "bodily injury" includes
> any "disease" caused by an automobile accident, we must give effect
> to the language of the contract. Thus, under the language of
> Appellee's policy, contraction of a "disease" caused by an accident
> arising out of the maintenance or use of a motor vehicle is a
> specifically covered bodily injury under the policy. As Appellee
> neither disputes that post-traumatic stress disorder is a disease nor
> the cause of Appellant's suffering, we find she has sustained a bodily
> injury within the meaning of the policy.

*Id*. at 873.

Reviewing the allegations in the M.M. Complaint, in the light most favorable to the

insured, demonstrates that the underlying plaintiffs are seeking damages from Brimar and the

District for both physical and emotional injuries, including post-traumatic stress disorder. (*See M.M. Complaint* at ¶ 52 (the underlying plaintiffs seek damages for "emotional anguish, past and future medical expenses, past and future therapy expenses, post traumatic stress, increased risk for post traumatic stress and/or emotional issues associated with victims of sexual assault."); *see also Id.* at ¶¶ 53-54)). Further, according to the state court pleading, the claims are not limited to damages for physical injuries resulting from the sexual assault, but also seek "damages recoverable for assault and battery, including apprehension." (*Id*. at ¶ 53).

The next question is whether there is a duty to defend damages claims caused by an accident "resulting from … the ownership, maintenance or use of the bus." National argues that the bus was merely the location of the event in question and that the Policy language should be read to preclude the claims. (Docket Nos. 53-54; 59). Defendants counter that the Policy is correctly interpreted as providing coverage. (Docket Nos. 57-58; 65-66). Both parties cite precedent in support of their respective positions. (Docket Nos. 53-54; 57-59; 65-66). The Court agrees with the Defendants.

In this Court's opinion, the most analogous case is *Lebanon Coach Co. v. Carolina Cas. Ins. Co*., 675 A.2d 279 (Pa. Super. Ct. 1996), wherein the Superior Court found that the insurance company had a duty to defend claims alleging that an insured bus company breached its duty of care to a child who was hit by a car after being dropped off in front of the school. As the Superior Court noted:

> [i]t is well settled in this Commonwealth that a common carrier owes its passengers the highest degree of care and diligence in carrying them to their destination, in setting them down at the terminus of their journey, and in enabling them to alight safely. *O'Malley v. Laurel Line Bus Company*, 311 Pa. 251, 254–55, 166 A. 868, 869 (1933). Moreover, while carrying children to and from school, a bus company is "bound to use every reasonable caution and care for the safety of these children, either while they are riding

27

in the bus or alighting from the bus or leaving the immediate vicinity of the bus at the completion of their journey." *Vogel v. Stupi*, 357 Pa. 253, 257, 53 A.2d 542, 544 (1947). In that case our Supreme Court upheld jury verdicts against both the company operating the bus by contract as well as the driver of the vehicle which struck a minor after the minor had alighted from the bus and was crossing the state highway to reach his home. *See also Sommers v. Hessler*, 227 Pa.Super. 41, 323 A.2d 17 (1974) (carrier held to highest degree of care, regardless of whether it is common or contractual carrier).

*Lebanon Coach Co.*, 675 A.2d at 291. Most pertinent to the instant matter, however, is the Superior Court's discussion of the phrase "use of a motor vehicle."

We have interpreted the phrase "use of a motor vehicle" to mean the use of a motor vehicle as a vehicle, including, incident to its use as a vehicle, occupying, entering into, or alighting therefrom. *Smith v. United Services Automobile Association*, 392 Pa.Super. 248, 252, 572 A.2d 785, 787 (1990), *appeal dismissed*, 529 Pa. 24, 601 A.2d 276 (1992) (quotation omitted) (emphasis in original).

'The term 'use' has been defined as the general catchall of an omnibus insurance clause, designed and construed to include all proper uses of the vehicle not falling within other terms of definition such as ownership and maintenance.' *State Farm Mutual Automobile Insurance Co. v. O'Brien*, 380 F.Supp. 1279 (1974). 'The word 'use' in connection with the words ownership and maintenance ..., must be taken in its usual meaning of use of a motor vehicle.' *Assurance Company of America v. Bell*, 108 Ga.App. 766, 772, 134 S.E.2d 540 (1963).

*Lebanon Coach Co*, 675 A.2d at 290. The Superior Court concluded that the child's injuries resulted from the "use" of the bus, as the bus company owed a duty to the child to transport her to her destination safely which did not end until she reached her school after safely alighting from the bus. *Id.*

