**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Nora Barry Fischer Civil Action No. 18-1129 |
| BRIMAR TRANSIT, INC., | ) ) | |
| Defendant, and | ) ) | |
| PITTSBURGH PUBLIC SCHOOL DISTRICT, | ) ) ) | |
| Intervenor Defendant. | ) | |

**MEMORANDUM OPINION**

## I.     INTRODUCTION

In this oft-litigated insurance coverage dispute, Plaintiff National Liability & Fire Insurance Company ("National") moves for summary judgment arguing that it is entitled to a declaration that there is no coverage for the claims which were asserted against Defendant Brimar Transit, Inc. ("Brimar") and Intervenor Defendant the Pittsburgh Public School District, (the "District") in the underlying action styled *M.M., parent and natural guardian of K.M., a minor v. Pittsburgh Public School District and Brimar Transit, Inc.*, Case No. GD-18-003257, ("underlying action"), in the Court of Common Pleas of Allegheny County.  (Docket No. 160).  National provided a defense to Brimar pursuant to Commercial Auto Policy No. 73 APB 00185 (the "Policy") under a reservation of rights but did not provide a defense to the District.  In ruling on a contested motion for judgment on the pleadings, this Court held that the District was an additional insured under the Policy and that National owed a duty to defend both Brimar and the District but

1

found that a ruling on National's duty to indemnify them was premature while the underlying action was pending. *See National Liability & Fire Ins. Co. v. Brimar Transit, Inc.*, 433 F. Supp. 3d 747 (W.D. Pa. 2020). National subsequently settled the underlying action with M.M. and K.M. during pretrial proceedings and that case was dismissed, with prejudice, prior to the trial court making any rulings limiting the claims at issue in the litigation. (Docket No. 128). National issued a series of letters to Brimar and the District purportedly reserving its rights to challenge coverage in this action and also made payments to the District to cover its defense costs. (*Id*.).

Presently before the Court are National's motion for summary judgment and the responses in opposition by Brimar and the District. (Docket Nos. 159-162). National maintains that summary judgment is warranted as the facts established during discovery of the underlying action allegedly demonstrate that the claims asserted in that case did not involve the "use" of a covered auto and are otherwise excluded under the Abuse or Molestation Exclusion. (Docket No. 160). National further contends that it is entitled to reimbursement from Brimar and the District of the settlement it paid to the M.M. plaintiffs in the underlying action and defense costs. (*Id*.). Brimar and the District counter that summary judgment is not warranted in light of the Court's prior rulings and that prevailing caselaw precludes National from relying upon facts outside the pleadings to establish that there is no coverage in this case. (Docket Nos. 161-62). National did not seek leave of court to file a reply such that the motion is now fully briefed and ripe for disposition. (*See* Docket Nos. 159-162).

After careful consideration of the parties' positions, and for the following reasons, National's motion for summary judgment is granted, in part, and denied, in part. National's motion is granted to the extent that the District's counterclaim will be dismissed but is denied in all other

respects.  As such, the Court will enter summary judgment in favor of Brimar and the District and dismiss National's claims in this declaratory judgment action.

II.     BACKGROUND

The Court focuses on those facts necessary to resolve the pending motion for summary judgment because the facts of this insurance coverage dispute and the underlying action were set forth in the Court's prior opinions, including its January 14, 2020 Memorandum Opinion holding that National owed a duty to defend Brimar and the District, which is fully incorporated herein, *See National*, 433 F. Supp. 3d at 747-69.

A.     *Relationship of Parties and Relevant Provisions in Commercial Auto Policy*

The District and Brimar are parties to a contract pursuant to which Brimar agreed to provide student transportation services for the District during several school years.  (*See* "Agreement", Exhibit A, Docket No. 46-1.  The relevant terms and conditions of the parties' contract state that Brimar was expected to perform such services using safe vehicles and qualified drivers in accordance with the Pennsylvania Vehicle Code and other highway standards.  (*Id*.).  Brimar was also required to maintain insurance coverage for its vehicles and to provide a certificate of insurance to the District each year naming the District "as additional insured, verifying coverage of $1,000,000 per accident and a $5,000,000 umbrella."    (*Id*. at ¶¶ 17-19; 2.f).  Brimar further agreed "to indemnify, defend and hold harmless" the District "against any and all loss, damage, cost and expenses which the [District] may hereafter suffer or incur arising from [Brimar's] obligations under this Agreement."  (*Id*. at ¶ 8).

…

As required under its agreement with the District, Brimar obtained Policy No. 73 APB 001185 from National for the policy period of January 11, 2016 through January 11, 2017, ("Policy").  (*See* "Commercial Policy", Docket No. 46-2).  The Business Auto Coverage Declarations ("Declarations") note that Brimar is the named insured and in the business of "school buses"; Burns & Wilcox, Inc. is listed as the producer or broker on the transaction; and the form indicates that this is a new policy, meaning that it was not renewed from a prior time period.  (Docket No. 46-2 at 55).  The Declarations state that the Policy provides $1,000,000 in liability

> coverage for a premium of $69,654 as well as smaller premium amounts for additional coverage for personal injury protection; uninsured motorists; and underinsured motorists. (*Id.*). The Schedule of Covered Autos lists 26 separate vehicles covered under the Policy, all of which are described as "passenger vans" with listed seating capacities of 7 or 9 seats. (*Id.* at 57-58).

*National*, 433 F.Supp.3d at 751.

The relevant terms and conditions of the Policy include the following.

## BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we" and "us" and "our" refer to the company providing this insurance.

…

## SECTION II-LIABILITY COVERAGE

**A.    Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

…

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

…

**B.    Exclusions**

This insurance does not apply to any of the following:

…

**2.    Contractual**

Liability assumed under any contract or agreement.
But this exclusion does not apply to liability or damages:

a.    Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property

4

damage" occurs subsequent to the execution of the contract or agreement; or

b. That the "insured" would have in the absence of the contract or agreement.

(Docket No. 46-2 at 59-61).

…

## PENNSYLVANIA CHANGES – DEFENSE COSTS

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART

…

A. The provisions of Paragraph B. are added to all Insuring Agreements that set forth a duty to defend under:

…

1. Section II – Liability Coverage in Paragraph A. Coverage under the Business Auto …

B. If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that none of the claims ("claims"), for which we provided a defense or defense costs, are covered under this insurance, we have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement under this provision will only apply to the costs we have incurred after we notify you in writing that there may not be coverage and that we are reserving our rights to terminate the defense or the payment of defense costs and to seek reimbursement for defense costs.

(Docket No. 46-2 at 85).

…

## ABUSE OR MOLESTATION EXCLUSION

PLEASE READ THIS ENDORSEMENT CAREFULLY

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

The following exclusion is added to the Policy:

5

This insurance does not apply to bodily injury or property damage arising out of:

      (a)     the alleged, actual or threatened abuse, molestation or sexual contact, whether or not intentional, by anyone or any person; or

      (b)     the negligent:

           (i)     employment;

           (ii)     investigation;

           (iii)     supervision; or

           (iv)     retention,

      of anyone or negligent entrustment to anyone whose conduct would be excluded by (a) above; or

      (c) the reporting to authorities or failure to report to authorities the alleged actual, or threatened abuse, molestation or sexual contact by anyone or any person.

All other terms and conditions remain unchanged.

(Docket No. 46-2 at 90).

The Policy also contains definitions of important terms and phrases quoted throughout the policy, endorsements, and exclusions. (*See* Docket No. 46-2 at 59 ("Other words and phrases that appear in quotation marks have special meaning. Refer to Section V-Definitions.")). These definitions are relevant.

SECTION V – DEFINITIONS

A.     "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

B.     "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

…

F.     "Employee" includes a "leased worker". "Employee" does not include a "temporary worker."

G.     "Insured" means any person or organization qualifying as an insured in the Who is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

H.     "Insured contract" means:

…

5.      That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

                                 …

J.      "Loss" means direct and accidental loss or damage.

                                 …

N.      "Suit" means a civil proceeding in which:
        1.      Damages because of "bodily injury" …

                                 …

        to which this insurance applies, are alleged…

(Docket No. 46-2 at 68-69).

    1.  Who is an Insured
        The following are "Insureds"
        a.  You for any covered "auto".
                                 …
        c.  Anyone liable for the conduct of an "insured" described above but
            only to the extent of that liability.

(Docket No. 46-2 at 61).  Again, an earlier portion of the Policy notes that "You" means the named

insured listed on the Declarations.  (*Id*. at 59).

        *B.      Allegations in Underlying Action*

        M.M. and K.M. initiated the underlying action against Brimar and the District alleging that

K.M., a minor student with disabilities, was assaulted on a school bus by a male student who also

has disabilities.  *National*, 433 F.Supp.3d at 754.