After viewing the allegations in the underlying pleading in the light most favorable to the insured, this Court holds that K.M.'s alleged bodily injuries resulted from the "use" of the bus. On its face, the Policy provides "business auto coverage" for 26 multi-passenger vehicles operated as "school buses" by a transit company. (*See* Docket No. 46-2 at 57-58). At the time of the events

in question, the bus was being "used" as that term is commonly understood, transporting children from school to their homes. *See Smith*, 572 A.2d 785, 787. The M.M. Complaint asserts that K.M. and the male student were riding the bus and therefore occupying it at the time the injuries were sustained. (*See e.g., M.M. Complaint* at ¶¶ 12). The alleged injuries resulted from the "use" of the bus because, akin to *Lebanon Coach*, the bus company and school district had a heightened duty to safely transport the minor child, with known special needs, from school to her home. *See Lebanon Coach Co.*, 675 A.2d at 291. Despite their knowledge of the prior assault in gym class, the District and Brimar assigned K.M. and the male student to continue to ride the same bus and voluntarily undertook the duty to separate the children by establishing a seating plan which they neglected to enforce on the date in question. (*See M.M. Complaint* at ¶¶ 12-17; 21-22; 32; 58). The factual allegations also assert that the driver neglected to intervene at a point in time when the male student had only physically assaulted, but not yet sexually assaulted, K.M. (*Id*. at ¶ 27). In addition, the driver likewise had an opportunity to intervene during the sexual assault but failed to do so, despite the cries for help by K.M. and other students on the bus. (*Id*. at ¶¶ 27-28).

For all of these reasons, National's motion for judgment on the pleadings is denied to the extent that it argues that there is no duty to defend because the claims set forth in M.M. Complaint are beyond the scope of the coverage provided in the Policy.

### 2. Exclusion Disputes

Since the Court has determined that the underlying complaint contains claims which are potentially covered by the policy, the next step is to evaluate National's position that any such claims are excluded. (Docket Nos. 53-54; 59). To reiterate, as the insurer and moving party, with the burden of proof at trial, National must demonstrate the applicability of the exclusion to bar all claims which are potentially covered. *See Mehlman*, 589 F.3d at 111. National primarily invokes

the abuse and molestation exclusion. (Docket Nos. 53-54; 59). Brimar and the District counter that the exclusion should not be read to exclude all potentially covered claims in the underlying action. (Docket Nos. 57-58; 65-66). Once again, the Court concurs with the Defendants' assessment.

The language set forth in the exclusion is the following:

> ABUSE OR MOLESTATION EXCLUSION
> This insurance does not apply to bodily injury or property damage arising out of:
> (a)      the alleged, actual or threatened abuse, molestation or sexual contact, whether or not intentional, by anyone or any person; or
> (b)      the negligent:
>       (i)      employment;
>       (ii)      investigation;
>       (iii)      supervision; or
>       (iv)      retention,
> of anyone or negligent entrustment to anyone whose conduct would be excluded by (a) above; or
> (c)      the reporting to authorities or failure to report to authorities the alleged actual, or threatened abuse, molestation or sexual contact by anyone or any person.

(Docket No. 46-2 at 90). The phrase "arising out of" is disputed by the parties with National arguing that any claim proximately caused by a sexual assault committed by anyone is excluded and the Defendants countering that a correct interpretation of the language does not limit claims with multiple proximate causes, as is alleged against them in the Court of Common Pleas. (Docket Nos. 53-54; 57-59; 65-66). The contested phrase "arising out of" is not defined in the exclusion or the Policy but has been analyzed in an analogous case which also involved the District.

To this end, in *Bd. of Pub. Educ. of Sch. Dist. of Pittsburgh v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 709 A.2d 910, 916 (Pa. Super. Ct. 1998), the "complaint alleged that because of various enumerated shortcomings by the School District *et. al*, [the president of the Parent Teacher Organization, Rudolph Walls] was able to sexually molest R.C.S., in violation of the student's

civil rights." *Id.* at 911. The insurance company invoked the following exclusion attempting to

avoid its duty to defend the lawsuit brought against the District:

> This policy does not apply:
>
> a) to any claim involving allegations of ... criminal acts ...
> b) to any claims arising out of ... (3) assault or battery ....
> c) to any claim arising out of bodily injury to ... any person[.]

*Id.* at 916. Analyzing the "arising out of language" in subsections b) and c), the Superior Court

noted:

> [t]he injuries arise, according to the pleadings to which we are
> restricted, from the School District's negligent acts and omissions;
> the omissions and negligence (the "claim") did not arise from the
> molestation. That is, Walls' acts "arose out of" the failings of the
> School District, not the other way around. The complaint of R.C.S.
> challenged the improper tending of the garden from which the weeds
> of Walls' misconduct grew, but it is clearly the latter which arose
> from the former. The weeds give proof of the bad gardening, but the
> claim, the ability to hold the gardener responsible, arises from the
> acts and omissions of the gardener, not the mere presence of weeds.
> Likewise, Walls' acts alone do not create or give rise to a claim
> against appellants; that claim cannot stand on allegations of assault
> alone. It arises, if at all, from other facts, grounded in negligence.

*Id.* at 916. Stated more succinctly,

> [t]he allegations against the School District were of negligence and
> violations of the student's constitutional rights. While there was a
> criminal act and an assault or battery here, that was not the act of the
> School District. To deny the School District a defense against claims
> that do not allege excluded conduct by the District would be
> intolerable.