        The underlying plaintiffs set forth the following factual allegations against the District and Brimar in their extensive, 124-paragraph pleading. (*Id.* at ¶¶ 1-124).

        K.M. suffers from disabilities which were known by the District and Brimar prior to the events in question. (*M.M. Complaint* at ¶ 6). During 2016, the District and Brimar assigned K.M. transportation on a smaller school bus operated by Brimar which carried, at most, seven students. (*Id.* at ¶ 12). Among the students assigned to this bus was a 12-year old male

student whom the District and Brimar knew suffered from disabilities and had behavioral issues. (*Id.* at ¶¶ 6; 13). The District and Brimar were also aware that the male student sexually assaulted K.M. during gym class by grabbing her breasts and understood that the male student remained a threat to engage in similar behavior toward K.M. in the future. (*Id.* at ¶¶ 12-13; 15-17; 58). After the gym class incident was reported to the principal and teachers at the school, the District and Brimar agreed to and implemented a seating plan for the bus with the express purposes of separating the male student and K.M. and to protect K.M. from being subject to additional assaults by the male student. (*Id.* at ¶¶ 8; 58). Specifically, pursuant to the agreement, K.M. would be required to sit near the bus driver, the male student would not be permitted to sit next to K.M. and the two students would always be separated when riding the bus. (*Id.* at ¶¶ 12; 15; 17; 21-22). M.M. relied upon the assurances of the District and Brimar that the agreement would be followed and declined to pursue alternative transportation for K.M. (*Id.* at ¶¶ 12; 15).

The underlying plaintiffs assert that the agreement was enforced for an unspecified period of time with the students being separated while on the bus by both the regular bus driver and a replacement bus driver who picked up the regular bus driver's route after she went on maternity leave. (*M.M. Complaint* at ¶¶ 18-20). On an unspecified date prior to April 29, 2016, a different bus driver was assigned to operate the school bus on the route in question. (*Id.* at ¶ 21). According to the underlying plaintiffs, this individual did not adhere to the separation plan and permitted the male student and K.M. to sit together on the bus while transporting the students to and from school. (*Id.*). This individual also engaged in a pattern of inattentiveness toward the students on the bus and texted and/or otherwise used her cell phone rather than supervising the students. (*Id.* at ¶¶ 26-27). The underlying plaintiffs contend that Brimar failed to inform the bus driver of the separation plan and to properly train and supervise this individual during the operation of the bus in accordance with the Pennsylvania School Bus Manual and other standards applicable to common carriers to ensure safety of the passengers, including K.M. (*Id.* at ¶¶ 22; 24-25; 62). They further assert that the District had duties to inform Brimar and its driver of the separation plan; to monitor the activities on the bus; and to ensure safety of the student passengers, including K.M. (*Id.* at ¶¶ 22-23; 43). They also maintain that the contract between Brimar and the District establishes an agency relationship such that the District is responsible for Brimar's actions and inactions. (*Id.* at ¶ 11).

On the afternoon of Friday, April 29, 2016, the bus driver did not enforce the separation plan and the male student and K.M. were seated together in the last row of the bus. (*M.M. Complaint* at ¶¶ 14; 32). A teacher driving in a separate vehicle observed the bus near Liberty Avenue and Main Street and saw that the students were in a seat together and that K.M. was sitting on the male student's lap. (*Id.* at ¶ 32). At some point, the male student pinned down K.M. on the seat and positioned himself on top of her. (*Id.* at ¶ 27). K.M. yelled for him to stop. (*Id.*). Other students on the bus yelled out to the bus driver to get her attention. (*Id.* at ¶¶ 27-28). The bus driver, who was only a few feet away in the small bus, failed to respond to these calls for help and did not do anything to intervene or separate the students. (*Id.*). Undeterred, the male student pulled down his pants and K.M.'s pants were also pulled down. (*Id.* at ¶ 29). K.M.'s calls for the male student to stop and the other students' cries to get the driver's attention continued but no action was taken by the bus driver. (*Id.*). The male student then sexually assaulted K.M. and penetrated her from behind. (*Id.*). The assault ended when K.M. pushed the male student off the seat. (*Id.* at ¶ 46). When she exited the bus, the male student slapped her in the rear end. (*Id.*).

The bus driver did nothing to prevent the assault despite having been alerted by K.M. and the other student passengers yelling to get the bus driver's attention and having an opportunity to intervene. (*M.M. Complaint* at ¶ 30). The bus driver allegedly ignored the students' calls for help; was generally inattentive; or was too busy texting or utilizing her cell phone to respond. (*Id.* at ¶¶ 26; 30; 58). K.M. sustained physical and emotional injuries from the assault and her emotional injuries were exacerbated by her having to subsequently re-live it through reporting the events to school officials, medical providers and others, and from having subsequent contact with the male student. (*Id.* at ¶¶ 40-42).

Despite the fact that a teacher observed the incident, it was not reported to the District or M.M. until the following Monday. (*M.M. Complaint* at ¶ 32). After being informed of the assault, M.M. took K.M. for treatment at Children's Hospital and she was subject to physical examination, including for sexually transmitted diseases. (*Id.* at ¶¶ 37-38). K.M. provided a detailed description to medical providers which confirmed penetration and a sexual assault, as well as the male student kissing her chest. (*Id.* at ¶ 39). The District assessed the male student an out-of-school suspension and informed him that he would not be permitted back on the bus. (*Id.* at ¶ 32). The District then conducted an investigation and received statements from K.M., the male student and another student who was on the bus. (*Id.* at ¶ 46). K.M. reported additional incidents

which occurred on the bus including one that took place one week before the April 29, 2016 assault, at which time the male student told K.M. to lay down and touched her leg, wanted to kiss her and she resisted; and that on another occasion the male student touched her waist. (*Id.* at ¶¶ 46-47). In his statement, the male student admitted that on April 29, 2016, K.M. kept saying no and hitting him but he kissed her and penetrated her when their pants were down. (*Id.* at ¶ 48). The other student reported that she would tell the male student to stop when he touched K.M. inappropriately and that he touched her breast and she did not like it. (*Id.* at ¶ 49).

K.M. received follow-up treatment at Children's on May 17, 2016, at which time it was reported that a new bus company had been hired for the route in question and the male student had returned to school but no longer rode the same bus as K.M. (*M.M. Complaint* at ¶ 40). Although K.M. and the male student did not have class together, she would see him at other times during the school day which caused her emotional distress. (*Id.*). During the next school year, the male student transferred to another school within the District but K.M. encountered him at a District-wide field trip to P.P.G. Paints Arena at which time she once again suffered emotional distress. (*Id.* at ¶¶ 33; 51). The underlying plaintiffs admit that the male student was unable to appreciate that his actions were wrong due to his disabilities and that he was neither criminally charged nor named as a defendant in the civil action because of his mental incapacities. (*Id.* at ¶ 35). As noted, they seek to hold Brimar and the District liable for their actions and inactions prior to, during and after the April 29, 2016 incident on the school bus involving K.M. and the male student. (*See generally M.M. Complaint*). They also assert that the contract between Brimar and the District created an agency relationship such that the District is liable for the negligence of Brimar and its driver. (*Id.* at ¶ 11).

*Id.* at 754-56.

C.   *National Defends Brimar but Declines to Defend the District*

National provided a defense to Brimar under a reservation of rights.   To that end, the July

24, 2018 reservation of rights letter stated that "the Policy does not apply to the allegations of, and

damages sought in the Lawsuit [and that] [National] will provide [Brimar] with a defense against

the Lawsuit subject to a full and complete reservation of rights under the Policy and applicable

law" but further states that National reserved the right to withdraw from the defense if it determined that the Policy does not apply to the lawsuit, to file a declaratory judgment action against Brimar, and "to seek reimbursement of any defense fees, defense costs, or any other sums expended or incurred by National Liability while defending the lawsuit or causes of action alleged in the Lawsuit to which the Policy does not or could not potentially apply." (Docket No. 160-3, Pltf Ex. "C"). The District tendered its defense to National through its named insured, Brimar, but National neither provided a defense nor issued a reservation of rights letter to the District. (Docket No. 163, Responsive Concise Statement of Additional Material Facts ("AF") at ¶ 49).

> D.   *National's Declaratory Judgment Action and Court's Decision on Duty to Defend*

National brought this declaratory judgment suit seeking to resolve its coverage obligations under the Policy and its named insured, Brimar. (Docket No. 1). The District was later permitted to intervene. (Docket No. 28). National filed its operative Second Amended Complaint on February 11, 2019 asserting claims for declaratory relief against Brimar and the District seeking declarations that it had no duty to defend or indemnify them in the underlying action and a separate claim for contractual damages against Brimar seeking reimbursement of defense costs advanced on its behalf. (Docket No. 46).