*Id.* at 917. The Superior Court further found that the separate exclusion at subsection a) barring

claims "involving allegations of … criminal acts" did not demonstrate that the insurer lacked a

duty to defend because it was unknown at the time of the insurance company's refusal to defend

its insured whether the alleged acts constituted crimes or not and it was not alleged that the insured

31

had committed any crimes or some type of tortious conduct requiring a lesser mens rea.  *Id.* at 914-15.

Here, the same type of analysis controls the disposition of National's motion for judgment on the pleadings brought at this early stage of the underlying action, i.e.: K.M. and M.M.'s allegations have been denied by Brimar and the District; the Court of Common Pleas has not issued any rulings limiting the scope of those allegations; and the matter is currently listed for trial in May of 2020.  As the Court has explained above, viewed in the light most favorable to the insured, the factual allegations against Brimar and the District are very broad, sound in negligence and assert various breaches of duties to K.M. and her mother, M.M. before, during, and after the alleged sexual assault.  (*See M.M. Complaint* at ¶¶ 1-124).  Continuing the analogy utilized by the Superior Court, the male student's sexual misconduct grew from the failures of Brimar and the District to tend to the needs of the passengers on the bus, including the victim K.M.  *See Bd. of Pub. Educ. of Sch. Dist. of Pittsburgh*, 709 A.2d at 916.  If the seating plan had been enforced, as they had agreed, the alleged actions would not have occurred.  Hence, the claims for "bodily injury" asserted against Brimar and the District arise out of their own negligence and not only from the male student's sexual assault.

In any event, the exclusion does not eliminate National's duty to defend all potential claims in the underlying action for several compelling reasons.  *See Ramara*, 814 F.3d at 673.  First, the provision expressly lists the types of negligence claims which are excluded including the insured's "(i) employment; (ii) investigation; (iii) supervision; or (iv) retention, … of anyone … whose conduct would be excluded" because that person engaged in "alleged, actual or threatened abuse, molestation or sexual contact."  (Docket No. 46-2 at 90).  At most, the exclusion bars a claim for the District's and Brimar's negligent supervision of the male student but the factual allegations

asserted against them are much broader, as the Court has already recounted above.  *See* § IV.B.1, *supra*.  National certainly could have written this provision to exclude <u>all</u> negligence claims against its insured if anyone (e.g., a noninsured third party) engaged in "alleged, actual or threatened abuse, molestation or sexual contact," but it chose language that specifically limited the instances of its insured's negligence to which the exclusion pertains. (Docket No. 46-2 at 90).  Again, the law requires that such exclusionary language must be read against the insurance company.  *Swarner*, 72 A.3d at 645.

Second, the M.M. Complaint is reasonably read as describing the male student's actions as constituting an assault and battery due to non-sexual contact he initiated against K.M. <u>before</u> the alleged sexual assault took place.  (*See M.M. Complaint* at ¶ 27).  Third, the assault and battery are also expressed as alternative theories to the alleged sexual assault if the same is not ultimately proven at the forthcoming trial.  (*Id.*).  Indeed, the underlying complaint contains multiple factors why a sexual assault may not be proven including: the inability of the male student to form the applicable mens rea; the lack of physical evidence due to the delays in reporting the incident and K.M.'s examination at Children's Hospital several days after the event; and, K.M.'s own special needs causing difficulties in reporting and/or testifying as to the incident.  (*Id.* at ¶¶ 6; 12; 32; 35; 37-38).  Of course, the allegations that the District's and Brimar's negligence led to the male student's assault and battery of K.M. avoid the invoked exclusion entirely.

To conclude, the Court finds that National has failed to meet its burden to demonstrate that an exclusion operates to bar all potential claims asserted against its insured in the underlying action.[1]  *See Sapa*, 939 F.3d at 249-50; *see also Swarner*, 72 A.3d at 645.  The Court further holds

---

[1]        National also briefly argues, in the alternative, that the contractual liability exclusion bars "any liability of Brimar to the School District under an indemnity clause, or by virtue of any obligation created in the Brimar-School District contract."  (Docket No. 54 at 13).  National's counsel conceded at the motion hearing that this is a secondary argument but has not further developed the grounds for same.  (Docket No. 82 at 23).  In light of the Court's rulings

that National has a duty to defend Brimar and the District.  Since the duty to defend is broader than the duty to indemnify, the Court also rejects National's position that it does not have a duty to indemnify Brimar and/or the District at this time.  *See Sapa*, 939 F.3d at 249-50.

V.      CONCLUSION

Based on the foregoing, National's motion for judgment on the pleadings [53] is denied. An appropriate Order follows.

> *s/Nora Barry Fischer*
> Nora Barry Fischer
> Senior U.S. District Judge

Dated: January 14, 2020

cc/ecf:  All counsel of record.

---

that the M.M. Complaint contains factual allegations wherein K.M. and M.M. assert claims against Brimar which are covered by the Policy and not subject to any exclusion, triggering its duty to defend Brimar from such claims, no further discussion of this particular exclusion is warranted at this time.