In the January 14, 2020 Memorandum Opinion, the Court analyzed the Policy, the underlying M.M. complaint and the parties' arguments, denied National's motion and held that National owed a duty to defend both Brimar and the District in the state tort action. *National*, 433 F. Supp. 3d at 751, 769. With respect to the District's status as an insured, the Court first analyzed the M.M. complaint in light of § II.A.1.c of the Policy which provided that an "insured" included "[a]nyone liable for the conduct of an 'insured' […] to the extent of that liability." *Id.* at 761 (citing Docket No. 46-2 at 61). After reviewing the allegations in the M.M. complaint, the Court

concluded that the District qualified as an "insured" under § II.A.1.c of the Policy because the underlying claims asserted in the M.M. lawsuit sought to hold the District vicariously liable for the conduct of the named insured, Brimar, or its driver. *Id.*

With respect to the parties' coverage disputes, the Court again considered the allegations in the M.M. complaint and held that National owed a duty to defend both Brimar and the District given that the underlying action "assert[ed] various causes of action which collectively claim that Brimar and the District were negligent and breached various duties causing them harm, separate and apart from the actions of the male student, who is neither a defendant in the underlying lawsuit nor seeking coverage under the Policy." *Id.* at 761-62. In reaching this decision, the Court rejected National's narrow characterization of the claims in the M.M. lawsuit as seeking only damages arising from an alleged sexual assault committed by the male student. *Id.* at 761. As the Court noted, the M.M. complaint stated succinctly that "K.M. and M.M. allegedly sustained 'bodily injury,' i.e., physical and/or mental harm; caused by an 'accident,' i.e., Brimar and the District's negligence; 'resulting from' K.M.'s occupancy or 'use' of the bus, triggering National's duty to defend such claims." *Id.* at 762. The Court then proceeded to analyze the disputed terms and phrases under the Policy.

> The Court initially assesses the parties' disputes surrounding the correct interpretation of the term "accident," which is undefined in the Policy. (*See* Docket Nos. 53-54; 57-59; 65-66). National maintains that "accident" should be interpreted narrowly to mean an "auto accident" while Brimar and the District proffer a broader construction covering the claims asserted against them in the underlying litigation. (Docket Nos. 53-54; 59). As the Court commented at the motion hearing, "accident" is not specifically defined by the Policy which operates to expand the definition of "accident" to "include[ ] continuous or repeated exposure to the same conditions resulting in bodily injury." *See Policy* at § V.A. If National wanted to confine the term "accident" to mean only "auto accidents," as its counsel suggested, it certainly could have written

> this Policy that way. It did not. Hence, the plain meaning of
> "accident" controls.
>
> …
>
> The Court holds that [the allegations in the M.M. Complaint], when
> properly viewed from the perspective of Brimar, its driver, and the
> District, broadly assert negligence theories against them such that
> the male student's actions constitute an "accident" under the Policy.
> *See Pipher*, 140 F.3d at 225.

*Nat'l Liab. & Fire Ins. Co.*, 433 F. Supp. 3d at 762.

Although the parties did not dispute the phrase "bodily injury," the Court reviewed the

Policy definitions, surveyed the pertinent authorities and found that:

> Persuasive caselaw recognizes that when "bodily injury" is defined
> in the disjunctive listing bodily injury, sickness or disease sustained
> by a person, physical harm is not needed to trigger coverage and an
> emotional injury alone will suffice.
>
> ...
>
> Reviewing the allegations in the M.M. Complaint, in the light most
> favorable to the insured, demonstrates that the underlying plaintiffs
> are seeking damages from Brimar and the District for both physical
> and emotional injuries, including post-traumatic stress disorder.
> (*See* M.M. Complaint at ¶ 52 (the underlying plaintiffs seek
> damages for "emotional anguish, past and future medical expenses,
> past and future therapy expenses, post traumatic stress, increased
> risk for post traumatic stress and/or emotional issues associated with
> victims of sexual assault."); *see also Id*. at ¶¶ 53-54)). Further,
> according to the state court pleading, the claims are not limited to
> damages for physical injuries resulting from the sexual assault, but
> also seek "damages recoverable for assault and battery, including
> apprehension." (*Id*. at ¶ 53).

*Nat'l Liab. & Fire Ins. Co.*, 433 F. Supp. 3d at 765.

The Court continued:

> The next question is whether there is a duty to defend damages
> claims caused by an accident "resulting from ... the ownership,
> maintenance or use of the bus." National argues that the bus was
> merely the location of the event in question and that the Policy
> language should be read to preclude the claims. (Docket Nos. 53-

13

54; 59). Defendants counter that the Policy is correctly interpreted as providing coverage. (Docket Nos. 57-58; 65-66). Both parties cite precedent in support of their respective positions. (Docket Nos. 53-54; 57-59; 65-66). The Court agrees with the Defendants.

In this Court's opinion, the most analogous case is *Lebanon Coach Co. v. Carolina Cas. Ins. Co.*, 675 A.2d 279 (Pa. Super. Ct. 1996), wherein the Superior Court found that the insurance company had a duty to defend claims alleging that an insured bus company breached its duty of care to a child who was hit by a car after being dropped off in front of the school. As the Superior Court noted:

> [i]t is well settled in this Commonwealth that a common carrier owes its passengers the highest degree of care and diligence in carrying them to their destination, in setting them down at the terminus of their journey, and in enabling them to alight safely.
>
> *O'Malley v. Laurel Line Bus Company*, 311 Pa. 251, 254-55, 166 A. 868, 869 (1933). Moreover, while carrying children to and from school, a bus company is "bound to use every reasonable caution and care for the safety of these children, either while they are riding in the bus or alighting from the bus or leaving the immediate vicinity of the bus at the completion of their journey." *Vogel v. Stupi*, 357 Pa. 253, 257, 53 A.2d 542, 544 (1947). In that case our Supreme Court upheld jury verdicts against both the company operating the bus by contract as well as the driver of the vehicle which struck a minor after the minor had alighted from the bus and was crossing the state highway to reach his home. *See also Sommers v. Hessler*, 227 Pa.Super. 41, 323 A.2d 17 (1974) (carrier held to highest degree of care, regardless of whether it is common or contractual carrier).

*Lebanon Coach Co.*, 675 A.2d at 291. Most pertinent to the instant matter, however, is the Superior Court's discussion of the phrase "use of a motor vehicle."

> We have interpreted the phrase "use of a motor vehicle" to mean the use of a motor vehicle as a vehicle, including, incident to its use as a vehicle, occupying, entering into, or alighting therefrom. *Smith v. United Services Automobile Association*, 392 Pa. Super. 248, 252, 572 A.2d 785, 787 (1990), *appeal dismissed*, 529 Pa. 24, 601 A.2d 276 (1992) (quotation omitted) (emphasis in original).

'The term 'use' has been defined as the general catchall of an omnibus insurance clause, designed and construed to include all proper uses of the vehicle not falling within other terms of definition such as ownership and maintenance.' *State Farm Mutual Automobile Insurance Co. v. O'Brien*, 380 F.Supp. 1279 (1974). 'The word 'use' in connection with the words ownership and maintenance ..., must be taken in its usual meaning of use of a motor vehicle.' *Assurance Company of America v. Bell*, 108 Ga.App. 766, 772, 134 S.E.2d 540 (1963).

*Lebanon Coach Co*, 675 A.2d at 290.

The Superior Court concluded that the child's injuries resulted from the "use" of the bus, as the bus company owed a duty to the child to transport her to her destination safely which did not end until she reached her school after safely alighting from the bus. *Id.*

After viewing the allegations in the underlying pleading in the light most favorable to the insured, this Court holds that K.M.'s alleged bodily injuries resulted from the "use" of the bus. On its face, the Policy provides "business auto coverage" for 26 multi-passenger vehicles operated as "school buses" by a transit company. (*See* Docket No. 46-2 at 57-58). At the time of the events in question, the bus was being "used" as that term is commonly understood, transporting children from school to their homes. *See Smith*, 572 A.2d 785, 787. The M.M. Complaint asserts that K.M. and the male student were riding the bus and therefore occupying it at the time the injuries were sustained. (*See e.g., M.M. Complaint* at ¶¶ 12). The alleged injuries resulted from the "use" of the bus because, akin to Lebanon Coach, the bus company and school district had a heightened duty to safely transport the minor child, with known special needs, from school to her home. *See Lebanon Coach Co., 675 A.2d at 291*. Despite their knowledge of the prior assault in gym class, the District and Brimar assigned K.M. and the male student to continue to ride the same bus and voluntarily undertook the duty to separate the children by establishing a seating plan which they neglected to enforce on the date in question. (*See M.M. Complaint* at ¶¶ 12-17; 21-22; 32; 58). The factual allegations also assert that the driver neglected to intervene at a point in time when the male student had only physically assaulted, but not yet sexually assaulted, K.M. (*Id.* at ¶ 27). In addition, the driver likewise had an opportunity to intervene during the sexual assault but failed to do so, despite the cries for help by K.M. and other students on the bus. (*Id.* at ¶¶ 27-28).

15

> For all of these reasons, National's motion for judgment on the pleadings is denied to the extent that it argues that there is no duty to defend because the claims set forth in M.M. Complaint are beyond the scope of the coverage provided in the Policy. (Doc. No. 91, pp. 28-29.).

*Id*. at 765-67.

Next, the Court examined the allegations in light of the relevant standard that "as the insurer and moving party, with the burden of proof at trial, National must demonstrate the applicability of the exclusion to bar all claims which are potentially covered." *National,* 433 F. Supp. 3d at 767 (citing *Mehlman,* 589 F.3d at 111).  The Court then overruled National's position that the claims were excluded under the Molestation or Abuse exclusion, opining, in pertinent part, as follows:

> … viewed in the light most favorable to the insured, the factual allegations against Brimar and the District are very broad, sound in negligence and assert various breaches of duties to K.M. and her mother, M.M. before, during, and after the alleged sexual assault. (*See M.M. Complaint* at ¶¶ 1-124). Continuing the analogy utilized by the Superior Court, the male student's sexual misconduct grew from the failures of Brimar and the District to tend to the needs of the passengers on the bus, including the victim K.M. *See Bd. of Pub. Educ. of Sch. Dist. of Pittsburgh,* 709 A.2d at 916. If the seating plan had been enforced, as they had agreed, the alleged actions would not have occurred. Hence, the claims for "bodily injury" asserted against Brimar and the District arise out of their own negligence and not only from the male student's sexual assault.
>
> In any event, the exclusion does not eliminate National's duty to defend all potential claims in the underlying action for several compelling reasons. *See Ramara,* 814 F.3d at 673. First, the provision expressly lists the types of negligence claims which are excluded including the insured's "(i) employment; (ii) investigation; (iii) supervision; or (iv) retention, … of anyone … whose conduct would be excluded" because that person engaged in "alleged, actual or threatened abuse, molestation or sexual contact." (Docket No. 46-2 at 90). At most, the exclusion bars a claim for the District's and Brimar's negligent supervision of the male student, but the factual allegations asserted against them are much broader, as the Court has already recounted above. *See* § IV.B.1, *supra*. National certainly could have written this provision to exclude all negligence claims against its insured if anyone (e.g., a noninsured third party) engaged

in "alleged, actual or threatened abuse, molestation or sexual contact," but it chose language that specifically limited the instances of its insured's negligence to which the exclusion pertains. (Docket No. 46-2 at 90). Again, the law requires that such exclusionary language must be read against the insurance company. *Swarner*, 72 A.3d at 645.

Second, the M.M. Complaint is reasonably read as describing the male student's actions as constituting an assault and battery due to non-sexual contact, he initiated against K.M. before the alleged sexual assault took place. (*See M.M. Complaint* at ¶ 27). Third, the assault and battery are also expressed as alternative theories to the alleged sexual assault if the same is not ultimately proven at the forthcoming trial. (*Id*.). Indeed, the underlying complaint contains multiple factors why a sexual assault may not be proven including: the inability of the male student to form the applicable mens rea; the lack of physical evidence due to the delays in reporting the incident and K.M.'s examination at Children's Hospital several days after the event; and, K.M.'s own special needs causing difficulties in reporting and/or testifying as to the incident. (*Id*. at ¶¶ 6; 12; 32; 35; 37-38). Of course, the allegations that the District's and Brimar's negligence led to the male student's assault and battery of K.M. avoid the invoked exclusion entirely.

To conclude, the Court finds that National has failed to meet its burden to demonstrate that an exclusion operates to bar all potential claims asserted against its insured in the underlying action.

*Id*. at 768-69.

Ultimately, the Court reasoned that there were claims asserted against the District and Brimar in the M.M. complaint which were potentially covered under the Policy, all of which were not excluded and that National had a duty to defend both. *Id.* Since the duty to defend is broader than the duty to indemnify and the underlying action remained pending in pretrial proceedings, "any further determinations as to the duty to indemnify either Defendant are premature given the procedural posture of the state tort action and this federal insurance coverage case." *Id.* None of the parties sought timely reconsideration of the Court's Memorandum Opinion nor pursued an

appeal.  However, National brought several later motions attempting to undermine the Court's rulings, as is further discussed in § II.G below.

>    E.    *Procedural Posture of Underlying Action*

Following this Court's decision on the duty to defend, discovery in the underlying action continued.  To that end, the parties in the underlying action produced documents, answered written discovery and conducted depositions of some, but not all available witnesses.  Of note, the parties deposed plaintiffs M.M. and K.M., the owner of Brimar, Marciano Nesbeth; and several District employees, including Theodore R. Vasser, III., director of transportation; Michelle Stanton, paraprofessional/classroom assistant; teacher Candice Miller; paraprofessional Kayla Reynolds; teacher Melissa Ringold; principal Valerie Merlo; and paraprofessional/assistant Justin Drexler. (Docket Nos. 160-1 at ¶¶ 9, 13, 17, 25, 28, 44, 55, 57; 163 at ¶¶ 9, 13, 17, 25, 28, 44, 55, 57). However, it is uncontested that fact discovery in the underlying action was not completed. (Docket No. 160-3, AF at ¶¶ 29, 30).  Among other potential witnesses, the parties in the underlying action did not depose the student who was the alleged perpetrator of the assault on K.M.; any of the student witnesses who were on the school bus at the time of the incident; Shaniece Johnson, the regular bus driver who was out on maternity leave at the time; a substitute bus driver who took over the route for some of that time; or K.M.'s counselor. (*Id*. at ¶¶ 31-35).  It is similarly undisputed that expert discovery was not finished.  (*Id*. at ¶ 30).

None of the parties in the underlying action filed a motion for summary judgment and the case did not proceed to trial.  (Docket No. 160-3 AF at ¶ 37). As such, the state court did not make any factual findings concerning the allegations in the M.M. Complaint and did not make any legal rulings eliminating any of the claims in that suit.  (*Id*. at ¶¶ 38-39).

F.      *Settlement of Underlying Action*

The parties in the underlying action participated in a mediation on November 6, 2020. (Docket No. 163 AF at ¶ 40).   National's coverage counsel was present and controlled the mediation.  (*Id*. at ¶ 41).   National's coverage counsel negotiated directly with counsel for M.M. and K.M. and made a financial offer to resolve the litigation, which was accepted by M.M. and K.M.  (*Id*. at ¶ 43).   National did not ask Brimar and the District for any input concerning the settlement amount.  (*Id*. at ¶ 42).   National also did not request that Brimar and the District contribute to the settlement amount nor to reimburse it for defense costs at that time.  (*Id*. at ¶ 46). However, National threatened to renege on the settlement if it was unable to include language therein reserving the right to seek reimbursement of defense costs and the settlement amount from Brimar and the District.  (*Id*. at ¶ 47).

National paid M.M. and K.M. to settle the underlying action.  (Docket No. 163 AF at ¶¶ 43-44). The District and Brimar also agreed to dismiss their respective cross claims in the underlying action and that case has been dismissed, with prejudice.  (Docket No. 160-1 at ¶ 77; 163 at ¶ 77).   National then made payments to the District to reimburse it for the defense costs incurred in defending the underlying action.  (Docket Nos. 160-1 at ¶¶ 81-82; 163 at ¶¶ 81-82). The settlement agreement from the underlying action was not made part of the summary judgment record in this case.  (Docket Nos. 160-1:160-5; 163).   But, National's counsel wrote several letters to Brimar and/or the District that are pertinent to this matter.   A December 4, 2020 letter from National's counsel to counsel for Brimar and the District states the following:

> I write with regard to the action pending in Allegheny County, captioned M.M., parent and natural guardian of K.M., a Minor v. School District of Pittsburgh, Pa. and Brimar Transit, Inc., No. GD18-003257 (the "Allegheny County Action"). This letter confirms that, if National makes any settlement payment to the plaintiffs in the Allegheny County Action, National will seek full

reimbursement to the extent of that payment from Brimar Transit, Inc. and School District of Pittsburgh. Because the Commercial Policy issued by National to Brimar was not intended to cover the claims in the Allegheny County Action and, National believes, ultimately will be declared not to cover those claims, National will be entitled to reimbursement from Brimar and School District of amounts it pays on their behalves (sic) to resolve the Allegheny County Action.

Any settlement payment by National that resolves the Allegheny County Action also will extinguish any duty of National to indemnify any Insured concerning that Action.

(Docket Nos. 160-1 at ¶ 78; 163 at ¶ 78). A February 10, 2021 letter from National's counsel to the District's counsel states the following, in relevant part:

On January 14, 2020, the Court in the above-referenced matter issued a Memorandum Opinion holding that National Liability & Fire Insurance Company ("National") has a duty to defend the Pittsburgh Public School District ("School District") in M.M., parent and natural guardian of K.M., a Minor v. School District of Pittsburgh, Pa. and Brimar Transit, Inc., No. GD18-003257 (the "Allegheny County Action"). As you are aware, National respectfully disagrees with the Court's Memorandum Opinion. Notwithstanding that disagreement and subject to all of National's rights and appellate remedies to contest the Court's ruling, enclosed herein is a check issued to the School District in the amount of $266,800.86.

…

As National informed you previously, including at the time it contributed monies to resolve the Allegheny County Action, the National policy does not apply and any amounts National expends, including the payment enclosed herein, are on a full recourse basis. *See, e.g.* December 4, 2020 Letter from Richard Mason, Esq attached hereto. Therefore, this payment is being made solely to comply with the Court's Memorandum Opinion and in no way waives any of National's claims or coverage defenses asserted in the pending Federal court action, or any future claims or defenses to be asserted by National in that action. In making this payment, National continues to reserve all rights with respect to coverage for the Allegheny County Action, including, without limitation, its legal and equitable rights to seek reimbursement of this payment, and the payment issued by National on behalf of the School District and Brimar Transit, Inc. to settle the Allegheny County Action. National also continues to reserve all of its rights to contest the Court's

20

Memorandum Opinion and any future orders issued by the Court, including all appellate remedies. Further, National reserves its right to contest the reasonableness and necessity of the School District's claimed defense costs. Of particular note, in light of the School District's heavily redacted invoices, National is unable to discern whether any particular task and related fee was reasonable or necessary. Now that the Allegheny County Action has resolved, please provide unredacted copies of all defense invoices.

Neither this letter nor any future communication, investigation, or action by National is intended, or should be deemed or construed, as an admission that the National Policy issued to Brimar Transit, Inc. applies to the Allegheny County Action. This letter should not be viewed as a waiver of any right or defense available to National, now or in the future, or an expansion of any duties National may have or may in the future acknowledge.

(Docket Nos. 160-1 at ¶ 81; 163 at ¶ 81; Pltf Ex. "F").  Finally, a July 9, 2021 letter from National's

counsel to the District's counsel notes the following:

We are in receipt of your February 26, 2021 correspondence providing supplemental defense cost documentation related to M.M., parent and natural guardian of K.M., a Minor v. School District of Pittsburgh, Pa. and Brimar Transit, Inc., No. GD18-003257 (the "Allegheny County Action"). As you are aware, National Liability & Fire Insurance Company ("National") respectfully disagrees with the Court's January 14, 2020 Memorandum Opinion which found that National had a duty to defend the Pittsburgh Public School District ("School District") in the Allegheny County Action. Notwithstanding that disagreement and subject to all of National's rights and appellate remedies to contest the Court's ruling, enclosed herein is a check issued to the School District in the amount of $ 71,346.

…

As National informed you previously, including at the time it contributed monies to resolve the Allegheny County Action, the National policy does not apply and any amounts National expends, including the payment enclosed herein, are on a full recourse basis. See, e.g. December 4, 2020 Letter from Richard Mason, Esq attached hereto. Therefore, this payment is being made solely to comply with the Court's Memorandum Opinion and in no way waives any of National's claims or coverage defenses asserted in the pending Federal court action, or any future claims or defenses to be

21

asserted by National in that action. In making this payment, National continues to reserve all rights with respect to coverage for the Allegheny County Action, including, without limitation, its legal and equitable rights to seek reimbursement of this payment, and the payment issued by National on behalf of the School District and Brimar Transit, Inc. to settle the Allegheny County Action. National also continues to reserve all of its rights to contest the Court's Memorandum Opinion and any future orders issued by the Court, including all appellate remedies. Further, National reserves its right to contest the reasonableness and necessity of the School District's claimed defense costs. As previously advised in our correspondence of February 10, 2021, in light of the School District's heavily redacted invoices, National is unable to discern whether any particular task and related fee was reasonable or necessary. Now that the Allegheny County Action has resolved, please provide unredacted copies of all defense invoices.

Neither this letter nor any future communication, investigation, or action by National is intended, or should be deemed or construed, as an admission that the National Policy issued to Brimar Transit, Inc. applies to the Allegheny County Action. This letter should not be viewed as a waiver of any right or defense available to National, now or in the future, or an expansion of any duties National may have or may in the future acknowledge.

(Docket Nos. 161-1 at ¶ 83; 163 at ¶ 83; Pltf Ex. "G").

G.    *Relevant Procedural History of Declaratory Judgment Action*

In this declaratory judgment action, the period for fact discovery was extended several times and then ended on October 29, 2020. (Docket No. 98). The parties engaged in some settlement discussions, but this matter was not resolved. (Docket No. 120). In joint status reports filed in January of 2021, the parties reported that Brimar and the District believed that this declaratory judgment action was resolved via the Court's prior rulings and the settlement of the underlying action while National wanted to amend its complaint and then move for summary judgment. (Docket Nos. 118; 120). Motions practice ensued with the Court issuing several Opinions and Orders.

In its September 16, 2021 decision, the Court denied National's motion for leave to file a Third Amended Complaint.  (Docket No. 128).  To that end, the Court found that National failed to meet its burden to establish good cause under Rule 16 to permit the untimely amendment to its pleadings which had been submitted many months beyond the deadlines for amendments of pleadings and fact discovery.  (*Id*.).  The Court further concluded that the claims set forth in the proposed Third Amended Complaint were otherwise futile. (*Id*.).  Most relevant here, this Court wrote the following with respect to National's claims asserting it has no duty to indemnify Brimar and the District:

> The Court of Appeals has recognized that "[i]f triggered, the duty to defend also carries 'a conditional obligation to indemnify in the event the insured is held liable for a claim covered by the policy.'" *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 249-50 (3d Cir. 2019) (quoting *Gen. Accident Ins. Co. of Am. v. Allen*, 547 Pa. 693, 692 A.2d 1089, 1095 (1997)). "Both duties are at issue until the underlying 'claim is confined to a recovery that the policy does not cover.'" *Id.*  However, a decision on the insurer's duty to indemnify may be muddled by a settlement of the underlying action and make it impossible to determine what theories of liability, if any, would have prevailed at trial. *Id.* at n.3 (citing *Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 766 (3d Cir. 1985)). This is particularly true if there are multiple claims and parties in the underlying action and there was no fact finding made by the trial court prior to the settlement on which a nuanced coverage determination could be made. *Id.* As the Court of Appeals later clarified, the holding in *Linn* "was based, in part, on the concern that an insurer would be able to settle a suit without an agreement with the insured, and attempt to avoid its duty to indemnify by claiming a jury would have found the claims in the underlying suit were not covered by the policy." *12th Street Gym, Inc. v. General Star Indem. Co.*, 93 F.3d 1158, 1167 (3d Cir. 1996). In such situations, Pennsylvania law does not permit the insurer to try the underlying case before the coverage decision may be made by the Court and the duty to indemnify follows the duty to defend. *See also Liberty Mutual Ins. Co. v. Penn National Mut. Casualty Ins. Co.*, 499 F. Supp. 3d 130, 141-42 (W.D. Pa. Nov. 6, 2020) (Hornak, C.J.) ("the two prerequisites for indemnification under the '*Linn* Rule' are: (1) that the nature of the case as being one with multiple parties, multiple theories of liability, and settlement making liability among

competing parties impossible to determine and (2) there must be a concern that an insurer could foreclose indemnification by its conduct relative to the underlying lawsuit. When those factors converge, the indemnity obligation follows the duty to defend.").

In this Court's estimation, National has failed to plead sufficient facts in the proposed Third Amended Complaint to state a plausible claim for declaratory judgment asserting that it has no duty to indemnify the Defendants. To reiterate, the Court reviewed the M.M. complaint asserting multiple claims against Brimar and the District as well as the Policy language and determined that National had a duty to defend them. (Docket No. 91). At most, National has now pled that it disagrees with this Court's decision, settled with the M.M. plaintiffs in the underlying action prior to trial, paid for Brimar's defense, and reimbursed the District for its attorney's fees and defense costs. (Docket No. 125-1). National issued reservation of rights letters in December of 2020 concerning the settlement and February of 2021 with regards to the reimbursement to the District. (*Id.*). Both letters indicate that National reserved the right to challenge this Court's rulings, including through an appeal. (*Id.*). Yet, National has not alleged that the trial court made any factual findings prior to the settlement and it is uncontested that the settlement of the underlying action took place prior to the trial court making any rulings narrowing the scope of the M.M. complaint. (*Id.*). Absent any rulings or factual findings from the trial court in the underlying case, the insurer's pre-trial settlement precludes this Court from undertaking a more nuanced coverage decision than has already been produced. *See Sapa*, 939 F.3d at 250, n.3. Therefore, National's proposed Third Amended Complaint may also be denied due to the futility of the claims.

(Docket No. 128 at 16-18).

National next filed a motion for reconsideration or, in the alternative, certification for interlocutory appeal which the Court denied in a Memorandum Opinion dated December 23, 2021 as National had failed to meet the standards for such relief. (Docket Nos. 142; 143). The Court later granted the District's motion for protective order quashing a subpoena National had issued to Brimar's defense counsel in the underlying action seeking deposition transcripts of K.M. and M.M. (Docket No. 158). The Court once again pointed out that the period for fact discovery had closed

24

in October of 2020 and that National's counsel had stated repeatedly that no discovery was needed to pursue this summary judgment motion, among other reasons. (*Id.*).

With respect to the instant motions practice, the Court encouraged the parties to confer in an effort to resolve this matter via a stipulated judgment but they were unable to do so. (Docket Nos. 143; 147-149). As such, the Court established a briefing schedule on National's forthcoming motion for summary judgment and noted that it "fully understand[s] Defendants' position that judgment should be entered at this time in light of the Court's prior rulings [91], [128], and [142] such that a cross-motion for summary judgment is unnecessary." (Docket No. 150). National filed its motion for summary judgment, supporting brief, concise statement of material facts and appendix on March 16, 2022. (Docket Nos. 159, 160). Brimar responded with its brief in opposition on April 6, 2022 wherein it objects to National presenting evidence beyond the M.M. Complaint in deciding the coverage issues. (Docket No. 161). On the same day, the District filed its brief in opposition, response to National's concise statement of material facts, its own responsive concise statement of material facts, and appendix. (Docket Nos. 162-63). National did not file a response to the District's responsive concise statement of material facts within 14 days as is set forth under Local Rule 56.D and did not seek leave of court to file a reply brief. *See* W.D. Pa. CvR 56.D. As such, the Court considers this matter to be fully briefed and ripe for disposition.

III.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted). Further, "[a] dispute is 'genuine' if 'a reasonable jury could return

a verdict for the nonmoving party.'"  *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A party seeking summary judgment "must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 160 (3d Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Conboy*, 992 F.3d at 160; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 586-87.

In order to determine whether a genuine issue of material fact exists, the Court's analysis begins by a review of the parties' filings to determine the realm of potentially disputed facts. As such, all summary judgment filings must comply with Federal Rule of Civil Procedure 56, as well as this Court's companion Local Rule 56. Both rules "allow facts to be deemed admitted where they are not properly opposed." *See Kelly v. DeJoy*, No. 19-204, 2021 WL 914207, at *4 (W.D. Pa. Mar. 10, 2021) (Hardy, J.); FED. R. CIV. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: ... consider the fact undisputed for purposes of the motion."); LCvR 56(E) ("[M]aterial facts set forth in the moving party's Concise Statement of Material Facts ... which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be

deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.").

IV.    DISCUSSION

National moves for summary judgment on its claims in this case asking the Court to issue a declaration that there is no indemnity coverage owed to the District and Brimar for the claims against them in the underlying action and that it is also entitled to reimbursement of defense costs and the settlement payments made on their behalf to resolve that litigation.  (Docket No. 160). Brimar and the District counter that National's voluntary settlement of the underlying action coupled with the Court's prior decisions in this coverage litigation preclude the requested relief. (Docket Nos. 161-62).  They further maintain that National should not be permitted to rely upon the partial discovery taken in the underlying action in support of its positions as to coverage and the challenged exclusion.  (*Id.*).  National separately argues that summary judgment should be entered in its favor on the District's counterclaim asserting that there is a comprehensive general liability policy which also covered the claims in the underlying action.  (Docket No. 160).  On this point, the District notes that it has agreed to dismiss its counterclaim from this insurance coverage dispute.  (Docket No. 162).  Having carefully considered the parties' positions, the Court agrees with Brimar and the District such that National's motion for summary judgment will be denied, in part, as to its coverage and the reimbursement claims.  Given the District's concession as to its counterclaim, National's motion will be granted, in part, and the District's counterclaim will be dismissed.  The Court's analysis follows.

A.  *Court's Consideration of Evidence Outside the Pleadings*

At the outset, the Court must address the threshold dispute between the parties concerning whether National may rely upon evidence outside the pleadings to support its coverage positions

at this stage of the proceedings.  (Docket Nos. 160-62).  As noted, on a contested motion for

judgment on the pleadings, the Court considered the Policy and the pleadings in the underlying

action and ruled that National had a duty to defend Brimar and the District.  *See National*, 433 F.

Supp. 3d at 747-69.  Later, the Court denied National leave to file its proposed Third Amended

Complaint, concluding that National's voluntary settlement of the underlying action which was

made prior to the trial court narrowing the claims at issue in that litigation precluded a more

nuanced coverage decision than had already been produced in this case.  (Docket No. 128).  In so

holding, the Court relied upon several decisions, including those of the Third Circuit in *Linn* and

*Sapa Extrusions* setting forth the general rule that the duty to indemnify follows the duty to defend

upon the insurer's settlement of the underlying action and a more recent decision by Chief Judge

Hornak in *Penn National v. Liberty Mutual Ins. Co.*  (*Id*. at 16-18 (citing *Sapa Extrusions*, 939

F.3d at 249-250; *Linn*, 766 F.2d at 766; *Liberty Mut. Ins. Co.*, 499 F. Supp. 3d at 141-42)).

Subsequent to this ruling, the Court of Appeals affirmed Chief Judge Hornak's decision and

helpfully provided further guidance to District Courts addressing this type of dispute, as follows:

> Unlike the duty to defend, the duty to indemnify requires a
> determination that the policy actually covered the claim at issue. *See*
> *Am. States Ins. Co. v. State Auto Ins. Co.*, 721 A.2d 56, 64 (Pa. Super.
> Ct. 1998) ("[A] duty to indemnify requires an inquiry into whether
> there was actual coverage for the underlying claim."). As a result, an
> insurer is "entitled to an opportunity to introduce evidence" that goes
> beyond the four-corners of the underlying tort complaint to "prov[e]
> the applicability of [a] subject [policy] exclusion" in the coverage
> action. *Regis Ins. Co. v. All American Rathskeller, Inc.,* 976 A.2d
> 1157, 1161 (Pa. Super. Ct. 2009). This rule, however, does not mean
> that insurers may present all factual issues associated with the tort
> case for resolution as part of the insurance coverage action. Rather,
> where the underlying tort case has been settled, the insurers may seek
> resolution of only the factual disputes that would not have been
> resolved had the underlying tort suit been tried. Thus, where the
> coverage suit raises factual disputes about coverage that would have
> also been addressed in the settled underlying litigation, such disputes
> cannot be resolved in the coverage action. In such a situation,

28

Pennsylvania law provides that the duty to defend itself triggers the duty to indemnify. *See Linn*, 766 F.2d at 766 (explaining that the duty to indemnify may follow the duty to defend where "settlement ma[kes] it impossible to determine on what theories of liability, if any, the underlying claimants would have prevailed").

*Liberty Mut. Ins. Co. v. Penn Nat'l Mut. Cas. Ins. Co.,* Appeal No. 20-3468, 2021 WL 5401543, at *4 (3d Cir. Nov. 18, 2021).

The analysis by the Court of Appeals continued.

> *American States* is instructive. There, the Pennsylvania Superior Court concluded that there was no automatic duty to indemnify following a settlement in a car accident lawsuit because "the settlement of the underlying tort claim [did] not ma[ke] it impossible to determine if the [insurer's] policy provided coverage." 721 A.2d at 64. The policy at issue required determining whether the vehicle involved in the accident fell within the policy's definition of a "temporary substitute auto." *Id.* "The issue of whether the vehicle being driven ... at the time of the accident was a 'temporary substitute auto' under the terms of the [insurer's] policy [was] one that would not have been resolved in the tort litigation, even if it had gone to trial" because it was not relevant to the tort claims or any defenses. *Id.* As a result, the settlement did not preclude the court from deciding whether the policy covered the claim. *Id.*

> Here, by contrast, the District Court properly concluded that because the Ramirez litigation involved multiple claims against multiple defendants, covered by multiple insurers, the settlement made it impossible to determine the precise basis of Cost's and Flexicore's liability. *Liberty Mut.*, 499 F. Supp. 3d at 141-46. That is, determining actual coverage here would require a court to decide whether Flexicore was liable for its "work," such as its "failure to provide warnings," App. 334 (Penn National policy), or liable under a different negligence or products liability theory not covered by the policy. Because such factual disputes cannot be decided in this multiparty, multiclaim case without factfinding in the underlying Ramirez litigation, Pennsylvania law requires that Penn National's duty to indemnify follows its duty to defend Cost. *See Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 250 n.3 (3d Cir. 2019) (reiterating *Linn*'s holding where there was "little to no fact-finding from the Underlying Action on which we could base a nuanced coverage determination because the parties settled that case before it went to trial" and rejecting the plaintiff's coverage

> argument which "would effectively force ... the [i]nsurers to try the Underlying Action before then trying the coverage case").
>
> …
>
> Were this not the case, "an insurer would be able to settle a suit without an agreement with the insured, and attempt to avoid its duty to indemnify by claiming a jury would have found the claims in the underlying suit were not covered by the policy." *12th St. Gym, Inc. v. Gen. Star Indem. Co.*, 93 F.3d 1158, 1167 (3d Cir. 1996).

*Liberty Mut. Ins. Co.*, 2021 WL 5401543, at *4, n.8.

Synthesizing the above caselaw, the duty to indemnify does not automatically flow from the duty to defend after a settlement of the underlying tort action and the insurer must be provided an opportunity to present evidence beyond the pleadings to prove the applicability of a challenged exclusion. However, the type of evidence which may be presented by the insurer is limited. Following the prevailing authority, this Court must determine whether the facts outside the pleadings which are proffered by National are only relevant to the insurance disputes in this coverage litigation or if they were also likely to have been resolved by factfinding or a judicial decision in the underlying action which has now been settled. *Liberty Mut. Ins. Co.*, 2021 WL 5401543, at *4.

In this Court's estimation, the instant case is more akin to *Linn*, *Sapa Extrusions* and *Liberty Mutual* than *American States* because National is asking this Court to revisit and decide coverage issues with reference to disputed facts that would have been resolved in the underlying action as opposed to an unrelated issue, such as, whether the claim involved a "covered auto"; or if the notice provisions of the Policy were met. At this stage, National proffers evidence from the discovery in the underlying action purportedly showing that K.M. was sexually assaulted by the male student on the bus on April 29, 2016. (Docket No. 160). National then argues that the "bodily injur[ies]" to K.M. must have all resulted from the sexual assault and not the "use" of the bus

and/or that the abuse or molestation exclusion bars coverage of all of the claims set forth in the M.M. Complaint. (*Id.* at 6-7). To reiterate, this Court has construed the M.M. Complaint as broadly asserting that the negligence of Brimar and the District led to alleged <u>physical</u> and <u>sexual</u> assaults of K.M. and resulted in harm to M.M. and K.M. *See National*, 433 F. Supp. 3d at 762. National settled the underlying action and no factfinding was made concerning the liability of Brimar or the District for their asserted negligence, if either or both of them were only liable for some other claim(s) not covered by the Policy, or if either or both of them were not liable at all. *See Grove v. Port Auth.*, 218 A.3d 877, 889 (Pa. 2019) (stating elements of negligence action as "(1) the defendant owed the plaintiff a duty or obligation recognized by law; (2) the defendant breached that duty; (3) a causal connection existed between the defendant's conduct and the resulting injury; and (4) actual damages occurred."). It is also uncontested that no civil claims have been made against the male student and that the District Attorney's Office declined to prosecute him. Thus, it is clear to this Court that to determine actual coverage would require a resolution of factual disputes which were unaddressed in the now-settled tort litigation but the same is precluded by the prevailing caselaw.

Beyond these reasons, the procedural postures of the state tort case and this federal insurance coverage action at the time of National's settlement make it even more difficult for this Court to make "a more nuanced coverage decision than has already been produced" via the prior decision denying National's motion for judgment on the pleadings. (Docket No. 128 at 17). In *Sapa Extrusions*, the Court of Appeals recognized the following:

> We also note that Sapa's argument to avoid the four-corners rule also raises a question it cannot answer: what outside-the-[underlying] Complaint "facts" should we credit? The discovery in both the underlying litigation and the coverage litigation was extensive—as shown by the mountain of appendices that the parties

unhelpfully submitted. And that voluminous discovery apparently
turned up "facts" supporting both sides.

*Sapa Extrusions, Inc.*, 939 F.3d at 250, n.3.  The same is true here with a twist, i.e., discovery was

not fully completed in the state or federal actions prior to the settlement.  (Docket No. 163 AF at

¶¶ 29-30).  To that end, it is uncontested that a number of potential witnesses were not deposed in

the state case, including, the male student actor; any of the other students who were on the bus and

may have witnessed the events; the substitute bus driver; and, K.M.'s counselor.  Expert discovery

was also not completed in the underlying action.  (*Id.* at ¶ 30).  Further, the discovery period in

this insurance coverage case closed in October of 2020.  (Docket No. 98).  As is referenced in prior

decisions, National repeatedly advised that fact discovery was unnecessary in this action to decide

the coverage issues and never sought to extend the period for fact discovery beyond the deadline.

(Docket Nos. 128; 142; 158).  Given same, this Court declines National's invitation to credit the

facts from the partial discovery in the state case and revisit its coverage rulings on the duty to

defend based on such evidence.  *See e.g., Sapa Extrusions*, 939 F.3d at 250, n.3; *Liberty Mut. Ins.*,

2021 WL 5401543 at *4.

    All told, the concerns articulated by the Court of Appeals in *Linn*, *12th St. Gym* and

subsequent decisions are present here as National settled the underlying action "'without an

agreement with the insured[s]'" and is now "'attempt[ing] to avoid its duty to indemnify by

claiming a jury would have found the claims in the underlying suit were not covered by the

policy.'" *Liberty Mut. Ins.*, 2021 WL 5401543, at *4, n.8 (quoting *12th St. Gym, Inc.*, 93 F.3d at

1167).  As a result of National's settlement of the underlying action, any trial of this matter would

require Brimar and the District to prove their own negligence and liability to K.M. and M.M. in

order to demonstrate an entitlement to coverage under the Policy as they no longer have the

opportunity to defend themselves in the underlying action from "all sums an 'insured' legally must

pay as damages" under the Policy.  Hence, National's duty to indemnify Brimar and the District is triggered by its duty to defend in this case.  *Id.*  As the Court of Appeals has held,

> [t]o reach the opposite conclusion could conceivably result in an insured never being indemnified in a suit that its insurer settles where that insurer defends under a reservation of rights. In such a situation, it would behoove the insurer to reserve its rights and to settle the suit to avoid both the costs of litigation and, at the same time, the costs of indemnification.

*12th St. Gym, Inc.*, 93 F.3d at 1167 (quoting *Linn*, 766 F.2d at 766).  Stated differently, National cannot be permitted to litigate (or re-litigate) the disputed coverage issues concerning the duty to indemnify based on an underdeveloped factual record after: (1) settling the underlying action when discovery was not completed and factfinding would have determined the liability of Brimar and the District on the multiple claims in that case; and, (2) strategically deciding to take little or no pertinent discovery in this insurance coverage action, despite the Court's ruling that it had a duty to defend them.  National simply cannot "have its cake and eat it to" as it is attempting here.

For all of these reasons, the Court holds as a matter of law that National's motion for summary judgment on its coverage claims must be denied because the duty to indemnify is triggered by the duty to defend given the unique factual circumstances of this case.  Further, since National's reimbursement claim is wholly contingent on its coverage claims, its motion must also be denied to the extent that it seeks summary judgment on that claim as well.  Accordingly, National's motion for summary judgment is denied, in part, as to its coverage and reimbursement claims.

### B.  Coverage Disputes

Having determined that the Court's prior analysis of National's duty to defend Brimar and the District controls, further discussion of the parties' continuing disputes over coverage is largely

unnecessary.  With that said, the Court will briefly address a few matters raised by National which were not raised in the prior motions practice.

National lodges two separate arguments in its summary judgment motion, i.e., the Policy issued to Brimar does not provide indemnity coverage because K.M.'s injuries do not result from the "ownership, maintenance or use" of a covered auto; and, indemnity coverage is barred by the Abuse or Molestation exclusion because K.M.'s injuries and damages arise out of abuse, molestation or sexual contact.  (Docket No. 160).  Yet, National does not challenge other aspects of the duty to defend decision, including this Court's interpretation of "accident" and "bodily injury"; the conclusion that the bodily injuries asserted in the underlying action were caused by the accident; or, that the District qualified as an insured.  (*See id*.).  Hence, National's positions must be examined with reference to those uncontested rulings.

As before, National's interpretation of whether the claims are covered takes too narrow a view of whether the claimed injuries resulted from the "use" of the bus.  *See National*, 433 F. Supp. 3d at 761.  Indeed, National's brief defines the subject of the underlying action as "the April 29 sexual assault" and refers to the entire episode that way throughout as opposed to recognizing the alternative theories and factual circumstances set forth in the extensive 124-paragraph pleading which was filed in state court and examined previously by the Court.  (Docket No. 160 at 10).  In any event, National argues that K.M.'s injuries resulted from "the April 29 sexual assault" and not from the "use" of the bus and that the bus was merely the "situs" of those injuries.  (Docket No. 160). Those arguments have been thoroughly addressed in the prior decision which has been incorporated herein and with which National repeatedly states that it disagrees.

National also relies heavily upon *Erie Ins. Exch. v. Claypoole*, 673 A.2d 348, 350 (Pa. Super. Ct. 1996) which was not brought up in the prior briefing.  While there are some similarities

in the underlying facts, it is this Court's opinion that *Claypoole* is distinguishable from the instant matter because that case analyzed the insurer's duty to defend the alleged assailant in a sexual assault case and not the school district and bus company as is the case here.

In *Claypoole*, the Superior Court reversed the trial court's ruling that the insurer had a duty to defend a bus driver in a lawsuit brought by several minor children and their parents. *Claypoole, 673 A.2d 348, 350 (Pa. Super. Ct. 1996)*. The plaintiffs alleged that the bus driver had engaged in negligent, intentional and unlawful conduct when he sexually molested the children on numerous occasions while driving them to and from school. *Id.* at 354-55. The Superior Court provided alternative rationales for its denial of coverage to the bus driver including that the inferred intent rule applied to the allegations of sexual abuse of children and that the intentional acts exclusion therefore barred the claims. *Id.* at 356. The Superior Court also rejected the driver's position that the injuries were casually connected to his use of the bus and emphasized that "no casual connection exists between the operation of a school bus and the injuries suffered by its minor passengers who have been sexually molested by its driver." *Id.*

However, the Superior Court did not address the claims for coverage made by the bus company and school district which alleged that they were negligent. *Id.* at 352-53. To the contrary, the Superior Court found that the appeal of the trial court decision finding coverage for the claims against the bus company and school district was moot given a settlement of the underlying case. *Id.* As with the other cases cited by National, this case remains factually unique in there was a prior sexual assault of K.M. by the male student which Brimar and the District knew about and then undertook a duty to protect her from the assailant through the seating plan which was designed to safely transport her to and from school. The lawsuit against the insureds alleged that they neglected to enforce the seating plan, failed to train the bus driver, who, in turn, failed to supervise

the children, and committed numerous other breaches of duties more fully outlined in the prior Opinion.  As such, the Court believes that this matter is more akin to the decisions finding coverage because the bodily injuries (physical and emotional) alleged in the underlying action were casually related to the "use" of the bus.  *See e.g., Lebanon Coach*, 675 A.2d 279; *State Auto. Ins. Ass'n v. Kuhfahl*, 527 A.2d 1039, 1044 (Pa. Super. Ct. 1987) (finding duty to defend claims of negligence when child was dropped off by family outside of school and injured by another motorist was casually related to use of vehicle); *Agway Ins. Co. v. Goodville Mut. Cas.*, 48 F. App'x 37, 38–39 (3d Cir. 2002) (finding duty to defend claims of negligence against truck driver brought by passing motorist who hit a steer which had escaped from the truck while unloading).

Turning to the Abuse or Molestation exclusion, National's current arguments largely mirror those which were previously raised and addressed by the Court and need not be restated here.  (Docket No. 160).  While National repeatedly denigrates the Court's interpretation that the plaintiffs in the underlying action asserted claims for both a physical assault and sexual assault, the Court remains unpersuaded by National's insistence that all claims for bodily injuries made in the underlying action arise from the alleged April 29, 2016 sexual assault on the school bus.  (*Id.*). The Court merely sets forth additional reasons to buttress its prior decision.

As this Court held, "the factual allegations against Brimar and the District are very broad, sound in negligence and assert various breaches of duties to K.M. and her mother, M.M. before, during, and after the alleged sexual assault." *National*, 433 F. Supp. 3d at 768 (citing M.M. Complaint at ¶¶ 1-124).  Those duties included, but were not limited to, the duty to inform the substitute bus driver of the seating plan to separate the children on the bus; the duty to enforce the seating plan; the duty to train the bus driver; and, the duty of the bus driver to pay attention to the

children and respond to calls for assistance rather than texting or generally ignoring their needs.

*Id*. at 755-56.  In addition,

> the M.M. Complaint is reasonably read as describing the male
> student's actions as constituting an assault and battery due to non-
> sexual contact, he initiated against K.M. before the alleged sexual
> assault took place. (*See* M.M. Complaint at ¶ 27). […][T]he assault
> and battery are also expressed as alternative theories to the alleged
> sexual assault if the same is not ultimately proven at the forthcoming
> trial. (*Id*.). Indeed, the underlying complaint contains multiple
> factors why a sexual assault may not be proven including: the
> inability of the male student to form the applicable mens rea; the
> lack of physical evidence due to the delays in reporting the incident
> and K.M.'s examination at Children's Hospital several days after the
> event; and, K.M.'s own special needs causing difficulties in
> reporting and/or testifying as to the incident. (*Id*. at ¶¶ 6; 12; 32; 35;
> 37-38).

*Id*. at 768.  National objects to the Court's broad interpretation of ¶ 27 of the M.M. Complaint as setting forth a physical and sexual assault but the Court further notes that the pleading, as a whole, is fairly interpreted as containing assertions that the separation plan was also violated by Brimar and the District on several days prior to the Friday, April 29, 2016 incident.  Indeed, ¶ 47 of the M.M. Complaint details two incidents earlier in the same week which were reported by K.M., the first of which involved the male student telling K.M. to lay down, and he then touched her leg, and tried to kiss her; and a second incident where he touched her waist.  (*M.M. Complaint* at ¶ 47). Hence, the allegations that plaintiffs sustained damages from Defendants' negligence resulting in a physical assault would necessarily include those flowing from these events as well and National has never argued that any claims from the pre-April 29, 2016 bus incidents are barred by the exclusion.[1]  (*See* Docket No. 160).

---

[1]      National notes in its brief that "[d]iscovery further confirmed that the male student previously touched K.M. on the waist and the leg while on the bus despite K.M.'s protests, and that K.M. felt harassed and fearful for her safety because of this student's ongoing misbehavior." (Docket No. 160 at 7 (citing SUMF ¶ 26)).

National also points to language in the M.M. Complaint referring to K.M. as a victim of a sexual assault and seeking damages recoverable by a victim of a sexual assault in an effort to demonstrate that all bodily injuries claimed arise out of attempted, actual, or threatened abuse, molestation or sexual contact.  (Docket No. 160). But, again, the pleading must be read in the context that K.M. was already a victim of sexual assault from the gym class episode which occurred several months prior to the bus incidents and was the reason the seating plan on the bus was implemented in the first place.  The allegations for damages should also be viewed from the perspective that K.M. is an eggshell plaintiff such that she may seek recovery for the exacerbation of any prior injuries from the gym class assault which were caused by the negligence of Brimar and the District in the later bus incidents.  *See Turkovich v. Sally Beauty Supply LLC*, No. 2:20-CV-00694-NR, 2020 WL 7059563, at *3 (W.D. Pa. Dec. 2, 2020) (citing *Hare v. H & R Indus., Inc.*, No. 00-4533, 2002 WL 777956, at *2 (E.D. Pa. Apr. 29, 2002) ("[U]nder the so-called eggshell plaintiff doctrine of tort law, it is well-known that the Defendant tortfeasor takes the Plaintiff as she is. That Plaintiff was susceptible to other stress factors is irrelevant to the amount of damages.")).

After once again viewing all reasonable inferences in favor of the insureds, Brimar and the District, the Court reiterates its decision that the M.M. Complaint seeks damages for bodily injuries arising from both a physical and sexual assault which resulted from the negligence of Brimar and the District.  The decisions upon which National relies are therefore distinguishable.  For these reasons and those previously expressed, National has failed to meet its burden to show that its exclusion operates to bar all potential claims against its insureds.  *See Sapa*, 939 F.3d at 249-50; *see also Swarner*, 72 A.3d at 645.

V.      CONCLUSION

Based on the foregoing, National's motion for summary judgment is granted, in part and denied, in part.  The Court will enter summary judgment in favor of Brimar and the District on National's coverage and reimbursement claims and dismiss the District's counterclaim.   An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
Senior U.S. District Judge

Dated: July 28, 2022

cc/ecf:  All counsel of record.